13:12:40

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


PUREWICK CORPORATION,          )
                               )
              Plaintiff,       )
                               ) C.A. No. 19-1508(MN)
v.                             )
                               )
SAGE PRODUCTS, LLC,            )
                               )
              Defendant.       )


              Tuesday, August 4, 2020
              10:00 a.m.
              Discovery Dispute Teleconference


              844 King Street
              Wilmington, Delaware


BEFORE:  THE HONORABLE MARYELLEN NOREIKA
         United States District Court Judge


APPEARANCES:


         SHAW KELLER LLP
         BY:  JOHN SHAW, ESQ.

         -and-

         QUINN EMANUEL URQUHART & SULLIVAN
         BY:  BRIAN P. BIDDINGER, ESQ.
         BY:  STEVEN CHERNY, ESQ.
         BY:  AMANDA ANTONS, ESQ.


              Counsel for the Plaintiff

1    APPEARANCES CONTINUED:

2

3

            YOUNG CONAWAY STARGATT & TAYLOR LLP
4            BY:  ANNE SHEA GAZA, ESQ.

5            -and-

6            MCANDREWS HELD & MALLOY
            BY:  ROBERT SURRETTE, ESQ.
7            BY:  SANDRA FRANTZEN, ESQ.
            BY:  BRICE PERSICHETTI, ESQ.
8
                        Counsel for the Defendant
9

10                    _ _ _ _ _ _ _ _ _

09:49:07  11

09:58:03  12            THE COURT:  Good morning, counsel.  Who is

09:58:05  13    there, please?

09:59:35  14            MR. SHAW:  Good morning, Your Honor.  It's John

09:59:37  15    Shaw for PureWick.  Joining me from Quinn Emanuel are Steve

09:59:42  16    Cherny, Brian Biddinger and Amanda Antons.

09:59:47  17            THE COURT:  Good morning to all of you.

09:59:48  18            And for Sage?

09:59:52  19            MS. GAZA:  Good morning, Your Honor.  It's Anne

09:59:54  20    Gaza from Young, Conaway on behalf of Sage.  I'm joined this

09:59:57  21    morning by Robert Surrette, Sandra Frantzen, and Brice

10:00:04  22    Persichetti of McAndrews, Held & Malloy.  And Mr. Surrette

10:00:05  23    will present on behalf of Sage.

10:00:08  24            THE COURT:  Okay.  Good morning to you as well.

10:00:08  25            So I have reviewed all of the letters as well as

10:00:12 1    the supplemental letters on the meet and confer and I think

10:00:15 2    it makes sense at this point just to deal with the substance

10:00:18 3    of the disputes.  So I will hear from the Plaintiffs first

10:00:27 4    on the disputes that were outlined in Mr. Shaw's letter from

10:00:35 5    July 30th and let's go through one by one, we'll get

10:00:41 6    Plaintiff's position and then Defendant's position so I can

10:00:43 7    address each request in turn.

10:00:46 8            So first, interrogatory number 6.

10:00:52 9            MR. BIDDINGER:  Your Honor, that's Defendant's

10:00:58 10   interrogatory.

10:00:59 11           THE COURT:  I'm sorry, I was looking at

10:01:01 12   Plaintiff's responsive letter.  Sorry.  Okay.  Thank you for

10:01:05 13   that.  Let's start with PureWick interrogatory number 1.

10:01:10 14           MR. BIDDINGER:  Good morning, Your Honor.  This

10:01:11 15   is Brian Biddinger from Quinn Emanuel for the Plaintiff.  So

10:01:15 16   I think briefly on this, not that there is a whole lot to

10:01:20 17   add beyond what's in the letter, but the issue is whether

10:01:23 18   Sage will provide the requested information which is related

10:01:28 19   to financials so, you know, sales data basically, for sales

10:01:33 20   that were made prior to the filing of the lawsuit.

10:01:39 21           We understand Sage's position to be that they

10:01:42 22   will not provide that information unless and until they're

10:01:46 23   satisfied that we have provided prima fascia evidence that

10:01:50 24   PureWick has complied with the marking statute.  We have

10:01:55 25   provided interrogatory in response that identifies a lot has

10:02:02 1   happened with the mark and the dates on which the marking

10:02:04 2   began.  We are producing documents that we believe

10:02:08 3   ultimately will support the information we provided in the

10:02:11 4   interrogatories, and so at this point we really don't see a

10:02:16 5   basis for them to be withholding discovery of the sales data

10:02:20 6   and sales information given the current record and frankly

10:02:24 7   even if we hadn't provided the information about the

10:02:29 8   markings, we don't see the authority or have the authority

10:02:34 9   for them withholding that information.

10:02:37 10          And the last thing I would note is that in

10:02:40 11  putting marking aside, information about the dates on which

10:02:44 12  they're sold, the accused products is relevant to other

10:02:50 13  issues including the date of first infringement, commercial

10:02:54 14  success, it's also evidence of indirect infringement and

10:03:00 15  will allow us to identify customers that we may need to take

10:03:04 16  follow-up discovery on to show direct infringement.  So

10:03:08 17  putting all that aside, again, our position is we told them

10:03:12 18  when we started marking to identify the products that had

10:03:16 19  been marked and at this point we believe they should provide

10:03:19 20  a full response to the interrogatory.

10:03:21 21          THE COURT:  Okay.  How far back are we talking

10:03:23 22  about?  I know you don't know exactly when they started

10:03:27 23  selling or maybe you do, but how far -- what's the time

10:03:31 24  period that we're talking about?

10:03:33 25          MR. BIDDINGER:  Relatively short, Your Honor.

10:03:41 1   The complaint was filed a year ago now, so 2019.  Our

10:03:45 2   understanding is their sales began in either towards the end

10:03:48 3   of 2017 or sometime in 2018.

10:03:51 4           THE COURT:  Okay.  Thanks.

10:03:52 5           So Sage, what's your position on this?  Is it

10:03:55 6   really that you are not going to produce documents until

10:03:59 7   you're satisfied with the marking.

10:04:00 8           MR. SURRETTE:  Well, first of all, Your Honor,

10:04:02 9   we have produced --

10:04:03 10          THE COURT:  Stop.  Wait, wait, wait.  Sorry.  I

10:04:06 11  forgot to give my warning at the beginning.  When you start

10:04:10 12  talking, you have to say who you are so that we get a clear

10:04:13 13  record.  So start with that and then you can go on.

10:04:17 14          MR. SURRETTE:  I am sorry, Your Honor.  Robert

10:04:20 15  Surrette on behalf of Sage.

10:04:22 16          First of all, we have produced documents,

10:04:24 17  financial documents related to when we first started --

10:04:27 18          THE COURT:  No, no, I get that.  But have you

10:04:29 19  produced the financial documents back to when you first --

10:04:34 20  they're requesting and that you have produced for things

10:04:37 21  after the filing of the lawsuit prior to -- have you

10:04:41 22  produced what they're asking for for the time between when

10:04:44 23  you first started selling and the lawsuit was filed?

10:04:51 24          MR. SURRETTE:  We have produced financial

10:04:55 25  information from the time we started selling the product

10:04:55 1    which was before the complaint was filed.

10:04:57 2                THE COURT:  So what's the fight about here

10:05:00 3    today?

10:05:06 4                MR. SURRETTE:  Well, the fight is about this

10:05:09 5    information, they're asking for it on a monthly basis,

10:05:09 6    they're asking for it on a customer basis, despite the fact

10:05:13 7    that we have produced financial documents going back to 2017

10:05:16 8    so they can't establish when the date of alleged first

10:05:20 9    infringement began.  We don't believe they have established

10:05:25 10   constructive notice under 287.  And under *Power Integrations*

10:05:29 11   where this Court denied a motion to compel on the same type

10:05:32 12   of information for failure to establish marking under

10:05:36 13   constructive notice under 287, we don't believe that it's

10:05:40 14   relevant at this point.

10:05:41 15               THE COURT:  But what do they have to do?  They

10:05:44 16   say we have shown you that we were marking and you say well,

10:05:48 17   that's not enough.  At what point -- I mean, I am not going

10:05:52 18   to make that determination now, so what is it that you

10:05:56 19   expect to happen here?

10:06:00 20               MR. SURRETTE:  Well, what I would think they

10:06:02 21   could provide and all they have provided to us is a

10:06:04 22   statement that they started marking and a picture of a

10:06:07 23   product, one picture of a product that has a patent on it

10:06:12 24   without any date, without any time when it started, and I'm

10:06:12 25   not sure we're required to just accept on face value that

10:06:21  1    that's when they started marking.  And frankly, Your Honor,

10:06:28  2    that's what the whole point of the meet and confer process

10:06:33  3    is about is to try to crystalize the issues.  And we were

10:06:38  4    still talking about this issue in our last meet and confer.

10:06:41  5    And I know the Court has just decided to address the issues

10:06:43  6    here, but it's very clear that they didn't follow the meet

10:06:46  7    and confer process here.

10:06:47  8          THE COURT:  I'm done.  Listen, I read your

10:06:50  9    letters on all that stuff.  I asked you what happened, and I

10:06:53 10    got enough and I don't want to hear anymore of the bickering

10:06:58 11    back and forth about that.  Okay?  I can't -- I got to just

10:07:03 12    move on.  So I guess my question then for the Plaintiff is

10:07:07 13    why do you need on a monthly basis by customer this

10:07:11 14    information on each of these things?  This seems a little

10:07:16 15    bit much.  Monthly by customer, why do you need that?

10:07:22 16          MR. BIDDINGER:  Sure, Your Honor, Brian

10:07:26 17    Biddinger for the Plaintiff.  I think there are a couple of

10:07:28 18    reasons.  Number one, and first of all, they agreed to

10:07:32 19    provide that, they just wouldn't do it prior to the filing

10:07:36 20    of the complaint.  But the identification of sales of

10:07:40 21    particular customers is important here because we have

10:07:42 22    direct infringement claims and we need to show that

10:07:46 23    particular customers, particularly for our method claims

10:07:50 24    actually practiced and directly infringe those claims.  So

10:07:55 25    identifying which customers have been sold to so that we can

10:08:00 1  identify the direct infringers and potentially take

10:08:03 2  follow-up discovery of those direct infringers is important.

10:08:07 3  It's also important because we have a lost

10:08:10 4  profits claim in this case, so determining which customers

10:08:13 5  have been sold to by the Defendants in order to prove that

10:08:18 6  we have lost sales to those particular customers is also

10:08:22 7  important.

10:08:23 8  And sorry, one other thing, I know that this

10:08:27 9  isn't specifically to your question, Your Honor, but counsel

10:08:30 10  for Defendants mentioned the *Power Integrations* case, and

10:08:33 11  there is an important distinction in that in that case the

10:08:38 12  Plaintiff admitted in their interrogatory responses that

10:08:42 13  they had not marked their product.  That's not the case

10:08:45 14  here, we have marked our product, it's just a case of

10:08:48 15  whether or not we have sufficiently proved to the Defendants

10:08:50 16  whether or not we have complied with that marking

10:08:54 17  requirement for the relevant time period.

10:08:56 18  THE COURT:  Okay.

10:08:57 19  MR. SURRETTE:  Your Honor, this is Robert

10:08:59 20  Surrette on behalf of Sage.  In fact, the facts are

10:09:02 21  identical.  Here PureWick has admitted that they haven't

10:09:09 22  marked two products.  There is three products that they have

10:09:13 23  identified and two of them they admit they have not marked.

10:09:19 24  THE COURT:  Why does it matter that they have

10:09:21 25  not marked one?  Isn't one enough to get the information

10:09:23 1    that they need?

10:09:25 2              MR. SURRETTE:  Well, we're not sure they have

10:09:28 3    established that they have actually marked it, and that's

10:09:30 4    really the heart of the dispute here.

10:09:31 5              THE COURT:  Okay.  So I'm going to grant this

10:09:33 6    request because I don't think Defendants, we're not going to

10:09:37 7    get into a substantive decision on whether the marking has

10:09:42 8    been established before they can ask for discovery.  So I'm

10:09:46 9    going to grant the motion for interrogatory number 1.  We'll

10:09:53 10   talk about the timing of these responses at the end, but

10:09:56 11   let's go to the next one.  Interrogatory number 5.  Is it

10:09:59 12   Mr. Biddinger again?

10:10:05 13             MR. SHAW:  Your Honor, I have this one.

10:10:05 14             THE COURT:  I'm sorry, who was that?

10:10:07 15             MR. SHAW:  It's John Shaw, Your Honor.  I have

10:10:10 16   interrogatory number 5.

10:10:11 17             THE COURT:  Mr. Shaw.

10:10:12 18             MR. SHAW:  So this one is pretty

10:10:14 19   straightforward.  It's a single interrogatory asking for

10:10:16 20   Sage's factual legal basis for affirmative defenses.  There

10:10:22 21   are two objections.  One is that there are multiple

10:10:26 22   subparts, the other is the timing of objections.  The first

10:10:28 23   as a matter of practice in the district and according to the

10:10:32 24   case law this has not been counted as multiple

10:10:35 25   interrogatories.  In part I'm sure that's because the number

10:10:38  1    of affirmative defenses varies by case and second it helps

10:10:42  2    on case management not to have to anticipate early on

10:10:46  3    exactly how many interrogatories are needed for affirmative

10:10:50  4    defenses.

10:10:51  5          But to the extent, Your Honor, these are

10:10:55  6    multiple subparts, we ask to have the interrogatory limit

10:10:59  7    expanded by ten because there are eleven from the Defendant

10:11:02  8    in this case.

10:11:03  9          THE COURT:  And let me just ask, Mr. Shaw, if I

10:11:06 10    were to do that, would you be okay with me doing that

10:11:12 11    reciprocally so that everybody gets another ten?

10:11:16 12          MR. SHAW:  I'm not sure that would be the case,

10:11:18 13    Your Honor.  The reason to do that here is to get at the

10:11:22 14    multiple issues that are typically treated as one.  You can

10:11:26 15    make the argument that other issues such as responses on

10:11:31 16    validity for anticipation, obviousness, other flavors should

10:11:36 17    also be counted as individual interrogatories, and if that

10:11:40 18    were true, I would think the additional ten would make

10:11:43 19    sense, but here we would commit the additional ten would

10:11:47 20    only be used for interrogatories that are dedicated to ask

10:11:50 21    the basis of each affirmative defense.  So we wouldn't be

10:11:54 22    expanding it beyond just trying to get the information.

10:11:57 23          THE COURT:  Okay.

10:11:58 24          MR. BIDDINGER:  On the timing question, all a

10:12:01 25    party can ever do is ask its opponent to get all the

10:12:06 1    information presently in its custody and control.  That's

10:12:10 2    what we have done here.  Their view is they seem to think we

10:12:14 3    can wait to some future part of the case to respond.  We

10:12:17 4    know they have some information about the interrogatories

10:12:20 5    and about the affirmative defenses because they put them in

10:12:24 6    their answer.  So at this point what we're asking is that

10:12:26 7    the objection on prematurity be overruled and that they

10:12:30 8    respond to the information that is presently in their

10:12:33 9    possession, custody and control.

10:12:35 10             THE COURT:  Mr. Surrette, are you dealing with

10:12:39 11   this one?

10:12:39 12            MR. SURRETTE:  Yes, I am, Your Honor.  We think

10:12:41 13   this interrogatory is clearly overbroad.  We have identified

10:12:44 14   eleven affirmative defenses, many which have sub-defenses,

10:12:49 15   in essence they're asking for eleven separate

10:12:51 16   interrogatories.  Much of the information sought by

10:12:52 17   interrogatory 5 is covered by other interrogatories, so --

10:12:56 18            THE COURT:  But don't you think they get --

10:12:59 19   don't you think that it makes sense that they get to ask an

10:13:00 20   interrogatory for the -- your contentions on any affirmative

10:13:08 21   defenses you assert, and I don't know how -- I mean, what

10:13:12 22   are they supposed to do if you assert a hundred affirmative

10:13:15 23   defenses, they're not allowed to ask?  That's where I'm

10:13:19 24   falling down on this one.

10:13:20 25            MR. SURRETTE:  Well, they have asked in other

10:13:22 1    interrogatories about our affirmative defenses.  This is an

10:13:25 2    omnibus interrogatory.

10:13:32 3                THE COURT:  All right.  Mr. Shaw, so tell me

10:13:35 4    what information that this one asks that you're not getting

10:13:39 5    from the other ones.  I didn't go back and look at all the

10:13:43 6    interrogatories to make a determination.

10:13:46 7                MR. SHAW:  We requested just six I believe, and

10:13:50 8    I'm looking through them now.  I don't believe there are any

10:13:53 9    directed to affirmative defenses.  There are ones directed

10:13:56 10   to explain why you don't infringe, explain why infringement

10:14:06 11   is not willful, identify noninfringing alternatives, so I'm

10:14:11 12   not sure that I agree that the interrogatories that have

10:14:14 13   been asked are duplicated if there already has been one

10:14:18 14   asked for each affirmative defense.

10:14:21 15               MR. SURRETTE:  Judge -- I'm sorry, Mr. Shaw.

10:14:25 16               THE COURT:  Go ahead.

10:14:26 17               MR. SHAW:  If certainly that is the case, we

10:14:28 18   will be happy to reduce that number, we will talk to them

10:14:32 19   and if they say hey, that one is the same as the affirmative

10:14:36 20   defense, we don't need that extra interrogatory.

10:14:39 21               MR. SURRETTE:  Your Honor, this is Mr. Surrette.

10:14:42 22   Noninfringement, invalidity, those are all affirmative

10:14:45 23   defenses and they're all separate interrogatories directed

10:14:49 24   towards those affirmative defenses.

10:14:51 25               THE COURT:  So for this one, I agree that if

10:14:55 1    there is overlap that the Defendants don't have to say the

10:15:01 2    same thing again, though I'm not sure why it's so difficult

10:15:04 3    to just refer to another interrogatory on noninfringement or

10:15:07 4    willfulness, but in any event, you guys can talk and come to

10:15:12 5    an agreement on which ones are repetitive, but for the other

10:15:15 6    ones, I think that Defendants should respond with the

10:15:22 7    information that they have now and then they have a duty to

10:15:26 8    supplement as discovery goes forward.  So for interrogatory

10:15:33 9    number 5, I'm going to grant the request to the extent that

10:15:38 10   the affirmative defenses requested the information is

10:15:42 11   requested about that are not already requested in other

10:15:45 12   interrogatories should be answered.

10:15:48 13            Okay.  What about interrogatory number 6?

10:15:55 14            MR. BIDDINGER:  Your Honor, Brian Biddinger

10:15:57 15   again.  I'll address interrogatory number 6.  So

10:16:01 16   interrogatory number 6 is related to information concerning

10:16:05 17   alleged noninfringing alternative.  Defendants have not

10:16:10 18   contended that the discovery is irrelevant, they have agreed

10:16:15 19   generally that what's sought by the interrogatory should be

10:16:19 20   provided and the issue really is a matter of timing.  Their

10:16:22 21   current response states that discovery is ongoing and that

10:16:28 22   they would supplement as necessary after further discovery

10:16:30 23   including an explanation by Plaintiffs on how the accused

10:16:34 24   product infringes and a determination by the Court on claim

10:16:38 25   construction issues.

10:16:39  1        So our understanding is that it's not a matter

10:16:44  2  of them not having any information right now, it's a matter

10:16:47  3  of them not being willing to provide the information that

10:16:51  4  they have until a somewhat later point in the case.  So

10:16:55  5  similar to interrogatory number 5, we believe that they

10:16:59  6  should provide the information that they have now and they

10:17:04  7  can supplement if they discover additional information

10:17:07  8  later.  But identifying any noninfringing alternatives on

10:17:11  9  which they may rely is important for us to obtain so that we

10:17:17 10  can take discovery about those alleged noninfringing

10:17:20 11  alternatives including whether they are reasonable

10:17:25 12  alternatives or feasible alternatives.

10:17:29 13        THE COURT:  Mr. Surrette, is it you again?

10:17:34 14        MS. FRANTZEN:  Your Honor, this is actually

10:17:36 15  Sandra Frantzen for Sage.  I will handle this interrogatory.

10:17:39 16        THE COURT:  Okay.

10:17:40 17        MS. FRANTZEN:  So we agree that information on

10:17:43 18  noninfringing alternatives is relevant.  And it's usually

10:17:47 19  the subject of testimony later in discovery because the

10:17:51 20  parties really at this point have no way of determining what

10:17:54 21  constitutes a noninfringing alternative until the claims are

10:17:58 22  construed.  So generally speaking the noninfringing

10:18:02 23  alternatives will say, for example, a noninfringing

10:18:06 24  alternative might be something that doesn't have a

10:18:10 25  reservoir, a noninfringing alternative might be something

that doesn't have this element of a container.  The claim construction is highly relevant especially when often times noninfringing alternatives are hypothetical while based on the market.  So coming up with every hypothetical element that could be a noninfringing alternative is just kind of a premature exercise at this point.

And a secondary point is that, you know, this kind of interrogatory which is interrogatory number 6 that we served, we served a request and asked them to identify all of their versions of the PureWick device, and we submitted an appendix in our brief an example of thirteen that were just publicly shown on the internet.  They only identified three and they don't know whether ten of them are covered.  Ten of them are not covered, so ten of those are noninfringing alternatives so we don't have that information from them.

So I guess the point of noninfringing alternatives is that it's always the case at this point to start coming up with real noninfringing alternatives and even hypothetical noninfringing alternatives until more has happened especially considering that they don't even know what their products are that are covered by their patents-in-suit.

THE COURT:  Mr. Biddinger.

MR. BIDDINGER:  Yes, Your Honor.  I mean, I

10:19:47 1   think -- I don't really understand the notion that we need

10:19:49 2   to wait until after claim construction for them to formulate

10:19:53 3   positions about what they believe are noninfringing or not.

10:19:57 4   Whether the alternatives are truly noninfringing or not may

10:20:01 5   change I guess based on claim construction, but they

10:20:05 6   obviously have positions on what they believe is

10:20:07 7   noninfringing.  And, you know, we have a relatively short

10:20:11 8   time period for conducting discovery post claim

10:20:16 9   construction, postponing understanding what they allege to

10:20:20 10  be a noninfringing alternative until then puts us in a

10:20:24 11  pretty difficult position in terms of taking discovery on

10:20:26 12  the feasibility of the alternative, whether or not it was

10:20:30 13  available at the time of the hypothetical negotiation,

10:20:33 14  whether customers would accept it as a noninfringing

10:20:37 15  alternative, what the costs are associated with the

10:20:40 16  noninfringing alternative --

10:20:42 17          THE COURT:  Right.  So is it your position, I

10:20:44 18  just want to understand with respect to earlier prototypes

10:20:49 19  or earlier versions of the products here where you haven't

10:20:50 20  formulated a position on whether it is or is not covered by

10:21:02 21  the claims, what are they supposed to do with those?  You

10:21:08 22  want them to just make their own determination as to whether

10:21:12 23  it is or is not covered and is a noninfringing alternative,

10:21:16 24  is that what you expect?

10:21:20 25          MR. BIDDINGER:  Yes, I think on this issue, if

10:21:22 1    they believe that there is some earlier prototype version or

10:21:27 2    a third-party product or anything else that they believe is

10:21:33 3    an available noninfringing alternative, that would have been

10:21:38 4    acceptable to customers, then I think that is a position for

10:21:41 5    them to take.  If they don't believe that, then they don't

10:21:45 6    need to identify it.  If they haven't formed an opinion on

10:21:49 7    that, I don't think we can ask them to identify it at this

10:21:51 8    stage.  But to the extent that they have formed any opinion

10:21:55 9    about any noninfringing alternatives, that's what we're

10:22:00 10   asking them to provide on this date instead of at some

10:22:04 11   unspecified date in the future.

10:22:05 12              THE COURT:  Ms. Frantzen, anything you want to

10:22:07 13   add?

10:22:10 14              MS. FRANTZEN:  You know, Your Honor, I would say

10:22:11 15   this proves a point that it's premature, and this is why we

10:22:15 16   need the discovery on our interrogatory number 5.  We can't

10:22:19 17   formulate views on noninfringing alternatives when they

10:22:23 18   haven't even provided us with the information and are

10:22:27 19   relying on pictures on the internet.  Issue number one.

10:22:31 20              Issue number two with regard to tying up claim

10:22:33 21   construction, there is two months of time and this happens

10:22:36 22   in every case.  Noninfringing alternatives are usually

10:22:40 23   addressed after claim construction, at least on the cases I

10:22:42 24   have been involved in and they're usually addressed by the

10:22:45 25   experts who can explain them.  It's just conducting a

10:22:50 1   hypothetical exercise right now with no information and no

10:22:53 2   discovery, you know, is just I guess inappropriate at this

10:23:01 3   point.

10:23:01 4               THE COURT:  Okay.  So what I am going to do is

10:23:05 5   to say -- well, the point of interrogatories is to find out

10:23:13 6   broadly what is at issue in the case.  And in this District,

10:23:16 7   we encourage early contention interrogatories.  And I don't

10:23:21 8   think it makes sense to wait until after claim construction.

10:23:24 9   And I certainly don't think it is appropriate to say that

10:23:28 10  you're not going -- anyone is not going to identify or

10:23:31 11  address noninfringing alternatives until expert discovery

10:23:35 12  because I think everybody needs to have some opportunity to

10:23:39 13  explore those issues.  So what I'm going to say is that if

10:23:45 14  Defendants have in mind things that are noninfringing

10:23:49 15  alternatives, they should identify them.  If they don't have

10:23:53 16  any in mind currently, that's fine, you can say that, and

10:23:57 17  then supplement later if it turns out that you have

10:24:03 18  something in mind.  But just so everyone is clear, I don't

10:24:09 19  agree that we can identify noninfringing alternatives for

10:24:12 20  the first time in expert discovery.

10:24:17 21               Okay.  Now, we have a bunch of document requests

10:24:22 22  that are sort of thrown in here at the end of the letter.

10:24:28 23  What do we really need to discuss with respect to those?

10:24:34 24               MR. SHAW:  Your Honor, this is John Shaw.  I

10:24:37 25  have this grouping.

10:24:38  1           THE COURT:  Okay.

10:24:39  2           MR. SHAW:  These requests are grouped together

10:24:40  3   because Sage has the same response to all of them which is

10:24:44  4   we will only produce documents according to our affirmative

10:24:47  5   defenses and counterclaims.  The requests themselves are

10:24:52  6   ranging in a variety of ways are designed to capture factual

10:24:58  7   information that goes beyond just their affirmative defenses

10:25:02  8   and what their positions are and the objections that they're

10:25:05  9   making doesn't make sense in the context of these.  For

10:25:08 10   example, take the first two, they are focused on invalidity

10:25:11 11   issues, can be internal analyses on validity or invalidity

10:25:17 12   and aren't limited just to what their affirmative defenses

10:25:21 13   -- documents supporting their affirmative defenses.

10:25:23 14           33 and 41 deal with commercial success.  There

10:25:28 15   can be many documents on commercial success including

10:25:31 16   failure by Sage if it existed to come up with a similar

10:25:35 17   product.  Any skepticism internal to Sage that would be

10:25:41 18   captured by 33 which you typically see from the business

10:25:45 19   side or an analysis of strengths, weaknesses, threats,

10:25:50 20   opportunities.  It could be responsive to that and to 41.

10:25:55 21   The same is true, we can go through any of those, it can be

10:25:59 22   internal discussions by Defendant about noninfringement

10:26:02 23   which is 39 and so forth.

10:26:04 24           So really the issue here is to try and get -- to

10:26:12 25   not sustain this objection that they're making that they

10:26:15  1    only have to give us things that are responsive -- that are

10:26:18  2    supporting their affirmative defenses.

10:26:21  3              THE COURT:  All right.  Who is handling this one

10:26:23  4    for Sage?

10:26:26  5              MR. SURRETTE:  This is Robert Surrette, Your

10:26:28  6    Honor.  First of all, we told PureWick that we're not

10:26:32  7    withholding any documents responsive to these requests based

10:26:36  8    on a fact that a document would achieve our contentions and

10:26:40  9    positions.  In fact, in response to other requests we have

10:26:44 10    agreed to produce relevant documents related to the

10:26:49 11    development, structure, design, operation of the product,

10:26:50 12    the marketing of the product, all of those are not limited

10:26:51 13    to only things that would support our contentions, but just

10:26:54 14    related to the development.  We've also agreed to produce

10:26:59 15    documents relating to the patents-in-suit and we haven't

10:27:04 16    limited those to only documents supporting our contention.

10:27:09 17              Frankly our issue with it is we're not sure what

10:27:11 18    we would search for to refute our contentions.  What do I go

10:27:15 19    to my client and ask them to search for?  We're not

10:27:18 20    withholding something on the basis that it's a negative or

10:27:24 21    does not support our contentions.  But I don't know what I

10:27:27 22    tell my clients to search for.  That's frankly the issue we

10:27:31 23    have with the request.

10:27:36 24              THE COURT:  So I guess, Mr. Shaw, what is it

10:27:40 25    that you think is missing given the representation that we

10:27:45 1  just heard from Sage's counsel that they're not going and

10:27:51 2  hiding anything, they told you that they would produce

10:27:55 3  things even if they -- that they found even if they refuted

10:28:00 4  their contentions.  What am I supposed to do with this?

10:28:03 5              MR. SHAW:  For example, Your Honor, we can pick

10:28:06 6  any one, but we start with 32, starts any investigation

10:28:10 7  about invalidity, validity, infringement --

10:28:13 8              THE COURT:  You think this is going to be -- I

10:28:18 9  mean, not privileged, but okay.

10:28:22 10             MR. SHAW:  It might, Your Honor.  After

10:28:25 11 litigating this issue for a long time in front of Judge

10:28:29 12 Stark, yes, there be can be some that are nonprivileged.

10:28:33 13 Here I would go to the client and ask have you had

10:28:36 14 investigations on any of these issues and if you have, let's

10:28:39 15 see the documents.  Take 41, have you done any analysis,

10:28:44 16 done any commentary, have you looked at commercial success

10:28:47 17 of Purewick's products and if you have, they should be

10:28:51 18 produced.

10:28:52 19             On any of the commercial success factors, the

10:28:54 20 same thing, go in and ask the client, what have your

10:28:58 21 marketing folks done, the salespeople done or the scientists

10:29:02 22 done in terms of looking at the commercial success of

10:29:05 23 Purewick's products.  What have your folks done in terms of

10:29:09 24 failing to make the products?  How long did it take?  So

10:29:11 25 each of these categories have specific questions that can be

10:29:14 1    asked of clients and we want to make sure are asked instead

10:29:18 2    of just broad questions going in and saying give us things

10:29:21 3    about noninfringement.

10:29:26 4            MR. SURRETTE:   Your Honor, this is Mr. Surrette.

10:29:29 5    If we can take the first one we talked about which is

10:29:31 6    request number 32.   If you look at our response it

10:29:34 7    highlights, you know, the point I was trying to make.   We

10:29:38 8    say that we will produce documents that mention the patents

10:29:44 9    located after a reasonable search.   That's not limited to

10:29:48 10   things that support or refute our contentions.   We're going

10:29:52 11   to produce documents that relate to the patents-in-suit.

10:29:56 12   And as I said earlier, with respect to previous requests,

10:30:00 13   we've agreed to produce development documents and those

10:30:04 14   development documents will encompass not only -- well, could

10:30:10 15   encompass -- if they exist, could encompass things that

10:30:13 16   didn't work out for us and things that did work out for us

10:30:16 17   and we've agreed to produce those.   So I'm really not sure

10:30:20 18   what the dispute is about.

10:30:22 19           THE COURT:   All right.   So this one, I agree

10:30:24 20   with Mr. Surrette that you guys need to go back and discuss

10:30:30 21   this a little bit more.   It seems like there is not really a

10:30:33 22   dispute here that Defendants aren't withholding anything.

10:30:33 23   If Plaintiffs want to go back and talk and say look, we just

10:30:41 24   want to make sure that you have asked folks for this kind of

10:30:45 25   stuff, you can do that and go back and if there is

10:30:51 1    additional questions that you think that Defendants need to

10:30:54 2    ask, you can go back and ask them to do that.  And I expect

10:30:58 3    Defendants would be reasonable in doing that.  But I'm not

10:31:01 4    going to order them to do anything right now because it

10:31:04 5    sounds like what they have done is at least in how it's been

10:31:09 6    described is reasonable.

10:31:11 7        Okay.  Let's go to Defendant's issues.  Now we

10:31:20 8    have interrogatory number 6.

10:31:23 9        MR. SURRETTE:  Yes.  Your Honor, this is Robert

10:31:26 10   Surrette again on behalf of Sage.  So interrogatory 6 seeks

10:31:29 11   information related to versions or iterations of the

10:31:33 12   PureWick external female catheter.  And if you look at

10:31:40 13   Purewick's response, they ignore the first part of the

10:31:43 14   interrogatory.  The interrogatory had two parts to it.  The

10:31:46 15   first it ask to identify each version or iteration of the

10:31:54 16   female external catheter ever made, sold, offered for sale,

10:31:58 17   and then it ask for any other product that might be covered,

10:32:01 18   so there is two parts to the interrogatory.  Now --

10:32:05 19       THE COURT:  I have to say that I don't read that

10:32:08 20   from what you have excerpted in the letter.  Hold on.  Let

10:32:12 21   me just go back and look at this interrogatory.

10:32:22 22       So what I recall when I read this was that maybe

10:32:26 23   you asked if they had questions here in the interrogatory

10:32:34 24   because it does seem to me to be asking for every version of

10:32:36 25   the product which is covered.  That is where I -- I don't

10:32:45 1    see it as two different interrogatories, or two different

10:32:49 2    subparts.  Tell me how that works.

10:32:51 3            MR. SURRETTE:  All right.  So first of all, if

10:32:53 4    you actually look at interrogatory 6 --

10:32:57 5            THE COURT:  I have it in front of me.

10:32:59 6            MR. SURRETTE:  All right.  Each version or

10:33:01 7    iteration of the PureWick external female catheter product,

10:33:06 8    if you look at the definition which is on page 3, it defines

10:33:13 9    it as each model or iteration of any female external

10:33:17 10   catheter product or system ever made, offered for sale, or

10:33:21 11   sold by Plaintiff, and then it ask for, and any other

10:33:24 12   product and any other products which is covered by the

10:33:31 13   claims and then it later ask, if applicable, how each

10:33:36 14   product or system meets the limitations of the claim.  So

10:33:39 15   from our perspective it's clearly asking for two things,

10:33:43 16   it's asking for each version of the catheter that was ever

10:33:47 17   made, used, offered for sale, and two, any other product

10:33:53 18   that's covered by the patent, and if it is covered, how it's

10:33:57 19   covered.

10:34:00 20           THE COURT:  Okay.  Who is handling this one for

10:34:02 21   the Plaintiff?

10:34:04 22           MR. BIDDINGER:  Your Honor, this is Brian

10:34:06 23   Biddinger again for the Plaintiff.  So our reading of it is

10:34:09 24   consistent with I think what Your Honor's reading of it was,

10:34:12 25   and that's how we've responded to it.  We have identified

10:34:17 1    the products that we presently are aware of that are covered

10:34:23 2    by the claims, we have provided claim charts for those, and

10:34:28 3    that's what we thought was responsive to the interrogatory.

10:34:32 4              And, you know, above and beyond that we're

10:34:37 5    producing documents, the prototypes that were in Sage's

10:34:42 6    letter to the Court, that's the first time that's ever been

10:34:45 7    raised with us.

10:34:46 8              THE COURT:  Let me ask you this.  I think you

10:34:48 9    said in your responsive letter that you're agreeable to

10:34:53 10   giving them documents on all of the earlier products,

10:34:57 11   prototypes, let's say that Mr. Surrette has convinced me

10:35:02 12   that this interrogatory arguably ask for two things, every

10:35:07 13   iteration of the PureWick products, and any other products

10:35:13 14   that are covered that you guys claim are covered.  So can

10:35:18 15   you just -- what's the harm in producing that or responding

10:35:22 16   in that way?  You don't have to say if you think those other

10:35:27 17   products are covered if you don't have an opinion, you just

10:35:29 18   have to identify them.  What's the issue with that given

10:35:32 19   that you said you would give them the documents?

10:35:36 20             MR. BIDDINGER:  Sure, Your Honor.  Yeah, we

10:35:37 21   certainly are briefing and will produce documents relating

10:35:42 22   to anything concerning the prior versions, et cetera.  I

10:35:47 23   think the issue with identifying them is that, you know, our

10:35:51 24   understanding is that the founders of this company and the

10:35:55 25   inventors and the couple, married couple actually who made

10:36:01 1   these first products did this in their kitchen, their first

10:36:06 2   actual even commercial products were made in their kitchen.

10:36:10 3   And, you know, there are potentially dozens of different

10:36:18 4   individual prototypes that they made over the course of

10:36:21 5   several years.  And identifying -- we certainly can produce

10:36:25 6   any documents that exist about those, but trying to track

10:36:29 7   down each of those prototypes when the product was made,

10:36:36 8   used, it's extremely burdensome for us.  I don't know that

10:36:43 9   we can do that any more or less than they can based on the

10:36:47 10  documents as we produced them.

10:36:52 11          MR. SURRETTE:  Judge, this is Robert Surrette if

10:36:54 12  I may.

10:36:54 13          THE COURT:  Sure.

10:36:55 14          MR. SURRETTE:  Let me try and explain why this

10:36:57 15  is so vitally important.  So Purewick's own discovery

10:37:01 16  responses, they can evidence that the version of the female

10:37:06 17  external catheter was publicly disclosed at least as early

10:37:11 18  as 2014 which is well before the priority date of the '989

10:37:14 19  and the '376 Patents.  In response to interrogatory number 9

10:37:18 20  which is directed towards secondary considerations or

10:37:21 21  objective indicia of nonobviousness and in order for a

10:37:25 22  product to demonstrate that it has to fall within the scope

10:37:29 23  of the claims, they have identified that their product won

10:37:33 24  an award in 2014.  If that is true and that product is

10:37:41 25  within the scope of the claim, then that's an invalidating

10:37:45  1    disclosure.  And PureWick, not Sage, is in total control of

10:37:50  2    all of that information.  And if that product wasn't covered

10:37:55  3    by the claims of the patent, then it does not serve as

10:38:00  4    nonobjective or objective indicia of nonobviousness and then

10:38:04  5    would likely be a noninfringing alternative which we talked

10:38:08  6    about a little bit ago.

10:38:10  7              So either way they're the ones that are in

10:38:13  8    control of the information.  This is key prior art.  Not

10:38:17  9    only do we need to know an identification of the products

10:38:20 10    but when they were sold, used, made or disclosed.  And the

10:38:26 11    relevant discovery responses highlight the issue.

10:38:32 12              And if I could just add if you look at appendix

10:38:35 13    A, there are thirteen products there.  The fifth one in, the

10:38:40 14    -- excuse me the sixth one in is labeled 2013-2014.  And it

10:38:49 15    would seem to me that this is the type of thing that you do

10:38:52 16    before you file a lawsuit to determine if there are any

10:38:56 17    prior sales of the product, any prior disclosures of the

10:39:00 18    product.

10:39:00 19              THE COURT:  All right.  Okay.  I get it.

10:39:07 20              Mr. Biddinger, what is your response to that?  I

10:39:11 21    mean, it does seem to me that a lot of this information is

10:39:14 22    within your client's control and, you know, just getting

10:39:22 23    over documents and telling Defendants figure it out for

10:39:25 24    yourself when you have made some assertions in

10:39:31 25    interrogatories about things like secondary considerations,

10:39:34 1    why shouldn't you just have to identify the products and say

10:39:37 2    whether they were offered for sale ever and if so, when?

10:39:43 3    How can that be so burdensome?  We're talking about, you

10:39:48 4    just said, two people in a kitchen.

10:39:50 5             MR. BIDDINGER:  Yes.  Your Honor, we certainly

10:39:52 6    are willing to supplement this interrogatory as we discover

10:39:56 7    additional facts, if we discover additional facts.  What

10:40:00 8    we've given them right now is what we know about products

10:40:03 9    that were sold that are covered by any claim in the asserted

10:40:09 10   patent.  I don't believe that there was any other product

10:40:11 11   that was ever sold --

10:40:13 12            THE COURT:  All right.  So this is what I'm

10:40:14 13   going to do.  I'm going to order you to respond to the

10:40:18 14   interrogatory.  Further, to the extent that there were other

10:40:22 15   products that were manufactured and then if they weren't

10:40:31 16   sold, you can say that they weren't sold, but I think that

10:40:35 17   the interrogatory needs to be read a little bit more broadly

10:40:40 18   than just products that you contend are covered by claims of

10:40:47 19   the asserted patents.  So I think that you need to identify

10:40:51 20   the patented products that were made, used, or sold, if they

10:40:55 21   were sold or demonstrated publicly, then identify the date

10:41:02 22   on that.  Now, I understand that this is an ongoing process

10:41:08 23   and that that interrogatory may need to be supplemented, but

10:41:12 24   I think you have to give a little bit more information over

10:41:16 25   now.

10:41:17  1                    Okay.   What's the next interrogatory we need to

10:41:20  2       deal with, or the next discovery dispute?

10:41:24  3                    MR. SURRETTE:   Well, Judge, it's a series of

10:41:27  4       document requests relating to prior art.   And I think to

10:41:30  5       kind of short-circuit things here and try and reach some

10:41:37  6       resolution, the night before we filed our letter, PureWick

10:41:42  7       basically said that they were going to conduct a reasonable

10:41:44  8       search of sources that are likely to contain responsive and

10:41:48  9       relevant information.   And we understand that to encompass

10:41:52 10       the request that we're seeking here.   It may make some sense

10:41:56 11       for us to have a further discussion on it before we try and

10:42:04 12       resolve this with the Court.   The key issue that we had was

10:42:07 13       they told us that they were only going to provide cited

10:42:12 14       prior art to us, and I'm sure the Court is aware that

10:42:17 15       sometimes the most relevant art is art that wasn't cited to

10:42:21 16       the Patent Office.   And it now appears that they are

10:42:24 17       searching for that information.   So I'm not sure if there is

10:42:28 18       a dispute on this anymore, but it may behoove us to have a

10:42:33 19       conversation before we burden the Court with more argument

10:42:37 20       related to it.   I'm always happy to have the parties discuss

10:42:41 21       things further.   And the response that PureWick gave about

10:42:44 22       conducting a reasonable search does seem to be an

10:42:49 23       appropriate response and so I'll give you guys more time to

10:42:51 24       go back and talk and determine whether or not there actually

10:42:56 25       is a dispute.

10:42:59  1        MR. SURRETTE:  I guess the only thing I might

10:43:01  2   add, Your Honor -- I'm sorry, I didn't mean to interrupt

10:43:04  3   you -- is that we need this information timely.  We have got

10:43:08  4   invalidity contentions coming up later in the month.  We had

10:43:14  5   to prepare our first set of invalidity contentions, so there

10:43:21  6   is a timing issue that is part of this, obviously that is

10:43:25  7   part of this that is very important to us.

10:43:29  8        THE COURT:  Well, there is a bunch of discovery

10:43:31  9   that I have required the parties to go back and supplement,

10:43:35 10   so it seems to me that you all can go back and talk about

10:43:40 11   the timing of when the various supplementations should occur

10:43:51 12   so that folks can do whatever additional disclosures they

10:43:55 13   need to do.  I assume, Mr. Surrette, that's something that

10:44:01 14   you think the parties can discuss?

10:44:04 15        MR. SURRETTE:  Yes, Your Honor, absolutely.

10:44:09 16        THE COURT:  So I ask that you all do that.  I

10:44:12 17   think that's the end of the issues in the letters.  Is there

10:44:14 18   anything else that we need to discuss?

10:44:20 19        From the Plaintiff?

10:44:22 20        MR. SHAW:  Your Honor, it's John Shaw.  I

10:44:24 21   believe the answer is no.

10:44:25 22        THE COURT:  Okay.  Thank you.

10:44:26 23        And Mr. Surrette, anything from the Defendants?

10:44:29 24        MR. SURRETTE:  Nothing further, Your Honor.

10:44:31 25   Thank you for your time today.

10:44:33  1                    THE COURT:   Thank you everyone.   Have a good

10:44:35  2       rest of the week.

          3                    (Teleconference concluded at 10:44 a.m.)

          4

          5                    I hereby certify the foregoing is a true and
                  accurate transcript from my stenographic notes in the proceeding.
          6

          7                                   /s/ Dale C. Hawkins
                                             Official Court Reporter
          8                                   U.S. District Court

          9

         10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25