IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PUREWICK CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 19-1508 (MN) |
| | ) |
| SAGE PRODUCTS, LLC, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM ORDER**

At Wilmington this 17th day of February 2021:

IT IS HEREBY ORDERED that the claim terms of U.S. Patents No. 8,287,508 ("the '508 Patent") and No. 10,376,407 ("the '407 Patent) with agreed-upon constructions are construed as follows (*see* D.I. 117 at 3, 11):

1. "an elongated exterior of the container" / "an elongated container" needs no construction and will be given its plain meaning ('508 Patent, claims 1, 17)

2. "hence inward" will be given its ordinary meaning ('407 Patent, claim 2)

Further, as announced at the hearing on February 2, 2021, IT IS HEREBY ORDERED that the disputed claim terms of U.S. Patents No. 10,226,376 ("the '376 Patent"), No. 10,390,989 ("the '989 Patent"), and the '508 and '407 Patents are construed as follows:

1. "the container is closed, except for having an array of openings . . . and at least one outlet port . . ." / "container defining a chamber that is closed at both ends . . . and having an array of openings in an elongated side of the container . . . and at least one outlet port" need no construction. These phrases will be given their plain and ordinary meanings with the understanding that "closed" means "one way for liquid to come in, one way for liquid to go out, and the container holds liquid" ('508 Patent, claims 1, 17)

2. "array" means "a group of two or more" ('508 Patent, claims 1, 17)

3. "moisture-wicking article" / "wicking material" means "an article that moves moisture by capillary action from one surface of the article to the

        other" ('508 Patent, claims 1, 3-6, 17-19; '376 Patent, claim 9; '407 Patent, claims 1, 5, 7, 8, 10, 13-15)

4.    "secured over the array of openings" means "held in place over the array of openings" with the clarification that the component to be secured must be held in place before the article is deployed and independent of deployment ('508 Patent, claims 1, 3, 17-18)

5.    "casing having [or defining] a fluid reservoir at a first end [and] . . ., a fluid outlet at a second end . . ." means "an outer cover having [or defining] a fluid reservoir at a first end and a fluid outlet at a second end" ('376 Patent, claims 1, 11, 13, 14; '989 Patent, claim 1)

6.    "the chamber being defined at least partially by . . . the porous material and the . . . layer of impermeable material" / "the chamber being [partially] defined by a portion of the . . . porous material and a portion of the impermeable material" will be given their plain and ordinary meanings with the clarification to be at least partially defined by the porous material and the impermeable layer, the porous material and the impermeable layer must each touch the chamber at some point ('407 Patent, claims 1, 7, 13)

7.    "a chamber [of/is void space] positioned" requires no construction and will be given its plain and ordinary meaning ('407 Patent, claims 1, 7, 9, 13)

8.    "opening of the cavity" will be given its plain and ordinary meaning ('407 Patent, claim 7)

The parties briefed the issues (*see* D.I. 105) and submitted a joint appendix that included the patents at issue, expert declarations, excerpts from the patents' prosecution histories and an IPR and various types of extrinsic evidence (*see* D.I. 106; D.I. 107). Sage provided a tutorial describing the relevant technology. The Court carefully reviewed all submissions in connection with the parties' contentions regarding the disputed claim terms, heard oral argument (*see* D.I. 127) and applied the following legal standards in reaching its decision:

## I.    LEGAL STANDARDS

"[T]he ultimate question of the proper construction of the patent [is] a question of law," although subsidiary fact-finding is sometimes necessary. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837-38 (2015). "[T]he words of a claim are generally given their ordinary and

customary meaning [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc) (internal citations and quotation marks omitted).  Although "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim also must be considered. *Id.* at 1314.  "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted).

The patent specification "is always highly relevant to the claim construction analysis . . . [as] it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  It is also possible that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess.  In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316.  "Even when the specification describes only a single embodiment, [however,] the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) (internal quotation marks omitted) (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004)).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).  The prosecution history, which is "intrinsic evidence, . . . consists of the complete record of the proceedings before the PTO [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d

at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

In some cases, courts "will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 135 S. Ct. at 841. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. Expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Phillips*, 415 F.3d at 1318. Nonetheless, courts must not lose sight of the fact that "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* Overall, although extrinsic evidence "may be useful to the court," it is "less reliable" than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19. Where the intrinsic record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90 F.3d at 1583).

## II.     THE COURT'S RULING

The Court's ruling regarding the disputed claim terms of the '376, '989, '407, and '508 Patents was announced from the bench at the conclusion of the hearing as follows:

Thank you for the arguments today. At issue we have four patents and eight disputed terms or phrases.[1]

I am prepared to rule on all of the disputes. I will not be issuing a written opinion, but I will issue an order stating my rulings. I want to emphasize before I announce my decisions that although I am not issuing a written opinion, we have followed a full and thorough process before making the decisions I am about to state. I have reviewed the patents in dispute. I have also reviewed the materials in the Joint Appendix, which include portions of the prosecution history and an IPR, expert declarations, other patents, articles and dictionary definitions. There was full briefing on each of the disputed terms. There was also a tutorial on the technology submitted by Sage. And there has been argument here today. All of that has been carefully considered.

As an initial matter, I am not going to read into the record my understanding of claim construction law and indefiniteness generally. I have a legal standard section that I have included in earlier opinions, including in *Quest Diagnostics Investments LLC v. Laboratory Corporation of America Holdings*, No. 18-1436. I incorporate that law and adopt it into my ruling today and will also set it out in the order that I issue.

The parties have proposed similar proposals for the definition of person of skill in the art. To the extent there are any disagreements, neither party has argued that any differences in the proposed definitions of a person of ordinary skill in the art are relevant to the issues before me today.

Now to my rulings. The first term is two similar phrases - "the container is closed, except for having an array of openings . . . and at least one outlet port . . ." in claim 1 of the '508 Patent and "container defining a chamber that is closed at both ends . . . and having an array of openings in an elongated side of the container . . . and at least one outlet port," in claim 17 of that patent. Plaintiff asserts that no construction is needed. Defendant proposes that the first phrase means "[t]he only openings on the container are the array of openings and the outlet port(s); the container has no other openings" and that the second means "[t]he container has no openings on either the anterior or posterior end. The container has

---

[1] The parties originally had ten disputed terms but came to an agreement on two of the terms ("an elongated exterior of the container" / "an elongated container" and "hence inward") prior to the hearing.

5

an array of openings in an elongated side of the container and an outlet port[s]."

Initially, let me say that today the parties agreed that closed means there is one way for the liquid to come in and one way for it to go out and that the container holds liquid. They also agree that the container need not be airtight or sealed and that breaks in the surface are allowed.

With that, I conclude that the meaning of the claim language at issue is clear and the terms are used in accordance with their ordinary meaning. No further construction is necessary.[2] Indeed, that also appears to be agreed-upon as in the briefing, Defendant acknowledged that "the terms in the claim mean what they say" and "the meaning can be ascertained from the claims themselves."[3]

I do not see the need to reorder the words of the term as Sage proposes. And I will not read into the claim that the outlet port is an opening. Neither the claims nor the specification support a construction that defines an outlet port as an "opening." Claim 1 distinguishes between the array of openings – referring to them as openings – and the outlet port. This is consistent with the specification, which in the summary of the invention states that the array of openings is how "urine can be drawn into the chamber" and distinguishes the openings from the "at least one outlet port through which urine can be drawn away from the chamber."[4]

I also am not concluding that the array of openings must be the only openings in the container rather than allowing them to be a sub-group through which all liquid enters the container because that would be inconsistent with the embodiment of the porous glass which has pores other than those through which urine passes. But the container must still be closed in that there must be one way for fluid to enter, one way for it to exit and it must hold liquid.

Similarly, with respect to the second phrase in claim 17, Sage's proposed construction removes the word "chamber" and just

---

[2] *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy.").

[3] (D.I. 105 at 8).

[4] ('508 patent, claim 1; *see also* 1:60-2:3).

refers to the "container." Different words in a patent claim are presumed to have different meanings, however.[5] And here, claim 17 requires "an elongated container defining a chamber that is closed at both ends for collecting urine." The container defines a chamber, and it is the chamber that is "closed at both ends."

The second term is "array," in claims 1 and 17 of the '508 Patent. Plaintiff's proposed construction is "a group of two or more." Defendant proposes that array means "a regular arrangement."

Here, I will construe "array" to mean "a group of two or more." As the parties have pointed out, "array" may be defined as "a regular order or arrangement," but it also may be defined as "a group or collection of things." It is this latter definition that is better supported by the intrinsic evidence.

For example, the specification of the '508 Patent states that "the array of openings 16 in the container 12 are slotted perforations, as shown in FIG 1, openings in a porous material such as frits in a porous glass container, or openings in a mesh screen in the wall of the container. The openings may have many different arrays, shapes and spacings alternative to those of the openings 16 shown in FIG 1."[6] Thus, although the "array" in question may include an arrangement of openings, it may also consist of an irregular series of openings, like those in fritted glass.[7] Defendant's construction would not include an irregular series of openings contemplated by the patent.

Plaintiff's construction is also consistent with the way the patentee used the term in the '376 Patent, which at column 7, lines 8 through 10 states: "The permeable support 140 can define one or more openings (e.g., an array of openings) to allow for fluid flow from the permeable membrane 130 to the reservoir 110." This is extrinsic evidence to the '508 Patent, but it is evidence of how the term is used and understood by those of skill in the art.

---

5   *See Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005).

6   ('508 Patent at 3: 38-44).

7   (*See* D.I. 107 Ex. 15 (porosity of a given "grade" is provided as a range of individual pore sizes:"[t]his should correlate with the average pore size of the whole frit. This also says nothing about the specific shape of the pores; some could be long and narrow, with the same functional aperture as those that are closer to round."))

Defendant's argument that Plaintiff's construction renders the word "array" unnecessary because "openings" is already plural, and therefore implies two or more, does not change my construction. The use of the plural form indicates "more than one thing," but does not necessarily require a "grouping" of those things, which is required in my construction.

The third term is "moisture-wicking article" or "wicking material," which is in claims 1, 3 through 6, 17 through 19 of the '508 Patent, claim 9 of the '376 Patent and claims 1, 5, 7, 8, 10, and 13 through 15 of the '407 Patent. Plaintiff proposes the construction: "[a]n article that moves moisture by capillary action from one surface of the article to the other." Defendant proposes "an article that includes a permeable material with a high absorption and permeation rate, such as gauze, felt, terrycloth, thick tissue paper, and paper towel." The parties agree that the term means the same thing in all three patents. And the parties agree that the ordinary meaning of wicking includes moving moisture from one surface to another surface by capillary action.

Here, I will construe this term consistent with its ordinary meaning as "[a]n article that moves moisture by capillary action from one surface of the article to the other."

As PureWick's expert, Dr. Collins, opined in his declaration, a "wicking material refers to a material that moves liquid through it from one surface to the other instead of absorbing or trapping the liquid within the fabric's fibers."[8] Therefore, a wicking material is a permeable material that absorbs very little water into the material's fibers.[9] Similarly, Sage's expert, Dr. Newman, opined that moisture wicking articles "broadly speaking are materials that allow fluid to be transported from one area in the material to another area, e.g., via capillary action."[10]

That is the way the term is used in the patents. For example, the '376 Patent states that "The permeable membrane 130 can be configured to wick fluid away from the urethral opening and/or the skin of the user."[11]

---

[8]  (D.I. 107 Ex. 17 at ¶ 37).

[9]  (*Id.*)

[10]  (*Id.*)

[11]  ('376 Patent at 6:28-30).

8

I reject Sage's construction that includes absorption and permeation rate because it improperly conflates the property of "wicking" with the separate properties of absorption and permeation. As Dr. Collins explained, although materials can provide for wicking, absorption and permeation, these are different properties.[12] And the patents treat them as different properties.

The '508 Patent contrasts the "moisture-wicking article" of the claimed invention with a "moisture-absorbent material" disclosed in the prior art Kuntz reference.[13] The '508 Patent describes Kuntz as disclosing a "pad containing a core of moisture absorbent material," and "urine that is expelled by the person is passed into and absorbed by the moisture absorbent material."[14] The invention of the '508 Patent, however, is described as a device that draws "urine into a moisture-wicking article" and then draws the urine "into the urine collection device from the moisture-wicking article."[15]

Similarly in the '376 Patent, the specification states that "permeable membrane" that "can be formed of a material that has permeable properties with respect to liquids such as urine."[16] It states that "[t]he permeable properties," which "can be wicking, capillary action, diffusion, or other similar properties or processes," which are referred to in the patent as "'permeable' and/or 'wicking.'"[17] And although the specification notes that "[t]he permeable membrane 130 can have a high absorptive rate and a high permeation rate such that urine can be rapidly absorbed by the permeable membrane 130 and/or transported through the permeable membrane 130," a high absorptive rate and high permeation rate is not required.[18] The permeable membrane can also "be configured

---

[12]    (D.I. 107, Ex. 100 at ¶ 41).

[13]    ('508 Patent at 1:24-26 (distinguishing U.S. Patent No. 4,747,166 to Kuntz (Ex. 19))).

[14]    ('508 Patent at 1:15-24; *see also* D.I. 107 Ex. 19 at 2:48-51).

[15]    ('508 Patent at 1:53-59).

[16]    ('376 Patent at 6:12-14).

[17]    (*Id.* at 6:14-17).

[18]    (*See also* '376 Patent at 35:39-42 ("For example, the permeable support 2840 can have an exterior surface with wicking properties, a high absorptive rate, **and/or** a high permeation

9

to wick fluid away from the urethral opening and/or the skin of the user such that the dampness of the skin of the user is lessened and infections are prevented."[19]

Finally, the '407 Patent also describes the "wicking material" as a material through which liquid moves. For example, claim 1 discloses "a receptacle . . . configured to draw urine flowing from said penis through the flexible wicking material and the porous material into the chamber." Likewise, the specification states that the "urine . . . can be drawn through the wicking material and the porous material into the chamber."[20] The '407 Patent says nothing about absorption and permeation.

The fourth term is "secured over the array of openings," which appears in claims 1, 3, 17 and 18 of the '508 Patent. Plaintiff proposes the construction "attached over the array of openings." Defendant proposes the term means "held in place over the array of openings."

The crux of the dispute is whether the moisture-wicking article must be secured before it is deployed. Here, I will construe the term to mean "held in place over the array of openings" with the clarification that it must be held in place before it is deployed and independent of deployment.

This is supported by the intrinsic evidence. For example, at column 4, lines 1 through 9, the patent states that the moisture-wicking article can "be secured over the array of openings 16 by applying elastic bands 22 about the moisture-wicking," and that it "can be secured to the container by such means as spring clips, with water-resistant adhesive tape, Velcro fasteners, zippers, and snaps," or can be "in the form of a sock or sleeve that slips snugly over the container."[21]

The intrinsic evidence supports a construction that requires the securing prior to disposing or putting it by a person's body. For example, the claims of the '508 Patent first claim securing the

---

rate such that urine can be rapidly absorbed and/or transported therethrough.") (emphasis added)).

[19] (*Id.* at 6:17-33:14).

[20] ('407 Patent at 3:49-60).

[21] (*See also* '508 Patent at 3:59-67; 5:3-9; claim 18).

10

moisture-wicking article to the container and then disposing or putting the secured article in contact with the body.

The specification of the '508 Patent similarly references the secured article being disposed into contact with a person. For example, at column 3, lines 45 through 49, the patent states: "The exterior of the container 12 is configured for enabling a moisture-wicking article 20 to be secured over the array of openings 16 and for enabling the secured moisture-wicking article 20 to be disposed in contact with the region of a female body surrounding the urethral opening."[22]

Similarly at column 2, lines 15 through 22, the patent refers to a method of transporting urine in the present invention. It lists steps - step (b) is the securing step which occurs before step (c) which is placing the secured article in contact with the person.

The fifth term is "casing having [or defining] a fluid reservoir at a first end [and] . . ., a fluid outlet at a second end . . ., which appears in claims 1, 11, 13, and 14 of the '376 Patent and claim 1 of the '989 Patent. Plaintiff proposes the construction "an enclosure having [or defining] a fluid reservoir and a fluid outlet." Alternatively, Plaintiff suggests replacing "enclosure" with "an outer cover" within its construction. Defendant proposes the construction "[a] casing secures a filling [in this case a permeable support] by surrounding and enclosing it at least partially on all sides. The casing has [or defines], among other things, a fluid reservoir and a fluid outlet. A backing/impermeable layer in combination with securing portions for other components is not a casing."

Here, the parties seem to agree that the ordinary meaning of a casing is "something that encases." The crux of their dispute, however, is whether a casing as claimed must include all of the additional elements Defendant seeks to import as well as the negative limitation that a backing layer in combination with securing portions for other components is not a casing.

I agree with Plaintiff that the claim term does not require reading in the limitations (or negative limitation) Defendant proposes. And I will construe the term to mean "an outer cover having [or defining] a fluid reservoir at a first end and a fluid outlet at a second end."

---

[22] (*See also id.* at 1:64-2:3).

11

This is consistent with the words of the claims. Claim 1 of both the '376 and '989 Patents requires "a fluid impermeable casing having a fluid reservoir at a first end, a fluid outlet at a second end, and a longitudinally extending fluid impermeable layer coupled to the fluid reservoir and the fluid outlet."

Neither the claims nor the specification refer to a filling. The specification has some embodiments in which the permeable support is in the casing,[23] but the claims do not have language that requires that. Similarly, the specification references embodiments in which the casing surrounds the permeable membrane,[24] but the claims do not require that.

Finally, I will not import Defendant's proposed negative limitations into the language of the claim. "Negative limitations will generally not be added to claim terms without 'express disclaimer or independent lexicography in the intrinsic record that justifies including the negative limitation.'"[25] Here, I find no such express disclaimer or lexicography in the pieced-together different parts of the specification and prosecution that Defendant cites. Nor do I find that the portions of the specification - aside from the disclaimer require me to read in the limitation proposed if, contrary to the way I read Defendant's proposed language, it were not found to be a negative limitation.

The sixth term is "the chamber being defined at least partially by . . . the porous material and the . . . layer of impermeable material" / "the chamber being [partially] defined by a portion of the . . . porous material and a portion of the impermeable material," as appears in claims 1, 7, and 13 of the '407 Patent. Plaintiff contends that no construction is necessary. Defendant has proposed that the language be construed "[t]he chamber is defined [at least partially] by the porous material and the impermeable layer/material. A chamber is not defined by the porous material and impermeable layer/material if there are other material(s) between the porous material and impermeable layer/material."

---

[23] (*E.g.*, '989 Patent at 21:31-33 ("In some implementations , the impermeable casing 1504 can be configured to contain a permeable membrane disposed over a permeable support."); '989 Patent at 21:50-60 ("… The permeable membrane 1530 and the permeable support 1540 can be positioned within the impermeable casing ….")).

[24] (*E.g.*, *id.* at 24:51-58).

[25] *Novartis Pharm. Corp. v. Par Pharm., Inc.*, C.A. No. 14-1494-RGA, 2015 WL 7566615, at *4 (D. Del. Nov. 23, 2015).

Here, the dispute is over adding to the construction the sentence in Defendant's proposal as to when a chamber is not defined by the requisite materials which Defendant asserts is based on disclaimers during prosecution when the patentee tried to distinguish prior art references.

Here, I will construe the term to have its ordinary meaning with the clarification that to be at least partially defined by the porous material and the impermeable layer, the porous material and the impermeable layer must each touch the chamber at some point.

I do not believe the statement of disclaimer that Defendant proposes is appropriate as I think it is broader than what was discussed during the prosecution and certainly broader than anything that was clearly and unambiguously disclaimed.[26] Defendant's proposed disclaimer prohibits any other material to be between the two things defining the chamber. But as discussed during the argument today, both the Suzuki reference and the Kuntz reference had additional materials in the chamber itself that were in effect between the two parts defining the chamber. Thus, in the absence of a clear and unambiguous disclaimer supporting Defendant's proposal, I cannot accept it.

The seventh term is "a chamber [of/is void space] positioned," as appears in claims 1, 7, 9, and 13 of the '407 Patent. Plaintiff proposes that no construction is necessary. Defendant has proposed construing this language to mean "[a]n enclosed space or compartment [of void space] placed in a certain position."

I agree with Plaintiff that no construction of this language is necessary. The language is clear and unambiguous. Indeed, the term chamber is used in the '508 Patent and the parties did not seek to construe it. Defendant's proposed construction adds nothing in terms of clarity or precision; in fact, by saying it's enclosed even though there must be inlets and an outlet, it may add ambiguity. So I will not add that limitation.

---

[26] *See Continental Circuits LLC v. Intel Corp.*, 915 F.3d 788, 797 (Fed. Cir. 2019) ("To disavow claim scope, the specification must contain expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.") (internal quotation omitted); *see also Citrix Systems, Inc. v. Workspot, Inc.*, C.A. No. 18-588-LPS, 2020 WL 5634219, at *4, 7 (D. Del. Sept. 21, 2020) (requiring "clear and unambiguous disclaimer of claim scope").

And finally, we have "opening of the cavity" in claim 7 of the '407 Patent. Plaintiff asserts that it means "opening." Defendant asserts that it is indefinite because the term lacks antecedent basis.

The parties agree that there is no antecedent basis to the term as written. But Plaintiff asks me to correct the claim to remove the reference to "the cavity" which would address the lack of antecedent basis. I am not at this point on the record before me prepared to conclude that correction is not subject to reasonable debate based on a review of the specification and the claim language and the prosecution history.

That being said, for a claim to be held invalid for indefiniteness, there must be clear and convincing evidence.[27]. Here, I conclude that Defendant has not met its burden to show that this is indefinite. And I will give the term its plain and ordinary meaning for now.

But I will say that should there still be a disagreement regarding the definiteness of this term in the future, Defendant may raise the issue later, if appropriate, after full fact and expert discovery.

/s/ Maryellen Noreika
The Honorable Maryellen Noreika
United States District Judge

---

[27] *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 912 n. 10 (2014) (citing *Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91, 95 (2011)).