IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PUREWICK CORPORATION, ) | |
| ) | |
| Plaintiff/Counterclaim Defendant, ) | **Redacted - Public Version** |
| ) | |
| v. ) | C.A. No. 19-1508-MN |
| ) | |
| SAGE PRODUCTS, LLC, ) | ███████████████ |
| ) | |
| Defendant/Counterclaim Plaintiff. ) | |

**PUREWICK'S ANSWERING BRIEF IN OPPOSITION TO SAGE'S
MOTIONS FOR SUMMARY JUDGMENT**

OF COUNSEL:
Steven C. Cherny
Brian P Biddinger
Matthew A. Traupman
Nicola R. Felice
Jason C. Williams
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Ave., 22nd Floor
New York, NY 10010

Athena Dalton
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400

Dated:  October 20, 2021

John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
David M. Fry (No. 5486)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
dfry@shawkeller.com
*Attorneys for Plaintiff*

## TABLE OF CONTENTS

Page

I.    SUMMARY OF THE ARGUMENT ...................................................................................1

II.   SAGE'S MOTIONS FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT SHOULD BE DENIED ...........................................................................2

    A.    The PrimoFit Infringes The Asserted '407 Patent Claims.......................................2

    B.    The PrimaFit Infringes The Asserted '508 Patent Claims.......................................4

        1.    The PrimaFit Includes a Closed Container ...................................................5

        2.    The PrimaFit Product Includes a Moisture-Wicking Article.......................7

    C.    The PrimaFit Infringes The Asserted '376 and '989 Patent Claims........................9

        1.    The PrimaFit Has a Fluid Reservoir That is Distinct From and Proximate To the Fluid Permeable Support.................................................10

        2.    There Is Substantial Evidence of Infringement of the '989 Claims..........12

III.  SAGE'S MOTIONS FOR SUMMARY JUDGMENT OF INVALIDITY SHOULD BE DENIED ................................................................................................14

    A.    The Asserted Claims of the '989 and '376 Patents Are Not Invalid ....................14

        1.    There Are Genuine Issues of Disputed Fact Concerning the Priority Date of the Asserted Claims of the '376 and '989 Patents..........15

        2.    There Are Genuine Issues of Disputed Fact Concerning Sage's Alleged Prior Use or Sale Defense ............................................................19

    B.    Claim 7 of the '407 Patent Is Not Invalid .............................................................22

IV.   SAGE'S MOTION FOR SUMMARY JUDGMENT OF NO WILLFUL INFRINGEMENT SHOULD BE DENIED ......................................................................23

V.    SAGE'S MOTION FOR SUMMARY JUDGMENT ON PUREWICK'S DAMAGES CLAIM SHOULD BE DENIED..................................................................26

    A.    PureWick Is Entitled to Pre-Suit Damages...........................................................26

    B.    PureWick Is Entitled to Lost Profits .....................................................................28

        1.    There Is A Genuine Dispute Regarding The Existence of Non-Infringing Alternatives..............................................................................28

        2.    Dr. Leonard's "But-For Analysis" is Legally Proper ...............................31

VI.   CONCLUSION...............................................................................................................31

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*Am. Med. Sys. Inc. v. Med. Eng. Corp.*,
  6 F.3d 1523 (Fed. Cir. 1993)..........................................................................27

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*,
  No. 3:01-CV-0485, 2013 WL 3773836 (M.D. Pa. July 17, 2013) .........................30

*Barry v. Medtronic, Inc.*,
  914 F.3d 1310 (Fed. Cir. 2019)................................................................14, 21

*Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*,
  C.A. 15-152-RGA, 2018 WL 4691047 (D. Del. Sept. 28, 2018) .........................32

*Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
  567 F.3d 1314 (Fed. Cir. 2009)......................................................................29

*In re Downing*,
  754 F. App'x 988 (Fed. Cir. 2018) .................................................................22

*Eko Brands, LLC v. Adrian Rivera Maynez Enterprises, Inc.*,
  946 F.3d 1367 (Fed. Cir. 2020)......................................................................24

*Energizer Holdings, Inc. v. Eveready Battery Co., Inc.*,
  435 F.3d 1366 (Fed. Cir. 2006)......................................................................22

*Gyromat Corp. v. Champion Spark Plug Co.*,
  735 F.2d 549 (Fed. Cir. 1984)........................................................................31

*Hologic, Inc. v. Minerva Surgical, Inc.*,
  325 F. Supp. 3d 507 (D. Del. 2018)................................................................26

*Honeywell Intern., Inc. v. Hamilton Sundstrand*,
  166 F. Supp. 2d 1008 (D. Del. 2001)..........................................................28, 29

*Intuitive Surgical, Inc. v. Auris*,
  C.A. 18-1359-MN, 2021 WL 3033396 (D. Del. July 19, 2021)............................26

*Invitrogen Corp. v. Biocrest Mfg., LP*,
  424 F.3d 1374 (Fed. Cir. 2005)......................................................................21

*Izumi Prods. Co. v. Koninklijke Philips Elecs. N.V.*,
  315 F. Supp. 2d 589 (D. Del. 2004)................................................................30

*Koninkliikje Philips NV v. Zoll Medical Corp.,*
    656 Fed. Appx. 504 (Fed. Cir. 2016) ................................................................. 13

*Lam, Inc. v. Johns-Manville Corp.,*
    718 F.2d 1056 (Fed. Cir. 1983) ......................................................................... 30

*Maxwell v. J. Baker, Inc.,*
    86 F.3d 1098 (Fed. Cir. 1996) ........................................................................... 27

*Mfg. Resources Int'l, Inc. v. Civiq Smartscapes, LLC,*
    397 F. Supp. 3d 560 (D. Del. 2019) .................................................................. 28

*Micro Chem., Inc. v. Lextron, Inc.,*
    318 F.3d 1119 (Fed. Cir. 2003) ................................................................... 29, 30

*Nintendo of America, Inc. v. iLife |Techs. Inc.,*
    717 Fed. Appx. 996 (Fed. Cir. 2017) ................................................................ 19

*On-Line Tech. v. Bodenseewerk Perkin-Elmer,*
    386 F.3d 1133 (Fed. Cir. 2004) ......................................................................... 11

*In re Owens,*
    710 F.3d 1362 (Fed. Cir. 2013) ......................................................................... 16

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.,*
    843 F.3d 1315 (Fed. Cir. 2016) ......................................................................... 13

*PowerOasis, Inc. v. T-Mobile USA, Inc.,*
    522 F.3d 1299 (Fed. Cir. 2008) ......................................................................... 17

*Purdue Pharma v. Faulding, Inc.,*
    230 F.3d 1320 (Fed. Cir. 2000) ......................................................................... 19

*SRI Int'l, Inc. v. Cisco Sys., Inc.,*
    --- F.4th ---, 2021 WL 4434231 (Fed. Cir. Sept. 28, 2021) .............................. 24

*Sunovion Pharms. Inc. v. Dey Pharma., L.P.,*
    C.A. 06-113-LPS, 2011 WL 6367749 (D. Del. Dec. 7, 2011) ............................ 30

*Symantec Corp. v. Computer Assocs. Int'l, Inc.,*
    522 F.3d 1279 (Fed. Cir. 2008) ......................................................................... 13

*Toshiba Corp. v. Imation Corp.,*
    681 F.3d 1358 (Fed. Cir. 2012) ......................................................................... 13

*TP Labs. v. Professional Positioners, Inc.,*
    724 F.2d 965 (Fed. Cir. 1984) ........................................................................... 21

*Trading Techs. Int'l, Inc. v. eSpeed, Inc.,*
    595 F.3d 1340 (Fed. Cir. 2010)..................................................................................... 16

*TWM Mfg. Co., Inc. v. Dura Corp.,*
    789 F.2d 895 (Fed. Cir. 1986)....................................................................................... 29

*Vas-Cath, Inc. v. Mahurkar,*
    935 F.2d 1555 (Fed. Cir. 1991)..................................................................................... 23

*W.R. Grace & Co.-Conn. v. Intercat, Inc.,*
    60 F. Supp. 2d 316 (D. Del. 1999)................................................................................ 31

*WBIP, LLC v. Kohler Co.,*
    829 F.3d 1317 (Fed. Cir. 2016)..................................................................................... 26

*Zimmer Surgical, Inc. v. Stryker Corp.,*
    365 F. Supp. 3d 466 (D. Del. 2019)................................................................... 24, 26, 31

## Statutes and Rules

35 U.S.C. § 112................................................................................................... 16, 19, 23

PureWick Corporation ("PureWick" or "Plaintiff") respectfully requests that the Court deny Sage Product LLC's ("Sage") motions for summary judgment.

## I.   SUMMARY OF THE ARGUMENT

Instead of focusing its motion on issues that arguably could be resolved on summary judgment, Sage submitted an indiscriminate collection of grounds hoping the Court will do the work of wading through its brief to find any worthy of consideration.  But none of Sage's motions meet that criteria.  Instead, much like Sage's expert reports, they are premised on previously rejected claim constructions, newly minted erroneous claim constructions, incorrect application of the law and a host of disputed material facts.  Remarkably, although the Court rejected every single claim construction proposed by Sage, Sage still contends that it is entitled to summary judgment of non-infringement on all four asserted patents.  But applying the Court's actual constructions and the plain and ordinary meaning of the claims, and viewing the facts in the light most favorable to PureWick, Sage's motions for summary judgment of non-infringement all should be denied.

Sage's motion for summary judgment of invalidity of the '376 and '989 patents based on alleged prior use or sale of PureWick prototype devices is also premised on facts that genuinely are in dispute.  PureWick has presented substantial evidence through its technical expert, Mr. Jezzi, that the asserted claims are entitled to a priority date that pre-dates the alleged prior use and sale relied on by Sage.  Moreover, the facts relating to the alleged prior use and sale also are in dispute. Sage fails to show that there was a prior sale of a prototype that included all of the elements of the asserted claims, and ignores the facts showing that PureWick's alleged "prior use" of prototypes was experimental.  These genuine factual disputes preclude summary judgment.

Sage's motion for summary judgment of invalidity of '407 patent claim 7 for indefiniteness and lack of written description should likewise be denied.  As set forth in Mr. Jezzi's report, the claim clearly apprises one of ordinary skill in the art of its scope and, therefore, is not indefinite.

And the claim is supported by the description in the specification.

Finally, there are genuine factual disputes that, when viewed in the light most favorable to PureWick, mandate denial of Sage's motions on willful infringement and damages. In particular, there is substantial evidence of Sage's willfulness that goes far beyond mere knowledge of the asserted patents, including evidence of intentional copying by Sage; PureWick's marking has been continuous throughout the damages period; there is a genuine dispute concerning the existence of non-infringing alternatives that precludes Sage's request for summary judgment of no lost profits; and PureWick's expert opinion on lost profits is consistent with the law.

## II.    SAGE'S MOTIONS FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT SHOULD BE DENIED

### A.    The PrimoFit Infringes The Asserted '407 Patent Claims

Sage contends it is entitled to summary judgment of non-infringement of the '407 patent because, according to Sage, the material PureWick alleges is the claimed wicking material "is not 'a wicking material' and does not satisfy the Court's construction." D.I. 204 at 3. Sage merely asks the Court to accept Sage's factual assertions as true and ignore all evidence to the contrary.

PureWick's expert, Dr. John Collins,[1] opined, based on his expertise and the evidence cited in his report, that ▮▮▮▮▮▮▮▮▮▮ in the Sage PrimoFit device is a wicking material. D.I. 210, Ex. 30 ¶238. Dr. Collins relied on multiple Sage documents, including those stating that the PrimoFit device has ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ Ex. 105; *see also id.* at Ex. 106 ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ ). Sage *argues* that these documents "do not discuss the accused ▮▮▮▮▮ material." D.I. 204 at 3. Sage fails, however, to address the fact that the documents

---

[1]    Dr. Collins has a PhD in Mechanical Engineering from MIT, and decades of experience in medical device design and development. Sage does not dispute his qualifications as an expert.

reference █████████████████████████████████████████████

████████████████████████████████. *See* D.I. 210, Ex. 31 ¶198.  Sage's

argument devolves down to a request that the Court, not the jury, decide that Dr. Collins' opinion

is incorrect and, perhaps more importantly, that its own documents ████████████████

███████████ cannot be credited.

Sage's documents describe the ████████████████████████████████

████████████████████ D.I. 211, Ex. 56.  Sage largely ignores this admission, stating only that

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████ D.I. 204 at 3.  But a material with a ████████████████████████.  As

Dr. Collins explained, when a material is ████████████████████████, the pores

in the material are small enough to create capillary forces that will transport between the pores.

D.I. 210, Ex. 31 ¶199.  He thus concluded that the ████████████████████ in the PrimoFit

product wicks fluid, consistent with Sage's own documents, because moisture will wet the fibers

and then move through the material by way of capillary action in the various pores throughout the

material.[2]  *Id.*  Dr. Collins relied on his expertise as well as patents and public documents, which

explained the wicking properties of ████████████████████.  *See id.*; *see also, e.g.*, Ex. 107

at 4:53-57 ("The hydrophilic coating 150 wicks liquids off the surface 137 and into the upper layer

135, thereafter the liquids travel by capillary action through the upper layer 135 and into the

absorbent layer 145.").

---

[2]  Mr. Jezzi similarly opined in his reply report that the PrimoFit ████████████████ would have
"fiber interstices with resulting cavities (pores)," and that ████████████████████████
████████████████████████████████ fluids will wick through the pores by
capillary action through the pores.  D.I. 210, Ex. 34 ¶¶6-14.

Sage does not confront or dispute any of Dr. Collins' analyses or the evidence he cited, and never has offered a contrary opinion concerning the effect of the ███████████████ on the wicking properties of the ███████ material. Instead, Sage hinges its entire argument that the ████████ material does not wick on its own expert's "testing" of the material. D.I. 204 at 4. That is not a basis for summary judgment, but an argument to be made at trial. And as PureWick's experts, Dr. Collins and Mr. Jezzi,[3] opined, Mr. Sheldon's test was flawed and was not determinative of the wicking properties of the material. D.I. 210, Ex. 31, ¶¶194-197; Ex. 34, ¶¶12-14. Indeed, the most that Mr. Sheldon could conclude from his testing is that the ████████ material allegedly does not wick *in the vertical direction*. As Mr. Jezzi explained, however, "[a] material may still wick even if a vertical wicking test does not make this apparent." *Id.* at Ex. 34, ¶12. Moreover, neither the claims nor the Court's construction require vertical wicking.[4] Instead, all that is required is the movement of moisture by capillary action from one surface of the article to the other. D.I. 128 at 1-2. PureWick has provided substantial evidence that the PrimoFit material is a wicking material, and accordingly, Sage's motion for summary judgment should be denied.

## B.    The PrimaFit Infringes The Asserted '508 Patent Claims

Sage moves for summary judgment of non-infringement of the '508 patent based on its assertion that the PrimaFit does not include a "closed" container and that PureWick allegedly failed

---

[3]  Rick Jezzi has a bachelor of science degree in chemical engineering and more than 30 years of experience designing and developing incontinence products. Sage does not dispute his qualifications as an expert.

[4]  Mr. Jezzi explained that, in the PrimoFit product, wicking in the horizontal direction is actually "more important to the operation of the device . . . because the device is designed so that urine is drawn quickly through the ████████ layer to the layer underneath where it is distributed before being drawn into the chamber below." D.I. 210, Ex. 34 at ¶14. Mr. Jezzi thus tested the horizontal wicking capabilities of the ████████ material and concluded that it "wicks not only from one surface of the ███████ fabric to the other in the 'Z' direction, but through the pores created by the interstices of the ██████████ ███████ fibers." *Id.* ¶33; *see also id.* ¶¶25-26, 29, 30, 32.

4

to show that the PrimaFit has a "moisture-wicking article."  Both arguments are premised on interpretations that are inconsistent with the Court's claim construction Order.[5]  And once again, Sage simply ignores the documentary evidence and expert testimony demonstrating infringement.

### 1.    The PrimaFit Includes a Closed Container

Sage contends that the PrimaFit "does not meet the 'closed' limitations" of claims 1 and 18 because there allegedly are "multiple gaps in the device" apart from the array of openings and outlet port.  D.I. 204 at 5.  This argument, however, merely rehashes Sage's rejected claim construction position.  In construing the "container is closed" limitation, the Court rejected Sage's proposed construction requiring that "[t]he only openings on the container are the array of openings and the outlet port(s); the container has no other openings."  D.I. 128 at 5.  Instead, the Court explained that it was "not concluding that the array of openings must be the only openings in the container rather than allowing them to be a sub-group through which all liquid enters the container because that would be inconsistent with the embodiment of the porous glass which has pores other than those through which urine passes."  *Id.* at 6.  As PureWick's expert explained in his report, the alleged openings that Sage identified are either part of the outlet port, or are not openings through which liquid enters or exits the PrimaFit.  Thus, the PrimaFit has one way for liquid to go in (through the array of openings), one way for liquid to go out (through the outlet port), and it holds liquid, as required by the Court's construction.  D.I. 210, Ex. 30 at Ex. D, p. 8; *see also* D.I. 210, Ex. 31 ¶¶37-39, 48-54.

Sage argues there are ████████████████████████████ through which fluid may go in or out.  D.I. 204 at 7.  First, this is a factual issue for the jury to assess.  And,

---

[5]  Sage's unwillingness to accept the Court's constructions permeate the case and have multiplied the issues the Court needs to address at the SJ and Daubert stages of the case.  *See* D.I. 190, 191.

importantly, Sage conceded during claim construction, and the Court specifically found, that "the container need not be airtight or sealed and that breaks in the surface are allowed."  D.I. 127 at 27:14-16, 119:18-20.  The PrimaFit device is not configured to allow for fluid to enter or exit ████████████.  D.I. 210, Ex. 31 ¶¶38-39, 52.  Indeed, Sage merely argues that liquid *could* enter or exit ████████████, but it provides no evidence of that ever occurring.  It certainly is not consistent with Sage's product design.  Sage's own documents represent that ██████████ ████████████████████████, which would not be the case if it were designed for liquid to enter or exit through the ████████████.  *See* Ex. 108 at SAGE00039813 (██ ████████████████████);  ██████████████████████████████ ████).  Sage asks the Court to grant summary judgment of noninfringement based on an unsupported factual argument that its device could operate in an unintended and, frankly, undesirable manner.

Sage also argues that the PrimaFit has ████████ at one end of the device, ████████ ████████."  D.I. 204 at 6.  This was discussed during the *Markman* hearing and was the focus of Sage's claim construction argument that the Court rejected.  D.I. 127 at 20:2-8 ("It has an outlet port, it has an array of openings, but it has additional openings other than the outlet port . . . ████████████████.").  The Court has already concluded that the container need not be airtight.  ████████████████ ████████████████ are not openings through which fluid enters or exits the PrimaFit.  D.I. 210, Ex. 31 ¶51.  ████████████████ are within the outlet port at the end of the device.  Dr. Collins opined that the outlet of the container is formed by the ████████ through which the tubing passes.  D.I. 210, Ex. 30 at Ex. D, p. at 8.  Thus ██ ████ are within the outlet port through which the tube passes to allow urine to be drawn away from the chamber.  D.I. 210, Ex. 31 ¶51; D.I. 210, Ex. 32 at 113:15-115:8.

6

Finally, Sage argues that the container is not closed because openings "exist on the bottom and other surfaces of the batting" that "are also capable of having fluid come in and out."  D.I. 204 at 7.  Those openings on other surfaces of the batting, however, are covered by the ████████ ████████.  Thus, fluid cannot enter or exit the PrimaFit container through these other surfaces. D.I. 210, Ex. 31 ¶¶47-53.  Fluid goes into the PrimaFit through the array of openings covered by the wicking material, not through the bottom of the batting that is covered by the casing within which the batting sits.  The claims do not require that each individual component of the container be closed, but only the container as a whole.  Unsurprisingly, the ████████████████ ████████████ are assembled together to form the claimed container, which has one way for liquid/urine to come in (through the array of openings in the batting material) and one way for liquid/urine to go out (through the outlet port).  D.I. 210, Ex. 30 at Ex. D, p. 8.

Sage's motion for summary judgment, which is premised on rejected claim construction arguments and disputed facts, should be denied.

## 2.    The PrimaFit Product Includes a Moisture-Wicking Article

Sage asserts that PureWick has failed to show that the PrimaFit product has a "moisture-wicking article," as required by the claims of the '508 patent.  D.I. 204 at 8.  As set forth in PureWick's motion for summary judgment of infringement, however, PureWick has presented undisputed evidence that the PrimaFit includes a wicking material under the Court's construction. *See* D.I. 191 at 15-17.  For example, Sage's own documents admit that ████████████████ ████████████████████████████████████████████████████████  D.I. 191-9 at 10. There is also evidence that ████████████████████████████ ████████████████████.  *Id.*; D.I. 191-10; D.I. 191-11 at 1-2.  Sage, apparently, has taken the novel strategy of trying to fend off summary judgment by ignoring its own documents and moving affirmatively for summary judgment on an issue for which there is no legitimate

dispute.  Sage's admissions not only suffice to defeat Sage's motion, but they are unrebutted and thus, support a finding of summary judgment in PureWick's favor.

Faced with overwhelming evidence from its own documents establishing the wicking properties of the PrimaFit material, Sage resorts to a mischaracterization of the Court's claim construction in an effort to manufacture a non-infringement defense.  Specifically, Sage argues that the fabric in the PrimaFit is ████ and that under the Court's construction an absorbent material cannot be a wicking material.  D.I. 204 at 8.  ***This was not the Court's construction.***  The Court did not construe the term "moisture-wicking article" to exclude materials that also are absorbent.  Rather, the Court recognized that there is a distinction between the ***properties*** of wicking and absorption, and that it was thus improper to construe wicking with reference to the property of absorption as Sage proposed.  D.I. 128 at 9.  The fact that wicking and absorption are separate properties of fabrics does not make them mutually exclusive.  The Court's construction was consistent with PureWick's expert, who opined that "a material may be capable of both absorption and wicking," even though "the wicking properties of a material [are] distinct from the permeation rate or the absorption rate of that material."  D.I. 107-6 ¶50; *see also* D.I. 107-6 ¶41; D.I. 210, Ex. 31 ¶¶9-13.[6]  Similarly, the Court's order recognized that "***materials can provide for wicking, absorption and permeation***."  D.I. 127 at 124:6-9 (emphasis added).  The Court's statement in that regard came directly from the '508 patent, which itself recognizes that a moisture-wicking article can be both absorbent and wicking.  *See* '508 patent, 4:10-15.  Indeed, contrary to Sage's summary judgment motion, Sage's own expert opined that "████████████ ████████████████████████."  D.I. 209, Ex. 25 at 5.  Sage's attempt

---

[6]  PureWick's counsel also made clear at the Markman hearing that no one was saying that wicking materials cannot also be absorbent.  D.I. 127 at 45:20-46:17.

to distort the Court's construction to exclude absorbent materials should be rejected.[7]

Sage also argues that PureWick failed to show that the fabric in the PrimaFit meets the Court's construction because PureWick's expert relies on a Sage document that describes the PrimaFit fabric as ███████████████." D.I. 204 at 8. Sage ignores, however, that Dr. Collins relies on the fact that the document states that ████████████████████████████████████

████████████████████████████████████." D.I. 191-12. With respect to Sage's own testing of the material, Dr. Collins explained how ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████." D.I. 210, Ex. 30 ¶195, n.5. Moreover, Sage ignores the numerous other documents relied on by Dr. Collins establishing that the PrimaFit has a "moisture wicking article." *See id.* ¶195; *Id.* at Ex. 31 ¶¶9-28.

Because Sage's only argument on this element is based on an erroneous application of the Court's construction of "moisture-wicking article," Sage's motion should be denied.

### C.    The PrimaFit Infringes The Asserted '376 and '989 Patent Claims

Sage also moves for summary judgment of non-infringement of the '376 and '989 patents. For the '376 patent, it claims that the PrimaFit lacks a reservoir that is distinct from and proximate to the fluid permeable support. D.I. 204 at 9-10. For the '989 patent, Sage argues that "[b]y failing to prove direct infringement, PureWick [also] failed to prove indirect infringement." *Id.* at 11. These assertions are based on a belated and erroneous claim construction argument, disputed facts,

---

[7]   Such clear misinterpretation of the Court's constructions unnecessarily magnifies the work of both the Court and the opposing party and should be actively discouraged. Indeed, Sage's argument that absorbent materials cannot be wicking materials is impossible to reconcile with the opinions of Sage's own experts, who repeatedly opine that absorbent materials in the prior art constitute wicking materials. *See, e.g.*, D.I. 208, Ex. 20 ¶62 (identifying absorbent material as a "moisture-wicking material"), ¶198 (same), ¶253 (same); D.I. 209, Ex. 23 at 156 (same).

and a misunderstanding of what the law requires to prove infringement.  Again, PureWick's

evidence suffices, at a minimum, for Sage's summary judgment motion to be denied.

### 1.    The PrimaFit Has a Fluid Reservoir That is Distinct From and Proximate To the Fluid Permeable Support

Sage argues that the permeable support in the PrimaFit is not distinct from and proximate

to the fluid reservoir because it extends partially inside the cap that provides the fluid reservoir.[8]

*Id.*  This argument is specious, ignores the plain meanings of the claim terms and impermissibly

reads the disclosed embodiments out of the '376 and '989 patents' asserted claims.

Contrary to Sage's argument, Sage's own expert has conceded that the permeable support

in the PrimaFit is proximate to the reservoir.  D.I. 191-7 at 202:24-25 ("███████████

█████████████████").  Indeed, the fact that the permeable support extends partially inside

the fluid reservoir cap does not mean it is not proximate to and distinct from the reservoir any more

than inserting a hand partially in a glove would render it not proximate to or distinct from the

glove.  As shown in the annotated figure below from Dr. Collins' report, the PrimaFit casing

includes an end cap that provides a fluid reservoir (shaded green) for collecting urine.



D.I. 210, Ex. 30 at Ex. E, p. 3.  The fluid reservoir is plainly proximate to (*i.e.*, near) and distinct

(*i.e.*, distinguishable) from the batting material that forms the permeable support.  *See* Exs. 109

---

[8]    Sage did not contend in its interrogatory responses that this element was not met during fact discovery and, thus, Sage should not be permitted to advance this theory at all, let alone in a motion for summary judgment.  *See* D.I. 191-2 at 19-20.

and 110.  Notably and importantly, the arrangement of the permeable support and reservoir in the PrimaFit is the same as the arrangement of these structures in the embodiments disclosed in the '376 patent.[9]  For example, Figures 34-35 show a casing with a fluid reservoir 1810.  *See* '376 patent at 25:28-36.  The device includes a permeable support 1840 made of spun plastic that is rolled into a tube and inserted into the top end of the casing.  *Id.* at 25:42-47.  The reservoir 1810 is then "pulled around the opposite end of the tubing 1821, the permeable support 1840, and the permeable membrane 1830."  *Id.* at 26:6-10.  Similarly, Figures 36-37 show a casing where the reservoir is provided by a flexible cap 1710 and there is a permeable support 1740 made of spun plastic that is rolled into a tube.  *Id.* at 26:65-27:2.  To assemble the device, "[t]he permeable support [] can [] be ***inserted into the reservoir*** [] (e.g., a flexible cap)" and the rest of the casing is formed by an impermeable backing 1750 and securing portions that "secure the reservoir 1710 to the backing portion 1753."  *Id.* at 27:3-7.  In both disclosed embodiments, the permeable support extends partially into the portion of the casing that provides the fluid reservoir, but the permeable support is distinct from and proximate to the reservoir.  ***Exactly like the '376 patent embodiments***, the PrimaFit device also has a reservoir—in the end cap—which provides an empty space for collecting urine that is distinct from, yet proximate to, the fluid permeable support even though the support extends partially into the end cap.  *See* D.I. 210, Ex. 31 at Ex. E, pp. 3-4.

Sage's attempt to equate the PrimaFit with the Kuntz reference cited during prosecution is misplaced.  D.I. 204 at 9-10.  In Kuntz, what the Examiner contended was a "reservoir" (shaded blue below) was formed entirely by the permeable support ("core 34," shaded yellow below), and not by the casing (identified as 36a).  D.I. 207, Ex. 12 at PureWick_0000527.

---

[9]  "'[A] claim interpretation that excludes a preferred embodiment from the scope of the claim "is rarely, if ever, correct."'"  *On-Line Tech. v. Bodenseewerk Perkin-Elmer*, 386 F.3d 1133, 1138 (Fed. Cir. 2004) (citation omitted).



Thus, in Kuntz, there was no casing having a reservoir at least because, to the extent there was a reservoir at all, it was formed by the permeable support. *Id.* at PureWick_0000546-49. In contrast, the casing of the PrimaFit provides the reservoir as the claims require. *See* '376 claim 1 ("a fluid impermeable casing having a fluid reservoir at a first end").

There is no support for Sage's contention that the batting cannot be distinct from, yet proximate to, the reservoir if it extends partly into the structure defining the reservoir. In fact, the patent discloses otherwise. Thus, Sage's motion regarding this element must also be denied.

### 2. There Is Substantial Evidence of Infringement of the '989 Claims

Sage argues that PureWick failed to identify specific instances of direct infringement to support its infringement claims for the asserted method claims of the '989 patent and therefore, the Court should grant summary judgment of no indirect infringement. D.I. 204 at 10-11. There is, however, substantial evidence from which a reasonable jury could conclude that Sage and its customers used the PrimaFit in a way that directly infringed the '989 patent.

It is axiomatic that "[d]irect evidence of infringement, as opposed to circumstantial evidence, is not necessary" to prove direct infringement. *Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279, 1293 (Fed. Cir. 2008). The Federal Circuit has thus held that "where an alleged infringer designs a product for use in an infringing way and instructs users to use the product in an infringing way, there is sufficient evidence for a jury to find direct infringement." *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1365 (Fed. Cir. 2012). Accordingly, the Circuit Court "ha[s] affirmed induced infringement verdicts based on circumstantial evidence of

inducement (e.g., advertisements, user manuals) directed to a class of direct infringers (e.g., customers, end users) ***without requiring hard proof that any individual third-party direct infringer was actually persuaded to infringe by that material***."  *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1335 (Fed. Cir. 2016) (emphasis added); *see also Symantec*, 522 F.3d at 1293.

The evidence shows that ███████████████████████████████ and instructed its customers (e.g., hospitals) to use the PrimaFit in an infringing way.  *See, e.g.*, D.I. 210, Ex. 30 ¶¶214-228; *Id.* at Ex. 31 ¶¶175-87.  Sage has sold ████████ PrimaFit devices to hospitals.  D.I. 211, Ex. 38 at Ex. 1; Ex. 111 at 181:17-182:25.  Sage is aware the PrimaFit device ███████████████████ Ex. 111 at 185:22-186:21, 188:7-190:2.  And PureWick's expert, Dr. Collins, explained how Sage's Instructions for Use for the PrimaFit, which are printed on the packaging for the PrimaFit product, instruct customers to use the PrimaFit in a manner that infringes the asserted claims of the '989 patent.  D.I. 210, Ex. 30 ¶217 and Ex. F, pp. 1-3, 14-17; Ex. 112; Ex. 113.  This evidence suffices under Federal Circuit precedent for the jury to infer direct infringement by Sage's customers.  *See Koninkliikje Philips NV v. Zoll Med. Corp.*, 656 Fed. Appx. 504, 522 (Fed. Cir. 2016) (affirming denial of JMOL of no inducement because "for the jury to conclude that the direct infringement requirement of the contributory infringement claim was not met, it would have had to conclude that not a single one of [plaintiff's] customers in this sizable share of the market used the devices for their intended purposes.").

There also is evidence establishing ████████████████████████ ██████████.  The evidence shows, for instance, that ███████████████████████ ████████████████████████.  D.I. 210, Ex. 31 ¶¶181-83.  It also shows that ████ ████████████████████████████████████████████

13

███████████████████████████████.  *Id.*  Sage argues that this evidence does not involve activity after the '989 patent's issue date, and thus, is irrelevant.  Sage is wrong as a matter of law.  Evidence of pre-issuance infringement can be relevant to proving that activity done after the patent issues also constitutes infringement.  *See Barry v. Medtronic, Inc.*, 914 F.3d 1310, 1336 (Fed. Cir. 2019) (finding sufficient proof of inducement after patent issuance based, in part, on extensive pre-issuance training materials provided to customers).  Here, like in *Barry*, there is substantial evidence that ████████████████████████████████████████ ███████████████████████████.  *See, e.g.*, D.I. 210, Ex. 31 ¶183.

Finally, Sage attempts to distract from PureWick's evidence by arguing that PureWick allegedly failed to show that a single entity performed every step of the method.  But PureWick never has alleged that "various unrelated parties and actors that do not act in concert" perform the methods.  D.I. 204 at 12.  PureWick has always asserted that Sage, healthcare providers, *or* patients *each* perform every step of the claimed method when using the PrimaFit product in accordance with Sage's instructions for use.  PureWick's assertion is supported by those instructions, which direct the same individual to place the PrimaFit product and attach it to the vacuum source.

The cited evidence showing Sage's specific instructions to third parties to infringe PureWick's method claims suffices to deny Sage's motion on this issue.

## III.  SAGE'S MOTIONS FOR SUMMARY JUDGMENT OF INVALIDITY SHOULD BE DENIED

### A.    The Asserted Claims of the '989 and '376 Patents Are Not Invalid

Sage moves for summary judgment of invalidity based on the alleged prior use or sale of certain PureWick prototype devices.  As set forth in PureWick's pending motion to exclude portions of the opinions of Donald Sheldon (D.I. 193, 194), Sage's invalidity theories based on PureWick prototypes were not timely disclosed pursuant to the Court's orders and should be

14

excluded.  If, however, the Court does not exclude these untimely theories, Sage's motion should be denied because there are genuine issues of disputed fact that preclude summary judgment.

### 1. There Are Genuine Issues of Disputed Fact Concerning the Priority Date of the Asserted Claims of the '376 and '989 Patents

Sage's motion should be denied at a minimum because there is a genuine material factual dispute about the priority date of the '376 and '989 patents.  If PureWick is correct regarding the priority dates of these patents then Sage cannot meet its high burden of establishing invalidity. The disputed issue here relates to what PureWick's earlier provisional applications disclose to a person of skill in the art.  That is a factual issue.  And PureWick's expert, Mr. Jezzi, demonstrated on an element-by-element basis how each of the asserted claims is supported by the description in, and thus entitled to the priority dates of, at least two earlier filed provisional applications – application no. 61/955,537 filed on March 19, 2014 (the "March 2014 Application") and application no. 62/084,078 filed on November 25, 2014 (the "November 2014 Application").  D.I. 206, Exs. 5 and 6.  Both the March and November 2014 priority dates pre-date the alleged prior use or sale relied on by Sage.  D.I. 204 at 15.  Although Sage disputes PureWick's entitlement to these priority dates, that is a dispute that cannot be resolved on summary judgment.  Viewing the evidence in the light most favorable to PureWick, Sage's motion must be denied.

Claims may benefit from the filing date of a provisional application "if the provisional application provided adequate written description under 35 U.S.C. § 112, ¶ 1."  *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1359 (Fed. Cir. 2010).  Although the entitlement to priority is ultimately a question of law, "[w]hether a claimed invention is supported by an adequate written description under § 112, ¶ 1, is a question of fact."  *In re Owens*, 710 F.3d 1362, 1366 (Fed. Cir. 2013); *see also Trading Techs.*, 595 F.3d at 1359 (affirming denial of summary judgment on priority issue and affirming jury verdict finding that claims were "entitled to claim priority to

the provisional application"). "The test for sufficiency of the written description [is] 'whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date.'" *In re Owens*, 710 F.3d at 1366. At a minimum, Mr. Jezzi's well-reasoned analysis of this issue raises a genuine issue of fact as to whether the disclosure of the provisional applications conveys to a person skilled in the art that the inventors possessed the claimed subject matter as of March 2014, or November 2014 at the latest. D.I. 210, Ex. 33 ¶¶1187-95, 1202-22, 1231-1434.

The only claim element Sage even argues was not disclosed in the March 2014 or November 2014 Applications is a "fluid impermeable casing." D.I. 200 ¶¶27-28.[10] Mr. Jezzi, however, showed exactly where and how the earlier applications disclosed a fluid impermeable casing. D.I. 210, Ex. 33 ¶1233 ("The apparatus described by the '537 application has a fluid impermeable casing, which is formed by the impermeable layer, the first end cap, and the second end cap."), ¶1333 ("The '078 application describes a device with a fluid impermeable casing. Specifically, the casing is the 'backing of non-permeable material 43,' which 'covers a portion of the web [of spun plastic fibers] 42.'").[11] In fact, Sage admits that the November 2014 application discloses a device that "used spun plastic ***with a covering***." D.I. 204 at 19, n.11 (emphasis added). Consistent with the Court's construction of casing to mean "an outer cover," the "non-permeable material covering" over the spun plastic in the November 2014 application is a fluid impermeable casing. D.I. 206, Ex. 6 at PureWick_0006793; D.I. 210, Ex. 33 ¶1333.

Rather than directly address the disclosures of the provisional applications, or Mr. Jezzi's

---

[10] As set forth in PureWick's Response to Sage's SOF, these alleged facts are disputed.

[11] The fact that these applications did not use the word "casing" is irrelevant as it is well established that "a prior application need not contain precisely the same words as are found in the asserted claims." *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1306 (Fed. Cir. 2008).

opinions, Sage incorrectly argues that "Ray Newton admitted that he and Forehand did not invent the idea of a casing until 2016, and they added that new concept of a casing (called a "shell" at that time) into an entirely new and independent PureWick patent application filed in June 2016." D.I. 204 at 19-20.  Mr. Newton did *not* testify that they did not invent the use of "a casing" until June 2016.  Rather, he testified that the June 2016 application disclosed the use of a silicon *shell*. As Mr. Forehand explained, his contribution to the June 2016 application was the development of an injection molded silicon shell made from "a single piece of silicon." D.I. 211, Ex. 45 at 133:24-134:25, 139:1-16, 145:2-21.  *A silicon shell is merely one embodiment of a casing*, which is claimed in, e.g., unasserted dependent claim 2 of the '376 patent.[12]  '376 patent at 36:37-38 ("wherein the casing is integrally formed of a polymer material.").  PureWick, however, invented the use of a casing long before the June 2016 application and disclosed it in the March 2014 and November 2014 Applications.  Sage's attempt to limit the claimed fluid impermeable casing to the silicon shell in the June 2016 application is simply a re-hashing of the same argument Sage made during claim construction that the Court rejected.  D.I. 105 at 55-58; D.I. 127 at 75:20-76:4.

Sage also argues that the Patent Office "already found during prosecution (twice) that the asserted subject matter was not entitled to a priority date earlier August 29, 2016." D.I. 204 at 20-21.  This is incorrect and, regardless, any such purported statement of the PTO is not binding on this Court or the jury who will apply the claims as construed by the Court in this case to the provisional applications in assessing the issue of priority.  The Examiner of the '989 patent

---

[12] Sage argues that the '376 and '989 patents are not entitled to the provisional priority dates because those applications, unlike the '376 and '989 patents, do not identify Joseph Forehand as an inventor.  D.I. 204 at 19.  But the law does not require that every inventor on a patent contribute to every claim.  The evidence shows that Mr. Forehand contributed to at least dependent claim 2, even if he may not have contributed to claim 1.  Regardless, Mr. Forehand's contributions to which specific claims also is a factual issue for the jury to decide.

provided an advisory observation (unrelated to any rejection of the claims) that the priority applications "do not support *the method* of using the claimed device." D.I. 206, Ex. 9 at PureWick_0001162 (emphasis added). In the same office action, however, the Examiner found that the pending *apparatus* claim of the '989 patent, which included a "fluid impermeable casing" as well as the other elements of the asserted claims, *was* entitled to the November 2014 priority date.[13] *Id.* at PureWick_0000950-51, 1162. Thus, contrary to Sage's argument, the Examiner found that the November 2014 application did disclose a fluid impermeable casing, the one element Sage alleges is missing from the earlier applications. Although the Examiner incorrectly, and for no apparent reason, found that the priority applications did not disclose the method of using the apparatus, Mr. Jezzi has opined that the priority applications do convey the method of using the apparatus to a person of ordinary skill. D.I. 210, Ex. 33 ¶¶1299-1300, 1411-12. The Examiner's statement concerning priority in the '989 prosecution did not apply the Court's construction of the term casing nor is it binding, particularly since it was not made as part of a rejection nor any final determination by the PTO. *See Purdue Pharma v. Faulding, Inc.*, 230 F.3d 1320, 1329 (Fed. Cir. 2000) (finding that the court is not "bound by the examiner's finding in the *ex parte* application proceeding that the new claims were supported by the specification."). At most, there is a clear factual dispute that cannot be resolved on summary judgment.

Finally, Sage incorrectly argues that "[w]hen a CIP adds new embodiments covered by the claims, this demonstrates that the original disclosure may not support the full scope of the invention as required by Section 112." D.I. 204 at 17. The fact that a patent is a CIP or adds a new embodiment, however, does not mean that its claims cannot, as a matter of law, benefit from the

---

[13]    Notably, the same Examiner did not issue any statement on the priority date in the later issued '376 patent, which included only apparatus claims. *See, e.g.*, D.I. 207, Ex. 12 at PureWick_0000126-29.

priority of a parent application.  "[T]he key question is whether the descriptive matter is present in the original application, not whether it is also present in any added disclosure."  *Nintendo of America, Inc. v. iLife Techs. Inc.*, 717 Fed. Appx. 996, 1001 (Fed. Cir. 2017).  Mr. Jezzi set forth on an element-by-element how the March 2014 and November 2014 Applications disclosed all of the elements of the asserted claims.  At a minimum, Mr. Jezzi's opinions concerning what a person of ordinary skill in the art would understand from the disclosure of the provisional applications raise material questions of fact such that Sage's motion should be denied.

### 2.    There Are Genuine Issues of Disputed Fact Concerning Sage's Alleged Prior Use or Sale Defense

If the Court finds that there are factual disputes as to whether the '376 and '989 patents are entitled to priority dates that pre-date the alleged prior uses or sales, as discussed above, then it need not consider Sage's prior use or sale arguments.  To the extent that the Court does reach this issue, however, there are disputes of fact that require denial of Sage's motion.

Sage argues that the '376 and '989 patents are invalid based on alleged prior uses or sales in 2015 of "a 'brown tape' version of its product."  D.I. 204 at 15.  Sage's expert, Mr. Sheldon, opined that a PureWick "brown tape product" anticipated the asserted claims, but he based that opinion solely on PureWick's alleged admission that a "brown tape" device practiced the inventions of the asserted claims of the '376 and '989 patents.  D.I. 209, Ex. 23 at pp. 249-52.  In his claim chart, Mr. Sheldon did not include analysis of how the claim elements allegedly read on the device, instead he repeatedly asserted that the elements were present because PureWick allegedly admitted that "the brown tape version of the PureWick FEC practiced the inventions" of the patents.  *Id.* at 250-52.  However, the specific Brown Tape product that PureWick contended practiced the asserted claims was first sold in January 2016 and differed from prior prototypes that PureWick tested using a spun fiber plastic support and tape.  *Compare, e.g.*, D.I. 209, Ex. 23, p.

250 *with* D.I. 194, Ex. 4.  As Ray Newton, one of the inventors, testified, "[w]e went through many different things we were trying on wicks" and "we assembled these, or I did, a little differently, sometimes experimentally, trying to find out what worked the best."  D.I. 211, Ex. 47 at 45:4-6, 47:6-13.  Significantly, Camille Newton testified that "[w]hen you say brown tape, though, there were more than one version of brown tape wicks."  D.I. 211, Ex. 46 at 186:2-3.  And PureWick's expert, Mr. Jezzi, likewise noted the differences between the commercial Brown Tape product sold by PureWick beginning in January 2016 and earlier prototypes.  D.I. 210, Ex. 33 ¶1573.  Because Mr. Sheldon did not include his own analysis on an element-by-element basis of any PureWick device, let alone any of the different prototypes that Sage alleges were used or sold in 2015, Sage has not shown by clear and convincing evidence, viewing the facts most favorably to PureWick, that there was a prior use or sale of a PureWick device that met all of the elements of the claims.[14]

PureWick also disputes that the testing PureWick conducted upon which Sage relies (with Dr. Newton's patient, █████) was a public use.  Sage contends that the "testing was public" because █████ "was not under any obligation of confidentiality."  D.I. 204 at 16, n.7.  An express obligation of secrecy, however, is not required for a use to be non-public.  *Barry v. Medtronic, Inc.*, 914 F.3d 1310, 1327 (Fed. Cir. 2019) (citing *Invitrogen Corp. v. Biocrest Mfg., LP*, 424 F.3d 1374, 1381 (Fed. Cir. 2005) (the Federal Circuit "has determined that a use before the critical period [may not be] public even without an express agreement of confidentiality.")).  In this case, ████ was Dr. Newton's patient and tested various PureWick prototypes in the privacy of her home.  D.I. 211, Ex. 46 at 181:5-14.  The people involved in her testing were limited

---

[14] This is a fundamental issue raised in PureWick's Motion to Preclude Untimely Invalidity Opinions of Donald Sheldon and Diane Newman.  D.I. 193, 194.  Sage refused to ever identify during discovery which PureWick devices they were relying on for their invalidity defense, instead treating tens of different prototypes as a single "reference."  Although Mr. Sheldon zeroed in on a "brown tape" product, he continued to blur together evidence relating to different versions.

to the inventors and ██████████████████████████. *Id.* at 181:5-8; D.I. 211, Ex 66. The doctor patient relationship between Dr. Newton and ██████, along with the private location of ██████ testing, is sufficient to imply an agreement of confidentiality. *TP Labs. v. Professional Positioners, Inc.*, 724 F.2d 965, 972 (Fed. Cir. 1984) (implying confidentiality from doctor-patient relationship); *Barry*, 914 F.3d at 1327 (finding implied duty of confidentiality for persons in operating room where invention was being experimentally used).

Moreover, there is substantial evidence that ██████ testing of PureWick prototype devices was experimental. "'[I]n the context of a public use bar, evidence of experimental use may negate either the 'ready for patenting' or 'public use' prong." *See id.* at 1328. The Federal Circuit has "has identified a host of factors that can be relevant to assessing whether a use is experimental," including, e.g., "the nature of the invention," "whether payment was made," "whether there was a secrecy obligation," "whether records of the experiment were kept," and "who conducted the experiment." *Barry*, 914 F.3d at 1328. The emails between ██████ and Dr. Newton show the testing of different "design revisions" and that ██████ was providing feedback on the performance of the various prototypes. D.I. 211, Ex 66 at Newton_0002668-70; *Id.* at Ex. 46 at 190:22-191:15; *Id.* at Ex. 47 at 38:8-14, 77:23-78:4, 190:5-191:15. PureWick kept records of the testing that identified successes and learning points. Ex. 114 at PureWick_0016026. Dr. and Mr. Newton were in regular contact with ██████ relating to the testing (D.I. 211, Ex. 66) and there is no evidence that ██████ ever paid for any of the PureWick prototypes. These facts, which Sage does not address at all in its motion, are sufficient to support a finding, or at least raise questions of fact, that the testing was experimental and not a public use.

Finally, Sage also incorrectly asserts that it is undisputed that "PureWick . . . sold brown tape versions of its female external catheter product" more than a year before the September 2016

and June 2017 filing dates of the '989 and '376 patents.  D.I. 204 at 13.  Specifically, Sage alleges that ███████████████████████████████████  D.I. 204 at 16-17 (emphasis added).  But as Dr. Newton testified, ████████ purchased the PureWick DryDoc system, which was a portable vacuum pump, not an external catheter.  D.I. 211, Ex 46 at 218:4-6.  There is no evidence ████████ ever purchased any PureWick external female catheter prototype, let alone one that included all of the elements of the asserted claims.

Sage's motion for summary judgment of invalidity should be denied.

## B.    Claim 7 of the '407 Patent Is Not Invalid

Sage argues that the phrase "opening of the cavity" in '407 patent claim 7 is invalid as indefinite because the phrase lacks an antecedent basis, and for lack of written description.  However, "the lack of an antecedent basis does not render a claim indefinite as long as the claim 'apprises one of ordinary skill in the art of its scope.'"  *In re Downing*, 754 F. App'x 988, 996 (Fed. Cir. 2018); *see also Energizer Holdings, Inc. v. Eveready Battery Co., Inc.*, 435 F.3d 1366, 1370-71 (Fed. Cir. 2006).  A person of ordinary skill in the art would understand that the "opening of the cavity" in claim 7 refers to the "opening" recited earlier in the claim, i.e., the opening in the impermeable layer.  Ex. 136 ¶¶496-502.  This opening is shown in Figure 2.

During prosecution, the Examiner initially rejected claims that recited a cavity for lack of adequate written description.  In a subsequent interview, however, the Examiner agreed that the claimed "cavity" was supported by Figure 2.  D.I. 207, Ex. 13 at PureWick_0007555.  Applicants nevertheless amended application claim 8 (issued claim 7) "to remove the 'cavity'."  *Id.* at PureWick_0007553, 7555.  In doing so, the applicants replaced an "impermeable material forming at least a portion of a cavity" with "an impermeable material defining an interior portion of the urine collection device," and replaced "a cavity having an opening" with "an opening in the impermeable material."  *Id.* at PureWick_0007570.  Although the applicants failed to similarly

amend a portion of the claim that also referenced an "opening of the cavity," the amendments demonstrate that the opening of the cavity refers back to the opening in the impermeable material.

Sage argues that there is a lack of clarity because the claims recite multiple openings. D.I. 204 at 22. But no individual claim refers to multiple openings. Rather, independent claim 7 recites an opening in the impermeable material, and independent claim 13 recites an opening in the receptacle. Thus, in each claim "the opening of the cavity" refers to the opening recited earlier in the claim. Importantly, as Mr. Jezzi opined, a person of ordinary skill would understand that in the '407 patent the opening in the impermeable material and opening in the receptacle refer to the same opening shown in Figure 2.[15] Ex. 136 ¶500. Sage does not contend otherwise. Although Sage argues that the claims refer to "multiple openings," Sage never identifies any substantive difference in meaning. Indeed, when Sage's own expert, Dr. Newman, purportedly applied "alternate meanings" for the claimed opening of the cavity, she pointed to the exact same disclosure in the prior art as allegedly meeting the claim element. D.I. 208, Ex. 20 at pp. 233-34. Sage's motion should be denied.

## IV.    SAGE'S MOTION FOR SUMMARY JUDGMENT OF NO WILLFUL INFRINGEMENT SHOULD BE DENIED

Sage moves for summary judgment of no willful infringement on the grounds that Sage's "pre-suit knowledge" of the asserted patents alone is not sufficient to support a finding of willful infringement. D.I. 204 at 23-24. But this case involves much more than pre-suit knowledge.

As a threshold issue, Sage argues that PureWick must show Sage's conduct was "egregious." Although Sage's conduct has been egregious, to satisfy its burden PureWick need

---

[15]    Figure 2 provides written description for this claim element. *Vas-Cath, Inc. v. Mahurkar*, 935 F.2d 1555, 1564 (Fed. Cir. 1991) ("drawings alone *may* be sufficient to provide the 'written description of the invention' required by § 112, first paragraph.") (emphasis in original).

only show there are genuine issues of fact as to whether Sage "acted despite a risk of infringement that was 'either known or so obvious it should have been known to the accused infringer.'" *Zimmer Surgical, Inc. v. Stryker Corp.*, 365 F. Supp. 3d 466, 491 (D. Del. 2019); *see also Eko Brands, LLC v. Adrian Rivera Maynez Enterprises, Inc.,* 946 F.3d 1367, 1378 (Fed. Cir. 2020) (the "concept of 'willfulness' requires a jury to find no more than deliberate or intentional infringement"); *SRI Int'l, Inc. v. Cisco Sys., Inc.*, --- F.4th ---, 2021 WL 4434231, at *4 (Fed. Cir. Sept. 28, 2021) (same). PureWick has met this standard.

PureWick launched its Female External Catheter product in January 2016 and within months ███████████████████████████████████████████████████████████ ███████████████████████████████████████. Ex. 115.  Over a period of several months PureWick ███████████████████████████████████████████████████████ ███████████████████████████████████████████████. Exs. 116-121.  Sage documents show that ██████████████████████████████████████████████████ █████████████████████████████████████████████." *See e.g.*, Ex. 122.  In June 2016, one of Sage's senior executive members noted that ████████████████████ ██████████████████████████████████████████████████████████████ ████  Ex. 123.  That same document states that "██████████████████████████ █████████████████████████████████████████." *Id.*  Nick Alexander, PureWick's corporate representative, testified that ██████████████████████████████████ ████████████████████████████████████████████████████████████. D.I. 211, Ex. 78 at 90:24-97:15; *see also* Ex. 121.

In late 2016, rather than continue its negotiations with PureWick, ████████████████ ██████████████████████████████████████████  Ex. 124.  Sage did so with full

knowledge of PureWick's '508 patent and pending applications, which █████████████████

████████████████████████████████████████. Ex. 121. ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████.

D.I. 210, Ex. 33 ¶¶1612-19; Ex. 125 at SAGE00026087-89, 106.[16] As a result of █████████████

████████████████████████████████████████████████████████████

████████. This collective evidence is sufficient for a jury to find that Sage acted despite a risk of

infringement that was either known or so obvious it should have been known. And at a minimum

it raises genuine questions of material fact that should not be resolved on summary judgment.

*WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1341 (Fed. Cir. 2016) (citing *Richardson v. Suzuki*

*Motor Co.*, 868 F.2d 1226, 1250 (Fed. Cir. 1989)) ("Willfulness of behavior is a classical jury

question of intent" and "should be decided by the jury.").

 Sage's argument that "there can be no willfulness related to Sage's pre-suit activities in

developing that product where the ['376 and '989] patents did not even exist" is contrary to the

law. D.I. 204 at 23. "There is no per se rule that a finding of willful infringement cannot stand

whenever manufacture of an accused device begins prior to the issuance of a patent, instead courts

must look to the totality of the circumstances presented in the case." *Hologic, Inc. v. Minerva*

*Surgical, Inc.*, 325 F. Supp. 3d 507, 534 (D. Del. 2018) (denying motion for summary judgment

of no willfulness where the patents issued after the defendant developed the accused product).

---

[16]  Sage's assertion that PureWick provided no evidence that Sage copied any features of a
PureWick product covered by the '508 patent (D.I. 204 at 24) is clearly incorrect. Dr. Collins
showed how PureWick's product is covered by the '508 patent, and Mr. Jezzi addressed evidence
that █████████████████████████████████. D.I. 210, Ex. 30 at Exs. H-J; D.I.
210, Ex. 33 ¶¶1618-19.████████████████████████████████████████
████████. *See, e.g.*, Ex. 126.

Sage also argues that its post-filing infringement is not willful because PureWick's allegations do not rise above typical garden variety infringement. Sage's ███████████████ ████████████, however, moves this beyond "garden variety" infringement. Moreover, upon being sued, Sage raised specious defenses premised on claim constructions that were uniformly rejected by the Court. And after the Court rejected its proposed constructions, Sage simply ignored these rulings and continued to advance defenses that are contrary to the Court's claim construction order and the plain language of the patents, as demonstrated in PureWick's co-pending motion for summary judgment of infringement. D.I. 190, 191. The evidence of Sage's pre-filing and post-filing behavior is sufficient for a jury to find that Sage's infringement to be willful. *Intuitive Surgical, Inc. v. Auris Healthcare, Inc.*, C.A. 18-1359-MN, 2021 WL 3033396 (D. Del. July 19, 2021) (denying motion for summary judgment of no post-filing willful infringement because defendant "neither ceased its conduct nor redesigned its products to avoid infringement"); *Zimmer*, 365 F. Supp. 3d at 492 (finding "a reasonable jury could find [defendant]'s post-filing conduct to be willful" based on allegations that "[defendant] continues to infringe, has failed to undertake efforts to design around the [asserted] patents, and has asserted defenses that it knows to be unreasonable"). Accordingly, Sage's Motion should be denied.

## V.    SAGE'S MOTION FOR SUMMARY JUDGMENT ON PUREWICK'S DAMAGES CLAIM SHOULD BE DENIED

### A.    PureWick Is Entitled to Pre-Suit Damages

Sage argues that PureWick is not entitled to pre-suit damages for infringement of the '508 patent because: 1) PureWick did not mark certain of its earlier products with the patent number, and 2) there is insufficient evidence that PureWick's current FEC product was consistently and

continuously marked.[17]  "Compliance with section 287(a) is a question of fact."  *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111 (Fed. Cir. 1996).

Sage's argument that PureWick did not mark earlier versions of its products, sold long before Sage's first acts of infringement, does not preclude PureWick from recovering pre-suit damages.  To the contrary, the Federal Circuit has established that damages are recoverable "from the point of full compliance with the marking statute."  *Am. Med. Sys. Inc. v. Med. Eng. Corp.*, 6 F.3d 1523, 1537 (Fed. Cir. 1993).  PureWick stopped selling the earlier versions of its products (i.e., the "brown tape" and "blue tape") by late 2016 when it started selling the blue silicon shell product.  D.I. 207, Ex. 11 at 22-23.  The blue silicon shell product has consistently and continuously been marked with the '508 patent.  Thus, PureWick has fully complied with the marking statute since it started marking the blue silicon shell product, which has included the entire period of Sage's infringement beginning in late 2017.

Sage's argument that PureWick's contention that the product itself is marked with the '508 patent number, and citation to a photo showing that marking on the product, is insufficient to show compliance with the marking statute also fails.  Not only did PureWick point to where the patent number is marked on its product, it also produced samples of the product to Sage that are marked.  And as PureWick's 30(b)(6) witness testified, "the shells themselves that are already in the stream of commerce would have the '508 patent number on them."  D.I. 211, Ex. 44 at 197:21-23.  This evidence is consistent with the evidence found sufficient by the Court in *Mfg. Resources Int'l, Inc. v. Civiq Smartscapes, LLC*, a case cited by Sage.  397 F. Supp. 3d 560, 576 (D. Del. 2019).  In that case the Court found that Plaintiff's production of a "sample product patent marking labels and a

---

[17]  PureWick's product is also marked with the '376 and '989 patents, but PureWick is not seeking past damages for those patents because marking of the '376 patent began at the same time this lawsuit was filed, and the '989 patent issued just one month before it was added to this case.

declaration under oath that . . . '[Plaintiff] has consistently and continuously marked substantially all of its patented products'" was "sufficient to survive summary judgment when the patentee engages in physical marking." *Id.*[18] Sage's motion should be denied.

      **B.**    **PureWick Is Entitled to Lost Profits**

            **1.**    **There Is A Genuine Dispute Regarding The Existence of Non-Infringing Alternatives**

      Sage argues that PureWick cannot obtain lost profits because it cannot prove the absence of acceptable non-infringing alternatives ("NIAs"). D.I. 204 at 27-30. "[T]he existence of a non-infringing substitute is a question of fact." *Honeywell Intern., Inc. v. Hamilton Sundstrand*, 166 F. Supp. 2d 1008, 1029 (D. Del. 2001). Notwithstanding Sage's self-serving assertion that "[t]he undisputed evidence does not support PureWick" (D.I. 204 at 28), there are genuine issues of material fact as to the existence of NIAs that cannot be resolved on summary judgment.

      Sage argues that it has "identified numerous NIAs including conventional adult incontinence products, such as diapers, pads, vacuum assist products, portable urinary collection devices…" D.I. 204 at 28. There is, however, a genuine dispute as to whether any of the products identified by Sage are acceptable NIAs. D.I. 210, Ex. 30 ¶¶271-306; D.I. 210, Ex. 31 ¶¶286-363; D.I. 211, Ex. 42 ¶¶5-19. "Mere existence of a competing device does not make that device an acceptable substitute."[19] *TWM Mfg. Co., Inc. v. Dura Corp.*, 789 F.2d 895, 901 (Fed. Cir. 1986).

---

[18]   Sage's reliance on *Nike*, *Belden Techs.*, and *Arctic Cat* (D.I. 204 at 26) is misplaced. Unlike in those cases, here, PureWick's discovery responses, document production, and deposition testimony, all show that PureWick has continuously marked its products with the '508 patent.

[19]   Sage claims that ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ D.I. 211, Ex. 58 at 252:13-16, 255:13-256:14, 267:19-268:6, 272:15-273:3; *see also* D.I. 210, Ex. 30 ¶305. Whether it qualifies as an "available" alternative is genuinely in dispute, and is Sage's burden to establish. *Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1331-32 (Fed. Cir. 2009).

"To be an acceptable non-infringing alternative, the substitute product must have the advantages of the patented product."  *Honeywell*, 166 F. Supp. 2d at 1028; *see also Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1124–25 (Fed. Cir. 2003).  PureWick has offered substantial evidence that Sage's proposed NIAs have different target audiences and characteristics, and do not offer the same advantages, as the PureWick device.  For example, PureWick's expert Dr. Yun opined that ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████  D.I. 211, Ex. 42 ¶¶6-32.  Dr. Yun also opined that the products identified by Sage "serve a very different purpose than the PureWick and PrimaFit products" (*id.* at ¶7) and carry with them ████████████████████████████████████████████████████████████

█████████████████████████████████████████████  *See, e.g.*, D.I. 211, Ex. 41 ¶¶23-49; Exs. 127, 128, 129.  Likewise, Dr. Collins considered Sage's alleged NIAs and opined that "there were no suitable non-infringing alternatives available at the time that Sage began selling its PrimaFit device in 2017, or PrimoFit device in 2020, that provided substantially similar benefits as the patents-in-suit."  D.I. 210, Ex. 30 ¶¶271-73; D.I. 210, Ex. 31 ¶¶286-363.  Even the PureWick business plan cited by Sage expressly states that "[t]he patented PureWick solution has no direct competition" and "is completely unique."  D.I. 211, Ex. 81 at PureWick_0020761.  Sage cannot simply ignore this evidence, especially in the context of a motion for summary judgment.[20] *Sunovion Pharms. Inc. v. Dey Pharma., L.P.*, C.A. 06-113-LPS, 2011 WL 6367749, at *2 (D. Del. Dec. 7, 2011) ("there are genuine disputes of material fact that preclude summary judgment concerning Sunovion's entitlement to lost profits").

---

[20]  As discussed further in opposition to Sage's *Daubert* motion, Sage's assertion that Dr. "Collins opined that, in determining acceptability, he did not compare Sage's NIAs to any PureWick product" (D.I. 204 at 30) is simply incorrect.

Sage's motion should be denied for the additional reason that Sage and PureWick are in a two-supplier market (*see* D.I. 211, Ex. 38 ¶¶45-51; Ex. 130; Ex. 131), which creates a presumption of causation for lost profits. *Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1125 (Fed. Cir. 2003) ("If the patentee shows two suppliers in the relevant market, capability to make the diverted sales, and its profit margin, that showing erects a presumption of 'but for' causation."); *see also Izumi Prods. Co. v. Koninklijke Philips Elecs. N.V.*, 315 F. Supp. 2d 589, 614 (D. Del. 2004), aff'd, 140 F. App'x 236 (Fed. Cir. 2005); *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1065 (Fed. Cir. 1983). When the two-supplier theory applies "the burden of going forward then shifts to the infringer." *Micro Chem.,* 318 F.3d at 1125; *see also Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, No. 3:01-CV-0485, 2013 WL 3773836, at *2 (M.D. Pa. July 17, 2013) ("'When the patent owner and infringers were the only suppliers of the patented product, it is reasonable to infer that the patent owner would have made the sales made by the infringers.'"). Sage has not identified any other participant in the market for external female urinary catheters. D.I. 211, Ex. 38 ¶¶45-52; Ex. 132 at 96:25-98:9 ("If your question is are those [PrimaFit and PureWick FEC] the only two that I'm aware of, my answer to that would be yes, of female external catheters."). Even if Sage did dispute that PureWick and Sage are the only market participants, however, any challenge to the number of suppliers in the relevant market is a factual dispute that cannot be resolved on summary judgment. *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, No. CV 15-152-RGA, 2018 WL 4691047, at *5 (D. Del. Sept. 28, 2018) ("I find the actual number of market participants to be a factual issue that should be addressed in cross-examination."); *Zimmer*, 365 F. Supp. 3d at 490 (denying motion for summary judgment of no lost profits because "the parties dispute whether there are any noninfringing alternatives").

## 2.    Dr. Leonard's "But-For Analysis" is Legally Proper

Sage argues that Dr. Leonard's lost profits opinion is legally incorrect because he considered evidence of Sage's customers' "preference for PrimaFit-like products" in concluding that those customers would likely purchase the PureWick product but for Sage's infringement. Sage argues that was improper because Dr. Leonard should have considered the market "absent the infringing product." D.I. 204 at 30-31.  Sage, however, does not cite a single case that supports the proposition that evidence of consumer preference for the patented features of the accused product cannot be considered in evaluating what they would have hypothetically done in a market without the accused product.  To the contrary, the Federal Circuit has affirmed lost profits awards that relied upon consumer purchases of the infringing product as evidence of demand for the patented features.  *See, e.g.*, *Gyromat Corp. v. Champion Spark Plug Co.*, 735 F.2d 549, 552 (Fed. Cir. 1984) ("The substantial number of sales by Champion of infringing products containing the patented features itself is compelling evidence of the demand for the product."); *see also W.R. Grace & Co.-Conn. v. Intercat, Inc.*, 60 F. Supp. 2d 316, 322 (D. Del. 1999).

Moreover, Sage's argument depends on the existence of a NIA, a fact that is in dispute. PureWick asserts there were no NIAs and the relevant market has only two products—Sage's PrimaFit and PureWick's FEC.  Therefore, at best Sage's argument "goes to the validity of [Dr. Leonard's] two-supplier market theory," and is more suitable for cross-examination.  *Bio-Rad Lab'ys, Inc. v. 10X Genomics, Inc.,* C.A. 15-152-RGA, 2018 WL 4691047, at *5 (D. Del. Sept. 28, 2018).  Sage has not and cannot show that PureWick is not entitled to lost profits, as a matter of law, and thus Sage's motion should be denied.

## VI.    CONCLUSION

For the foregoing reasons, PureWick respectfully requests that the Court deny Sage's motions for summary judgment.

31

/s/ Andrew E. Russell
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
David M. Fry (No. 5486)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
dfry@shawkeller.com
*Attorneys for Plaintiff*

OF COUNSEL:
Steven C. Cherny
Brian P Biddinger
Matthew A. Traupman
Nicola R. Felice
Jason C. Williams
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Ave., 22nd Floor
New York, NY 10010

Athena Dalton
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400

Dated:  October 20, 2021

## CERTIFICATE OF SERVICE

I, Andrew E. Russell, hereby certify that on October 20, 2021, this document was served

on the persons listed below in the manner indicated:

**BY EMAIL**

Anne Shea Gaza
Samantha G. Wilson
YOUNG, CONAWAY, STARGATT &
TAYLOR LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6727
agaza@ycst.com
swilson@ycst.com

Robert A. Surrette
Sandra A. Frantzen
Christopher M. Scharff
Ryan J. Pianetto
Paul W. McAndrews
Deborah A. Laughton
MCANDREWS, HELD & MALLOY, LTD
500 West Madison Street
Chicago, IL 60661
(312) 775-8000
bsurrette@mcandrews-ip.com
sfrantzen@mcandrews-ip.com
cscharff@mcandrews-ip.com
rpianetto@mcandrews-ip.com
pwmcandrews@mcandrews-ip.com
dlaughton@mcandrews-ip.com

*/s/ Andrew E. Russell*
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
David M. Fry (No. 5486)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
dfry@shawkeller.com
*Attorneys for Plaintiff*

# EXHIBITS 105-106 REDACTED IN THEIR ENTIRETY

# EXHIBIT 107

US007025198B2

(12) **United States Patent**
Bekele et al.

(10) **Patent No.:** **US 7,025,198 B2**
(45) **Date of Patent:** **Apr. 11, 2006**

(54) **ABSORBENT PAD WITH CONTROLLED RATE OF WICKING**

(75) Inventors: **Solomon Bekele**, Taylors, SC (US);
**Richard E. Douglas, III**, Simpsonville,
SC (US); **Grady Franklin Vaughn, Jr.**,
Winona, MS (US); **David Kinard**,
Grenada, MS (US); **Charles
Kannankeril**, North Caldwell, NJ (US)

(73) Assignee: **Cryovac, Inc.**, Duncan, SC (US)

( * ) Notice: Subject to any disclaimer, the term of this
patent is extended or adjusted under 35
U.S.C. 154(b) by 219 days.

(21) Appl. No.: **10/335,583**

(22) Filed: **Dec. 31, 2002**

(65) **Prior Publication Data**

US 2004/0126513 A1     Jul. 1, 2004

(51) **Int. Cl.**
*B65D 75/00*     (2006.01)

(52) **U.S. Cl.** ...................... **206/204**; 426/392; 426/129;
426/124; 426/326; 428/76

(58) **Field of Classification Search** ............... 206/204;
426/129
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,661,815 A | * | 5/1972 | Smith ...................... 525/54.32 |
| 3,700,096 A | * | 10/1972 | Reifers .................... 229/162.4 |
| 3,713,849 A | * | 1/1973 | Grindrod et al. .......... 426/123 |
| RE30,009 E | | 5/1979 | Perdue et al. |
| 4,654,039 A | | 3/1987 | Brandt et al. |
| 4,818,548 A | * | 4/1989 | Cheng ...................... 426/265 |
| 4,940,621 A | * | 7/1990 | Rhodes et al. .............. 428/137 |
| 5,022,945 A | * | 6/1991 | Rhodes et al. .............. 156/253 |
| 5,055,332 A | * | 10/1991 | Rhodes et al. .............. 428/74 |
| 5,093,176 A | * | 3/1992 | Pribonic et al. .............. 428/76 |
| 5,096,722 A | | 3/1992 | Bair |

| | | | |
|---|---|---|---|
| 5,135,787 A | | 8/1992 | Bair |
| 5,176,930 A | * | 1/1993 | Kannankeril et al. ....... 426/124 |
| 5,250,310 A | * | 10/1993 | Fujino et al. ............... 426/124 |
| 5,254,354 A | * | 10/1993 | Stewart ...................... 426/106 |
| 5,346,735 A | | 9/1994 | Logan et al. |
| 5,348,752 A | * | 9/1994 | Gorlich ...................... 426/129 |
| 5,439,132 A | * | 8/1995 | Gorlich .................. 220/257.1 |

(Continued)

FOREIGN PATENT DOCUMENTS

EP          893 482 A     1/1999

(Continued)

*Primary Examiner*—Gregory Vidovich
*Assistant Examiner*—Dolores R. Collins
(74) *Attorney, Agent, or Firm*—Alston & Bird LLP

(57) **ABSTRACT**

The invention provides an absorbent pad for a case-ready
package that has a controlled rate of wicking. The packaging
comprises a support member, a food product that exudes
liquids positioned on the support member, an absorbent pad
between the food product and the support member, and a lid
member enclosing the package. The absorbent pad is com-
posed of an upper layer, an intermediate absorbent layer, and
a lower layer. The upper and lower layers extend beyond the
periphery of the absorbent layer and are attached directly to
one another. Preferably, the upper and lower layers are
composed of nonwoven materials that are coated with a
hydrophilic composition. Typically the upper layer will be a
spunbonded/meltblown/spunbonded web and the lower
layer will be a spunbonded web. The hydrophilic coating
wicks liquid exuded by the food product into the absorbent
layer, and therefore prevents the accumulation of liquids
within the support member. Changing the amount of hydro-
philic coating on the upper layer will decrease or increase
the rate of wicking that occurs at the upper layer. Thus, to
prevent drying from occurring within the food product the
rate of wicking can be controlled by changing the amounts
of hydrophilic coating present on the layers.

**36 Claims, 10 Drawing Sheets**



## US 7,025,198 B2

Page 2

### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,552,169 | A | * | 9/1996 | Kannankeril et al. ....... 426/107 |
| 5,747,082 | A | * | 5/1998 | Floyd et al. ............... 426/109 |
| 5,770,287 | A | | 6/1998 | Miranda et al. |
| 5,820,955 | A | * | 10/1998 | Brander .................... 428/35.7 |
| 5,896,994 | A | * | 4/1999 | Krebs ...................... 206/524.4 |
| 5,908,649 | A | * | 6/1999 | Floyd et al. ............... 426/109 |
| 6,015,582 | A | * | 1/2000 | Kageyama et al. ......... 426/392 |
| 6,015,585 | A | * | 1/2000 | Yamaguchi et al. |
| 6,023,915 | A | * | 2/2000 | Colombo ..................... 53/432 |
| 6,085,930 | A | * | 7/2000 | Curtis ........................ 220/371 |
| 6,095,325 | A | | 8/2000 | Simhaee |
| 6,270,873 | B1 | * | 8/2001 | Darnett ........................ 428/76 |
| 6,376,034 | B1 | * | 4/2002 | Brander ..................... 428/35.2 |
| 6,447,892 | B1 | * | 9/2002 | Hatley et al. ............... 428/218 |
| 6,602,590 | B1 | * | 8/2003 | Ting et al. .................. 428/218 |
| 6,695,138 | B1 | * | 2/2004 | Colombo et al. ........... 206/204 |
| 2002/0096291 | A1 | * | 7/2002 | Hansen et al. .............. 162/173 |
| 2002/0096292 | A1 | * | 7/2002 | Hansen et al. .............. 162/173 |
| 2003/0035867 | A1 | * | 2/2003 | Kinard et al. ............... 426/124 |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| GB | 2 214 201 A | 8/1989 |
| GB | 2 325 195 A | 11/1998 |

* cited by examiner



FIG. 1.



**FIG. 2.**



FIG. **3**.



FIG. 4.



FIG. 5.



FIG. **6**.



FIG. 7.



FIG. **8**.



FIG. 9.



FIG. 10.

US 7,025,198 B2

**1**

## ABSORBENT PAD WITH CONTROLLED RATE OF WICKING

### FIELD OF THE INVENTION

This invention relates to a food package of the type used to contain and display various foods, and more particularly to a food package containing a food product that exudes liquids, such as meat products, with the package containing an absorbent pad for the liquid exudates.

### BACKGROUND OF THE INVENTION

It is now the customary practice for a retail grocer to receive meat and poultry products pre-packaged and ready to display to the consumer. This packaging format, commonly known as case-ready packaging, allows the consumer to select among the available choices for a food item that is the desired size and has the freshest appearance, while promoting efficiencies in distribution and display.

The conventional form of case-ready package includes a rigid support member, such as a flat sheet or tray, upon which the product is supported. The tray is usually sealed with a lidding film that is applied over the top of the tray and food product and sealed to the edges of the tray to enclose the food in the package. An absorbent pad is typically placed between the support member and the food product to absorb any excess liquids exuded by the product. Typically, the absorbent pad comprises three layers: an upper layer; a lower layer; and an intermediate absorbent layer that is completely enclosed between the upper and lower layers.

The absorbent pad is normally hidden from the consumer's sight. The absorbent pad improves the appearance of the package by precluding free exudates from gathering in the corners, reducing the possibility of bacterial growth, and reducing the opportunities for seal failure. The presence of free liquids is unsightly to the consumer and may result in the product not being selected for purchase.

Typically, a packaged product containing poultry requires an absorptive pad having superior absorption capabilities. Not only does poultry, in and of itself, exude large quantities of liquids, but eviscerated poultry carcasses are normally dipped into a chilled bath that can add up to 8 percent water weight to each carcass. Current trends in the market include selling moisture enhanced meat products. For example, meat products, including poultry and beef, may be marinated in seasoned liquids before being packaged. As a result, after packaging, the processed poultry and meat products normally continue to exude not only their own natural liquids over time, but typically exude liquids that have been absorbed during the marinating and dipping processes.

Absorbent pads incorporate a number of different designs. The predominant design features an absorbent pad having three layers: an upper layer, lower layer, and an intermediate absorbent layer sandwiched between the upper and lower layers. Preferably, the intermediate absorbent layer is completely enclosed between the upper and lower layers, and the upper and lower layers are sealed directly to one another, so that there is no contact between the food and the intermediate absorbent layer. For example, U.S. Pat. Nos. 4,940,621, 5,055,332 and 5,022,945 to Rhodes et al. disclose an absorbent pad comprising top and bottom layers that are made of a liquid impervious film. The films have slits cut in at least one of the layers whereby liquids are transported away from the bottom of the support member and are absorbed into the intermediate absorbent layer. A number of different materials have been used in the absorbent layer. For

**2**

example, U.S. Pat. No. 6,095,325 to Simhaee et al. discloses the use of a combination of wood fluff and tissue as an absorbent layer. U.S. Pat. No. 4,654,039 to Brandt et al. teaches the use of a superabsorbent polymer ("SAP") to absorb excess liquids into the absorbent layer.

A need exists to provide an absorbent pad that removes excess liquids from within the package at a rate that can be adjusted depending upon the moisture content of the product that is to be packaged so that liquids are quickly removed without drying out the food.

### SUMMARY OF THE INVENTION

The invention provides a new absorbent pad having upper and lower nonwoven layers for use in a case-ready package that is especially adapted to quickly absorb liquids exuded by a food product having a high moisture content.

The absorbent pad is composed of an upper layer, a lower layer, and an inner absorbent core. The upper and lower layers are made from nonwoven webs of thermoplastic synthetic filaments, such as polyolefin, polyester, polyethylene, or polyamide filaments. In one embodiment the upper layer is a spunbonded/meltblown/spunbonded (SMS) web and the lower layer is a spunbonded web. In a second embodiment, both layers are made from a spunbonded web, and in a third embodiment both layers are made from a SMS web. Both the upper and lower layers are coated with a hydrophilic composition that attracts and pulls the liquid exudates into an intermediate absorbent layer.

The intermediate layer may comprise several alternative materials that are capable of absorbing and retaining water and other juices, as well as fats and oils or greases, simultaneously. Examples are wood pulp and melt blown discontinuous fibers having SAP dispersed therein. The upper and lower layers of the pad are preferably secured together around their periphery to enclose the intermediate layer therebetween. Typically, the upper and lower layers are adhered to each other with an adhesive or by forming a heat seal.

The rate of absorbency is controlled depending upon the characteristics of the food product by increasing or decreasing the amount of hydrophilic coating on the upper and lower layers. The lower layer will usually have a greater amount of hydrophilic coating than the upper layer, so that the lower layer wicks liquids at a greater rate than the upper layer. Preferred hydrophilic coatings include food grade alkylphenol ethoxylates, alkylphenyl polyethylene glycol ethers, polysorbates, exothylated linear alcohols, fatty amine oxides, alkanolamides and block copolymers of ethylene oxide and propylene oxide and dimethylsiloxane based that are couple together to polar groups such as poly(oxyethylene) containing the hydrophilic moiety, and mixtures thereof.

In one embodiment the invention the amount of hydrophilic coating on the upper and lower layers is between 0.1 to 1.0 percent based on the weight of the layer. In a preferred embodiment the amount of hydrophilic coating on the lower layer is between 0.5 to 1.0 percent based on the weight of the lower layer, and the amount of hydrophilic coating on the upper layer is between 0.1 to 0.35 percent based on the weight of the upper layer.

A second aspect of the invention provides a case-ready package that contains a food product that exudes liquids. The case-ready package comprises a support member containing a food product, an absorbent pad that is in accor-

US 7,025,198 B2

3

dance with the first aspect of the invention disposed between the support member and the food product, and a lid member enclosing the package.

Preferably, the support member is a foam, thermoformed, or other rigid plastic tray that supports the food product. The absorbent pad is placed on the surface of the tray between the tray and the food product. The lid member is normally a flexible transparent or printed film that is typically heat bonded to the tray, thereby enclosing the food product within. The space surrounding the food product between the lid member and the tray may be air, vacuum, or a modified atmosphere. The food product is normally meat, poultry, cheese, or produce, especially poultry and beef having a high moisture content.

BRIEF DESCRIPTION OF THE DRAWINGS

Having thus described the invention in general terms, reference will now be made to the accompanying drawings, which are not necessarily drawn to scale, and wherein:

FIG. 1 is a perspective view of a food package embodying the features of the present invention;

FIG. 2 is a perspective view of a food package illustrating a preferred embodiment of the present invention;

FIG. 3 is a perspective view of a packaging tray containing the absorbent pad embodying the features of the present invention;

FIG. 4 is a perspective view of the absorbent pad embodying the features of the present invention;

FIG. 5 is an exploded perspective view of the absorbent pad shown in FIG. 4 having a SMS upper layer and spunbonded lower layer;

FIG. 6 is an enlarged fragmentary sectional side view of the absorbent pad shown in FIG. 5;

FIG. 7 is an exploded perspective view of the absorbent pad shown in FIG. 4 having a spunbonded upper layer and spunbonded lower layer;

FIG. 8 is an enlarged fragmentary sectional side view of the absorbent pad shown in FIG. 7;

FIG. 9 is an exploded perspective view of the absorbent pad shown in FIG. 4 having a SMS upper layer and SMS lower layer;

FIG. 10 is an enlarged fragmentary sectional side view of the absorbent pad shown in FIG. 9.

DETAILED DESCRIPTION OF THE INVENTION

The invention will now be described more fully hereinafter with reference to the accompanying drawings, in which the preferred embodiments are shown. This invention may however, be embodied in many different forms and should not be construed as limited to the embodiments set forth herein; rather these embodiments are provided so that this disclosure will be thorough and complete, and will convey the scope of the invention to those skilled in the art. Like numbers refer to like elements throughout.

Referring more specifically to the drawings, for purposes of illustration, but not of limitation, there is shown in FIG. 1 one form of the case-ready food package 95 embodying the features of the invention in a package for cut-up chicken. With reference to FIG. 2, reference number 100 broadly designates an embodiment of the invention of a package for a whole chicken. As illustrated, chicken package 95, 100 includes an absorbent pad 130, a tray 110, also termed a support member, a lid member 120, and the poultry 105, 105a. Absorbent pad 130 rests on the bottom of the tray 110

4

and is adapted to receive the poultry 105, 105a thereon. The absorbent pad 130 will therefore support the food product 105, 105a thereon and is adapted to absorb liquids in the form of juices, water, or the like that are exuded by the food product 105, 105a. Absorbent pad 130 is adapted to absorb liquids at a controlled rate of wicking that will not result in desicating the food product 105, 105a. This is especially advantageous in regards to poultry products. Poultry contains a large volume of liquids, and thus requires a pad with superior absorptive abilities.

With reference to FIGS. 4 through 10, an absorbent pad 130 of the invention is illustrated. As illustrated in FIG. 3, the absorbent pad 130 is preferably placed flat on the bottom of the tray 110a. The absorbent pad 130 comprises an upper layer 135, a lower layer 140, and an absorbent intermediate layer 145. As illustrated in FIGS. 4 through 10, upper layer 135 and lower layer 140 are highly permeable to water and air, and can be woven, knitted, etc., and are preferably a nonwoven fibrous web. The nonwoven web is typically comprised of continuous filaments that are bonded to form a coherent web. Staple length fibers, including meltblown fibers can also be used, although not necessarily with equivalent results. The fiber can be any thermoplastic or thermosetting polymer, and normally the fiber comprises a polyolefin, polyester, or polyamide. Typically, the upper layer 135 and lower layer 140 contain fiber made from a hydrophobic polymer such as polypropylene, polyethylene, or polyester.

In a preferred embodiment, broadly designated by reference number 130a, the nonwoven upper layer 135 is of a spunbonded/meltblown/spunbonded trilaminate construction (SMS) in which a layer of substantially discontinuous meltblown polymeric fibers 135b is sandwiched between layers 135a, 135c of substantially continuous spunbonded polymeric filaments (FIG. 6). The substantially continuous polymeric spunbond filaments and the substantially discontinuous meltblown polymeric fibers can be prepared from a wide variety of thermoplastic polymers. Polypropylene or polyethylene terephthalate polymer is often used to prepare meltblown fibers and spunbonded filaments. SMS webs include Avgol® nonwoven polypropylene, obtainable from John Cleaver Associates of Aaoli, Pa., BBA® nonwoven polypropylene, obtainable from BBA of Simpsonville, S.C., and other SMS webs available from various suppliers.

With reference to FIGS. 5 and 6, an absorbent pad 130a having a SMS upper layer and a spunbonded nonwoven lower layer is illustrated. SMS fabrics provide an increased barrier to liquid ingress than a spunbonded nonwoven, and therefore the top surface 137 of the upper layer 135 is necessarily coated with a hydrophilic surfactant 150 so that liquid exudates are pulled off the surface of the upper layer and absorbed into the intermediate absorbent layer 145. The hydrophilic coating 150 wicks liquids off the surface 137 and into the upper layer 135, thereafter the liquids travel by capillary action through the upper layer 135 and into the absorbent layer 145. In this manner, the upper layer only wicks liquids that are present on its surface 137, and does not result in drying out the food product.

The lower layer 140 is a nonwoven fibrous web and is also coated with a hydrophilic surfactant 160. Nonwoven webs for the lower layer 140 include Reemay® spunbonded polyester (polyethylene terephthalate), Typar® nonwoven spunbonded polypropylene (also known as Tekton® nonwoven spunbonded polypropylene), both of which are available from Reemay, Inc. of Old Hickory, Tenn. Other nonwoven webs include Avgol® nonwoven polypropylene,

US 7,025,198 B2

5

obtainable from John Cleaver Associates of Aaoli, Pa., and BBA® nonwoven polypropylene, obtainable from BBA of Simpsonville, S.C.

In a second embodiment, broadly designated by reference number **130**b, both the upper layer **135** and lower layer **140** are a spunbonded nonwoven web, and are normally made of the nonwoven webs discussed above. With this regard, FIGS. **7** and **8** illustrate an absorbent pad having a nonwoven upper layer **135** and lower layer **140**. The upper layer **135** and the lower layer **140** may be made from the same material, or alternatively, upper layer **135** could comprise a different nonwoven material than lower layer **140**.

In a third embodiment, broadly designated by reference number **130**c, both the upper layer **135** and lower layer **140** are made of a SMS construction. With reference to FIGS. **9** and **10** an absorbent pad **130**c having a SMS upper and lower layer **135**, **140** is illustrated. Both layers are coated with hydrophilic surfactants **150**, **160**. Similar to the SMS upper layer in the first embodiment (FIG. **6**), liquids are wicked into the layers **135**, **140** by the hydrophilic coatings **150**, **160**, and thereafter are transported into the absorbent layer by capillary action. Having a SMS upper and lower layer **135**, **140** provides for the slowest rate of wicking and may be ideal for applications where a food product could be easily dried out by excessive wicking.

With reference to FIGS. **5**–**10**, a hydrophilic coating **150** is illustrated on the food-facing surface of the upper layer **135**. FIGS. **6**, **8**, and **10** illustrate a hydrophilic coating **160** on the tray-facing surface **142** of lower layer **140**. The hydrophilic coatings **150**, **160** enable controlled strike through by liquid exudates to the intermediate absorbent layer **145**. Varying the amount of hydrophilic coatings **150**, **160** on the upper and lower layers **135**, **140** changes the hydrophobic/hydrophilic balance of the upper and lower layers **135**, **140**, and thereby controls the absorbent pad's rate of wicking. The absorbent pad **130** may therefore be customized to different types of food products depending upon the characteristics of the food products and particularly the type and/or volume of exudates therefrom. For example, poultry will normally exude significantly more liquids than a beef or pork product, and may therefore require an absorbent pad having a greater amount of wicking. Thus, an absorbent pad specifically adapted for poultry normally has a greater amounts of hydrophilic coatings on both its upper and lower layers than does an absorbent pad adapted for a beef product.

In all embodiments, less hydrophilic coating is applied to the upper layer than to the lower layer. Applying less hydrophilic coating **150** on the upper layer **135** increases the hydrophobic character of the nonwoven, and will therefore result in decreasing the rate at which the upper layer **135** wicks liquids. Applying a greater amount of hydrophilic coating on the lower layer **140** than is present on the upper layer **135** ensures that adequate wicking is maintained by the absorbent pad **130**.

In this regard, there is illustrated in FIGS. **6**, **8**, and **10** a cross-sectional view of an absorbent pad **130** having a greater amount of hydrophilic coating **160** on the lower layer **140** than the amount of hydrophilic coating **150** that is present on the upper layer **135**. The arrows **180** and **190** represent liquids entering into the absorbent pad **130**. This illustrates that the lower layer **140** with the greater amount of hydrophilic coating **160** has a greater rate of wicking than the upper layer **135**. Thus, the amount of hydrophilic coating **150** that is present on the upper layer **135** can be adjusted to pre-select the rate of wicking on the top surface **137** and to

6

ensure that the food product **105**, **105**a is not dried out by excessive wicking of the upper layer.

In this manner, an absorbent pad having a SMS upper layer and a spunbonded nonwoven lower layer (FIGS. **5** and **6**) has features that are most advantageous. The SMS layer naturally acts as a moisture barrier and it is only through the addition of a hydrophilic coating that liquids are absorbed into the absorbent layer, whereas, the lower layer, being liquid-permeable and coated with a hydrophilic surfactant will independently absorb large quantities of exudates. This combination creates an absorbent pad that has an upper layer that has a rate of wicking that is independently adjusted with respect to the lower layer, and a lower layer that has a high rate of wicking.

The hydrophilic coatings **150**, **160** applied to the upper and lower layers **135**, **140** that impart hydrophilicity to the layers are typically a cationic, anionic, nonionic or amphoteric surfactant. Normally, the hydrophilic coating is a nonionic surfactant such as alkylphenol ethoxylates, alkylphenyl polyethylene glycol ethers (including alkylaryl polyether alcohol, polyethylene glycol mono-(4-octylphenyl) ether, polyethylene glycol mono-(4-tert-octylphenyl) ether, polyoxyethylated octylphenol, ethoxylated octylphenol, octylphenol ethyleneoxide$_x$ where X stands for the average units of ethylene oxide). The surfactant will have a range of ethylene oxide units from 1 to 40 with a calculated Hydrophilic/Lipophilic Balance ("HLB") of 2 to 20. HLB is an arbitrary scale from 0 to 40 depicting the hydrophilic/lipophilic balance of a surfactant. Examples of the hydrophilic coating include TRITON X-35™, X-45™, X-100™, X-102™, X-405™ from Dow Chemical Co., OTIX 3, 10, and 40™ from Sasol Chemical Industries of Bad Homberg, Germany, and Polystep OP-9™, OP-3070™, and OP-4070™ from Stepan Co. of Northfield, Ill.

Additional sources of nonionic surfactants include combinations of ethers of phenol, polyethylene glycol, alkylphenol, and polypropylene glycol, polysorbates, fatty amine oxides, linear alcohol ethoxylates, alkanolamides, and block copolymers of ethylene oxide and propylene oxide and dimethylsiloxane based that are coupled to polar groups such as poly(oxethylene) containing the hydrophilic moiety, and mixtures thereof. Although any hydrophilic composition could be used, preferred compositions include Cirracol® PP842 fiber finish, obtainable from Uniquema. All the components in Cirracol® PP842 can be used in applications where direct food contact is desired. However, the hydrophilic coatings are not limited to above recited surfactants and any surfactant may be substituted provided that it adheres to the upper and lower layers, is food-grade compatible, and imparts hydrophilicity thereto.

The hydrophilic coating **160** may be advantageously applied to the lower layer **140** in an amount of from about 0.05 to 10 percent based on the weight of the nonwoven lower layer **140**. Typically, the coating is applied in an amount from about 0.1 to 2.0 weight percent. Somewhat more typically, the coating is applied in an amount from about 0.5 to 1.0 percent. The hydrophilic coating **150** applied to the upper layer **150** is preferably in an amount from about 0.0 to 1.0 percent based on the weight of the nonwoven upper layer **135**. Typically, the coating is applied in an amount from about 0.01 to 0.75 percent. Somewhat more typically, the coating is applied in an amount from about 0.01 to 0.35 percent. It should be understood that the present invention is not limited to the proportions and percentages of hydrophilic coatings recited above and that

US 7,025,198 B2

7

other percentages or proportions of hydrophilic coatings may be used depending upon the desired rate of wicking that is sought.

Additionally, changing the basis weight (permeability) of the upper and lower layers **135**, **140** can control the absorbent pad's **130** rate of wicking. In this regard, FIG. **6** also illustrates that the nonwoven spunbonded lower layer **140** wicks at a greater rate than the SMS upper layer **135**. The balance of properties desirable in the SMS of the invention is related to the basis weight of the individual webs used in the fabric and to the overall weight of the fabric. The SMS will have an overall basis weight between 6 to 20 gsm, more typically, from about 11 to 15 gsm, and somewhat more typically between 11 and 14 gsm. With respect to embodiments **130***a* and **130***b*, the spunbonded nonwoven layers will have an overall basis weight of 1 to 25 gsm, more typically, from about 5 to 20 gsm, and somewhat more typically between 10 and 15 gsm.

With reference to FIG. **5**, **7**, and **9** the permeability of the upper layer **135** and lower layer **140** is broadly illustrated, without limitation, by the openings in the webs at **165** and **170**. Increasing the permeability of a layer increases that layer's rate of wicking. With reference to FIG. **7**, the upper layer **135** nonwoven and the lower layer **140** nonwoven webs can be chosen independently with respect to each other, so that one layer has a greater permeability than the other layer. This will allow one skilled in the art to choose a material for the upper layer and lower layer depending upon the desired rate of wicking for each layer. The openings **165** and **170** are merely illustrative of the permeability of the upper and lower layers and the actual size of the openings (permeability) in the layers will be dependent upon the basis weights of the web and the manufacturing process. As will be apparent to one skilled in the art, the permeability of the layers and the amount of hydrophilic coating applied thereto are independently controlled so that one skilled in the art can manipulate both factors to create an absorbent pad having the desired rate of wicking.

Intermediate absorbent layer **145** is disposed between and enveloped by upper layer **135** and lower layer **140** and the layers **135**, **140** extend beyond the periphery of the intermediate absorbent layer **145** and are sealed together as illustrated at **155** (FIG. **4**).

Intermediate layer **145** comprises a mat of absorbent fibers **145***a*, such as several layers of absorbent tissue or a relatively thick layer of wood fluff, which are relatively inexpensive and highly absorbent. When wood fluff is used, it is desirable to isolate the very short wood fluff fibers in the mat from the permeable lower layer **140**. A layer of tissue **145***b* is therefore placed between the mat and the permeable lower **140** layers, to act as a mechanical barrier between the upper **135** and lower **140** layers and the short wood fluff fibers. The tissue layer may be any suitable layer of tissue paper, such as that commonly referred to as facial grade tissue or wet strength tissue.

The absorbent layer **145** can further comprise a component which is a superabsorbent, present in the form of fibers, granules, or any other suitable form. Typically, the absorbent layer **145** will be between 0 to 1% SAP by weight. Some chemical compounds that have been found particularly effective as superabsorbents include a carboxyl-methyl-cellulose superabsorbent compound and an acrylic superabsorbent (acrylic acid and sodium acrylate copolymer compound). Both of these chemical compounds are USDA/FDA approved or approvable chemical compounds that can be used in connection with processed meat products. Other superabsorbent chemical compounds can also be used in the

8

absorbent layer, as desired. Superabsorbent fiber having a length of about 3 mm is available under the OASIS™ from Technical Absorbents Ltd., as disclosed in UK Patent Application 2325195, published Nov. 18, 1998, entitled "Absorbent Pad." Preferred superabsorbent granules are Favor PAC™ 100, obtained from Stockhausen, of Greensboro, N.C. These granules have a particle size of 100 to 850 microns, and are preferably in the pad in an amount of from about 0.1 to 50 weight percent, and even more preferably from about 1 to 30 weight percent. However, the absorbent intermediate layer is not limited to the use of a combination of woodfluff and tissue paper or a superabsorbent and other materials, such as fluffed cellulose pulp, cellulose tissue, cotton ball, thermoplastic or thermoset foams, continuous superabsorbent fibers, a highly hydrophilic nonwoven fabric, or a meltblown layer, may be substituted for such, provided that the ability to absorb liquids exuded by the food product is maintained.

A second aspect of the present invention is the enhanced seal strength that results from bonding a nonwoven upper layer **135** directly to a nonwoven lower layer **140**. Having two nonwovens bonded directly to each other creates a seal that is more resistant to rupturing. The upper layer **135** can be directly attached to the lower layer **140** with a heat seal. The upper and lower layers **135**, **140** are attached to one another around their perimeter using an adhesive, typically a hot melt adhesive (e.g., melting at 200° F. to 400° F.), or a liquid adhesive.

One such adhesive is a semi-pressure-sensitive adhesive based on a polymeric component mixed with tackifier and wax. A primary polymeric component is an aromatically-modified $C_5$ petroleum hydrocarbon resin, such as Wingtack® 86, made by Goodyear Tire and Rubber Co., which can make up 40 to 55 percent of the total weight of the adhesive. The secondary polymeric component of the adhesive is normally an amorphous polymerized alpha-olefin such as a propylene polymer. A particularly preferred secondary polymeric component is RT2304 1-propene polymer with ethane (present in an amount of from 25 to 35 percent), made by Huntsman Corp. of Salt Lake City, Utah. Alternatively, the secondary polymeric component can be RT2315 (present in an amount of from 25 to 35 percent), also from Huntsman. Indopol® H300 isobutylene/butene copolymer, obtained form Amoco Corp., is a preferred tackifier, it being present at a level of from 1 to 5 percent. Irganox® 1010, obtained from Ciba-Geigy, of McIntosh, Ala., it being present at a level of from 0.01 to 0.5 percent. A blend of the above polymeric components, tackifier, and antioxidants was obtained from Henkel Adhesives of Lewisville, Tex., as well as from National Starch and Chemical of Bridgewater, N.J.

As will be apparent to one of skill in the art, the dimensions of the absorbent pad **130** can be modified depending upon the size and quantity of food that is packaged in the case-ready package **100**, **95**. For example, the invention is particularly suited for packaging of poultry. Poultry can be purchased in a grocery store in a variety of different cuts and proportions. A 5 lb. package of poultry will therefore require a larger absorbent pad than would be needed for a 2 lb. package of poultry. Preferably, an absorbent pad accommodating a family-size package of poultry (approximately 5 lbs.) will have about 12.7"x7.5". The absorbent pad will preferably be between 2 to 3 mm thick prior to absorbing exudates.

US 7,025,198 B2

9

10

A second embodiment of the present invention, directed to a case-ready package is illustrated in FIGS. 1 and 2 and is broadly designated by reference number 95 and 100 respectively. Typically, a case-ready package is a package in which the food product has been processed, packaged, and shipped from a single origination point to the retailer for immediate display and sale. The case-ready package 95, 100 comprises a tray 110 (also referred to as a support member), a food product 105, 105*a*, a lid member 120, and the absorbent pad 130 as discussed above.

As shown in FIG. 3, tray 110 comprises a bottom wall 110*a*, side walls 110*b*, end walls 110*c* integrally formed to provide a receptacle for receiving and containing therein a food product 105, 105*a* (FIGS. 1 and 2), and an (optional, but preferred) horizontal flange 115 projecting outward from the top edge of the side and end walls 110*b*, 110*c*. Tray 110 is preferably made from conventional foamed materials such as polystyrene, polypropylene, polyester, and the like. Additional suitable materials from which the tray 110 can be formed include, without limitation, polyvinyl chloride, polyethylene terephthalate, polyolefins such as high-density polyethylene or polypropylene, paper pulp, nylon, polyurethane, etc. While preferred, tray 110 is by no means the only type or form of container for the food product. Such containers may be in any form currently employed in packaging food products for display, storage etc. For example, it is well known that food products may be packaged in plastic film bags, molded fibrous trays, or paperboard boxes.

The tray 110 can have any desired configuration or shape, e.g., rectangular, round, oval, etc. Similarly, a flange 115 on the tray may have any desired shape or design including a simple, substantially flat design as shown, or a more elaborate design such as, e.g., those disclosed in U.S. Pat. Nos. 5,348,752 and 5,439,132, the disclosures of which are hereby incorporated in their entireties, by reference thereto. Alternatively, the tray may be in the form of a substantially flat sheet.

The lid member 120 is preferably made from a flexible and transparent film. Suitable materials for the cover member include, without limitation, polyester, polyethylene, terephalate, nylon, polypropylene, high density polyethylene, or release coated papers such as cellophane, silicone, coated paper or quilon-coated paper. The cover member can be secured to tray 110 by attaching it with a heat seal or adhesive. Preferably, the lid member 120 is sealed to the tray 110 at the horizontal flange 115. Alternatively, the lid member 120 can be wrapped under bottom of the tray 110*a* along the entire perimeter of the tray and adhesively bonded or heat-sealed to itself or the bottom of the tray.

In a preferred embodiment, the lid member 120 is made from a flexible film having two separate layers (an upper film and a lower film) that are peelably separable from each other. The film is placed on the case-ready package 100, 95 during the packaging process following atmosphere evacuation within the package 100, 95. The upper film is substantially gas impermeable whereas the lower film is gas-permeable. In this manner, a product can be packaged and shipped under a vacuum or modified atmosphere that will maximize the product's shelf-life. At the point of sale, the retailer removes the upper gas-impereable film and the food product is subsequently exposed to the atmosphere which causes the fresh red meat, poultry, and pork to bloom, while the product remains in the original package 100, 95. Preferred examples of multiplayer, coextruded films that are suitable for a film in accordance with the present invention are described in U.S. Pat. No. 5,770,287 (Miranda et al.).

In vacuum skin packaging the film is thermoformable, i.e., capable of being formed into a desired shape upon the application of heat, and is thermoformed about the product on the support member by means of heat and differential pressure. Virtually all of the air is evacuated from the interior of the package so that the film conforms very closely to the contour of the packaged product. Generally, sufficient heat is applied to cause the film to bond with the support member outside the periphery of the product, either by employing a heat activated adhesive at the interface of the film and support member or by forming the film and support member from materials that are otherwise sealingly compatible upon the application of heat, e.g., by employing similar polymeric materials, such as polyethylenes, at the seal interface that bond to one another when heated. Alternatively, a pressure sensitive adhesive can be used. Further details are described in, e.g., U.S. Pat. No. Re 30,009 (Purdue et al.), U.S. Pat. No. 5,346,735 (Logan et al.), and U.S. Pat. No. 5,770,287 (Miranda et al.), the disclosures of which are hereby incorporated in their entireties by reference.

In modified-atmosphere packaging, a food product is generally packaged in a tray-like support member having a peripheral flange to which the film is secured. Prior to securing the film to the support member, air is generally evacuated from the interior of the support member and replaced by a gas which extends the shelf-life of the packaged product.

The food product 105, 105*a* may be any type of meat, poultry, or produce. Preferably, the food product 105, 105*a* is poultry. The absorbent pad of the present invention is especially suited for products containing high volumes of liquids that will be exuded between the time of packaging and point of sale. With reference to FIGS. 1 and 2, a food product 105, 105*a* is illustrated. FIG. 1 illustrates a preferred embodiment of the case-ready packaging 95. FIG. 2 depicts an entire chicken being packaged with a large proportion of the chicken extending upwardly beyond the top of the tray's sidewalls 110*b*. Preferably, the food product 105, as depicted in FIG. 1, is processed chicken parts, such as breasts, thighs, drumsticks, etc. However, the case-ready package 95, 100 is not limited to the above recited food products, and as such, any food can be packaged therein.

The attached Table 1 shows five absorbent pads prepared in accordance with the invention. Absorbent pads 1 through 5 are constructed of a SMS upper layer and a spunbonded (SB) lower layer. Absorbent pad #1 has no surfactant applied to the upper layer and 0.6 percent surfactant applied to the lower layer based on the weight of the lower layer. Absorbent pad #2 has 0.2 percent surfactant applied to the SMS layer and 0.6 percent surfactant applied to the SB layer based on the weight of each respective layer. Similarly, pad #3 has 1.0 percent applied to the SMS and 0.6 percent applied to the SB; pad #4 has 0.2 percent applied to the SMS and 1.0 percent applied to the SB; and pad #5 had 1.0 percent applied to the SMS layer and 1.0 percent applied to the SB layer.

Table 2 is a measure of the each pad's absorptive capabilities as a function of time. Each pad was dipped vertically into a saline solution that is dyed red. A picture of each pad is taken at the time intervals listed below, and the area of the pad that is red is divided by the total area of the pad. The resulting ratios are the percent rate of wicking as a function of time.

US 7,025,198 B2

**11**

TABLE 1

| Absorbent Pad | Upper layer material | Amount of Surfactant present on upper layer (%) | Lower layer material | Amount of surfactant present on lower layer (%) |
|---|---|---|---|---|
| Pad # 1 | SMS* | 0.0 | SB* | 0.6 |
| Pad # 2 | SMS | 0.2 | SB | 0.6 |
| Pad # 3 | SMS | 1.0 | SB | 0.6 |
| Pad # 4 | SMS | 0.2 | SB | 1.0 |
| Pad # 5 | SMS | 1.0 | SB | 1.0 |

SMS* = spunbonded/meltblown/spunbonded;
SB* = spunbonded

TABLE 2

| Absorbent Pad | Wicking at 5 min. | Wicking at 10 min. | Wicking at 15 min. | Wicking at 20 min. | Wicking at 30 min. | Wicking at 45 min. | Wicking at 60 min. | Wicking at 120 min. |
|---|---|---|---|---|---|---|---|---|
| Pad # 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pad # 2 | 3.81 | 12.91 | 29.07 | 44.83 | 60.18 | — | 70 | 97 |
| Pad # 3 | 17.12 | 29.6 | 41.13 | 41.13 | 75.69 | — | 85 | 100 |
| Pad # 4 | 13.18 | 30 | 40 | 40 | — | 80 | 97 | 100 |
| Pad # 5 | 20 | 40 | 46 | 46 | — | 96 | 99 | 100 |

As can be seen from Table 2, the area saturated increases as a function of time and in proportion to the amount of hydrophilic coating that is applied to each layer. In this regard, it can be seen that pad #2, which embodies the preferred features of the invention, has close to 100 percent saturation after 120 minutes.

Many modifications and other embodiments of the invention will come to mind to one skilled in the art to which this invention pertains having the benefit of the teachings presented in the foregoing descriptions and associated drawings. Therefore, it is to be understood that the invention is not limited to the specific embodiments disclosed and that modifications and other embodiments are intended to be included within the scope of the appended claims. Although specific terms are employed herein, they are used in a generic and descriptive sense only and not for the purposes of limitation.

What is claimed is:

**1**. An absorbent pad comprising: a liquid-permeable upper layer, a liquid-permeable lower layer, and an absorbent layer disposed between said upper and lower layers, wherein said upper and lower layers extend outwardly beyond the periphery of said intermediate layer, and said upper layer and said lower layer are attached directly to one another around the entire perimeter of said intermediate layer, such that said intermediate absorbent layer is confined within the bounds of said upper and said lower layers,

said upper and lower layers comprising nonwoven fibrous webs having hydrophilic composition coated thereon, and wherein said lower layer has a greater amount of hydrophilic composition coated thereon than said upper layer.

**2**. An absorbent pad according to claim **1**, wherein said upper and lower layer hydrophilic compositions are independently selected from the group consisting of alkylphenol ethoxylates, alkylphenyl polyethylene glycol ethers (including alkylaryl polyether alcohol, polyethylene glycol mono-(4-octylphenyl) ether, polyethylene glycol mono-(4-tertoc-tylphenyl) ether, polyoxyethylated octylphenol, ethoxylated octylphenol, octylphenol ethyleneoxide$_x$ where X stands for

**12**

the average units of ethylene oxide), polyethylene glycol, alkylphenol, polypropylene glycol, polysorbates, fatty amine oxides, linear alcohol ethoxylates, alkanolamides, block copolymers of ethylene oxide and propylene oxide, and mixture thereof.

**3**. An absorbent pad according to claim **1** wherein said lower layer absorbs liquid at a rate greater than said upper layer.

**4**. An absorbent pad according to claim **1**, wherein said upper layer nonwoven is a spunbonded/meltblown/spun-bonded trilaminate construction.

**5**. An absorbent pad according to claim **4**, wherein said upper layer nonwoven is selected from the group consisting of polyolefin, polyester, polypropylene, and polyamide thermoplastic fibers.

**6**. An absorbent pad according to claim **1**, wherein said intermediate absorbent layer comprises a superabsorbent.

**7**. An absorbent pad according to claim **6**, wherein at least some of the superabsorbent is present in granular form.

**8**. An absorbent pad according to claim **1**, wherein said intermediate absorbent layer comprises a layer of wood fluff and a layer of tissue paper.

**9**. An absorbent pad according to claim **8**, wherein said intermediate absorbent layer further comprises a superabsorbent.

**10**. An absorbent pad according to claim **1**, wherein said upper layer is attached to said lower layer with an adhesive.

**11**. An absorbent pad according to claim **1**, wherein said upper layer is attached to said lower layer with a heat seal.

**12**. An absorbent pad comprising: a liquid-permeable upper layer, a liquid-permeable lower layer, and an absorbent layer disposed between said upper and lower layers, wherein said upper and lower layers extend outwardly beyond the periphery of said intermediate layer, and said upper layer and said lower layer are attached directly to one another around the entire perimeter of said intermediate layer, such that said intermediate absorbent layer is confined within the bounds of said upper and said lower layers,

said upper and lower layers comprising nonwoven fibrous webs having hydrophilic composition coated thereon, said lower layer having a greater amount of hydrophilic composition coated thereon than said upper layer, and wherein said lower layer nonwoven is selected from the group consisting of polyolefin, polyester, polypropylene, and polyamide.

**13**. An absorbent pad according to claim **12**, wherein said upper layer hydrophilic composition is present on said upper layer in an amount from 0.05 to 1.0 percent based on the weight of said upper layer.

**14**. An absorbent pad according to claim **12**, wherein said lower layer hydrophilic composition is present on said lower layer in an amount from 0.05 to 10 percent based on the weight of said lower layer.

**15**. An absorbent pad according to claim **12**, wherein said lower layer hydrophilic composition is present on said lower

US 7,025,198 B2

**13**

layer in an amount from 0.5 to 1 percent based on the weight of said lower layer and said upper layer hydrophilic composition is present on said upper layer in an amount from 0.1 to 0.35 percent based on the weight of said upper layer.

**16**. An absorbent pad comprising: a liquid-permeable upper layer, a liquid-permeable lower layer, and an absorbent layer disposed between said upper and lower layers, wherein said upper and lower layers extend outwardly beyond the periphery of said intermediate layer, and said upper layer and said lower layer are attached directly to one another around the entire perimeter of said intermediate layer, such that said intermediate absorbent layer is confined within the bounds of said upper and said lower layers,

said upper and lower layers comprising a spunbonded/ meltblown/spunbonded trilaminate construction having hydrophilic composition coated thereon.

**17**. An absorbent pad according to claim **16**, wherein said lower layer has a greater amount of hydrophilic composition coated thereon than said upper layer.

**18**. An absorbent pad comprising: a liquid-permeable upper layer, a liquid-permeable lower layer, and an absorbent layer disposed between said upper and lower layers, wherein said upper and lower layers extend outwardly beyond the periphery of said intermediate layer, and said upper layer and said lower layer are attached directly to one another around the entire perimeter of said intermediate layer, such that said intermediate absorbent layer is confined within the bounds of said upper and said lower layers,

said upper layer comprises a spunbonded/meltblown/ spunbonded trilaminate construction having hydrophilic composition coated thereon, and said lower layer comprises a nonwoven fibrous web having hydrophilic composition coated thereon, and wherein said lower layer has a greater amount of said hydrophilic composition coated thereon than said upper layer.

**19**. An absorbent pad according to claim **18**, wherein said lower layer wicks liquids at a greater rate than said upper layer.

**20**. An absorbent pad according to claim **18**, wherein said intermediate absorbent layer comprises a superabsorbent.

**21**. An absorbent pad according to claim **20**, wherein at least some of the superabsorbent is present in granular form.

**22**. An absorbent pad according to claim **18**, wherein said intermediate absorbent layer comprises a layer of wood fluff and a layer of tissue paper.

**23**. An absorbent pad according to claim **22**, wherein said intermediate absorbent layer further comprises a superabsorbent.

**24**. An absorbent pad according to claim **18**, wherein said upper layer is attached to said lower layer with an adhesive.

**25**. An absorbent pad according to claim **18**, wherein said upper layer is attached to said lower layer with a heat seal.

**26**. An absorbent pad comprising: a liquid-permeable upper layer, a liquid-permeable lower layer, and an absorbent layer disposed between said upper and lower layers, wherein said upper and lower layers extend outwardly beyond the periphery of said intermediate layer, and said upper layer and said lower layer are attached directly to one another around the entire perimeter of said intermediate layer, such that said intermediate absorbent layer is confined within the bounds of said upper and said lower layers,

said upper layer comprises a spunbonded/meltblown/ spunbonded trilaminate construction selected from the group consisting of polyolefin, polyester, and polyamide thermoplastic fibers having hydrophilic composition coated thereon, and said lower layer comprises a nonwoven fibrous web having hydrophilic composition

**14**

coated thereon, and wherein said lower layer has a greater amount of said hydrophilic composition coated thereon than said upper layer.

**27**. An absorbent pad according to claim **26**, wherein said spunbonded/meltblown/spunbonded trilaminate is polypropylene.

**28**. An absorbent pad according to claim **26**, wherein said lower layer is a spunbonded nonwoven.

**29**. An absorbent pad according to claim **26**, wherein said lower layer hydrophilic composition is present on said lower layer in an amount from 0.5 to 1.0 percent based on the weight of said lower layer and said upper layer hydrophilic composition is present on said upper layer in an amount from 0.1 to 0.35 percent based on the weight of said upper layer.

**30**. An absorbent pad according to claim **26**, wherein said upper and lower layer hydrophilic compositions are independently selected from the group consisting of alkylphenol ethoxylates, alkylphenyl polyethylene glycol ethers (including alkylaryl polyether alcohol, polyethylene glycol mono-(4-octylphenyl) ether, polyethylene glycol mono-(4-tert-octylphenyl) ether, POE octylphenol, ethoxylated octylphenol, octylphenol EO(X) where X stands for the average units of ethylene oxide), polyethylene glycol, alkylphenol, polypropylene glycol, polysorbates, fatty amine oxides, linear alcohol ethoxylates, alkanolamides, block copolymers of ethylene oxide and propylene oxide, and mixture thereof.

**31**. A case-ready package comprising:

a support member;

a lid member;

a food product; and

an absorbent pad comprising:

a liquid-permeable upper layer in contact with a food product, and a liquid-permeable lower layer, and an intermediate absorbent layer wherein said upper and said lower layer extend outwardly beyond the periphery of said intermediate layer, and said upper layer and said lower layer are attached directly to one another around the entire perimeter of said intermediate layer, such that said intermediate absorbent layer is confined within the bounds of said upper and said lower layer, and wherein

said upper layer comprises a nonwoven fibrous web having a hydrophilic composition coated on said upper layer, and wherein the rate of liquid ingress through said upper layer is controlled by changing the amount of said hydrophilic composition coated on said upper layer, and

said lower layer comprising a nonwoven fibrous web having a hydrophilic composition coated on said lower layer, wherein the amount of said hydrophilic composition on said lower layer is greater than the amount of said hydrophilic composition on said upper layer, such that said lower layer wicks said liquids at a rate that is greater than the rate at which said upper layer wicks said liquids.

**32**. The case-ready package according to claim **31**, wherein said food product is selected from the group consisting of meat, cheese, poultry, and produce.

**33**. The case-ready package according to claim **31**, wherein said food product is poultry.

**34**. The case-ready package according to claim **31**, wherein said package has a modified atmosphere between said support member end said lid member.

**35**. The case-ready package according to claim **34**, wherein the atmosphere has been substantially evacuated from within said case-ready package.

US 7,025,198 B2

**15**

36. A case-ready package comprising:

a support member;

a lid member;

a food product; and

an absorbent pad comprising:

a liquid-permeable upper layer in contact with a food product, and a liquid-permeable lower layer, and an intermediate absorbent layer wherein said upper layer and said lower layer extend outwardly beyond the periphery of said intermediate layer, and said upper layer and said lower layer are attached directly to one another around the entire perimeter of said, intermediate layer, such that said, intermediate absorbent layer is confined within the bounds of said upper and said lower layer, and wherein

said upper layer comprises a nonwoven fibrous web having a hydrophilic composition coated on said upper

**16**

layer, and wherein the rate of liquid ingress through said upper layer is controlled by changing the amount of said hydrophilic composition coated on said upper layer; and

said lower layer comprising a nonwoven fibrous web having a hydrophilic composition coated on said lower layer, wherein the amount of said hydrophilic composition on said lower layer is greater than the amount of said hydrophilic composition on said upper layer, such that said lower layer wicks said liquids at a rate that is greater than the rate at which said upper layer wicks said liquids, and wherein said lower layer nonwoven is selected from the group consisting of polyolefin, polyester, polypropylene, and polyamide.

\*   \*   \*   \*   \*

# EXHIBIT 108
# REDACTED IN ITS ENTIRETY

# EXHIBIT 109



SINCE 1828



[GAMES & QUIZZES](#) [THESAURUS](#) [WORD OF THE DAY](#) [FEATURES](#)
- SHOP

[Buying Guide](#) ⤢ [M-W Books](#) ⤢

- [LOG IN](#)
- [REGISTER](#)
- ⌄

[settings](#) [log out](#)

10/11/21, 1:28 AM
Case 1:19-cv-01508-MN    Document 243    Filed 10/27/21    Page 64 of 139 PageID #:
18979
proximate | Definition of proximate by Merriam-Webster

- 🔖 MY WORDSMY WORDS



proximate

✕

🔍

dictionary
thesaurus

view recents

Log in Sign Up

Hello,

Games & Quizzes Thesaurus Word of the Day Features Buying Guide ⬀ M-W Books ⬀

- 🔖 My WordsMy Words
-  View Recents
-  Account

Log Out

# proximate

*adjective*

🚩 Save Word

To save this word, you'll need to log in.

Log In

prox·i·mate | \ ˈpräk-sə-mət 🔊 \

## Definition of *proximate*

1 : immediately preceding or following (as in a chain of events, causes, or effects) proximate, rather than ultimate, goals— Reinhold Niebuhr
2a : very near : close
b : soon forthcoming : imminent

⬇ Other Words from *proximate*   ⬇ Synonyms & Antonyms   ⬇ Did you know?   ⬇ More Example Sentences

⬇ Learn More About *proximate*

Keep scrolling for more

# Other Words from *proximate*

proximately adverb
proximateness noun

# Synonyms & Antonyms for *proximate*

Synonyms

- approaching,
- coming,
- forthcoming,
- imminent,
- impending,
- nearing,
- oncoming,
- pending,
- upcoming

Antonyms

- late,
- recent

Visit the Thesaurus for More ⊗

# Did you know?

You can approach a better understanding of this word, and an approximation of its history, if you recognize its two cousins in this sentence. *Proximate* derives from Latin *proximatus,* itself the past participle of the verb *proximare,* meaning "to approach." The noun "approximation" and both the noun and verb "approximate" derive from "proximare" (via the Late Latin verb *approximare*). "Proximare," in turn, comes from "proximus" ("nearest, next") and can be traced back to the adjective *prope,* meaning "near." "Prope" is also an ancestor of the English verb "approach," as well as "proximity," "propinquity," and "reproach."

# Examples of *proximate* in a Sentence

the *proximate* cause of the fire the *proximate* publication of his first novel
Recent Examples on the Web The fact that Taiwan is so physically *proximate* to the PRC only emphasizes how different their political systems are, and how much more closely aligned Taiwan is with the US on a number of these core values. — Lanhee J. Chen, *CNN*, 15 Apr. 2021 The *proximate* cause of the unrest being police violence and the underlying issues that have fueled the protests, which are continued racial equality and discrimination and socioeconomic exclusion, are really at the heart of both. — Olivia B. Waxman, *Time*, 2 June 2020

These example sentences are selected automatically from various online news sources to reflect current usage of the word 'proximate.' Views expressed in the examples do not represent the opinion of Merriam-Webster or its editors. Send us feedback.

See More ⊕ ⊖

# First Known Use of *proximate*

1661, in the meaning defined at **sense 1**

# History and Etymology for *proximate*

Latin *proximatus*, past participle of *proximare* to approach, from *proximus* nearest, next, superlative of *prope* near — more at **approach**

Keep scrolling for more

# Learn More About *proximate*

Share *proximate*

 **Post the Definition of proximate to Facebook**  **Share the Definition of proximate on Twitter**

Time Traveler for *proximate*



# The first known use of *proximate* was in 1661

**See more words from the same year**

Listen to Our Podcast About *proximate*

Theme music by Joshua Stamper ©2006 **New Jerusalem Music/ASCAP**

Get Word of the Day delivered to your inbox!

| Your email address | | Sign Up >> |

# Dictionary Entries Near *proximate*

**proximal convoluted tubule**

proximate

proximate matter

See More Nearby Entries

# Statistics for *proximate*

Look-up Popularity

Top 3% of words

Cite this Entry

"Proximate." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/proximate. Accessed 11 Oct. 2021.

**Style:** MLA
MLA ⊘ Chicago ⊘ APA ⊘ Merriam-Webster ⊘
Seen & Heard
People are talking about

AdChoices ▷    Sponsored



Keep scrolling for more

More Definitions for *proximate*

proximate

adjective



# English Language Learners Definition of *proximate*

**:** coming or happening immediately before or after something in a way that shows a very close and direct relationship

See the full definition for *proximate* in the English Language Learners Dictionary

proximate

adjective

prox·i·mate | \ ˈpräk-sə-mət  \

# Medical Definition of *proximate*

1a **:** very near
b **:** next, preceding, or following especially **:** relating to or being a proximate cause
2 **:** determined by proximate analysis
3 **:** proximal sense 1b

Other Words from *proximate*

proximately adverb

proximate

adjective

prox·i·mate | \ ˈpräk-sə-mət  \

# Legal Definition of *proximate*

1 **:** next immediately preceding or following (as in a chain of causation, events, or effects) **:** being or leading to a particular especially foreseeable result without intervention — see also proximate cause at cause sense 1
2 **:** very or relatively close or near would be sufficiently proximate to the commencement of the defendant's trial — *Johnson v. New Jersey*, 384 U.S. 719 (1966)

Other Words from *proximate*

proximately adverb

More from Merriam-Webster on *proximate*

Britannica English: Translation of *proximate* for Arabic Speakers

**WORD OF THE DAY**

restaurateur

See Definitions and Examples »

Get Word of the Day daily email!

Your email address          SUBSCRIBE

---

**Test Your Vocabulary**

Dog Words Quiz

- - Which of the following
    animals has a dog in its
    etymology?



---

Can you spell these 10
commonly misspelled words?

TAKE THE QUIZ

---

Case 1:19-cv-01508-MN    Document 243    Filed 10/27/21    Page 72 of 139 PageID #: 18987

## Love words? Need even more definitions?

Subscribe to America's largest dictionary and get thousands more definitions and advanced search—ad free!

MERRIAM-WEBSTER UNABRIDGED

WORDS AT PLAY

10/11/21, 1:28 PM    Case 1:19-cv-01508-MN    Document 243 Filed 10/27/21 Page 73 of 139 PageID #:
Proximate | Definition of Proximate by Merriam-Webster
18988

## "In Vino Veritas" and Other
## Latin Phrases to Live By

- Top 10 Latin Phrases

## The Difference Between 'i.e.'
## and 'e.g.'

- For example, the different ways to use them

## 'Awhile' vs. 'A While'

- There are rules, but who's listening?

## 15 of the Creepiest Ghosts,
## Creatures, and Monsters

- We bring you the strangest, most elusive beasts i...

### ASK THE EDITORS

## 'Everyday' vs. 'Every Day'

- A simple trick to keep them separate

10/11/21, 1:28 AM
Case 1:19-cv-01508-MN    Document 243    Filed 10/27/21    Page 74 of 139 PageID #:
18989
Proximate | Definition of Proximate by Merriam-Webster

## What Is 'Semantic Bleaching'?

- How 'literally' can mean "figuratively"

## Literally

- How to use a word that (literally) drives some pe...

## Is Singular 'They' a Better Choice?

- The awkward case of 'his or her'

### WORD GAMES

## Surprising Hispanic Origins Behind Everyday Words

What treat did the Aztecs refer to as "bitter wat...

- **TAKE THE QUIZ**

## Test Your Punctuation Skills

Do you really know how to use a
semicolon?

- **TAKE THE QUIZ**

## Spell It

Can you spell these 10 commonly
misspelled words?

- **TAKE THE QUIZ**

**Learn a new word every day. Delivered to your inbox!**

Your email address

**OTHER MERRIAM-WEBSTER DICTIONARIES**

- LEARNER'S ESL DICTIONARY
- VISUAL DICTIONARY
- SCRABBLE® WORD FINDER

- MERRIAM-WEBSTER'S UNABRIDGED DICTIONARY
- BRITANNICA ENGLISH - ARABIC TRANSLATION
- NGLISH - SPANISH-ENGLISH TRANSLATION

FOLLOW US

• • • •

Browse the Dictionary:   A   B   C   D   E   F   G   H   I   J   K   L   M   N   O   P   Q   R   S   T   U   V   W   X   Y   Z   0-9

Home  |  Help  |  Apps  |  About Us  |  Shop  |  Advertising Info  |  Dictionary API  |
Contact Us  |  Join MWU  |  Videos  |  Word of the Year  |  Puku  |
Vocabulary Resources  |  Law Dictionary  |  Medical Dictionary  |  Privacy Policy  |
Terms of Use  |  Do Not Sell My Info

Browse the Thesaurus  |  Browse the Medical Dictionary  |  Browse the Legal Dictionary

© 2021 Merriam-Webster, Incorporated

# EXHIBIT 110



SINCE 1828



[GAMES & QUIZZES](#) [THESAURUS](#) [WORD OF THE DAY](#) [FEATURES](#)

- SHOP

[Buying Guide](#) [M-W Books](#)

- - [LOG IN](#)
  - [REGISTER](#)
  - ⌄

    [settings](#) [log out](#)



- MY WORDSMY WORDS

distinct

×

dictionary
thesaurus

view recents

Log in Sign Up

Hello,

Games & Quizzes  Thesaurus  Word of the Day  Features  Buying Guide ⧉  M-W Books ⧉

- My WordsMy Words
- View Recents
- Account

Log Out

# distinct

adjective

Save Word

To save this word, you'll need to log in.

Log In

dis·tinct | \ di-ˈstiŋ(k)t \

## Definition of *distinct*

1 **:** distinguishable to the eye or mind as being discrete (see discrete sense 1) or not the same **:** separate a distinct cultural group teaching as distinct from research
2 **:** presenting a clear unmistakable impression a neat distinct handwriting
3 archaic **:** notably decorated
4a **:** notable a distinct contribution to scholarship
b **:** readily and unmistakably apprehended (see apprehend sense 2a) a distinct possibility of snow a distinct British accent the distinct odor of sulfur

↓ Other Words from *distinct*  ↓ Synonyms & Antonyms  ↓ Choose the Right Synonym  ↓ More Example Sentences  ↓ Learn More About *distinct*

Keep scrolling for more

## Other Words from *distinct*

distinctly \ di-ˈstiŋ(k)-tlē 🔊 , -ˈstiŋ-klē \ adverb

distinctness \ di-ˈstiŋ(k)t-nəs 🔊 , -ˈstiŋk-nəs \ noun

## Synonyms & Antonyms for *distinct*

Synonyms

- different,
- disparate,
- dissimilar,
- distant,
- distinctive,
- distinguishable,
- diverse,
- nonidentical,
- other,
- unalike,
- unlike

Antonyms

- alike,
- identical,
- indistinguishable,
- kin,
- kindred,
- like,
- parallel,
- same,
- similar

Visit the Thesaurus for More »

## Choose the Right Synonym for *distinct*

distinct, separate, discrete mean not being each and every one the same. distinct indicates that something is distinguished by the mind or eye as being apart or different from others. two *distinct* versions separate often stresses lack of connection or a difference in identity between two things. *separate* rooms discrete strongly emphasizes individuality and lack of connection. broke the job down into *discrete* stages

**synonyms** see in addition evident

# Examples of *distinct* in a Sentence

There are three *distinct* categories. Each herb has its own *distinct* flavor.

See More ⊕ ⊖

Recent Examples on the Web The respondents Three *distinct* groups emerged among the 7,423 professionals who were surveyed . — Judith Magyar, *Forbes*, 29 Sep. 2021 Britain's collective memory is also *distinct* but is more often defined against the French. — Tom Mctague, *The Atlantic*, 24 Sep. 2021

These example sentences are selected automatically from various online news sources to reflect current usage of the word 'distinct.' Views expressed in the examples do not represent the opinion of Merriam-Webster or its editors. [Send us feedback](#).

See More ⊕ ⊖

## First Known Use of *distinct*

14th century, in the meaning defined at [sense 1](#)

## History and Etymology for *distinct*

Middle English, from Latin *distinctus*, from past participle of *distinguere* — see [distinguish](#)

Keep scrolling for more

## Learn More About *distinct*

Share *distinct*

[Post the Definition of distinct to Facebook](#)  [Share the Definition of distinct on Twitter](#) 

Time Traveler for *distinct*



## The first known use of *distinct* was in the 14th century

[See more words from the same century](#)

## Dictionary Entries Near *distinct*

[distills](#)

distinct

[distinctio](#)

[See More Nearby Entries](#)

# Phrases Related to *distinct*

[as distinct from](#)

# Statistics for *distinct*

Last Updated

3 Oct 2021

Look-up Popularity

Top 1% of words

Cite this Entry

"Distinct." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/distinct. Accessed 11 Oct. 2021.

**Style:** MLA
MLA ✓  Chicago ✓  APA ✓  Merriam-Webster ✓
Seen & Heard
People are talking about



Planned Parenthood® GIV

AdChoices ▷                    Sponsored



Keep scrolling for more

More Definitions for *distinct*

distinct

adjective



# English Language Learners Definition of *distinct*

**:** different in a way that you can see, hear, smell, feel, etc. **:** noticeably different
**:** easy to see, hear, smell, feel, etc.
**:** strong and definite

See the full definition for *distinct* in the English Language Learners Dictionary

distinct

adjective

dis·tinct | \ di-ˈstiŋkt  \

# Kids Definition of *distinct*

1 **:** different from each other *distinct* species
2 **:** easy to notice or understand a *distinct* odor

Other Words from *distinct*

distinctly adverb

More from Merriam-Webster on *distinct*

Nglish: Translation of *distinct* for Spanish Speakers

Britannica English: Translation of *distinct* for Arabic Speakers

**WORD OF THE DAY**

———

# restaurateur 🔊

See Definitions and Examples »

Get Word of the Day daily email!

Your email address          SUBSCRIBE

10/11/21, 1:26 AM    Case 1:19-cv-01508-MN    Document 248    Filed 10/27/21    Page 85 of 139 PageID #:
19000
                                           Distinct | Definition of Distinct by Merriam-Webster

**Test Your Vocabulary**

Dog Words Quiz

- 
  - Which of the following
    animals has a dog in its
    etymology?



| | |
|---|---|
| **eel** | **cat** |
| **canary** | **hippo** |

Can you spell these 10
commonly misspelled words?

TAKE THE QUIZ

Case 1:19-cv-01508-MN    Document 248    Filed 10/27/21    Page 86 of 139 PageID #: 19001

# Love words? Need even more definitions?

Subscribe to America's largest dictionary and get thousands more definitions and advanced search—ad free!

**MERRIAM-WEBSTER UNABRIDGED**

**WORDS AT PLAY**

## "In Vino Veritas" and Other Latin Phrases to Live By

- Top 10 Latin Phrases

## The Difference Between 'i.e.' and 'e.g.'

- For example, the different ways to use them

## 'Awhile' vs. 'A While'

- There are rules, but who's listening?

## 15 of the Creepiest Ghosts, Creatures, and Monsters

- We bring you the strangest, most elusive beasts i...

**ASK THE EDITORS**

## 'Everyday' vs. 'Every Day'

- A simple trick to keep them separate

## What Is 'Semantic Bleaching'?

- How 'literally' can mean "figuratively"

## Literally

- How to use a word that (literally) drives some pe...

## Is Singular 'They' a Better Choice?

- The awkward case of 'his or her'

### WORD GAMES

## Surprising Hispanic Origins Behind Everyday Words

What treat did the Aztecs refer to as "bitter wat...

- **TAKE THE QUIZ**

## Test Your Punctuation Skills

Do you really know how to use a semicolon?

- **TAKE THE QUIZ**

## Spell It

Can you spell these 10 commonly
misspelled words?

- **TAKE THE QUIZ**

## Learn a new word every day. Delivered to your inbox!

Your email address

---

**OTHER MERRIAM-WEBSTER DICTIONARIES**

- LEARNER'S ESL DICTIONARY
- VISUAL DICTIONARY
- SCRABBLE® WORD FINDER

- MERRIAM-WEBSTER'S UNABRIDGED DICTIONARY
- BRITANNICA ENGLISH - ARABIC TRANSLATION
- NGLISH - SPANISH-ENGLISH TRANSLATION

**FOLLOW US**

Browse the Dictionary:   A   B   C   D   E   F   G   H   I   J   K   L   M   N   O   P   Q   R   S   T   U   V   W   X   Y   Z   0-9

Home | Help | Apps | About Us | Shop | Advertising Info | Dictionary API |
Contact Us | Join MWU | Videos | Word of the Year | Puku |
Vocabulary Resources | Law Dictionary | Medical Dictionary | Privacy Policy |
Terms of Use | Do Not Sell My Info

Browse the Thesaurus | Browse the Medical Dictionary | Browse the Legal Dictionary

© 2021 Merriam-Webster, Incorporated

# EXHIBITS 111-112 REDACTED IN THEIR ENTIRETY

# EXHIBIT 113

# PrimaFit™
# External Urine Management System for Females



SAGE00040001

---

**CONTENTS:** (1) Collector, adult size

---

Reorder **#5400**

## INDICATIONS

For the non-invasive, non-sterile collection of urine for female patients unable to control voiding or confined to the bed

## CONTRAINDICATIONS

Do not use on patients with urinary retention



**SUPPLIES NEEDED** • Suction canister • Tubing

## DIRECTIONS

### Prior to use
- Perform a skin assessment and document per hospital protocol.
- Refer to manufacturer's instructions for suction set up.

### Placement

**STEP 1** Set up suction canister with tubing per hospital protocol.

**STEP 2** Place patient in supine position and separate patient's legs.

**STEP 3** Clean patient's genital area from front to back per hospital protocol and assess skin integrity.

**STEP 4** Remove device from package.

**STEP 5** Attach suction tubing. Ensure connection to device is secure.

**STEP 6** Position device vertically with Tapered End Cap facing downward and white fabric facing patient's labia.

**STEP 7** Align Tapered End Cap with perineum and place device between the labia and against the urethral opening. Ensure absorbent fabric is covering the urethral meatus.



Tapered End Cap

**STEP 8** Curve the device toward the patient's lower abdomen.



**STEP 9** While holding the device in place, remove the adhesive liner and smoothly adhere the adhesive pad over the suprapubic region.



**STEP 10** Ensure suction tubing does not run under the patient.

**STEP 11** Set vacuum to low, continuous suction at a minimum of 40mmHG. Always use the minimum amount of suction necessary.

**STEP 12** Return patient's legs to naturally closed position.



### Removal

**STEP 1** Place the patient in the supine position and separate patient's legs.

**STEP 2** Gently remove the adhesive pad.

**STEP 3** Separate the labia and remove the device.

**STEP 4** Assess skin integrity and perform perineal care.

**STEP 5** Disconnect device from suction tubing and discard device per hospital protocol.

- Perform a skin assessment periodically per hospital protocol.
- Ensure tubing is connected at all times while device is in use.
- Assess device periodically to ensure proper placement, particularly after turning or repositioning patient.
- Replace device every 12 hours or if soiled with stool or bodily fluids other than urine. Dispose of device per hospital protocol.
- Replace tubing and empty and/or replace suction canister per hospital protocol.

## CAUTIONS
- Not intended for use on patients in the prone position.
- Not intended for use on male patients.
- Not intended for stool collection.
- Use caution if using on patients with altered mental status.
- Remove device during ambulation.

## WARNINGS
- Do not place internally.

## DISCONTINUE USE
- When independent or assisted toileting is feasible.

Single Patient Use • Not made with natural rubber latex
Non-sterile • Patents: sageproducts.com/patents
Made in the U.S.A. of U.S. and Imported Parts
R4770C



**SAGE** PRODUCTS

Sage Products LLC
3909 Three Oaks Road • Cary, Illinois 60013
sageproducts.com
800 323 2220 • +1 815 455 4700



6  18029 60041  7

# EXHIBITS 114-134 REDACTED IN THEIR ENTIREY

# EXHIBIT 135

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PUREWICK CORPORATION,

      Plaintiff and Counterclaim Defendant,

v.

SAGE PRODUCTS, LLC,

      Defendant and Counterclaim Plaintiff.

C.A. No. 19-1508-MN

**CONTAINS CONFIDENTIAL INFORMATION**

## DEFENDANT'S THIRD SUPPLEMENTAL OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST AND SECOND SET OF INTERROGATORIES (NOS. 4-6 AND 9)

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant and Counterclaim Plaintiff Sage Products, LLC ("Sage") hereby supplements its objections and responses to Plaintiff's Interrogatory Nos. 4- 6, and 9 as set forth herein.

### GENERAL OBJECTIONS

1.    Sage hereby incorporates its General and specific objections set forth in its prior responses to Plaintiff's Interrogatories and Requests for the Production of Documents and Things.

2.    Sage is willing to meet and confer to discuss its objections in a good faith attempt to resolve or narrow any differences between the parties.

### INTERROGATORIES

4.    State the basis for any contention that any infringement of the Patents-in-Suit was not or will not be willful, including identifying all facts, literature, or other documents or evidence that Defendant asserts support its contention, and identifying each person with knowledge of such facts.

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY 4:**

5.    Provide the complete factual and legal bases for each of Defendant's affirmative defenses raised in its Answer to Plaintiff's Amended Complaint.

**THIRD SUPPLEMENTAL RESPONSE TO INTERROGATORY 5:**

In addition to the General Objections set forth above, Sage objects to this interrogatory as compound, overly broad and unduly burdensome in that it requests Sage identify "the complete factual and legal bases for each of Defendant's affirmative defenses." Sage objects to this interrogatory because it contains multiple discrete parts, which should be counted as separate interrogatories pursuant to Fed. R. Civ. P. 33. Indeed, there are at least eleven enumerated affirmative defenses, many of which have sub defenses, including at least:

1.    The Second Amended Complaint fail to state a claim upon which relief can be granted, including, but not limited to, failing to adequately plead indirect or willful infringement and failing to plead infringement.

2.    Sage has not engaged and is not engaging in any act that constitutes direct infringement, induced infringement, or contributory infringement, either literally or under the doctrine of equivalents, of any valid and enforceable claim of any of the patents-in-suit.

3.    Sage has not engaged and is not engaging in any act that constitutes willful infringement of any valid and enforceable claim of any of the patents-in-suit.

4.    The claims of the patents-in-suit are invalid for failure to meet one or more of the conditions of patentability as specified in Title 35 of the United States Code, including 35 U.S.C. §§ 102, 103, and/or 112, *et seq*. No claim of the patents-in-suit can be validly construed to cover any product or action of Sage.

5.    Plaintiff's claims are barred in whole or in part by prosecution history estoppel.

6. Plaintiff's claims are barred or otherwise limited under principles of equity, including waiver, estoppel, unclean hands, and/or acquiescence and render the patents-in-suit unenforceable.

7. Plaintiff's right to seek damages is limited or barred, including, without limitation, by 35 U.S.C. § 287.

8. Plaintiff is barred by 35 U.S.C. § 288 from recovering any costs associated with this suit.

9. Plaintiff may not seek injunctive relief against Sage because the alleged damages are not immediate or irreparable.

10. Plaintiff has suffered no damages.

11. This is an exceptional case, and Sage is entitled to an award of attorneys' fees pursuant to 35 U.S.C. § 285.

Thus, the interrogatory is unduly compound and improper under established law.

Sage further objects to this interrogatory as premature because it seeks information that is the subject of ongoing discovery and investigation, and there has been no deposition discovery. Sage objects to this interrogatory to the extent it seeks information which is protected by any applicable privilege, including attorney-client privilege and/or work product immunity doctrine. Sage objects to this interrogatory because it attempts to impose obligations on Sage beyond and/or inconsistent with those set forth in the Federal Rules of Civil Procedure, the District of Delaware Local Rules, the Default Standard, the Case Scheduling Order, the Protective Order, or any Order of the Court.

Subject to and without waiving any general or specific objections, Sage hereby incorporates Sage's Answer, Defenses, and Counterclaims to Plaintiff's Amended Complaint (D.I.

12) and its Answer, Defenses, and Counterclaims to Plaintiff's Second Amended Complaint (D.I. 53), which explain the basis of its defenses as well as its Answering Brief in Opposition to PureWick's Motion to Dismiss and Motion to Strike (D.I. 19). Sage also incorporates its Letter Brief in Response to PureWick Corporation's Motion for Leave to Amend (D.I. 43), which relates to at least some of its affirmative defenses. ██████████████████████████████

████████████████████████ Sage also incorporates its Invalidity Contentions regarding the patents-in-suit. Sage also incorporates its petition for *inter partes review* of U.S. Patent No. 8,287,508 (IPR2020-01426). Sage also incorporates its responses to Interrogatories Nos. 1-4, 6, 9, and 10, which relate to at least some of its affirmative defenses including noninfringement, invalidity, no willfulness, and unenforceability.

As explained above, Sage has eleven enumerated affirmative defenses, many of which have sub-defenses. In addition to what was set forth above, Sage identifies the factual and legal bases for its affirmative defenses based on information that is presently known to Sage after a reasonable effort to locate responsive information. Sage reserves the right to supplement its response to this interrogatory to the extent Sage learns of additional information that may develop or come to Sage's attention at a later time. For example, much of the information that supports Sage's affirmative defenses is uniquely in the possession of PureWick, and yet has not been provided by PureWick in response to Sage's discovery requests. In addition, the Court's final claim constructions may affect Sage's contentions regarding its affirmative defenses. Additionally, much of the information that may support Sage's affirmative defenses is the subject of expert discovery, which will be provided according to the Case Scheduling Order.

Sage has not engaged in and is not engaging in any act that constitutes direct infringement, induced infringement, or contributory infringement, either literally or under the doctrine of

equivalents, of any valid and enforceable claim of the '508 patent. No product made, used, sold, offered for sale, or imported by Sage infringes, either literally or under the doctrine of equivalents, any valid and enforceable claim of the '508 patent under any section of 35 U.S.C. § 271, and no party directly infringes any valid and enforceable claim of the '508 patent.

The PrimaFit® product, or the use of the product, does not directly infringe any claim of the '508 patent, either literally or under the doctrine of equivalents. For example, as previously explained, including in Sage's interrogatory responses, the PrimaFit® product does not include several elements of the claims of the '508 patent, including at least the claimed "urine collection device" or "moisture-wicking article" adapted for use with such a device that includes "a container defining a chamber" (including one that "is closed at both ends"), "wherein the container is closed except for having an array of openings . . . through which urine can be drawn into the chamber," "at least one outlet port through which urine can be drawn away from the chamber," and "wherein an elongated exterior of the container is configured [and dimensioned] for enabling a moisture-wicking article to be secured over the array of openings of the container by wrapping the article over the array and securing the wrapped article." This is at least because the PrimaFit® product does not include a container, much less one that is closed or defines or has a chamber (much less one that is closed at both ends). It also does not include an array of openings (much less any article secured over the array by wrapping the article over it and securing the article) or a port through which urine is drawn away from any chamber. Nor does the PrimaFit® product have, for example, each of a container, an array of openings, and a moisture wicking article over such an array, all in the same device at the same time.

Sage has not induced, and is not inducing, the infringement of any valid and enforceable claim of the '508 patent. Sage has not contributorily infringed, and is not contributorily infringing,

any valid and enforceable claim of the '508 patent. In addition to there being no direct infringement, Sage does not have the requisite specific intent to infringe or knowledge of infringement of the '508 patent required for inducement of infringement or contributory infringement. Sage does not offer to sell or sell within the United States or import into the United States any component knowing that it is especially made or especially adapted for use in infringement of the '508 patent. No third party directly infringes the '508 patent via use of a PrimaFit® product.

The '508 patent is invalid for failure to meet one or more conditions of patentability as specified in the Patent Laws (Title 35 of the U.S. Code), including, but not limited to, 35 U.S.C. §§ 102, 103, and/or 112, *et seq*. No claim of the '508 patent can be validly construed to cover any product or action of Sage.

The claims of the '508 patent are invalid under 35 U.S.C. §§ 102 and 103 in view of the prior art. For example, as explained in Sage's Invalidity Contentions, the claims of the '508 patent are anticipated and/or obvious in view of at least U.S. Patent Nos. 2,644,234, 3,349,768, 3,520,300, 4,233,025, 4,747,166, 4,883,465, 5,002,541, 5,628,735, 5,678,654, 6,979,324, 7,749,205, and/or 8,241,262 and U.S. Patent Publication Nos. 2005/0197639, 2005/0279359, 2006/0015080, and/or 2007/0191804, which disclose every element of the claims. To the extent that an element is missing from any one of these references, that element would have been obvious in view of other prior art or the knowledge of a person of ordinary skill in the art. These contentions are explained in detail in Sage's invalidity contentions, which have been incorporated by reference, as well as Sage's IPR for the '508 patent.

For example, U.S. Patent Publication No. 2006/0015080 to Mahnensmith ("Mahnensmith") was published on January 19, 2006, and is prior art to the '508 Patent. Figures 1 and 4 from Mahnensmith are depicted below:



Mahnensmith discloses every element of claims of the '508 patent. Mahnensmith describes a urine collection device and moisture-wicking article, as claimed in the '508 patent. As shown in the figures and described in the specification, the device includes a container defining a chamber (including one that is closed at both ends) where the container is closed except for having an array of openings through which urine can be drawn into the chamber. There is at least one outlet port through which urine can be drawn away from the chamber and an elongated exterior of the

11

container is configured and dimensioned for enabling a moisture-wicking article to be secured over the array of openings of the container by wrapping the article over the array and securing the wrapped article, and for enabling the article to be disposed in contact with the region surrounding a female's urethra. This can be seen in the images above. Urine is drawn from the moisture-wicking material, through the array and into the chamber from the article. To the extent that an element of the claims is missing from this reference, that element would have been obvious in view of other prior art and/or the knowledge of a person of ordinary skill in the art as already explained.

As another example, the moisture wicking article of Kuntz (U.S. Pat. No. 4,747,166) includes every element of claims of the '508 patent, as those claims are interpreted by PureWick. Figures 1 and 2 of the Kuntz reference are reproduced below:



As shown in the figures and described in the Kuntz patent and Sage's IPR, the Kuntz device includes a container defining a chamber where the container is closed except for having an array of openings through which urine can be drawn into the chamber. There is at least one outlet port through which urine can be drawn away from the chamber. This can be seen in the images above. There is an elongated exterior of the container configured and dimensioned for enabling a moisture-wicking article to be secured over the array of openings of the container by wrapping the article over the array and securing the wrapped article, at least as that element is apparently construed by Plaintiff. Urine is drawn from the moisture-wicking material, through the array and into the chamber from the article. To the extent that an element is missing from this reference, that element would have been obvious in view of other prior art or the knowledge of a person of ordinary skill in the art as explained for example in Sage's IPR.

On April 9, 2012, the Examiner of the application that led to the '508 patent rejected pending claims of the '508 patent application for anticipation in view of Kuntz. The Examiner stated that Kuntz "teaches a urine collection device for transporting urine voided from the body of a person or an animal by drawing the urine into a moisture-wicking article, i.e., pad 12, that is disposed in contact with a region of the body surrounding the urethral opening (col. 3, lines 48-52), and further drawing the urine into the collection device from the moisture-wicking article, comprising: a container, i.e., a perforated tube portion 30, defining a chamber for collecting urine, wherein the container is closed, except for having an array of openings, i.e. perforations (col. 3, line 62), through which urine can be drawn into the chamber and at least one outlet port, i.e. tubing connector 24, through which urine can be drawn away from the chamber (see entire document, particularly Figs. 1 & 2)." To obtain the '508 patent, PureWick amended the claims on May 29, 2012, and represented to the Patent Office that Kuntz did not disclose a moisture wicking article

"wrapping the article over the array" as required by the amended claims, because the moisture wicking article of Kuntz did not "wrap[] over" the openings in the container. Yet, now, in its Second Amended Complaint, PureWick alleges that a moisture wicking article that is not wrapped over any array of openings satisfies this claim element, that a fibrous core material is a "container," and that the openings between fibers can constitute an "array" of openings. Kuntz discloses all of these features (core 40) as well as a moisture wicking material wrapped over the openings between the fibers. PureWick is estopped from taking these contrary positions. Nevertheless, each of the '508 patent claims are anticipated based on PureWick's interpretation of the claims of the '508 patent and otherwise rendered obvious in view of Kuntz alone or in combination with Telang (U.S. Pat. No. 5,382,244), *e.g.*, as previously explained by the Examiner.

The claims of the '508 patent are also invalid for being indefinite, lacking written description support, and/or lacking enablement under 35 U.S.C. § 112. For example, at least the elements "array of openings," "wrapping the article over the array and securing the wrapped article," "securing a moisture wicking article over the array of openings by wrapping the article over the array and securing the article," and "the moisture wicking characteristic of a paper towel" lack written description support, lack enablement, and are indefinite.

Sage's current bases for invalidity are further set forth in detail in its Invalidity Contentions, which are hereby incorporated by reference. Sage further incorporates its Petition for *Inter Partes* Review as well as the PTAB's Institution Decision, for example, as discussed in response to Interrogatory No. 4.

It is PureWick's burden to establish willful infringement. Sage has not and cannot willfully infringe the '508 patent as explained previously in response to Interrogatory No. 4. Not only does

PureWick fail to provide any evidence that would satisfy the requisite elements for willfulness,

Sage cannot willfully infringe an invalid and/or not infringed patent.

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████. The inadequacy

of Sage's infringement contentions have been discussed many times and PureWick has not

supplemented. Notwithstanding these deficiencies, Plaintiff has not withdrawn its allegations.

The '508 patent is unenforceable under principles of equity, including waiver, estoppel,

unclean hands, and/or acquiescence. ████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████

        ████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████  ████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████████████████

████████ Sage has suffered prejudice as a result of PureWick's actions and inactions. Sage would be materially prejudiced if PureWick was allowed to proceed with its charge of infringement of the '508, '376, and '989 patents ███████████████████████████████

████████████████████ Because PureWick misleadingly allowed Sage to continue to grow the market for its PrimaFit® product, and improve and expand its product by investing in research and development, PureWick's deceptive conduct bears directly upon its allegations of infringement of the '508, '376, and '989 patents. Moreover, as explained further below, PureWick

16

further exacerbated the prejudice to Sage in this lawsuit █████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

The baseless allegations of patent infringement made by PureWick against Sage are causing irreparable damage to Sage. Since the conduct of PureWick renders this case to be "exceptional" under 35 U.S.C. § 285, Sage is entitled to recover its reasonable costs, expenses and attorneys' fees.

Sage has not infringed and is not infringing, directly or indirectly, either literally or under the doctrine of equivalents, the '376 patent, and the claims of the '376 patent are invalid and unenforceable.

Sage has not engaged in and is not engaging in any act that constitutes direct infringement, induced infringement, or contributory infringement, either literally or under the doctrine of equivalents, of any valid and enforceable claim of the '376 patent. No product made, used, sold, offered for sale, or imported by Sage infringes, either literally or under the doctrine of equivalents, any valid and enforceable claim of the '376 patent under any section of 35 U.S.C. § 271, and no party directly infringes any valid and enforceable claim of the '376 patent.

The PrimaFit® product does not directly infringe any claim of the '376 patent, either literally or under the doctrine of equivalents. For example, as previously explained including in Sage's interrogatory responses, the PrimaFit® product does not include several elements of the claims of the '376 patent, including at least the claimed "apparatus" that includes "a fluid impermeable casing having [or defining] a fluid reservoir at a first end," "a fluid impermeable casing defining a pliable fluid reservoir at a first end," "a fluid impermeable layer," and/or "a

membrane . . . supported on the support." This is at least because the PrimaFit® product does not include at least a casing, much less an impermeable one or one that has or defines a fluid reservoir (or a pliable fluid reservoir). The PrimaFit® product also does not include a membrane supported on an inner support.

Sage has not induced, and is not inducing, the infringement of any valid and enforceable claim of the '376 patent. Sage has not contributorily infringed, and is not contributorily infringing, any valid and enforceable claim of the '376 patent. In addition to there being no direct infringement, Sage does not have the requisite specific intent to infringe or knowledge of infringement of the '376 patent required for inducement of infringement or contributory infringement. Sage does not offer to sell or sell within the United States or import into the United States any component knowing that it is especially made or especially adapted for use in infringement of the '376 patent. No third party directly infringes the '376 patent via use of a PrimaFit® product.

The '376 patent is invalid for failure to meet one or more conditions of patentability as specified in the Patent Laws (Title 35 of the U.S. Code), including, but not limited to, 35 U.S.C. §§ 102, 103, and/or 112, *et seq*. No claim of the '376 patent can be validly construed to cover any product or action of Sage.

The claims of the '376 patent are invalid under 35 U.S.C. §§ 102 and 103 in view of the prior art. For example, as explained in Sage's Invalidity Contentions, the claims of the '376 patent are anticipated and/or obvious in view of at least U.S. Patent Nos. 3,349,768, 4,747,166, 4,886,508, 4,886,509, 5,002,541, 5,678,564, 6,888,044, 7,220,250, 7,695,460, 7,749,205, and/or 8,287,508, U.S. Patent Publication Nos. 2004/0128749, 2005/00549981, 2006/0015080, and/or 2013/0006206, and International Publication No. WO 2007/042823, which disclose every element

18

of the claims. To the extent that an element is missing from any one of these references, that element would have been obvious in view of other prior art or the knowledge of a person of ordinary skill in the art.

For example, International Publication No. WO 2007/042823 to Van Den Heuvel ("Van Den Heuvel") was published on April 19, 2007, and is prior art to the '376 Patent. Figures 1 and 3 from Van Den Heuvel are depicted below:



**Figure 1**



**Figure 3**

Van Den Heuvel discloses every element of claims of the '376 patent. As shown in the figures and described in the specification, Van Den Heuvel discloses a fluid impermeable casing

having a fluid reservoir at a first end, a fluid outlet at a second, opposite end, a longitudinally extending fluid impermeable layer coupled to the fluid reservoir and the fluid outlet and defining a longitudinally elongated opening between the fluid reservoir and the fluid outlet. It also has a fluid permeable support disposed within the casing with a portion extending across the elongated opening. It has a portion of the support extending across the elongated opening and distinct from and at least proximate to the fluid reservoir. It also discloses a fluid permeable membrane disposed on the support and covering at least the portion of the support that extends across the elongated opening, so that the membrane is supported on the support and disposed across the elongated opening. Van Den Heuvel discloses a tube having a first end disposed in the reservoir and extending behind at least the part of the support disposed across the opening. The tube extends through the fluid outlet to a second, fluid discharge end. The Van Den Heuvel apparatus is configured to be disposed with the opening adjacent to a urethral opening of a user, to receive urine discharged from the urethral opening. Urine will pass through the opening of the fluid impermeable layer, the membrane, the support, and into the reservoir, where it is withdrawn from the reservoir via the tube and out of the fluid discharge end of the tube. These elements can be seen in the images above and/or in the specification. To the extent that an element of the claims is missing from this reference, that element would have been obvious in view of other prior art or the knowledge of a person of ordinary skill in the art.

As another example, claims of the '376 Patent are obvious in view of at least Sanchez (U.S. Patent No. 8,287,508) and Kuntz (U.S. Patent No. 4,747,166). In a July 13, 2018, Office Action related to the application that led to the '376 patent, the Patent Office rejected pending claims as obvious in view of Sanchez and Kuntz. The independent claims were then amended to require "wherein the fluid permeable support is distinct from and at least proximate to the fluid reservoir"

to overcome this art and the Examiner subsequently allowed the claims. However, numerous prior art references disclosed a fluid permeable support distinct from the fluid reservoir, including Van Den Heuvel, U.S. Patent No. 7,695,460 and U.S. Patent No. 4,886,508. Any of these references in combination with Kuntz and/or Sanchez would render claims of the '376 patent obvious in view of the knowledge of a person of ordinary skill in the art.

The claims of the '376 patent are also invalid for being indefinite, lacking written description support, and/or lacking enablement under 35 U.S.C. § 112. For example, at least the elements "fluid impermeable layer," "wherein the fluid permeable support is distinct from and at least proximate to the fluid reservoir," and "substantially cylindrical," lack written description support, lack enablement, and are indefinite.

Sage's current bases for invalidity are further set forth in detail in its Invalidity Contentions, which are hereby incorporated by reference.

It is PureWick's burden to establish willful infringement. Sage has not and cannot willfully infringe the '376 patent as explained previously in response to Interrogatory No. 4. Not only does PureWick fail to provide any evidence that would satisfy the requisite elements for willfulness, Sage cannot willfully infringe an invalid and/or not infringed patent.

████████████████████████████████████████████

████████████████████████████████████████████ The inadequacy of Sage's infringement contentions have been discussed many times and PureWick has not supplemented. Notwithstanding these deficiencies, Plaintiff has not withdrawn its allegations.

The '376 patent is unenforceable under principles of equity including waiver, estoppel, unclean hands, and/or acquiescence, including as described above.

21

The baseless allegations of patent infringement made by PureWick against Sage are causing irreparable damage to Sage. Since the conduct of PureWick renders this case to be "exceptional" under 35 U.S.C. § 285, Sage is entitled to recover its reasonable costs, expenses and attorneys' fees.

Sage has not infringed and is not infringing, directly or indirectly, either literally or under the doctrine of equivalents, the '989 patent, and the claims of the '989 patent are invalid and unenforceable.

Sage has not engaged in and is not engaging in any act that constitutes direct infringement, induced infringement, or contributory infringement, either literally or under the doctrine of equivalents, of any valid and enforceable claim of the '989 patent. No product made, used, sold, offered for sale, or imported by Sage infringes, either literally or under the doctrine of equivalents, any valid and enforceable claim of the '989 patent under any section of 35 U.S.C. § 271, and no party directly infringes any valid and enforceable claim of the '989 patent.

The PrimaFit® product, or the use of the product, does not directly infringe any claim of the '989 patent, either literally or under the doctrine of equivalents. For example, as previously explained, including in Sage's interrogatory responses, the PrimaFit® product does not include several elements of the claims of the '989 patent, including at least the claimed "method" that includes "disposing in an operative relationship with the urethral opening of a female user a urine collecting apparatus" where the apparatus includes "a fluid impermeable casing having a fluid reservoir at a first end," "a fluid impermeable layer," and/or "a membrane . . . supported on the fluid permeable support." This is at least because the PrimaFit® product does not include at least a casing, much less an impermeable one or one that has or defines a fluid reservoir. The PrimaFit®

product also does not include a membrane supported on an inner support. The use of PrimaFit® product therefore does not infringe any of the claims.

There is also no direct infringement because there is no party that performs all of the steps of any claimed method claim. For example, there is no party that performs the steps of "disposing in operative relationship with the urethral opening of a female user . . .," "allowing urine discharged from the urethral opening to be received," and "allowing the received urine to be withdrawn . . ." Under PureWick's own allegations, various unrelated parties and actors that do not act in concert would perform such steps, and Sage does not direct or control others' performance. Moreover, PureWick has not identified any entity that directly infringes in its infringement contentions or in response to PureWick's interrogatories.

Sage has not induced, and is not inducing, the infringement of any valid and enforceable claim of the '989 patent. Sage has not contributorily infringed, and is not contributorily infringing, any valid and enforceable claim of the '989 patent. In addition to there being no direct infringement, Sage does not have the requisite specific intent to infringe or knowledge of infringement of the '989 patent required for inducement of infringement or contributory infringement. Sage does not offer to sell or sell within the United States or import into the United States any component knowing that it is especially made or especially adapted for use in infringement of the '989 patent. No third party directly infringes the '989 patent via use of a PrimaFit® product.

The '989 patent is invalid for failure to meet one or more conditions of patentability as specified in the Patent Laws (Title 35 of the U.S. Code), including, but not limited to, 35 U.S.C. §§ 102, 103, and/or 112 *et seq*. No claim of the '989 patent can be validly construed to cover any product or action of Sage.

The claims of the '989 patent are invalid under 35 U.S.C. §§ 102 and 103 in view of the prior art. For example, as explained in Sage's Invalidity Contentions, the claims of the '989 patent are anticipated and/or obvious in view of at least U.S. Patent Nos. 3,349,768, 4,747,166, 4,886,508, 4,886,509, 5,002,541, 5,678,564, 6,888,044, 7,220,250, 7,695,460, 7,749,205, and/or 8,287,508 and U.S. Patent Publication Nos. 2004/0128749, 2005/00549981, 2006/0015080, and/or 2013/0006206, and International Publication No. WO 2007/042823, which disclose every element of the claims. To the extent that an element is missing from any one of these references, that element would have been obvious in view of other prior art or the knowledge of a person of ordinary skill in the art.

For example, Van Den Heuvel was published on April 19, 2007, and is prior art to the '989 Patent. Figures 1 and 3 from Van Den Heuvel are depicted above.

Van Den Heuvel discloses every element of claims of the '989 patent. As shown in the figures and described in the specification, Van Den Heuvel discloses a method of using a urine collecting device, the method including disposing the urine collecting device in an operative relationship with the urethral opening of a female user; allowing discharged urine to be received through a longitudinally elongated opening, a fluid permeable membrane, a fluid permeable support, and into a reservoir of the device as described further herein; and allowing the received urine to be withdrawn from the reservoir via a tube and out of the fluid discharge end of the tube. Specifically, as discussed above, Van Den Heuvel describes a device with a fluid impermeable casing with a fluid reservoir at one end, a fluid outlet at another end, a longitudinally extending fluid impermeable layer coupled to the reservoir and the outlet that defines a longitudinally elongated opening between the two. The opening is to be placed adjacent to the urethral opening of the female user. It also describes a fluid permeable support within the casing with a portion

24

extending across the opening. The support is distinct from and proximate to the reservoir. It also discloses a fluid permeable membrane disposed on the support, covering at least the portion of the support that extends across the opening, so that the membrane is supported on the support and disposed across the opening. Van Den Heuvel also discloses a tube having a first end in the reservoir, extending behind at least the part of the support disposed across the opening and through the fluid outlet to a second, fluid discharge end. These elements can be seen in the images above and/or in the specification. To the extent that an element of the claims is missing from this reference, that element would have been obvious in view of other prior art or the knowledge of a person of ordinary skill in the art.

As another example, the asserted claims of the '989 Patent are obvious in view of at least Kuntz (U.S. Patent No. 4,747,166). In a February 14, 2019, Office Action related to the application that led to the '989 patent, the Patent Office rejected the then-pending (and now asserted) claims as anticipated by Kuntz. The asserted claims were then amended to require "wherein the fluid permeable support is distinct from and at least proximate to the fluid reservoir" to overcome this art, and the Examiner subsequently allowed the claims. However, numerous prior art references disclosed a fluid permeable support distinct from the fluid reservoir, including Van Den Heuvel, U.S. Patent No. 7,695,460, and Sanchez. Any of these references in combination with Kuntz would render the asserted claims obvious in view of the knowledge of a person of ordinary skill in the art.

The claims of the '989 patent are also invalid for being indefinite, lacking written description support, and/or lacking enablement under 35 U.S.C. § 112. For example, at least the elements "fluid impermeable layer," "wherein the fluid permeable support is distinct from and at least proximate to the fluid reservoir," and "disposing in operative relationship with the urethral

opening of a female user a second urine collecting apparatus substantially similar to the first urine collecting apparatus," lack written description support, lack enablement, and are indefinite.

Sage's current bases for invalidity are further set forth in detail in its Invalidity Contentions, which are hereby incorporated by reference.

It is PureWick's burden to establish willful infringement. Sage has not and cannot willfully infringe the '989 patent as explained previously in response to Interrogatory No. 4. Not only does PureWick fail to provide any evidence that would satisfy the requisite elements for willfulness, Sage cannot willfully infringe an invalid and/or not infringed patent.

███████████████████████████████████████████████████

███████████████████████████████████████████████████. The inadequacy of Sage's infringement contentions have been discussed many times and PureWick has not supplemented. Notwithstanding these deficiencies, Plaintiff has not withdrawn its allegations.

The '989 patent is unenforceable under principles of equity including waiver, estoppel, unclean hands, and/or acquiescence, including as described above, which is incorporated by reference.

The baseless allegations of patent infringement made by PureWick against Sage are causing irreparable damage to Sage. Since the conduct of PureWick renders this case to be "exceptional" under 35 U.S.C. § 285, Sage is entitled to recover its reasonable costs, expenses and attorneys' fees.

Sage has not infringed and is not infringing, either literally or under the doctrine of equivalents, the '407 patent, and the claims of the '407 patent are invalid and unenforceable.

Sage has not engaged in and is not engaging in any act that constitutes direct infringement, either literally or under the doctrine of equivalents, of any valid and enforceable claim of the '407

26

patent. No product made, used, sold, offered for sale, or imported by Sage infringes, either literally or under the doctrine of equivalents, any valid and enforceable claim of the '407 patent under any section of 35 U.S.C. § 271, and no party directly infringes any valid and enforceable claim of the '407 patent.

The PrimoFit™ product, or the use of the product, does not directly infringe any claim of the '407 patent, either literally or under the doctrine of equivalents. For example, as previously explained including in Sage's interrogatory responses, the PrimoFit™ product does not include several elements of the claims of the '407 patent including the claimed "chamber of void space positioned within the interior portion of the device between the flexible layer of porous material and the flexible layer of impermeable material," "the chamber being defined at least partially by the second side of the porous material and the flexible layer of impermeable material," the chamber "configured to collect urine for transport," the chamber "having a port for receiving a tube . . . ," "a receptacle . . . dimensioned and configured to receive a head of the penis . . . ," "the flexible layer of impermeable material . . . dimensioned and configured to shape the receptacle to receive the head of the penis . . ," and "the receptacle . . . configured to draw urine flowing from said penis through the flexible wicking material and the porous material into the chamber . . . ." ████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████ PrimoFit™ therefore does not infringe any claims of the '407 patent as explained in multiple different documents.

PureWick is barred by prosecution disclaimer and prosecution history estoppel from asserting that the PrimoFit™ infringes the '407 patent.

For example, in August 2016, PureWick filed its original claims, which generally related to a male external catheter with several features including a "porous material" layer, an "impermeable material" layer, and a "chamber" between those layers.

In August 2018, the PTO rejected those claims as anticipated by U.S. Pat. No. 7,220,250 ("Suzuki") and Kuntz. The PTO found that Suzuki and Kuntz contained every element of the claims including the claimed porous material, impermeable material, and chamber.

In November 2018, PureWick amended its claims to require, *inter alia,* that the "chamber" be "defined at least partially by the second side of the porous material and the layer of impermeable material."

In January 2019, the PTO again rejected the claims as anticipated by Suzuki and Kuntz, stating that those references disclosed a chamber between the porous and impermeable layers.

In March 2019, PureWick distinguished the prior art by representing that, if a device had materials between the porous and impermeable layers (such as pad core or space filler material), the chamber was not "defined partially by the . . . porous material and the . . . impermeable material" because of the material between the layers.

With regard to the Kuntz reference, PureWick stated (emphasis in original):

> Assuming, *arguendo*, the lower backing layer 36 of Kuntz discloses the impermeable layer, the absorptive pad 12 of Kuntz discloses the porous material of claim 1, and the central bore 22 (asserted by the PTO to disclose the chamber of claim 1) is not defined at least partially by the second side of the absorptive pad 12 and the lower backing layer 36. For example, in Figs. 2 and 3 of Kuntz (provided below for reference), the impermeable material 36a is separated from the central bore 22a by the pad core 34. Figs. 4-6 demonstrate similar configurations. Accordingly, the PTO has not demonstrated that the Kuntz discloses a "chamber being defined at least partially by the second side of the porous material and ***the flexible layer of impermeable material***," as recited in currently amended claim 1. (emphasis added).

With regard to the Suzuki reference, PureWick stated:

Based on the Examiner's explanation, the space retention materials 23 create a chamber. Assuming, *arguendo,* the space retention materials 23 create a chamber, the chamber created by the space retention materials does not appear to be defined by the leak proof sheet 22 and the surface sheet 15, which the PTO has asserted disclose the impermeable material and the layer of porous material, respectively. Instead, as shown in Fig. 3 of Suzuki (provided below for reference), if the space retention materials 23 create a chamber, the chamber created by the space retention materials appears to be defined by the lead proof sheet 22 and the air impermeable sheet 21. Furthermore, the surface material 14, conductor 134, permeable coating materials 135 and 136, the band shaped electrode sheet 132, and the air impermeable sheet 21 all appear to be positioned between the space retention material 23 and the porous surface sheet 15. Accordingly, Suzuki does not appear to disclose "the chamber being defined at least partially by the second side of the porous material and the flexible layer of impermeable material," as recited in currently amended independent claim 1.

PureWick repeated these statements in a later response in April 2019.

The arguments were accepted by the Examiner, and claims were allowed with the arguments noted.

The statements by PureWick during prosecution of the '407 patent constitute clear and unmistakable disclaimer of the configurations in the prior art. PureWick has clearly and unmistakably disclaimed from the scope of the claims of the '407 patent any device with a material or materials between the alleged impermeable material and the alleged porous material. These statements to the Patent Office put the public on notice that the claims of the '407 patent do not cover configurations with material between the alleged impermeable and porous materials.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

The '407 patent is invalid for failure to meet one or more conditions of patentability as specified in the Patent Laws (Title 35 of the U.S. Code), including, but not limited to, 35 U.S.C.

§§ 102, 103, and/or 112, *et seq*. No claim of the '407 patent can be validly construed to cover any product or action of Sage.

The claims of the '407 patent are invalid under 35 U.S.C. §§ 102 and 103 in view of the prior art. For example, as explained in Sage's Invalidity Contentions, the claims of the '407 patent are anticipated and/or obvious in view of at least Kuntz, Suzuki, U.S. Pat. No. 3,349,768 ("Keane"), U.S. Pat. No. 6,740,066 ("Wolff"), U.S. Pat. No. 5,300,052 ("Kubo"), JP2001 276107A ("Ishii"), U.S. Pat. Pub. No. 20030195484A1 ("Harvie"), European Patent No. EP0032138A2 ("Ozenne"), British Patent No. GB2106395A ("Bevan"), U.S. Pat. No. 4,020,843 ("Kanall"), U.S. Pat. Pub. No. 20040006321A1 ("Cheng"), Hollister Male Urinary Pouch, AMXDmax In-Flight Bladder Relief System, U.S. Pat. No. 8,287,508B1 ("Sanchez"), and U.S. Pat. No. 7,927,320B2 ("Goldwasser"), which disclose every element of the claims. To the extent that an element is missing from any one of these references, that element would have been obvious in view of other prior art or the knowledge of a person of ordinary skill in the art.

For example, Kuntz and Suzuki both include every element of claims of the '407 patent, including as those claims are interpreted by PureWick. Kuntz, which issued on May 31, 1988 and is prior art to the '407 patent is hereby incorporated by reference. Figures 1 and 2 of the Kuntz reference are reproduced below:

30



Suzuki, which issued on May 22, 2007, is prior art to the '407 patent and is hereby incorporated by reference. Figures 3 and 10B of the Suzuki reference are reproduced below:

Fig. 3





Suzuki and Kuntz disclose each and every element of claims of the '407 patent including the claimed porous material, impermeable material, and chamber as those claims are now interpreted by PureWick. As discussed above, the Examiner found that Kuntz and Suzuki each disclose every element of claims of the '407 patent, but allowed the claims after PureWick represented that its claims do not cover a device with material between the "porous material" and the "impermeable material." Yet now, PureWick alleges that a device containing material between the alleged porous material and alleged impermeable material satisfies the claim limitation of a "chamber" defined by "the porous material" and "the impermeable material." Worse, PureWick keeps changing its infringement contentions to change its assertions, which further renders the case exceptional. Both Suzuki and Kuntz, however, disclose this limitation. Each of the '407 patent claims are anticipated based on PureWick's interpretation of the claims of the '407 patent and/or rendered obvious in view of Suzuki or Kuntz alone or in combination with Wolff (U.S. Pat. No. 6,740,066) *e.g.*, as previously explained by the Examiner. To the extent that an element is missing

from these references, that element would have been obvious in view of other prior art or the knowledge of a person of ordinary skill in the art.

As another example, Keane was issued on October 31, 1967, and is prior art to the '407 patent. Figures 9 and 10 from Keane are depicted below:





Keane discloses every element of claims of the '407 patent. For example, with respect to independent claim 1, Keane describes a urine collection device, including specifically for a male, which transports urine from the device as urine is being collected, as claimed in the '407 patent. As shown in the figures and as described in the specification, the device also includes a flexible layer of porous material having a first and second side. It has a flexible layer of wicking material disposed on the porous layer. It further has a flexible layer of impermeable material defining an interior portion of the device. The porous material and wicking material are positioned within the

33

interior portion of the impermeable material, with at least a portion of the second side of the porous material being secured to the impermeable material. Between the porous material and impermeable material is a chamber of void space, defined by the second side of the porous material and the impermeable material, configured to collect urine for transport. The chamber has a port for receiving a tube to transport urine by drawing it from the chamber through the tube when a vacuum is applied via the tube. The device also has a receptacle within the interior portion of the device (defined partially by the top of the wicking material), which is dimensioned and configured to receive a head of a penis within the receptacle. The receptacle is also dimensioned to receive the head of the penis within it. And in use, when a vacuum is applied to the tube, the receptacle draws urine flowing out of a penis that is positioned in it, through the wicking material and the porous material and into the chamber. To the extent that an element is missing from this reference, that element would have been obvious in view of other prior art or the knowledge of a person of ordinary skill in the art.

The claims of the '407 patent are also invalid for being indefinite, lacking written description support, and/or lacking enablement under 35 U.S.C. § 112. For example, at least the elements "chamber of void space," "the chamber being defined at least partially by the second side of the porous material and the flexible layer of impermeable material," "configured to collect urine for transport," a "receptacle . . . dimensioned and configured to receive a head of the penis within the receptacle," "wherein the flexible wicking material and the flexible layer of impermeable material are dimensioned and configured to shape the receptacle to receive the head of the penis therein," "a chamber positioned substantially opposite to the opening," "the port being positioned substantially opposite to the opening of the cavity," "receptacle . . . being shaped to receive at least a head of a penis," "wherein the chamber is void space," "the chamber being partially defined by

a portion of the flexible porous material and a portion of the impermeable material," and "the port being positioned substantially opposite to the opening of the cavity" lack written description support, lack enablement, and are indefinite. Sage further incorporates by reference its claim construction briefing on the indefiniteness of the phrase "opening of the cavity" in the asserted claims.

Sage's current bases for invalidity are further set forth in detail in its Invalidity Contentions, which are hereby incorporated by reference.

It is PureWick's burden to establish willful infringement. Sage has not and cannot willfully infringe the '407 patent as explained previously in response to Interrogatory No. 4. Not only does PureWick fail to provide any evidence that would satisfy the requisite elements for willfulness, Sage cannot willfully infringe an invalid and/or not infringed patent.

The '407 patent is also unenforceable under principles of equity including waiver, estoppel, unclean hands, and acquiescence, including as described above. As described above, PureWick made repeated statements to the Patent Office that the claims of the '407 patent did not cover urine management devices with material between the permeable material and impermeable material, putting the public on notice that it did not believe that such embodiments were covered by the claims, impliedly consenting to devices with such configurations, and waiving any rights to assert intellectual property rights over such devices. The public, including Sage, was entitled to rely and relied on that communication. Sage invested significant time, effort, and money in research, development, and marketing on its PrimoFit™ product before PureWick later decided to advance an inconsistent position (and continued inconsistent and evolving positions). Yet PureWick now alleges the PrimoFit™ product is covered by the claims of the '407 patent, which means under PureWick's own theories, its prior public statements were misleading and false. Sage would be

materially harmed if PureWick is now permitted to assert a claim inconsistent with its earlier
statements and conduct and/or to continually change its infringement contentions to suit its current
theories rather based on any actual allegations of infringement. PureWick's actions led Sage to
believe that PureWick did not believe that devices such as PrimoFit™ infringed the '407 patent.
Moreover, PureWick's statements before the Patent Office, which PureWick now claims are
inaccurate, are directly related to the equity being sought in this litigation as described above.
PureWick is asserting the '407 patent against Sage despite knowing it is either not infringed or
invalid in view of the prior art. Sage put PureWick on notice regarding the inconsistency of its
claims ███████████████████████████████████████████████████████
██████████████████████████████████. PureWick did not withdraw its infringement
allegations, but instead filed its infringement claims on the '407 Patent.

The baseless allegations of patent infringement made by PureWick against Sage are
causing irreparable damage to Sage. Since the conduct of PureWick renders this case to be
"exceptional" under 35 U.S.C. § 285, Sage is entitled to recover its reasonable costs, expenses and
attorneys' fees.

With regard to patent marking, the burden of proving compliance with marking is, and at
all times remains, on the patentee. Sage's Interrogatory No. 6 asked PureWick to "[i]dentify each
version or iteration of the PureWick Female External Catheter product and any other product
(including iterations), combination of products, or system ever manufactured, used, offered for
sale or sold by any party (whether licensed or unlicensed) which is covered by any claim of the
Asserted Patents; the dates when that product/product iteration, combination of products, or system
was demonstrated, used, manufactured, offered for sale, or sold; the party(ies) which manufactured
and sold it; and, if applicable, how each product or system meets the limitation of the claim (i.e.,

prepare a claim chart)." In response, PureWick answered that ██████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████ There were other versions of the PureWick FEC product that were publicly disclosed and/or on sale that PureWick has not yet identified as marked with any of the patents-in-suit. The Court ordered PureWick to identify these additional products and whether they were sold or demonstrated publicly. (D.I. 72 at 28.) PureWick has not yet adequately identified these additional products, causing further prejudice and delay in this case.

Sage's Interrogatory No. 7 asked PureWick to "detail all facts and circumstances supporting or refuting whether any products, combination(s) of products, or system(s) were marked with any of the Asserted Patents (including any products, combination(s) of products, or system(s) referenced in Interrogatory No. 6) including all marking in compliance with 35 U.S.C. § 287, the products or materials that are so marked, the entire language used to identify the marking, where the marked products or materials can be found, the date when such marking began, and identification of all persons with knowledge of marking practices with respect to the Asserted Patents. Plaintiff's response should include this information for each version or iteration of any marking on any product or material that refers to any of the Asserted Patents."

In its response, ██████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ PureWick provided no evidence of substantial compliance with the requirements of 35 U.S.C. § 287. And, this image does not establish that the ████████████████████████████████████████████████ ████████████████████████████████████████████████ PureWick has failed to provide any more information responsive to the full scope of Sage's Interrogatory No. 7. Additionally PureWick, ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████ Thus, PureWick has not adequately shown substantial compliance with the marking requirement with regard to the ████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████

Plaintiff is barred by 35 U.S.C. § 288 from recovering any costs associated with this suit. For example, Sage has set forth the factual and legal bases for its contention that the asserted claims of the Patents-In-Suit are invalid in its Invalidity Contentions, including its Initial Invalidity Contentions served on May 29, 2020, its Supplemental Invalidity Contentions Regarding U.S. Patent Nos. 8,287,508, 10,226,375, 10,390,989 and Initial Invalidity Contentions Regarding U.S. Patent No. 10,376,407 served on August 21, 2020, its petition for *inter partes review* of U.S. Patent Nos. 8,287,508 (IPR2020-01426), and its response to Interrogatory No. 10. PureWick has not disclaimed these invalid claims and therefore is barred by 35 U.S.C. § 288 from recovering any costs associated with this suit.

Plaintiff may not seek injunctive relief against Sage because the alleged damages are not immediate or irreparable. A plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S. Ct. 1837, 1839, 164 L. Ed. 2d 641 (2006). PureWick has not demonstrated that its alleged damages are immediate or irreparable. The Second Amended Complaint only provides conclusory statements that "Under 35 U.S.C. § 283, Plaintiff is entitled to a permanent injunction against further infringement. Defendant's wrongful conduct has caused and will continue to cause Plaintiff to suffer irreparable harm resulting from the loss of its lawful patent right to exclude others from making, using selling, offering to sell, and/or importing Plaintiff's patented inventions. On information and belief, Defendant will continue to infringe the '508 ['376, '989, '407] patent

39

unless permanently enjoined by the Court." (D.I. 44, ¶¶ 60, 85, 109, 126.) Therefore PureWick has not demonstrated that it is entitled to injunctive relief at least because it has not demonstrated that its alleged damages are immediate or irreparable nor any of the other factors for irreparable harm.

Plaintiff has suffered no damages. For example, Sage has not engaged and is not engaging in any act that constitutes direct infringement, induced infringement, or contributory infringement, either literally or under the doctrine of equivalents, of any valid and enforceable claim of any of the patents-in-suit.

Additionally, "In patent cases, '[t]he burden of proving damages falls on the patentee,' . . . and '[t]he [patentee] must show his damages by evidence,'. . . Damages 'must not be left to conjecture by the jury. They must be proved, and not guessed at.'" *Promega Corp. v. Life Techs. Corp.*, 875 F.3d 651, 660 (Fed. Cir. 2017). PureWick has not proven that it has suffered any damages with any evidence. PureWick's damages model in PureWick Corporations Supplemental Identification of Accused Products, Asserted Patents and Damages Model, served on May 21, 2020, only states ████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████ ███████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████ This provides no basis for its damages claim.

Further, Sage's Interrogatory No. 10 asked PureWick to "[i]dentify the amount of damages that Plaintiff believes is the appropriate measure of damages should liability be established for Sage's alleged infringement of the Asserted Patents, and describe in detail all formulas, evidence, documents, theories, calculations, and facts upon which the amount is based." PureWick responded that "that pursuant to Rule 33(d) of the Federal Rule of Civil Procedure, Plaintiff will produce documents from which further information responsive to this interrogatory can be derived." PureWick has not responded to Sage's Interrogatory No. 10 with any evidence of its alleged damages.

This is an exceptional case, and Sage is entitled to an award of attorneys' fees pursuant to 35 U.S.C. § 285. Sage's numerous defenses are described above. For example, Sage reincorporates all of its statements above and its Answer, Defenses, and Counterclaims to Plaintiff's Second Amended Complaint (D.I. 53), which explain the basis for Sage's affirmative defense that this is an exceptional case, and Sage is entitled to an award of attorneys' fees pursuant to 35 U.S.C. § 285. ██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████ The other deficiencies have been discussed repeatedly in this case. Moreover, Plaintiff's litigation misconduct also warrants fees. Plaintiff has resisted responding to interrogatories and requests for production on critical issues, most notably with regard to its own prior art products and other prior art in its possession, as explained in the April 10, 2020, May 15, 2020, and June 19, 2020 letters from Bryce Persichetti to Amanda Antons, as well as the Letter to

the Honorable Maryellen Noreika from Anne Shea Gaza Regarding Discovery Dispute (D.I. 65), which are hereby incorporated by reference (and many other correspondence). As another example, PureWick has been admittedly withholding relevant prior art information, including information that was Court-ordered relating to its own prior art and products to Sage's prejudice as admitted in the September 20, 2020 email from Brian Biddinger to Christopher Scharff. Further, as explained in the letter from Anne Shea Gaza to the Honorable Maryellen Noreika regarding PureWick's Discovery Motion (D.I. 66), which is hereby incorporated by reference, PureWick improperly filed a surprise discovery motion (D.I. 64) without following the procedures set forth in the Scheduling Order (D.I. 56).

Additionally, PureWick acted in bad faith by failing to investigate, and continuing to fail to investigate, whether the prior demonstration and disclosure of its products prior to the critical date result in invalidation of its patents. Indeed, █████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████

Moreover, well into this litigation, PureWick advised Sage (after the parties had already exchanged and agreed upon search procedures for electronic searching) that ███████████ █████████████████████ As detailed in correspondence on this issue, including in an ████████████████████████████████, █████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████ PureWick's email is highly germane to issues in this case. Four of the six identified PureWick custodians are legacy PureWick employees. ███████████ ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ Sage has been significantly prejudiced in its ability to present its defenses due to PureWick's failure to preserve evidence. Sage further states that discovery is ongoing and Sage will supplement its response to this interrogatory as necessary pursuant to Fed. R. Civ. P. 26(e) after further discovery has been conducted. Sage expressly reserves the right to supplement, modify, or amend its responses contained herein.

6.      For each of the Patents-in-Suit, identify and describe in detail any alleged non-infringing alternative that Defendant contends can be used as an alternative to each Patent-in-Suit, including but not limited to: (i) a description of each alleged non-infringing alternative; (ii) a description of when and how each alleged non-infringing alternative was developed; (iii) the identity of individuals involved in developing and/or most knowledgeable about each alleged non-infringing alternative (if applicable); (iv) costs associated with developing and/or implementing each alleged non-infringing alternative; and (v) steps and the time required to develop and/or implement each alleged non-infringing alternative.

# EXHIBITS 136-147 REDACTED IN THEIR ENTIRETY

# EXHIBIT 148

# FILED IN NATIVE FORMAT ONLY

## REDACTED IN ITS ENTIRETY

# EXHIBITS 149-152 REDACTED IN THEIR ENTIRETY