13:51:08    IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


PUREWICK CORPORATION,         ) (Sealed)
                             ) CONFIDENTIAL
            Plaintiff,       )
                             ) C.A. No. 19-1508(MN)
v.                           )
                             )
SAGE PRODUCTS, LLC,          )
                             )
            Defendant.       )



                    Wednesday, February 23, 2022
                    2:00 p.m.
                    Oral Argument


                    844 King Street
                    Wilmington, Delaware


BEFORE:   THE HONORABLE MARYELLEN NOREIKA
          United States District Court Judge



APPEARANCES:


                    SHAW KELLER LLP
                    BY:  JOHN SHAW, ESQ.

                    -and-

                    QUINN EMANUEL URQUHART & SULLIVAN, LLP
                    BY:  STEVEN CHERNY, ESQ.
                    BY:  BRIAN P. BIDDINGER, ESQ.
                    BY:  NICOLA R. FELICE, ESQ.

                              Counsel for the Plaintiff

1    APPEARANCES CONTINUED:

2

3                  YOUNG CONAWAY STARGATT & TAYLOR
                   BY:  ANNE SHEA GAZA, ESQ.
4                  BY:  SAMANTHA G. WILSON, ESQ.

5                  -and-

6                  McANDREWS HELD & MALLOY LTD.
                   BY:  ROBERT A. SURRETTE, ESQ.
7                  BY:  SANDRA A. FRANTZEN, ESQ.
                   BY:  CHRISTOPHER SCHARFF, ESQ.
8                  BY:  RYAN PIANETTO, ESQ.

9

                        Counsel for the Defendant
10

11                      _ _ _ _ _ _ _ _ _ _ _

14:01:28 12

14:01:28 13                  THE COURT:  Good afternoon, everyone.  Please be

14:01:30 14    seated.

14:01:33 15                  Mr. Shaw.

14:01:34 16                  MR. SHAW:  Yes, Your Honor.  John Shaw for

14:01:37 17    plaintiff, PureWick Corporation.  Joining me from Quinn

14:01:40 18    Emanuel, Steven Cherny, Brian Biddinger, and Nicola Felice,

14:01:44 19    and from Becton Dickinson, Deanna Savage.

14:01:48 20                  MR. CHERNY:  Good afternoon, Your Honor.

14:01:49 21                  THE COURT:  Good afternoon.

14:01:51 22                  MS. GAZA:  Good afternoon, Your Honor.  Anne

14:01:54 23    Gaza from Young, Conaway.  I am joined today by my

14:01:57 24    colleagues from the McAndrews, Held & Malloy, Sandra

14:02:01 25    Frantzen, Bob Surrette, Christopher Scharff and Ryan

14:02:07 1    Pianetto, as well as my colleague from Young, Conaway,

14:02:10 2    Samantha Wilson.

14:02:11 3            THE COURT:  Good afternoon to all of you as

14:02:13 4    well.

14:02:13 5            So we have reviewed all of the materials on

14:02:17 6    these motions.  There are seven motions, but many, many

14:02:22 7    subparts.  Before we start, let's deal with the '508 patent.

14:02:29 8    And that one seems like we should stay the case.  It seems

14:02:32 9    like the case is different than TRUSTID.  In TRUSTID not all

14:02:37 10   of the amended claims were invalidated and contested.  They

14:02:39 11   didn't have a second trial where I was going to be forced to

14:02:43 12   hear the case again regardless.  I didn't think that

14:02:46 13   PureWick cared that much, it was more of a deferral to me,

14:02:50 14   but maybe I misread that.

14:02:52 15           MR. CHERNY:  Your Honor, Steve Cherny.  You read

14:02:54 16   it correctly, we are entirely deferring to your views as to

14:02:58 17   what is best for the Court.

14:03:02 18           THE COURT:  Okay.  So with that I think I am

14:03:02 19   going to stay the case.  I think the stay will simplify the

14:03:06 20   issues.  We're late in the litigation, but all of the

14:03:08 21   asserted claims in that patent have been invalidated.  I

14:03:11 22   don't think it's terribly prejudicial to PureWick to say

14:03:12 23   that the claim to the PTAB has been found to be unpatentable

14:03:16 24   particularly given that PureWick has already brought a

14:03:18 25   second lawsuit and we're going to have a second trial if we

14:03:21 1    need to deal with the '508 Patent claims.  So Sage, don't

14:03:26 2    file a motion.  I granted you the relief.  And I am done

14:03:30 3    with that issue.

14:03:31 4          Okay.  So any parts of the summary judgment

14:03:34 5    motions that deal with the five -- or the motions to exclude

14:03:37 6    that deal with the '508 are going to be denied as moot

14:03:40 7    subject to being brought again if that patent comes back.

14:03:44 8          All right.  Now, I have allotted thirty minutes

14:03:49 9    for each side for this hearing.  So Sage, either you're

14:03:56 10   going to be talking fast or you're going to have to

14:04:00 11   prioritize.  But there were a couple of things that I

14:04:04 12   thought I would say at the beginning to try to shorten

14:04:07 13   things.  Starting with plaintiff's position on summary

14:04:11 14   judgment and to exclude opinions inconsistent with my claim

14:04:17 15   construction, DI 190.  I am going to deny that motion as to

14:04:21 16   summary judgment.

14:04:22 17         As to the exclusion of opinions inconsistent

14:04:25 18   with my claim construction, I will grant it.  No one should

14:04:29 19   be offering arguments or opinions inconsistent with any of

14:04:32 20   my claim constructions from either side.  More specifically,

14:04:36 21   I construed a casing, meaning an outer cover having or

14:04:42 22   defining a fluid reservoir at the first end and a fluid

14:04:46 23   outlet at the second end.  I rejected the defendant's

14:04:48 24   proposal that the construction included a negative

14:04:51 25   limitation that a backing/impermeable layer in combination

14:04:55 1   with securing portion for other components is not a casing.

14:04:58 2   So defendants cannot argue that the patent excludes such

14:05:01 3   things as casings by definition citing to the patent.

14:05:06 4       Similarly I construed a wicking material to mean

14:05:09 5   an article that moves moisture by capillary action from one

14:05:13 6   surface of the article to the other.  That is the

14:05:18 7   construction.  To the extent that defendant argues that

14:05:23 8   comments I made about absorption need to be read into the

14:05:27 9   construction, I disagree.  I did not construe the wicking

14:05:30 10  term to mean that a moisture absorbant material could not

14:05:34 11  also be moisture wicking, so you cannot base your augment on

14:05:39 12  that.  If you have an argument that the moisture is not

14:05:42 13  moved by capillary action, that's fine, you can make that as

14:05:45 14  a factual matter, but you cannot argue that simply because

14:05:49 15  it absorbs it is not wicking.

14:05:52 16      I think those were the only two terms that were

14:05:54 17  at issue in the contrary to claim construction.  Correct,

14:05:56 18  Mr. Cherny?

14:05:57 19          MR. CHERNY:  Correct.

14:05:58 20          THE COURT:  All right.  So now, let me see if

14:06:00 21  there were any other easy ones to deal with.  No, I think

14:06:04 22  they were all on the '508.  We're going to go one, one, and

14:06:12 23  you can prioritize with what you want to raise.

14:06:17 24          MS. GAZA:  Your Honor, if I may, as an

14:06:19 25  administrative matter, we have marked our slides

14:06:23  1   confidential.  And we do anticipate that there may be some

14:06:26  2   confidential material addressed during this proceeding.  We

14:06:30  3   believe that there may be some confidential information also

14:06:33  4   in PureWick's slides.  We would ask if we could to seal the

14:06:37  5   transcript subject to redactions pursuant to the local

14:06:41  6   rules.

14:06:41  7            THE COURT:  We can do that, but I want ultra

14:06:44  8   minimum redactions.  If you start over-redacting, it's all

14:06:48  9   going to come in.  Court proceedings are public proceedings.

14:06:51 10            MS. GAZA:  Thank you, Your Honor.

14:06:52 11            THE COURT:  All right.  Mr. Cherny, are you

14:06:55 12   going first?

14:06:55 13            MR. CHERNY:  If plaintiff goes first, then I'm

14:06:58 14   going first.

14:06:59 15            THE COURT:  Okay.

14:06:59 16            MR. CHERNY:  Make sure we have the right one.

14:07:04 17   We do.

14:07:05 18            Good afternoon, Your Honor.  May it please the

14:07:08 19   Court.

14:07:08 20            THE COURT:  And by the way, you can leave your

14:07:10 21   mask on or take it off, you can speak from the table,

14:07:12 22   whatever you want, whatever is your preference.

14:07:15 23            MR. CHERNY:  I will stand at the lectern and

14:07:16 24   remove my mask, Your Honor.

14:07:20 25            THE COURT:  Sorry about that.  I usually tell

14:07:22 1    people that.

14:07:22 2                MR. CHERNY:  That's okay.  So I'm going to start

14:07:24 3    with our motion relating to what I call the bundling of

14:07:29 4    PureWick prior art devices, Your Honor.

14:07:32 5                THE COURT:  Here is my question for this one

14:07:34 6    just to shorten this one, because I did look at your slides

14:07:37 7    and I get it, this is what you have been worried about the

14:07:40 8    whole time.

14:07:40 9                MR. CHERNY:  Yes.

14:07:41 10               THE COURT:  But in the final contentions,

14:07:46 11   defendant says look, these all have similar salient features

14:07:50 12   and it did mention the brown tape products.  So it could

14:07:54 13   have been clearer, but isn't there enough in there to put

14:07:58 14   you on notice?

14:07:59 15               MR. CHERNY:  Two things, Your Honor.  No, there

14:08:00 16   is not because there were a number of products that had

14:08:03 17   brown tape.  But also, perhaps more importantly, by doing

14:08:07 18   that, they avoided the limiting of the order down to 35 and

14:08:11 19   then later by essentially including approximately 100

14:08:12 20   devices, and what's even more problematic is --

14:08:12 21               THE COURT:  Are there currently 100 devices that

14:08:22 22   they're asserting of these PureWick prior art things?

14:08:27 23               MR. CHERNY:  I apologize, Your Honor, there were

14:08:29 24   up and through until expert discovery.

14:08:32 25               THE COURT:  Okay.

14:08:33 1          MR. CHERNY:  Every time -- but obviously I'm

14:08:35 2 happy to continue answering questions, but Your Honor, I can

14:08:38 3 go through and point out one other issue that I think is not

14:08:41 4 coming to the forefront now.

14:08:43 5          So obviously you have seen -- this is your

14:08:46 6 order, and early on they came to you and said look, compel

14:08:51 7 these guys to differentiate between this grouping of like a

14:08:55 8 hundred prior devices that span three years, different

14:08:58 9 times, different dates, many of which had similar -- many

14:09:01 10 very different.  And that's what they look like.  They're

14:09:05 11 literally tens of these things from different years.  You

14:09:09 12 said wait a second, I'm not going to make you tell you

14:09:13 13 what's different about them or why they're not prior art

14:09:15 14 until you actually give them specific contentions.  I know

14:09:19 15 you have read the slide, but it helps me pace myself to be

14:09:23 16 repetitive.

14:09:23 17          So anyway, we get to December 18, 2020, this is

14:09:28 18 when they're supposed to limit, there is a title, PureWick

14:09:31 19 prior art devices.  That's PureWick prior art devices.  That

14:09:35 20 doesn't really seem like that's complying with your limiting

14:09:37 21 and it actually put us in a tough position wherein terms of

14:09:41 22 claim construction we had to go in thinking about all these

14:09:42 23 indifferent things without them identifying the specific art

14:09:46 24 they were relying on, and you have this broad array of

14:09:51 25 years.

Here is what they claim was their element-by-element analysis of versions of the PureWick prior art devices and then they would go element by element saying PureWick prior art devices.  Now, we tried hard throughout discovery to get them to get off of this position.  They then raised this in -- we have back and forth motions in front of Magistrate Judge Fallon and they say that the only reason they won't tell us what's different is because we won't identify the prior art devices.  And they say they should be counted as one reference.  They all have the same salient features.  I keep saying throughout this case, I don't know what it means to have the same salient feature.  When you look at these different products, they're entirely different.  I want you to keep in mind because this is something that's not entirely clear from your slides as to why this becomes a problem.  So we got the April 5th, 2021 final contentions and as you can see, the devices are referred to herein as the PureWick prior art devices are the PureWick female external catheter products tested, offered for sale, sold between 2013 and 2016, so three years down there.  Some of these can't be prior art because priority date at latest is 2015.  These public disclosures of PureWick prior art devices include female catheter products tested during 2013, '14 and '15, curved, extruded, everything is still under PureWick prior art

14:11:18  1    devices.  This is at the end of fact discovery.

14:11:21  2            What happens is what they said here is explain

14:11:24  3    these public disclosures, that's what just came from here,

14:11:28  4    include curved, extruded, tapered, they said PureWick

14:11:33  5    products are not one product because they have different

14:11:36  6    colored tape, et cetera, they should be counted as one

14:11:39  7    reference as they all have the same salient features.  As of

14:11:42  8    the end of fact discovery their position is everything is

14:11:45  9    one.  They're all the same.  There is no difference between

14:11:47 10    any of them.  That's the position that they took, again, in

14:11:49 11    front of Judge Fallon.  And she says, look, you guys want to

14:11:53 12    bundle this, but the plaintiff doesn't agree they're all the

14:11:56 13    same, at some point there will be motion practice.  And

14:11:59 14    guess what, there is motion practice.

14:12:01 15            And she then points out because they again try

14:12:04 16    to say well, you guys should tell us what's different about

14:12:07 17    all these things and Judge Fallon not surprisingly said I

14:12:12 18    looked at this, this is the same as the issue back in

14:12:15 19    December in front of Judge Noreika.  You had all the stuff,

14:12:18 20    you had the samples, you had the pictures, you could

14:12:20 21    actually identify specifically amongst these hundred

14:12:22 22    different things over three years, but you keep trying to

14:12:26 23    shift it to PureWick.  So this is the end of fact discovery

14:12:30 24    and this is where we're at, everything is the same.

14:12:32 25            And I then predicted, I said look, I'm willing

14:12:37 1   to live with that being their contention interrogatory, they

14:12:41 2   say everything is the same, it's all PureWick prior art

14:12:44 3   devices, but they can't come forward in expert discovery and

14:12:47 4   say this specific one is invalidated for this reason.  Guess

14:12:51 5   what, here is one of the ones that was allegedly the same.

14:12:54 6   This is their expert report.

14:12:57 7            I will explain further, PureWick asserts the

14:13:00 8   extruded wick prototype is an embodiment of the inventions

14:13:02 9   in the claim.  I disagree as a number of elements were

14:13:06 10  missing.  This is one that was before one of PureWick prior

14:13:09 11  art devices, part of one that --

14:13:12 12            THE COURT:  Now it's not covered?

14:13:13 13            MR. CHERNY:  Now it's not covered.  And now I'm

14:13:15 14  sure knowing the Court is inquisitive, why are they saying

14:13:19 15  this, because they had pointed to this as supporting our

14:13:22 16  earlier priority date, so all of a sudden it didn't have the

14:13:25 17  same salient features, whereas this version of the brown

14:13:28 18  paper, remember there was five or six different ones with

14:13:32 19  brown tape and there was testimony that didn't differentiate

14:13:34 20  in terms of saying which one was when, and whether one was

14:13:37 21  covered up, and this one now that you point to, that's the

14:13:41 22  only one out of a hundred, now two things that before were

14:13:44 23  the same don't have the same salient features anymore.  And

14:13:47 24  of course, why couldn't we have known that during fact

14:13:50 25  discovery?  It would have been better had they actually

14:13:53 1  followed the court order and said here is the ones we're

14:13:55 2  picking, but they chose not to, and so not surprisingly this

14:13:59 3  is where we are.

14:14:00 4          Here is their interrogatory.  As explained,

14:14:03 5  these public disclosures of PureWick prior art devices

14:14:07 6  including female, and in that three-year span, extruded --

14:14:11 7          THE COURT:  Is the one that's now being

14:14:14 8  excluded.

14:14:14 9          MR. CHERNY:  Extruded.

14:14:16 10         THE COURT:  No, I'm sorry, is the one that's

14:14:18 11 being excluded, that's the extruded one in those time

14:14:21 12 periods?

14:14:22 13         MR. CHERNY:  Right.  That's what this is

14:14:23 14 pointing out here.  It says 2013-2014, that's the entire

14:14:28 15 period of all of those devices, that hundred devices.  And

14:14:32 16 in each of these instances the PureWick prior art device

14:14:35 17 included every element of the asserted claim.  So those

14:14:38 18 things are unclear, literally this is from their final

14:14:44 19 contentions was extruded plus everything which includes

14:14:42 20 every element of asserted claims, this is the end of fact

14:14:42 21 discovery.  And, in fact -- but then you get to the expert

14:14:52 22 report, all of a sudden it's different.  I mean, look, there

14:14:55 23 is always some amount of sloppiness, but we brought this

14:14:58 24 issue up over and over and over again, said look, it's not

14:15:02 25 fair that they are not limiting it out --

THE COURT:  Let me hear from the defendant.

MR. CHERNY:  Okay.

THE COURT:  And I don't want you to just he said she said, I can see where it says prior art products and I want to see where did you ever get more specific during discovery that it's not something new in the expert report, that's what I want, one.  And two, it does seem like there was a change in position from the expert -- from the interrogatory where it said everything is included, and now the expert is saying oh, no, that one is not included because that one might be helpful to them.  So I want to see where that is consistent with what you disclosed in discovery as well.

MS. FRANTZEN:  Okay.  So let me start on slide 72 and hopefully we can find that slide for you.

The one kind of overarching point that I actually want to make is that during fact discovery we had been attempting to ascertain information about these various products, but one thing that was kind of very clear as Mr. Cherny put up those hundred devices, 75 percent of those devices are not PureWick prior art devices.  I have no idea what that image is.  That includes stuff from the '508 patent on it, that includes our current product --

THE COURT:  Stop.

Mr. Cherny, is that true?

14:16:27   1                    MR. CHERNY:  No, that was all claimed PureWick

14:16:31   2      prior art devices that they never identified what was in.

14:16:35   3                    THE COURT:  So his point is, that's everything

14:16:38   4      that PureWick made before.  You just said PureWick prior art

14:16:43   5      as if you were somehow including well, of course only those

14:16:48   6      things that are covered by the patent and he's saying, well,

14:16:51   7      I don't know what those are, so here is everything.

14:16:54   8                    MS. FRANTZEN:  Your Honor, some of those

14:16:55   9      products are their current product that were not

14:16:59  10      manufactured in 2016 and some of those are the '508 patent.

14:17:02  11      With due respect, Mr. Cherny is not accurate in saying those

14:17:06  12      are PureWick prior art devices, that is just not true.  And

14:17:09  13      with respect --

14:17:10  14                    THE COURT:  When did he get more specific during

14:17:15  15      discovery?

14:17:16  16                    MS. FRANTZEN:  Two points.  Let me go to this

14:17:18  17      slide where we were specifically -- this is in our

14:17:23  18      invalidity contentions where we were focusing on the brown

14:17:28  19      taped version and the fact that we did not learn until the

14:17:30  20      last week of discovery that they had sold this brown tape

14:17:33  21      product in July 2015 and we specifically identified it in

14:17:33  22      our contentions, the female external catheter product

14:17:42  23      disclosed and demonstrated brown tape in association with

14:17:42  24      the CONNECT Foundation's most innovative new product award.

14:17:50  25      We had subpoenaed CONNECT to get the information that said

14:17:53  1     that they had sold the product in July 2015.  During

14:17:57  2     discovery, Your Honor ordered them to identify when the

14:17:59  3     products were sold.  This is an order by Your Honor to say

14:18:04  4     identify the patent products when they were sold.  Their

14:18:07  5     first response told us right immediately after that there

14:18:10  6     wasn't a disclosure until September 2015.  In February,

14:18:16  7     months later into fact discovery, they finally revealed that

14:18:20  8     there was a sale in July 26, 2015, but they would not tell

14:18:24  9     us what product it was.  It was not until we subpoenaed

14:18:27 10     CONNECT Foundation, this is a video from CONNECT Foundation

14:18:30 11     where they disclosed the product and showed the brown tape

14:18:33 12     version, and that was -- this is their application to

14:18:36 13     CONNECT -- sorry, let me find it here.  I'm skipping

14:18:40 14     through.  This is their application to CONNECT that says the

14:18:43 15     product was sold July 26th, 2015, which was clearly prior to

14:18:48 16     the September 8, 2016, priority date.

14:18:55 17             THE COURT:  When did you get this?

14:18:57 18             MS. FRANTZEN:  This was produced to CONNECT I

14:19:01 19     would say maybe thirty days before the close of fact

14:19:02 20     discovery.  This is a CONNECT fact document.  And the

14:19:02 21     witnesses that were their witnesses and inventors that

14:19:02 22     testified about these documents were not deposed and not

14:19:12 23     made available until the last week of fact discovery, which

14:19:12 24     was after our invalidity contentions were due.

14:19:20 25             THE COURT:  When did you disclose this?  Did you

14:19:22  1    then supplement your invalidity contentions or did you wait

14:19:25  2    for an expert report?

14:19:27  3              MS. FRANTZEN:  Our invalidity contentions

14:19:30  4    mention the CONNECT Foundation because we were aware of the

14:19:33  5    award and the fact that it was pictured in the award and

14:19:38  6    that there was a sale in July 2015, but they never told us

14:19:42  7    as I showed in this interrogatory where it says they said a

14:19:45  8    single sale was made on July 26, 2015.  This was in February

14:19:51  9    2021, during fact discovery, they say they were unable to

14:19:54 10    determine which product was sold as of that date.  I mean,

14:19:57 11    this is a case where we have a clear on sale bar.  If the

14:20:02 12    priority date issue is accepted and it is one of our key

14:20:05 13    defenses, and we did everything we could during fact

14:20:09 14    discovery, we supplemented every time we could to identify

14:20:12 15    the brown tape product and --

14:20:14 16              THE COURT:  Tell me, though, about how this --

14:20:18 17    where in fact discovery you disclosed that there is one that

14:20:23 18    they're relying on for priority that doesn't have all of the

14:20:28 19    elements?

14:20:30 20              MS. FRANTZEN:  Well, we always said that --

14:20:33 21              THE COURT:  Show me, don't tell me we always

14:20:35 22    said, show me where it was disclosed.

14:20:39 23              MS. FRANTZEN:  Well, in our summary judgment

14:20:41 24    motion, and I'm sorry I don't have a slide on this, in our

14:20:45 25    summary judgment motion, they alleged priority based on the

14:20:48  1    March 2014 application.  The March 2014 application

14:20:51  2    discloses that extruded wick embodiment, and so we have

14:20:57  3    always alleged that they were not entitled to priority based

14:20:59  4    on the March 2014 --

14:21:01  5        THE COURT:  But I'm not talking about the

14:21:03  6    application, I'm asking your expert said a particular

14:21:06  7    product, at least as I read the slide that was up there, I

14:21:10  8    had said a particular product, the extruded product was

14:21:18  9    missing elements.  Where was that disclosed?

14:21:21 10        MS. FRANTZEN:  They brought up the extruded

14:21:26 11    product as missing elements in their expert reports to

14:21:29 12    support their priority argument.

14:21:32 13        THE COURT:  Can someone tell me what page this

14:21:34 14    is?  Because as I remember it, it said something like I

14:21:38 15    disagree with PureWick that this contains all of the

14:21:41 16    elements.  And you're saying PureWick is saying it had

14:21:45 17    missing elements.

14:21:47 18        MS. FRANTZEN:  No, no, I'm sorry, PureWick was

14:21:50 19    saying it had all the elements because they were arguing --

14:21:52 20        THE COURT:  Where in discovery, not in your

14:21:54 21    expert report, did you say that?

14:21:57 22        MS. FRANTZEN:  We didn't have to say it because

14:21:59 23    it didn't have to do with our invalidity position, it had to

14:22:02 24    do with them establishing priority, so it was not our --

14:22:07 25        THE COURT:  You were never asked about what was

14:22:09 1    missing or why they weren't entitled to priority, there was

14:22:13 2    no --

14:22:15 3              MS. FRANTZEN:  We served an interrogatory on

14:22:17 4    them that said tell us why you believe you're entitled to

14:22:20 5    priority which is not at issue here, and they relied on that

14:22:24 6    device.

14:22:26 7              THE COURT:  So I think the problem here is you

14:22:31 8    had -- and I get what you're saying about CONNECT, but you

14:22:36 9    had an interrogatory response that said all these products,

14:22:40 10   extruded, elongated, whatever they are from 2013, '14 and

14:22:45 11   '15, are prior art and invalidate these claims.  And now

14:22:51 12   there is one of those that you are saying is missing

14:22:56 13   elements.  Why aren't they entitled to rely on your

14:23:03 14   assertions during fact discovery that you are saying all the

14:23:08 15   products had them?

14:23:12 16             MS. FRANTZEN:  Your Honor, we never asserted

14:23:13 17   that, the thing that he was pointing to was part of this.

14:23:16 18   We always relied on the devices that had --

14:23:19 19             THE COURT:  So hold on, stop talking when I'm

14:23:22 20   talking.

14:23:22 21             MS. FRANTZEN:  Pardon me.

14:23:22 22             THE COURT:  It's only important that I

14:23:25 23   understand, not that you get to talk.

14:23:27 24             MS. FRANTZEN:  Sure.

14:23:27 25             THE COURT:  Okay.  So when I have this

interrogatory and response that says PureWick's prior art

devices including female external catheter products tested

during 2013, '14 and '15, e.g., curved, extruded, tapered,

spun fiber backing, and you are saying that those products

were what were invalidating the claims?

MS. FRANTZEN:  The products that -- from 2013,

'14 and '15.

THE COURT:  And is the product that is now being

said is missing elements from that time period?

MS. FRANTZEN:  I -- they say it's before that

time period and that they filed a patent on it in

March 2014, so they are alleging --

THE COURT:  So I'm trying to understand, you

know, again, fair disclosure, and I take your point on

CONNECT, whatever.  This one is a different issue because

this one is saying now they have to deal with an issue where

you're saying before all these products, all the same, same

salient features, and now you're saying oh, this guy, he

doesn't have the same salient features.  And that I don't

see where there was a fair disclosure of that given that you

said generally extruded products in 2013, '14 and '15 fell

into that category.

MS. FRANTZEN:  Your Honor, I guess the

disconnect is that we were not relying on that so we had no

reason to disclose that it was missing a feature.  I mean,

14:25:26 1  why would we -- they actually served an interrogatory on

14:25:29 2  them asking them to identify any that were missing a feature

14:25:32 3  and they didn't identify any.  But we had no reason to say

14:25:37 4  oh, by the way, there is one that's missing a feature.  We

14:25:40 5  were trying to say the ones that had all the features.

14:25:43 6          THE COURT:  When did you understand that they

14:25:44 7  were asserting priority and that that was covered?

14:25:49 8          MS. FRANTZEN:  We served an interrogatory on

14:25:51 9  them asking for their priority arguments and they provided

14:25:55 10 that early in the case.

14:25:56 11         THE COURT:  So you knew from early in the case

14:25:58 12 that this particular product was being asserted to have all

14:26:04 13 of the elements?

14:26:06 14         MS. FRANTZEN:  They didn't rely on the product,

14:26:08 15 they only relied on what was in the application.  Later in

14:26:11 16 expert discovery they were the ones during their own expert

14:26:15 17 reports that said this product embodies the priority

14:26:20 18 application.  They did that, not us.  So just to kind of set

14:26:24 19 the stage, in their expert report, we asked for priority,

14:26:28 20 they relied on their patent applications, not products, they

14:26:31 21 said this patent application discloses X, Y, Z.  Then when

14:26:35 22 we came to their expert reports, they said in their expert

14:26:38 23 reports that this product that Mr. Cherny is showing you has

14:26:42 24 all the elements, and we said we don't agree that -- we said

14:26:45 25 it's missing this element.  And that was consistent with

14:26:51 1    what we have been arguing all along.

14:26:53 2             THE COURT:  All right.  All right.  I don't need

14:26:55 3    you to tell me you were consistent.

14:26:57 4             Mr. Cherny, when was the first time that you

14:27:00 5    disclosed that a particular product rather than an

14:27:02 6    application had all the elements?

14:27:03 7             MR. CHERNY:  From our perspective, Your Honor,

14:27:05 8    in order to prove priority for the provisional, we have to

14:27:09 9    show that it was in the application, then after they lump

14:27:12 10   everything together and said they all had the same salient

14:27:16 11   features we used that and pointed to it and said well, given

14:27:18 12   that this is from our perspective the same thing, but we

14:27:21 13   won't point to a product to prove priority, we would prove

14:27:26 14   physical application, that's where it's got to be disclosed,

14:27:29 15   I think they were relying on the fact that that plus

14:27:32 16   everything else met all the elements, so I don't see where

14:27:34 17   the argument here is from their perspective.

14:27:38 18            THE COURT:  All right.  I am going to deny the

14:27:39 19   motion.  And if you want to cross-examine their expert with

14:27:42 20   what they said before was included and that he's being

14:27:42 21   inconsistent, I guess you can do that.

14:27:50 22            All right.  What's next?  Defendant, what's your

14:27:52 23   first motion?

14:27:54 24            MS. FRANTZEN:  Okay.  I'm happy to turn to our

14:27:57 25   Daubert motion.

14:27:58  1              THE COURT:  Well, your Daubert motion has

14:28:00  2      seventeen different things you asked me to exclude in

14:28:04  3      nineteen pages.

14:28:04  4              MS. FRANTZEN:  I promise we'll be more focused.

14:28:07  5              THE COURT:  You better be.

14:28:09  6              MS. FRANTZEN:  Let me turn to slide 5.  And the

14:28:13  7      one issue we wanted to talk about was our motion on

14:28:18  8      Mr. Jezzi and his new testing.  So with regard to the '508

14:28:25  9      patent -- I'm sorry, the '407 patent which is the male

14:28:29 10      product, the '407 patent requires this wicking material to

14:28:32 11      be the top layer where the genitals lay on the materials.

14:28:39 12      And what happened is because this is a patent case, PureWick

14:28:43 13      alleged that this material which is a microclimate layer was

14:28:48 14      the alleged wicking material.  During expert reports, their

14:28:51 15      opening expert report and their expert did not provide any

14:28:54 16      testing evidence.  And here is a quote on slide 7 that

14:28:58 17      addresses that.  And so then our expert responded and said

14:29:03 18      yeah, it's not wicking.  It actually repels water, it's not

14:29:07 19      a wicking material at all.

14:29:09 20              And then what happened is on reply they got a

14:29:12 21      new expert, Dr. Jezzi, and Mr. Jezzi was their invalidity

14:29:17 22      expert.  And Mr. Jezzi provided these splat tests that

14:29:22 23      purported to say that for the first time these tests prove

14:29:24 24      that this material is wicking.

14:29:27 25              And as we explained in our briefing, the tests

14:29:30 1   didn't follow any known procedures and they gave false

14:29:33 2   results.  I'm happy to talk about why that's true, but the

14:29:37 3   main reason was he was going to apply a horizontal test, you

14:29:42 4   have to suspend it and he basically splatted it, splatted

14:29:47 5   globules and said look, the fluid spread.  And then he also

14:29:52 6   separately did a test that used the wrong material.

14:29:54 7         So if we can go to slide 17, we believe that

14:30:01 8   that testing was unreliable.  It didn't use known

14:30:07 9   methodology and it's the type of information that should be

14:30:10 10   stricken.  And at a minimum, as we noted here, we put in a

14:30:15 11   footnote, we should at least -- they should not be bringing

14:30:18 12   new infringement theories on the fly and we should at least

14:30:21 13   have a chance for our expert to respond, but we believe it

14:30:24 14   should have been stricken in the first instance.

14:30:26 15         THE COURT:  All right.  Who has got this one?

14:30:32 16         So here is my question.  How is this going to be

14:30:34 17   used at trial?  So you didn't put it in in your opening

14:30:38 18   reports, so it's not coming in in your case in chief, right?

14:30:41 19         MR. BIDDINGER:  That's correct, Your Honor.

14:30:42 20         THE COURT:  So you use it in rebuttal if they

14:30:45 21   get up and put in test results; right?

14:30:48 22         MR. BIDDINGER:  Correct, Your Honor.

14:30:49 23         THE COURT:  How is their expert supposed to

14:30:52 24   respond, like let's say he thinks that your expert's test

14:30:56 25   results are garbage, how does he respond?

14:31:00 1          MR. BIDDINGER:  Well, Your Honor, I guess on

14:31:02 2   that specific question, they never asked to do any kind of

14:31:07 3   reply to our testing report.  They did bring it up in their

14:31:10 4   opposition -- or in their motion and we didn't oppose it,

14:31:14 5   but we haven't heard anything about it since that point in

14:31:17 6   time.  So if they need to put in some kind of supplement to

14:31:21 7   address that, we won't oppose that.  But the reason that we

14:31:24 8   got to this point that we're at is because during fact

14:31:28 9   discovery, we provided our contentions, they are exactly

14:31:33 10  what we relied on --

14:31:35 11         THE COURT:  Yeah, you don't have to tell me

14:31:37 12  because I'm not going to exclude it and I don't want to hear

14:31:41 13  how nobody understood what anybody else was doing in fact

14:31:44 14  discovery.  So I am going to deny the motion both with

14:31:47 15  respect to the new result and saying that they are

14:31:51 16  unreliable.  I think that the reliability issue is a

14:31:55 17  question of weight and can be addressed during

14:31:58 18  cross-examination.

14:31:59 19         And defendant, if you want to take -- if you

14:32:01 20  want to put in a short expert report to address the results

14:32:02 21  and then give your expert up for a deposition limited to

14:32:02 22  that, you can do so.

14:32:11 23         Okay.  Plaintiff.

14:32:26 24         MR. BIDDINGER:  Your Honor, the next motion we

14:32:35 25  would like to talk about is DI 199, the motion to exclude

14:32:38 1    the expert report, reply expert report of Erika Lietzan.

14:32:46 2    And --

14:32:48 3              THE COURT:  I'm sorry, what number?

14:32:50 4              MR. BIDDINGER:  I believe it's DI 199.  201.

14:32:54 5    Sorry.

14:33:00 6              So the issue here, Your Honor, is actual this

14:33:03 7    actually relates --

14:33:04 8              THE COURT:  Before -- I don't want to cut you

14:33:06 9    off from arguing, but what is the point of this, other than

14:33:09 10   to say he's lying?  I don't know, whoever is opposing this,

14:33:15 11   I didn't understand this report other than to have an expert

14:33:20 12   testify about this guy's credibility which seemed like maybe

14:33:24 13   there is some good points in there you can do on cross, but

14:33:27 14   basically she's just saying I don't believe what he said.

14:33:33 15             MS. FRANTZEN:  No, Your Honor, I think it's

14:33:36 16   just, he's not discussing the credibility at all, rather

14:33:40 17   they are arguing there has been experimental use, again,

14:33:43 18   with the prior devices, and that the uses were experimental

14:33:48 19   and not public disclosures.  And what Dr. Lietzan testifies

14:33:52 20   is that if they were, in fact, experimental, these are

14:33:55 21   medical devices that require FDA documentation and she

14:34:01 22   discusses the FDA aspects of it and says there is no

14:34:05 23   evidence that it's experimental use because there is no

14:34:07 24   requisite FDA document.  That's it.  It's specifically in

14:34:11 25   response to their argument, Mr. Jezzi's argument that it was

14:34:16 1   experimental and that the products did not work for their

14:34:19 2   intended purpose as their kind of defense to the public use

14:34:23 3   issue.

14:34:23 4            THE COURT:  So what is she going to say?

14:34:25 5   Because when I read the excerpts it was like well, what he

14:34:29 6   said is not right, and that -- for him to imply this is

14:34:33 7   wrong, it seems like there was a lot of credibility in there

14:34:38 8   rather than her just saying look, if you did experimental

14:34:44 9   testing, you would need documents.  Have you seen any

14:34:48 10   documents?  And that's it.  But she seems like she had a

14:34:51 11   heck of a lot of stuff in her report other than that.

14:34:54 12            MS. FRANTZEN:  Your Honor, the intent is only to

14:34:57 13   have what documents would be required to show that there is

14:35:00 14   experimental testing, like what you would need to have and

14:35:03 15   that they don't have those documents.  And she just walks

14:35:07 16   through the FDA regs for that.

14:35:09 17            THE COURT:  And not talking about what Dr. Jezzi

14:35:12 18   said.

14:35:12 19            MS. FRANTZEN:  She does say he said this, but I

14:35:15 20   don't agree that it was experimental because you would have

14:35:17 21   to have these documents documenting it.  So she disagrees

14:35:21 22   with him, I guess, but her main point is that the

14:35:23 23   documentation is not there to support the claim that this

14:35:27 24   medical device was an experiment.

14:35:29 25            THE COURT:  All right.  Now I'll let you talk.

14:35:33 1            MR. BIDDINGER:  Thank you, Your Honor.  So this

14:35:38 2    is not -- first of all, I would say Professor Lietzan said

14:35:43 3    that there should be documents no matter what, whether it's

14:35:46 4    experimental or not, you know, developing a medical device

14:35:50 5    if you're using it, if you're testing it, if you're selling

14:35:55 6    it, she said there should be documents, but I don't have the

14:35:58 7    documents.  It's not directed to this experimental use

14:36:00 8    issue.  If you look at what she says, she's saying she's

14:36:04 9    taking his response to them when he says look, you haven't

14:36:07 10   proven this prior use or sale, right, you haven't shown

14:36:10 11   which device was actually tested when, you know, who it was

14:36:14 12   tested with, whatever, on the right is what she's saying.

14:36:17 13   Jezzi, she's saying implies there is no records, reference,

14:36:21 14   and then she goes on and says this documentation could have

14:36:24 15   been on the server that I understand is missing, PureWick

14:36:27 16   should have documented and recorded these things.  Right?

14:36:30 17            THE COURT:  Okay.  Let's say I say all of that

14:36:33 18   goes, okay, she can't speculate about what would have been

14:36:37 19   on a server, whatever.  What about her just getting up and

14:36:42 20   saying look, in order to do testing on a medical device for

14:36:42 21   the FDA, you need documentation, I haven't seen it.

14:36:52 22            MR. BIDDINGER:  So I guess I would say that's

14:36:56 23   still speculation from the standpoint she has no -- we don't

14:37:00 24   know if those documents existed or not.  Nobody has proven

14:37:02 25   that.  If they thought during discovery that those documents

14:37:06 1    should have existed, they could have moved to compel on

14:37:09 2    that.  They didn't do that.  It's a discovery dispute that's

14:37:13 3    being aired in front of the jury.  We don't believe the

14:37:16 4    documentation did exist.  This is a husband and wife who

14:37:19 5    developed this product in their kitchen.

14:37:22 6            THE COURT:  Let's say that it never existed, not

14:37:24 7    that it's been lost, but it never existed, is that relevant

14:37:27 8    to whether or not it was an experimental use?

14:37:31 9            MR. BIDDINGER:  If there is no documents that

14:37:32 10   prove an experimental use, then that's the answer, right,

14:37:35 11   then there is no proof that there was an experimental use,

14:37:38 12   it's a failure of proof issue.

14:37:40 13           THE COURT:  On whose part?

14:37:42 14           MR. BIDDINGER:  On our part in terms of proving

14:37:44 15   that there was an experimental use.  We don't need an expert

14:37:47 16   to get up there and say oh, there might be documents out

14:37:50 17   there and I would expect to see them and they should be

14:37:53 18   coming forward with those documents, that's completely

14:37:57 19   irrelevant for the jury to decide that.  The jury looks at

14:38:00 20   the facts and decides was it experimental or not.

14:38:02 21           One last point, there are documents, there are

14:38:02 22   logs relating to the testing that are on the exhibit list.

14:38:02 23   There is not like a complete absence of documents relating

14:38:11 24   to the testing.  It happened, it's just that she doesn't

14:38:12 25   think that they're the right kind of documents that the FDA

required.

THE COURT:  Let's say that's an argument, you say here is our testing documents, and they want to say well, that's nice, but these aren't the type of testing documents that show an experimental use.  How are they supposed to do that, to say that your guy, they're not, and he says they are, why can't they have someone come in and say yeah, typically what the FDA sees is this.

MR. BIDDINGER:  I don't -- I guess to me, Your Honor, that's just completely abstract because we have no idea if those documents existed or not, so you're suggesting to the jury --

THE COURT:  You just said, you just said we have documents.

MR. BIDDINGER:  Yes.

THE COURT:  Okay.  We have documents that we are going to use to show experimental use.  It's your burden.  And they want to say those documents aren't enough and how are they supposed to say that?  How do they get that in?

MR. BIDDINGER:  That's not what she says, Your Honor.  She doesn't look -- to answer your question, I don't know how they get that in because they haven't come forward with somebody who says that.  She doesn't look at the documents that exist and say those aren't sufficient to prove experimental use and those aren't the type of

14:39:34 1    documents the FDA requires.  She simply says here is what

14:39:37 2    the FDA requires when you develop a medical product.  I

14:39:41 3    would expect to see those types of documents.  But I don't

14:39:43 4    know where they are.  Maybe they are on the missing server.

14:39:46 5    That's it.  She doesn't attack, she doesn't specifically say

14:39:51 6    here are the documents that he's pointing to related to

14:39:54 7    experimental use and say those are insufficient or those

14:39:57 8    aren't the right type of documents or that's not what the

14:40:00 9    FDA requires.

14:40:01 10            THE COURT:  Is that right, Ms. Frantzen, that

14:40:04 11   your expert didn't say I looked at the documents they have,

14:40:07 12   and those aren't sufficient to show experimental use?

14:40:11 13            MS. FRANTZEN:  She actually -- she didn't

14:40:13 14   identify any documents to support their experimental use

14:40:17 15   defense, so her response was you didn't identify any

14:40:21 16   documents, we did have a 30(b)(6) witness --

14:40:23 17            THE COURT:  Hold on.  Stop.  You just said we

14:40:26 18   have documents that we're relying on to show experimental

14:40:28 19   use.  She said they never told us that.  So where did you

14:40:32 20   tell them and what are the documents?  No, seriously, you

14:40:36 21   should know the answer to that.  Where are they?  You just

14:40:39 22   told me they exist and they should know about them.  Where

14:40:42 23   are they?

14:40:44 24            MR. BIDDINGER:  They are on our exhibit list,

14:40:46 25   Your Honor.  They cited to them themselves in their

14:40:48  1    interrogatories.

14:40:49  2              THE COURT:  Did you ever identify them in

14:40:51  3    response to an interrogatory or anywhere telling them that

14:40:53  4    they're supposed to rely on them, that you're relying on

14:40:57  5    them?

14:40:57  6              MR. BIDDINGER:  We certainly have an

14:40:58  7    interrogatory response that says that they conducted

14:41:02  8    experimental testing on these prototype devices.

14:41:05  9              THE COURT:  Did you identify those documents?

14:41:08 10              MR. BIDDINGER:  I would have to look back at the

14:41:09 11    interrogatory response, Your Honor.  I'm sorry, I can't tell

14:41:12 12    you 100 percent that we did or did not.

14:41:15 13              THE COURT:  Let's assume you didn't tell them

14:41:17 14    that you are going to rely on those documents, now you want

14:41:19 15    to come in and have someone say yeah, here are the

14:41:24 16    documents, we did our testing.  What are they supposed to

14:41:27 17    do?

14:41:27 18              MR. BIDDINGER:  I believe they're also cited in

14:41:29 19    our expert report to which she was supposedly relying.

14:41:34 20              THE COURT:  You guys are pretty good at saying

14:41:37 21    they should have given it to us in discovery and we put it

14:41:39 22    in an expert report, we put it in an expert report.  Nobody

14:41:42 23    seemed to put anything in discovery and now it's all in an

14:41:47 24    expert report.  Okay.  So I don't know what I'm supposed to

14:41:50 25    do with this.

14:41:51  1          MR. BIDDINGER:  I guess -- I apologize, Your

14:41:53  2   Honor, that I can't point you to the exact place that we

14:41:56  3   cited those documents, but there is nothing in her report

14:41:59  4   where she's saying they have not come forward with evidence

14:42:04  5   of an experimental use, that is not what her expert report

14:42:08  6   says.  It just is not it.  All she's saying is he's raising

14:42:16  7   questions about a failure of proof on their part in the

14:42:18  8   opening invalidity expert report and she's saying PureWick

14:42:22  9   should have documented and recorded the types of details,

14:42:25 10   right, they would have documents regarding these that would

14:42:27 11   show exactly what models are tested, et cetera.

14:42:30 12          THE COURT:  This is what I am going to do, given

14:42:33 13   that there is so much in the report that I think is

14:42:36 14   objectionable, I am going to grant the motion because I

14:42:38 15   think a lot of it is unreliable and calls for speculation.

14:42:42 16   That being said, if you can give me a proffer of what she

14:42:47 17   will say that is actually appropriate and not just guessing

14:42:50 18   at what should have been someplace and that she's responding

14:42:53 19   to something, I will reconsider that limited portion of her,

14:42:58 20   allowing that limited portion.  But right now when I looked

14:43:02 21   through it, it seemed to be a lot of I'm guessing this

14:43:02 22   should exist and that doesn't seem appropriate for expert

14:43:12 23   testimony.

14:43:12 24          What's next from the defendant?

14:43:14 25          MS. FRANTZEN:  Your Honor, it's our turn to go.

14:43:17 1    If we turn to slide 19, we have an issue on a new

14:43:22 2    infringement -- we have a new -- an issue on a new

14:43:31 3    infringement theory that was offered for the first time in

14:43:34 4    expert reports.  And that is this issue, again, we're back

14:43:40 5    to the wicking material layer.

14:43:44 6              As we talked about with the testing, this is a

14:43:47 7    picture from PureWick's final infringement contentions on

14:43:52 8    slide 19.  They identify this as their image that that

14:43:55 9    material right there is the wicking material, then all of a

14:43:59 10   sudden in expert reports they said that basically both items

14:44:03 11   are the wicking material.

14:44:04 12             THE COURT:  All right.  Do you have their final

14:44:06 13   contentions?

14:44:07 14             MS. FRANTZEN:  Their final contentions, we say

14:44:11 15   Exhibit D, but it's Defendant's Exhibit 10.

14:44:13 16             THE COURT:  Take a look, because I have in my

14:44:15 17   notes that there was disclosure of this at least in a

14:44:18 18   footnote in their contentions.

14:44:25 19             MS. FRANTZEN:  That's where they cite two

14:44:28 20   documents in their final contentions.  And I don't have

14:44:32 21   those in front of me, but what they refer to in those

14:44:35 22   footnotes is a document -- I mean, this is kind of clear as

14:44:38 23   day if you look at this Exhibit D, what are we identifying

14:44:42 24   as the wicking material, it's an arrow, this is what they do

14:44:46 25   in their expert report, they say these two layers are the

14:44:50 1    wicking material and part of this second layer is the

14:44:52 2    wicking material.  That is completely new.  The footnote

14:44:56 3    cites to documents, but all those documents do is refer to a

14:44:58 4    document that says hey, here is a picture of our device that

14:45:02 5    has multilayers.  It never says that there is multiple, like

14:45:08 6    that one layer is the wicking layer and another layer is the

14:45:12 7    wicking layer.

14:45:12 8            THE COURT:  All right.  So the issue that I just

14:45:14 9    identified was the chambers limitation and to the extent you

14:45:20 10   have a motion on that, it's denied because I think what was

14:45:22 11   disclosed in the footnote is sufficient.

14:45:25 12           For the wicking material, this one I did have a

14:45:27 13   question for the plaintiff.  You say the wicking material

14:45:32 14   limitation of claim 7 is pointing to both the spun bond

14:45:37 15   layer and the Jersey layer as reading on the microclimate

14:45:43 16   spun bond material.  And then you have a red box that you

14:45:46 17   refer to in there.  So looking at your contentions, and if

14:45:50 18   you pull them out, plaintiff, show me where you rely on only

14:45:55 19   a portion of the Jersey layer for the claimed wicking

14:46:00 20   material.

14:46:02 21           MS FELICE:  Yes, Your Honor, there are two spots

14:46:04 22   where we're relying -- so this is our final infringement

14:46:12 23   contentions for the wicking limitation, claim 7, Your Honor.

14:46:12 24   And in both of these -- so let me put this one first.  We

14:46:12 25   are pointing to both the Jersey fabric wicking material in

14:46:22 1    addition to the spun bond layer as fulfilling this wicking

14:46:27 2    material requirement as claimed.

14:46:34 3            THE COURT:  Okay.  Do you want to tell me what

14:46:36 4    you're talking about?  Do you want me to just read the whole

14:46:40 5    paragraph?

14:46:41 6            MS. FELICE:  No.  I'm sorry, Your Honor.  If we

14:46:43 7    look at the first line it talks about the PrimaFit utilizes

14:46:48 8    the wicking Jersey material.  That's the material that

14:46:51 9    they're pointing to as saying this is the material that

14:46:54 10   underlies this spun bond material.  So in this limitation,

14:46:59 11   we identified both this wicking Jersey material in addition

14:47:03 12   to the added spun bond layer for quicker drying and

14:47:08 13   diversion.  We're saying both of these things combined

14:47:11 14   together to be the wicking material that this claim

14:47:14 15   requires.

14:47:15 16           THE COURT:  I'm sorry, where does it say that

14:47:17 17   the added spun bond layer is part of the wicking?

14:47:22 18           MS FELICE:  It starts here, Your Honor.

14:47:23 19           THE COURT:  I see these words are there.  I

14:47:26 20   don't see a word about wicking.

14:47:27 21           MS FELICE:  We are talking about the quicker

14:47:30 22   drying and diversion, diversion specifically as being

14:47:33 23   wicking.  If I may, Your Honor --

14:47:41 24           THE COURT:  Did you just highlight that for me

14:47:44 25   here?

14:47:44  1                MS FELICE:  No, that was highlighted in our

14:47:47  2       final contentions, Your Honor.

14:47:49  3                THE COURT:  All right.

14:47:49  4                MS FELICE:  And this follows, immediately

14:47:52  5       followed the next page, that was 43 and this is page 44

14:47:55  6       where we're pointing to both the wicking Jersey and the spun

14:47:59  7       bond layers to satisfy this claim limitation.

14:48:07  8                THE COURT:  All right.  Ms. Frantzen.

14:48:10  9                MS. FRANTZEN:  Your Honor -- do you mind keeping

14:48:12 10       those, because I don't have a copy of that?

14:48:14 11                MS FELICE:  Sure.

14:48:15 12                MS. FRANTZEN:  Thank you.

14:48:16 13                So just to be clear here, this document shows

14:48:21 14       the wicking material and it's that layer, it's the spun bond

14:48:24 15       layer.  The spun bond layer is what they're pointing out

14:48:28 16       with the arrow.  This is just a quote from our document that

14:48:31 17       discusses both layers --

14:48:33 18                THE COURT:  Go to the next thing where they

14:48:35 19       circle that thing in a red box.

14:48:37 20                MS. FRANTZEN:  Yeah.  So this is another picture

14:48:39 21       of this -- this shows the entire product.  And if I may,

14:48:41 22       Your Honor, you know, when you're pointing at the product,

14:48:47 23       these layers are all combined together.  Here is the

14:48:50 24       PrimaFit device that I have here.  And so this is just a

14:48:54 25       picture pointing at this which has all the layers in it so

14:48:59 1   what they described and what they said repeatedly in that

14:49:04 2   blow up that we have on our slide 19, this is their picture

14:49:07 3   of what they said the wicking layer was and it was the spun

14:49:10 4   bond layer.  And the reason why that is important is because

14:49:13 5   for the '407 patent you have to have these three layers.

14:49:16 6   You have to have wicking, porous and impermeable in that

14:49:21 7   order.  That's how they identified it.  I think this is just

14:49:23 8   after they realized during discovery that this wicking

14:49:27 9   material is not wicking at all, this is where we are trying

14:49:30 10  to recreate by saying oh, we pointed at this device and said

14:49:35 11  it's wicking.  That is not what they said.  And we built our

14:49:38 12  invalidity contentions around the concept that they had to

14:49:45 13  be discrete concrete layers, not that the second layer can

14:49:48 14  also be the first layer, that's a completely new concept.

14:49:59 15          THE COURT:  All right.  Hold on a second.

14:50:30 16          (Pause.)

14:51:42 17          All right.  I am going to deny the motion.

14:51:45 18          What's next?

14:51:46 19          MR. BIDDINGER:  Your Honor, I am going to talk

14:51:48 20  about I think it's DI 199 -- I hope I have it right this

14:51:54 21  time -- which is a motion to exclude opinions relating to

14:51:57 22  non-infringing alternatives.  And during discovery we sought

14:52:03 23  contentions regarding non-infringing alternatives including

14:52:07 24  details such as when they were developed, persons most

14:52:10 25  knowledgeable, costs associated with them, et cetera.  We

14:52:13 1    actually moved to compel a response to this which Your Honor

14:52:17 2    granted.  And eventually we got a supplemental response and

14:52:22 3    there is a couple of different parts to it.

14:52:25 4           On the left-hand side this is just an excerpt,

14:52:28 5    but they went through for each patent and said

14:52:32 6    non-infringing alternatives including a urine collection

14:52:35 7    device without some claim limitation, so without a wicking

14:52:39 8    material, with the container is closed, et cetera, et

14:52:42 9    cetera, but there was no detail about what urine collection

14:52:45 10   device they were talking about, how it was constructed,

14:52:49 11   nothing about costs, anything like that.  They mentioned a

14:52:54 12   bunch of other urine management products like diapers, et

14:52:58 13   cetera.  And then they have this one sentence on the right

14:53:01 14   that's highlighted that says, "Moreover, Sage further

14:53:06 15   identifies at least the following documents relevant to this

14:53:08 16   interrogatory relating to PrimaFit 2.0 reflected above and

14:53:14 17   discussed during PureWick's depositions of Sage's witnesses.

14:53:17 18   That's all they said about PrimaFit 2.0.  I don't know what

14:53:21 19   that means.  I don't know what reflected above means.

14:53:23 20           THE COURT:  All right.  Get on from the

14:53:26 21   interrogatory response is crummy because, you know, I think

14:53:30 22   you guys have some crummy interrogatory responses as well.

14:53:34 23   What else do you have?

14:53:35 24           MR. BIDDINGER:  Fair enough, Your Honor.  When

14:53:37 25   we got to the expert reports, we got an extensive amount of

14:53:41 1    detail about what they were talking about.

14:53:42 2              THE COURT:  Just like you did.

14:53:43 3              MR. BIDDINGER:  They described a brand-new

14:53:45 4    alternative where they modified the accused product, they

14:53:49 5    never mentioned that ever before in fact discovery.  They

14:53:53 6    also had a bunch of conversations with fact witnesses where

14:53:57 7    the fact witnesses told their expert about development

14:54:01 8    costs, something we specifically called for in the

14:54:04 9    interrogatory that they never gave us, about when it was

14:54:07 10   developed, how long it would take to develop it,

14:54:10 11   contractors, all sorts of new facts and details that we

14:54:14 12   specifically sought from them, expressly went after during

14:54:19 13   discovery and they didn't disclose to us.  And we had no

14:54:22 14   opportunity to depose any of their fact witnesses about

14:54:27 15   because we didn't know any of these people had any knowledge

14:54:29 16   about that.

14:54:29 17             THE COURT:  What about their argument that these

14:54:31 18   folks were disclosed in the Rule 26 as knowledgeable

14:54:35 19   concerning design options?

14:54:37 20             MR. BIDDINGER:  I don't know how that alerts us

14:54:40 21   that they're knowledgeable about --

14:54:42 22             THE COURT:  Did you take their depositions?

14:54:44 23             MR. BIDDINGER:  We did take their depositions,

14:54:47 24   Your Honor, and we had no idea that they knew about the

14:54:49 25   costs to implement some alternative design of the accused

14:54:53 1   product that they never told us about before.

14:54:55 2              THE COURT:  All right.  Let me hear from the

14:54:57 3   defendants.  Where do you disclose this?  And let's assume

14:55:02 4   that just saying in a Rule 26 the design option isn't

14:55:05 5   enough, where was it disclosed?

14:55:08 6              MR. SURRETTE:  It was disclosed in the

14:55:11 7   interrogatory, that's where it's disclosed.

14:55:14 8              THE COURT:  Where was the information that

14:55:18 9   you're now arguing about Mr. Blabas and Mr. Alleri where

14:55:24 10  that was disclosed that folks should have known that they

14:55:27 11  were going to give all this specific information on

14:55:30 12  non-infringing alternative?

14:55:34 13             MR. SURRETTE:  We identified a number of

14:55:36 14  non-infringing alternatives as relates to the PrimaFit and

14:55:39 15  PrimaFit product, here is an example right here, what else

14:55:43 16  would we be talking about other than the PrimaFit product?

14:55:46 17             THE COURT:  Well, they asked for information

14:55:48 18  about what it would cost to do -- to make a non-infringing

14:55:52 19  alternative, et cetera, where did you disclose any of that?

14:55:57 20  They're saying now you got someone to tell your expert this

14:56:00 21  and we don't have any ability to cross-examine that person.

14:56:02 22             MR. SURRETTE:  Well, Judge, they had an

14:56:04 23  interrogatory response, they had the Rule 26 disclosures

14:56:09 24  that Ms. Blabas, Mr. Ulrich and Mr. Sexton were designated

14:56:12 25  on PrimaFit design options, they didn't ask a single

question about it.

I guess I want to be perfectly clear, their motion seems to exclude discussions of all non-infringing alternatives and I think we want to make clear there is three buckets of alternatives, there is alternatives of product that existed before that we identified, we have identified PrimaFit 2.0 as a non-infringing alternative and we did these design options.  They got the opportunity to depose our witnesses, they put expert reports on this issue, they got to depose our experts on this issue, there is no prejudice.

THE COURT:  What would you say about them getting a deposition of those witnesses who talked to their experts?

MR. SURRETTE:  We would be agreeable to that.

THE COURT:  I'm going to deny the motion.  If you want to have a deposition with those folks who had off-the-record discussions with those folks, you can do it.

What's next for the defendant?

MR. SURRETTE:  Judge, I would like to start with Mr. Leonard's apportionment.  It's going to be on slide 46.  So Leonard fails to apply a method to the apportionment between the patented and unpatented features for the accused products.  Let me just explain how we believe what he did.  So he did a two-step process.  And for the first step he

14:57:41 1    used something called the Shapley analysis to determine the

14:57:45 2    apportioned profit attributable to the patent-in-suit.   Then

14:57:49 3    he takes that apportioned profit and discusses how the

14:57:53 4    parties would bargain over that using discount rates.   The

14:58:00 5    issue is -- one of the issues is with this first step.   His

14:58:08 6    first error is the Shapley Value Analysis, and then what he

14:58:12 7    did was he compared the profitability of two products that

14:58:16 8    were described in a Sage projection document.   And the first

14:58:21 9    product is a premium product having the features of the

14:58:25 10   PrimaFit that aren't covered by the patent-in-suit such as

14:58:29 11   things like fit and securement.   And then he compared the

14:58:34 12   profitability of that product to something called the Tier 2

14:58:37 13   product that was an unidentified hypothetical Tier 2 product

14:58:41 14   neither described or ever developed by Sage.   And that's the

14:58:46 15   issue.   The issue is with the Tier 2 product.

14:58:49 16         Leonard assumed that Tier 2 product is a proxy

14:58:52 17   important for the PrimaFit without the other features not

14:58:56 18   covered by the patent-in-suit, but he had no basis for that

14:58:59 19   assumption.   The document describing the Tier 2 product is

14:59:02 20   up on the screen here and all it merely states is that it's

14:59:02 21   a simpler version and has reduced features.

14:59:02 22         In deposition, Dr. Leonard admitted that he

14:59:12 23   doesn't know what features might have been in the

14:59:12 24   hypothetical Tier 2 product.   He conceded he had never seen

14:59:12 25   it, further admitted he doesn't know what specific features

14:59:22 1    it would have.  In essence he treats the Tier 2 product as

14:59:26 2    only having the patented features and nothing else, but he

14:59:30 3    has no basis to say that.  And this is the entirety of

14:59:34 4    Dr. Leonard's analysis.

14:59:35 5                   THE COURT:  Plaintiff.

14:59:36 6                   MR. SURRETTE:  I had --

14:59:38 7                   THE COURT:  Let me get a response to this.

14:59:41 8    Okay?

14:59:42 9                   MR. SURRETTE:  Sorry.

14:59:43 10                  THE COURT:  Plaintiff, tell me how Dr. Leonard

14:59:46 11   determined what Sage's Tier 2 product versus the PrimaFit

14:59:51 12   product is expected to have, how is it in his report, how

14:59:55 13   are we tying this all together?

14:59:57 14                  MR. BIDDINGER:  The apportionment analysis is in

14:59:59 15   paragraphs 75 to 88 in his report.

15:00:05 16                  THE COURT:  Why don't you show me rather than

15:00:07 17   tell me.  You gave me two boxes of documents.  I don't have

15:00:11 18   paragraphs 75 to 78, so if you want to say it's there, show

15:00:14 19   me.

15:00:14 20                  MR. BIDDINGER:  Okay, Your Honor, I can't pull

15:00:16 21   his report up right now.  I'm sorry.  We did our best to try

15:00:20 22   to figure out which motions we were going to have to deal

15:00:23 23   with here.  This is what he cites to in his report, this

15:00:27 24   document.

15:00:27 25                  THE COURT:  Yes, but he just said he had no idea

15:00:30 1     what features these things had.  How are we tying this

15:00:33 2     together?

15:00:34 3                    MR. BIDDINGER:  Well, actually this document

15:00:36 4     talks about the premium tier product has the features that

15:00:41 5     counsel just said are not part of the patented invention, so

15:00:46 6     it's securement and this inner spine.  The document says

15:00:50 7     that.  And then it says we have a Tier 2 one with reduced

15:00:54 8     features without the features that it just talked about in

15:00:56 9     the document.  This is --

15:00:58 10                   THE COURT:  Does it have any features that are

15:01:00 11    not in the patent?

15:01:03 12                   MR. BIDDINGER:  No, we don't believe that it

15:01:05 13    does.

15:01:05 14                   THE COURT:  Does Dr. Leonard know that?

15:01:08 15                   MR. BIDDINGER:  What he said was it didn't have

15:01:10 16    the features of the premium product, right, or similar to

15:01:15 17    ours.  He knows that document, he based his analysis on an

15:01:19 18    actual document in this case and that's a factual question

15:01:23 19    that they can cross-examine him on.  But they don't

15:01:25 20    challenge his methodology.  He did an apportionment.  They

15:01:30 21    say he didn't do an apportionment, that's absolutely not

15:01:33 22    true.  He absolutely tried to conduct an apportionment and

15:01:37 23    he did it based on the facts of this case.  That's a

15:01:40 24    cross-examination question, not a reliability of his

15:01:44 25    methodology question.

15:01:46  1                    THE COURT:  All right.

15:01:46  2                    MR. SURRETTE:  May I respond to that, Your

15:01:48  3    Honor?

15:01:48  4                    THE COURT:  Yes.

15:01:49  5                    MR. SURRETTE:  So the fundamental problem is he

15:01:53  6    allegedly apportions and he's a comparing the profitability

15:01:57  7    of two products.  He doesn't know what one of the products

15:01:59  8    is so how can that ever demonstrate a proper apportionment?

15:02:06  9    That's the error.  And that's the very basis, that's the

15:02:09 10    starting point for the rest of his analysis.  He has another

15:02:14 11    step where he talks about okay, now that there is this

15:02:18 12    profit that's attributable to the patent-in-suit, how would

15:02:21 13    the parties split it up?  But the first step, that's

15:02:24 14    unreliable, because he doesn't know, he doesn't know what

15:02:28 15    features that product has.  That product, it can have other

15:02:32 16    features, it could not be covered by the patent, it could be

15:02:35 17    prior art, he simply doesn't know and he testified to that.

15:02:48 18                    THE COURT:  So if I were to -- this is for the

15:02:57 19    royalty and you're saying if I grant this motion, they would

15:03:01 20    only have lost profits to rely on at trial?

15:03:05 21                    MR. SURRETTE:  I don't think he's properly

15:03:06 22    apportioned the royalty.  Yes, they would only have lost

15:03:11 23    profits.

15:03:18 24                    THE COURT:  All right.

15:03:20 25                    MR. BIDDINGER:  Can I have one point?

15:03:21 1          THE COURT:  Go ahead.

15:03:22 2          MR. BIDDINGER:  This is their document, Your

15:03:24 3  Honor.

15:03:24 4          THE COURT:  But the problem I have is who is

15:03:27 5  tying this together with the patent?  We have a premium

15:03:31 6  product that has at least a couple of features.  We have a

15:03:35 7  Tier 2 product that I guess doesn't have at least those

15:03:40 8  couple of features.  But I don't know what it has.

15:03:44 9          MR. BIDDINGER:  But the premium features, those

15:03:47 10  are -- we know exactly what those are.  That's the accused

15:03:50 11  product, so we know exactly what those features are and

15:03:54 12  they're talked about by multiple people that they have this

15:03:58 13  added securement at the top.

15:04:00 14          THE COURT:  Does Tier 2 have anything else

15:04:02 15  that's not covered by the patent?  And if not, how do you

15:04:05 16  know?

15:04:06 17          MR. BIDDINGER:  We go in based on the document

15:04:08 18  that they have that it doesn't have those features that we

15:04:11 19  have identified that are different from our patent.

15:04:14 20          THE COURT:  I just want to understand.  As far

15:04:16 21  as you're concerned, the patent covers every single feature

15:04:20 22  that would make someone want to buy a product other than

15:04:24 23  those couple of two things that are in the premium product.

15:04:28 24          MR. BIDDINGER:  No, it covers everything about

15:04:30 25  the product, the PrimaFit product other than those added

15:04:35 1    features --

15:04:35 2                    THE COURT:  What are those other features and

15:04:36 3    are those features all fairly attributable to the patent or

15:04:40 4    not?

15:04:40 5                    MR. BIDDINGER:  The other features are the

15:04:41 6    features of the PrimaFit product without the --

15:04:46 7                    THE COURT:  I get it, but the question isn't the

15:04:48 8    patent -- I mean the question isn't the product, the

15:04:51 9    question is how are you tying this to the advantages of the

15:04:55 10   patent?  All you're saying is well, we took out some of the

15:04:59 11   features.  Okay.  Did you take out all the features that

15:05:04 12   make it an appropriate apportionment?  I don't know the

15:05:07 13   answer to that, and I don't understand what you're telling

15:05:11 14   them.

15:05:12 15                   MR. BIDDINGER:  We have our experts, technical

15:05:14 16   experts talking about the fact that the product is

15:05:16 17   completely encompassed by the patent, right, the patent

15:05:20 18   claims cover all the core functionality of the product

15:05:24 19   except for that adhesive for the flex fit spline which are

15:05:31 20   those patented features that we are talking about in this

15:05:35 21   document.

15:05:35 22                   THE COURT:  Does Dr. Leonard say he's relying on

15:05:38 23   that?

15:05:39 24                   MR. BIDDINGER:  Yes, absolutely.  Sorry, it says

15:05:45 25   I understand the asserted patent covers technology that

15:05:49 1   enabled the fundamental features of the PrimaFit product,

15:05:52 2   however the PrimaFit products have additional features not

15:05:55 3   covered by the asserted patent related to fit and

15:05:59 4   securement.  Question, and the adhesive pad.  And he cites

15:06:02 5   to conversations with Dr. Collins, the technical expert.

15:06:08 6   This is paragraph 78 of his expert report.

15:06:11 7            THE COURT:  All right.  Any response?

15:06:13 8            MR. SURRETTE:  My response, Your Honor, is he's

15:06:15 9   talking about the premium product.  The first step of the

15:06:19 10  process compares the profitability of the premium product to

15:06:22 11  the Tier 2 product and no one knows what the Tier 2 product

15:06:25 12  is.  They didn't ask a single witness about it during

15:06:30 13  deposition, not a single fact witness did they ask anybody

15:06:32 14  about the Tier 2 product.

15:06:34 15            Dr. Lennon admitted that he doesn't know what

15:06:39 16  features are in the Tier 2 product.  All this document says

15:06:41 17  is it has reduced features, but that it's similar, but that

15:06:45 18  doesn't mean -- there is no testimony, there is no evidence

15:06:48 19  as to what's in that product, but he's saying that it has

15:06:51 20  all the features in the patent, that's the fundamental

15:06:54 21  error.

15:06:57 22            THE COURT:  So they're saying by logic if you

15:07:01 23  take the premium product which is the accused product and

15:07:05 24  you take out the couple of features that are mentioned as

15:07:10 25  premium features, then what's left is Tier 2, and that's

15:07:15 1    what they're asserting is an apportion of the product.

15:07:20 2         MR. SURRETTE:  With all due respect, Your Honor,

15:07:22 3    that's just guess work.  They don't know that.  That

15:07:27 4    document doesn't say that.  They took no deposition

15:07:30 5    testimony.  They could have asked Ms. Blabas, Ms. Sexton

15:07:34 6    about, they never did.  That's the fundamental error.

15:07:47 7         THE COURT:  I get it, you're saying that's

15:07:49 8    logic, but is it true you never asked anyone what's the Tier

15:07:52 9    2 product?

15:07:53 10        MR. BIDDINGER:  We actually did ask

15:07:55 11   Mr. Alexander, one of the witnesses about this, and he said

15:07:59 12   he doesn't know anything about the document.  But I think

15:08:02 13   it's a cross-examination question.  It's their document, I

15:08:05 14   mean, for him to say we don't know --

15:08:07 15        THE COURT:  My problem is your expert had to

15:08:10 16   apportion, and he's apportioned based on a product that

15:08:15 17   nobody knows what it is.  That seems wrong.

15:08:21 18        MR. BIDDINGER:  I mean, I guess I disagree with

15:08:24 19   the interpretation of the document.  I think that what we

15:08:27 20   know what it is --

15:08:28 21        THE COURT:  Let me see the document again.

15:08:38 22        So I'm sorry, how do we know what the reduced

15:08:42 23   features are?

15:08:42 24        MR. BIDDINGER:  So the document above this talks

15:08:44 25   about it being -- so it's describing, you can see in the

15:08:48 1   kind of grayed out thing on the left, product Sague, that's

15:08:52 2   the product that led to the accused product.  That's the

15:08:55 3   picture that led to the accused product and it talks about

15:08:57 4   how it had a feature rich solution and highlighting the

15:09:02 5   features, like we talked about, the flexion and absorbant

15:09:05 6   pad, and the design basically without those features.

15:09:11 7           MR. SURRETTE:  That's not what that says.  It

15:09:13 8   could have a cheaper version of the Flexfit Core, it could

15:09:17 9   have a number of things that are reduced features, we just

15:09:21 10  don't know what they are and no one asked about it.  And

15:09:24 11  Mr. Alexander is a corporate designee, he's our in-house

15:09:30 12  counsel.  They didn't ask a single technical -- and I stand

15:09:34 13  corrected that they asked him about this.

15:09:36 14          THE COURT:  I'm going to grant the motion

15:09:38 15  because I don't see that there is any tie between the

15:09:43 16  unknown Tier 2 products and the features of the patent.  I

15:09:46 17  get it that it eliminates perhaps or gives cheaper versions

15:09:50 18  of some of the features, but it doesn't seem that we have

15:09:53 19  any idea what Tier 2 is.

15:09:55 20          What's next for the defendants, or plaintiffs?

15:10:00 21          MR. CHERNY:  I went first.

15:10:01 22          THE COURT:  Plaintiff, what's next?

15:10:11 23          MR. CHERNY:  I guess, Your Honor, we only had

15:10:20 24  four Dauberts.  I think we have argued everything that we

15:10:24 25  had intended to argue.

15:10:26 1          THE COURT:  Okay.  Excellent.

15:10:32 2          You're just about out of time, so what's the

15:10:35 3   most important one for me to deal with here?

15:10:39 4          MS. FRANTZEN:  Just a quick one, Your Honor, on

15:10:41 5   the state of mind interrogatory -- the state of mind motion

15:10:55 6   -- 24.  Just we provided a motion that Mr. Jezzi and

15:11:04 7   Mr. Collins provide all this testimony.  Can you go to the

15:11:09 8   next slide.

15:11:12 9          Here is the example, Dr. Collins just opining

15:11:16 10  that we're willful and malicious and we're a pirate and that

15:11:20 11  we willfully infringed and that we acted in bad faith.  We

15:11:25 12  provided specific paragraphs in our proposed order and

15:11:28 13  Mr. Jezzi makes similar statements where he's just saying

15:11:32 14  you're bad --

15:11:33 15         THE COURT:  Copying is different than saying

15:11:35 16  willful like a pirate.  You can have evidence of copying

15:11:40 17  that he could opine on, he could say they had this, they

15:11:43 18  looked at it, they wrote in their document I am going to use

15:11:47 19  this as my model and copy it, copying, I don't get.

15:11:52 20         MS. FRANTZEN:  Can I just make one point on

15:11:55 21  copying.  Mr. Jezzi is not an expert on whether something is

15:11:58 22  a copy or not.  If he wanted to say something like this is

15:12:02 23  not, you know, in engineering we don't do the following

15:12:06 24  things.  But for him to say something is a copy of another

15:12:10 25  thing, that invades the province of the jury in our view and

15:12:15 1     we did cite some case law that says we can't say that.

15:12:18 2             Our expert, for example, provided an opinion

15:12:21 3     that like normal engineering behavior you can do this or

15:12:25 4     that.  This isn't something like what a standard engineer

15:12:29 5     would do, it's just looking at something and saying it's a

15:12:32 6     copy.  That's invading what the fact finder is supposed to

15:12:36 7     find or determine.  So if it was linked to some type of

15:12:42 8     engineering knowledge, that would be fine, but other than

15:12:44 9     just looking at something and saying that it was a copy,

15:12:50 10    that involves no expertise and he's not a copying expert,

15:12:55 11    he's just an engineer.

15:12:56 12            THE COURT:  What is the evidence -- nobody is

15:12:59 13    getting up here and saying it was wanton and willful like a

15:13:04 14    pirate.  Right?  First of all, that's not going before a

15:13:07 15    jury anyway because that's for me.  That goes to enhancement

15:13:11 16    if there was willfulness.  You agree, your experts are not

15:13:14 17    going to get up there and say that?

15:13:16 18            MR. BIDDINGER:  Yes, Your Honor.

15:13:17 19            THE COURT:  Now, what is the evidence of copying

15:13:19 20    that he's going to -- that any expert is going to rely on?

15:13:25 21            MR. BIDDINGER:  So they look at -- these are our

15:13:27 22    technical experts.  Just so I don't have to bend over, I'm

15:13:33 23    sorry, Your Honor.  They look at the documents relating to

15:13:38 24    the development of the product and the prototypes that they

15:13:40 25    made, the evolution of those prototypes and how they

15:13:44 1    converged on a solution that was identical to our product.

15:13:48 2    And the fact that they were actually testing our product in

15:13:50 3    doing that.  There are lab notebooks that record those tests

15:13:54 4    that they cite to, and they have -- our expert has mapped

15:13:58 5    our product to the claims, and mapped their product to the

15:14:02 6    claims, and opined on the similarity of those products and

15:14:07 7    the fact that it is functionally and structurally the same

15:14:11 8    as our product.  It is evidence that it is a copy of our

15:14:14 9    product based on their own documentation.

15:14:22 10           THE COURT:  So can he do what they just said up

15:14:26 11   to the point where he says Sague copied, can he go through

15:14:32 12   and say look, this is what they did to develop it.  They had

15:14:35 13   our product.  They went through these things and they

15:14:38 14   ultimately landed on a product that's very similar to our

15:14:41 15   product.  What's wrong with that?

15:14:43 16           MS. FRANTZEN:  Yeah, so, I think those facts are

15:14:46 17   okay if he wants to compare the technological similarities.

15:14:50 18   I will say one thing that someone pointed out which I think

15:14:53 19   is a good point, is that now that the '508 patent is out of

15:14:57 20   the case, the other patents that they are going to claim

15:15:00 21   were copied didn't even exist at the time, so it makes it

15:15:04 22   even more irrelevant that those products are not covered by

15:15:10 23   the patent and would not be, you know, part of that.  And I

15:15:12 24   guess that might be an issue for another day --

15:15:18 25           THE COURT:  No, I think that there is case law

15:15:20 1    out there that pre-issuance copying may be relevant to

15:15:24 2    defendant's state of mind post issuance.  So that's not

15:15:28 3    going to get it out.  But whether I am going to let him say

15:15:33 4    copied or not we can decide at trial.  If you really want

15:15:37 5    him to say my opinion is they copied, don't say it until we

15:15:42 6    talk about it some more and I can hear it in context.  But

15:15:46 7    everything else that he's allowed to get up there and say

15:15:56 8    they had the PureWick product, they looked at it, they

15:16:01 9    developed something that had many of the same features of

15:16:06 10   that product, that's all fine, and we're not going to say

15:16:09 11   the characteristic stuff about pirate.  Just so you know in

15:16:14 12   my view all you have to do is show knowledge of the patent

15:16:17 13   and deliberate infringement, so all of this stuff about

15:16:20 14   wrongful, flagrant, bad faith, deliberate, egregious,

15:16:23 15   malicious, wanton, wilful, that comes in if the jury finds

15:16:30 16   willfulness.  You don't use those words in front of a jury.

15:16:34 17                Okay.  What's next?  You got one more.

15:16:37 18                MS. FRANTZEN:  We do not have anymore.  Thank

15:16:40 19   you, Your Honor.

15:16:41 20                THE COURT:  So we dealt with plaintiffs.  I know

15:16:52 21   that we had -- defendant had as part of DI 197 no

15:17:00 22   infringement of the '407, that is denied.

15:17:07 23                No infringement of the '989 and '376.  That's

15:17:12 24   denied.

15:17:15 25                No infringement of the '989.  That's denied.

15:17:19  1          Invalidity based on prior sales.  That's denied.

15:17:23  2          Invalidity regarding claim 7 as indefinite, lack

15:17:27  3  of written description.  That's denied.

15:17:29  4          No willfulness.  That's denied.

15:17:33  5          Damages, I think that was on the '507.  That's

15:17:40  6  mooted.

15:17:42  7          The lost profits summary judgment on the lost

15:17:45  8  profits claim.  Denied.

15:17:50  9          Then we have the teaching away issue.  That was

15:17:57 10  one where I think I mentioned at the last hearing, there

15:18:03 11  might be something in one of those, all you did was give me

15:18:06 12  a string cite basically saying go figure out for yourself if

15:18:11 13  there is teaching away appropriately in there.  So that's

15:18:15 14  denied, but I guess to the extent you want to object at

15:18:18 15  trial, you can.

15:18:19 16          The testing one I think we already denied.

15:18:26 17          Irrelevant materials.  Denied.

15:18:28 18          The errata.  Denied.

15:18:32 19          The Collins non-infringing alternatives.

15:18:37 20  Denied.

15:18:37 21          The PrimaFit 2.0.  Denied.

15:18:48 22          The new infringement regarding the chamber.

15:18:51 23  Denied.

15:18:51 24          The wicking material, whatever I had on that

15:18:56 25  one, I don't even remember.  The new theories about the '989

patent.  Denied.

Willfulness.  Denied.

Yun has offered to provide an opinion from the prospective of a clinician.  I don't even remember what that one is, but I have cross-examine him if you have a problem with him.

Leonard apportionment we already decided.  And the other ones on Dr. Leonard are denied.

So to the extent I haven't responded to a specific one, it's denied.  But I think from the defendants I had twenty-nine separate grounds for motions.  So, you know, by doing that in the page limits, you not only gave me terrible arguments, but you messed up their arguments because they had to try and respond to so much, so that's another grounds to the extent I haven't said something in particular on given grounds, that's another reason that the motions are denied.

So with that, I think I have dealt with those. Anything else we need to deal with?

MR. CHERNY:  Not from the plaintiffs, Your Honor.

THE COURT:  Defendants?

MR. SURRETTE:  Nothing else, Your Honor.

THE COURT:  All right.  I will say this, that you guys need to get together and discuss whether there is

15:20:26 1    any potential to settle these matters.  I know that

15:20:30 2    sometimes that's difficult, but I am going to order you to

15:20:34 3    do it and have decision makers involved in those discussions

15:20:38 4    and report back to me on who was involved, how long they

15:20:42 5    occurred, things like that.

15:20:43 6            MR. CHERNY:  Your Honor, may I address that for

15:20:45 7    a second?

15:20:46 8            THE COURT:  Yes.

15:20:47 9            MR. CHERNY:  If it wasn't clear, we've actually

15:20:49 10   had conversations with the decision makers or at least

15:20:53 11   representatives of each party.  And then after that, Sage

15:20:58 12   contacted Magistrate Judge Thynge.  We talked to her and it

15:21:01 13   was her conclusion that she didn't think a mediation at this

15:21:05 14   point would be fruitful.

15:21:06 15           We're happy to continue talking because

15:21:08 16   obviously the Court would like that, but it wasn't clear to

15:21:11 17   me that the Court was aware that we actually have had

15:21:14 18   discussions.

15:21:15 19           THE COURT:  I know.  But we now have decisions

15:21:17 20   on these things.  We are a going to trial.  You guys have

15:21:21 21   multiple trials.  We are bringing in a jury during the

15:21:22 22   pandemic.  And I think the least the parties can do is

15:21:22 23   engage in some good faith discussions.

15:21:28 24           MR. CHERNY:  Your Honor, we are a happy to do

15:21:29 25   that.  I want to make sure the Court was aware that there

15:21:32  1    was some --

15:21:32  2              THE COURT:  Yeah, I know, Judge Thynge told me.

15:21:35  3              MR. CHERNY:  Okay.

15:21:36  4              THE COURT:  Anything else?

15:21:37  5              MR. SURRETTE:  No, Your Honor.

15:21:38  6              THE COURT:  So I am going to order that that be

15:21:42  7    done by some point by the time before the pretrial order is

15:21:47  8    submitted and then you're going to have to send me a letter

15:21:50  9    with who was involved, how long the discussions lasted, how

15:21:53 10    were they, were they in person, were they on the phone, how

15:21:57 11    did they go.  All right?

15:22:00 12              MR. CHERNY:  May I raise one additional issue,

15:22:02 13    Your Honor?

15:22:02 14              THE COURT:  Of course.

15:22:03 15              MR. CHERNY:  We have proposed per our last

15:22:05 16    hearing a narrowing, and you told us sixteen claims.

15:22:10 17              THE COURT:  Sixteen was too many.

15:22:11 18              MR. CHERNY:  Sixteen was too many.

15:22:12 19              THE COURT:  You lost a few with the '508 patent.

15:22:14 20              MR. CHERNY:  Yes.  And so we have made a

15:22:17 21    proposal, we assume that having heard your decision today

15:22:19 22    that Sage will be prepared to respond to it, but it seems

15:22:22 23    like it would be good to have a date by which we can inform

15:22:28 24    you that we've managed to narrow things for you.

15:22:32 25              THE COURT:  I saw that proposal, it was attached

15:22:34 1    to something.  Was it twelve or ten?

15:22:36 2              MR. CHERNY:  We have proposed going from sixteen

15:22:39 3    to ten.  I don't know whether the Court has a reaction

15:22:41 4    whether ten is a good number.

15:22:43 5              THE COURT:  I guess it depends if they're

15:22:44 6    overlapping.  If you think you can -- it's a lot for a jury,

15:22:50 7    but it's getting into the range of reason, yes.

15:22:53 8              MS. FRANTZEN:  I would just say we didn't agree

15:22:56 9    to talk about it because -- well, eliminating the '508

15:23:00 10   patent eliminates some of those claims.  And the main issue

15:23:03 11   for us was what dependent claims were being asserted because

15:23:07 12   that implicated the prior art.  We're at a point that it

15:23:10 13   would be helpful to just know, please just tell us what

15:23:14 14   claims you're asserting against us so we can --

15:23:17 15             THE COURT:  Yes, but you understand if they do

15:23:19 16   that they're giving up their leverage in you telling them --

15:23:22 17   you guys need to start to eliminate -- limit your prior art

15:23:27 18   defenses.  Do they know what you're asserting in terms of

15:23:31 19   prior art?

15:23:33 20             MS. FRANTZEN:  Yes, Your Honor.  And our prior

15:23:34 21   art, the patents -- for example, with the '376 and '989, we

15:23:39 22   have basically the PureWick prior art and the two other

15:23:42 23   references, so the other subsidiary --

15:23:47 24             THE COURT:  Wait.  I don't want to hear ever

15:23:49 25   again the PureWick prior art.  It needs to be a product.

15:23:53  1      Okay?

15:23:55  2                      MS. FRANTZEN:  Brown tape product.

15:23:56  3                      THE COURT:  Wait.  Do we know what brown tape

15:23:58  4      product because apparently there is multiple?

15:24:02  5                      MS. FRANTZEN:  The brown tape product that was

15:24:04  6      demonstrated and sold, for example, at CONNECT and used by

15:24:11  7      -- but my point to that is, for example, when they narrowed

15:24:14  8      the claims, I don't mean to get into a subsidiary dispute,

15:24:18  9      but, for example, they picked claim 6 which depended on

15:24:22 10      claim 5 which depended on claim 1, so that was one claim but

15:24:25 11      it's really three claims.  So we have to invalidate all the

15:24:29 12      other claims in that one supposed claim.  And that's why we

15:24:32 13      just like to -- we're not asserting a lot of references.

15:24:36 14      We're at a point where it's so narrow, and the extra ones

15:24:40 15      are just for dependent claims.

15:24:42 16                      So we just would like to know what they're

15:24:44 17      asserting, and then I think we would propose something

15:24:48 18      reasonable because it's not like we have twenty references.

15:24:51 19                      THE COURT:  What's your proposal that got you

15:24:52 20      down to ten, what claims are they?

15:24:54 21                      MR. CHERNY:  Do we have those specific claims?

15:24:58 22      We made a proposal to exchange, without --

15:25:01 23                      THE COURT:  Exchanging really kind of -- I know

15:25:04 24      it's probably not you, but if there is no exchanging, no one

15:25:08 25      knows what's going on here.

15:25:09  1                   MR. CHERNY:  Your Honor, may I be frank?  I

15:25:11  2       raised this, we made --

15:25:12  3                   THE COURT:  You may be Frank, Steve.

15:25:16  4                   MR. CHERNY:  May I be Steven again?

15:25:17  5                   Your Honor, we made a proposal and said here is

15:25:20  6       how we should do this, the '508 is now out, that changes

15:25:24  7       things a little bit.  When I stood up all I wanted was a

15:25:28  8       date which we could provide you with it.  I don't want to

15:25:32  9       argue with the other side about whether dependent claims are

15:25:34  10      necessary because some may be necessary depending on the

15:25:37  11      art, I really much rather not argue with the other side

15:25:40  12      about what the narrowing is.  Let's get together and pick a

15:25:43  13      date by which we can say to you here are the claims we

15:25:48  14      propose and here is the prior art.

15:25:49  15                  THE COURT:  I think what we're saying is are you

15:25:51  16      suggesting that you won't do those things on the same day or

15:25:55  17      what --

15:25:56  18                  MR. CHERNY:  No.

15:25:57  19                  THE COURT:  What Ms. Frantzen is suggesting is

15:26:00  20      give you her claim numbers and they'll tell you their prior

15:26:04  21      art.  If you think she needs to limit her prior art, you can

15:26:08  22      tell her.  If she thinks you need to limit your claims

15:26:11  23      further, she can tell you.

15:26:12  24                  MR. CHERNY:  Your Honor, that was exactly the

15:26:15  25      proposal, we would give them our claims and they would

15:26:17 1    respond.   I want a date to which we can inform you.

15:26:20 2                    THE COURT:   I am shutting down my computer which

15:26:23 3    is having some slowness issues.

15:26:25 4                    What date?   I don't have a calendar in front of

15:26:28 5    me.

15:26:29 6                    MR. CHERNY:   We can give them claims by what

15:26:32 7    date, five days, four days, Monday.

15:26:34 8                    THE COURT:   Monday.   When do you want to respond

15:26:37 9    to them?

15:26:38 10                    MS. FRANTZEN:   Four or five days after that.

15:26:40 11   We'll try to do it faster because we're trying to prepare.

15:26:44 12                    THE COURT:   Once you get theirs, try and get it

15:26:46 13   to me by a week.

15:26:48 14                    MR. CHERNY:   This one was the one part where I

15:26:50 15   think cooperation was not going to be hard, I just want to

15:26:54 16   get a date so we can move on to a trial.

15:26:56 17                    MS. FRANTZEN:   Absolutely.

15:26:57 18                    THE COURT:   All right.

15:27:00 19                    COURT CLERK:   All rise.

20                    (Court adjourned at 3:27 p.m.)

21

22                    I hereby certify the foregoing is a true and
       accurate transcript from my stenographic notes in the proceeding.
23

24                                      /s/ Dale C. Hawkins
                                       Official Court Reporter
25                                       U.S. District Court