13:40:12  1                    IN THE UNITED STATES DISTRICT COURT

       2                    FOR THE DISTRICT OF DELAWARE

       3

       4    PUREWICK CORPORATION,        )
                                         )
       5                  Plaintiff,     )
                                         ) C.A. No. 19-1508(MN)
       6    v.                           )
                                         )
       7    SAGE PRODUCTS, LLC,          )
                                         )
       8                  Defendant.     )

       9

      10                    Monday, March 21, 2022
                            2:00 p.m.
      11                    Pretrial Hearing

      12

      13                    844 King Street
                            Wilmington, Delaware

      14

      15    BEFORE:   THE HONORABLE MARYELLEN NOREIKA
                      United States District Court Judge
      16

      17

      18    APPEARANCES:

      19

      20                    SHAW KELLER LLP
                            BY:  JOHN SHAW, ESQ.

      21                    -and-

      22                    QUINN EMANUEL URQUHART & SULLIVAN, LLP
                            BY:  STEVEN CHERNY, ESQ.
      23                    BY:  BRIAN P. BIDDINGER, ESQ.
                            BY:  RAYMOND NIMROD, ESQ.
      24
                                      Counsel for the Plaintiff
      25

1    APPEARANCES CONTINUED:

2

3              YOUNG CONAWAY STARGATT & TAYLOR
              BY:  ANNE SHEA GAZA, ESQ.
4              BY:  SAMANTHA G. WILSON, ESQ.

5              -and-

6              McANDREWS HELD & MALLOY LTD.
              BY:  ROBERT A. SURRETTE, ESQ.
7              BY:  SANDRA A. FRANTZEN, ESQ.
              BY:  CHRISTOPHER SCHARFF, ESQ.
8              BY:  DEBORAH LAUGHTON, ESQ.
              BY:  JENNA SAUNDERS, ESQ.
9              BY:  BRADLEY LOREN, ESQ.

10

              Counsel for the Defendant
11

12              _ _ _ _ _ _ _ _ _ _ _

13:50:37 13

14:02:44 14              THE COURT:  All right.  Good afternoon.  We will

14:02:48 15    start with some introductions.

14:02:52 16              MR. SHAW:  Good afternoon, Your Honor.  John

14:02:55 17    Shaw for plaintiff, PureWick Corporation.  Joining me today

14:02:57 18    from Quinn Emanuel, Steven Cherny, Brian Biddinger, Ray

14:03:01 19    Nimrod.  And then from Becton Dickinson Gene Savage.

14:03:07 20              THE COURT:  Good afternoon.

14:03:09 21              MS. GAZA:  Good afternoon, Your Honor.  Anne

14:03:12 22    Gaza from Young, Conaway on behalf of Sage.  I'm joined

14:03:13 23    today, Your Honor, by Sandra Frantzen.

14:03:19 24              MS. FRANTZEN:  Good morning, Your Honor.

14:03:21 25              MS. GAZA:  Robert Surrette, Christopher Scharff,

14:03:24 1    and Bradley Loren.  And behind them we have Jenna Saunders

14:03:30 2    and Deborah Laughton, all from the McAndrews Held & Malloy,

14:03:35 3    as well as my colleague, Samantha Wilson.

14:03:38 4             THE COURT:  Good afternoon to all of you as

14:03:39 5    well.

14:03:40 6             So we're here for the pretrial conference.  I

14:03:43 7    want to go over some of the things that I saw and then I'll

14:03:46 8    let you clarify anything else that you want to clarify.

14:03:50 9             First the motions in limine.  Plaintiff's motion

14:03:53 10   in limine number one to preclude evidence or argument that

14:03:56 11   Sage has patents covering its products.  And for that one I

14:04:04 12   didn't see anything in defendant's response about what the

14:04:09 13   evidence is that the patents cover their products.  What

14:04:13 14   evidence do we have that the patents cover the products

14:04:15 15   because if we don't have that evidence, it doesn't seem like

14:04:18 16   we need to worry about this issue.

14:04:20 17            MS. FRANTZEN:  Your Honor, we're going to have

14:04:23 18   Brad Loren who is an attorney who just passed the bar in

14:04:28 19   November address this motion.

14:04:29 20            THE COURT:  Congratulations.

14:04:32 21            MR. LOREN:  Thank you, Your Honor.

14:04:33 22            THE COURT:  So I don't want to get to relevance

14:04:37 23   yet.  I want you to tell me what evidence there is in the

14:04:40 24   record that those patents cover the products so that we know

14:04:44 25   if we even need to get to whether it would be relevant.

14:04:47  1          MR. LOREN:  Yes, Your Honor, Sage's experts have

14:04:50  2   analyzed the patents and have found that they cover the

14:04:52  3   products.

14:04:52  4          THE COURT:  Where?  Because I didn't see that.

14:04:55  5          MR. LOREN:  So in Sage's expert reports --

14:04:57  6          THE COURT:  If you can point me to the specifics

14:05:00  7   so I know what's in the record and so that PureWick can tell

14:05:04  8   me if that's sufficient.

14:05:09  9          MR. LOREN:  For example, in Exhibit D at

14:05:12 10   page 200.

14:05:12 11          THE COURT:  I'm sorry, what am I looking at here

14:05:14 12   for the motion in limine number one, Exhibit E or D?

14:05:27 13          MR. LOREN:  D.

14:05:30 14          So this is excerpts of Mr. Sheldon's responsive

14:05:34 15   expert report where he explained how Sage's patents

14:05:36 16   highlighted the innovative features of Sage's products.

14:05:41 17          THE COURT:  The whole exhibit is what you're

14:05:45 18   relying on?

14:05:46 19          MR. LOREN:  Sorry, at page 200.

14:06:24 20          THE COURT:  But does that explain -- I mean, in

14:06:27 21   order for the patent to cover the product, the products have

14:06:30 22   to be covered by the claims of the patent.  Does he say that

14:06:33 23   or is the entirety of his opinion this three-line sentence?

14:06:40 24          MR. LOREN:  I believe at this point that's the

14:06:42 25   entirety of the opinion.  He did not go through an

14:06:45 1    element-by-element analysis, but he did analyze the patents

14:06:49 2    and other evidence.

14:06:53 3            THE COURT:  Okay.  So if that's the only

14:06:58 4    evidence there is that the product was covered by any

14:07:01 5    patents of Sage, I'm going to grant the motion and preclude

14:07:08 6    defendant from relying on Sage's patent because there is

14:07:11 7    insufficient evidence that the patents are actually relevant

14:07:14 8    to the accused products in the case.

14:07:17 9            All right.

14:07:20 10           MS. FRANTZEN:  Your Honor, may I just address

14:07:22 11   one issue to that point which was addressed in the briefing?

14:07:26 12   We do have -- pardon me, Your Honor.  We do have fact

14:07:30 13   witnesses that are also going to be testifying about those

14:07:33 14   patents and we did reference that in our opposition as well.

14:07:38 15   About the -- their patents and what it covers.

14:07:41 16           THE COURT:  Was this disclosed during discovery?

14:07:43 17           MS. FRANTZEN:  Yes, in fact they served an

14:07:45 18   interrogatory on us asking for what our patents were and we

14:07:49 19   responded and that was an attachment --

14:07:51 20           THE COURT:  Right.  But did you disclose the

14:07:55 21   people who are now going to be testifying about the issue so

14:08:01 22   that they could take a deposition on it?

14:08:04 23           MS. FRANTZEN:  Yes.  In fact, during the

14:08:06 24   deposition of the inventors they did ask about our patent,

14:08:08 25   our main witnesses, which are our main engineer on the one

14:08:12 1    product and the second engineer on the other product.

14:08:14 2            THE COURT:  So he's going to get up and give

14:08:16 3    expert testimony, a fact witness is going to get up and give

14:08:20 4    expert testimony that a product is covered?

14:08:21 5            MS. FRANTZEN:  No, I think a fact witness would

14:08:26 6    get up and say I have patents that have this feature and

14:08:28 7    this feature is novel.  And as it relates to willfulness,

14:08:31 8    one of our main points was that it was relevant to counter

14:08:35 9    their evidence that we are copyist and we have a patent on

14:08:38 10   it especially with regard to these features and Georgia

14:08:41 11   Pacific Factor 13 which requires you to look at other

14:08:45 12   features, innovative features in the accused product.  So it

14:08:51 13   was relevant to both --

14:08:53 14           THE COURT:  I guess what I'm missing here is

14:08:55 15   you're going back and saying look, we have a patent that

14:08:59 16   addresses these features, that is a different question than

14:09:02 17   does the accused product that may or may not have those

14:09:06 18   features is covered by that patent.

14:09:09 19           MS. FRANTZEN:  Yes, I understand that.  So the

14:09:12 20   features that are relevant to the -- the innovative features

14:09:17 21   in the patent are in the patent and we have fact witnesses

14:09:20 22   and multiple experts that have relied on it, both the

14:09:24 23   technical expert and the damages expert for Georgia Pacific

14:09:28 24   13, which requires you to look at innovative features in a

14:09:32 25   product.

14:09:37  1          THE COURT:  Okay.  But I'm still not

14:09:40  2   understanding.  In order to be covered -- the motion in

14:09:43  3   limine says you can't say our product is covered by our

14:09:48  4   patents.  You have no expert who went through all of the

14:09:53  5   elements and it doesn't seem to me that you're going to have

14:09:55  6   a fact witness go through the elements, you just want to

14:09:58  7   have the fact witness say, hey, we have our -- our product

14:10:03  8   has this feature and that feature is included in some of our

14:10:06  9   patents?

14:10:07 10          MS. FRANTZEN:  Yes, as it relates to non-copying

14:10:11 11   and Georgia Pacific 13.  So if --

14:10:14 12          THE COURT:  What I'm missing is those patents

14:10:21 13   could have other features that make things patentable, and

14:10:26 14   if we don't know that your product is covered by those

14:10:30 15   patents, how is it -- it seems like you can't tell the jury

14:10:34 16   well, this is a novel feature, it's in our patent if that --

14:10:37 17   we don't have any testimony that that aspect is what made

14:10:41 18   things patentable.

14:10:42 19          MS. FRANTZEN:  Well, I think the inventors

14:10:44 20   themselves can testify as to the features that were novel in

14:10:48 21   their patents and in their product, and the experts

14:10:51 22   consider, the damages expert considered an apportionment

14:10:57 23   those innovative features in determining how to apportion

14:11:01 24   PureWick's patents.

14:11:06 25          THE COURT:  Okay.  I granted the motion and I am

14:11:10  1    going to stick with that because I'm still not understanding

14:11:14  2    how we're going to have any testimony that ties a patent to

14:11:18  3    the particular product.   And I don't understand how a fact

14:11:23  4    witness is going to come in and say yes, we got this patent

14:11:26  5    because of this novel feature.   So that motion is granted.

14:11:31  6            MS. FRANTZEN:   Your Honor, just to clarify, so

14:11:34  7    are we able then to say like we have a culture of innovation

14:11:38  8    with our patents without I guess discussing specific

14:11:41  9    features, because that information is relevant to

14:11:45  10   non-willfulness, our culture of innovation.

14:11:50  11           THE COURT:   Mr. Cherny.

14:11:52  12           MR. CHERNY:   Pardon me?

14:11:53  13           MS. FRANTZEN:   Pardon me.

14:11:54  14           MR. CHERNY:   Your Honor, I'm not sure I exactly

14:11:57  15   understand, but I don't understand what she's talking about

14:12:01  16   in terms of relating it to -- they've identified two

14:12:04  17   patents, we understand your ruling and agree with it, one is

14:12:07  18   a design patent, the other one there is no connection to

14:12:10  19   that's ever been drawn between the products.

14:12:12  20           And so if they want to talk about features of

14:12:14  21   their product and say okay, this product has this feature,

14:12:18  22   sure.   And the whole issue here is they can't go in and

14:12:22  23   start talking about well, we have patents in an attempt to

14:12:24  24   try to get the jury to think that that's somehow relevant to

14:12:28  25   their patents.   There has been no evidence that any of their

patents are relevant to anything, certainly not copying or willfulness.

THE COURT:  What do you think about them saying look, they said that we're copyist, we aren't copyist, and not this specifically, but we have a culture of innovation, we get our own patent without specifying whatever.

MR. CHERNY:  I think that is prejudicial in the sense, Your Honor, they can certainly say we have a culture of innovation and that's something for the jury to weigh compared to the evidence that we're going to put forth in terms of copying and willfulness.  I don't see the relevance of the fact that someone got other patents.  For example, one of the two patents they're going to point to is a design patent.  I don't know what the jury can make from the fact that hey, I got a patent, therefore, I have a culture of innovation.  So the prejudicial aspect of the is the clear possibility for the jury to think that somehow this is relevant to any issue here.

If they want to say we have a culture of innovation, sure, somebody is going to get up there and the jury will assess the credibility of that assertion.  Saying we have a culture of innovation and we have patents, I don't know that that's relevant.  You can have a patent on a chair and say what does that have to do with whether you copy my device.

14:13:41 1            THE COURT:  Okay.  So I'm going to grant the

14:13:43 2  motion.  You can say you have a culture of innovation, but

14:13:47 3  can't point to the patent.  I think those patents are of

14:13:50 4  minimal relevance and there is a substantial risk of

14:13:53 5  confusing the jury by putting a design patent or other

14:13:56 6  patents in front of it that don't have any real explanation

14:13:59 7  and I think there is some prejudice involved.

14:14:03 8             Okay.  Motion in limine number two, to exclude

14:14:06 9  evidence or argument concerning any findings by the USPTO in

14:14:13 10  the '508 patent IPR proceeding.

14:14:16 11             Now, as I understand that, the defendant says

14:14:19 12  they don't intend to make arguments regarding the PTAB

14:14:24 13  patentability findings unless the plaintiff opens the door.

14:14:30 14  And is that right?

14:14:36 15             MR. SCHARFF:  Yes, Your Honor.  Christopher

14:14:39 16  Scharff for defendants.

14:14:40 17             THE COURT:  So if you're not saying that you

14:14:42 18  want to do it, why are we fighting?

14:14:45 19             MR. SCHARFF:  Partly because we just wanted to

14:14:47 20  clarify that if they were to, in fact, open the door on it

14:14:51 21  and say our -- you know, we have this earlier patent as part

14:14:54 22  of trying to tell a story of innovation, this patent is

14:14:58 23  great and it's inventive and it's valuable, we should have a

14:15:02 24  level playing field.  We shouldn't be precluded from saying

14:15:05 25  -- you know, providing evidence, no, it isn't valuable.

14:15:08  1          THE COURT:  We're going to have a very limited

14:15:10  2   time in this case and if they're going to spend a whole

14:15:13  3   bunch of time talking about how a patent at the PTAB was

14:15:17  4   found as not valid is so great and not talking about the

14:15:21  5   patents that are at issue here, you probably are doing

14:15:23  6   pretty well in your case.

14:15:25  7          MR. SCHARFF:  It may be a moot issue.  The only

14:15:27  8   other thing, Your Honor, that we wanted to raise is to

14:15:29  9   clarify that they had only actually asked to preclude us

14:15:33 10   from mentioning that the PTAB found claims of the '508

14:15:36 11   patent to be unpatentable.  They didn't ask to preclude

14:15:40 12   evidence from the IPR.  For example, statements that their

14:15:44 13   expert might have made for purposes of impeachment.

14:15:47 14   Statements that the PTAB might have made that constitute

14:15:50 15   part of the prosecution history.  So we just wanted that out

14:15:56 16   -- I'm sorry.

14:15:57 17          THE COURT:  So I am a little concerned about

14:16:04 18   statements the PTAB might have made that constitute the

14:16:08 19   prosecution history because I don't quite know what that

14:16:12 20   means and why you would be putting statements like that in

14:16:12 21   front of the jury here, so give me some examples here.

14:16:24 22          MR. SCHARFF:  Yes, it's very unlikely that that

14:16:27 23   would happen, but for example there is overlapping prior art

14:16:29 24   so the PTAB made some findings that certain prior art, for

14:16:35 25   example, Mani Smith disclosed a wicking material, whether

14:16:38 1    Mani Smith discloses a wicking material is an issue in this

14:16:40 2    case.

14:16:41 3           And so the IPR is part of the continued

14:16:44 4    prosecution of the patent where just the same as the

14:16:49 5    statements that PureWick made to the patent examiner are

14:16:52 6    considered to be part of the prosecution history, this is,

14:16:55 7    too, it's just a continuation of the prosecution.

14:16:59 8           I think the more likely instance would be we had

14:17:01 9    pointed out, for example, the PTAB in its final written

14:17:05 10   decision --

14:17:05 11          THE COURT:  Yes, you're going to talk about the

14:17:07 12   credibility issue.

14:17:08 13          MR. SCHARFF:  Yes, Your Honor.

14:17:09 14          THE COURT:  Just so I understand that one,

14:17:10 15   you're not going to get up when Dr. Jezzi is on the stand

14:17:15 16   and say he says something about a piece of prior art, but

14:17:18 17   the PTAB on a different piece of prior art said they didn't

14:17:22 18   believe him.  You're not going to get up and say you're

14:17:25 19   telling this jury this, but the PTAB has already found that

14:17:28 20   you're not credible.  Right?

14:17:30 21          MR. SCHARFF:  No, Your Honor, it would obviously

14:17:33 22   depend on -- you know, I think the fact that another forum

14:17:33 23   found his testimony on the subject matter to not be credible

14:17:34 24   --

14:17:35 25          THE COURT:  No, the subject matter is where

14:17:41 1   you're getting me, because the subject matter is a PureWick

14:17:45 2   patent, that's too broad.  Right?  Now, if he gets up there

14:17:50 3   and he says it doesn't have a wicking material, and in the

14:17:54 4   PTAB he said it did have a picking material, that seems like

14:17:58 5   it might be fair game.  If he gets up and says it doesn't

14:18:02 6   have a wicking material and the PTAB said that particular

14:18:05 7   piece of prior art did have a wicking material, that's

14:18:08 8   probably fair game.

14:18:09 9          But some of the examples that you gave me I'm

14:18:12 10  not sure that they were -- that they're not going a little

14:18:16 11  outside the bounds of what would be fair and I just want to

14:18:19 12  make sure you're not going to get up there and just be like

14:18:23 13  you are a known not credible person based on something

14:18:26 14  that's different in the PTAB from what he's testifying.

14:18:30 15          MR. SCHARFF:  No, not like that, Your Honor, but

14:18:32 16  for example, if another court had precluded his testimony

14:18:35 17  because they found it not credible, I would think that I

14:18:38 18  would be able to ask, has your testimony ever been excluded.

14:18:41 19          THE COURT:  No, you're not going to be able to

14:18:42 20  ask that in my courtroom.

14:18:44 21          MR. SCHARFF:  Thank you for that clarification,

14:18:46 22  then, Your Honor.

14:18:52 23          Well, for example, would we be able to ask

14:18:57 24  questions, for example, prior to this trial, you worked on

14:19:00 25  behalf of PureWick in another proceeding, correct, in that

14:19:03 1    proceeding the fact finder did not accept your positions.

14:19:06 2                THE COURT:  Nope.

14:19:07 3                MR. SCHARFF:  Okay.  Thank you, Your Honor.

14:19:08 4                THE COURT:  I just think that's inappropriate.

14:19:11 5                MR. NIMROD:  Your Honor, if I may speak to this

14:19:14 6    issue.

14:19:14 7                THE COURT:  I just ruled for you.  Do you really

14:19:16 8    need to?

14:19:17 9                MR. NIMROD:  There is one issue that you said

14:19:19 10   might be fair game, that's findings of the PTAB.  I don't

14:19:22 11   think that's consistent with the case law.

14:19:24 12               THE COURT:  If the PTAB found a piece of prior

14:19:26 13   art, the very piece of prior art that he's testifying

14:19:29 14   doesn't have a wicking material, PTAB said it does, he's not

14:19:32 15   allowed to be cross-examined on that.

14:19:34 16               MR. NIMROD:  No, Your Honor, he should not be

14:19:36 17   cross-examined on that.  What he should be cross-examined on

14:19:38 18   is what you said earlier which is if he took an inconsistent

14:19:41 19   position --

14:19:42 20               THE COURT:  Is it relevant to say the PTAB found

14:19:45 21   a piece of prior art that in this case PureWick is saying

14:19:50 22   does not have what a wicking material does?

14:19:52 23               MR. NIMROD:  It's not relevant, Your Honor,

14:19:52 24   because that's not a final decision.  It's a decision of the

14:19:56 25   PTAB that still could be taken on appeal, could be taken on

14:20:00 1   different burdens of proof, so the case law consistently

14:20:03 2   says you cannot rely on the ruling itself even if it's on

14:20:06 3   the same patent which is not here.   The Pack Bioscience case

14:20:10 4   that they rely on states that the petition in the

14:20:12 5   declaration may be used to impeach the expert provided the

14:20:16 6   parties reference them as being related to "another matter

14:20:20 7   without disclosing the nature, details, result of the IPR

14:20:23 8   proceeding."

14:20:23 9            THE COURT:  Right.

14:20:24 10           MR. NIMROD:  That's what the cases say.  But the

14:20:26 11  result of the IPR proceeding is what did the PTAB say about

14:20:29 12  the prior art.  That's not a final decision, it's on appeal,

14:20:33 13  there are different standards.  All they should be able to

14:20:35 14  do is impeach our witness if he said something inconsistent

14:20:39 15  in the PTAB, not the finding of the PTAB.  The cases are

14:20:43 16  uniform in that respect, Your Honor.  And the credibility

14:20:45 17  determination absolutely should not come up whatsoever.

14:20:49 18           THE COURT:  And the PTAB is talking about a

14:20:51 19  different patent?

14:20:52 20           MR. NIMROD:  They are, Your Honor, it's the '508

14:20:54 21  patent which has been withdrawn in this case.  Then there is

14:20:57 22  --

14:20:57 23           THE COURT:  It's withdrawn or it's stayed,

14:20:59 24  because you can withdraw at any time.

14:21:02 25           MR. CHERNY:  I'm putting it back.

14:21:04 1                        MR. NIMROD:  Sorry, it's not an issue for this

14:21:06 2      trial, Your Honor.

14:21:07 3                        THE COURT:  I should have just gotten him to say

14:21:09 4      it before you stood up.  All right.

14:21:11 5                        MR. NIMROD:  So, Your Honor, in cases where it

14:21:13 6      --

14:21:13 7                        THE COURT:  I'm done.  I got it.

14:21:15 8                        MR. NIMROD:  Thank you.

14:21:15 9                        THE COURT:  Thank you.  I am going to grant the

14:21:18 10     motion to the extent the defendant cannot use the PTAB

14:21:20 11     finding of unpatentability in the final written decision to

14:21:23 12     the '508 patent to support its assertion that prior art

14:21:26 13     invalidates the asserted patent in this litigation.  I will,

14:21:29 14     however, grant this motion without prejudice.  The defendant

14:21:32 15     brings up multiple situations where the relevant and

14:21:35 16     probative value of statements could outweigh during the PTAB

14:21:39 17     proceedings, could outweigh the potential for prejudice.  If

14:21:41 18     such a situation arises at trial, the defendant may request

14:21:45 19     to introduce the findings from the PTAB's decision or

14:21:50 20     statements about it and I will decide whether to exclude

14:21:52 21     them.

14:21:52 22                        So what I want is don't do it until you tell me

14:21:55 23     in advance outside of the jury, we'll talk about it and then

14:22:00 24     decide on a case-by-case basis.

14:22:04 25                        Additionally, with this decision I'm not

14:22:07 1    prohibiting defendant from relying on specific statements

14:22:10 2    made by plaintiff or its experts such as Mr. Jezzi in the

14:22:15 3    PTAB proceedings to impeach contrary statements made if this

14:22:20 4    were to occur, however, defendant cannot refer to the '508

14:22:24 5    IPR proceeding directly and instead must refer to any

14:22:27 6    contrary statements as being related to another matter

14:22:30 7    without disclosing the nature, details, or results of the

14:22:34 8    IPR.

14:22:35 9           All right.  Plaintiff's motion in limine number

14:22:38 10   three to exclude evidence or argument that PrimaFit 2.0 is

14:22:43 11   commercially available or a non-infringing alternative.  It

14:22:46 12   seems from the two footnotes in the pretrial order that Sage

14:22:49 13   is not making that argument, and plaintiff also suggested

14:22:53 14   that again in its letter.  Is that one moot?

14:22:58 15          MS. FRANTZEN:  From our side, Your Honor, yeah,

14:23:00 16   part of the second case so of course we still say it's not

14:23:04 17   infringing and all of that jazz, but we are not asserting as

14:23:07 18   a non-infringing alternative for this case.

14:23:10 19          MR. CHERNY:  The answer, Your Honor, is yes,

14:23:12 20   it's moot.

14:23:14 21          THE COURT:  So it is moot.

14:23:15 22          Defendant's motion in limine number one, to

14:23:18 23   preclude plaintiff from comparing the accused products to

14:23:20 24   the patent features of plaintiff's products.  Who has got

14:23:22 25   this one?

14:23:29   1          MR. SCHARFF:  That would be me, Your Honor.

14:23:34   2          So, Your Honor, what we are asking for in this

14:23:37   3   motion in limine is to preclude improper comparisons based

14:23:41   4   on appearance.  So, for example, either comparing our

14:23:44   5   accused products to figures -- specifically pictures of our

14:23:48   6   accused products to figures or embodiment of the asserted

14:23:53   7   patents instead of patent claims and then comparing just how

14:23:56   8   our accused product looks versus how PureWick's commercial

14:24:00   9   product looks.  The reason is that despite any reason that

14:24:03  10   PureWick might claim for wanting to do these comparisons,

14:24:06  11   the effect would be the same.  There would be a high risk

14:24:09  12   that the jury would be influenced into thinking that there

14:24:11  13   is infringement by putting up a picture of their product, a

14:24:14  14   picture of our product and saying look, they look similar,

14:24:18  15   wink, wink, take from that what you will.

14:24:21  16          So the important thing is that PureWick did not

14:24:24  17   patent how its product looks, its patents require specific

14:24:28  18   features, some of which you can't even tell if they're

14:24:31  19   present just from looking at the outside.  And so numerous

14:24:35  20   courts as we cited have stated that that is so prejudicial

14:24:40  21   that any minimal relevance would outweigh -- would be

14:24:44  22   outweighed by that prejudice at risk that the jury would

14:24:47  23   think that they must infringe because they look similar.

14:24:50  24          And none of PureWick's reasons for why they want

14:24:52  25   to make these comparisons make sense.  For example, they say

14:24:57 1   well, the comparisons are relevant to show that Sage

14:25:00 2   allegedly copied PureWick's not yet issued patent figures,

14:25:05 3   or not yet patented products, but even when their patents

14:25:11 4   issued, again, they didn't cover the look of the device,

14:25:14 5   they covered specific features.  So even if that

14:25:17 6   pre-issuance copying allegation was relevant, alleging that

14:25:21 7   we copied how their product looked isn't even relevant to

14:25:25 8   the patent.

14:25:25 9          And then PureWick says well, these comparisons

14:25:28 10  are also relevant to lost profits, but again, they never

14:25:32 11  explain how comparing the look of the product is relevant to

14:25:35 12  lost profits.  And again, if you look at PureWick's law,

14:25:40 13  they cite to some law saying that in some situations you can

14:25:44 14  compare the products.  For example, they cite a chemical

14:25:46 15  case where it was allowable to compare the products when the

14:25:51 16  patent there specifically required a chemical that met a

14:25:55 17  certain standard and you prove that through that comparison

14:25:59 18  to the covered product.  But the court didn't say yeah, you

14:26:04 19  can put the two up and see if they look similar.

14:26:06 20         And then on the second issue, they also cited to

14:26:11 21  this Medtronic case, but again, just said it had to do with

14:26:17 22  can you compare the products period, compare the features,

14:26:20 23  and then the court said there is a high risk of the jury

14:26:24 24  being confused on infringement, but because in that case the

14:26:28 25  District Court gave repeated cautionary instructions, the

14:26:31 1    court was okay with just comparing the products but not

14:26:35 2    doing this, you know, put up the pictures side-by-side and

14:26:38 3    take from it what you will kind of suggestion.  So that's

14:26:41 4    what we're moving on, Your Honor.

14:26:46 5                    MR. BIDDINGER:  Good afternoon, Your Honor,

14:26:48 6    Brian Biddinger.

14:26:50 7                    So I mean, it sounds, what I just heard --

14:26:54 8                    THE COURT:  You don't want to use it to prove

14:26:56 9    infringement?

14:26:56 10                   MR. BIDDINGER:  No, Your Honor, correct.

14:26:58 11                   THE COURT:  And you agree that you're not going

14:27:00 12   to do that, right?

14:27:02 13                   MR. BIDDINGER:  That is correct, Your Honor,

14:27:03 14   we're going to compare the accused products to the claim.

14:27:05 15                   THE COURT:  So tell me some details, what is

14:27:07 16   it -- like how is it going to come in at trial that you

14:27:11 17   would do a comparison?

14:27:12 18                   MR. BIDDINGER:  Yes.  So for example, Your

14:27:14 19   Honor, one of the paragraphs that defendants cited to in

14:27:19 20   their motion was paragraph 266 of our opening infringement

14:27:25 21   expert report.  It's at DI 210, Exhibit 30 in the docket.

14:27:31 22   And probably it's not attached to the motion.  I apologize,

14:27:34 23   Your Honor.  I can put it on the Elmo or I can tell you.

14:27:37 24   It's really short.  I can just read it.

14:27:39 25                   But basically in that he says references claim

14:27:43  1  charts, attaches the report, he has claim charts obviously

14:27:48  2  for an accused product and also claim charts for our product

14:27:53  3  because for lost profits purposes he's going to prove that

14:27:56  4  it practices the claim.  He says as shown in those charts,

14:28:00  5  claim-by-claim chart the PrimaFit PureWick devices each

14:28:04  6  include all of the elements of the asserted claims of the

14:28:06  7  patent, the PrimaFit accused product is structurally and

14:28:10  8  functionally the same as the PureWick device.  The changes

14:28:13  9  that Sage made such as the addition of adhesive, et cetera,

14:28:17 10  are not relevant to whether it's covered by the

14:28:19 11  patent-in-suit.  So that he's comparing the claims to each

14:28:23 12  product, and he's saying based on my technical analysis,

14:28:28 13  they are structurally and functionally the same.

14:28:30 14          THE COURT:  Right.  My question was, tell me in

14:28:33 15  what instance or for what purpose you would be putting up a

14:28:37 16  picture from the patent and comparing it to their product?

14:28:42 17          MR. BIDDINGER:  I'm not sure that there is any

14:28:44 18  instance that we plan to do that, Your Honor.  We plan to

14:28:47 19  talk about figures from the patent and explaining what the

14:28:50 20  invention is about and what the claims are about, and then

14:28:54 21  we plan to compare the accused product with the claims and

14:28:57 22  we plan to compare our product with the claims.  And for

14:29:01 23  purposes of lost profits, we are talking about both products

14:29:05 24  and the features of those products and the benefits that the

14:29:07 25  claimed features provide for those products.  But I don't

14:29:12  1    think there is an intention to put up the products

14:29:16  2    side-by-side and say, you know, their product, you know,

14:29:20  3    infringes because it looked like our product.

14:29:23  4              THE COURT:  What about copying?

14:29:25  5              MR. BIDDINGER:  For purposes of copying, there

14:29:27  6    is evidence -- the evidence on copying is the fact that they

14:29:31  7    were provided the patent application, the fact that they

14:29:34  8    were provided samples of our products, the fact that they

14:29:37  9    tested those samples of our products, and what I just read

14:29:41  10   is in the context of copying as well which is what our

14:29:45  11   expert said, look, I have analyzed both versus the claims

14:29:48  12   and there are not structural differences between the two of

14:29:51  13   them.

14:29:52  14             THE COURT:  So does that mean for copying

14:29:54  15   purposes you're going to put that picture up and say here is

14:29:58  16   their device and here is the picture that was in the patent

14:30:01  17   and also in the confidential patent application, is that

14:30:04  18   what you're going to do?

14:30:06  19             MR. BIDDINGER:  I don't have any plan to do

14:30:08  20   that, Your Honor.  I think that evidence will come in

14:30:10  21   separately, the patent application they had access to, the

14:30:14  22   samples that they had access to and the analysis of each of

14:30:20  23   those individually against the claims, but I don't -- I am

14:30:24  24   not aware of any plan to say the evidence of copying is look

14:30:27  25   at these two products together on the screen side-by-side.

14:30:31 1          THE COURT:  I am going to grant in part the

14:30:33 2    motion.  Plaintiff can't prove infringement by relying on

14:30:36 3    comparisons between the accused product and plaintiff's

14:30:38 4    product or the asserted patent product features which I

14:30:42 5    think plaintiff agrees to.  It may be that plaintiff can

14:30:44 6    rely on the at issue comparisons to support other arguments

14:30:48 7    such as copying or lost profit, but it isn't clear to me at

14:30:53 8    this point that plaintiff intends to do so or whether that

14:30:57 9    particular comparison in a given situation would be

14:31:00 10   appropriate, so again, before plaintiff is going to -- if

14:31:04 11   you decide you're going to put up some kind of comparisons

14:31:08 12   like that of their product in your pictures, tell me first

14:31:12 13   so that we can talk about it outside the presence of the

14:31:15 14   jury.

14:31:16 15          Okay.  Defendant's motion in limine number two

14:31:21 16   to exclude plaintiff from suggesting unpled causes of action

14:31:26 17   including suggestion that Sage breaches a mutual

14:31:32 18   confidentiality agreement.  Plaintiff says it does not

14:31:34 19   intend to argue or suggest that Sage breached the mutual

14:31:38 20   confidentiality agreement, but the existence of the

14:31:42 21   agreement is relevant to willfulness and copying.  And I

14:31:48 22   don't think defendant disagrees that the agreement itself is

14:31:52 23   relevant, you just don't want them to say or imply that it

14:31:58 24   is breached.  Right?

14:32:00 25          MR. SCHARFF:  Thank you, Your Honor.  So yes, I

14:32:05 1 think the issue is we don't dispute that they can say that

14:32:08 2 there was a CDA, but how can you then tie the CDA to

14:32:12 3 willfulness, because willfulness by definition is that we

14:32:16 4 did something wrong.  So how can you say this CDA is proof

14:32:20 5 that they willfully infringed because they stole our

14:32:24 6 information because they -- I mean, if for example, that's

14:32:27 7 exactly what they did in their other opposition to our

14:32:31 8 motion in limine is they specifically said exactly what

14:32:34 9 we're concerned about.  They said we gave Sage confidential

14:32:38 10 information and they used that confidential information to

14:32:41 11 copy our product and design their own.

14:32:44 12          THE COURT:  Can't they say that in the context

14:32:45 13 of willfulness?  I get it, they can't get up there and ask

14:32:50 14 the jury to find that you breached the contract outside of

14:32:53 15 the realm because that's not a pleaded defense, but for

14:32:56 16 willfulness, they have to show that you knew about it and

14:33:00 17 they continued to infringe.  Why can't they make the

14:33:03 18 argument that you're talking about?

14:33:05 19          MR. SCHARFF:  I think the issue I have is the

14:33:07 20 issue that they gave us confidential information which would

14:33:10 21 be disputed, but we then stole that confidential

14:33:12 22 information.  They can argue copying, things like that.

14:33:12 23          THE COURT:  Isn't that an issue for the jury to

14:33:17 24 determine?  If they say it's confidential, you say it's not

14:33:19 25 confidential, based on the discussion it seems like an issue

of fact for the jury to decide whether it was confidential
information.

MR. SCHARFF:  I think the issue, Your Honor, is
we're not just concerned with them using the magic words,
Sage breached this MDA or CDA, but if they say we had this
CDA, we gave Sage confidential information, Sage took our
confidential information, the clear implication is that we
--

THE COURT:  Yeah, but okay, but that is also
relevant to willfulness.  They're allowed to put on a
willfulness case.  That's relevant arguably to willfulness.
So I get it.  And the jury is not going to be asked did they
breach the contract, but what you just said is okay.  I
mean, there is lots of things that are relevant to one issue
that I wouldn't let in for another issue.  I'm not letting
them argue breach of contract and proving a breach of
contact.  I am going to let them argue willfulness in which
case part of their willfulness is you had this document and
you had these samples and it all looks kind of the same.

MR. SCHARFF:  Yes, Your Honor, that's fair game.
I think the issue we have is linking that to the CDA.  They
can say we gave them confidential information and we think
they stole it, but if they tie that with that CDA, we gave
them a CDA or they signed a CDA and then we gave them
confidential information under that CDA, it's that implying

14:34:49 1    that we breached this agreement and that we had this

14:34:52 2    agreement that we violated, that I think crosses the line.

14:34:58 3             THE COURT:  Anyone?

14:34:59 4             MR. CHERNY:  Thank you, Your Honor.

14:35:02 5             So I agree with what the Court has said so far,

14:35:06 6    we're not going to assert that they breached the

14:35:10 7    confidentiality agreement.  I agree there is overlapping

14:35:13 8    facts here.  I think the jury is entitled to understand how

14:35:16 9    it is that they were given a confidential patent application

14:35:19 10   that otherwise they wouldn't get and take that into account

14:35:22 11   on the willfulness assessment.  So we gave them a

14:35:26 12   confidential patent application, I don't know why they say

14:35:28 13   they disagree with it.  I guess that will be a fact for the

14:35:32 14   jury to decide.  We gave it to them.  In there we say they

14:35:36 15   copied the figures in there and structures of the

14:35:38 16   embodiments as well as the other stuff we gave them, and I

14:35:43 17   agree with the Court that that is something for the jury to

14:35:45 18   assess in terms of willfulness.

14:35:47 19            THE COURT:  I'm going to grant the motion in

14:35:49 20   part because plaintiff agrees plaintiff cannot argue that

14:35:52 21   Sage breached the confidentiality agreement.  However, the

14:35:55 22   existence of the confidentiality agreement and the

14:35:57 23   information conveyed, confidential or not confidential, may

14:36:01 24   be relevant to plaintiff's willful infringement and copying

14:36:05 25   claims.

14:36:05  1              MR. CHERNY:  Thank you, Your Honor.

14:36:06  2              THE COURT:  All right.  So now I think that's

14:36:08  3     all the motions in limine.  And before I forget, for the

14:36:15  4     local folks who are here, Mr. Shaw, I don't know if it was

14:36:17  5     someone in your office who put this pretrial order together,

14:36:21  6     but it is the best one that I have ever had.  Thank that

14:36:24  7     person.  Everything was labeled.  I could find the motions

14:36:27  8     in limine.  So I wanted to tell you if you always do them

14:36:31  9     like that, it would be super.

14:36:33 10              MR. SHAW:  I will let Ms. James know, Your

14:36:36 11     Honor.

14:36:38 12              THE COURT:  It was very, very well done.

14:36:40 13              And you guys get credit for that, too.

14:36:43 14              MS. GAZA:  Thank you, Your Honor.

14:36:44 15              THE COURT:  Okay.  Witnesses.  In the proposed

14:36:47 16     voir dire the parties list thirty witnesses who may testify

14:36:50 17     in this case.  What's the realistic expectation?  I'm

14:37:05 18     starting to worry that you guys can't count that high.

14:37:10 19              MR. BIDDINGER:  If we're talking live witnesses

14:37:12 20     for the plaintiff.

14:37:12 21              THE COURT:  In the pretrial order you had six

14:37:12 22     will call, thirteen may call.

14:37:25 23              MR. BIDDINGER:  I think it's about six or seven

14:37:28 24     live witnesses for plaintiff, Your Honor.

14:37:32 25              THE COURT:  Okay.  And what about Ms. Frantzen.

14:37:35 1 You had nine plus eight more -- nine of defendants plus

14:37:40 2 eight more represented by plaintiff, I think there was

14:37:44 3 overlap with one or two of those.

14:37:47 4    MS. FRANTZEN:  Yeah.  So we have some of the

14:37:49 5 witnesses.  I think of the thirty, I think there is a lot of

14:37:52 6 overlap.  So I think a lot of folks on their may call list

14:37:55 7 are people on our will call list.  And one question that we

14:38:00 8 actually approached them prior to this that hasn't been

14:38:05 9 sorted out, when witnesses are witnesses for both cases, we

14:38:08 10 specifically asked them, for example, can we --

14:38:12 11    THE COURT:  Only calling them once?

14:38:14 12    MS. FRANTZEN:  Yes, on their will call list we

14:38:18 13 said can we go beyond the scope of cross potentially if they

14:38:22 14 needed to, but she's one of the people on our list, too, so

14:38:25 15 there is a lot of crossover lap there.  And then there --

14:38:29 16    THE COURT:  Can you have give me an estimate on

14:38:31 17 numbers?

14:38:32 18    MS. FRANTZEN:  I think we probably have with

14:38:34 19 live, we have somewhere around five.  And then depositions

14:38:39 20 we have kind of minor issues where it's short, so I would

14:38:42 21 say like four.  You know, I know we had one person, this

14:38:48 22 person will be like one minute.  We just needed one question

14:38:52 23 in.  But it is -- it's not nothing, it's at least ten, some

14:38:56 24 of which are their own people.

14:38:59 25    THE COURT:  And Mr. Cherny, you were going to

14:39:02 1    say something about can we just call everyone once.

14:39:04 2            MR. CHERNY:  Your Honor, can I defer on that

14:39:06 3    one?  I understand the benefits of the efficiency.  Before

14:39:09 4    we sat down, Ms. Frantzen came over and said we would like

14:39:13 5    to do that, and I said sure, we're happy to talk about it.

14:39:17 6    I said anyone in specific?  They said we want a blanket go

14:39:21 7    beyond the scope for any of the witnesses.

14:39:23 8            From our perspective, if they have something

14:39:27 9    specific they want to go past the scope of direct and at the

14:39:30 10   present time they want to talk about it, I'm happy, but for

14:39:34 11   example, I don't want to put Dr. Newton up for an hour and

14:39:37 12   have them examine her for two hours for my case.  It breaks

14:39:42 13   the flow.  We're only here for basically four days of

14:39:44 14   testimony.  The witnesses are going to be here.  We're not

14:39:47 15   going to spirit them out of Delaware.  I'm happy to work

14:39:50 16   with them if there is something specific.

14:39:52 17           THE COURT:  Why don't you guys try to come up

14:39:54 18   with something.  To the extent that's possible, that's my

14:39:57 19   preference, that's the jury's preference.  As a matter of

14:40:00 20   fact, I ask them when I talk to jurors afterward, "I don't

14:40:02 21   understand.  We thought we were done and these people kept

14:40:02 22   popping up again," so it's a not popular.

14:40:08 23           MR. CHERNY:  Believe me, I want to be popular

14:40:10 24   with the jury.  Like I said, if they can be a little

14:40:12 25   specific and not just say in general.

14:40:15 1          THE COURT:  I'll give you guys an opportunity to

14:40:17 2   talk about that a little bit more.

14:40:18 3          In paragraph 34 of the pretrial order it states

14:40:24 4   parties also reserve the right to change or modify these

14:40:28 5   witness lists for good cause.  So I would like to adopt the

14:40:37 6   pretrial order afterwards and to the extent that you all

14:40:42 7   reserve to make what could be significant changes after the

14:40:45 8   pretrial conference, it makes me nervous.  Is there any plan

14:40:48 9   to add a witness?  I understand you might drop people

14:40:52 10  because of time constraints or whatever.  Anyone foresee a

14:40:55 11  situation where we're going to add someone to these

14:40:59 12  witnesses?

14:40:59 13          MR. BIDDINGER:  No, Your Honor.

14:41:00 14          MS. FRANTZEN:  Not on our end, either.

14:41:02 15          THE COURT:  All right.  Thank you.

14:41:04 16          Paragraph 35 of the pretrial order, Sage request

14:41:07 17  to add, the attorneys would like to reserve the right to

14:41:12 18  call any witnesses for the purposes of rebuttal, impeachment

14:41:15 19  or authentication of documents.  And that's okay with me as

14:41:18 20  long as the witness is already on a witness list.  To the

14:41:23 21  extent it was written broadly enough to suggest that someone

14:41:27 22  new was coming in, that's not okay.

14:41:31 23          Witnesses should be given a binder of documents

14:41:34 24  for direct and a binder of documents for cross to eliminate

14:41:38 25  the back and forth.  So when a person goes up on the stand,

14:41:41  1    give over everything so that we don't have people -- the

14:41:45  2    jurors don't like people breathing on them over in the jury

14:41:49  3    box, so we'll do it as few times as possible.

14:41:52  4            You may leave a notebook for the court reporter

14:41:55  5    if he or she wants it.  Don't give a notebook to me or my

14:42:01  6    clerk.  For us, we would like you to submit all the exhibits

14:42:06  7    electronically to us by Wednesday, March 23rd, and then the

14:42:11  8    morning a witness will testify, you will send us a folder

14:42:15  9    for that witness with the exhibits and any demonstratives to

14:42:20 10    be used on direct.  If you're going to have a cross binder

14:42:23 11    that has a deposition transcript or an expert report in it,

14:42:27 12    that should also be in the electronic folder that you send

14:42:30 13    to us.  So essentially you're going to give us the

14:42:33 14    equivalent of an electronic binder.

14:42:36 15            And so we need one of those.  You guys, your

14:42:40 16    direct witnesses, you give us an electronic, and for your

14:42:43 17    cross you give us the stuff in electronic form.  Work with

14:42:47 18    Mr. Buckson on coordinating delivery of that and how he

14:42:51 19    wants them.  And when they are sent, please copy Mr. Buckson

14:42:54 20    and my judicial administrator, Diana Welham, on the e-mail.

14:43:00 21            Sequestration.  In paragraphs 77 and 100 the

14:43:05 22    parties propose that fact witnesses be sequestered.  But

14:43:11 23    then in paragraph 100, it's not really sequestration, it

14:43:18 24    talks about having three corporate representatives and

14:43:21 25    that's here for the protective order stuff.  That might be

14:43:24 1    okay, but in the first instance, until I find out how

14:43:29 2    comfortable the jury is with being in here, we're going to

14:43:32 3    have to limit the number of people in the courtroom.  So

14:43:34 4    we're not going to have a free-for-all, all the back pews

14:43:38 5    filled.  We're going to allow -- I think six people are

14:43:41 6    allowed in here at one time.  My guess is that that number

14:43:44 7    will be expanded as we go through, that's what we have been

14:43:47 8    doing.  But until I know how the jury feels, I don't want to

14:43:51 9    allow more than six people in here at a time.

14:43:54 10           But, you know, at some time on a break on the

14:43:58 11   first day or after the end of the first day you can ask and

14:44:01 12   I'll figure out whether we can do that.  But the rest of it,

14:44:05 13   sequestration is fine.

14:44:08 14           What I typically do is if the person is going to

14:44:10 15   be a fact witness, you can have one corporate representative

14:44:13 16   who would be a fact witness.  It seems like the three

14:44:16 17   corporate representatives that you all were talking about

14:44:18 18   weren't going to be fact witnesses, you just want to make

14:44:22 19   sure that they're not precluded by the protective order.

14:44:26 20   Okay?

14:44:27 21           Deposition testimony.  In paragraph 88, the

14:44:30 22   parties have numerous disputes regarding when to exchange

14:44:34 23   identification of deposition testimony and objections.  I

14:44:40 24   guess you guys need to talk about that.  It seems to me

14:44:44 25   plaintiff's is a little more reasonable.

14:44:46  1          MR. SHAW:  I think the only difference, Your

14:44:48  2   Honor, is when we start, it gives time to narrow the

14:44:52  3   disputes before they get to you.

14:44:53  4          THE COURT:  I would say try to work it out.  If

14:44:56  5   you can't work it out, go with the plaintiff's because we

14:45:00  6   start another day.  You, the defendants, you get it at one

14:45:03  7   point and an hour or two later you have to do all the

14:45:07  8   counter-depositions and objections and that seems ripe to

14:45:10  9   cause a problem.

14:45:10 10          MS. FRANTZEN:  Your Honor, can I say one point

14:45:12 11   about that?  In fact, we didn't want to do it in one hour

14:45:15 12   and I wish we didn't have to do that.  But four days before

14:45:18 13   we have to do the dep designations is when they propose they

14:45:21 14   give it.  We haven't even heard their case.  How can we

14:45:24 15   really give dep designations when we haven't heard one

14:45:29 16   witness testify?  And that was kind of the real issue.  And

14:45:31 17   it kind of goes with a corollary request that we had which

14:45:35 18   is that three days before the trial or on Friday, the

14:45:39 19   parties meet to say this is what we anticipate so we have a

14:45:44 20   clue of what we're designating.

14:45:46 21          THE COURT:  Why don't we do this.  You do -- you

14:45:49 22   go with plaintiff's proposal.  If there is a particular

14:45:52 23   witness who after you hear their case you say, oh, my God,

14:45:56 24   we absolutely need to have this deposition testimony in, you

14:46:00 25   can add it then, talk about it then.

14:46:03  1          MR. SHAW:  Just a question for clarification,

14:46:05  2     Your Honor, in terms of when do you want the deposition

14:46:08  3     designations.

14:46:09  4          THE COURT:  I want them two days ahead of time,

14:46:12  5     and two days means forty-eight hours.  But if given what

14:46:15  6     Ms. Frantzen is saying that there is some issue that she had

14:46:18  7     no idea what you all were going to say and she needs to deal

14:46:22  8     with it in deposition testimony.  We can be a little more

14:46:25  9     neutral in that, but not as a regular matter.

14:46:27 10          MR. SHAW:  If we expect a deposition on Monday,

14:46:30 11     deposition at noon, we will have it to you on Saturday.

14:46:34 12     Thank you.

14:46:35 13          THE COURT:  Okay.  Your proposal in paragraph 95

14:46:39 14     regarding objections to expert testimony is fine.  I will

14:46:41 15     rule on the expert issues during trial and charge the time

14:46:45 16     as I think is fair.

14:46:47 17          Exhibits.  The exhibit lists are the sum total

14:46:51 18     of the exhibits that may be offered for admission into

14:46:54 19     evidence.  If it isn't in the exhibit list, it does not come

14:46:57 20     in.  So documents used solely for impeachment or rebuttal

14:47:02 21     that are not on the exhibit list will not be received into

14:47:02 22     evidence and demonstratives will not be received into

14:47:07 23     evidence, either.  No exhibit will be admitted unless

14:47:11 24     offered into evidence through a witness and no exhibit will

14:47:12 25     be published to the jury until it's submitted into evidence

so the parties must move to admit each exhibit individually
prior to showing it to the jury.

In the pretrial order the procedures for
disclosing exhibits, demonstratives, et cetera, are okay.  I
will add to this that for any unresolved objection sent to
the court, the parties should attach -- so attach for me the
exhibit or demonstrative that is the subject of the dispute,
and just give me a few words or a rule number regarding the
objection.  So I don't want you -- so when you send the
e-mail to Diana at 7 o'clock in the morning or before
7 o'clock in the morning and you say we have an objection
over plaintiff's opening slide number 2, attach slide number
2 and then your objection should just be it refers to
something you have excluded.  I don't want more than that,
or you can just say 403, or you can say something like that.
I don't want argument.  We'll have argument here and you can
use your time up to do that, but just to give me an idea so
in the morning when I come in and I look at the document, I
have a clue what I'm looking for.

Okay.  If you don't follow my procedures for
objections, your objections may be waived.  Consistent with
my procedures, the parties should provide a completed AO
Form 187 exhibit list to my courtroom deputy on the first
day of trial.

All right.  COVID procedures.  I have already

14:48:50 1    told you we're going to have some limits about people in the

14:48:56 2    courtroom.  I don't plan to have lawyers and witnesses wear

14:49:01 3    face masks.  Again, if I get a jury full of people with

14:49:06 4    compromised immune systems or whatever, it could change.

14:49:10 5    But I am not -- that's my plan is not to force people to

14:49:13 6    have to wear masks or face masks or face shields.

14:49:20 7            There are limits, I told you, six people.  We're

14:49:24 8    going to limit the movement in the courtroom.  During

14:49:27 9    openings I ask you to stay around the podium and don't

14:49:30 10   approach the jurors.  You can turn the podium if you want to

14:49:33 11   and stand next to the podium, but just don't get too close.

14:49:37 12   During cross-examinations, we're not going to have the back

14:49:40 13   and forth going up with documents.  I think we already

14:49:43 14   talked about that.

14:49:44 15           Side-bars, I have kind of gotten out of the

14:49:49 16   habit of doing side-bars.  If we really need to have a

14:49:52 17   side-bar, what I have been doing is let the jury stay here

14:49:55 18   and we go back into my jury room.  I don't know how

14:50:00 19   appropriate that's going to be if the jurors are using that

14:50:02 20   jury room.  I'm going to have to think about that, so we

14:50:02 21   might just go out into the hall or whatever.  But if we do

14:50:10 22   or we have a side-bar, I'm going to ask you to keep the

14:50:12 23   number of people at the side-bar to a minimum.  Don't bring

14:50:17 24   extra people up here just to give us a little bit of COVID

14:50:22 25   physic value here that we're doing something.

14:50:24 1            Is there any plan that the parties will be

14:50:30 2  broadcasting the trial for people who aren't in the

14:50:37 3  courtroom or anything like that?

14:50:39 4            MR. CHERNY:  Not from our side, Your Honor.

14:50:40 5            MS. FRANTZEN:  We haven't considered that, but

14:50:42 6  with the COVID procedures you're saying, maybe that's

14:50:45 7  something I can look into.  If you have some kind of order

14:50:48 8  on that, we would be happy to take it back.

14:50:50 9            THE COURT:  I don't.

14:50:50 10           MS. FRANTZEN:  Okay.

14:50:51 11           THE COURT:  But if you do it, you know, we're

14:50:53 12 not supposed to have cameras in the courtroom, so if you do

14:50:57 13 it, you need to minimize what you're doing and have maybe a

14:51:02 14 camera just on there.  I don't want the jury on the camera.

14:51:06 15 I'm not going to be on the camera.  My staff is not going to

14:51:09 16 be on the camera.  Just make sure that you run anything that

14:51:12 17 you do by Mr. Buckson.

14:51:14 18           I am generally disinclined to close the

14:51:17 19 courtroom, but if any party anticipates attempting to close

14:51:21 20 the courtroom at any point, you must keep it to an absolute

14:51:24 21 bare minimum and you must give sufficient advanced notice to

14:51:28 22 the other side and to me that it's going to happen.  It's

14:51:31 23 not guaranteed that I will seal the courtroom, but if you

14:51:34 24 don't give me advanced notice and you just say it in front

14:51:37 25 of the jury, chances are your request will be denied.

14:51:40  1          Okay.  This is a trial that must be completed in

14:51:45  2   the five days.  I am going to time the trial.  Looking at

14:51:50  3   the issues and the witnesses, I'm not sure this needs to be

14:51:53  4   a five-day trial, but you'll have ten hours for opening,

14:51:57  5   presenting your case, and dealing with evidentiary issues,

14:52:00  6   and one additional hour for closing arguments.

14:52:03  7          Now, I make you save that one hour for closing

14:52:07  8   arguments because I have had parties who save ten minutes

14:52:10  9   for closing arguments and that's not fair to the jurors.  So

14:52:13 10   you have to keep at least an hour for closing arguments.  If

14:52:16 11   you're running behind and you say look, I need five minutes

14:52:20 12   of that, you can ask me, but you can't use up that last hour

14:52:24 13   and not give the jury an adequate closing.

14:52:28 14          If you wind up having more than an hour left at

14:52:31 15   the end, you can use anything you want that you have left.

14:52:36 16   So you're not limited to that hour if you still have three

14:52:40 17   hours left, though I'm sure the jury would prefer that you

14:52:43 18   not do that.

14:52:44 19          Neither side will be charged time for voir dire

14:52:47 20   unless the questions asked become excessive.  Other than

14:52:52 21   jury selection and when I'm reading jury instructions, if we

14:52:52 22   are in the courtroom, we are on the clock and someone is

14:52:56 23   being charge for time.

14:53:00 24          Trial days generally run from 9:00 a.m. to

14:53:02 25   4:30 p.m., a fifteen-minute break in the morning, a lunch

14:53:06 1 break around forty-five minutes, and a fifteen-minute break

14:53:08 2 in the afternoon.

14:53:09 3   Now, I have ask at different times in cases like

14:53:13 4 this whether the parties -- if the parties bring in lunch

14:53:17 5 for the jurors, we can keep the lunch break to thirty to

14:53:21 6 forty-five minutes.  If the jurors have to go out for lunch,

14:53:23 7 then we have to take a longer break because, you know, they

14:53:27 8 have to go out, come back through security.  So you guys can

14:53:30 9 talk about that and let us know if you want to provide lunch

14:53:34 10 for the jurors.

14:53:35 11   What are we doing about equitable issues?  What

14:53:44 12 was your thinking?

14:53:44 13   MS. FRANTZEN:  Yes, Your Honor, I think some of

14:53:46 14 the equitable issues are to be decided by the Court.  Some

14:53:50 15 of the issues of -- the factual issues relating to those

14:53:53 16 equitable issues will come in just as part of the facts

14:53:56 17 relating to the rest of the case.  So there is nothing

14:53:59 18 really left to be done in that regard other than the Court

14:54:04 19 deciding after the fact because there is an overlap on those

14:54:06 20 issues.

14:54:06 21   MR. CHERNY:  Your Honor, if there is an overlap,

14:54:12 22 of course we should do it at the same time.  On the other

14:54:16 23 hand, they have equitable estoppel, for example, I'm not

14:54:20 24 sure anything having to do with our alleged delay in filing

14:54:24 25 suit or their reliance on that, that would overlap.

14:54:28  1          THE COURT:  I'm just curious, we have

14:54:30  2   unenforceability, can you give me an example of how all of

14:54:35  3   this is going to come in?

14:54:36  4          MS. FRANTZEN:  Yes.  For example, with regard to

14:54:38  5   equitable estoppel, there was some correspondence between

14:54:43  6   the parties that will come in as a discussion between the

14:54:45  7   parties that, for example, they're alleging that they gave

14:54:49  8   us these patents applications, so part of that is coming in

14:54:52  9   just in terms of discussing what happened between the

14:54:55 10   parties.  And so that fact is just a fact that's going to

14:54:59 11   come in as part of the case.

14:55:01 12          There is -- we're not going to obviously be

14:55:04 13   arguing legal issues of equitable estoppel and we haven't

14:55:09 14   included those in our jury instructions, but those facts are

14:55:12 15   part of the case.

14:55:14 16          MR. CHERNY:  Your Honor, I'm not sure I

14:55:16 17   understood what Ms. Frantzen is pointing to so, for example,

14:55:19 18   yes, we did give -- provide them as discussed earlier our

14:55:23 19   patent application as part of our discussions.  I don't know

14:55:26 20   what that has to do with equitable estoppel which goes to

14:55:30 21   alleged delay and their reliance on there, so I don't see

14:55:33 22   what the overlap is.  I am concerned that it appears Sage is

14:55:38 23   arguing that they should put all the facts in front of the

14:55:41 24   jury whether they have anything to do with a claim or

14:55:45 25   defense and then all decide them afterward.

14:55:48  1          THE COURT:  Tell me about unclean hands, that

14:55:50  2    equitable estoppel, if you're going to rely on that

14:55:53  3    correspondence and make arguments from it, okay, but the

14:55:56  4    ones that caught my attention were more like unclean hands,

14:56:00  5    so what is that that you're going to be saying?  I just want

14:56:03  6    to make sure we're not putting in -- you know, like what are

14:56:09  7    your facts to support that?

14:56:11  8          MS. FRANTZEN:  So with regard to unclean hands,

14:56:13  9    and to be honest with you, I haven't looked at this

14:56:16 10    recently, but the facts relating to that all kind of relate

14:56:19 11    to the same kind of facts, relating to the fact that we have

14:56:25 12    these communications, they didn't do anything and sat around

14:56:29 13    for years and never told us, sent us multiple correspondence

14:56:34 14    but never claimed we infringe any patent application they

14:56:38 15    gave us despite multiple communications between the parties.

14:56:41 16    That's kind of part and parcel to the supposed willfulness

14:56:45 17    case.  So it's all the same set of objective facts, just the

14:56:49 18    additional determination that would constitute equitable

14:56:54 19    estoppel, unclean hands.  Of course, if Mr. Cherny feels

14:56:58 20    that a question is inappropriate or irrelevant, then he's

14:57:02 21    free to object to the question, he's free to object to

14:57:02 22    exhibits.  So it's just going to be on a

14:57:02 23    question-by-question basis.

14:57:10 24          MR. CHERNY:  I am concerned --

14:57:12 25          MS. FRANTZEN:  And I can't understand how you

14:57:15  1    could -- they didn't move to eliminate to preclude anything

14:57:19  2    so I don't know what kind of general argument --

14:57:22  3                THE COURT:  I think the issue is if there are

14:57:27  4    facts relevant to the equitable issues that are only

14:57:30  5    relevant to the equitable issues, they should not go in

14:57:33  6    front of the jury.

14:57:34  7                MS. FRANTZEN:  Fair enough.

14:57:35  8                THE COURT:  If there are facts that overlap and

14:57:37  9    you seem to be saying all of the facts are relevant to not

14:57:41 10    only the equitable issues, but some other issue properly

14:57:45 11    before the jury.  That's what you're telling me?

14:57:47 12                MS. FRANTZEN:  Yes.

14:57:50 13                MR. CHERNY:  I would ask out of an abundance of

14:57:54 14    caution that they identify the facts that they think are

14:57:56 15    overlapping because I am concerned about having to object

14:57:59 16    every time I think something relates to unclean hands or

14:58:03 17    equitable estoppel as opposed --

14:58:06 18                THE COURT:  I think we should have that, and

14:58:07 19    actually I think it would be helpful to me to have that so

14:58:10 20    that I can listen to what I need to listen to with respect

14:58:12 21    to the issues.  Because what I was going to say is we're

14:58:12 22    going to try the equitable issues at the end of the day

14:58:22 23    after the jury goes home so that I deal with this all at

14:58:28 24    once, you're saying even better, you don't have to do that,

14:58:30 25    Judge, because anything that I need to rely on is going to

14:58:33 1    be in front of the jury.  So if that's the case, then I do

14:58:36 2    think it would be helpful to me to have what you think the

14:58:42 3    evidence will be.  Like if you were doing pretrial findings,

14:58:47 4    what is it that I should be listening for in connection with

14:58:51 5    these, and that might help us to be able to discuss in

14:58:57 6    advance if there is a particular fact that is not relevant

14:59:00 7    to anything else that would be coming in.

14:59:02 8            MS. FRANTZEN:  I mean, we're happy to do that.

14:59:04 9    I'm just going to add, we gave detailed interrogatory

14:59:07 10   responses on those and the specific facts and documents --

14:59:10 11           THE COURT:  Yes, but that is not helpful to me.

14:59:12 12           MS. FRANTZEN:  Yes, absolutely, we're happy to

14:59:14 13   provide that to you, and we absolutely will.  But in regard

14:59:17 14   to Mr. Cherny not knowing what our evidence is --

14:59:20 15           THE COURT:  I think that his problem isn't

14:59:21 16   necessarily he doesn't know what your evidence is, his

14:59:24 17   problem is that he doesn't know what some of that evidence

14:59:27 18   has to do with other issues in this case and therefore he

14:59:29 19   doesn't want to agree, sure, it all comes in in front of the

14:59:30 20   jury.

14:59:34 21           MS. FRANTZEN:  Fair enough.  We'll provide that

14:59:36 22   information to Your Honor.

14:59:37 23           MR. CHERNY:  And Your Honor, I know we talked

14:59:39 24   about this probably too long, but I'm also concerned about

14:59:42 25   for opening, so it's not just in front of the jury, in terms

14:59:45 1    of evidence, it would be good to have this resolved so that

14:59:48 2    we're not having discussions of equitable estoppel or

14:59:53 3    variants thereof or alleged delay in front of the jury.

14:59:57 4               THE COURT:  Okay.

14:59:58 5               MR. CHERNY:  I can tell that we are past that

15:00:00 6    issue, Your Honor.

15:00:01 7               THE COURT:  Okay.  Voir dire and jury issues.

15:00:05 8    We have your proposed voir dire questions and we'll get you

15:00:12 9    a revised draft.  Give me one second.

15:00:15 10              Okay.  So what I was thinking, Sage has a

15:00:37 11   proposal in here about do you, somebody in your family have

15:00:42 12   experience with urinary catheters and products.  That seems

15:00:45 13   a little personal here for someone to have to come in when

15:00:50 14   you think about how many people have family members who have

15:00:53 15   been hospitalized.  So what I was wondering is can we ask

15:00:59 16   the question more to, you know, the product that we're going

15:01:03 17   to hear about in this trial, have you or anyone in your

15:01:06 18   family had experience with particular products?  So what are

15:01:10 19   the products that we're going to be hearing about?

15:01:14 20              MR. CHERNY:  Our product is called PureWick.

15:01:18 21   The company is PureWick and the product is called PureWick

15:01:21 22   as well.

15:01:23 23              MS. FRANTZEN:  So, Your Honor, if I could

15:01:25 24   respond as well.  Obviously we have our products which are

15:01:28 25   the PrimaFit and the PrimoFit, but we also have the issue of

15:01:33 1    non-infringing alternatives which there is a wide array of

15:01:37 2    urinary incontinence products that are going to come up

15:01:40 3    during the trial and as well as the issue of inflowing

15:01:45 4    catheters.   And if there is a strong reaction or somebody

15:01:47 5    has had --

15:01:48 6             THE COURT:   I know, but products that deal with

15:01:51 7    urinary incontinence, and we're going to come in here and

15:01:55 8    some guy is yeah, I wear Depends.   Really, you are going to

15:01:59 9    say that in front of a roomful of lawyers?   That is not

15:02:03 10   necessary for a patent trial.   It's not.   Tell me what

15:02:05 11   products you think I need, what are important to talk about,

15:02:08 12   and let's figure this out.   We got the PureWick product, the

15:02:11 13   PrimaFit, PrimoFit, what else?

15:02:14 14            MS. FRANTZEN:   Well, those products are also at

15:02:19 15   issue, but can I say why I don't think our request says

15:02:21 16   that?   We just say -- we ask them about if they have

15:02:26 17   opinions or strong beliefs --

15:02:28 18            THE COURT:   Or experience with.   Experience

15:02:32 19   with.

15:02:33 20            MS. FRANTZEN:   We can X out experience with.   We

15:02:37 21   really just want to know if someone has a strong belief or

15:02:41 22   opinion about urinary incontinence products.

15:02:45 23            THE COURT:   That's something people have strong

15:02:47 24   beliefs or opinions about?

15:02:50 25            MR. CHERNY:   I don't, Your Honor.

THE COURT:  I will think about that.

We have sent out questionnaires to prospective jurors asking about COVID hardships, underlying conditions, hardships due to work, vaccine status, things like that. You will not get a copy of those.  The response date is not until later this week, so we don't know what all of the responses will be.  The current plan is to bring in those whose forms indicate that they are vaccinated and they have no concerns as well as those who don't return the questionnaire.  And then we will excuse the rest.  Hopefully that will give us sufficient numbers to pull from.  If not and we have to change our plan, I'll let you know.  But is there any concern about bringing in those folks that I just mentioned?

MR. CHERNY:  No, Your Honor.

MS. FRANTZEN:  None, Your Honor.

THE COURT:  All right.  This is how we will do voir dire.  I'm not sure, Mr. Shaw, you have been in here when I have done these, or Ms. Gaza, but we've changed things around a little bit.  The way we do voir dire is the jurors will come in and be randomized.  It used to be they would come in and have a number in alphabetical order, but now we randomize them.  They will get a number 1 through whatever number we are calling in.  Folks in 1 through 14 numbers will be over here, 15 through 28 over here, and

anyone else here.  And if we need seats in the front, they
will be there as well.  Each juror will wear a number and
each juror will be provided a sheet that includes the voir
dire questions and a pencil so that each may keep track of
yes answers when I read the questions.

After that is done, the attorneys will move to
the conference room or probably back to the jury room where
we will conduct voir dire.  The parties can have just two
attorneys come in to the jury room.

And given that we need -- so once we have
everybody seated in order, I will ask the folks with numbers
1 through 14 if they have answered yes to any of the voir
dire questions.  Those who say yes will go into the hall
where they will wait to be brought -- not in the hall,
they'll actually come back here where they will wait and
we'll talk to them.  Anyone who has not answered yes to a
voir dire question will remain seated and be subject to
preemptory strikes.  So you will not talk to anybody who
answers no to every single question on the voir dire sheet.

Prospective jurors who are questioned but not
excused for cause will return to their seat over here for 1
through 14.  If we need more prospective jurors, we will
start with numbers 15, 16, 17.  So let's say we excuse juror
number 2, then we will go to number 15 and say number 15,
did you answer yes to any questions?  If number 15 says no,

15:05:50 1   he's going to take a seat over here and they'll tell us

15:05:54 2   number 15 didn't answer yes to any questions.  If number 15

15:05:58 3   says yes, I did answer yes to some of the questions, that

15:06:01 4   juror will be brought back to talk to us.

15:06:04 5            Once we get to fourteen jurors, at that point we

15:06:12 6   will be finished talking with the folks and we will proceed

15:06:16 7   to preemptory strikes.

15:06:17 8            As I said, the prospective jurors will be

15:06:21 9   provided a sheet that includes the voir dire questions so

15:06:24 10  that they can keep track of their answers.  The plaintiff

15:06:26 11  needs to provide us with enough hard copies of questions and

15:06:29 12  enough pens and pencils for up to forty people.  We need

15:06:33 13  those delivered to the clerk's office by 3:00 p.m. on

15:06:40 14  Wednesday the 23rd.

15:06:41 15           The parties seem to have agreed on a set of

15:06:43 16  documents to be given to the jury, just the patent, right,

15:06:47 17  and a notebook.  That's fine.  But you have to bring eight

15:06:50 18  copies of the juror notebooks to the court on Monday

15:06:53 19  morning.

15:06:52 20           Other issues in the pretrial order and trial

15:06:58 21  logistics.  Paragraph 23, plaintiff alleges defendant made

15:07:02 22  untimely objections to the trial exhibits and those

15:07:04 23  objections must be waived, and then states that according to

15:07:09 24  Rule 26(a)(3)(b), any objections are not waived.  I'm not

15:07:14 25  going to find that the objections were waived.  And some of

15:07:17 1    those objections, I don't even know what documents you're

15:07:20 2    talking about because you just say several exhibits and some

15:07:22 3    of those, you know, when we get to trial there may not even

15:07:26 4    be any real objection anybody has.  So we can deal with

15:07:30 5    those on their merits.

15:07:32 6              In paragraph 27, defendant request to add the

15:07:39 7    sentence, "The deadline to supplement the exhibit list is

15:07:42 8    March 23rd.  Thereafter the exhibit list shall not be

15:07:45 9    supplemented without approval of the parties or leave of the

15:07:48 10   Court."

15:07:48 11             And then plaintiff said no problem, but that one

15:07:52 12   got my attention just like the number of witnesses did.  Are

15:07:55 13   we really planning to add a bunch of exhibits after I have

15:07:59 14   gone through the pretrial order?

15:08:01 15             MR. CHERNY:  Your Honor, this was the other

15:08:02 16   side's request.  We're not planning to add a whole lot of

15:08:05 17   exhibits, a handful at most.

15:08:08 18             MS. FRANTZEN:  I mean, that's fine.  If we're

15:08:11 19   spending -- we understood this was agreed to it.  If we're

15:08:16 20   sending it to Your Honor on the 23rd, we can do it by the

15:08:22 21   22nd.

15:08:22 22             THE COURT:  No, you're supposed to have

15:08:25 23   everything in the pretrial order so when I adopt the

15:08:27 24   pretrial order it's final.  You get my attention when you

15:08:30 25   say, oh, it doesn't matter that you just spent all this

15:08:34  1    time, Judge, in two days we're going to add a whole bunch of

15:08:38  2    new stuff.  That's what I want to know, what kind of new

15:08:41  3    stuff is the plan?  If it's a handful of exhibits, I'm not

15:08:44  4    crazy about it, but I can live with it.  What's the plan?

15:08:47  5            MS. FRANTZEN:  You know what, Your Honor, we're

15:08:50  6    good if -- to just have it be what's in the pretrial order.

15:08:56  7    We only added that because there was a different dispute

15:08:59  8    that ended up getting resolved.  So if we want to end it

15:09:03  9    today, that's fine.  If they want to add a handful and we

15:09:06  10   agree up to five or ten, we can do that, too.  We're

15:09:10  11   flexible.

15:09:11  12           MR. CHERNY:  How about we go for -- obviously

15:09:13  13   unless the Court doesn't want this to be added, five each.

15:09:17  14   Fair?

15:09:17  15           THE COURT:  Five each.

15:09:18  16           Okay.  Paragraph 31, the parties seek guidance

15:09:26  17   regarding how to handle voluminous spreadsheets, videos and

15:09:31  18   product samples.

15:09:38  19           MS. FRANTZEN:  The main issue there was just how

15:09:42  20   to kind of tender the electronic exhibits, when you have an

15:09:47  21   Excel spreadsheet and just wanting the Court's guidance on

15:09:51  22   electronic, for example a video, how to handle that with the

15:09:55  23   Court.

15:09:58  24           THE COURT:  Do you mean how to get it to the

15:10:02  25   jury?  How to authenticate?  I don't know what you're

15:10:03 1    talking about.

15:10:04 2             MS. FRANTZEN:  Mainly how to get it to the jury

15:10:06 3    and how to handle it especially like do you want it on a USB

15:10:11 4    disk?  I'm sorry, I'm not the technical person that knows

15:10:14 5    all this, but there was just a question regarding how to

15:10:17 6    handle those Excel spreadsheets and videos in terms of

15:10:21 7    getting them to the jury.

15:10:23 8             MR. SHAW:  Your Honor, for videos, my thought

15:10:26 9    was if Your Honor doesn't object we can give a lock down

15:10:29 10   laptop that just has the admitted videos on it.  For

15:10:34 11   spreadsheets what we put in the next paragraph is just

15:10:38 12   creating a Rule 1006 summary for what the jury saw, just a

15:10:41 13   screen capture of that piece, giving the same exhibit number

15:10:46 14   dash A and the exhibit they saw.  I can't imagine anyone is

15:10:50 15   going to want to see the full spreadsheet.

15:10:52 16            THE COURT:  We can have that on a USB?

15:10:54 17            MR. SHAW:  Yes, Your Honor.

15:10:55 18            THE COURT:  What do you think?

15:10:56 19            MS. FRANTZEN:  I think the idea of putting it on

15:10:58 20   the laptop will work.  I don't know about the screen shot

15:11:00 21   issue, that might work for some, not all, but the laptop

15:11:02 22   that has all the information seems to be reasonable.

15:11:06 23            THE COURT:  Mr. Buckson, can we do that?  Let's

15:11:10 24   plan that and just coordinate with Mark so he can fix

15:11:12 25   something that I just messed up.

15:11:17 1            Paragraph 74, defendant request to add that the

15:11:22 2    parties shall discuss the scheduled live witnesses to be

15:11:25 3    called, any proposed witnesses at 3:00 p.m., at 3:00 p.m., 3

15:11:30 4    dot 00, very specific, three days in advance of trial.

15:11:35 5    What's the concern?

15:11:37 6            MS. FRANTZEN:  So the issue there, Your Honor,

15:11:39 7    is we feel that it would be helpful to communicate through

15:11:42 8    trial, before trial.  I think there has been lots of issues

15:11:45 9    where there is a lack of communication and so the idea is to

15:11:49 10   have a conference, it can be at 2:00 p.m., whatever p.m., so

15:11:53 11   the parties can just communicate and say this is what we

15:11:57 12   intend to call just so the other side can be prepared and

15:12:01 13   especially now since our dep designations are going to be

15:12:05 14   due the next day.  I think -- I'm not sure when they're due.

15:12:10 15   We have no idea how many of the thirty witnesses they're

15:12:13 16   going to call or what's happening, so it's hard for us to

15:12:17 17   plan dep designations four days before the witness is

15:12:24 18   called.  And it seemed to be not harmful to just ask us to

15:12:29 19   talk to each other.  And then prior to trial then you can

15:12:32 20   give a final list, this is how we intend to do it.  But it's

15:12:36 21   just requesting a conversation which I feel would be a very

15:12:41 22   beneficial.

15:12:41 23           THE COURT:  I like conversing.

15:12:44 24           MR. SHAW:  We do as well, Your Honor, we just

15:12:46 25   don't want to violate the order.  As long as we know what

15:12:49  1    we're supposed to accomplish in the meeting.

15:12:51  2              THE COURT:  I think what makes sense is for you

15:12:54  3    all to talk about what you're thinking of doing and if it

15:12:57  4    changes, you tell them.

15:12:59  5              MR. SHAW:  All right.

15:13:00  6              THE COURT:  Okay.

15:13:01  7              MS. FRANTZEN:  That's great.

15:13:02  8              THE COURT:  Okay.  In paragraph 76, defendant

15:13:09  9    request to further specify that the final live trial

15:13:12 10    witnesses will be identified two days before.  That's all

15:13:16 11    part of the same thing, talk about it and try and figure out

15:13:19 12    what you're doing.  If you know someone is not coming, tell

15:13:22 13    them.  If you know you're changing order because someone got

15:13:26 14    stuck in traffic, tell them as soon as you know.  Same goes

15:13:30 15    for you guys.

15:13:31 16              In paragraph 97, the parties dispute whether and

15:13:34 17    when copies of their presentations for closing arguments

15:13:37 18    need to be exchanged.  I don't think you have to exchange

15:13:41 19    them too early.  What I would say is so what -- the way I

15:13:47 20    typically do closings is I do closings after I read the jury

15:13:52 21    instructions.  So at some point in the morning before

15:13:55 22    closings, how about you give them over so that you guys can

15:13:59 23    look them over while I'm reading jury instructions, and then

15:14:02 24    there is no objection during closings.  But you don't have

15:14:05 25    to worry about, you know, you just finished your witnesses

15:14:07 1    and you don't have time.

15:14:08 2              MR. CHERNY:  That's all I care about.  We don't

15:14:11 3    want to have objections during closing.  As long as we have

15:14:14 4    a procedure to exchange and raise objections with the Court,

15:14:17 5    that's all we care about.

15:14:18 6              THE COURT:  The plan will be at some point at

15:14:20 7    the beginning of when I read jury instructions or before I

15:14:23 8    start to read jury instructions, you exchange them, someone

15:14:28 9    can go out in the hall during the jury instructions and talk

15:14:32 10   with each other about the objections and any objections that

15:14:34 11   are not resolved, I will deal with before we go into

15:14:37 12   closings.

15:14:38 13             In paragraphs 43 to 45 plaintiff states that it

15:14:44 14   intends to prove -- that it intends to prove infringement of

15:14:48 15   ten claims, 1, 5 and 9 of the '376, 1, 2 and 6 of the '989,

15:14:54 16   1, 2, 7 and 13 of the '407.

15:14:58 17             MR. CHERNY:  Your Honor, since that time we have

15:15:00 18   now come down to seven claims.

15:15:02 19             THE COURT:  Which ones?

15:15:04 20             MR. CHERNY:  Well, that's a harder question.

15:15:06 21   Mr. Biddinger can address that.

15:15:09 22             MR. BIDDINGER:  '376, claims 1 and 5; '989,

15:15:13 23   claims 1 and 6; and '407, claims 1 and 2.

15:15:21 24             THE COURT:  Okay.  All right.  So that was

15:15:26 25   actually my question.  Most of them at least for the '376

15:15:31 1   and '989 seem overlapping because they were dependent

15:15:36 2   claims, but were three independent claims on the '407 so I

15:15:40 3   wasn't sure.  Seven claims.

15:15:51 4            For the invalidity argument, prior art argument,

15:15:54 5   it looks like there is only a 112 argument for -- well, it

15:16:00 6   looked like there was a 112 argument for claim 7 of the '407

15:16:04 7   patent, but you dropped that.  Right?

15:16:06 8            MR. BIDDINGER:  Correct.

15:16:07 9            THE COURT:  So are there no more 112 arguments?

15:16:11 10           MS. FRANTZEN:  I believe that's correct.

15:16:12 11           THE COURT:  So then we just have prior art

15:16:14 12   invalidity defences, right?

15:16:16 13           MS. FRANTZEN:  Yes, I believe that's right, Your

15:16:18 14   Honor.

15:16:18 15           THE COURT:  So what are you relying on?  You

15:16:21 16   don't have to give me -- I mean, if you can give me

15:16:24 17   specifics, that would be great, but I'm trying to get an

15:16:26 18   idea of the scope.  Like how many references?  How many

15:16:29 19   combinations?  If it's obviousness.  What are we talking

15:16:32 20   about here?

15:16:33 21           MS. FRANTZEN:  It's anticipation and obviousness

15:16:36 22   for the '376 and '989.  There is like two main references

15:16:42 23   and then some references related to the state of the art

15:16:42 24   independent claims.  I will say just for some of these

15:16:42 25   dependent claims, it's like it's one dependent claim but it

15:16:53 1   has like four elements to it, so that's an issue.

15:16:56 2           And the '376 claim 1 and '989 claim 1 are

15:17:01 3   similar in scope.  There is wording differences which as you

15:17:06 4   know you have to march through all of that which is a bit

15:17:11 5   time consuming.  But that's the '376 and '989.

15:17:14 6           On the '407, there are two main references and

15:17:17 7   again just kind of in combination with the, you know, state

15:17:24 8   of the art type issues.

15:17:25 9           The only other thing I would add is the PureWick

15:17:30 10  prior art brown tape product related to the '376 and '989,

15:17:37 11  and they raise the priority issues which as you may have

15:17:43 12  seen in the pretrial order, a new dispute arose whether they

15:17:49 13  could claim priority to an additional fourth application.

15:17:53 14  And that was something that seemed like we needed further

15:17:59 15  clarity on.  It was bad enough having three priority

15:18:02 16  applications, but adding a fourth one seems to be a surprise

15:18:06 17  for the pretrial order.

15:18:08 18           MR. CHERNY:  Your Honor, in response to what

15:18:11 19  Ms. Frantzen just raised, Mr. Nimrod is going to raise an

15:18:12 20  issue.  We're having a couple of issues.  First of all, I

15:18:18 21  think the prior art to rely upon is more than just has been

15:18:22 22  described and we are still having some problems in terms of

15:18:25 23  getting clarification as to what are the PureWick prior art

15:18:27 24  devices which is exactly what she said.

15:18:31 25           THE COURT:  I thought we had agreed the brown

15:18:33  1    tape was one thing and today you just said brown tape

15:18:36  2    products which gave me a little bit of pause.

15:18:40  3              MS. FRANTZEN:  It's in the brown tape product,

15:18:41  4    Your Honor.  It's in our expert report.  They know what it

15:18:45  5    is.

15:18:45  6              THE COURT:  We agreed at the last conference

15:18:47  7    when we were together what the brown tape -- I thought it

15:18:50  8    was one, brown tape product.

15:18:51  9              MS. FRANTZEN:  It's the brown tape products are

15:18:54 10    products that were shown to CONNECT and also used with

15:18:58 11    numerous individuals including individual patients.  The

15:19:03 12    DD --

15:19:03 13              THE COURT:  I thought it was CONNECT -- wait.

15:19:05 14    Let me see if we have the transcript from the last one,

15:19:08 15    because I remember -- I didn't want to have this fight, but

15:19:11 16    let me see if I have that.

15:19:19 17              MS. FRANTZEN:  It's one product that's used

15:19:22 18    multiple times, the brown tape one, the one --

15:19:30 19              MR. CHERNY:  I think we have a copy of the

15:19:31 20    transcript.  Your Honor, if I may beg your indulgence for a

15:19:33 21    second.

15:19:33 22              THE COURT:  Yes, just give me one second to --

15:19:41 23    let me ask Diana if she has it.

15:19:44 24              MR. CHERNY:  Your Honor, may I approach with the

15:19:47 25    transcript?  It's a little bit marked up, but it's the same

15:19:50 1    actual area that I think you wanted to look at.  It's a --

15:20:19 2              MS. FRANTZEN:  Do you have a copy?

15:20:20 3              MR. CHERNY:  No.  This is the only copy.  It's

15:20:22 4    just the transcript.

15:20:23 5              THE COURT:  I'll let you read it.  So it's on

15:20:39 6    page -- here it is, Mark, give that to Ms. Frantzen.

15:20:47 7              MS. FRANTZEN:  Your Honor, our expert report is

15:20:49 8    very clear about the brown tape product that was displayed

15:20:52 9    and shown to --

15:20:53 10             THE COURT:  Why don't you read that and then

15:20:55 11   we'll make sure we're all talking about the same thing.

15:21:08 12             MS. FRANTZEN:  Yes, it looks like I was trying

15:21:11 13   to say used by patient DD, so we have the product that was

15:21:17 14   given to CONNECT -- it's all one product.  They displayed

15:21:21 15   and sold the product.  The product they told CONNECT about

15:21:26 16   in a CONNECT application, in the CONNECT application they

15:21:30 17   told CONNECT they sold a product in July 27th, 2015.  That

15:21:34 18   product was used by patient DD and others, but it's the

15:21:39 19   brown tape product.  It's not a mystery --

15:21:42 20             THE COURT:  You understand, you are now using a

15:21:45 21   singular, but earlier today just a few seconds ago you kept

15:21:50 22   saying "brown tape products," plural.  That's what I'm a

15:21:52 23   little concerned about.  Is it a product or is it different

15:22:00 24   versions of something?

15:22:02 25             MS. FRANTZEN:  Your Honor, it's obvious --

15:22:05 1          THE COURT:  Because you seem to have told me it

15:22:06 2 was a product, singular, the product that was demonstrated

15:22:11 3 and sold at CONNECT.

15:22:13 4          MS. FRANTZEN:  So Your Honor, it's a single

15:22:16 5 product, but obviously the one that went -- what I'm trying

15:22:19 6 to communicate is the one that went to CONNECT is not the --

15:22:23 7 you know, patient DD used like twenty of them.  So it's

15:22:28 8 products that she used that show that they use the method of

15:22:31 9 the '989 patent.  It's multiple other patients used the

15:22:36 10 products, they were all not using the same product

15:22:39 11 obviously, but it's the brown tape one.  So it's the brown

15:22:43 12 tape product, these are -- we have pictures of them in our

15:22:48 13 expert report --

15:22:49 14          THE COURT:  Yes.  But I think the plural thing

15:22:52 15 is important.  When you talk about PrimaFit, you're talking

15:22:55 16 about the style, right?  Not everybody is using the same

15:22:58 17 PrimaFit product, right?

15:23:00 18          MS. FRANTZEN:  Right.

15:23:01 19          THE COURT:  So I get it, so you're talking about

15:23:02 20 the one design of the product, the brown tape, the design

15:23:07 21 that was used at CONNECT.

15:23:09 22          MS. FRANTZEN:  Well, it was shown at CONNECT and

15:23:13 23 used by Doris Duffy.  We have images in our summary judgment

15:23:17 24 motion, we literally put in images of those products, the

15:23:20 25 ones used by the patient, the one --

15:23:22 1            THE COURT:  It's different, since it's a

15:23:24 2  different style, the one used by DD versus the one shown at

15:23:27 3  CONNECT.

15:23:28 4            MS. FRANTZEN:  Not in any relevant way.  They're

15:23:30 5  the same product, they're brown tape.

15:23:32 6            THE COURT:  No, no, no, no.  We got at the last

15:23:35 7  hearing it's not enough that you say brown tape because

15:23:38 8  Mr. Cherny said we have lots of things with brown tape on

15:23:41 9  it, I don't know what they are.  So I made you -- I said

15:23:44 10  wait, do we know what brown tape product, because apparently

15:23:49 11  there are multiple.  And you said, the brown tape product

15:23:54 12  that was demonstrated and sold, for example, at CONNECT.

15:23:58 13            MS. FRANTZEN:  And then I added used by, and

15:24:01 14  that's when I was talking about the patient that used it.

15:24:06 15  To be fair, Your Honor, Mr. Cherny did not talk about the

15:24:09 16  brown tape product.  He got up here with a picture of a

15:24:12 17  hundred products that included blue, white, all kinds of non

15:24:16 18  --

15:24:16 19            THE COURT:  That's not my question.  I don't

15:24:18 20  care what Mr. Cherny said.  I remember what Mr. Cherny said

15:24:22 21  because it was -- it made me not want to have this talk that

15:24:26 22  we are having right now.

15:24:27 23            My question was, do we know what brown tape

15:24:30 24  product, because there are multiple, and I was told the

15:24:34 25  brown tape product that was demonstrated and sold at CONNECT

15:24:39 1 and used by, nothing.  My point is that when they narrowed

15:24:43 2 the claims, blah, blah, blah, blah.

15:24:50 3          MS. FRANTZEN:  Your Honor, if --

15:24:54 4          THE COURT:  So we're not just going to have a

15:24:57 5 generic talk about the brown tape product.  You can talk

15:25:00 6 about the CONNECT product, you can talk about the CONNECT

15:25:03 7 brown tape product, but not just generic brown tape product

15:25:06 8 because I don't want to have a record that says I have no

15:25:10 9 idea what that is.  Let's say you win and they come in and

15:25:12 10 say it doesn't have all the elements and I'm like okay, I

15:25:16 11 don't know what I'm comparing it to.

15:25:20 12          MS. FRANTZEN:  Your Honor, we have the patient,

15:25:21 13 DD, and I would like to not say her name on the record.

15:25:24 14          THE COURT:  You already said her name.  Don't

15:25:26 15 say it again, but you already said it.

15:25:29 16          MS. FRANTZEN:  The patient, DD, that used that

15:25:31 17 product that has always been part of our case, the CONNECT

15:25:35 18 aspect of it was their admission that they sold it prior to

15:25:39 19 the critical date.  But we have a patient that used it as

15:25:42 20 part of the method claim.  So those are -- there is all the

15:25:42 21 brown tape product, they know what it is, they have pictures

15:25:42 22 of it.  There is an e-mail that was our prime exhibit during

15:25:52 23 summary judgment where DD sent images of her using the brown

15:25:55 24 tape product.

15:25:55 25          They have been trying to exclude this evidence

15:26:01 1    because --

15:26:03 2              THE COURT:  Stop.  Stop.  I know why they're

15:26:06 3    trying to exclude it.  Nobody wants a potential prior art

15:26:10 4    whether it's good or bad.  Right?

15:26:14 5              MR. CHERNY:  Your Honor, may I respond to

15:26:16 6    Ms. Frantzen for a second?

15:26:18 7              THE COURT:  Yes.

15:26:19 8              MR. CHERNY:  Okay.  The frustration you have

15:26:22 9    mirrors the frustration we have.  I would like Mr. Nimrod to

15:26:26 10   go through the communications we have had on this issue for

15:26:29 11   the last week-and-a-half where we keep trying to pin down

15:26:33 12   apart from the fact that they're not all the same, that can

15:26:36 13   easily be shown, there are different dates that are

15:26:39 14   relevant.  You can say the same thing happened, but of

15:26:41 15   course what happened after the critical date, what happened

15:26:43 16   before, so we keep trying to pin down which one.

15:26:46 17             The CONNECT one I understand, they're going to

15:26:49 18   say whatever was shown to CONNECT, that's one thing.  I

15:26:51 19   understand that.  But then as she just said, DD went through

15:26:55 20   many, many of these things.  In fact, there are e-mails that

15:26:58 21   show they were all different.  They literally have

15:27:00 22   different -- they're different types.

15:27:01 23             So my problem is that they keep saying brown

15:27:04 24   tape product.  There were many different brown tape products

15:27:08 25   that spanned different times including over the various

15:27:12  1  dates that mattered here and we cannot and have not been

15:27:16  2  able to get them to say here, this brown tape product, this

15:27:19  3  specific one so that we can look at whether the elements are

15:27:21  4  right, was sold on this date.  This other one was used by DD

15:27:25  5  on this date and had this structure.

15:27:29  6          THE COURT:  So --

15:27:30  7          MS. FRANTZEN:  We have done that, Your Honor.

15:27:32  8          THE COURT:  So where, so that I can see it and I

15:27:34  9  can make a determination?

15:27:36 10          MS. FRANTZEN:  I can tell you in our summary

15:27:39 11  judgment motion when we moved for invalidity based on the

15:27:43 12  brown tape product because yes, they showed CONNECT the

15:27:47 13  brown tape product --

15:27:47 14          THE COURT:  I just want facts.  I don't want

15:27:49 15  argument.

15:27:50 16          MS. FRANTZEN:  So truly --

15:27:51 17          THE COURT:  Here is my concern.  Okay?  You win

15:27:54 18  at trial and the jury says anticipated on the brown tape

15:27:59 19  product.  And Mr. Cherny and Mr. Nimrod come in, or maybe

15:28:03 20  Mr. Biddinger, comes in and says there is no support for the

15:28:08 21  jury's verdict because there is no support that this product

15:28:11 22  had this result, this element, this element and this element

15:28:11 23  because -- and then I have to go and compare what was said

15:28:14 24  and what the product had.  And I'm sitting here saying, you

15:28:22 25  know, it's one thing if I can see a product, but I have no

15:28:26 1    idea what you're talking about.

15:28:27 2              MS. FRANTZEN:  Well, I can tell you that --

15:28:29 3              THE COURT:  What are you going to show the jury,

15:28:32 4    a product?  A picture?

15:28:33 5              MS. FRANTZEN:  There is -- we have video from

15:28:35 6    the CONNECT presentation.  We have pictures from the Doris

15:28:39 7    Duffy e-mail --

15:28:39 8              THE COURT:  Would you stop saying her name.

15:28:41 9              MS. FRANTZEN:  I apologize.

15:28:42 10             THE COURT:  That's the second time.

15:28:43 11             MS. FRANTZEN:  I apologize.

15:28:45 12             We have e-mails from the DD that we used during

15:28:48 13   summary judgment, and --

15:28:50 14             THE COURT:  So what do the e-mails -- do the

15:28:52 15   e-mails have a product, like do I know what the features of

15:28:55 16   the product -- can I see that?

15:28:57 17             MS. FRANTZEN:  It showed the pictures of the

15:28:58 18   product.  It showed the use.  And moreover, importantly to

15:29:03 19   this case, we have their interrogatory admission where they

15:29:07 20   say the brown tape product is covered by the claims of the

15:29:11 21   patent.  So we don't have to guess what the features are,

15:29:14 22   they themselves in the interrogatory response which is

15:29:16 23   Defendant's Exhibit 803 say that the brown tape product,

15:29:22 24   their words, in their interrogatory, is covered by the

15:29:26 25   claims of the '376 Patent.  They use the words brown tape

15:29:29 1    product.  That is their --

15:29:31 2              THE COURT:  You go on a little too long.

15:29:33 3              MS. FRANTZEN:  Sorry.

15:29:34 4              MR. NIMROD:  Your Honor, the interrogatory

15:29:36 5    response has to do with a January 2015 --

15:29:38 6              THE COURT:  A specific product.

15:29:39 7              MR. NIMROD:  A specific product that was after

15:29:41 8    the bar date.  If you look at the e-mails --

15:29:44 9              THE COURT:  Okay.  Someone has to give me facts.

15:29:47 10   Okay?  You keep saying, that's not right, that's not right.

15:29:51 11   But that is not helpful.  So facts.  Where is your

15:29:54 12   interrogatory response?

15:29:55 13             MR. NIMROD:  In PG 38 there are brown tape

15:29:58 14   product after brown tape products and what they --

15:30:01 15             THE COURT:  No, we're back on, she called you a

15:30:03 16   liar on the interrogatory response.  So let's see what it

15:30:07 17   says.

15:30:07 18             MR. CHERNY:  Your Honor, I think we have an

15:30:08 19   electronic copy.  Would that work?

15:30:11 20             THE COURT:  Sure.

15:30:11 21             MR. SHAW:  I just need to make sure I have the

15:30:14 22   right exhibit number, Your Honor.

15:30:15 23             MS. FRANTZEN:  It is Defendant's Exhibit 803

15:30:18 24   which is an interrogatory response.

15:31:06 25             MR. CHERNY:  I apologize, Your Honor, for the

15:31:09 1    amount of time this is taking.  We're just trying to get it

15:31:13 2    pinned down for the trial.

15:31:14 3            THE COURT:  I want it pinned down as well

15:31:16 4    because I never want to hear this argument again.  I thought

15:31:18 5    I already made that clear, but I didn't get what I wanted.

15:31:21 6            MS. FRANTZEN:  Your Honor, I can pull it up.

15:31:23 7    I'm pulling it up right now, if I can, but there is an

15:31:29 8    interrogatory --

15:31:29 9            THE COURT:  Don't explain it to me, just show

15:31:32 10   me.

15:31:33 11           MS. FRANTZEN:  All right.  Do you guys have it,

15:31:40 12   because I can actually -- I know exactly where it is.

15:31:48 13           MR. CHERNY:  Give us one second.

15:32:25 14           MS. FRANTZEN:  May I see it?  I can point to the

15:32:28 15   page.  It's the part that refers to the CONNECT, that it was

15:32:33 16   given to CONNECT.

15:32:36 17           MR. NIMROD:  Your Honor, this is January 16th,

15:32:39 18   the first commercial sale of the brown tape wick occurred.

15:32:43 19           MS. FRANTZEN:  That's not the right one.  Do you

15:32:46 20   mind?

15:32:46 21           MR. NIMROD:  Please.

15:33:16 22           MS. FRANTZEN:  Here it is.  In approximately

15:33:18 23   September 2015 --

15:33:20 24           THE COURT:  Hold on.  Hold on.  Where --

15:33:22 25           MS. FRANTZEN:  Sorry.  In approximately

15:33:31 1    September 2015, Camille -- that's not showing.  There we go.

15:33:39 2    Camille and Ray Newton presented on the brown tape wick at

15:33:44 3    CONNECT's 28 annual Most Innovative New Product Awards

15:33:49 4    presentations.  In December 2015, PureWick was awarded a

15:33:52 5    prize as most innovative new product.  As indicated in

15:33:56 6    plaintiff's supplemental response, the brown tape wick

15:33:59 7    practiced the inventions in the '376 patent claims, et

15:34:03 8    cetera.  There is also another interrogatory response where

15:34:05 9    they refer to the '989 patent.

15:34:09 10            That is the brown tape wick that they presented

15:34:12 11   to CONNECT but also was used -- and they're calling it the

15:34:16 12   brown tape wick, that's their name of it.  And that was also

15:34:19 13   the one that was used with patient DD.  And actually patient

15:34:26 14   DD also signed a publicity form for it and is featured on

15:34:33 15   their advertising, so I --

15:34:35 16            THE COURT:  It doesn't matter about her name.

15:34:36 17            MS. FRANTZEN:  Maybe it doesn't.  But she also

15:34:40 18   used it.  And did she use others?  Yes, but those are not

15:34:43 19   the brown ones that we're talking about.  We're talking

15:34:46 20   about the brown ones.  But this is the one that they said

15:34:49 21   would practice the invention and they used the words brown

15:34:52 22   tape product.  That's not my word, that's their admission.

15:34:58 23   And that is something that our expert is going to reference,

15:35:02 24   their own admission so they can't be confused on what it was

15:35:02 25   because they said that it was covered.

15:35:08  1          MR. NIMROD:  May I, Your Honor?  That -- it says

15:35:11  2  as indicated in plaintiff's supplemental response which is a

15:35:14  3  reference to our response relating to the January 2016 sale.

15:35:18  4  But in any event, what she's referring to there is a

15:35:22  5  December 15 date, December 2015 date, both after the bar

15:35:26  6  date.  So the question is --

15:35:28  7          THE COURT:  Is that after the bar date or after

15:35:30  8  the priority date that's in question?

15:35:34  9          MR. CHERNY:  It's after the bar date.  Nobody is

15:35:36 10  arguing about the September date.

15:35:39 11          MS. FRANTZEN:  Your Honor, you may remember from

15:35:40 12  the last conference how I told you that we didn't find out

15:35:44 13  until we subpoenaed CONNECT that the September 2015 was

15:35:47 14  wrong because they told CONNECT that they sold it back in

15:35:51 15  July of 2015.  But they never answered the interrogatory to

15:35:54 16  tell us that.  So that was the problem that we had in the

15:35:57 17  discovery.

15:35:58 18          MR. NIMROD:  Your Honor, if I may.

15:35:59 19          MS. FRANTZEN:  They presented the information to

15:36:00 20  CONNECT in July 2015, not September 2015.

15:36:04 21          MR. NIMROD:  Your Honor, if I could just address

15:36:05 22  that, that's what I was handing up this exhibit for.  The

15:36:10 23  CONNECT document they're referring to is after the bar date.

15:36:12 24  What they say is we told CONNECT we did something in July,

15:36:17 25  July 26th of 2015.  Well, the document I have just shown

15:36:20 1    you, DTX 488, there is an entry from July 26th that refers

15:36:26 2    to, for example, wick 6A used by patient DD.  That's one

15:36:33 3    version saying, "I just want to let you know for some reason

15:36:36 4    that last batch of wicks is not working properly."

15:36:40 5              And then on July 27th, and that's at Bates

15:36:43 6    number -- on July 27th, the fourth page of the document, DTX

15:36:51 7    488-0004, PureWick responds, Mr. Newton, July 27th, "I will

15:36:58 8    put some wicks together from the last two design revisions

15:37:01 9    and bring them over.  Maybe you can help isolate the

15:37:04 10   problem."  And that's more brown tape products.

15:37:08 11             If we go forward, there is more correspondence.

15:37:12 12   This is the correspondence we're relying on, Your Honor,

15:37:16 13   July 31st, the patient's daughter responds that, "On Friday,

15:37:20 14   July 31st, one, Wednesday night was wick H, about 300 ccs.

15:37:26 15   Brief wet but not soaked.  Two, Thursday night was wick I.

15:37:29 16   It appears the only urine that went in the jar was," and

15:37:34 17   goes on, "brief was soaked."

15:37:35 18             So they're still doing revisions, but this is

15:37:37 19   the time they said was the on sale where there was one brown

15:37:40 20   wick product.  If you look at the end of this document, Your

15:37:42 21   Honor, the e-mail had brown tape product after brown tape

15:37:42 22   product.  There was not one brown tape product in July of

15:37:52 23   2015.

15:37:52 24             THE COURT:  One design.

15:37:54 25             MR. NIMROD:  There was not one design.  There

15:37:55 1    was not one design, Your Honor, you're right.  They were

15:37:58 2    different, structurally different, that's what they're

15:38:00 3    saying, we'll try some different things here and some work

15:38:04 4    better than others and they all seemed to have some

15:38:06 5    problems.

15:38:07 6           So what they would need to do, Your Honor, is to

15:38:09 7    come in and say we are relying on, is it wick A, is it wick

15:38:13 8    H, is it wick I, what brown tape product are they referring

15:38:17 9    on, what documents shows it so we can understand what

15:38:19 10   they're relying on for prior art here?

15:38:22 11          MS. FRANTZEN:  Your Honor, may I respond?  I

15:38:23 12   actually took the deposition of Mr. Newton and he talked

15:38:26 13   about -- he was their designee on the brown tape product.

15:38:30 14   And he testified that the brown tape product had -- they

15:38:35 15   were the same product.  They operated the same way.  All the

15:38:39 16   features that were relevant to the patents-in-suit were

15:38:41 17   relevant.  He's trying a case right now to prevent us from

15:38:45 18   trying our case.  If he wants to get up and cross-examine

15:38:49 19   and say this is 4A, or whatever he's saying now which is not

15:38:52 20   relevant, there is actually pictures of the brown tape

15:38:55 21   product.  I can see them in his papers over there.  We

15:38:55 22   shouldn't be litigating a case here, we should be able to

15:39:00 23   present our case that they literally said that they

15:39:08 24   practiced the invention using the brown tape product, their

15:39:12 25   words, and we should be able to litigate it and show that

15:39:15 1    there was an on sale bar.

15:39:18 2                    MR. NIMROD:  Your Honor --

15:39:19 3                    MS. FRANTZEN:  There is a patient that -- I have

15:39:20 4    never been in a case where the patient actually took

15:39:23 5    pictures of the product and said here is me using it with

15:39:26 6    pictures of the urine next to it.  I mean, it's like, if

15:39:29 7    they want to say oh, that's not it, then they can argue that

15:39:32 8    in trial.  And that's what their expert did.

15:39:35 9                    THE COURT:  But is your whole position that --

15:39:40 10   what I'm trying to understand is you're going to present

15:39:44 11   what features the different products that DD used had.  And

15:39:49 12   you have to show that those had the claimed features.

15:39:52 13   Right?

15:39:52 14                   MS. FRANTZEN:  Yes, but --

15:39:53 15                   THE COURT:  No.  Stop.  Just answer my

15:39:57 16   questions.

15:39:57 17                   Is the only thing that you are going to tell the

15:40:00 18   jury in terms of those products meet the limitations that

15:40:05 19   they said it for the brown tape wick product, or are you

15:40:10 20   going to be able to say for the products that she told us

15:40:12 21   about, that these have the limitations?  That's what I don't

15:40:12 22   understand.  You going to be saying look, DD used this

15:40:23 23   product, she took pictures of it, it had all the elements of

15:40:28 24   the claim, or are you going to just say they said something

15:40:32 25   in September practiced all the elements because those are

15:40:34 1    two different things.

15:40:35 2              MS. FRANTZEN:   So there is two aspects to that,

15:40:38 3    Your Honor.   We are relying on the CONNECT disclosure and

15:40:42 4    the fact that they said that.   With regard to a number of

15:40:46 5    the elements, we deposed Ray Newton for the 30(b)(6) witness

15:40:52 6    and we asked him about the brown tape product specifically

15:40:55 7    and how they operated.   And he described them in that way,

15:41:00 8    so we'll have designation testimony on that part.

15:41:03 9              And our -- we have an expert who does rely on

15:41:09 10   their interrogatory response, but he also additionally

15:41:13 11   states separate and apart from their interrogatory response

15:41:16 12   that it would have been obvious based on what was sold and

15:41:20 13   used by DD, as well as shown to CONNECT, it would be obvious

15:41:27 14   to add a particular feature and that, you know, renders the

15:41:32 15   claims invalid.

15:41:35 16             THE COURT:   But the DD issue, you just said I

15:41:43 17   never had a case where I have pictures of the product next

15:41:48 18   to a vial of urine.   These products that are in the pictures

15:41:53 19   are the ones that you want to say are invalidated.   Right?

15:41:58 20             MS. FRANTZEN:   Yes, but that's the DD --

15:42:02 21             THE COURT:   Do you have someone saying that

15:42:05 22   product meets all of the elements of the claim, or is it

15:42:11 23   them saying something in September had the elements of the

15:42:14 24   claim and you're saying well, it's all the same?

15:42:19 25             MS. FRANTZEN:   Your Honor, this refers

15:42:21 1    specifically --

15:42:22 2                THE COURT:  I'm asking you, is that what you are

15:42:24 3    going to say?  Are you going to have someone say this

15:42:27 4    product in this picture meets all the elements and explain

15:42:31 5    how this product meets that?

15:42:33 6                MS. FRANTZEN:  Our expert --

15:42:34 7                THE COURT:  Yes or no?

15:42:35 8                MS. FRANTZEN:  Yes, our expert has a claim chart

15:42:38 9    that references pictures of those products and shows on the

15:42:41 10   use claim the method, and shows pictures in his report that

15:42:47 11   here is an image showing that it was used.

15:42:50 12               THE COURT:  So --

15:42:55 13               MS. FRANTZEN:  We also rely on the interrogatory

15:42:57 14   response.

15:42:58 15               THE COURT:  But the interrogatory response is an

15:43:01 16   admission that something that was done in September of 2015

15:43:05 17   was -- that's what it says, I get it, you don't agree, you

15:43:09 18   think that they're wrong, but if you're going to use it as

15:43:12 19   an admission, the only admission we have is that something

15:43:16 20   in 2015 -- September of 2015 was covered by the claims.

15:43:22 21               MS. FRANTZEN:  It was what was presented to

15:43:25 22   CONNECT which is what is shown in the CONNECT video which

15:43:30 23   was the CONNECT documents show it had to be submitted by

15:43:33 24   July 27th, 2015.  And both Newtons admitted that they

15:43:40 25   provided the information to CONNECT and were honest in their

statements to CONNECT that the products were sold by
July 27th, 2015.  That was in the CONNECT application.  That
interrogatory response references the CONNECT application
which is the same thing.

MR. NIMROD:  Your Honor, the only analysis the
expert did was to take the interrogatory response which has
to do with a commercial sale in 20 -- January 2016 and took
the element-by-element analysis from there and that's it.
As we see here, that's their expert report here.  There is
no analysis done by the expert saying I have looked at any
of these wicks that are referred to in the July 26th
correspondence with DD and her daughter saying any of these
-- they need to identify what wick they're relying on as
prior art.  We don't know.  It can't be the thing from
January 2016, it's got to be something that is prior --
they're saying July 26th, 2015.  You can see from here,
there are multiple brown tape products.

MS. FRANTZEN:  Your Honor, the July 27th, 2015,
is the sale of the product.  That's separate and apart from
the use by --

THE COURT:  I think at least the part that I
understood was that the daughter seems to be coming back and
saying okay, this was the H version.  The H version still
leaked.  And then they say well, we're going to send you a
new design.  Do we have anything that looks at all those

15:45:03 1    different versions and says hey, the H version didn't have

15:45:08 2    wicking material or the H version had the same wicking

15:45:11 3    material that's on the K version?

15:45:13 4              MS. FRANTZEN:  This is a complete red herring

15:45:15 5    because we're not relying on the H version, we're relying on

15:45:18 6    the images attached --

15:45:20 7              THE COURT:  I'm sorry, but the H version is one

15:45:23 8    of the versions -- she says one of the pictures in here from

15:45:28 9    July.  Well, that was the H version and the H version, her

15:45:31 10   underwear was all wet.  So that's why I am not

15:45:39 11   understanding, how -- it seems like there are multiple

15:45:43 12   iterations of this thing going on.  So it seems like it's

15:45:47 13   important to understand what iteration we had at what time.

15:45:49 14             MS. FRANTZEN:  Your Honor, if we have -- you

15:45:51 15   know, he's showing you one page, but if you want to scroll

15:45:55 16   down there is literally pictures of Doris Duffy in the claim

15:45:59 17   chart and the versions that she used.  So it's with respect

15:46:05 18   to the '989 patent.

15:46:07 19             And more kind of beyond that, with regard to the

15:46:10 20   CONNECT version in particular that they told CONNECT they

15:46:14 21   sold by July 27th, 2015, they claim that that -- they're

15:46:21 22   using it for objective indicia of nonobviousness.  I don't

15:46:25 23   know how they can win the award when it's objective indicia

15:46:30 24   of nonobviousness, but somehow it's not evidence that we can

15:46:33 25   use for an on sale bar.

15:46:35  1           THE COURT:  The problem I'm having is I don't

15:46:43  2    know what product there is.  You seem to be saying it's

15:46:47  3    brown tape, they want it, they did this.  And at least what

15:46:52  4    I am seeing is in this July/August time period, there were

15:46:57  5    different versions.  Maybe all the versions had all of the

15:47:00  6    relevant components, but I don't see anyone telling me that.

15:47:07  7    I don't see any expert saying every version here, we have an

15:47:11  8    L on that one, we have a B on that one, is there anyone who

15:47:16  9    says version L has all the elements?

15:47:20 10           MS. FRANTZEN:  There is Ray Newton who is their

15:47:22 11    own 30(b)(6) witness that we discussed the brown tape with

15:47:27 12    which they described as a brown tape wick.

15:47:31 13           THE COURT:  But the only thing that I see that

15:47:33 14    they made an admission on the brown tape wick, the earliest

15:47:38 15    date is September of 2015.  What I'm trying to figure out is

15:47:42 16    is it okay for you to say that admission on the brown tape

15:47:47 17    wick as of September applies with this DD stuff that is

15:47:54 18    earlier and maybe more problematic, but I am not seeing

15:48:00 19    anybody say this -- the versions of this product, B, H, L,

15:48:07 20    whatever are in these pictures are the -- have all of the

15:48:11 21    same elements as that picture.

15:48:13 22           MS. FRANTZEN:  Your Honor, so again, this says

15:48:17 23    in approximately September 2015, their priority date by the

15:48:22 24    way is September 7th on their first patent, that they

15:48:26 25    presented the brown tape product to CONNECT at the awards

15:48:29  1    presentation.  We have documents that we will use at trial

15:48:32  2    and prove through our witnesses that, in fact, they told

15:48:35  3    CONNECT about it in July 2015.  And they told CONNECT about

15:48:39  4    it in July 2015 that it was sold by July 27, 2015.  Did they

15:48:45  5    put that in their interrogatory response?  That part is not

15:48:48  6    in their response.  However, the fact that it practiced the

15:48:51  7    patent, the stuff that was shown to CONNECT is in their

15:48:54  8    response, and that's part of what the trial is, Your Honor.

15:48:57  9    I mean, if they want to criticize us and say you didn't

15:49:00  10   provide that evidence --

15:49:02  11            THE COURT:  My issue is -- I get it, there is

15:49:07  12   something here that comes in at trial.  The problem I'm

15:49:10  13   having is you don't seem to have anyone saying B has all the

15:49:16  14   elements of the claim.  Instead, you want to say B is a

15:49:21  15   brown tape product, and the brown tape product they admit it

15:49:27  16   contains all the elements.  That's not -- I don't read that

15:49:33  17   as an admission that all of these have the same element.

15:49:38  18   That's my problem.

15:49:39  19            MS. FRANTZEN:  But, Your Honor, that's because

15:49:40  20   you haven't heard the testimony from Ray Newton.

15:49:44  21            THE COURT:  So why aren't you giving me the

15:49:47  22   testimony of Ray Newton?  Why are you just summarizing it?

15:49:50  23            MS. FRANTZEN:  I can pull it up.  We did put it

15:49:52  24   in our summary judgment motion.  I'm sorry, that motion had

15:49:56  25   been denied so I wasn't ready for this issue.

15:49:58   1          But Ray Newton did testify about the brown tape
15:50:01   2   product, that's what I'm trying to tell you.  And I can pull
15:50:04   3   that up if we, you know, take a break, I will find Ray
15:50:08   4   Newton's testimony.
15:50:09   5          MR. NIMROD:  Your Honor, Ray Newton testified
15:50:11   6   there were several iterations of the brown tape product, and
15:50:14   7   he was asked questions and said they had different features.
15:50:18   8   You can see right from the document they were different.
15:50:20   9   They had leakage issues, different leakage issues.  He was
15:50:24   10   changing them.  In the CONNECT issue, they're not saying
15:50:26   11   there was a sale to CONNECT, they're saying there was an
15:50:28   12   allegation that the CONNECT application, that some sale
15:50:31   13   occurred on July 26th and these are the relevant documents.
15:50:34   14          You can see right here, Your Honor, there is
15:50:36   15   number 7, number 9, number 6, number 5, and they have no
15:50:39   16   expert testifying as to what is in any of those.  And Ray
15:50:42   17   Newton did not concede that the elements of the claims were
15:50:45   18   met by those.  Their expert analyzed what was set forth in
15:50:48   19   an interrogatory response regarding a January 2016 version
15:50:48   20   of the brown tape product and they do not make a connection.
15:50:51   21   They are trying to pull them together and say here is what
15:50:55   22   the brown wick product was at this time frame and it must be
15:50:55   23   the same one as earlier, but they have no evidence on that.
15:51:02   24          MS. FRANTZEN:  The problem with this whole
15:51:03   25   discussion is that it is involving people that were not at

15:51:10  1  the depositions, that don't have the testimony, and Ray

15:51:13  2  Newton did -- this kind of goes back to the issue of

15:51:17  3  pictures and looking at pictures and saying they're the same

15:51:20  4  or not the same.  Ray Newton testified what the products

15:51:23  5  needed to have, a tube, a reservoir, a wicking material, a

15:51:29  6  tape on the back, those things are all present in those

15:51:35  7  products.  The fact that we're looking at a picture and

15:51:38  8  saying oh, this picture doesn't look like this picture, this

15:51:42  9  is the exact -- the reverse of what they were doing with our

15:51:45 10  product.  The image that they keep comparing our product to

15:51:49 11  is a picture of the brown tape product that they added to

15:51:53 12  their patent well after, after they had already told CONNECT

15:51:57 13  that they solved it.

15:52:00 14          So, you know, this is what the trial is for.

15:52:05 15  And I will attempt to -- I will attempt to find --

15:52:10 16          THE COURT:  The problem I'm having is if you're

15:52:13 17  saying the trial is about do these products have all of the

15:52:17 18  elements of the claims, okay, that's one thing.  What I'm

15:52:22 19  concerned about is that you don't -- you're not saying that,

15:52:27 20  instead you're saying it's a brown tape product, they admit

15:52:30 21  brown tape products covered, end of analysis.

15:52:34 22          The first thing if you go through and say these

15:52:37 23  products had it and you have an expert who says that,

15:52:40 24  totally with you.  My problem is using as an admission when

15:52:45 25  we don't know what -- it's not an admission that anything in

15:52:50 1    July of 2017 used the claims.

15:52:56 2            MS. FRANTZEN:  Your Honor, we do have our expert

15:53:01 3    that the brown tape product that's referenced in that

15:53:05 4    interrogatory in particular is the CONNECT product that they

15:53:08 5    said was sold.  Our expert relies on their admission and in

15:53:11 6    cases where he agreed, he also further states the elements,

15:53:14 7    but that is an admission about what was given to CONNECT.

15:53:17 8    And it's what they rely on as objective indicia, the award

15:53:21 9    for nonobviousness.

15:53:24 10           THE COURT:  When was the award, July of 2015?

15:53:26 11           MS. FRANTZEN:  No.  But they gave it to CONNECT

15:53:27 12   and told CONNECT they sold it in July 2015.  How can we --

15:53:32 13   they won the award later, but they told CONNECT in July --

15:53:36 14   the deadline for the award was July 27th, 2015, and they

15:53:40 15   told CONNECT we sold the product on July 27th, 2015.  And

15:53:46 16   then there is a product with the award.  And they're saying

15:53:50 17   that's objective indicia of nonobviousness.

15:53:54 18           And we have invoices --

15:53:56 19           THE COURT:  Stop.  Let me remember each piece.

15:54:01 20   Before you say whatever you wanted to say, can you respond

15:54:04 21   to that?  So what I just understood Ms. Frantzen to be

15:54:08 22   saying is in order to get the award that was awarded after

15:54:14 23   the bar date, you had to have applied by July and so

15:54:21 24   whatever you got the award for, you said you applied for it

15:54:25 25   by July.

15:54:27 1          MR. CHERNY:  We applied for an award in July.

15:54:30 2     The evidence will show, we can show it today, I obviously

15:54:34 3     don't want to try this right here right now, was not for the

15:54:37 4     sale of a wick, it was for the sale of a pump, and there is

15:54:41 5     actually a receipt.

15:54:42 6          But the issue here, I don't mean to go on to

15:54:45 7     what I want to say, Your Honor, but this kind of comes back

15:54:48 8     to what we have been dealing with for the whole time which

15:54:51 9     is throughout this case, they keep saying the PureWick prior

15:54:55 10    art devices.  We brought it to the Court's attention many

15:54:58 11    times.  And Judge Fallon said you had in your hand all the

15:55:02 12    prototypes.  You had all the pictures.  And we're not trying

15:55:06 13    to try it and get a judgment here.  All we're trying to find

15:55:11 14    out, Mr. Nimrod can show you the 282 notes, literally says

15:55:16 15    the say same thing, goes back to the PureWick devices as

15:55:19 16    clarified at the last hearing.  What does that mean?  As she

15:55:23 17    admitted, DD did not use the -- DD had twenty -- she

15:55:27 18    admitted, there is twenty different things or thirty

15:55:30 19    different things, she was urinating on all these different

15:55:32 20    things and they were sitting there and going back and forth

15:55:35 21    with the news.

15:55:37 22          Just tell me which ones.  At some point she says

15:55:39 23    oh, I say this is the one.  Then I say okay, H on this date

15:55:42 24    was shown to Doris Duffy and given to CONNECT.  All I want

15:55:46 25    is the specific ones.  And we have been trying to get this

15:55:49 1   throughout the case and they would say they all have the

15:55:52 2   same salient features.  At the last hearing I showed they

15:55:56 3   didn't really have the same salient features.  So we keep

15:55:59 4   saying just point to the specific one.

15:56:01 5          THE COURT:  Do you agree that if their expert

15:56:03 6   had said I looked at H in these pictures and H has all of

15:56:11 7   the features of the claim that that would be okay, and then

15:56:15 8   the jury could decide whether to believe that?

15:56:17 9          MR. CHERNY:  I'm obviously assuming he had

15:56:19 10  something other than -- because there is stuff inside, the

15:56:22 11  elements are inside.  But if he actually did an analysis

15:56:24 12  where he said I'm relying on H, H was used publicly with DD

15:56:30 13  on this date so we get the date aspect of prior art in

15:56:34 14  there, okay, I have analyzed it, it meets all the elements

15:56:37 15  of the claim and it was used on this date and all the other

15:56:41 16  things having to do with public use, yes.  But we never get

15:56:44 17  anything specific like that.  What we get is you admitted

15:56:47 18  the brown tape product --

15:56:48 19         THE COURT:  So what if -- what did Mr. Newton

15:56:52 20  say?  Did he say every product had the same material, the

15:56:56 21  same casing, the same whatever?

15:56:58 22         MR. CHERNY:  No.  What happened was -- and we're

15:57:02 23  happy to show it to the Court.  I don't know if we can do it

15:57:02 24  now.  If we can send it to the Court.  There was a couple of

15:57:07 25  questions where there was some overlap, but there is never a

15:57:10  1    question where he says they're all the same.  There is

15:57:13  2    questions and answers where he says well, we were changing

15:57:16  3    these at the time and there were differences.  In fact at

15:57:18  4    one point he says this one, I'm not even sure this one has a

15:57:22  5    reservoir on it, because we're just taping the bottom and

15:57:25  6    the reservoir is an element that's required.  We can show

15:57:27  7    you that.  There is no admission where Mr. Newton says they

15:57:31  8    are all the same.  Ms. Frantzen would say did this one have

15:57:34  9    a wicking material and he might say yes.  But then he would

15:57:37 10    say we were looking at all these different ones at the time

15:57:40 11    and I'm not even sure which ones are which because they

15:57:43 12    labeled them like this and there is no evidence at all that

15:57:46 13    he knows which one is which.  Not just which one is which,

15:57:50 14    which one is from which time and which one was allegedly

15:57:53 15    sold or showed to somebody.

15:57:54 16            Again, if they'll just tell us which is what we

15:57:57 17    have been asking for for the last year, instead of saying

15:58:00 18    you're relying on the PureWick -- can you give me the 282

15:58:04 19    notice?  This is what we got, literally, after the last

15:58:12 20    hearing.  It says -- where is it?

15:58:32 21            MS. FRANTZEN:  Your Honor, I have an example

15:58:41 22    quote from Ray Newton to just kind of show the issue.  I'm

15:58:42 23    trying to quickly go through the 300 pages.  But this is

15:58:46 24    what Ray Newton says, for example, the same -- talking about

15:58:52 25    the brown tape product which he was designated.

15:58:56 1          "So in both cases of the brown tape vinyl wick

15:58:59 2   cap versus the brown tape vinyl tape reservoir, both devices

15:59:04 3   have that vinyl portion serving as a reservoir on the end of

15:59:08 4   the device?

15:59:08 5          "ANSWER:  Yes."

15:59:09 6          There is multiple quotes where we step through

15:59:12 7   the elements of the claims with Ray Newton where we ask him,

15:59:15 8   okay, this one is black and this one is white, this one is

15:59:20 9   taped, but is this a reservoir for the device, and he said

15:59:23 10   yes.  And that's the kind of stuff that Ray, we talked about

15:59:28 11   -- and when we asked him are you here to testify about the

15:59:30 12   brown tape, and we also asked for the other version, but the

15:59:34 13   brown tape, these are the questions that we asked him.

15:59:37 14          MR. CHERNY:  There is no doubt that one is a

15:59:39 15   black one, but in fact which one is which?  Here, so when

15:59:44 16   they narrowed their prior art, they said that they were

15:59:47 17   relying upon -- which one?

15:59:59 18          We got the brown tape wick devices as clarified

16:00:03 19   at the hearing, the hearing that you said you were reading

16:00:07 20   from before, they said clarified.  We said what does that

16:00:10 21   mean?  Here is the e-mail we got in response that, Your

16:00:13 22   Honor, that essentially was the clarification we got.

16:00:16 23   "Finally to answer Jason's question in his e-mail from

16:00:19 24   Tuesday, the reference to PureWick's prior art" -- by the

16:00:21 25   way, a term we told them never to use again -- "refers to a

discussion at the February 23rd hearing which focused on

PureWick's brown tape products as addressed in our expert

reports, e.g., the brown tape products used, demonstrated,

and sold including as disclosed to and by CONNECT and DD."

Can I bring to Your Honor, you have to see it.

The amount of things that could be within this, I'm not even

sure it can be limited down to twenty.

MS. FRANTZEN:  Your Honor, this is so much hand

waving because they know -- there is a limited scope of

exhibits on this issue.  They're on the exhibit list.  And

Ray Newton's testimony has been designated.  They know what

the brown tape product is.  And they know what's disclosed

to CONNECT.  They know Doris Duffy used it.  They know we

discussed it with Ray Newton.  Our expert says that it would

have been obvious to make modifications rendering the patent

invalid.  This is not a mystery, Your Honor.  And I know

that we have had motion after motion on this.  We just want

to fairly present our case.

THE COURT:  But Ms. Frantzen, you keep saying

everybody knows what it is.  I don't.  Okay?  So that's

where you got a little bit of an uphill battle.  So tell me

if I say you can't use that interrogatory response for them

admitting that the products are covered because -- you can't

use that for the July/August stuff that we have.  Tell me

how you're going to use this to show that these products

16:02:07 1    have all the elements of the claim.

16:02:09 2              MS. FRANTZEN:  We can't use it for the CONNECT

16:02:12 3    plans which they say is covered by the patent?

16:02:15 4              THE COURT:  You can't use it for anything in

16:02:16 5    this July/August time frame, in this -- the DD stuff, that's

16:02:23 6    what I have the e-mails on, so let's start with -- I know

16:02:27 7    there is DD and there is CONNECT.  I'm asking about DD.  So

16:02:31 8    let's start with DD.

16:02:32 9              MS. FRANTZEN:  Okay.

16:02:33 10             THE COURT:  Okay.  You can't use that admission

16:02:36 11   because I don't know what -- I don't know that the product

16:02:39 12   of that admission is this product.

16:02:42 13             MS. FRANTZEN:  Okay.

16:02:43 14             THE COURT:  Okay.  So what are you going to use?

16:02:45 15             MS. FRANTZEN:  So with regard to the DD items,

16:02:48 16   Ray Newton did discuss the DD e-mail in particular.  That

16:02:51 17   was a deposition exhibit of Ray Newton.  And we showed Ray

16:02:58 18   Newton pictures of DD's products.  We discussed with --

16:03:01 19             THE COURT:  Whether each of these products has

16:03:02 20   the elements?

16:03:02 21             MS. FRANTZEN:  We asked him about particular

16:03:02 22   features and then our expert opined that the casing feature

16:03:11 23   would have been obvious.  So Ray Newton and our expert on

16:03:16 24   certain features and then additional features are addressed

16:03:21 25   by our expert in terms of obviousness.

16:03:27  1          THE COURT:  Wasn't that fairly the subject of --

16:03:32  2          MR. CHERNY:  I have never heard anything about

16:03:34  3   any allegation about the casing feature being allegedly

16:03:38  4   missing and I do not think Mr. Newton testified as they're

16:03:42  5   saying.  As I said, point me to which one.

16:03:44  6          THE COURT:  No, no, but if he didn't testify as

16:03:48  7   she's saying, that seems like an issue for the jury.  Did he

16:03:51  8   actually say that all these products have the elements of

16:03:55  9   the claims or not?

16:03:56 10          MR. CHERNY:  The answer is no, Your Honor.  But

16:03:59 11   the problem is in terms of an issue for the jury -- I beg

16:04:02 12   your indulgence in this regard.  Which one?  Point me to one

16:04:06 13   and then you can say that Ray Newton said had all the

16:04:09 14   things.  What happens is we have literally as you can see

16:04:12 15   from the DD e-mails, the Hs, the Is, again, it's like which

16:04:17 16   one, pick one, which is the one that is the right date and

16:04:21 17   that you're saying meets the public use?

16:04:23 18          THE COURT:  She would say all of them.

16:04:24 19          MR. CHERNY:  Okay.  She's going to rely on all

16:04:27 20   of Doris Duffy, B, I, J, is that what she's saying?  Because

16:04:31 21   I never heard that one before.

16:04:33 22          MS. FRANTZEN:  Your Honor, this argument that

16:04:34 23   you had so many prior uses of this product --

16:04:37 24          THE COURT:  That's not the argument.  Just focus

16:04:38 25   on this.  Are you going to have someone testify L was used

16:04:43 1    in July/August of 20 whatever, and L has all the elements?

16:04:49 2              MS. FRANTZEN:  The one that we rely on are the

16:04:51 3    ones in the e-mail that are cited by our expert and he shows

16:04:55 4    the pictures of them.

16:04:56 5              THE COURT:  Which ones are they?

16:04:59 6              MS. FRANTZEN:  That's in the Doris Duffy e-mail.

16:05:02 7              THE COURT:  I got the Doris Duffy e-mail, there

16:05:04 8    is P, there is L.

16:05:05 9              MS. FRANTZEN:  It's the images at the back which

16:05:08 10   we attached to the top e-mail.

16:05:10 11             THE COURT:  So I have S, and C, and B, and L,

16:05:20 12   and E, and 9.

16:05:22 13             MS. FRANTZEN:  Okay.

16:05:23 14             THE COURT:  So is it all of those?

16:05:26 15             MS. FRANTZEN:  Your Honor, I don't have that

16:05:28 16   paper in front of me, but our expert identified and put a

16:05:31 17   picture of the particular one he was relying on.  And there

16:05:35 18   were certain ones that were specifically given to discuss

16:05:40 19   with Ray Newton with that exhibit where we said look at this

16:05:42 20   particular page.  Does this product have -- what type of

16:05:48 21   gauze was used in this product.  And, for example, Ray would

16:05:51 22   say things like oh, this one used a compression bandage.

16:05:55 23   This was a bandage but it wasn't a compression one.  Are

16:05:59 24   they all wicking materials?  Yes, it was irrelevant it if it

16:06:02 25   was a compression or noncompression.  The parts of the

16:06:05 1    product that were relevant to their claims that were in

16:06:09 2    prior use were the same.  And the fact is, when we submitted

16:06:14 3    this in our summary judgment briefing, with regard to DD,

16:06:17 4    she signed a release in May 2015 and there is an ad from

16:06:21 5    June 2015 with her with the brown tape product.  That's from

16:06:25 6    May 2015.

16:06:26 7              THE COURT:  You understand that if the products

16:06:29 8    were changing over time, you saying she's holding a brown

16:06:35 9    tape product doesn't mean anything if the brown tape product

16:06:40 10   that she was holding didn't have all the features.  You

16:06:43 11   understand that; right?

16:06:44 12             MS. FRANTZEN:  I understand that.

16:06:46 13             THE COURT:  So what I'm trying to get at is are

16:06:51 14   we making an assumption that they all had the same features,

16:06:56 15   or do you have evidence that the products she was using or a

16:07:02 16   particular version that is cited in these e-mails meets the

16:07:06 17   claim limitations?  That's all I want to know.

16:07:09 18             MS. FRANTZEN:  That is the testimony of Ray

16:07:10 19   Newton who discusses the brown tape product and we step

16:07:20 20   through the brown tape product with Ray --

16:07:23 21             THE COURT:  I got it.  I got it.  Does he step

16:07:25 22   through -- did you go through and say okay, here is the B

16:07:31 23   product, does the B product have that?  Is that what you

16:07:34 24   did?

16:07:34 25             MS. FRANTZEN:  We showed him particular images

16:07:36 1    from that e-mail, yes.

16:07:39 2              THE COURT:  Okay.

16:07:39 3              MS. FRANTZEN:  I don't know if it was the B --

16:07:41 4              THE COURT:  Because my problem is you saying

16:07:44 5    brown tape products, it's not helpful.  Because I can't say

16:07:49 6    that every brown tape product, she is saying in here, the H

16:07:52 7    product leaked, H product didn't work.  And then he says

16:07:57 8    well, I'll send you a new design.  I don't know if those

16:08:00 9    design changes are meaningful for these patents.

16:08:04 10             MS. FRANTZEN:  Your Honor, if that was the case,

16:08:06 11   then, and this actually really comes down to it, if they had

16:08:10 12   so many different versions that they showed, they should

16:08:13 13   have answered the interrogatory response because we had it

16:08:16 14   and Your Honor ordered them to answer it for when they first

16:08:21 15   used the product.  And they should have said we had the A

16:08:23 16   version but it was different than the B version or different

16:08:26 17   from the C version.

16:08:26 18             THE COURT:  This is what we are going to do.

16:08:29 19   You are going to send me, if you want to use this, what

16:08:30 20   pictures of what product, no more brown tape product.  Okay?

16:08:33 21   You're going to say we are going to prove that the brown

16:08:42 22   tape product in this picture is -- was sold in whatever

16:08:44 23   date, I don't care if it's an actual date or July or August

16:08:51 24   of whatever, as long as it's before the time period, and

16:08:51 25   this is the evidence, not the interrogatory that talks about

16:09:01 1    it's something that could be a different product, but what

16:09:03 2    is the evidence you have for these products, whether it's

16:09:09 3    Mr. Newton, and you can give me his specific testimony that

16:09:13 4    is sufficient to show that.  I want to see that first.  I

16:09:20 5    don't want anything from you until I see that and then I'll

16:09:22 6    ask for it.

16:09:23 7            MR. CHERNY:  I'm not giving anything until I'm

16:09:25 8    told to.

16:09:25 9            THE COURT:  Okay.  Now when can you get me that?

16:09:31 10           MS. FRANTZEN:  We will do it as fast as we can.

16:09:35 11           THE COURT:  The trial is Monday.  So I guess I

16:09:38 12   need it by Wednesday.

16:09:41 13           So let me ask this.  That's the DD stuff?

16:09:45 14   CONNECT?

16:09:45 15           MR. CHERNY:  Yes.

16:09:47 16           THE COURT:  You know what the CONNECT product

16:09:49 17   was?

16:09:49 18           MR. CHERNY:  I know the September 1st.  If

16:09:51 19   they're talking about the one --

16:09:52 20           THE COURT:  You say the July CONNECT product

16:09:55 21   wasn't a product, it was a pump.

16:09:55 22           MR. CHERNY:  Correct, I can show you the

16:09:55 23   receipts.

16:09:58 24           THE COURT:  But can't you -- isn't that an issue

16:10:01 25   for the jury, they say oh, you had to have applied for it in

16:10:05 1   July and you say --

16:10:07 2             MR. CHERNY:  Your Honor, I have no issue with

16:10:09 3   them going forward on that product as long as they say this

16:10:12 4   is the CONNECT product.  Is it the one on the video?  Fine,

16:10:16 5   just tell me which one it is.

16:10:17 6             THE COURT:  Is the CONNECT product the one in

16:10:19 7   the video?

16:10:20 8             MS. FRANTZEN:  The CONNECT product is in the

16:10:21 9   video.  If it is just the pump that they pulled --

16:10:25 10            THE COURT:  Why are you arguing to me?  Argue

16:10:27 11  that to the jury.

16:10:28 12            MS. FRANTZEN:  I'm sorry.

16:10:28 13            THE COURT:  No, I don't care.  I don't care.

16:10:30 14  I'm not making that decision.  The jury is making that

16:10:33 15  decision.  They're okay with the CONNECT product, the

16:10:37 16  CONNECT product used in the video.  That is what you are

16:10:40 17  left with.  Okay?

16:10:41 18            MS. FRANTZEN:  Right.  Which they said was sold

16:10:43 19  in July 20th --

16:10:45 20            THE COURT:  Oh, my God, I don't care.  You're

16:10:48 21  not -- you're trying to win your case with me.  I'm saying

16:10:51 22  you now can take that one to the jury.

16:10:53 23            MS. FRANTZEN:  Okay.

16:10:54 24            THE COURT:  You can take that to the jury, but

16:10:56 25  we want to make sure we know what product.  No more brown

16:11:00 1   tape product, brown tape product, brown tape product, brown

16:11:03 2   tape products.  The brown tape product that you are taking

16:11:06 3   for CONNECT is the one that was in the video.  Is that

16:11:09 4   right?

16:11:10 5             MS. FRANTZEN:  Yes.

16:11:11 6             MR. CHERNY:  Thank you, Your Honor.

16:11:12 7             THE COURT:  Okay.  And then the DD stuff I just

16:11:15 8   need to see the evidence on that as to what we have on that.

16:11:24 9             MR. CHERNY:  At the risk of vexing the Court,

16:11:27 10   Mr. --

16:11:27 11            THE COURT:  You're not vexing me, you're

16:11:30 12   confusing me so much that I -- I can barely speak anymore.

16:11:34 13            MR. CHERNY:  I don't think that I'm confusing

16:11:36 14   Your Honor, but I understand.  Mr. Biddinger said there are

16:11:41 15   two CONNECT videos, so he would like to know which CONNECT

16:11:45 16   video you want?

16:11:45 17            THE COURT:  Of course there are.

16:11:46 18            MS. FRANTZEN:  The brown product, the brown

16:11:48 19   products are in both CONNECT videos, 519 and 520.  They

16:11:52 20   submitted them for the award.  They're relying on them for

16:11:55 21   objective indicia.  And now they're saying it was the pump

16:11:58 22   that was sold.  How is it that they can rely on it --

16:12:01 23            THE COURT:  Again, save it for the jury.  Save

16:12:02 24   it for the jury.  You are way too invested in this, you

16:12:07 25   know.  You are way too invested.  I'm a little concerned

16:12:11 1    that -- you got to -- okay.

16:12:13 2            So Mr. Biddinger, is the product in 519, video

16:12:21 3    519 and 520 the same product?

16:12:23 4            MR. BIDDINGER:  I don't know.  They're two

16:12:25 5    different videos, Your Honor.

16:12:26 6            THE COURT:  But are those two videos evidence

16:12:28 7    that you all are relying on for commercial -- for secondary

16:12:32 8    considerations?

16:12:33 9            MR. BIDDINGER:  We're not relying on those

16:12:35 10   videos, Your Honor.

16:12:36 11           THE COURT:  But are you relying on the products

16:12:38 12   that was given to CONNECT that is exemplified in those

16:12:41 13   videos?

16:12:45 14           MR. BIDDINGER:  I think the answer is yes for at

16:12:48 15   least -- there is a video I think of the award winners, that

16:12:52 16   one I know that that relates to the award because it's

16:12:55 17   literally showing the award winners.

16:12:58 18           THE COURT:  And the award winners video has the

16:13:00 19   product in it?

16:13:02 20           MR. BIDDINGER:  Yes, it appears in the video,

16:13:02 21   yes.

16:13:02 22           MR. CHERNY:  Yes, there is a product there.

16:13:02 23           MS. FRANTZEN:  CONNECT produced at the award

16:13:02 24   presentation, you know, and then --

16:13:11 25           THE COURT:  What exhibit is that?

16:13:13  1              MS. FRANTZEN:  I believe that one is 519.  And

16:13:16  2    520 is the video that was submitted to CONNECT showing here

16:13:21  3    using it for purposes of the --

16:13:27  4              MR. BIDDINGER:  With respect to the second part

16:13:28  5    of that, I don't know what evidence there is of that, I

16:13:31  6    don't.

16:13:32  7              MR. CHERNY:  Well, at some point --

16:13:34  8              THE COURT:  That's an issue, an evidentiary

16:13:36  9    issue.  But at least the product that is in 519 is the

16:13:40 10    product you're going to rely on as the one to CONNECT.

16:13:44 11              MS. FRANTZEN:  519 and 520.

16:13:46 12              THE COURT:  519, yes.  520, I don't know.

16:13:50 13    Right?  I don't know if it's the same product, that might be

16:13:52 14    something you have to prove.

16:13:53 15              MS. FRANTZEN:  Okay.

16:13:55 16              THE COURT:  Okay.  But 519 is the product you're

16:13:58 17    relying on?

16:13:59 18              MS. FRANTZEN:  Yes.  The only caveat is I don't

16:14:01 19    know if I mixed up those two numbers, but it's the award

16:14:02 20    video that shows the award presentation of them saying it

16:14:10 21    gets the award.

16:14:14 22              MR. CHERNY:  Your Honor, I don't know if we're

16:14:16 23    done with that.

16:14:17 24              THE COURT:  I hope we are.

16:14:18 25              MR. CHERNY:  I hope so, too.

16:14:20 1                   May we raise another issue or have we reached

16:14:25 2      the end of the Court's patience?

16:14:27 3                   THE COURT:  I don't know how we got there.  I

16:14:29 4      just asked what prior art combinations we had and I am so

16:14:32 5      sorry I asked that question, I can't even tell you.

16:14:38 6                   MR. CHERNY:  Well, one --

16:14:39 7                   THE COURT:  Let me finish -- I have two bullet

16:14:42 8      points and then you can raise whatever other issues there

16:14:46 9      are.

16:14:46 10                  MR. CHERNY:  Thank you, Your Honor.

16:14:49 11                  THE COURT:  Parties may access the courtroom on

16:14:51 12     the morning of March 25th, coordinate with Mr. Buckson.

16:14:55 13                  After trial we request that you take a look at

16:14:58 14     the trial transcripts within two weeks and get any errata

16:15:02 15     back to the court reporter.  If you need more time let me

16:15:04 16     know, but having reviewed a corrected trial transcript is

16:15:08 17     important before we get the post-trial briefing because we

16:15:10 18     don't need repeat versions with corrected numbers.

16:15:12 19                  Okay.  Anything else you want to discuss?

16:15:17 20                  MR. CHERNY:  I'm going to try to shortcut one of

16:15:21 21     the two things that remain, Your Honor.  The way we got to

16:15:24 22     the last conversation is you were are raising the amount of

16:15:27 23     prior art that's at issue and there still is quite a bit of

16:15:30 24     prior art.  I think was it twelve references still,

16:15:33 25     Mr. Nimrod?

16:15:34 1          MR. NIMROD:  That's right.

16:15:35 2          MR. CHERNY:  And so at this point I would ask

16:15:37 3   them really to take a serious shot, we got down to seven

16:15:41 4   claims, I'm not going to ask the Court to sit through a

16:15:44 5   discussion of the twelve references.  I think that we're

16:15:47 6   probably -- it's more than I think the Court had in mind in

16:15:50 7   terms of the amount of prior art, so I would ask that the

16:15:55 8   other side take a serious shot at actually reducing down.

16:15:59 9          And of course the prior discussion about the

16:16:02 10  brown tape wick obviously impacts as well because that's

16:16:06 11  also part of the prior art.

16:16:07 12          The other issue that I want to raise which is

16:16:10 13  somewhat substantive, Mr. Shaw is going to address it, is

16:16:13 14  throughout this case, and I think you probably recall it

16:16:15 15  from the discussion of the FDA expert, Erica Liasson, there

16:16:20 16  has been this discussion of a server.

16:16:23 17          THE COURT:  A what?

16:16:25 18          MR. CHERNY:  A server.  A server that we could

16:16:28 19  not find.  And there has been discussion of that.  We said

16:16:32 20  that Ms. Liasson was suggesting that somehow there might be

16:16:36 21  documents on that.  They are now asking to have a jury

16:16:39 22  instruction put in front of the jury on spoliation.  Quite

16:16:42 23  frankly we think it's inappropriate, that this should have

16:16:47 24  been brought to the Court long ago.  This has been going on

16:16:50 25  for a year-and-a-half.

16:16:52  1          The only reason I'm raising it now as opposed to

16:16:55  2    jury instructions is I'm concerned that during opening there

16:16:58  3    is going to be discussions of spoliation which I do not

16:17:00  4    think is an issue for the jury before the Court has

16:17:03  5    addressed it.

16:17:04  6          May I ask Mr. Shaw to address specifically the

16:17:06  7    issue, Your Honor?

16:17:07  8          THE COURT:  Let's ask if there is going to be

16:17:09  9    any discussion of spoliation in the opening statement?

16:17:12  10          MS. FRANTZEN:  In the opening statement, no.

16:17:15  11          MR. CHERNY:  The other question is will there be

16:17:18  12    an attempt to introduce evidence from the Newtons on

16:17:22  13    spoliation since I don't think it's rightfully in front of

16:17:25  14    the Court at the point.

16:17:26  15          MS. FRANTZEN:  Your Honor, we do think

16:17:28  16    spoliation is relevant.  I'm sorry, Your Honor.  It kind of

16:17:32  17    goes back to the issues of we did not have documents that we

16:17:36  18    needed in the case because a server was lost.  We did serve

16:17:41  19    a 30(b)(6.), we had a topic on it.  They provided a witness

16:17:42  20    on the lost server.  And we proposed an instruction

16:17:42  21    consistent with what is in another case in Delaware by I

16:17:50  22    believe Judge Stark.  And so it's the appropriate time to

16:17:52  23    issue that, and it's one from the Third Circuit.

16:18:02  24          But there is no dispute that they lost the

16:18:06  25    server and did not tell us about it until after we had

16:18:10 1    performed our electronic discovery words were exchanged, and

16:18:17 2    you know, we -- it was an issue for our case because we

16:18:21 3    weren't able to obtain documents.

16:18:23 4            MR. CHERNY:  Your Honor, when one looks at the

16:18:26 5    rule, it's very clear that if -- yes, a server was lost.  We

16:18:30 6    were very up front with them as far back as a

16:18:33 7    year-and-a-half ago.  And they have kind of talked about

16:18:36 8    this tangentially throughout, and they did take a 30(b)(6).

16:18:41 9    I'm pretty sure Mr. Shaw knows the rules better than I do on

16:18:45 10   that regard.

16:18:45 11           They have two things, on the one hand you can

16:18:48 12   come to the court and say I have been prejudiced and ask the

16:18:51 13   court to see if it can come up with some remedy, and the

16:18:54 14   other one is you have to prove intent, and neither of that

16:18:58 15   has happened.

16:18:59 16           So the issue here is that I don't think that at

16:19:02 17   this point this is an appropriate issue for the jury.  But

16:19:05 18   like I said, Mr. Shaw has steeped himself in the issue and

16:19:10 19   is as invested as Ms. Frantzen is in the brown tape wick, he

16:19:14 20   is invested in this issue and would love to talk about it.

16:19:17 21           Thank you, Your Honor.

16:19:17 22           THE COURT:  I want some cache in here, Mr. Shaw.

16:19:22 23           MR. SHAW:  I was afraid of that with the

16:19:24 24   introduction, Your Honor.  First, this is not an issue

16:19:26 25   that's in the pretrial order.  And the issues of fact or

issues of law to be decided, the only place it shows up is in the jury instruction.  We think if it even got that far there is a waiver.  I want to point that out first of all.

Second, the reason we're addressing it now is because we only learned about it when the jury instruction draft came in which is the day before the reply briefs on the MILs were served.  There wasn't really an opportunity to deal with it ahead of time.

But Mr. Cherny pointed out rightfully, we're concerned about the opening and the first two witnesses and there are potentially questions about it there.  The rules are very clear, the first instance when there is a problem, you are to come to the court and work out whether there is remedial action during the discovery period that that can be solved.  They did take the position as Ms. Frantzen mentioned.  In terms of the people that they're concerned about, I'm not sure whether it's an e-mail server or a server, that correspondence is a little different on that, but in terms of questions they asked about what was actually lost to Ms. Newton, they asked one question about e-mails and she didn't -- she wasn't sure there was even a server.  For Mr. Newton, his testimony was the e-mails he used while at PureWick were on his private e-mail account and I believe those were collected and produced.

In terms of the timing, this is an issue we

16:20:46 1    discovered in late 2020, disclosed on December 30th, gave

16:20:50 2    more details on January 15, 2021.  There is a little bit of

16:20:54 3    e-mail traffic back and forth, but February 15th we received

16:20:58 4    an e-mail from Sage stating that they were reserving all

16:21:01 5    their rights, they were prejudiced --

16:21:03 6                 THE COURT:  2020 -- I'm sorry, February of 2021,

16:21:06 7    more than a year ago?

16:21:08 8                 MR. SHAW:  Correct.

16:21:09 9                 Fact discovery then closed somewhere toward late

16:21:12 10   April of 2021.  And as I mentioned there were two

16:21:15 11   depositions and then there was 30(b)(6).

16:21:18 12                THE COURT:  On equitable estoppel.

16:21:21 13                MR. SHAW:  Maybe so, Your Honor.  So that's the

16:21:23 14   factual background.  I'm happy to answer questions about

16:21:26 15   where this is.

16:21:27 16                The jury instruction in terms of what they're

16:21:28 17   proposing, it ask the jury to decide whether documents were

16:21:32 18   lost and then it adopts the language from Judge Stark's jury

16:21:36 19   instruction which he adopted after making a finding that

16:21:39 20   there was intent to destroy evidence.  That instruction

16:21:42 21   doesn't go -- wasn't one where it's asking the jury to do

16:21:45 22   anything.  He already made findings in that case.  It was GN

16:21:50 23   v. Medtronics.  That a higher level officer told people to

16:21:54 24   destroy documents.  They had destroyed documents --

16:21:56 25                THE COURT:  There was a hearing on it.

16:21:58  1          MR. SHAW:  There was a hearing on it, that's

16:21:59  2    right, an evidentiary hearing.  And here what it seems to be

16:22:03  3    they want to put a little bit of evidence in, it was a

16:22:06  4    server, it was missing and ask the jury to say -- decide

16:22:09  5    whether that was bad.  And frankly under the case law, Rule

16:22:15  6    37(e)(2), the discovery rule, there has to be a finding of

16:22:17  7    intentional destruction, gross negligence or negligence is

16:22:21  8    not enough to get any kind of instruction like that.  There

16:22:23  9    is no evidence that there is anything here at all on intent.

16:22:29 10          MS. FRANTZEN:  Your Honor, we did disclose and

16:22:32 11    it's on our final jury instruction.

16:22:35 12          THE COURT:  I have it here.  Did you raise it

16:22:37 13    during discovery?

16:22:38 14          MS. FRANTZEN:  Yes, this is a response to our

16:22:40 15    interrogatory where we rely on the lost server.

16:22:43 16          THE COURT:  Did you raise it with the Court

16:22:45 17    during discovery?

16:22:45 18          MS. FRANTZEN:  We didn't raise it with the

16:22:47 19    Court.

16:22:47 20          THE COURT:  Did you raise it with the Court in

16:22:48 21    the pretrial order?

16:22:49 22          MS. FRANTZEN:  As part of this jury instruction

16:22:51 23    and --

16:22:52 24          THE COURT:  No, the jury instructions are not in

16:22:54 25    the pretrial order.  Did you raise it as an issue in the

16:22:57 1    pretrial order?

16:22:58 2            MS. FRANTZEN:  No, Your Honor, I can't remember.

16:23:00 3            THE COURT:  So the only place that this has been

16:23:03 4    brought to anyone in the Court's attention is the jury

16:23:07 5    instruction?

16:23:07 6            MS. FRANTZEN:  That may be correct.

16:23:09 7            THE COURT:  Okay.

16:23:10 8            MS. FRANTZEN:  And our deposition designations

16:23:12 9    on the issue.

16:23:21 10           The server that was lost was the PureWick

16:23:24 11    server, the entire PureWick server for the PureWick company.

16:23:28 12    And we did not find out about it until well into discovery.

16:23:32 13    And all of our search terms that we provided to them were

16:23:35 14    prior art search terms.  So we did respond to

16:23:40 15    interrogatories and included it as part of our case which we

16:23:44 16    quoted here, so they were well aware that we contended that

16:23:49 17    we were prejudiced by the loss of the evidence and we took a

16:23:54 18    30(b)(6) --

16:23:55 19           THE COURT:  What is the evidence relevant to?

16:23:59 20    So that I can understand, I'm not making a decision on

16:24:02 21    whether you get a spoliation instruction or not, and I

16:24:07 22    certainly have not made any findings on intent, so to the

16:24:10 23    extent that's relying on something not quite apples to

16:24:12 24    apples, I will take that into consideration.  But spoliation

16:24:15 25    is where the evidence is relevant to the claims or defenses

in this case, there has been actual suppression or
withholdings and the duty to preserve was reasonably
foreseeable.  So what is the evidence relevant to that?

MS. FRANTZEN:  The evidence that we contend was
lost is relevant to their prior art, all of this information
that went to CONNECT, that was the type of evidence we were
looking for when we gave them search terms, not knowing they
didn't have a server until well after that point.  And then
when we discovered they didn't have the server, they didn't
tell us that they hadn't gone and searched the inventors'
files.  We found out later that they claimed that inventors
were third parties, so we had to go and subpoena them.  And
all this evidence was coming in like the last month of
discovery.

So there was -- you know, of course the
inventors don't have what was on their company server, but
there was a delay that caused us significant prejudice,
especially as it relates to these prior art issues which we
thought were pretty --

THE COURT:  How much time are we spending on
this issue at trial?  Because I have to decide if I need to
decide it before these folks get on the stand.  So how much
time?  Are you going to spend like an hour cross-examining
these people on this?

MS. FRANTZEN:  No, I think it would be a very

16:25:50 1   small amount because it would be their 30(b)(6) witness.  We

16:25:54 2   answered a few questions about not knowing where the server

16:25:57 3   was or what happened to the server.  So it would be a very

16:26:02 4   -- regarding the lost server, it would be a few minutes of

16:26:05 5   testimony at most.

16:26:07 6          THE COURT:  Is there something else that goes

16:26:08 7   into spoliation other than the lost server?  You just said

16:26:13 8   regarding this lost server is a few minutes so I don't know

16:26:16 9   if you're excluding something.

16:26:20 10          MS. FRANTZEN:  I just think the lost server,

16:26:23 11  unless I'm misunderstanding your question of we can display

16:26:33 12  the issue on a day that we can potentially present that

16:26:36 13  witness.

16:26:40 14          THE COURT:  You're talking about deposition

16:26:42 15  testimony?

16:26:42 16          MS. FRANTZEN:  Yes.

16:26:43 17          THE COURT:  I think he's wondering if you're

16:26:45 18  going to cross-examine the witnesses when they're up here so

16:26:48 19  that there will be an opportunity for them to object to

16:26:51 20  deposition testimony and I'll have the specific deposition

16:26:51 21  testimony and can make a determination.

16:26:55 22          MS. FRANTZEN:  The witnesses did not know -- so

16:27:01 23  the witnesses don't know about the lost server.  It was lost

16:27:04 24  after PureWick was acquired, so the witnesses don't -- the

16:27:05 25  one, the 30(b)(6) witness is the only witness that knows

16:27:14 1    about the lost server.

16:27:15 2            THE COURT:  So you're not going to cross-examine

16:27:18 3    Camille Newton on the stand on that?

16:27:20 4            MS. FRANTZEN:  Yes, she doesn't know about the

16:27:22 5    lost server.

16:27:23 6            MR. SHAW:  All I have heard right now, Your

16:27:25 7    Honor, is that they have a lost server.  We have no idea of

16:27:28 8    the content.  There is no evidence on the contents.  From

16:27:31 9    there they want the jury to speculate about -- so there is

16:27:34 10   no findings now about prejudice.  There is no findings about

16:27:38 11   intent which you need one or the other to get into the

16:27:42 12   evidentiary analysis under 37(e)(1) or (e)(2).  And secondly

16:27:49 13   --

16:27:49 14           THE COURT:  I guess my question is aside from

16:27:51 15   spoliation, let's say I'm not prepared to do a spoliation

16:27:55 16   instruction right now, but we're going to have a prayer

16:27:57 17   conference, and I may be moved based on what I hear, but if

16:28:10 18   you all are going to say where is the beef, Ms. Frantzen,

16:28:13 19   what is the evidence that this product was used on this date

16:28:16 20   by these people rather than all this implication, why can't

16:28:19 21   she come in and say well, there are some documents missing

16:28:27 22   here?  Why can't as part of her case she ask some questions

16:28:30 23   or put on some evidence that says maybe?

16:28:35 24           MR. SHAW:  So first of all that's the reason you

16:28:37 25   do this in the discovery period to figure out whether there

16:28:40 1      are other ways to gather the information.

16:28:41 2                THE COURT:  You're talking about sanctions.  I'm

16:28:43 3      not saying there are sanctions, I'm saying can she ask

16:28:46 4      the --

16:28:48 5                MR. SHAW:  The question being are there --

16:28:50 6                THE COURT:  -- the question to the jury saying,

16:28:51 7      or can she put on some testimony saying there are documents

16:28:54 8      out there, there was a server that was missing, it's a few

16:28:57 9      minutes and that's what she's going to do, she's not going

16:29:01 10     to cross-examine the witnesses on it, she's just going to

16:29:04 11     put on the deposition testimony.  Again, I haven't seen it,

16:29:06 12     so I'll make an actual determination.  But I'm trying to

16:29:11 13     distinguish between your argument which is in order to

16:29:14 14     impose sanctions for something, you have to meet certain

16:29:17 15     standards, and her position which is right now before she

16:29:20 16     even gets to the sanctions, she just wants to be able to put

16:29:24 17     on some evidence that says yeah, we didn't -- there is stuff

16:29:27 18     out there that was lost.

16:29:30 19               MR. SHAW:  So the prior case law would probably

16:29:32 20     let her do that before the amendment when you could make

16:29:35 21     those arguments based to the loss due to negligence or loss

16:29:39 22     due to gross negligence, but the rule was expressly changed

16:29:42 23     to avoid that kind of comment.

16:29:44 24               Second, the evidence that you do have including

16:29:46 25     the documents, the exhibits that's in front of Your Honor

16:29:49 1   from patient DD, those e-mails were exchanged using their

16:29:53 2   private e-mail address.  That's how the documents were

16:29:56 3   collected.  We believe that most -- and Mr. Newton's

16:29:59 4   testimony was, and I have it here, a lot of other e-mails

16:30:09 5   were you got them, so much of our e-mails were personal

16:30:13 6   e-mails and Camille's e-mail that we used for many, many

16:30:15 7   years and my personal e-mail I probably used more than

16:30:19 8   anything else and that's borne out by document production,

16:30:21 9   those sources were collected.  Again, if we were doing this

16:30:25 10  in the discovery phase we would be looking at can we get the

16:30:27 11  materials, can they be collected, does that create or does

16:30:31 12  that solve the problem without having to ask the jury to

16:30:34 13  speculate about what might have been on the server or might

16:30:37 14  not have been on a server without getting through the first

16:30:40 15  chance to have a remedial solution.  That's especially true

16:30:45 16  with prior art because if they had come to Your Honor in

16:30:48 17  February, there might have been other ways if there was

16:30:50 18  information on the server to find it, collect it, and deal

16:30:53 19  with it rather than just to ask the jury --

16:30:55 20          THE COURT:  Let me ask this.  Given that

16:30:55 21  Ms. Frantzen is not going to be cross-examining the

16:31:01 22  witnesses on that, isn't this an issue that I can address

16:31:02 23  when she designates the deposition testimony?

16:31:02 24          MR. CHERNY:  The answer is yes, Your Honor.

16:31:05 25  Given her representation relating to the opening and that

16:31:12 1   she's got going to examine or cross-examine the witnesses

16:31:15 2   on, I think we can deal with it when the deposition

16:31:18 3   testimony is designated.

16:31:19 4          THE COURT:  Anything else?

16:31:21 5          MR. CHERNY:  No, Your Honor.

16:31:24 6          MS. FRANTZEN:  I do have a few questions, Your

16:31:27 7   Honor.  One question we had was in terms of the order of

16:31:32 8   evidence.  You may recall, Your Honor allowed us -- they had

16:31:38 9   an expert report on reply which we responded to as kind of

16:31:42 10   like a -- like when they have a new testing and we just want

16:31:47 11   to clarify because it was a disputed issue for the original

16:31:52 12   jury instruction that obviously we have no idea what they're

16:31:55 13   going to put on in terms of evidence, you know, in reply, so

16:31:59 14   that when our expert comes back to address the invalidity

16:32:03 15   issues that he can also address any new testing that they

16:32:07 16   responded on reply.  I just want to make sure that that

16:32:10 17   would be how it would go in.

16:32:12 18          MR. CHERNY:  I think that's fair, Your Honor.

16:32:15 19          THE COURT:  That's great.  It was my problem

16:32:20 20   that I didn't quite understand what you were saying, but he

16:32:22 21   understood and agreed, so okay.

16:32:25 22          MR. CHERNY:  I'm just going to make sure, there

16:32:27 23   was some ambiguity.  My understanding was there was a

16:32:30 24   question of Mr. Jezzi's testing that was on the reply, you

16:32:34 25   allowed them to put in a supplemental report on that.  My

take is since it relates to infringement they're concerned

that they're not going to have a chance to respond to him if

he puts it on in reply since all they'll have left at that

time is their invalidity rebuttal.  What I'm saying is --

THE COURT:  Got it.  You can respond.  Yes.

Excellent.  You said it well, I just -- my brain is a little

tired.  Okay.

MS. FRANTZEN:  The other issue is the order of

proof regarding priority.  And I brought this up a little

bit earlier where they're now relying on four priority

applications.  And I just want to -- one, I don't think it's

proper for them to bring up a fourth one at this point.  But

I just want to have like a discussion and maybe we can have

it with them on this Friday conference, but that what

they're relying on for priority as we have to come back and

respond to it because the burden shifts to them to establish

priority once we show that there is prior art that's in the

intervening period.  So I kind of wanted to address the

order of proof on that priority issue.

THE COURT:  How many applications are you

relying on for priority?

MR. CHERNY:  We are relying on four

applications.  And all of them are addressed in one or other

expert reports.  So, for example, the one I think she's

talking about is addressed in Dr. Collins' report where he

16:34:08 1    essentially says that this application has the same

16:34:10 2    disclosure as this application and that's what we're relying

16:34:15 3    upon.

16:34:15 4              MS. FRANTZEN:  So that's a little bit different.

16:34:18 5    Just so I can clarify, these four different applications,

16:34:22 6    they're all separate individual applications.  This is not a

16:34:26 7    chain of priority, they're four individual ones.

16:34:28 8              With regard to the fourth one, there is no

16:34:32 9    expert testimony that the fourth application has the full

16:34:39 10   scope, claims the full scope as the third application.  So

16:34:45 11   they might say they have a similar disclosure, but the

16:34:48 12   disclosures are different so there was no proof on that for

16:34:51 13   the application that just came in for the first time during

16:34:54 14   the pretrial.

16:34:55 15             MR. CHERNY:  I don't agree with what

16:34:58 16   Ms. Frantzen is saying, but it seems to me as to when people

16:35:01 17   have the burden to put in evidence, that's not something we

16:35:04 18   need to discuss.  As she said, it's our burden to put in the

16:35:08 19   priority evidence and we believe our experts have provided

16:35:10 20   it.  If they want to make an objection saying I don't think

16:35:12 21   that that's disclosed, I guess they should raise it at this

16:35:17 22   point.  I don't know there is an issue here in terms of what

16:35:19 23   the order has to be on the issue.

16:35:22 24             MS. FRANTZEN:  Well, the order issue as my

16:35:25 25   understanding is as follows.  We raised prior art in our

16:35:31 1    response that predates their filing date creating a priority

16:35:35 2    issue.  Then the burden shifts to them to identify that the

16:35:40 3    full scope is within prior applications.  They originally

16:35:45 4    relied on three different ones.  Then we respond and say

16:35:48 5    it's not.  And I just want to be on the same page that

16:35:54 6    that's the order of --

16:35:57 7            MR. CHERNY:  I'm honestly not sure what

16:36:00 8    Ms. Frantzen is asking for.  But we agree, there may be

16:36:04 9    evidence that gets in that's relevant to the issue earlier

16:36:07 10   than we have to put it in.  So for example, it may be that

16:36:09 11   Mr. Collins talked about this disclosure here is the same,

16:36:15 12   that's what he's going to do.  But the patents will be in

16:36:18 13   evidence.

16:36:18 14           But again, it's not that I don't want to be here

16:36:21 15   and argue some more, but just at this point, I'm not sure

16:36:24 16   what Ms. Frantzen is asking for in terms of a ruling meaning

16:36:28 17   that if there is an issue in terms of whether we are putting

16:36:31 18   in what we need to do to meet our burden on a priority issue

16:36:34 19   and we don't do it when it's our burden, I guess she'll move

16:36:39 20   for JMOL.  And if she thinks that one of our experts is

16:36:41 21   testifying about it and it is not in his expert report, I

16:36:44 22   guess she'll say that.  I'm not really sure what the

16:36:46 23   question is here.

16:36:47 24           THE COURT:  I think she is saying in her

16:36:51 25   case-in-chief on validity, she's not going to -- she's not

16:36:56 1  planning to critique anticipated testimony of your experts

16:37:03 2  saying that the applications aren't sufficient.  She plans

16:37:08 3  to do that after you put that testimony on, presumably in

16:37:11 4  your reply.

16:37:11 5          MR. CHERNY:  Of course, that's why I believe

16:37:13 6  that she gets a rebuttal on validity.  I do appreciate -- I

16:37:17 7  wasn't feigning, I was actually being a jerk there, which is

16:37:22 8  that she gets a rebuttal on invalidity and so she can

16:37:28 9  critique our person on the issue as much as the time allows.

16:37:32 10         MS. FRANTZEN:  Thank you.  That clarifies that.

16:37:35 11         So the other issue is, I'm getting random notes.

16:37:39 12 Do the six people that are allowed in the courtroom, does

16:37:42 13 that include experts or are they part of the six for that

16:37:47 14 first day?

16:37:47 15         THE COURT:  Anyone who breaths counts.

16:37:49 16         MS. FRANTZEN:  Breaths, okay.

16:37:50 17         And then with regard to the time on the trial,

16:37:56 18 and I just know that you have given us ten hours.  I was

16:38:02 19 hoping we could get more than ten hours.  You had mentioned

16:38:05 20 eleven the last time, and --

16:38:05 21         THE COURT:  You got eleven.

16:38:05 22         MS. FRANTZEN:  I'm sorry?

16:38:05 23         THE COURT:  You have eleven, because you have

16:38:11 24 ten plus one, that's eleven.

16:38:12 25         MS. FRANTZEN:  Can we get twelve?  Or I was

1  going to actually ask for thirteen.

2          MR. CHERNY:  Your Honor, I would like to move

3  for eight.

4          MS. FRANTZEN:  And we would provide lunch for

5  the jury to have more time, Your Honor, because we -- these

6  claims, I feel like it took me eleven hours to read the

7  claim allowed.  We just have a lot of evidence and we would

8  really appreciate the extra time on our side.  We will be

9  very efficient.

10          THE COURT:  Most of the time the parties don't

11  even use all of the time I give them because they make

12  things much more streamlined.  So I'll consider that, but

13  I'm not going to give it to you right now.

14          MS. FRANTZEN:  Okay.

15          THE COURT:  And you're certainly not getting --

16  if you get anything, it would be thirty minutes to an hour.

17  Don't count on -- you're not getting more than that.  You

18  don't need more than that.  There are seven claims in this

19  case.  It is not terribly complex technology.  And you need

20  to start focusing on the strongest issues, not just talking

21  about, you know, all kinds of extraneous things.

22          MS. FRANTZEN:  Thank you, Your Honor, for

23  considering it.

24          The last issue that I think I wanted to ask

25  about, there was something you said today about publishing

16:39:37 1    exhibits which we understood that they have to be admitted

16:39:41 2    into evidence before they were published, but in our

16:39:44 3    pretrial order, the parties agreed that they could reference

16:39:48 4    exhibits and that they would exchange them in advance of

16:39:51 5    what exhibits may be referenced during openings, for

16:39:56 6    example, some of the patents or the products.

16:39:57 7            THE COURT:  You can do it during opening.

16:40:00 8    During openings you can reference exhibits that there is no

16:40:05 9    objection to.  And if there is an objection in the pretrial

16:40:09 10   order, just tell them that you're going to use the patents

16:40:12 11   or whatever, and yes, you may do that.  I should have

16:40:16 12   clarified that.

16:40:17 13           MR. CHERNY:  And in that regard, Your Honor, if

16:40:18 14   during -- if, for example, either side wants to use in

16:40:25 15   opening a document that seems likely it's going to come in

16:40:28 16   to evidence, for example, it's from somebody's file, is it

16:40:31 17   the Court's preference to essentially deal with that ahead

16:40:33 18   of time or not use it during opening?

16:40:36 19           THE COURT:  No, so I would say that you should

16:40:42 20   -- you're going to exchange slides, right?

16:40:44 21           MR. CHERNY:  Correct.

16:40:45 22           THE COURT:  So I would exchange slides and I

16:40:47 23   would say I may also refer to exhibit PTX 1, 4, 9, 8, 7, and

16:40:54 24   DTX 42, right, and then they can say that's fine, but we're

16:41:00 25   going to object and we don't think that PTX 7 should come

16:41:04 1    into evidence so then you can raise that for me on the first

16:41:07 2    day of trial.

16:41:08 3              MR. CHERNY:  Understood, Your Honor.  So the

16:41:09 4    answer is it will probably be the -- the exhibits will

16:41:13 5    probably be within the slide I imagine, but if there is

16:41:16 6    something else that's outside obviously we'll exchange.  And

16:41:19 7    then if, for example, there is something that I want to use

16:41:21 8    and they say oh, we object, that's hearsay, I say Your Honor

16:41:25 9    look, this is an admission, it will get resolved?

16:41:28 10             THE COURT:  Yes.  Before the opening.

16:41:30 11             MR. CHERNY:  Understood.

16:41:31 12             MS. FRANTZEN:  That's what we understood we put

16:41:34 13   in the pretrial order, that we would exchange exhibits.  I

16:41:38 14   believe that was the last issue.  Thank you.

16:41:39 15             MR. CHERNY:  I'm just putting this back.

16:41:41 16             THE COURT:  Okay.  Settlement, where are you?

16:41:47 17             MR. CHERNY:  Your Honor, I'm up here and I'm not

16:41:50 18   sure how to put that back.  I think we filed a report with

16:41:53 19   the Court.

16:41:54 20             THE COURT:  It didn't say anything about time

16:41:56 21   or, you know, it was just kind of --

16:41:59 22             MR. CHERNY:  I thought it did, Your Honor.

16:42:02 23             MR. SURRETTE:  It actually had some time, not a

16:42:05 24   lot of time.  We're trying to schedule a conference for

16:42:07 25   tomorrow.  We're just waiting to make sure the schedule --

16:42:15  1                    MR. BIDDINGER:  To be honest, Your Honor, we've

16:42:17  2    had --

16:42:18  3                    THE COURT:  In contrast to the --

16:42:19  4                    MR. CHERNY:  To the last time.  We had I think

16:42:23  5    two or three meetings between the parties.  We are always

16:42:27  6    happy to talk and we will continue to talk, but I'm not

16:42:34  7    hopeful on this one.

16:42:36  8                    THE COURT:  Okay.  So if nobody has any other

16:42:48  9    issues, get us that submission by Wednesday, the close of

16:42:52 10    business, and we will let you know if we want something from

16:42:54 11    you all.  And we'll figure out what we want to do from

16:43:01 12    there.  All right.

         13                         (Court adjourned at 4:43 p.m.)

         14

         15             I hereby certify the foregoing is a true and
               accurate transcript from my stenographic notes in the proceeding.
         16

         17                              /s/ Dale C. Hawkins
                                       Official Court Reporter
         18                               U.S. District Court

         19

         20

         21

         22

         23

         24

         25