IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PUREWICK CORPORATION, | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | **Redacted - Public Version** |
| | ) | |
| v. | ) | C.A. No. 19-1508-MN |
| | ) | |
| SAGE PRODUCTS, LLC, | ) | ▮▮▮▮▮▮▮▮ |
| | ) | ▮▮▮▮▮▮▮▮▮▮▮ |
| Defendant/Counterclaim Plaintiff. | ) | |

## PLAINTIFF'S OPENING BRIEF IN SUPPORT OF ITS POST-TRIAL MOTIONS

OF COUNSEL:
Steven C. Cherny
Raymond Nimrod
Brian P Biddinger
Matthew A. Traupman
Nicola R. Felice
Jason C. Williams
Bianca Fox
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Ave., 22nd Floor
New York, NY 10010

Athena Dalton
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400

Dated: May 5, 2022

John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
*Attorneys for Plaintiff*

## TABLE OF CONTENTS

**Page**

I.    NATURE AND STAGE OF THE PROCEEDINGS ............................................................1

II.   SUMMARY OF THE ARGUMENT ...............................................................................1

III.  PUREWICK'S MOTION FOR ENHANCED DAMAGES.................................................3

IV.   PUREWICK'S MOTION FOR A PERMANENT INJUNCTION AGAINST THE
      PRIMAFIT..............................................................................................................15

V.    PUREWICK'S MOTION FOR ONGOING ROYALTIES ...............................................23

VI.   PUREWICK'S MOTION FOR SUPPLEMENTAL DAMAGES ....................................25

VII.  PUREWICK'S MOTION FOR PREJUDGMENT INTEREST.......................................26

VIII. PUREWICK'S MOTION FOR POST JUDGMENT INTEREST ...................................26

IX.   PUREWICK'S MOTION FOR JUDGMENT ON SAGE'S COUNTERCLAIMS ..........27

X.    CONCLUSION........................................................................................................30

## **TABLE OF AUTHORITIES**

**Page**

*Advanced Med. Optics, Inc. v. Alcon Laboratories, Inc.*,
   2005 WL 3454283 (D. Del. Dec. 16, 2005) ............................................................................ 5

*Agrofresh Inc. v. Essentiv, LLC*,
   C.A. No. 16-662-MN, 2020 WL 7024867 (D. Del. Nov. 30, 2020) ..................................... 26

*Amado v. Microsoft Corp.*,
   517 F.3d 1353 (Fed. Cir. 2008) .......................................................................................... 24

*Amgen Inc. v. Hospira, Inc.*,
   336 F. Supp. 3d 333 (D. Del. 2018) .................................................................................... 26

*Apple Inc. v. Samsung Elecs. Co.* Ltd.,
   809 F.3d 633 (Fed. Cir. 2015) ...................................................................................... 19, 22

*Arctic Cat Inc. v. Bombardier Recreational Prod., Inc.*,
   198 F. Supp. 3d 1343 (S.D. Fla. 2016),
   *aff'd*, 876 F.3d 1350 (Fed. Cir. 2017) ............................................................................ 5, 13

*Asetek Danmark v. CMI USA, Inc.*,
   100 F.Supp.3d 871 (N.D. Cal. 2015) ............................................................................ 28, 30

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs.*,
   No. CV-03-597-PHX-MHM, 2010 U.S. Dist. LEXIS 144259 (D. Ariz. Sep. 8, 2010) ......... 24

*Bio-Rad Labs, Inc. v. 10X Genomics Inc.*,
   967 F.3d 1353 (Fed. Cir. 2020) .......................................................................................... 19

*Bio-Rad Labs., Inc. v. Nicolet Instrument Corp.*,
   807 F.2d 964 (Fed. Cir. 1986) ............................................................................................ 26

*Broadcom v. Emulex*,
   732 F.3d 1325 (Fed. Cir. 2013) .......................................................................................... 16

*Broadcom Corp. v. Qualcomm, Inc.*,
   543 F.3d 683 (Fed. Cir. 2008) ............................................................................................ 21

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
   664 F.3d 922 (Fed. Cir. 2012) ............................................................................................ 18

*Creative Internet Advert. Corp. v. Yahoo! Inc.*,
   674 F. Supp. 2d 847 (E.D. Tex. 2009) ................................................................................ 24

*Del Mar Avionics, Inc. v. Quinton Instrument Co.*,
   836 F.2d 1320 (Fed. Cir. 1987) .......................................................................................... 14

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
   717 F.3d 1336 (Fed. Cir. 2013)..................................................................... 18, 20

*E.F. Johnson Co. v. Uniden Corp. of Am.*,
   623 F. Supp. 1485 (D. Minn. 1985) ..................................................................... 21

*EagleView Techs., Inc. v. Xactware Sols., Inc.*,
   522 F. Supp. 3d 40 (D.N.J. 2021) ....................................................................... 14

*Eaves v. Cty. of Cape May*,
   239 F.3d 527 (3d Cir. 2001)................................................................................ 27

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006)............................................................................................ 15

*E.I. DuPont de Nemours and Co. v. Unifrax I LLC*,
   C.A. 14-1250-RGA, 2017 WL 4004419 (D. Del. Sept. 12, 2017) .............. 17, 18, 20

*Edwards Lifesciences AG v. CoreValve, Inc.*,
   699 F.3d 1305 (Fed. Cir. 2012)........................................................................... 15

*Energy Transp. Group, Inc. v. William Demant Holding*,
   697 F.3d 1342 (Fed. Cir. 2012)........................................................................... 26

*Evonik Degussa Gmbh v. Materia, Inc.*,
   C.A. 09-cv-00636-NLH/JS, 2017 WL 3434156 (D. Del. Aug. 10, 2017)............. 16

*F'Real Foods, LLC v. Hamilton Beach Brands, Inc.*,
   C.A. No. 16-41-CFC, 2020 WL 4015481 (D. Del. July 16, 2020)................... 17, 26

*Fresenius USA, Inc. v. Baxter Int'l, Inc.*,
   No. C 03-1431 PJH, 2012 WL 761712 (N.D. Cal. Mar. 8, 2012) ........................ 24

*Fresenius USA, Inc. v. Baxter Intern., Inc.*,
   582 F.3d 1288 (Fed. Cir. 2009)........................................................................... 23

*Gavrieli Brands LLC v. Soto Massini (USA) Corp.*,
   C.A. No. 18-462-MN, 2020 WL 1443215 (D. Del. Mar. 24, 2020)...................... 16

*Genband US LLC v. Metaswitch Networks Corp.*,
   861 F.3d 1378 (Fed. Cir. 2017)........................................................................... 18

*Goodwall Const. Co. v. Beers Const. Co.*,
   991 F.2d 751, 758 (Fed. Cir. 1993)....................................................................... 5

*Halo Elecs. v. Pulse Elecs.*,
   136 S.Ct. 1923 (2016).......................................................................................... 3

*Illumina, Inc. v. Qiagen, NV.*,
  207 F. Supp. 3d 1081 (N.D. Cal. 2016) ................................................................ 20

*Invista N.A. S.À.R.L. v. M & G USA Corp.*,
  35 F.Supp.3d 583 (D. Del. 2014) ......................................................................... 17

*Lucent Techs., Inc. v. Newbridge Networks Corp.*,
  168 F. Supp. 2d 269 (D. Del. 2001) ..................................................................... 14

*Muniauction, Inc. v. Thomson Corp.*,
  502 F. Supp. 2d 477 (W.D. Pa. 2007) .................................................................. 17

*nCUBE Corp. v. SeaChange Int'l, Inc.*,
  313 F. Supp. 2d 361 (D. Del. 2004)
  *aff'd*, 436 F.3d 1317 (Fed. Cir. 2006) ............................................................. 4, 14

*Odetics, Inc. v. Storage Tech. Corp.*,
  14 F. Supp. 2d 785 (E.D. Va. 1998),
  *aff'd*, 185 F.3d 1259 (Fed. Cir. 1999) .................................................................. 21

*Paice LLC v. Toyota Motor Corp.*,
  609 F. Supp. 2d 620 (E.D. Tex. 2009) .................................................................. 24

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
  702 F.3d 1351 (Fed. Cir. 2012) ............................................................................ 16

*PureWick Corp. v. Sage Products, LLC*,
  C.A. No. 1-22-cv-00102-MN ............................................................................... 22

*Read Corp. v. Portec. Inc.*,
  970 F.2d 816 (Fed. Cir. 1992) ................................................................................ 4

*Rite-Hite Corp. v. Kelley Co.*,
  56 F.3d 1538 (Fed. Cir. 1995) .............................................................................. 21

*Sanofi–Synthelabo v. Apotex, Inc.*,
  470 F.3d 1368 (Fed. Cir. 2006) ............................................................................ 21

*Silicon Graphics, Inc. v. ATI Techs., Inc.*,
  607 F.3d 784 (Fed. Cir. 2010) ........................................................................ 28, 29

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
  254 F. Supp. 3d 680 (D. Del. 2017),
  *aff'd in relevant part*, 14 F.4th 1323 (Fed. Cir. 2021) ........................... 4, 11, 12, 13

*Strub v. Axon Corp.*,
  168 F.3d 1321, 1998 WL 537721 at *10 (Fed. Cir. Aug. 17, 1998) ...................... 29

*SynQor, Inc. v. Artesyn Techs., Inc.*,
    708 F.3d 1365 (Fed. Cir. 2013) ............................................................................... 25

*Synthelabo v. Apotex, Inc.*,
    470 F.3d 1368 (Fed. Cir. 2006) ............................................................................... 21

*Telcordia Tech. Inc. v. Cisco Sys., Inc.*,
    No. 04-876-GMS, 2014 WL 1457797 (D. Del. Apr. 14, 2014) ............................ 24

*Uniroyal, Inc. v. Rudkin-Wiley Corp.*,
    939 F.2d 1540 (Fed. Cir. 1991) ............................................................................... 26

*U.S. v. Marine Shale Processors*,
    81 F.3d 1329 (5th Cir. 1996) ................................................................................... 21

*Vectura Ltd. v. GlaxoSmithKline LLC*,
    C.A. No. 16-638-RGA, 2019 WL 4346502 (D. Del. 2019) .................................. 23

*VirnetX Inc. v. Apple Inc.*,
    Case No. 6:13-CV-211, 2014 WL 12672822 (E.D. Tex. Mar. 6, 2014) ................ 23

*Whitserve, LLC v. Computer Packages, Inc.*,
    694 F.3d 10 (Fed. Cir. 2012) ................................................................................... 25

*XY, LLC v. Trans Ova Genetics*,
    890 F.3d 1282 (Fed. Cir. 2018) ............................................................................... 24

## Statutory Authorities

28 U.S.C. §1961 ...................................................................................................................... 27

## I.     NATURE AND STAGE OF THE PROCEEDINGS

PureWick Corporation ("PureWick") filed this action against Sage Products LLC ("Sage") for infringement of U.S. Patent Nos. 10,226,376 ("the '376 patent"), 10,390,989 ("the '989 patent"), 10,376,407 ("the '407 patent"), and 8,287,508 ("the '508 patent").[1]  Sage answered and counterclaimed seeking judgments of unenforceability, invalidity and non-infringement.  D.I. 53.

Following a five day trial, the jury found that Sage's PrimaFit product willfully infringed the '376 and '989 patents, and that Sage's PrimoFit product infringed the '407 patent.  D.I. 316. The jury also found that Sage failed to prove that any of the asserted claims were invalid, and awarded PureWick $26,215,545 in lost profits for sales of the infringing PrimaFit product, and $1,799,193 in reasonable royalty damages for sales of the infringing PrimoFit product.  *Id.*  The Court entered judgment in favor of PureWick on April 7, 2022.  D.I. 320.

## II.    SUMMARY OF THE ARGUMENT

The evidence showed that PureWick revolutionized urine management for bedridden and incontinent women, significantly improving many people's lives.  In contrast, Sage, despite being in the urine management business for years, never developed an external catheter until it met with PureWick.  Very shortly thereafter, Sage developed its infringing products.  Although Sage repeatedly contended that its PrimaFit engineers "were walled off from any of the people that had discussions with PureWick" (Trial Tr. 139:6-8), the evidence showed that "people that had discussions with PureWick," like Greg Davis, ***were not*** walled off from people like Brett Blabas, the lead designer of the PrimaFit.  Instead, Mr. Davis actively participated in the process, often directing that prototypes be modified to be more like PureWick.

---

[1]   On February 23, 2022, the Court stayed the parties' claims and defenses relating to the '508 patent pending resolution of IPR2020-01426.

The jury heard and credited extensive evidence showing that Sage copied PureWick and found that Sage willfully infringed PureWick's '376 and '989 patents.  The jury also heard evidence that Sage wanted to get on the market ahead of PureWick before PureWick could release a male product, and found that PrimoFit infringes PureWick's '407 patent.  Accordingly, PureWick respectfully requests that the Court award PureWick the following post-trial relief:

1.      In view of Sage's willful infringement and litigation conduct, PureWick requests that the Court enhance the jury's award of damages for sales of the PrimaFit product.[2]

2.      Sage's continued sales of the PrimaFit product will cause PureWick irreparable harm and, therefore PureWick requests that the Court permanently enjoin Sage from selling the PrimaFit product and any products that are not more than colorably different from that product.

3.      At this time, PureWick requests an award of ongoing royalties for future sales of the PrimoFit and any products that are not more than colorably different, with the understanding that once PureWick launches its male external catheter product, PureWick intends to request that the Court modify the equitable order to permanently enjoin Sage's sales of the PrimoFit product.

4.      Because the jury's verdict only included sales provided by Sage through November 30, 2021 for PrimaFit and December 31, 2021 for PrimoFit, PureWick requests supplemental damages for sales of the infringing products and products not more than colorably different that have been, or will be, made up to the entry of final judgment.

5.      PureWick requests an award of prejudgment interest at the prime rate compounded quarterly on the damages owed by Sage, including any supplemental or enhanced damages awarded by the Court, and post judgment interest on the total award.

---

[2]   PureWick intends to move pursuant to Section 285 for an order that this is an exceptional case and an award of fees and costs on the schedule ordered by the Court.  (D.I. 320).

6.      PureWick requests judgment in favor of PureWick on Sage's counterclaims that it affirmatively raised and maintained in the pretrial order but for which Sage failed to present evidence at trial, including Sage's counterclaims for unenforceability, lack of written description of '407 claims 1 and 2, and anticipation of '989 claim 6 and '407 claims 1 and 2.

## III.    PUREWICK'S MOTION FOR ENHANCED DAMAGES

District Courts have discretion to decide whether to enhance damages and in what amount. *Halo Elecs. v. Pulse Elecs*., 136 S.Ct. 1923, 1931-32 (2016).  This determination is done on a case by case basis, and the facts in this case strongly support enhancement.

In determining the propriety and amount of enhancement, courts consider the *Read* factors: "(1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; . . . (3) the infringer's behavior as a party to the litigation"; (4) "defendant's size and financial condition"; (5) "closeness of the case"; (6) "duration of defendant's misconduct"; (7) "remedial action by the defendant"; (8) "defendant's motivation for harm"; and (9) "whether defendant attempted to conceal its misconduct." *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 254 F. Supp. 3d 680, 721 (D. Del. 2017) ("SRI I"), *aff'd in relevant part*, 14 F.4th 1323, 1330 (Fed. Cir. 2021) (citing *Read Corp. v. Portec. Inc.*, 970 F.2d 816, 826-27 (Fed. Cir. 1992)).

In this case, as in *SRI I*, Sage created a substantial amount of "needlessly repetitive or irrelevant or frivolous" work for PureWick and the Court.  *Id.* at 723.  Sage "[r]eargu[ed] claim construction and the significance of certain prior art references" already considered by the Patent Office.  *Id.* at 723 n.55.  It also "assert[ed] . . . a multitude of invalidity arguments and prior art references pre-trial that were dropped late in the case."  *Id.* at 723 n.56.  And, as in *SRI*, the jury

here also determined that Sage's infringement was willful.  *Id.*  In sum, Sage "crossed the line in several regards," and thus, as in *SRI I*, the Court should award enhanced damages.  *Id.* at 722.

A.     *Read* Factor 1: Sage Deliberately Copied PureWick's Invention

First, the jury's willfulness finding, after being instructed to consider "whether or not Sage intentionally copied a PureWick product that is covered by the asserted patents" (*see* D.I. 314, p. 21), supports the conclusion that Sage intentionally copied PureWick's invention.  *See nCUBE Corp. v. SeaChange Int'l, Inc.*, 313 F. Supp. 2d 361, 388 (D. Del. 2004) (awarding enhanced damages where jury found willfulness and had been instructed to consider "whether or not SeaChange copied nCUBE's" patented product), *aff'd*, 436 F.3d 1317 (Fed. Cir. 2006).

Second, Sage's accelerated development of its product after signing an NDA with PureWick (PTX-127; Trial Tr. at 212:25-213:9), engaging in discussions with PureWick (*id.* at 213:10-215:11), and receiving PureWick's product samples and confidential patent applications (PTX-152, PTX-154, PTX-158), and its false claim that it had walled off "the Sage engineers that worked on the PrimaFit . . . from any of the people that had discussions with PureWick" (Trial Tr. at 139:6-8), also support a finding that Sage deliberately copied PureWick's patented invention. *See Goodwall Const. Co. v. Beers Const. Co.*, 991 F.2d 751, 754, 758 (Fed. Cir. 1993) (inference of copying appropriate where infringer developed competing product after receiving a demonstration of patented process from patentee).  Here, the evidence (including Sage's internal records) not only showed access to the patented invention, but also repeated reference to the PureWick product and instructions to incorporate its features.  These facts strongly support a finding of copying.  *See Advanced Med. Optics, Inc. v. Alcon Laboratories, Inc.*, 2005 WL 3454283, at *9 (D. Del. Dec. 16, 2005); *Arctic Cat Inc. v. Bombardier Recreational Prod., Inc.*, 198 F. Supp. 3d 1343, 1350 (S.D. Fla. 2016) (treble damages where infringer "test[ed] [patentee's] actual prototype" and "developed a very similar system"), *aff'd*, 876 F.3d 1350 (Fed. Cir. 2017).

4

In the summer of 2016 Sage met with PureWick regarding a possible acquisition.  PTX-151; PTX-152.  Prior to those discussions, Sage had never come close to designing an external female catheter despite its avowed "culture of innovation" and its presence in the urine management market.  *See, e.g.*, DTX-29.  As part of those meetings with PureWick, Sage gained access to "everything [PureWick] had at the time" (Trial Tr. at 212:25-213:9), including samples of multiple versions of the PureWick product and PureWick's confidential pending patent applications.  PTX-152.2; PTX-157; PTX-158.  After PureWick took Sage employees to hospitals to meet with its customers, Sage immediately recognized PureWick's value noting that "[o]n the "Excite-O-Meter scale of 1-10," PureWick "get[s] an 11."  PTX-129.  Sage's witnesses cynically testified at trial that reaction to Purewick was "lukewarm" (Trial Tr. at 333:8-9), **but the contemporaneous evidence told a far different story**, as Sage employees reported that "[f]eedback was *all positive*" and advised management to "***Move Quickly***!" because "[t]he excitement [wa]s only growing from the Nursing staff and its [sic] contagious."  PTX-57.  But Sage did not take that recommendation.  Instead, Sage terminated discussions and instead commenced developing its infringing product.  PTX-141.

Sage's "design" process started and ended with the PureWick.[3]  The first step for Sage's lead engineer on the project, Brett Blabas, was analysis and testing of two versions of the PureWick under the supervision of project manager, Greg Davis.[4]  PTX-20; Trial Tr. at 611:8-12.  Mr. Davis, Director of Engineering in the New Product Development Group, was one of the key members of

---

[3]  Aside from the addition of non-patented features, such as a flex-fit spine and adhesive pad, the PrimaFit is a copy of the PureWick.  *See, e.g.*, Trial Tr. 401:7-16, 403:22-406:2, 474:19-475:20. Sage spent a great deal of time during trial focusing on the addition of these ancillary features instead of squarely addressing the design records evidencing copying.

[4]  Despite the documentary record showing Mr. Davis' involvement in the design of the PrimaFit, PTX-23, Sage did nothing to secure his testimony to rebut the contemporaneous record.

the Sage team in discussions with PureWick.  Mr. Davis was given broad access to information and took part in hospital visits arranged by PureWick.  *See, e.g.*, PTX-129; Trial Tr. 211:12-24. He also received copies of PureWick's then-pending patent applications, clearly marked "confidential."  PTX-158.1-2.

Sage attempted to rebut the evidence that it copied PureWick by asserting that a "wall" existed between the PrimaFit development team and Sage employees involved in discussions with PureWick.  *See* Trial Tr. 609:10-18, 749:1-5, 139:5-15.  That was false.  Not only was Mr. Davis the PrimaFit project manager (Trial Tr. 611:5-12; PTX-597), he also dictated product design.  Ms. Blabas initially tried using various cup-shaped designs, numbered prototypes 1-10, but none of them worked and they were rejected by Mr. Davis.  Trial Tr. at 613:9-620:20; PTX-23; Trial Tr. 614:23-621:3.  Mr. Davis, thereafter, brought the development squarely back to mimicking PureWick, advising Ms. Blabas that he "really want[ed] to marry the PureWick w/ Ryan's SLA design."  PTX-23.3.  As a result, Ms. Blabas abandoned her designs and moved to cylindrical designs mimicking PureWick.  *Id.*; DTX-187.26.

Sage even began to refer to its internal product under development as "the Purewick."  For example, with prototype #12, Ms. Blabas' notes state that "the other end would funnel liquid ***into the Purewick***" and "thus there are 2 tubes ***inside the Purewick*** suctioning out liquid."  PTX-23.4. The "Purewick" in those statements clearly refers to Sage's own prototype product because, for example, PureWick's device does not include two tubes inside.  Similarly, for prototype #14, Ms. Blabas's notes state that Mr. Davis "just wants something that inserts into the labia minora to passively funnel the urine ***into the purewick.***"  PTX-23.5.

Ms. Blabas did attempt to modify the basic PureWick design, but Mr. Davis repeatedly rejected those modifications.  For example, for prototype #14, Ms. Blabas tried to introduce

multiple points of suction.  PTX-023.5.  When she showed it to Mr. Davis his "feedback was that he envisioned something that didn't have 2 points of suction" but instead had only one point of suction "[at] the bottom *like PureWick's*."  *Id.*

Shortly thereafter, and within just three months of starting development, Sage had its "first viable concept," which was nearly identical to a version of the PureWick product that Ms. Blabas possessed and tested.  *Compare* DTX-187.26, *with* JTX-009.2; *see* Trial Tr. 612:2-23, 624:14-22, 625:16-19.  This was remarkable given the multi-year PureWick development process and that Sage had never come close to a "viable" female catheter prior to meeting with PureWick.  But the record is clear, Sage spent a short time attempting to design a different catheter (prototypes 1-10) and then quickly, at the direction of Mr. Davis, focused its design process on copying PureWick instead of innovating.  This record, including the false assertion that people like Mr. Davis were walled off from the design process, compels a finding of Sage's deliberate copying of PureWick's patented invention supporting and consistent with the jury's finding of willful infringement.

### B.    *Read* Factor 2: Sage, When It Knew of Plaintiffs' Patent Protection, Failed to Form a Good-Faith Belief of Invalidity or Non-Infringement

Years before this lawsuit began PureWick's patent counsel sent copies of patent applications marked "confidential," pursuant to an NDA, to individuals at Sage, including its in-house Counsel Nick Alexander.  Trial Tr. 883:14-884:1; PTX-158.  After receiving those applications, Mr. Alexander took part in a phone call with PureWick's patent counsel to discuss PureWick's "patent application strategy" and its "pending patent applications."  Trial Tr. 883:14-894:1.  One of the patent applications that Mr. Alexander and Sage received was No. 15/260,103, which matured into the asserted '989 patent.  PTX-158.3.  Likewise, the '376 patent issued from a continuation-in-part of the same '103 application.  JTX-2.

Sage learned of the '376 and '989 patents on the day that each patent issued.  Trial Tr. at

886:20-24.  That did not happen as a matter of chance; Sage was keenly aware of and focused on PureWick's efforts to protect its inventions.  Despite Sage's immediate knowledge of PureWick's patents, Sage offered no evidence that the company conducted a reasonable investigation, formed a good faith belief of non-infringement or invalidity, or obtained an opinion of counsel.  Moreover, Mr. Alexander, "the primary attorney for the Sage business," (Trial Tr. 878:16-17) admitted that he was not aware of whether Sage had any policies about obtaining freedom to operate or advice of counsel opinions.  Trial Tr. 887:12-20.  Sage's copying, its systemic unwillingness to assess other's patent rights and its failure to offer any evidence that it had formed a good-faith (or any) belief that it would not infringe PureWick's patents weighs heavily in favor of enhanced damages.

C.    *Read* Factor 3: Sage's Behavior as a Party to the Litigation

Sage's litigation conduct, which was nothing short of vexatious, also supports enhancement.  Sage pursued unsupportable positions and disregarded Court orders, thereby exacerbating the time and resources spent litigating this case.  Sage repeatedly hid the ball with respect to its claims and defenses prior to and during trial.  Indeed, Sage continued its tactics post-trial, by withholding until the night before PureWick filed this brief, that the PrimaFit at issue at trial (JTX-14) is no longer being manufactured for sale and apparently has not been sold by Sage *since November 2021*.  Exhibit A.  As discussed below, Sage's misconduct caused PureWick and the Court to waste time addressing claims and defenses it never advanced.

*First*, Sage hid the ball up to, and during, trial by alleging invalidating public use and prior sale of "PureWick's Prior Art Devices," *while refusing to specify precise devices upon which it was relying*.  Even when Sage included no slides on these defenses/counterclaims in its opening and was asked if it was maintaining that defense, Sage hid the ball.  Trial Tr. at 17:14-18.  As PureWick's counsel noted in making its Rule 50(a) motion (Trial Tr. 928:11-930:11), Sage forced PureWick to waste time adducing evidence from multiple witnesses and then put on no case in

support of these invalidity arguments and did not oppose PureWick's motion. This was particularly frustrating given the focused time constraints under which the trial proceeded.

Throughout, Sage contended that a group of hundreds of different prototypes it blandly referred to as—"PureWick Prior Art Devices"—allegedly were offered for sale or publicly used before the critical date. *See, e.g.*, D.I. 194, Ex. 10, pp. 111-15, 209; Exhibit B. As the evidence showed, this grouping covered numerous prototypes of different designs created over a span of years. Despite repeated requests, Sage never explained why it believed those devices were prior art or how any specific "PureWick Prior Art Device" met each element of any claim. Instead, Sage repeatedly asserted, meaninglessly, that all the "PureWick Prior Art Devices" had the same "salient features."

Instead of providing specific invalidity contentions, Sage *twice* moved to compel PureWick to provide *validity* contentions for *all* of PureWick's prototypes. The Court denied Sage's first motion, stating that PureWick "shouldn't have to give you validity contentions before you have given them invalidity contentions." D.I. 99 at 7:21-23. Sage disregarded that ruling and filed a second motion to compel before Judge Fallon on the same interrogatory. D.I. 146 at 3-4. The Court denied that duplicative motion stating: "I've read nothing really different in the papers that wasn't before Judge Noreika." D.I. 194, Ex. 11 at 60:19-21.

Sage's expert, Donald Sheldon, however, did not opine that all the "Purewick Prior Art Devices" were the same, but instead asserted that "PureWick's prior art brown tape products" were prior art. D.I. 194, Ex. 1 at P. 249. PureWick moved to exclude those untimely assertions and, although the Court denied PureWick's motion, the Court instructed Sage's counsel, "I don't want to hear ever again the PureWick prior art. It needs to be a product." D.I. 287 at 59:24-25. Sage's counsel then represented it would rely on "[t]he brown tape product that was demonstrated and

sold, for example, at Connect." *Id.* at 60:5-6.

Sage nonetheless continued to hide the ball in its "Supplemental Statement Regarding References and Combinations," which listed "PureWick Prior Art Devices *(as clarified)*" in the plural. Exhibit C. When asked for clarification, Sage again broadly referred to "brown tape products" as a class, with one non-limiting example. Exhibit D at 2.

At the pretrial conference, Sage's counsel said it would be relying on "the brown tape product*s* shown to CONNECT and also *used with numerous individuals including individual patients*." D.I. 296 at 57:9-11 (emphasis added). The Court responded: "I thought we had agreed *the brown tape was one thing* and today you just said brown tape product*s* which gave me a little bit of pause." *Id.* at 56:25-57:2 (emphasis added). The Court stated that it would not allow "generic talk about the brown tape product" *id*. at 61:4-5, because Sage seemed to be "making an assumption that [the brown tape products] all had the same features." *Id.* at 89:13-14. In response, Sage represented that Ray Newton's testimony would demonstrate that all of the brown tape products met the claim elements. *See, e.g.*, *id.* at 89:18-20. Sage also said it would rely on at least the brown tape product shown in the Connect award video. *Id.* at 95:16-18; D.I. 303 at 4. After all of that, *Sage never asked Mr. Newton a single question regarding the features of the PureWick prototypes used prior to the critical date* and certainly never even tried to prove that all "brown tape products" had the same features. *See* Trial Tr. 309:4-324:11. Nor did Sage attempt to establish that the version in the Connect video was prior art. *See* Trial Tr. 188:25-191:7, 232:9-236:21. And then, the night before closing arguments, Sage did not to oppose PureWick's motion that Sage had failed to establish invalidity on the basis of an alleged prior sale or public use.[5]

---

[5]   Sage instead submitted a brief acquiescing based on alleged discrepancies between Mr. Newton's deposition testimony and his trial testimony despite never asking Mr. Newton any

The Court and PureWick expended substantial time on Sage's prior use and sale defense. Sage's actions in litigating those defenses clearly favor enhanced damages.  *See SRI Int'l, Inc. v. Cisco Sys., Inc.*, 254 F. Supp. 3d 680, 723 n.56 (D. Del. 2017) ("SRI I"), *aff'd in relevant part*, 14 F.4th 1323, 1330 (Fed. Cir. 2021) (awarding enhanced damages where "Cisco's litigation strategies in the case at bar created a substantial amount of work for both SRI and the court, much of which work was needlessly repetitive or irrelevant or frivolous" and Cisco asserted "a multitude of invalidity arguments and prior art references pre-trial that were dropped late in the case").

**Second**, Sage wasted the parties' resources and burdened the Court with respect to its PrimaFit 2.0 product, which is at issue in the second case pending before the Court.  Sage had presented the infringement question for PrimaFit 2.0 for resolution in this case by asserting that PrimaFit 2.0 was a non-infringing alternative ("NIA").  Accordingly, the parties conducted fact and expert discovery on the issue, with both parties' technical experts opining on the issue. Nevertheless, just prior to trial, Sage withdrew its NIA assertion in an attempt to eliminate the risk of an adverse finding by the jury.  Sage withdrew the NIA assertion for strategic reasons only, reserving the right to contend that PrimaFit 2.0 is non-infringing in the second case pending before this Court.  *See* D.I. 308 at p. 5 n.1.  Thus, Sage wasted the parties' resources by making the NIA allegation in this case, proceeding through expert discovery, and then withdrawing the allegation. And the Court and the parties are burdened with further proceedings—either a contempt hearing or a second trial—on an issue Sage raised and that the jury could have resolved.

**Third**, Sage repeatedly re-litigated rejected claim construction positions.  In particular, in construing "casing," the Court rejected Sage's proposal to include a "negative limitation that a

---

questions at trial concerning the alleged inconsistency.  ***Mr. Newton's deposition is not evidence***. Sage's representation regarding what Mr. Newton's trial testimony would show and its failure to elicit any evidence to even try to support that representation also support enhancement.

backing/impermeable layer in combination with securing portion for other components is not a casing." D.I. 287 at 4:20-5:1. Notwithstanding the Court's order, Sage's expert included the same argument in his expert report, which the Court subsequently excluded on PureWick's motion. *Id.* at 4:17-18, 5:2-3. Even after the Court granted PureWick's motion, Sage tried to present the same argument through its cross-examination of PureWick's expert (Trial Tr. 532:17-535:5) and also through its' own experts testimony that "the selective components don't add up to a casing." Trial Tr. 771:13-14. This conduct further favors enhanced damages. *See SRI*, 254 F. Supp. 3d at 722 (enhanced damages where "[a]lthough the court had explained that '[t]he claim language and the parties' constructions do not require that the 'network monitor' and 'hierarchical monitor' be separate structures', Cisco maintained throughout trial that separate monitors were required").[6]

*Fourth*, Sage twice improperly served reports from legal experts. In both instances, the Court granted PureWick's motions to strike these reports.[7] D.I. 178; D.I. 287 at 32:12-15.

*Fifth*, Sage asserted baseless counterclaims of unenforceability based on equitable estoppel, waiver, acquiescence and unclean hands with respect to PureWick's '376, '989 and '407 patents despite the fact that PureWick asserted the '376 patent five months after it issued, the '989 patent just days after it issued, and the '407 patent within a month of learning of Sage's launch of the PrimoFit product. After the Court asked Sage to make a submission as to what their evidence was for these counterclaims, Sage instead dropped them one business day before trial. D.I. 302.

*Sixth*, Sage's primary reliance on the Van Den Heuvel prior art, which was considered by the Patent Office, also supports an award of enhanced damages. *See Arctic Cat Inc. v. Bombardier Recreational Prod., Inc.*, 198 F. Supp. 3d 1343, 1348 (S.D. Fla. 2016), *aff'd*, 876 F.3d 1350 (Fed.

---

[6] Sage also filed an excessive number of *Daubert* and summary judgment motions. D.I. 197, 198.

[7] While the Court invited Sage to make a proffer as to Professor Lietzan Sage never did so despite keeping Professor Lietzan listed as a trial witness in the pretrial order. D.I. 287 at 32:16-20.

Cir. 2017); *see also SRI*, 254 F. Supp. 3d at 723 n.55 (D. Del. 2017).  Despite asserting dozens of references before trial, Sage relied on Van Den Heuvel as its sole primary prior art reference at trial.  Exhibit E.  Although Sage relied on the PCT publication of Van Den Heuvel, its expert admitted that the Patent Office considered the U.S. version of Van Den Heuvel—having the same relevant disclosures—during prosecution.[8]  Trial Tr. 845:1-858:10.

    ***Finally,*** as noted above, Sage failed to advise the Court or PureWick that it had discontinued sales of the PrimaFit product specifically at issue in this case by November 2021.  To the contrary, Sage asserted in the pre-trial order that it " intends to prove that PureWick cannot carry its burden of establishing that PureWick is entitled to a permanent injunction." D.I. 308 ¶ 69.  Accordingly, PureWick drafted its post-trial brief with a section on supplemental damages for PrimaFit sales after the period considered by the jury and drafted its injunction argument based on the assumption of ongoing sales. However, on the evening of May 4, the night before the filing deadline of this brief, Sage notified PureWick that sales were discontinued last November, mooting at least the issue of supplemental damages for PrimaFit although PureWick and the Court will now need to assess whether the PrimaFit 2.0 is not more than colorably different from the discontinued product at the center of the trial.  Sage should have advised PureWick and the Court prior to trial, but instead chose the hide the ball yet again.

### D.    *Read* Factor 4: Sage's Size and Financial Condition

    Sage is owned by Stryker, one of "the world's leading medical technology companies." Exhibit F at p. 12.  According to its Form 10K, its net sales for 2021 totaled over $17 billion.  *See id.* at p. 11; *Arctic Cat*, 198 F. Supp. 3d at 1352 (citing online SEC statement when evaluating

---

[8]  Sage's invalidity contentions included both the U.S. and PCT versions of Van Den Heuvel, but Sage cynically removed the U.S. version and included only the PCT version in its expert report so that Mr. Sheldon could misleadingly assert that it had not been considered by the Patent Office. *See, e.g.*, D.I. 194, Ex. 9 at p. 108 (citing Van Den Heuvel 894 and Van Den Heuvel 823).

Read Factor 4).  Trebling the damages award would amount to less than 0.5% of Stryker's 2021 net sales.  The fact that Sage "will not be materially impacted by an award of enhanced damages . . . weighs in favor of enhancing damages."  *nCUBE*, 313 F. Supp. 2d at 390.

E.     ***Read* Factor 5: Closeness of the Case**

This was not a close case.  The jury decided that Sage's PrimaFit product willfully infringed every asserted claim of the '376 and '989 patents, and that Sage failed to prove that any claim was invalid.  D.I. 465; *see also nCUBE*, 313 F. Supp. 2d at 390.  The jury also rendered its verdict in under two hours, which further supports a damages enhancement. Trial Tr., 1228:18, 1231:16; *see, e.g., EagleView Techs., Inc. v. Xactware Sols., Inc.*, 522 F. Supp. 3d 40, 68 (D.N.J. 2021) (awarding treble damages and noting "Plaintiff's success with the jury" and fact that the "jury deliberated for only two hours before reaching its verdict").

F.     ***Read* Factors 6 and 7: Duration of Misconduct and No Remedial Action**

Sage has been selling the infringing PrimaFit product since the issuance of the '376 and '989 patents, over two years ago.  Even after PureWick filed suit against Sage for its infringement, Sage continued to market and sell the PrimaFit.  D.I. 1 (filed August 13, 2019); PTX-799 (showing PrimaFit sales in 2020-21).  Sage's "failure to discontinue its infringement once notified of [PureWick's] law suit, and its failure to take remedial action to remedy its alleged infringement . . . weigh[] in favor of enhanced damages."  *Lucent Techs., Inc. v. Newbridge Networks Corp.*, 168 F. Supp. 2d 269, 275 (D. Del. 2001).  *See also nCUBE*, 313 F. Supp. 2d at 390; *Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1328 (Fed. Cir. 1987).

G.     ***Read* Factors 8 and 9: Motivation to Harm and Conceal Misconduct**

At the time Sage chose to willfully copy the patented invention, Sage knew that PureWick was a much smaller player in the market that was actually seeking financing.  Sage decided to infringe rather than pay for use of the patented invention.  *See supra* Section III.A.  And Sage

developed its infringing product to compete head-to-head against PureWick. PTX-035.1; PTX-036.5-6; PTX-719. Those facts favor enhanced damages. *See nCUBE*, 313 F. Supp. 2d at 390 (fact that parties "are direct competitors" favors enhanced damages).

Moreover, Sage never informed PureWick that it intended to develop its own competing product. PureWick and Sage were still in contact until at least mid-October 2016. *See* DTX-403. By November 2016, Sage was already working on designing the PrimaFit product. Trial Tr. at 584:12-585:8. Yet when Sage informed PureWick of its reasons for not making the acquisition, it never disclosed its intention to develop its own product. *See* Trial Tr. at 218:19-221:5, 223:6-224:17. In fact, Sage's concealment of its misconduct continued through trial. Sage argued without basis that a "wall" existed between the PrimaFit design team and the Sage employees involved in discussions with PureWick. That was a complete deception that, but for Ms. Blabas's internal notes, might well have succeeded in misleading the jury.

The totality of the circumstances in this case supports an award of treble damages.

## IV.    PUREWICK'S MOTION FOR A PERMANENT INJUNCTION AGAINST THE PRIMAFIT

"Absent adverse equitable considerations, the winner of a judgment of validity and infringement may normally expect to regain the exclusivity that was lost with the infringement." *Edwards Lifesciences AG v. CoreValve, Inc.*, 699 F.3d 1305, 1314 (Fed. Cir. 2012). An injunction is appropriate here if PureWick shows: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

As discussed above, the evening before this brief was filed, Sage disclosed for the first time

that it discontinued sales of "[t]he PrimaFit at issue at trial" *after November 2021*.  Ex. A.  It is remarkable that Sage never disclosed this to the Court.  Sage knew that PureWick was seeking an injunction, and even opposed it in the pretrial order.  *See* D.I. 286, ¶69.  Rather than disclose that it had stopped manufacture of its accused product, Sage proceeded with this case through trial and *up until yesterday* as though PrimaFit still was on the market.  At the same time (as discussed in Section IV.E. below), Sage secretly launched a new version of PrimaFit (referred to by Sage as "PrimaFit 2.0"), which it had been contending was a NIA, and then dropped that NIA position shortly before trial to avoid the risk of an adverse finding by the jury on infringement by the PrimaFit 2.0.  This is nothing short of gamesmanship.

PureWick respectfully requests that the Court permanently enjoin Sage with respect to the PrimaFit product and any products that are not more than colorably different.  *See Gavrieli Brands LLC v. Soto Massini (USA) Corp.*, C.A. No. 18-462-MN, 2020 WL 1443215, at *9 (D. Del. Mar. 24, 2020) (entering injunction against infringing product and products not more than colorably different because "[t]he Federal Circuit has made clear that the 'colorable differences' test is the proper one for determining whether a newly accused product violates a prohibition on continued infringement by a product already adjudged to be infringing.").  Sage's infringement allows it to compete "head-to-head" with PureWick in a two-supplier market and inflict irreparable harm with its infringing PrimaFit device by locking up market share, establishing customer relationships, raising PureWick's costs, and undermining PureWick's reputation as an industry leader.  *See* Declaration of John Gohde ("Gohde ¶") ¶¶ 2-7.

As discussed in Section IV.E. below, should the Court grant PureWick's request for an injunction, PureWick respectfully requests that the Court set a briefing schedule to promptly determine whether Sage's PrimaFit 2.0 product is not more than colorably different than the

16

PrimaFit product found to infringe by the jury.

### A.    PureWick Would Suffer Irreparable Harm Absent an Injunction

When there is "[d]irect competition in the same market," it "suggest[s] strongly the potential for irreparable harm without enforcement of the right to exclude." *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1363 (Fed. Cir. 2012); *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1338 (Fed. Cir. 2013) ("district court determined that Broadcom and Emulex were competitors and that Broadcom lost market share while Emulex gained it—thus Broadcom established irreparable harm."). For this reason, this District regularly enjoins infringing competitors. *See, e.g.*, *E.I. DuPont de Nemours and Co. v. Unifrax I LLC*, C.A. 14-1250-RGA, 2017 WL 4004419, at *4-*6 (D. Del. Sept. 12, 2017) (finding irreparable harm where parties were "direct competitors" and infringement had led to a "reduction in sales."); *Bio-Rad Laboratories Inc., et al. v. 10X Genomics, Inc.*, No. 15-cv-152-RGA, D.I. 568 at 5 (D. Del. Jul. 24, 2019 (finding irreparable harm where Plaintiffs were "forced to compete with [Defendant's] products that incorporate and infringe their own patented inventions.").

PureWick introduced overwhelming evidence that Sage is a direct competitor and that PureWick and Sage are the only two companies in the relevant market. Indeed, the jury's award of lost profits confirms that "defendant's action caused the patentee to lose sales" and "squarely supports a finding of irreparable harm." *F'Real Foods, LLC v. Hamilton Beach Brands, Inc.*, C.A. No. 16-41-CFC, 2020 WL 4015481, at *4 (D. Del. July 16, 2020).

Sage's own documents show that this is a two-supplier market. PTX-35 ("***PureWick is the only competitor in this space*** when it comes to an external device for females."); *see also* PTX-597.2; PTX-36.5; PTX-69.56; PTX-719. Similarly, PureWick's witnesses testified that the PureWick and PrimaFit devices compete head-to-head in a two-supplier market. Trial Tr. 196:10-13 ("Q. Okay. When you started selling the PureWick external catheter, what other products were

on the market that were also like the PureWick?  A. Nothing."); 402:22-24 ("There are no other devices to the best of my knowledge on the market that look like this or function, have the same functionality as [PureWick and PrimaFit products]."); *see also* 550:4-552:10; PTX-107; PTX-719. The direct competition in a two-supplier market creates irreparable harm attendant to lost market share, increased costs, and lost reputation for innovation.  Gohde ¶¶ 2-7.

Other factors also support a finding of irreparable harm.  First, PureWick has not licensed its patents, and would not have considered licensing to Sage (Trial Tr. 367:22-368:5, 368:23-25), thus, weighing "in favor of a finding of irreparable harm."  *E.I. DuPont*, 2017 WL 4004419, at *4-*6.

Second, the jury found that Sage's infringing conduct was *willful*.  *See, e.g.*, *Muniauction, Inc. v. Thomson Corp.*, 502 F. Supp. 2d 477, 483 (W.D. Pa. 2007), *rev'd in part, vacated in part*, 532 F.3d 1318 (Fed. Cir. 2008) (jury's finding of willfulness supports "conclusion that plaintiff has suffered irreparable injury to its patent rights, for which there is no adequate remedy at law").

Third, Sage's decision to copy PureWick's technology to accelerate Sage's market entry exacerbates the irreparable harm to PureWick, particularly because of the emerging nature of the market.  *See, e.g.*, PTX-107.3 ("[I]t is more important than ever to speed the product launch to gain the original market position.").  Sage's early market entry allowed Sage to develop customer relationships that will be difficult for PureWick to overcome if Sage's infringement is allowed to continue.  Gohde ¶ 4.  Once Sage wins business at a hospital it is difficult to displace them, requiring extra sales and marketing expenses that are hard to quantify and difficult to recoup.  *Id.*

Fourth, Sage's infringement and continued sale of the PrimaFit damages PureWick's goodwill and reputation and thus constitutes irreparable harm.  Gohde ¶¶ 5-7; *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) ("Price erosion, loss of goodwill, damage

to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm."). In *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336 (Fed. Cir. 2013), the Federal Circuit explained that the patentee's "reputation as an innovator will certainly be damaged if customers found the same 'innovations' appearing in competitors' [products]." *Id*. at 1344-45.

### 1.    Causal nexus between infringement and irreparable harm

To establish irreparable injury, a patentee also must show "that a sufficiently strong causal nexus relates the alleged harm to the alleged infringement." *Bio-Rad Labs, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1377-78 (Fed. Cir. 2020).  The infringing features do not need to be the "exclusive or predominant reason" that consumers buy the accused products, there only needs to be "'some connection' between the patented features and the demand for the infringing products." *Apple Inc. v. Samsung Elecs. Co. Ltd*., 809 F.3d 633, 642 (Fed. Cir. 2015).  Here, PureWick's patents are directed to the device as a whole, as opposed to individual features of the PrimaFit device.  Thus, causal nexus and consumer demand are apparent from the fact of infringing sales. *See Genband US LLC v. Metaswitch Networks Corp*., 861 F.3d 1378, 1384-85 (Fed. Cir. 2017). Indeed, although Sage chose to spend much of its trial time on ancillary, non-patented features of its infringing product, Sage never contended that there would be any demand at all for its infringing product if the infringing technology were removed, leaving only the ancillary features.

PureWick's '376 and '989 patents are directed to external urine collection devices that are "configured to be disposed . . . adjacent to a urethral opening of a user, to receive urine discharged from the urethral opening . . . and to have the received urine withdrawn" out of the end of the device. *See, e.g.*, JTX-2 at claim 1.  The patents solve problems associated with prior devices used to manage urinary incontinence, including the risk of CAUTI posed by invasive devices and the risk of skin problems, such as incontinence-associated dermatitis (IAD), associated with absorbent products. *See, e.g.*, Trial Tr. 433:25-435:1; *see also* Trial Tr. 394:16-400:7.

PureWick presented substantial evidence of a connection between the patented features and the demand for PrimaFit.  Dr. Collins testified that PrimaFit and PureWick both practice the '376 and '989 patents.  *See, e.g.*, Trial Tr. 440:22-44:16, 453:2-460:16, 468:8-470:7.  Dr. Yun testified that both products eliminate problems associated with invasive catheters and pre-existing urine management products, such as diapers and pads (Trial Tr. at 402:7-18), and that the PureWick and PrimaFit "are completely interchangeable in terms of their functionality."  Trial Tr. 403:5-8; *see also* PTX-486.11.  And Sage's own documents show that it designed PrimaFit to address the same need and demand in the market.  PTX-597.2; *see also* PTX-107.3.  Thus, there is a clear connection between the infringement and PureWick's injury.

## B.  Monetary Damages Are Inadequate to Compensate PureWick For Continued Infringement by The PrimaFit Device

Sage has willfully infringed PureWick's patents for years in direct violation of PureWick's statutory right to exclude, thereby taking PureWick's market share and harming its goodwill with hospitals.  This alone suggests that monetary damages are insufficient.  *E.I DuPont*, 2017 WL 4004419, at *5 ("Monetary damages are inadequate to compensate Plaintiff here because Plaintiff would be forced to compete against a rival gaining market share with Plaintiffs technology."), *aff'd*, 921 F.3d 1060 (Fed. Cir. 2019); *Douglas Dynamics*, 717 F.3d at 1345.

Similarly, as described above, PureWick's reputational harm is impossible to remedy through damages at law.  *See id.* (finding legal remedies "inadequate to compensate [patentee] for at least the reputation loss [patentee] has suffered from [defendant's] infringement.").  These concerns are particularly strong here because Sage's infringement coincided with the emergence of the female external catheter market (*see, e.g.*, PTX-36.5 and PTX-719), thus allowing Sage to capture and partially define the market with its infringing technology.  *See Illumina, Inc. v. Qiagen, NV.*, 207 F. Supp. 3d 1081, 1093 (N.D. Cal. 2016); Trial Tr. 364:24-366:2.

### C.      Sage Will Suffer No Recognizable Harm From An Injunction

In view of Sage's last-minute revelation that it has discontinued sales of the infringing

PrimaFit product, Sage cannot possibly assert that they would be harmed by being enjoined from

further manufacture, use and sale of the PrimaFit product specifically at issue in the trial.

Moreover, any alleged harm to Sage should be given no weight because Sage is a willful

infringer. *Broadcom Corp. v. Qualcomm, Inc.*, 543 F.3d 683, 704 (Fed. Cir. 2008) ("'[O]ne who

elects to build a business on a product found to infringe cannot be heard to complain if an

injunction against continuing infringement destroys the business so elected.'"). Courts often give

***no weight*** to hardship in such circumstances. *See U.S. v. Marine Shale Processors*, 81 F.3d 1329,

1358-59 (5th Cir. 1996) (holding that "a court need not balance the hardship when a defendant's

conduct has been willful"); *E.F. Johnson Co. v. Uniden Corp. of Am.*, 623 F. Supp. 1485, 1504 (D.

Minn. 1985) ("A willful infringer which seeks to profit by copying from others' creative ideas

should not be heard to complain that its interests will be disturbed by an injunction.").

### D.      A Permanent Injunction Serves The Public Interest

The public interest is best served by having a strong patent system that protects and

encourages innovation. *See Odetics, Inc. v. Storage Tech. Corp.*, 14 F. Supp. 2d 785, 795 (E.D.

Va. 1998), *aff'd*, 185 F.3d 1259 (Fed. Cir. 1999).  The right to exclude is fundamental to that

interest.  *Sanofi–Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 2006).  Given this

strong interest, "the public interest nearly always weighs in favor of protecting property rights in

the absence of countervailing factors, especially when the patentee practices his inventions."

*Apple*, 809 F.3d at 647.  In fact, only "in rare instances" have courts "exercised their discretion to

deny injunctive relief in order to protect the public interest."  *Rite-Hite Corp. v. Kelley Co.*, 56

F.3d 1538, 1547 (Fed. Cir. 1995).

Enjoining Sage will not deprive customers of a female external catheter device because

PureWick has proven that it can fill that demand.  Trial Tr. at 561:5-564:6; PTX-193; Gohde ¶ 8. Accordingly, this factor strongly supports granting a permanent injunction.

PureWick thus has established that all four factors strongly support issuance of an injunction against PrimaFit and products not more than colorably different therefrom.

### E. PureWick Submits That Sage's New PrimaFit Product Is Not More Than Colorably Different From Its Old PrimaFit Product

Late in discovery Sage revealed that it was developing a new version of the PrimaFit (that it referred to as PrimaFit 2.0), which Sage contended was a non-infringing alternative ("NIA"). D.I. 196, Ex. 1 at 83. ███████████████████████████████

████████████████████████████████████████████████

████████████████        *See, e.g.*, Exhibit G, Ulreich Tr. at 30:22-24, 47:20-48:22; Exhibit H, Sexton Tr. at 267:19-268:6.  Both parties addressed the product in their expert reports.  Sage's expert, Donald Sheldon, contended that the PrimaFit 2.0 did not infringe because it allegedly does not include "a urine collection apparatus . . . wherein the fluid permeable support is distinct from and at least proximate to the fluid reservoir."  D.I. 209, Ex. 24 at p. 183.  PureWick's expert, Dr. Collins, disagreed, and opined that the PrimaFit 2.0 infringes the asserted claims of the '376 and '989 patents, including the reservoir element.  D.I. 210, Ex. 31 at ¶¶302-07, 322-54.

In November 2021, long after the close of discovery, PureWick learned on its own that Sage had begun commercially selling the PrimaFit 2.0.  On December 1, 2021, PureWick asked Sage for samples of the PrimaFit 2.0, but Sage refused.  Exhibit I.  PureWick subsequently obtained publicly available samples and on January 26, 2022, PureWick filed a new lawsuit against Sage alleging that the PrimaFit 2.0 infringes PureWick's patents.[9]  *See PureWick Corp. v. Sage*

---

[9]   PureWick filed the second case to avoid any risk that Sage would argue in this case that PureWick's failure to assert infringement against the PrimaFit 2.0 somehow supported Sage's position that the product was a NIA.

*Products, LLC*, C.A. No. 1-22-cv-00102-MN.  As discussed above, less than a month before trial, Sage dropped its argument that the PrimaFit 2.0 was an NIA (Exhibit J).

It is apparent that Sage dropped the PrimaFit 2.0 from this case to avoid the risk of the jury finding that the product infringed.  Had Sage maintained its assertion that PrimaFit 2.0 was a NIA and the jury disagreed, that issue would have been resolved.  PureWick, however, contends that the PrimaFit 2.0 product not only infringes the '376 and '989 patents, but also that it is not more than colorably different from the PrimaFit product found to infringe by the jury.  *See, e.g.*, Exhibit K ("The proposed modifications do not affect the intended use or the fundamental scientific technology of the device.  The fit and function of the device remains the same.").  Accordingly, if the Court enters a permanent injunction, PureWick respectfully requests that the Court promptly set a briefing schedule to determine whether Sage's sales of the PrimaFit 2.0 should be subject to the injunction because the product is not more than colorably different.

## V.     PUREWICK'S MOTION FOR ONGOING ROYALTIES

PureWick requests an award of ongoing royalties for Sage's future sales of PrimoFit and products that are not more than colorably different.[10]

"While an ongoing royalty is not automatic, 'the Federal Circuit has indicated that a prevailing patentee should receive compensation for any continuing infringement.'"  *Vectura Ltd. v. GlaxoSmithKline LLC*, 2019 WL 4346502, at *6 (D. Del. 2019).  Ongoing royalties are appropriate because "'[a] damages award for pre-verdict sales of the infringing product does not fully compensate the patentee because it fails to account for postverdict sales.'"  *Fresenius USA, Inc. v. Baxter Intern., Inc.*, 582 F.3d 1288, 1303 (Fed. Cir. 2009).

---

[10]   PureWick does not now move for a permanent injunction on the PrimoFit, but PureWick has a male external catheter product in development that it expects to release soon that will directly compete with the PrimoFit and reserves the right to seek an injunction upon its launch.

The jury's damages award is "a starting point for evaluating ongoing royalties." *Vectura Ltd.*, at *7. But there is a "fundamental difference" between "a reasonable royalty for pre-verdict infringement and damages for post-verdict infringement." *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1361 (Fed. Cir. 2008). "When patent claims are held to be not invalid and infringed, this amounts to a 'substantial shift in the bargaining position of the parties.'" *XY, LLC v. Trans Ova Genetics*, 890 F.3d 1282, 1297 (Fed. Cir. 2018). Accordingly, "the district court should consider the 'change in the parties' bargaining positions, and the resulting change in economic circumstances, resulting from the determination of liability.'" *Id.*

Here, the jury awarded PureWick a reasonable royalty of 6.5% of infringing PrimoFit revenues. This provides an appropriate starting point, but PureWick's bargaining position post-verdict has been substantially strengthened by the jury's findings on infringement and damages, which justifies an increased rate going forward. *See, e.g.*, *Creative Internet Advert. Corp. v. Yahoo! Inc.*, 674 F. Supp. 2d 847, 861 (E.D. Tex. 2009) (noting "[t]he Federal Circuit has instructed that post-verdict infringement should typically entail a higher royalty rate than the reasonable royalty found at trial") (*citing Amado*, 517 F.3d at 1361 (Fed. Cir. 2008)); *see also Telcordia Tech. Inc. v. Cisco Sys., Inc.*, No. 04-876-GMS, 2014 WL 1457797, at *5 (D. Del. Apr. 14, 2014) (ongoing royalty at nearly twice the jury's rate).

In view of these circumstances, PureWick requests an ongoing royalty set at two times the rate determined by the jury, i.e., 13% of revenues for the PrimoFit product. Such an enhancement is appropriate because Sage's continued infringement following the verdict is willful. It is also consistent with what other courts have done in similar situations. *See, e.g.*, *Telcordia*, 2014 WL 1457797, at *5 (awarding royalty at nearly twice the jury's rate); *VirnetX Inc. v. Apple Inc.*, Case No. 6:13-CV-211, 2014 WL 12672822, at *4 (E.D. Tex. Mar. 6, 2014) (awarding ongoing royalty

at nearly twice the jury's implied rate); *Bard Peripheral Vascular*, 2010 U.S. Dist. LEXIS 144259, at *9 (awarding royalty up to twice the jury's rate); *Paice LLC v. Toyota Motor Corp.*, 609 F. Supp. 2d 620, 630-31 (E.D. Tex. 2009) (awarding royalty at four times the jury's rate).

## VI.   PUREWICK'S MOTION FOR SUPPLEMENTAL DAMAGES

PureWick respectfully moves for an award of supplemental damages on Sage's sales made up to the time of entry of judgment that were not included in the jury's verdict. The jury awarded damages for PrimaFit sales through November 30, 2021, and PrimoFit through December 31, 2021. PureWick requests supplemental damages for Sage's sales of these products through entry of final judgment at a rate of 6.5% of net revenue for PrimoFit and ███ ███ of PrimaFit.

The court has discretion to award supplemental damages for periods not considered by the jury. *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 38 (Fed. Cir. 2012). "Typically, supplemental damages are calculated based on the jury's damages verdict." *E.I. du Pont de Nemours & Co. v. Unifrax I LLC*, 2017 WL 4004419, at *7 (D. Del. Sept. 12, 2017).

With respect to PrimoFit, the total sales from January 1, 2020 through December 31, 2021 were $27,679,891. Trial Tr. 913:22-23; PTX-799.5. The jury awarded $1,799,193 in reasonable royalty damages, which equates to a rate of 6.5%. Leonard Decl. at ¶4; *see also* D.I. 316 at 5 (jury indicating that they applied a 6.5% rate). Accordingly, PureWick submits that the Court should award supplemental damages of 6.5% on Sage's revenues for sales of the PrimoFit that have been, or will be, made between January 1, 2022 and the date of entry of judgment.

In the event that any sales of PrimaFit were made subsequent to November 30, 2021, PureWick respectfully requests an award of supplemental damages on those sales. For PrimaFit, the jury awarded PureWick $26,215,545 in lost profits on 80.06% of Sage's unit sales. Leonard Decl. ¶¶4, 8; Dkt. 316 at 5. In 2021, PureWick's incremental profits ███████████. Leonard Decl. ¶8. Accordingly, supplemental damages calculated in a manner consistent with the jury

award would equate to the number of units × 80.06% × ████████████████. *Id.*

## VII.   PUREWICK'S MOTION FOR PREJUDGMENT INTEREST

PureWick also respectfully moves for an award of prejudgment interest at the prime rate, compounded quarterly.  An award of pre-judgment interest is "the rule, not the exception." *Energy Transp. Group, Inc. v. William Demant Holding*, 697 F.3d 1342, 1358 (Fed. Cir. 2012).  The rate of prejudgment interest and whether it should be compounded are within the Court's discretion. *See Bio-Rad Labs., Inc. v. Nicolet Instrument Corp.*, 807 F.2d 964, 969 (Fed. Cir. 1986).  In determining the rate, the Court "must be guided by the purpose of prejudgment interest, which is to ensure that the patent owner is placed in as good a position as he would have been had the infringer entered into a reasonable royalty agreement." *Bio-Rad*, 807 F.2d at 969.

"The common practice in the District of Delaware is to use 'the prime rate, compounded quarterly[.]'" *Amgen Inc. v. Hospira, Inc.,* 336 F. Supp. 3d 333, 364 (D. Del. 2018).  "[T]he prime rate represents the cost of borrowing money, which is 'a better measure of the harm suffered as a result of the loss of the use of money over time.'" *Id.*; *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991) (upholding award at the prime rate); *Gavrieli Brands*, 2020 WL 1443215, at *9 (same); *Agrofresh Inc. v. Essentiv, LLC*, C.A. No. 16-662-MN, 2020 WL 7024867, at *26 (D. Del. Nov. 30, 2020) (same).

Dr. Leonard has calculated prejudgment interest on the jury award by applying the prime rate compounded quarterly, which results in prejudgment interest of $1,144,734.  Leonard Decl. ¶6.  Dr. Leonard will calculate the prejudgment interest on supplemental damages, if awarded, once Defendant provides the relevant sales data.

## VIII.   PUREWICK'S MOTION FOR POST JUDGMENT INTEREST

Post Judgment interest is mandatory for damages in civil cases at "a rate equal to the weekly average 1-year constant maturity Treasury yield . . . for the calendar week preceding the date of

the judgment." 28 U.S.C. §1961.  Post judgment interest is computed daily, compounded annually, and based on the total money award.  *Id.*; *Eaves v. Cty. of Cape May*, 239 F.3d 527, 534 (3d Cir. 2001).   The weekly average interest preceding the April 7, 2022 judgment was 1.67%, corresponding to a daily interest rate of 0.0046%.  Leonard Decl. ¶ 10.  The appropriate daily post judgment interest rate on the jury's damages award, therefore is $1,281.77 per day.  *Id.*

## IX.   PUREWICK'S MOTION FOR JUDGMENT ON SAGE'S COUNTERCLAIMS

Sage broadly asserted counterclaims for a declaratory judgment that the '376, '989 and '407 patents were "unenforceable under principles of equity including waiver, estoppel, unclean hands, and/or acquiescence" and were "invalid for failure to meet one or more conditions of patentability as specified in the Patent Laws (Title 35 of the U.S. Code), including, but not limited to, 35 U.S.C. §§ 102, 103, and/or 112, et seq."  D.I. 53 at ¶¶ 45-51, 53, 68-74, 76, 100-108. PureWick is entitled to entry of judgment against Sage on Sage's unenforceability and invalidity counterclaims included in the pre-trial order for which Sage presented no evidence at trial.

### A.   PureWick is Entitled To Judgment On Sage's Equitable Counterclaims of Unenforceability

For over two years the parties litigated Sage's counterclaims that the patents-in-suit were allegedly unenforceable. PureWick initially sought dismissal of these counterclaims at the pleading stage (D.I. 15), which Sage successfully resisted.  The parties thereafter provided and took discovery concerning those counterclaims.  In the pre-trial order, Sage stated that it "asserts defenses ***and a counterclaim*** seeking a declaration of unenforceability of the '376, and '989, and '407 patents" and that it intended "to prove, by a preponderance of the evidence, that the '376, and '989, and '407 patents are unenforceable" on several grounds.  D.I. 286 at ¶ 65 and Ex. B2 at p. 5.

At the final pretrial conference, Sage reiterated its intent to present evidence at trial on "the equitable issues."  3-21-2022 Tr. at 39:11-41:23.  However, on March 25, just one business day

27

before the start of trial, Sage informed the Court that Sage would "not assert its equitable defenses, including waiver, estoppel, unclean hands and acquiescence in this case with respect to PureWick's claims on the '376, '407 and '989 patents." D.I. 302. Notably, Sage explicitly "reserve[d] its equitable defenses with respect to PureWick's claim on the '508 patent." In sharp contrast, Sage did not reserve any rights with respect to the unenforceability defenses or counterclaims for the '376, '407 and '989 patents. Nor did Sage seek to dismiss its unenforceability counterclaims without prejudice. Under these circumstances judgment in favor of Purewick is appropriate.

Voluntarily dropping a counterclaim included in the pretrial order, or failing to adduce evidence at trial in support of such a claim or defense, constitutes waiver. For example, in *Asetek Danmark v. CMI USA, Inc.*, the court found waiver of a written description defense included in the pretrial statement, but for which the defendant elicited no testimony at trial. 100 F.Supp.3d 871, 891-92 (N.D. Cal. 2015). Similarly, in *Silicon Graphics, Inc. v. ATI Techs., Inc.*, the Federal Circuit affirmed waiver where defendant asserted intent to pursue counterclaims at the pre-trial conference, but failed to present evidence on the counterclaims at trial. 607 F.3d 784, 801 (Fed. Cir. 2010). Because Sage had the full opportunity to pursue its unenforceability counterclaims consistent with the pre-trial order, but failed to do so, the defenses have been waived.

Sage's letter to the Court one business day before trial does not change the outcome. It was incumbent on Sage to identify any counterclaims that "it wishe[d] to reserve for another day." *Silicon Graphics,* 607 F.3d at 801. Sage not only failed to do, but its express reservation of equitable defenses **only** with respect to the '508 patent suggested the opposite for the '376, '407 and '989 patents. In addition, had Sage attempted to reserve rights, it was further "incumbent on [Sage] to expressly request that the district court dismiss those counterclaims without prejudice rather than ask the district court to infer an implicit request based on ambiguous statements." *Id*.

28

Likewise, in *Strub v. Axon Corp.*, 168 F.3d 1321, 1998 WL 537721 at *10 (Fed. Cir. Aug. 17, 1998), the Federal Circuit reversed the district court's denial of plaintiff's motion for JMOL of validity where the defendant unilaterally attempted to withdraw its claim during trial. *Id.* The Court found that allowing defendant to withdraw its claim, which had been included in the pre-trial order, was an abuse of discretion. Specifically, the Court found that there was

> no reason why [defendant] should be allowed to modify its litigation strategy in mid-course, forcing [plaintiff] to expend time and money preparing for claims that were never litigated, only to withdraw those claims without prejudice when time pressures of trial dictated another course. . . . Withdrawal of a clearly presented claim at such a late stage in the proceeding was clearly prejudicial to [plaintiff] which was forced to prepare a defense to this claim in advance of trial. [Plaintiff] is entitled to judgment as a matter of law on this claim, and the district court's failure to grant [Plaintiff's] motion on this issue was an abuse of discretion.

*Id.* at *11. As in *Strub*, Sage's unilateral decision to abandon its counterclaims was insufficient to avoid judgment against it. Sage's counterclaims for unenforceability should be deemed to have been waived and judgment on them should be entered in PureWick's favor.

### B.     PureWick is Entitled To Judgment On Sage's Invalidity Counterclaims

PureWick is also entitled to judgment on Sage's invalidity counterclaims for which Sage failed to present any evidence at trial. In particular, Sage raised the following invalidity counterclaims in the pre-trial order, but failed to present any evidence in support of them at trial:

- Invalidity of '407 claims 1 and 2 for failure to comply with 35 U.S.C. § 112 (*see* D.I. 286 at ¶62 and Ex. B2, p. 4);
- Anticipation of '989 claim 6 (*id.* at ¶61 and Ex. B2, p. 4) and '407 claims 1 and 2.

Sage presented no evidence at all that either of the asserted claims of the '407 patent were invalid for failing to comply with 35 U.S.C. § 112. After the close of the evidence, PureWick moved for judgment as a matter of law on this counterclaim. D.I. 310 at 9. PureWick hereby renews that motion pursuant to Rule 50(b) and respectfully requests that judgment be entered in

favor of PureWick as to Sage's counterclaim and defense that '407 patent claims 1 and 2 are invalid for failing to comply with 35 U.S.C. §112. *See Asetek Danmark*, 100 F.Supp.3d at 891-92.

With respect to anticipation, although Sage sought to prove anticipation of other asserted claims at trial, Sage did not offer any evidence as to anticipation of '989 claim 6 or '407 claims 1 and 2. Nor did Sage ever seek to withdraw its counterclaim of anticipation for those claims. To the contrary, in advance of trial Sage identified multiple references that it contended anticipated the asserted claims of the '376, '989 and '407 patents (*see* Ex. C) and proposed a verdict form that included questions on anticipation for '989 claim 6 and '407 claims 1 and 2 (D.I. 282-2). Even as Sage narrowed the prior art during trial, Sage continued to assert anticipation for all asserted claims. *See* Ex. E ("Sage will be arguing that these primary references anticipate the asserted 376/989 claims"). It was not until the direct testimony of Sage's experts, Dr. Sheldon and Dr. Newman, that Sage revealed that it was only arguing obviousness for '989 claim 6 and '407 claims 1 and 2. Trial Tr. 702:8-16, 766:2-9, 781:1-6.

Following the close of the evidence PureWick moved for judgment that Sage had failed to prove that any of the asserted claims of the '989 and '407 patents were invalid as anticipated by the prior art. D.I. 310 at pp. 5, 9. PureWick hereby renews that motion. Given Sage's concession that it did not present evidence of anticipation of these claims (*see* Trial Tr. at 934-35), PureWick respectfully requests that judgment be entered in PureWick's favor.

## X.    CONCLUSION

PureWick respectfully requests that the Court award PureWick supplemental and enhanced damages, a permanent injunction against the PrimaFit product, ongoing royalties for the PrimoFit product, pre- and post judgment interest, and enter judgment against Sage on its counterclaims.

/s/ Andrew E. Russell

OF COUNSEL:

Steven C. Cherny
Raymond Nimrod
Brian P Biddinger
Matthew A. Traupman
Nicola R. Felice
Jason C. Williams
Bianca Fox
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Ave., 22nd Floor
New York, NY 10010

Athena Dalton
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400

Dated: May 5, 2022

John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
*Attorneys for Plaintiff*

31

## CERTIFICATE OF SERVICE

I, Andrew E. Russell, hereby certify that on May 5, 2022, this document was served on

the persons listed below in the manner indicated:

**BY EMAIL**

Anne Shea Gaza
Samantha G. Wilson
YOUNG, CONAWAY, STARGATT &
TAYLOR LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6727
agaza@ycst.com
swilson@ycst.com

Robert A. Surrette
Sandra A. Frantzen
Christopher M. Scharff
Ryan J. Pianetto
Paul W. McAndrews
Deborah A. Laughton
Bradley P. Loren
Jenna Saunders
MCANDREWS, HELD & MALLOY, LTD
500 West Madison Street
Chicago, IL 60661
(312) 775-8000
bsurrette@mcandrews-ip.com
sfrantzen@mcandrews-ip.com
cscharff@mcandrews-ip.com
rpianetto@mcandrews-ip.com
pwmcandrews@mcandrews-ip.com
dlaughton@mcandrews-ip.com
bloren@mcandrews-ip.com
jsaunders@mcandrews-ip.com

*/s/ Andrew E. Russell*
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
*Attorneys for Plaintiff*

# EXHIBIT A
# REDACTED IN ITS
# ENTIRETY

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PUREWICK CORPORATION, | ) |
| | ) |
| Plaintiff/Counterclaim Defendant, | ) |
| | ) |
| v. | )   C.A. No. 19-1508-MN |
| | ) |
| SAGE PRODUCTS, LLC, | ) |
| | ) |
| Defendant/Counterclaim Plaintiff. | ) |
| | ) |

## SAGE'S SUPPLEMENTAL STATEMENT REGARDING REFERENCES AND COMBINATIONS

As a supplement to Sage's Statement Regarding References and Combinations set forth in Sage's Final Invalidity Contentions, and pursuant to the Court's October 28, 2020 Order (D.I. 89), Sage identifies the following references: Coley 804, DesMarais 130, Flower 300, Hanifl 377, Harvie 012, Ishii 107, Keane 768, Kuntz 166, Kuntz EP355, Mahnensmith 080, Stewart 794, Okabe 547, 2007 Omni Medical User & Maintenance Guide; Omni Medical AMXD/DMax Devices, PureWick Prior Art Devices, Sanchez 508, Suzuki 250, Van Den Heuvel 823, Washington 508, Wolff 784.

As previously explained, these references anticipate and/or render obvious one or more of the remaining asserted claims[1] of the 508 Patent (Claims 1, 3, 4, 6, 18[2]), 376 Patent (Claims 1, 4, 5, and 9), 989 Patent (Claims 1, 2, and 6), and/or 407 Patent (Claims 1, 2, 7 and 13). The detailed

---

[1] PureWick provided a list of asserted claims on August 6, 2021. The previously asserted claims are no longer asserted including Claims 2, 5, 7, 8, 17, and 19 of the 508 patent, Claims 6-8 and 11-14 of the 376 patent, Claims 2-5 of the 989 patent, and Claims 5, 9, 14 and 15 of the 407 patent.
[2] Claim 18 of the 508 patent depends on independent Claim 17 of the 508 patent.

bases for these contentions are found in the sections and charts in Sage's Invalidity Contentions, as well as Sage's expert reports, including identification of where each element of the asserted claims was known in the art, where each asserted reference discloses elements of the asserted patent claims, and reasons for combining the asserted references including knowledge in the art (if needed). As explained, numerous references anticipate the claims (including to the extent that they incorporate other art by reference). But, as also explained, to the extent that an identified anticipatory reference does not anticipate, that reference renders the asserted claims obvious in view of the knowledge of a person of ordinary skill in the art at the time of the alleged inventions (for example, as discussed in the 508 IPR and the expert reports). Indeed, as discussed, many aspects of the claimed inventions were well known in the art and well within the knowledge of any ordinarily skilled artisans including known design choices (*see* pages 19-29, 96-110, 247-255 of the Final Invalidity Contentions as well as relevant sections of expert reports). In addition to anticipation or obviousness of a reference in view of the ordinarily skilled artisan, pursuant to the Court's October 28, 2020 Order (D.I. 89), the below combinations of two references, in view of the knowledge of a person of ordinary skill in the art, render the claims obvious.

*508 Patent*: Flower 300 in combination with Coley 804 (claim 1); Kuntz 166 in combination with DesMarais (all asserted claims); Kuntz EP355 in combination with Mahnensmith 080 (claim 18); and Omni AMXD / AMXDMax Devices (TBD) (all asserted claims).

*376 Patent and 989 Patent*: Kuntz 166 in combination with Van Den Heuvel 823 (376 patent claims 1, 5, and 9; 989 patent claims 1, 2, and 6); Sanchez 508 in combination with PureWick Prior Art Devices (all asserted claims); Van Den Heuvel 823 in combination with (a) Coley (376 patent claim 4) and (b) Sanchez 508 (all asserted claims); and Washington 508 in combination with Sanchez 508 (376 patent claims 4, 5 and 989 patent claim 6).

2

***407 Patent***: Hanifl 377 in combination with Harvie 012 (all asserted claims); Harvie 012 in combination with Sanchez 508 (all asserted claims); Ishii 107 in combination with Harvie 012 (claim 2); and Keane 768 in combination with Sanchez 508 (claims 2, 7, 13).

Sage reserves the right to add to, amend, or supplement the foregoing based on, *inter alia*, any additional claim construction rulings and the discovery of additional information including the production of additional information by PureWick and other third parties as well as consultation with experts and expert testimony.

# Exhibit C

## SAGE'S SUPPLEMENTAL STATEMENT REGARDING
## REFERENCES AND COMBINATIONS

Pursuant to the parties' discussions, Sage further narrows its invalidity contentions as follows and identifies the following 15 references as relevant to the 10 remaining asserted claims in this case:[1] Coley 804, Hanifl 377, Harvie 012, Ishii 107, Keane 768, Kuntz 166, Kuntz EP355, Mahnensmith 080, 2007 Omni Medical User & Maintenance Guide; PureWick Prior Art Devices (as clarified), Sanchez 508, Suzuki 250, Van Den Heuvel 823, Washington 508, Wolff 784.

Sage incorporates its prior statements regarding references and combinations, as well as its invalidity contentions and expert reports, which explained how these references relate to the anticipation and obviousness of one or more of the ten remaining asserted claims. As explained, references anticipate the claims (including to the extent that they incorporate other art by reference) including Van Den Heuvel, Keane, and PureWick Prior art (as clarified) for the 376 and 989 patents and Suzuki, Keane, Harvie, and Sanchez 508 for claims of the 407 patent. Each of those references, as well as Sanchez 508, renders the asserted claims obvious in view of the knowledge of a POSITA (for example, as discussed in the expert reports). The following combinations of two references, in view of the knowledge of a POSITA, render the claims obvious (all claims unless noted). For the 376 and 989 Patents: Van Den Heuvel 823 in combination with Sanchez 508, Kuntz 166, and Coley (376 claim 5); and Sanchez 508 in combination with Washington 508 (376 claim 5, 989 claim 6) and PureWick prior art. For the 407 Patent: Harvie 012 in combination with Sanchez 508, Hanifl 377, and Ishii 107 (claim 2); and Keane 768 in combination with Sanchez 508 (claims 2, 7, 13). Sage reserves the right to add to, amend, or supplement the foregoing.

---

[1] The ten remaining claims are: 376 Patent (Claims 1, 5, and 9), 989 Patent (Claims 1, 2, and 6), and/or 407 Patent (Claims 1, 2, 7 and 13).

# Exhibit D

## Brian Biddinger

| | |
|---|---|
| **From:** | Ryan J. Pianetto <RPianetto@mcandrews-ip.com> |
| **Sent:** | Wednesday, March 9, 2022 9:29 PM |
| **To:** | Steven Cherny; Ray Nimrod; Brian Biddinger; Jason Williams; Nicola Felice; Athena Dalton; Bianca Fox; John Shaw; SKPurewick |
| **Cc:** | Bob Surrette; Sandra Frantzen; Christopher Scharff; Brad P. Loren; Annette Vonder Mehden; Wilson, Samantha; Gaza, Anne Shea |
| **Subject:** | PureWick v. Sage (No. 19-1508-MN) - PTO |
| **Attachments:** | Joint Pretrial Order - Sage revisions (Redline - Sage 03.09 to PW 03.04).docx; Joint Pretrial Order - Sage revisions 3.9.22 (clean with comments).docx; Schedule A - Admitted Facts (3-4-2022) - Sage's updates 3.9.22.docx; Schedule A - Admitted Facts (Redline - Sage 03.09 to PW 03.04).docx; Schedule B1 - Plaintiff's Statement of Issues of Fact (3.9.22)- Sage Edits (clean).docx; Schedule B1 - Plaintiff's Statement of Issues of Fact (Redline - Sage 03.09 to PW 03.04).docx; Schedule B2_Sage Statement of Facts Remaining to Be Litigated - Sage edits 3.9.22 (clean).docx; Schedule B2_Sage Statement of Facts Remaining to Be Litigated - Sage edits 3.9.22 (redline).docx; Schedule C1 - PureWick Statement of Issues of Law (3-4-2022).docx; Schedule C2_Sage_Statement of Issue of Law - Sage 3.9.22 edits (Redline).docx; Schedule C2_Sage_Statement of Issue of Law - Sage 3.9.22 edits.docx; Schedule D1 - PureWick's Trial Exhibit List - Sage's Objections (updated 3-9-22)-WITH HIGHLIGHTS.xlsx; Schedule D2 - Sage's Amended Trial Exhibit List (3-9-22) - PureWick's Obj (with highlights).xlsx; Schedule D3 - Joint Trial Exhibit List - (Sage edits 3.9.22).XLSX; Schedule E1 - Plaintiff's Witness List.pdf; Schedule E3 - Sage's Witness List.pdf; Schedule E4a - Sage's Designations.pdf; Schedule E4b - Sage Designations, PW Objections (PW Doc).pdf; Schedule E4c - Sage's Objections to PureWick's Counter Designations (03.04.2022).pdf; Schedule E4d - Sage's Counter-Counter Designations.pdf; Schedule F4 - Sage MIL 1, Opp, & Reply.pdf; Schedule F5 - Sage MIL 2, Opp, & Reply.pdf; VOIR DIRE - Sage edits 3.9.22.docx |

**[EXTERNAL EMAIL from rpianetto@mcandrews-ip.com]**

Counsel:

Attached please find the following documents with edits thereto and including redlines for some of the documents as indicated in the filenames. The Joint Pretrial Order includes some comments where we needed additional clarity.  We propose talking tomorrow so we can understand some of your positions. We would like to narrow the disputes and likely will have additional edits once we gain a better understanding of your objections. We are available any time after 2 pm CT. Let us know your availability. This may also be a good time to discuss the verdict form.

Note that we are still missing Schedules E2 and F1-3 on your end. Please provide those immediately.

- Joint Pretrial Order
- Schedule A – Admitted Facts
- Schedule B1 – Pl's Statement of Issues of Fact
- Schedule B2 – Sage's Statement of Issues of Fact
- Schedule C1 – PureWick's Statement of Issues of Law
- Schedule C2 – Sage's Statement of Issues of Law
- Schedule D1 – PureWick's Trial Exhibit list with Sage's objections (new items/corrections highlighted for clarity)
- Schedule D2 – Sage's Trial Exhibit list with PureWick objections (new items/corrections highlighted for clarity)
- Schedule D3 – Joint Trial Exhibit List

1

- Schedule E1 – Pl's Witness List
- Schedule E3 – Sage's Witness List
- Schedule E4a-d – Sage's Designations and related documents
- Schedule F4 & F5 – Sage MILs, Oppo, Reply
- Voir Dire

Additionally, with respect to your objections to Sage's Trial Exhibit List, we did not understand PureWick's "Error" objections (e.g., DTX-479 to DTX-490).  Can you please explain?

Sage reserves the right to make changes and additions to the documents in view of our discussions, the Court's pre-trial order, events at trial, or based on circumstances that may evolve prior to the commencement of trial. Please note that we will be following up with edits to preliminary and final jury instructions as soon as possible.

Finally, to answer Jason's question in his email from Tuesday, the reference to PureWick prior art refers to the discussion at the February 23rd hearing, which focused on PureWick's brown tape products as addressed in our expert reports (e.g., the brown tape products used, demonstrated, and sold including as disclosed to and by CONNECT and Dorris Duffy).

Regards,

Ryan



**Ryan Pianetto**
**Attorney**
McAndrews, Held & Malloy, Ltd.
500 W. Madison St., 34th floor | Chicago, IL 60661
P: 312-775-8000
RPianetto@mcandrews-ip.com
bio | v-card | website

CONFIDENTIALITY NOTICE:
This material is intended for the named recipient and, unless otherwise expressly indicated, is confidential and privileged information. Any dissemination, distribution or copying of this material is prohibited. If you received this message in error, please notify the sender by replying to this message and then deleting it from your system. Your cooperation is appreciated.

# Exhibit E

**Nicola Felice**

| | |
|---|---|
| **From:** | Christopher Scharff <CSCHARFF@mcandrews-ip.com> |
| **Sent:** | Sunday, March 27, 2022 10:27 AM |
| **To:** | Athena Dalton; Brad P. Loren; Deborah Laughton; Fanelli, Dominic; Sandra Frantzen; Gaza, Anne Shea; Jenna E. Saunders; Paul McAndrews; Ryan J. Pianetto; Bob Surrette; Annette Vonder Mehden; Wilson, Samantha |
| **Cc:** | Brian Biddinger; Steven Cherny; Jason Williams; Ray Nimrod; SKPurewick; Bianca Fox; Nicola Felice; 'John Shaw' |
| **Subject:** | RE: PureWick Corporation v. Sage Products, Case No. 19-1508-MN - Prior Art |

**[EXTERNAL EMAIL from cscharff@mcandrews-ip.com]**

Counsel,

As a preliminary matter, Sage will be further narrowing its invalidity positions; Sage will not be asserting Harvie as a primary reference for purposes of anticipation or obviousness of the 407 patent.  Sage may reference it among evidence of the scope and content of the prior art.

Regarding the below, you appear to have mis-read my email below.  As I stated, Sage's two <u>primary</u> references (as opposed to any secondary references or knowledge of a POSA/background of the art) for anticipation and obviousness of the 376/989 patents will be Van Den Heuvel and PureWick's earlier product.  We were not referring to a combination of those two primary references.  Rather, as I said Sage will be arguing that these primary references anticipate the asserted 376/989 claims or render them obvious in combination with the knowledge of a POSA/the previously identified <u>secondary</u> references.

In response to your question regarding Van Den Heuvel and our list from March 7, we are asserting that Claim 5 is obvious in view of Van Den Heuvel and the knowledge of a POSITA.  (Sheldon Opening at p. 80.)  As we have previously explained, Coley (among others on our narrowed list of art) may be discussed as part of the scope and content of the art within the knowledge of a POSITA. (See, e.g., Sheldon Opening, p. 33-34.)

Finally, we note that we have been continuously advising your of our narrowed positions throughout this case and over the last week. We ask that you provide a similar courtesy regarding your side of the case.

Sincerely,

Chris

**McAndrews**
**Christopher Scharff**
**Attorney at Law**
McAndrews, Held & Malloy, Ltd.
500 W. Madison St.
Suite 3400 | Chicago, IL 60661
P: 312-775-8000
cscharff@mcandrews-ip.com
bio | v-card | website

1

**CONFIDENTIALITY NOTICE:**
This material is intended for the named recipient and, unless otherwise expressly
indicated, is confidential and privileged information. Any dissemination, distribution
or copying of this material is prohibited. If you received this message in error,
please notify the sender by replying to this message and then deleting it from your
system. Your cooperation is appreciated.

**From:** Athena Dalton <athenadalton@quinnemanuel.com>
**Sent:** Saturday, March 26, 2022 6:20 PM
**To:** Christopher Scharff <CSCHARFF@mcandrews-ip.com>; Brad P. Loren <BLoren@mcandrews-ip.com>; Deborah Laughton <DLAUGHTON@mcandrews-ip.com>; Fanelli, Dominic <DFanelli@ycst.com>; Sandra Frantzen <SFRANTZEN@mcandrews-ip.com>; Gaza, Anne Shea <agaza@ycst.com>; Jenna E. Saunders <JSaunders@mcandrews-ip.com>; Paul McAndrews <PWMCANDREWS@mcandrews-ip.com>; Ryan J. Pianetto <RPianetto@mcandrews-ip.com>; Bob Surrette <BSURRETTE@mcandrews-ip.com>; Annette Vonder Mehden <AVONDERMEHDEN@mcandrews-ip.com>; Wilson, Samantha <SWilson@ycst.com>
**Cc:** Brian Biddinger <brianbiddinger@quinnemanuel.com>; Steven Cherny <stevencherny@quinnemanuel.com>; Jason Williams <jasonwilliams@quinnemanuel.com>; Ray Nimrod <raynimrod@quinnemanuel.com>; SKPurewick <SKPurewick@shawkeller.com>; Bianca Fox <biancafox@quinnemanuel.com>; Nicola Felice <nicolafelice@quinnemanuel.com>; 'John Shaw' <jshaw@shawkeller.com>
**Subject:** RE: PureWick Corporation v. Sage Products, Case No. 19-1508-MN - Prior Art

**CAUTION: External Email From:** athenadalton@quinnemanuel.com

Counsel,

Thank you for identifying what prior art you plan to use at trial.  To clarify, does the proposed obviousness combination of Van Den Heuvel in combination with "PureWick's earlier product" include the Sanchez 508 reference, or not?

Further, Sage's Second Supplemental Disclosure re Invalidity states that Sage may rely on an obviousness combination of Van Den Heuvel and Coley for claim 5 of the '376 patent.  However, this combination for claim 5 of the '376 patent was not discussed in Mr. Sheldon's expert reports.  Please confirm that you will not be presenting this combination at trial.

Best regards,

**Athena Dalton**
*Associate,*
Quinn Emanuel Urquhart & Sullivan, LLP

191 N. Wacker Drive Suite 2700
Chicago, IL 60606
312.705.7437 Direct
312.705.7400 Main Office Number
312.705.7401 FAX
athenadalton@quinnemanuel.com
www.quinnemanuel.com

**From:** Christopher Scharff <CSCHARFF@mcandrews-ip.com>
**Sent:** Friday, March 25, 2022 2:42 PM
**To:** 'John Shaw' <jshaw@shawkeller.com>; Brad P. Loren <BLoren@mcandrews-ip.com>; Deborah Laughton <DLAUGHTON@mcandrews-ip.com>; Fanelli, Dominic <DFanelli@ycst.com>; Sandra Frantzen <SFRANTZEN@mcandrews-ip.com>; Gaza, Anne Shea <agaza@ycst.com>; Jenna E. Saunders <JSaunders@mcandrews-ip.com>; Paul McAndrews <PWMCANDREWS@mcandrews-ip.com>; Ryan J. Pianetto <RPianetto@mcandrews-ip.com>; Bob Surrette <BSURRETTE@mcandrews-ip.com>; Annette Vonder Mehden <AVONDERMEHDEN@mcandrews-ip.com>;

Wilson, Samantha <SWilson@ycst.com>
**Cc:** Brian Biddinger <brianbiddinger@quinnemanuel.com>; Steven Cherny <stevencherny@quinnemanuel.com>; Athena Dalton <athenadalton@quinnemanuel.com> Jason Williams <jasonwilliams@quinnemanuel.com>; Ray Nimrod <raynimrod@quinnemanuel.com>; SKPurewick <SKPurewick@shawkeller.com>; Bianca Fox <biancafox@quinnemanuel.com>; Nicola Felice <nicolafelice@quinnemanuel.com>
**Subject:** RE: PureWick Corporation v. Sage Products, Case No. 19-1508-MN - Prior Art

**[EXTERNAL EMAIL from cscharff@mcandrews-ip.com]**

Nicola and John,

In response to your email below, Ms. Frantzen spoke to Mr. Nimrod about our art on Monday when he asked about them at the pretrial conference. As explained, Sage can provide further narrowing of its invalidity trial positions. We note, however, that your characterizations of our invalidity positions are incomplete. Our narrowed invalidity positions were set forth in our March 7, 2022 disclosure, as later modified by my March 21, 2022 email dropping even more anticipation and obviousness assertions. At this time, for the 376 and 989 patents, our primary references for anticipation and obviousness are Van Den Heuvel and PureWick's earlier product (see below), and for the 407 patent our primary references are Suzuki and Harvie. As previously disclosed, these primary references anticipate the asserted claims or render them obvious in combination with the knowledge of a POSA/the previously identified secondary references. The other references identified in our March 7, 2022 submission may be referenced as background of the scope and content of the prior art. With regard to John's email, we assume that the Court's order from today answers your questions about PureWick's earlier product.

We still haven't heard back from your team on our question we raised on Monday with you and Mr. Cherney regarding going beyond the scope on PureWick's witnesses. We specifically raised the issue of Camille Newton. Can you please provide a response? We would like to be able to prepare.

Additionally we note that, even though PureWick's case on the 508 patent is stayed, in your designations of Mr. Sanchez you designate material that relates to your claims of the 508 patent and the alleged value of that patent that is no longer in the case. We specifically raised in our motion in limine briefing PureWick opening the door to evidence regarding the alleged value of that now-stayed patent. Can you please explain how Sanchez's testimony on the 508 patent and how much he was paid for it is relevant to this case? Please respond before our objections and counter designations are due this evening.

Sincerely,

Chris


**Christopher Scharff**
**Attorney at Law**
McAndrews, Held & Malloy, Ltd.
500 W. Madison St.
Suite 3400 | Chicago, IL 60661
P: 312-775-8000
cscharff@mcandrews-ip.com
bio | v-card | website

**CONFIDENTIALITY NOTICE:**
**This material is intended for the named recipient and, unless otherwise expressly**

indicated, is confidential and privileged information. Any dissemination, distribution or copying of this material is prohibited. If you received this message in error, please notify the sender by replying to this message and then deleting it from your system. Your cooperation is appreciated.

**From:** John Shaw <jshaw@shawkeller.com>
**Sent:** Thursday, March 24, 2022 8:29 PM
**To:** Brad P. Loren <BLoren@mcandrews-ip.com>; Deborah Laughton <DLAUGHTON@mcandrews-ip.com>; Fanelli, Dominic <DFanelli@ycst.com>; Sandra Frantzen <SFRANTZEN@mcandrews-ip.com>; Gaza, Anne Shea <agaza@ycst.com>; Jenna E. Saunders <JSaunders@mcandrews-ip.com>; Paul McAndrews <PWMCANDREWS@mcandrews-ip.com>; Ryan J. Pianetto <RPianetto@mcandrews-ip.com>; Christopher Scharff <CSCHARFF@mcandrews-ip.com>; Bob Surrette <BSURRETTE@mcandrews-ip.com>; Annette Vonder Mehden <AVONDERMEHDEN@mcandrews-ip.com>; Wilson, Samantha <SWilson@ycst.com>
**Cc:** Brian Biddinger <brianbiddinger@quinnemanuel.com>; Steven Cherny <stevencherny@quinnemanuel.com>; Athena Dalton <athenadalton@quinnemanuel.com>; Jason Williams <jasonwilliams@quinnemanuel.com>; Ray Nimrod <raynimrod@quinnemanuel.com>; SKPurewick <SKPurewick@shawkeller.com>; Bianca Fox <biancafox@quinnemanuel.com>; Nicola Felice <nicolafelice@quinnemanuel.com>
**Subject:** RE: PureWick Corporation v. Sage Products, Case No. 19-1508-MN - Prior Art

**CAUTION: External Email From:** jshaw@shawkeller.com

Counsel:

We have reviewed Sage's March 23 letter to Judge Noreika concerning "the brown tape product in this picture" (Tr. 90:21-22) that Sage intends to rely upon at trial.

From your letter, we understand that the specific product that you are relying on is the brown tape product depicted in DTX-311 (also in the record as JTX-9).

From the pre-trial conference, we understand that Sage is also relying on the product shown in the video found at DTX-519.

Please confirm that our understanding is correct no later than 3 p.m. tomorrow, Friday so that we can narrow our trial preparation efforts and cover the issues that will in the trial during opening statements.

Also, we have not received a response to Nicola Felice's email below concerning the prior art and prior art combinations that Sage intends to rely upon at trial.  With openings now just a few days away, we need to know what combinations are at issue so that we can prepare and present an opening statement that addresses the invalidity theories that Sage intends to present.  We would appreciate your response to this issue as well by no later than 3 p.m. tomorrow, Friday.

If we do not hear from you, we will have little choice but to approach the Court tomorrow so that opening statements can proceed smoothly on Monday.

Sincerely,

John Shaw

**From:** Nicola Felice <nicolafelice@quinnemanuel.com>
**Sent:** Tuesday, March 22, 2022 9:53 PM
**To:** BLoren@mcandrews-ip.com; dlaughton@mcandrews-ip.com; Fanelli, Dominic <DFanelli@ycst.com>; Frantzen, Sandra <sfrantzen@mcandrews-ip.com>; Gaza, Anne Shea <agaza@ycst.com>; JSaunders@McAndrews-ip.com; pwmcandrews@mcandrews-ip.com; rpianetto@mcandrews-ip.com; Scharff, Christopher <cscharff@mcandrews-ip.com>; Surrette, Bob <bsurrette@mcandrews-ip.com>; Vonder Mehden, Annette <avondermehden@mcandrews-

ip.com>; Wilson, Samantha <SWilson@ycst.com>
**Cc:** Brian Biddinger <brianbiddinger@quinnemanuel.com>; Steven Cherny <stevencherny@quinnemanuel.com>; Athena
Dalton <athenadalton@quinnemanuel.com>; Nicola Felice <nicolafelice@quinnemanuel.com>; Jason Williams
<jasonwilliams@quinnemanuel.com>; Ray Nimrod <raynimrod@quinnemanuel.com>; SKPurewick
<SKPurewick@shawkeller.com>; Bianca Fox <biancafox@quinnemanuel.com>
**Subject:** PureWick Corporation v. Sage Products, Case No. 19-1508-MN - Prior Art

Counsel,

During yesterday's hearing, Sage told the court that it had "two main references" for the 376/989 patents.  We note,
however, that you currently list three main prior art references for the 376/989 patents—Van Den Heuvel and PureWick
prior art (both alleged anticipatory references) and Sanchez 508 (single reference obviousness).  We would appreciate it
if you could let us know if only two main references remain and, if so, which ones they are.

For the 407 patent, you advised the Court that "there is two main references and again just kind of in combination with
the, you know, state of the art type issues."  We note that you currently list three pieces of prior art for anticipation
(Suzuki, Harvie, and Sanchez 508), plus obviousness combinations (Harvie + Sanchez; Harvie + Hanifl; and Harvie +
Ishii).  We would appreciate it if you could let us know which two pieces of prior art you will be using as your main
references, as well as which obviousness combinations you plan to present for the 407 patent.

Best,
Nicola

**Nicola Felice**
*Associate*
**Quinn Emanuel Urquhart & Sullivan, LLP**

51 Madison Avenue, 22nd Floor
New York, NY 10010
212-849-7346 Direct
212-849-7000 Main Office Number
212-849-7100 FAX
nicolafelice@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message
may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended
recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any
review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately
by e-mail, and delete the original message.

# Exhibit F

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**FORM 10-K**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2021

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Commission file number: 001-13149

# stryker

**STRYKER CORPORATION**
(Exact name of registrant as specified in its charter)

| **Michigan** | **38-1239739** |
|---|---|
| (State of incorporation) | (I.R.S. Employer Identification No.) |
| **2825 Airview Boulevard,    Kalamazoo,    Michigan** | **49002** |
| (Address of principal executive offices) | (Zip Code) |

**(269) 385-2600**
(Registrant's telephone number, including area code)

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| **Common Stock, $.10 Par Value** | **SYK** | **New York Stock Exchange** |
| **1.125% Notes due 2023** | **SYK23** | **New York Stock Exchange** |
| **0.250% Notes due 2024** | **SYK24A** | **New York Stock Exchange** |
| **2.125% Notes due 2027** | **SYK27** | **New York Stock Exchange** |
| **0.750% Notes due 2029** | **SYK29** | **New York Stock Exchange** |
| **2.625% Notes due 2030** | **SYK30** | **New York Stock Exchange** |
| **1.000% Notes due 2031** | **SYK31** | **New York Stock Exchange** |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes ☒    No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act.    Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities and Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).    Yes ☒    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☒ | Accelerated filer | ☐ | Emerging growth company | ☐ |
|---|---|---|---|---|---|
| Non-accelerated filer | ☐ | Small reporting company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.    ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C.7262(b)) by the registered public accounting firm that prepared or issued its audit report.    ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).    Yes ☐    No ☒

The aggregate market value of the voting stock held by non-affiliates of the registrant was approximately $91,942,474,363 at June 30, 2021. There were 377,544,686 shares outstanding of the registrant's common stock, $0.10 par value, on January 31, 2022.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the proxy statement to be filed with the U.S. Securities and Exchange Commission relating to the 2022 Annual Meeting of Shareholders (the 2022 proxy statement) are incorporated by reference into Part III.

**STRYKER CORPORATION 2021 FORM 10-K**

**TABLE OF CONTENTS**

**PART I**

| | | |
|---|---|---|
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 4 |
| Item 1B. | Unresolved Staff Comments | 9 |
| Item 2. | Properties | 9 |
| Item 3. | Legal Proceedings | 9 |
| Item 4. | Mine Safety Disclosures | 9 |

**PART II**

| | | |
|---|---|---|
| Item 5. | Market for the Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 9 |
| Item 6. | Selected Financial Data | 11 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 12 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 19 |
| Item 8. | Financial Statements and Supplementary Data | 20 |
| | Report of Independent Registered Public Accounting Firm (PCAOB ID: 42) | 20 |
| | Consolidated Statements of Earnings | 22 |
| | Consolidated Statements of Comprehensive Income | 22 |
| | Consolidated Balance Sheets | 23 |
| | Consolidated Statements of Shareholders' Equity | 24 |
| | Consolidated Statements of Cash Flows | 25 |
| | Notes to Consolidated Financial Statements | 26 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 37 |
| Item 9A. | Controls and Procedures | 38 |
| Item 9B. | Other Information | 39 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions That Prevent Inspections | 39 |

**PART III**

| | | |
|---|---|---|
| Item 10. | Directors, Executive Officers and Corporate Governance | 39 |
| Item 11. | Executive Compensation | 39 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 39 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 39 |
| Item 14. | Principal Accounting Fees and Services | 39 |

**PART IV**

| | | |
|---|---|---|
| Item 15. | Exhibits, Financial Statement Schedules | 40 |
| Item 16. | Form 10-K Summary | 43 |

**STRYKER CORPORATION 2021 FORM 10-K**

---

**PART I**

## ITEM 1.    BUSINESS.

Stryker Corporation (Stryker or the Company) is one of the world's leading medical technology companies and, together with its customers, is driven to make healthcare better. Stryker offers innovative products and services in Medical and Surgical, Neurotechnology, Orthopaedics and Spine that help improve patient and hospital outcomes.

Our core values guide our behaviors and actions and are fundamental to how we execute our mission.



Stryker was incorporated in Michigan in 1946 as the successor company to a business founded in 1941 by Dr. Homer H. Stryker, a prominent orthopaedic surgeon and the inventor of several medical products. Our products are sold in over 75 countries through company-owned subsidiaries and branches, as well as, third-party dealers and distributors, and include surgical equipment and surgical navigation systems; endoscopic and communications systems; patient handling, emergency medical equipment and intensive care disposable products; neurosurgical and neurovascular devices; implants used in joint replacement and trauma surgeries; Mako Robotic-Arm Assisted technology; spinal devices; as well as other products used in a variety of medical specialties. In the United States most of our products are marketed directly to doctors, hospitals and other healthcare facilities.

As used herein, and except where the context otherwise requires, "Stryker," "we," "us," and "our" refer to Stryker Corporation and its consolidated subsidiaries.

### Business Segments and Geographic Information

Effective December 31, 2021 we changed our reportable business segments to (i) MedSurg and Neurotechnology and (ii) Orthopaedics and Spine to align to our new internal reporting structure. We have reflected this change in all historical periods presented. Financial information regarding our reportable business segments and certain geographic information is included under "Consolidated Results of Operations" in Item 7 of this report and Note 14 to our Consolidated Financial Statements.

*Net Sales by Reportable Segment*

|  | 2021 | | | 2020 | | | 2019 | | |
|---|---|---|---|---|---|---|---|---|---|
| MedSurg and Neurotechnology | $ | 9,538 | 56 % | $ | 8,345 | 58 % | $ | 8,475 | 57 % |
| Orthopaedics and Spine | | 7,570 | 44 | | 6,006 | 42 | | 6,409 | 43 |
| **Total** | **$** | **17,108** | **100 %** | **$** | **14,351** | **100 %** | **$** | **14,884** | **100 %** |

### MedSurg and Neurotechnology

MedSurg products include surgical equipment, patient and caregiver safety technologies, and navigation systems

(Instruments), endoscopic and communications systems (Endoscopy), patient handling, emergency medical equipment and intensive care disposable products (Medical), reprocessed and remanufactured medical devices, and other medical device products used in a variety of medical specialties. Neurotechnology includes neurosurgical, neurovascular and craniomaxillofacial implant products. Our neurotechnology offering includes products used for minimally invasive endovascular procedures; a comprehensive line of products for traditional brain and open skull based surgical procedures; orthobiologic and biosurgery products, including synthetic bone grafts and vertebral augmentation products (Neuro Cranial); and minimally invasive products for the treatment of acute ischemic and hemorrhagic stroke (Neurovascular). The craniomaxillofacial implant offering includes cranial, maxillofacial, and chest wall devices, as well as, dural substitutes and sealants.

We are one of five leading global competitors in Instruments; the other four being Zimmer Biomet Holdings, Inc. (Zimmer), Medtronic plc., Johnson & Johnson and ConMed Linvatec, Inc. (a subsidiary of CONMED Corporation). In Endoscopy we compete with Karl Storz GmbH & Co., Olympus Optical Co. Ltd., Smith & Nephew plc (Smith & Nephew), ConMed Linvatec, Arthrex, Inc. and STERIS plc. In Medical our primary competitors are Baxter/Hill-Rom, Inc., Zoll Medical Corporation, Medline Industries and Ferno-Washington, Inc. Stryker is also one of five leading global competitors in Neurotechnology; the other four being Medtronic, Johnson & Johnson, Terumo Corporation and Penumbra, Inc.

*Composition of MedSurg and Neurotechnology Net Sales*

|  | 2021 | | | 2020 | | | 2019 | | |
|---|---|---|---|---|---|---|---|---|---|
| Instruments | $ | 2,111 | 22 % | $ | 1,863 | 22 % | $ | 1,959 | 23 % |
| Endoscopy | | 2,141 | 22 | | 1,763 | 21 | | 1,983 | 23 |
| Medical | | 2,607 | 27 | | 2,524 | 30 | | 2,264 | 27 |
| Neurovascular | | 1,188 | 13 | | 973 | 12 | | 924 | 11 |
| Neuro Cranial | | 1,214 | 13 | | 972 | 12 | | 1,059 | 13 |
| Other | | 277 | 3 | | 250 | 3 | | 286 | 3 |
| **Total** | **$** | **9,538** | **100 %** | **$** | **8,345** | **100 %** | **$** | **8,475** | **100 %** |

In 2021 Instruments launched a T7 helmet with increased comfort and disposables in orthopaedic instruments, and had strong second year sales of TPX next generation corded power tools for conducting small bone orthopaedic procedures. Endoscopy launched the SLX surgical light portfolio to improve safety in the operating room through customized lighting. In addition, Endoscopy launched the InSpace balloon, the industry's first balloon implant for arthroscopic treatment of massive, irreparable rotator cuff tears (MIRCTs). Medical increased penetration and focus in their broad portfolio with significant investment in their specialized sales forces.

In 2021 we furthered our expansion into the global flow diversion market with the continued launch of the next generation Surpass Evolve™ Flow Diverter in the United States and Brazil, as well as the Surpass Streamline™ Flow Diverter in China and Japan. Also in 2021 we continued the launches of the Trevo NXT and Vecta Aspiration Catheter families, as well as the next generation of the market leading Synchro guidewire in multiple regions of the world.

### Orthopaedics and Spine

Orthopaedics products consist primarily of implants used in total joint replacements, such as hip, knee and shoulder, and trauma and extremities surgeries. We bring patients and physicians advanced implant designs and specialized instrumentation that make orthopaedic surgery and recovery simpler, faster and more effective. We support surgeons with the technology and services they need as they develop new surgical techniques. The Mako

---

**STRYKER CORPORATION 2021 FORM 10-K**

Robotic-Arm Assisted Surgical System was designed to help surgeons provide patients with a personalized surgical experience based on their specific diagnosis and anatomy. The Mako System currently offers three applications supporting Partial Knee, Total Hip and Total Knee procedures. Mako is the only robotic-arm assisted technology enabled by 3D CT-based pre-operative planning and, with AccuStop™ haptic technology, Mako provides surgeons the ability to know more about their patients' anatomy so they can cut less in bone preparation and implant placement with intra-operative haptic guidance.

Our spinal implant offering includes cervical and thoracolumbar systems that include fixation, minimally invasive and interbody systems used in spinal injury, complex spine and degenerative therapies. Our spine enabling technologies portfolio includes best in class imaging solutions, image-guided surgical technology, patient specific implants and digital health solutions supporting surgeons and their patients throughout the continuum of care.

We are one of four leading global competitors for joint replacement and trauma and extremities products and robotics; the other three being Zimmer, DePuy Synthes (a Johnson & Johnson company) and Smith & Nephew. We are one of five leading global competitors in Spine; the other four being Medtronic Sofamor Danek, Inc. (a subsidiary of Medtronic), DePuy Synthes, Nuvasive, Inc. and Globus Medical, Inc.

***Composition of Orthopaedics and Spine Net Sales***

| | | 2021 | | | 2020 | | | 2019 | |
|---|---|---|---|---|---|---|---|---|---|
| Knees | $ | 1,848 | 25 % | $ | 1,567 | 26 % | $ | 1,815 | 28 % |
| Hips | | 1,342 | 18 | | 1,206 | 20 | | 1,383 | 22 |
| Trauma and Extremities | | 2,664 | 35 | | 1,722 | 29 | | 1,639 | 26 |
| Spine | | 1,167 | 15 | | 1,047 | 17 | | 1,157 | 18 |
| Other | | 549 | 7 | | 464 | 8 | | 415 | 6 |
| **Total** | $ | **7,570** | **100 %** | $ | **6,006** | **100 %** | $ | **6,409** | **100 %** |

In 2021 we moved to full commercial launch in the United States, and first clinical use in the European Union and Canada, of the new Tornier Perform Humeral™ shoulder implant system for anatomic and reverse shoulder arthroplasty. United States Food and Drug Administration (FDA) approval was received in 2020, Health Canada approval was received in the first quarter of 2021 and European Union approval is expected in early 2022.

**Raw Materials and Inventory**

Raw materials essential to our business are generally readily available from multiple sources; however, certain of our raw materials are currently sourced from single suppliers. Substantially all products we manufacture are stocked in inventory, while certain MedSurg products are assembled to order. Where some electronic components have had limited availability due to current global shortages, we have worked closely with suppliers to ensure this temporary supply constraint did not have a material adverse effect on continuity of supply.

**Patents and Trademarks**

Patents and trademarks are significant to our business to the extent that a product or an attribute of a product represents a unique design or process. Patent protection of such products restricts competitors from duplicating these unique designs and features. We seek to obtain patent protection on our products whenever appropriate for protecting our competitive advantage. On December 31, 2021 we owned approximately 4,458 United States patents and approximately 7,199 patents in other countries.

**Seasonality**

Our business is generally not seasonal in nature; however, the number of orthopaedic implant surgeries is typically lower in the summer months, and sales of capital equipment are generally

higher in the fourth quarter. The dollar amount of customer backlog orders at any given time is not meaningful to an understanding of our business taken as a whole.

**Competition**

In each of our product lines we compete with local and global companies. The development of new and innovative products is important to our success in all areas of our business. Competition in research involving the development and improvement of new and existing products and processes is particularly significant. The competitive environment requires substantial investments in continuing research and maintaining sales forces.

We believe our commitment to innovation, quality and service and our reputation differentiates us in the highly competitive product categories in which we operate and enables us to compete effectively. We believe that our competitive position in the future will depend to a large degree on our ability to develop new products and make improvements to existing products.

**Regulation**

Our businesses are subject to varying degrees of governmental regulation in the countries in which we operate, and the general trend is toward increasingly stringent regulation.

In the United States the Medical Device Amendments of 1976 to the Federal Food, Drug and Cosmetic Act and its subsequent amendments and the regulations issued and proposed thereunder provide for regulation by the FDA of the design, manufacture and marketing of medical devices, including most of our products. Many of our new products fall into FDA classifications that require notification submitted as a 510(k) and review by the FDA before we begin marketing them. Certain of our products require extensive clinical testing, consisting of safety and efficacy studies, followed by pre-market approval (PMA) applications for specific surgical indications. Certain of our products also fall under other FDA classifications, such as drugs and Human Cells, Tissues, and Cellular and Tissue-Based Products.

The FDA's Quality System regulations set forth standards for our product design and manufacturing processes, require the maintenance of certain records and provide for inspections of our facilities by the FDA. There are also certain requirements of state, local and foreign governments that must be complied with in the manufacture and marketing of our products.

The European Union enacted the European Union Medical Device Regulation in May 2017 with an effective date of May 2021, which imposes stricter requirements for the marketing and sale of medical devices, including in the areas of clinical evaluation requirements, quality systems, labeling and post-market surveillance. Additionally, as a result of the exit of the United Kingdom from the European Union (Brexit), new medical device regulations were released by the United Kingdom, which became effective January 1, 2021. A gap analysis against the prior Medical Device Directive (MDD) and a compliance plan are being implemented for both the European Union and United Kingdom regulations to ensure compliance and minimize business disruption. Finally, we are required to comply with the unique regulatory requirements of each country within which we market and sell our products. For example, China's National Medical Products Administration (NMPA) has recently promulgated more stringent regulatory requirements.

Initiatives to limit the growth of general healthcare expenses and hospital costs are ongoing in the markets in which we do business. These initiatives are sponsored by government agencies, legislative bodies and the private sector and include

price regulation and competitive pricing. It is not possible to predict at this time the long-term impact of such cost containment measures on our future business. In addition, business practices in the healthcare industry are scrutinized, particularly in the United States, by federal and state government agencies. The resulting investigations and prosecutions carry the risk of significant civil and criminal penalties.

### Environment

We are subject to various rules and regulation in the United States and internationally related to the protection of human health and the environment. Our operations involve the use of substances regulated under environmental laws, primarily in manufacturing and sterilization processes. We believe our policies, practices and procedures are properly designed to comply, in all material respects, with applicable environmental laws and regulations. We do not expect compliance with these requirements to have a material effect on purchases of property, plant and equipment, cash flows, net earnings or competitive position.

### Employees

On December 31, 2021 we had approximately 46,000 employees globally, with approximately 25,000 employees in the United States. Our talented employees are an integral reason for our standing as one of the world's leading medical technology companies where, together with our customers, we are driven to make healthcare better. Our company values of integrity, accountability, people and performance are a key component of that mission. Our people, as one of our core values, continue to be a key focus.

Our success is dependent on our ability to attract the best talent that reflects our diverse communities. To do so, we continue to focus on the basics of creating a great workplace. We believe in attracting the right people, maintaining and building employee engagement and developing our employees. We believe when people are able to do what they do best, they will look forward to coming to work and, in turn, will deliver great business results. Stryker is made up of hardworking, results-oriented people who are driven to go above and beyond for our customers.

Our leadership team and Board of Directors receive regular updates on our people and culture strategy and provide feedback on our strategy and goals, including alignment to mission and values, peer benchmarking and stakeholder feedback.

### Employee Development

Our employee development is extensive and exists at all levels of the organization, including company-wide training on our Code of Conduct, job-related technical training and management and leadership training. Our development programs include on-the-job learning, coaching and mentoring, management and leadership development courses, team building and collaboration training and immersive experiences with expert partners.

We encourage all employees to establish individual development plans, in partnership with their manager, to help employees gain the needed development experience to grow their careers.

### Employee Engagement

An engaged workplace culture that drives performance and business outcomes is central to our mission. Listening to and learning from our employees forms the foundation of an engaging culture. More than 90% of our global employees participate in our annual engagement survey, which provides a valued platform for listening and allows us to take action based on the feedback collected.

We supplement our annual engagement survey with targeted pulse surveys to gather feedback on topics relevant to the current climate. Additionally, we establish forums for collecting qualitative feedback to gain insights and identify actions we can take to ensure all employees feel included, engaged and able to achieve their full potential.

We also provide tools and resources that enable managers and teams to act on the insights we gain from our surveys and to drive employee engagement and strong business outcomes.

### Diversity, Equity and Inclusion (DE&I)

An essential part of our culture is respecting each individual's strengths and values. Building on this foundation, we are focused on maintaining an inclusive, engaging work environment and prioritizing DE&I in keeping with our values of integrity and people. Our DE&I strategy is centered around these three commitments:

- Strengthen the diversity of our workforce
- Advance a culture of inclusion, engagement and belonging
- Maximize the power of inclusion to drive innovation and growth

We are advancing our commitments through the following actions, among others:

- Holding leadership accountable through transparent data, performance objectives and inclusion in our business review process
- Engaging and inspiring all talent and empowering every employee to take action
- Developing our people and processes by removing barriers and optimizing the power of diverse backgrounds, talents and perspectives
- Attracting a diverse talent pool through focused outreach and ensuring an objective hiring process
- Advancing our employee resource groups (ERGs) to expand reach through executive leadership, global presence, funding and aligned strategies
- Positively impacting our customers and communities through building and strengthening external partnerships

As of December 31, 2021, approximately 36.6% of our global employees were women and 26.0% of our employees in the United States identified as racially or ethnically diverse.

### Attracting and Hiring

We understand that every employee drives our success. We focus on attracting, identifying and selecting strong candidates who will be successful at Stryker and ensuring that each person we hire brings the talent, expertise and passion we need to continue to be successful.

### Health and Safety

Ensuring our employees' safety is a top priority. It is a responsibility that we share throughout the company and one that has evolved to meet the needs of our workforce during the pandemic. Employees' safety risks vary depending on the roles they perform, so we tailor our safety efforts accordingly.

### Competitive Pay and Benefits

Our compensation and benefits programs are designed to attract and retain top talent and to incentivize performance and alignment to our mission and values.

We offer market-competitive base pay and benefits to our employees in countries around the world. We regularly evaluate our compensation and benefit offerings and levels, using

**STRYKER CORPORATION 2021 FORM 10-K**

recognized outside consulting firms to ensure fairness and competitiveness in our offerings.

Most of our employees also have variable components to their compensation packages that reward employees based on individual, business unit and/or company-wide performance.

Our proxy statement provides more detail on the competitive compensation programs we offer.

### Information about our Executive Officers

*As of January 31, 2022*

| Name | Age | Title | First Became an Executive Officer |
|------|-----|-------|-----------------------------------|
| Kevin A. Lobo | 56 | Chair, Chief Executive Officer and President | 2011 |
| Yin C. Becker | 58 | Vice President, Communications, Public Affairs and Corporate Marketing | 2016 |
| William E. Berry Jr. | 56 | Vice President, Chief Accounting Officer | 2014 |
| Glenn S. Boehnlein | 60 | Vice President, Chief Financial Officer | 2016 |
| M. Kathryn Fink | 52 | Vice President, Chief Human Resources Officer | 2016 |
| Robert S. Fletcher | 51 | Vice President, Chief Legal Officer | 2019 |
| Viju S. Menon | 54 | Group President, Global Quality and Operations | 2018 |
| J. Andrew Pierce | 48 | Group President, MedSurg and Neurotechnology | 2021 |
| Spencer S. Stiles | 45 | Group President, Orthopaedics and Spine | 2021 |

Each of our executive officers was elected by our Board of Directors to serve in the office indicated until the first meeting of the Board of Directors following the annual meeting of shareholders in 2022 or until a successor is chosen and qualified or until his or her resignation or removal. Each of our executive officers held the position above or served Stryker in various executive or administrative capacities for at least five years, except for Mr. Fletcher and Mr. Menon. Prior to joining Stryker in April 2019, Mr. Fletcher held various legal leadership roles with Johnson & Johnson for the previous 14 years, most recently as the Worldwide Vice President, Litigation. Prior to joining Stryker in April 2018, Mr. Menon held various senior supply chain leadership roles with Verizon Communications Inc. during the previous eight years, most recently as the Chief Supply Chain Officer.

### Available Information

Our main corporate website address is *www.stryker.com*. Copies of our filings with the United States Securities and Exchange Commission (SEC) are available free of charge on our website within the "Investors Relations" section as soon as reasonably practicable after having been electronically filed or furnished to the SEC. All SEC filings are also available at the SEC's website at *www.sec.gov*.

### ITEM 1A.        RISK FACTORS.

This report contains statements that are not historical facts and are considered "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. These statements are based on current projections about operations, industry conditions, financial condition and liquidity. Words that identify forward-looking statements include words such as "may," "could," "will," "should," "possible," "plan," "predict," "forecast," "potential," "anticipate," "estimate," "expect," "project," "intend," "believe," "may impact," "on track," "goal," "strategy" and words and terms of similar substance used in connection with any discussion of future operating or financial performance, an acquisition or our businesses. In addition, any statements that

refer to expectations, projections or other characterizations of future events or circumstances, including any underlying assumptions, are forward-looking statements. Those statements are not guarantees and are subject to risks, uncertainties and assumptions that are difficult to predict. Therefore, actual results could differ materially and adversely from these forward-looking statements. Some important factors that could cause our actual results to differ from our expectations in any forward-looking statements include the risks discussed below.

Our operations and financial results are subject to various risks and uncertainties, including those discussed below that could materially and adversely affect our business, cash flows, financial condition and results of operations. Additional risks and uncertainties not currently known to us or that we currently deem not to be material may also materially and adversely affect our business, cash flows, financial condition or results of operations.

### COVID-19 PANDEMIC RISKS

**The COVID-19 pandemic has materially adversely affected, and could continue to materially adversely affect, our operations, supply chain, manufacturing, product distribution, customers and other business activities:** The global COVID-19 pandemic has led to severe disruptions in the market and the United States and international economies that may continue for a prolonged duration and trigger a recession or a period of economic slowdown. In response, various governmental authorities and private enterprises have implemented, and may continue to implement, numerous measures to contain the pandemic, such as travel bans and restrictions, quarantines, shelter-in-place orders and shutdowns. A significant number of our customers, global suppliers, distributors and manufacturing facilities are located in regions that have been affected by the pandemic and those operations have been, and could continue to be, materially affected by restrictive measures implemented in response to the pandemic. As a result, some of our customers, distributors and indirect sales channels have at times been unable to retain employees, distribute or use our products or provide required services. Any delay or shortage in the supply of components or materials or delay in delivering our products may result in our inability to satisfy consumer demand for our products in a timely manner or at all, which could harm our reputation, future sales and profitability. For example, certain of our products contain electronic components and we have experienced, and could continue to experience, limited product availability due to the electronic components shortage in certain product lines. If the shortage persists, we may not be able to obtain electronic components from our suppliers on a timely basis, or at all, or identify any alternative suppliers to provide the electronic components we need to produce our products.

In addition, the pandemic could adversely impact our ability, and the ability of our third-party suppliers, manufacturers, distributors and customers, to retain key employees and ensure the continued service and availability of skilled personnel necessary to run our, and their, complex operations. To the extent our management or other personnel, or the management or other personnel of our third-party suppliers, manufacturers, distributors and customers, are impacted in significant numbers by the pandemic and are not available to perform their job duties, we could experience delays in, or the suspension of, our manufacturing operations, sales activities, research and product development activities, regulatory work streams, clinical development programs and other important commercial and corporate functions.

Moreover, the actions we take to mitigate the effect of the pandemic on our workforce could reduce the efficiency of our operations or prove insufficient. Our relationships with our employees may be disrupted due to measures implemented in response to the COVID-19 pandemic. We have observed an overall tightening and increasingly competitive labor market due to labor shortages caused in part by the COVID-19 pandemic and responsive measures, which has included increased wages offered by other employers and voluntary attrition of our employees and the employees of our third-party suppliers, manufacturers, distributors and customers.

The extent of the pandemic's effect on our business and industry will depend on future developments, including the duration, spread and intensity of the pandemic, including future resurgences and/or the spread of variants, and the successful development, distribution and acceptance of vaccines for COVID-19, all of which are uncertain and difficult to predict. We are not able at this time to estimate with certainty the effect of these and other unforeseen factors on our business, but the adverse impact on our business, cash flows, financial condition and results of operations has been, and could in the future be, material. A prolonged impact of COVID-19 also could heighten many of the other risks described in this report.

**We have experienced, and may continue to experience, a significant and unpredictable need to adjust our operations as market demand for certain of our products has shifted and continues to shift or as may be mandated by governmental authorities in response to the COVID-19 pandemic:** Some of our products are particularly sensitive to reductions in elective medical procedures. Elective medical procedures were suspended or reduced at various times in 2020 and 2021 in many of the markets where our products are marketed and sold, which negatively affected our business, cash flows, financial condition and results of operations. It is not possible to predict whether elective medical procedures will again be suspended or reduced in the future and, to the extent individuals and customers are required to continue to de-prioritize, delay or cancel elective procedures as a result of the COVID-19 pandemic or otherwise, our business, cash flows, financial condition and results of operations could be negatively affected.

In addition, our products in certain divisions, such as Medical, have experienced, and could continue to experience, higher demand as our customers focus on treating COVID-19 patients. Unpredictable increases in demand for certain of our products has exceeded in the past, and could exceed in the future, our capacity to meet such demand timely, which could adversely affect our customer relationships and result in negative publicity. In this regard, the accelerated development and production of products and services in an effort to address medical and other requirements as a result of the pandemic could increase the risk of regulatory enforcement actions, product defects or related claims.

## LEGAL AND REGULATORY RISKS

**Current economic and political conditions make tax rules in jurisdictions subject to significant change**: Our future results of operations could be affected by changes in the effective tax rate as a result of changes in tax laws, regulations and judicial rulings. We are continuing to evaluate the impact of tax reform in the countries in which we operate as new guidance and regulations are published. In addition, further changes in the tax laws could arise, including as a result of the base erosion and profit shifting (BEPS) project undertaken by the Organisation for

Economic Cooperation and Development (OECD). The OECD, which represents a coalition of member countries, has issued recommendations that, in some cases, would make substantial changes to numerous long-standing tax positions and principles. These contemplated changes, to the extent adopted by OECD members and/or other countries, could increase tax uncertainty and may adversely affect our provision for income taxes.

**We could be negatively impacted by future changes in the allocation of income to each of the income tax jurisdictions in which we operate:** We operate in multiple income tax jurisdictions both in the United States and internationally. Accordingly, our management must determine the appropriate allocation of income to each jurisdiction based on current interpretations of complex income tax regulations. Income tax authorities regularly perform audits of our income tax filings. Income tax audits associated with the allocation of income and other complex issues, including inventory transfer pricing and cost sharing, product royalty and foreign branch arrangements, may require an extended period of time to resolve and may result in significant income tax adjustments.

**The impact of United States healthcare reform legislation on our business remains uncertain:** In 2010 the Patient Protection and Affordable Care Act (ACA) was enacted. While the provisions of the ACA are intended to expand access to health insurance coverage and improve the quality of healthcare over time, other provisions of the legislation, including Medicare provisions aimed at decreasing costs, comparative effectiveness research, an independent payment advisory board and pilot programs to evaluate alternative payment methodologies, are having a meaningful effect on the way healthcare is developed and delivered and could have a significant effect on our business. There have been ongoing litigation and congressional efforts to modify or repeal all or certain provisions of the ACA. We face uncertainties that might result from modification or repeal of any of the provisions of the ACA, including as a result of current and future executive orders and legislative actions. We cannot predict what other healthcare programs and regulations will ultimately be implemented at the federal or state level or the effect that any future legislation or regulation in the United States may have on our business.

**We are subject to extensive governmental regulation relating to the classification, manufacturing, sterilization, labeling, marketing and sale of our products:** The classification, manufacturing, sterilization, labeling, marketing and sale of our products are subject to extensive and evolving regulations and rigorous regulatory enforcement by the FDA, European Union, the NMPA in China, and other governmental authorities in the United States and internationally. The process of obtaining regulatory clearances and/or approvals to market and sell our products can be costly and time consuming and the clearances and/or approvals might not be granted timely. We have ongoing responsibilities under the laws and regulations applicable to the manufacturing of products within our facilities and those contracted by third parties that are subject to periodic inspections by the FDA and other governmental authorities to determine compliance with the quality system, medical device reporting regulations and other requirements. Costs to comply with regulations, including the European Union Medical Device Regulation enacted by the European Union in May 2017 and effective in May 2021, the free trade agreement between the United Kingdom and the European Union that became effective January 1, 2021, and the regulatory laws established by the NMPA in China, and costs associated with remediation can be significant. If we fail to comply with applicable regulatory

requirements, we may be subject to a range of sanctions, including substantial fines, warning letters that require corrective action, product seizures, recalls, the suspension of product manufacturing, revocation of approvals, exclusion from future participation in government healthcare programs, substantial fines and criminal prosecution.

**We are subject to federal, state and foreign healthcare regulations, including anti-bribery, anti-corruption, anti-kickback and false claims laws, globally and could face substantial penalties if we fail to comply with such regulations and laws:** The relationships that we, and third-parties that market and/or sell our products, have with healthcare professionals, such as physicians, hospitals, healthcare organizations and others, are subject to scrutiny under various state and federal laws often referred to collectively as healthcare fraud and abuse laws. In addition, the United States and foreign government regulators have increased the enforcement of the Foreign Corrupt Practices Act (FCPA) and other anti-bribery and anti-kickback laws. We also must comply with a variety of other laws that impose extensive tracking and reporting related to all transfers of value provided to certain healthcare professionals and others. These laws and regulations are broad in scope and are subject to evolving interpretation and we have in the past been, and in the future could be, required to incur substantial costs to investigate, audit and monitor compliance or to alter our practices. Violations of these laws could result in litigation and we may be subject to criminal or civil penalties and sanctions, including substantial fines, imprisonment of current or former employees and exclusion from participation in governmental healthcare programs. In 2013 and 2018 we settled claims brought by the United States Securities and Exchange Commission (SEC) related to the FCPA. Pursuant to these settlements, we paid fines and penalties and retained an independent compliance consultant. We continue to implement recommendations that resulted from the independent compliance consultant's review of our commercial practices to enhance our commercial business practices.

**We are subject to privacy, data protection and data security regulations and laws globally, and could face substantial penalties if we fail to comply with such regulations and laws:** We are subject to a variety of laws and regulations globally regarding privacy, data protection, and data security, including those related to the collection, storage, handling, use, disclosure, transfer, and security of personally identifiable healthcare information. For example, in the United States, privacy and security regulations under the Health Insurance Portability and Accountability Act of 1996, including the expanded requirements under the Health Information Technology for Economic and Clinical Health Act of 2009, establish comprehensive standards with respect to the use and disclosure of protected health information (PHI), by covered entities, in addition to setting standards to protect the confidentiality, integrity and security of PHI. Further, the European Union's General Data Protection Regulation (GDPR), which became effective in May 2018, applies to all of our activities related to products and services that we offer to European Union customers and employees. The GDPR established requirements regarding the handling of personal data and includes significant penalties for non-compliance (including possible fines of up to 4% of total company revenue). Other governmental authorities around the world are considering similar types of legislative and regulatory proposals concerning data protection, which could impose significant limitations and increase our cost of providing our products and services where we process personal data. These laws and regulations are broad

in scope and are subject to evolving interpretation and we have in the past been, and in the future could be, required to incur substantial costs to monitor compliance or to alter our practices.

**We may be adversely affected by product liability claims, unfavorable court decisions or legal settlements:** We are exposed to potential product liability risks inherent in the design, manufacture and marketing of medical devices, many of which are implanted in the human body for long periods of time or indefinitely. We may be exposed to additional potential product liability risks related to products designed, manufactured and marketed in response to the COVID-19 pandemic, including discretionary products and products permitted under the Emergency Use Authorization granted by the FDA. We are currently defendants in a number of product liability matters, including those relating to our Rejuvenate and ABGII Modular-Neck hip stems, LFIT Anatomic CoCr V40 Femoral Heads and the product liability lawsuits and claims relating to Wright legacy hip products discussed in Note 7 to our Consolidated Financial Statements. These matters are subject to many uncertainties and outcomes are not predictable. Further, in November 2020 the European Parliament voted in favor of the European Representative Actions Directive (the Collective Redress Directive), which mandates a class action regime in each member state to facilitate domestic and cross-border class actions in a wide range of areas, including product liability claims with medical devices. The Collective Redress Directive will take effect in 2023 after a 24-month implementation period. The Collective Redress Directive, when implemented, could result in additional litigation risks and significant legal expenses for us. In addition, we may incur significant legal expenses for product liability claims regardless of whether we are found to be liable.

**Intellectual property litigation and infringement claims could cause us to incur significant expenses or prevent us from selling certain of our products:** The medical device industry is characterized by extensive intellectual property litigation and, from time to time, we are the subject of claims of infringement or misappropriation. Regardless of outcome, such claims are expensive to defend and divert management and operating personnel from other business issues. A successful claim or claims of patent or other intellectual property infringement against us could result in payment of significant monetary damages and/or royalty payments or negatively impact our ability to sell current or future products in the affected category.

**Dependence on patent and other proprietary rights and failing to protect such rights or to be successful in litigation related to such rights may impact offerings in our product portfolios:** Our long-term success largely depends on our ability to market technologically competitive products. If we fail to obtain or maintain adequate intellectual property protection, it could allow others to sell products that directly compete with proprietary features in our product portfolio. Also, our issued patents may be subject to claims challenging their validity and scope and raising other issues. In addition, currently pending or future patent applications may not result in issued patents.

## MARKET RISKS

**We have exposure to exchange rate fluctuations on cross border transactions and translation of local currency results into United States Dollars:** We report our financial results in United States Dollars and approximately 30% of our net sales are denominated in foreign currencies, including the Australian Dollar, British Pound, Canadian Dollar, Chinese Yuan, Euro and Japanese Yen. Cross border transactions with external parties and intercompany relationships result in increased exposure to

foreign currency exchange effects. While we use derivative instruments to manage the impact of currency exchange, our hedging strategies may not be successful, and our unhedged exposures continue to be subject to currency fluctuations. In addition, the weakening or strengthening of the United States Dollar results in favorable or unfavorable translation effects when the results of our foreign locations are translated into United States Dollars.

**Additional capital that we may require in the future may not be available to us or may only be available to us on unfavorable terms, which could negatively affect our liquidity:** Our future capital requirements will depend on many factors, including operating requirements, current and future acquisitions and the need to refinance existing debt. Our ability to issue additional debt or enter into other financing arrangements on acceptable terms could be adversely affected by our debt levels, unfavorable changes in economic conditions or uncertainties that affect the capital markets, including disruption caused by the COVID-19 pandemic. Changes in credit ratings issued by nationally recognized credit rating agencies could also adversely affect our access to and cost of financing. Higher borrowing costs or the inability to access capital markets could adversely affect our ability to support future growth and operating requirements. In addition, we have experienced, and could continue to experience, loss of sales and profits due to delayed payments or insolvency of healthcare professionals, hospitals and other customers and suppliers facing liquidity issues caused by the COVID-19 pandemic. As a result, we may be compelled to take additional measures to preserve our cash flow, including through the reduction of operating expenses or suspension of dividend payments, at least until the consequences of the pandemic subside.

## BUSINESS AND OPERATIONAL RISKS

**We are subject to cost containment measures in the United States and other countries resulting in pricing pressures:** Initiatives to limit the growth of general healthcare expenses and hospital costs are ongoing in the markets in which we do business. These initiatives are sponsored by government agencies, legislative bodies and the private sector and include price regulation and competitive pricing. For example, China has implemented a volume-based procurement process designed to decrease prices for medical devices and other products. This has already impacted our joint replacement business on a national level, and our trauma and spine products on a provincial level, and we expect further adoption of volume-based procurement provincially or nationally in China in 2022. Pricing pressure has also increased due to continued consolidation among healthcare providers, trends toward managed care, the shift toward governments becoming the primary payers of healthcare expenses, reduction in reimbursement levels and medical procedure volumes and government laws and regulations relating to sales and promotion, reimbursement and pricing generally.

**We operate in a highly competitive industry in which competition in the development and improvement of new and existing products is significant:** The markets in which we compete are highly competitive. New business models, products and surgical procedures are introduced on an ongoing basis and our present or future products could be rendered obsolete or uneconomical by technological advances by us, as we continue to innovate to address physician and patient needs, or by our existing competitors and new market entrants. Our existing competitors and new market entrants may respond more quickly to new or emerging technologies, undertake more extensive marketing campaigns, have greater access to clinical information

to support ongoing product position in the market, have greater financial, marketing and other resources or be more successful in attracting potential customers, employees and strategic partners.

**We may be unable to maintain adequate working relationships with healthcare professionals:** We seek to maintain close working relationships with respected physicians and medical personnel in healthcare organizations, such as hospitals and universities, who assist in product research and development. We rely on these professionals to assist us in the development and improvement of proprietary products. As a result of the COVID-19 pandemic, our access to these professionals has been limited as hospitals have restricted access for non-patients, including our research and development specialists and other employees, and governmental authorities have imposed travel restrictions, shutdowns or similar measures, which has adversely affected our ability to develop, market and sell products. If we are unable to maintain these relationships, our ability to develop, market and sell new and improved products could be further adversely affected.

**We rely on indirect distribution channels and major distributors that are independent of Stryker:** In many markets, we rely on indirect distribution channels to market, distribute, and sell our products. These indirect channels often are the main point of contact for the healthcare professionals and healthcare organization customers who buy and use our products. Our ability to market, distribute, and sell our products through indirect channels has been adversely affected as a result of precautionary responses to the COVID-19 pandemic, including travel restrictions, suspension and shutdown orders and other measures intended to limit person-to-person contact. Our ability to continue to market, distribute, and sell our products may be at risk if the indirect channels become insolvent, choose to sell competitive products, choose to stop selling medical technology, or are subject to new or additional government regulation, whether related to the COVID-19 pandemic or for unrelated reasons.

**We are subject to risks associated with our extensive global operations:** We develop, manufacture and distribute our products globally. Our global operations are subject to risks and potential costs, including changes in reimbursement, changes in regulatory requirements, differing local product preferences and product requirements, diminished protection of intellectual property in some countries, tariffs and other trade protection measures, international trade disputes and import or export requirements, difficulty in staffing and managing foreign operations, introduction of new internal business structures and programs, political and economic instability, such as the United Kingdom's exit from the European Union (Brexit), and disruptions of transportation due to a global pandemic of contagious diseases like COVID-19 or otherwise, such as reduced availability of transportation, port closures, increased border controls or closures, increased transportation costs and increased security threats to our supply chain. Our business could be adversely impacted if we are unable to successfully manage these and other risks of global operations in an increasingly volatile environment.

**We may be unable to capitalize on previous or future acquisitions:** In addition to internally developed products, we invest in new products and technologies through acquisitions, including our pending acquisition of Vocera Communications, Inc. Such investments are inherently risky, and we cannot guarantee that any acquisition will be successful or will not have a material unfavorable impact on us. The risks include the activities required and resources allocated to integrate new businesses, diversion of

management time that could adversely affect management's ability to focus on other projects, the inability to realize the expected benefits, savings or synergies from the acquisition, the loss of key personnel, litigation resulting from the acquisition and exposure to unexpected liabilities of acquired companies. In addition, we cannot be certain that the businesses we acquire will become or remain profitable.

**We could experience a failure of a key information technology system, process or site or a breach of information security, including a cybersecurity breach or failure of one or more key information technology systems, networks, processes, associated sites or service providers:** We rely extensively on information technology (IT) systems to conduct business. In addition, we rely on networks and services, including internet sites, cloud and SaaS solutions, data hosting and processing facilities and tools and other hardware, software (including open source software) and technical applications and platforms, some of which are managed, hosted, provided and/or used by third-parties or their vendors, to assist in conducting our business. Numerous and evolving cybersecurity threats have posed, and will continue to pose, risks to the security of our IT systems, networks and product offerings, as well as the confidentiality, availability and integrity of our data. Some of our products and services, and information technology systems, contain or use open source software, which poses particular risks, including potential security vulnerabilities, licensing compliance issues and quality issues. A security breach, whether of our products, of our customers' network security and systems or of third-party hosting services, could impact the use of such products and the security of information stored therein. While we have made investments seeking to address these threats, including monitoring of networks and systems, hiring of experts, employee training and security policies for employees and third-party providers, the techniques used in these attacks change frequently and may be difficult to detect for periods of time and we may face difficulties in anticipating and implementing adequate preventative measures. In addition, a greater number of our employees working remotely during the COVID-19 pandemic has exposed us, and may continue to expose us, to greater risks related to cybersecurity and cyber-liability. If our IT systems are damaged or cease to function properly, the networks or service providers we rely upon fail to function properly, or we or one of our third-party providers suffer a loss or disclosure of our business or stakeholder information due to any number of causes ranging from catastrophic events or power outages to improper data handling or security breaches and our business continuity plans do not effectively address these failures on a timely basis, we may be exposed to reputational, competitive and business harm as well as litigation and regulatory action.

**An inability to successfully manage the implementation of our new commercial global enterprise resource planning (ERP) system could adversely affect our operations and operating results:** We are in the process of implementing a new commercial global ERP system. This system will replace many of our existing operating and financial systems. Such an implementation is a major undertaking, both financially and from a management and personnel perspective. Any disruptions, delays or deficiencies in the design and implementation of our new ERP system could adversely affect our ability to process orders, ship products, provide services and customer support, send invoices and track payments, fulfill contractual obligations or otherwise operate our business.

**We may be unable to attract and retain key employees:** Our sales, technical and other key personnel play an integral role in

the development, marketing and selling of new and existing products. If we are unable to recruit, hire, develop and retain a talented, competitive work force in our highly competitive industry, or if we are unable to plan effective succession for the future, we may not be able to meet our strategic business objectives. In addition, if we are unable to maintain an inclusive culture that aligns our diverse work force with our mission and values, this could adversely impact our ability to recruit, hire, develop and retain key talent. Further, the ongoing remote work environment in response to COVID-19 could harm our culture and/or decrease employee engagement, which could adversely impact our ability to recruit, hire, develop and retain a talented, competitive work force.

**Interruption of manufacturing operations could adversely affect our business:** We and our suppliers have manufacturing and supply sites all over the world; however, the manufacturing of certain of our product lines is concentrated in one or more plants or geographic regions. We have principal manufacturing and distribution facilities in the United States in Arizona, California, Florida, Illinois, Indiana, Michigan, Minnesota, New Jersey, Tennessee, Texas, Utah, Virginia and Washington, and outside the United States in China, France, Germany, Ireland, Mexico, the Netherlands, Puerto Rico, Switzerland and Turkey. Damage to our facilities, to our suppliers' or service providers' facilities, or to our central distribution centers as a result of natural disasters, fires, explosions or otherwise, as well as issues in our manufacturing arising from a failure to follow specific internal protocols and procedures, compliance concerns relating to the quality systems regulation, equipment breakdown or malfunction, IT system failures or cybersecurity incidents, environmental hazard incidents or changes to environmental regulations or other factors, could adversely affect the availability of our products. In the event of an interruption in manufacturing, we may be unable to move quickly to alternate means of producing affected products to meet customer demand. In the event of a significant interruption, we may experience lengthy delays in resuming production of affected products due to the need for regulatory approvals, and we may experience loss of market share, additional expense and harm to our reputation.

**We use a variety of raw materials, components, devices and third-party services in our global supply chains, production and distribution processes; significant shortages, price increases or unavailability of third-party services could increase our operating costs, require significant capital expenditures, or adversely impact the competitive position of our products:** Our reliance on certain suppliers to secure raw materials, components and finished devices, and on certain third-party service providers, such as sterilization service providers, exposes us to product shortages and unanticipated increases in prices, whether due to inflationary pressure, regulatory changes or otherwise. In addition, several raw materials, components, finished devices and services are procured from a sole-source due to the quality considerations, unique intellectual property considerations or constraints associated with regulatory requirements. If sole-source suppliers or service providers are acquired or were unable or unwilling to deliver these materials or services, we may not be able to manufacture or have available one or more products during such period of unavailability and our business could suffer. In certain cases we may not be able to establish additional or replacement suppliers for such materials or service providers for such services in a timely or cost effective manner, largely as a result of FDA and other regulations that require, among other things, validation of materials, components and services prior to their use in or with our products. In addition,

during 2021, the market experienced increasing inflationary pressures in part due to global supply chain disruptions, labor shortages and other impacts of the COVID-19 pandemic, which we anticipate will continue in 2022. We may experience inflationary increases in manufacturing costs and operating expenses, caused by the COVID-19 pandemic or as a result of general macroeconomic factors, and may not be able to pass these cost increases on to our customers in a timely manner, which could have a material adverse impact on our profitability and results of operations.

**Our insurance program may not be adequate to cover future losses:** We maintain third-party insurance to cover our exposure to certain property and casualty losses and are self-insured for claims and expenses related to other property and casualty losses, including product liability, intellectual property infringement and enforcement, environmental, and cybersecurity and data privacy losses. We manage a portion of our exposure to self-insured losses through a wholly-owned captive insurance company. Insurance coverage limits provided by third-party insurers and/or our captive insurance company may not be sufficient to fully cover unanticipated losses.

## ENVIRONMENTAL, SOCIAL AND GOVERNANCE (ESG) RISKS

**We could be negatively impacted by ESG and sustainability-related matters:** Governments, investors, customers, employees and other stakeholders are increasingly focusing on corporate ESG practices and disclosures, and expectations in this area are rapidly evolving. On occasion, we announce new initiatives, including goals, under our Corporate Responsibility framework. This framework is aligned with our areas of interest, which include environment and sustainability, social impact, diversity, equity and inclusion and supply chain management, among others. The criteria by which our ESG practices are assessed may change due to the quickly evolving landscape, which could result in greater expectations of us and cause us to undertake costly initiatives to satisfy such new criteria. Moreover, the increasing attention to corporate ESG initiatives could also result in reduced demand for products, reduced profits and increased investigations and litigation. If we are unable to satisfy such new criteria, investors may conclude that our policies and/or actions with respect to ESG matters are inadequate. If we fail or are perceived to have failed to achieve previously announced initiatives or goals or to accurately disclose our progress on such initiatives or goals, our reputation, business, financial condition and results of operations could be adversely impacted.

**Physical effects of climate change or legal, regulatory or market measures intended to address climate change could adversely affect our operations and operating results:** Risks associated with climate change are subject to increasing societal, regulatory and political focus in the United States and globally. Shifts in weather patterns caused by climate change are expected to increase the frequency, severity or duration of certain adverse weather conditions and natural disasters, such as hurricanes, tornadoes, earthquakes, wildfires, droughts, extreme temperatures or flooding, which could cause more significant business and supply chain interruptions, damage to our products and facilities as well as the infrastructure of hospitals, medical care facilities and other customers, reduced workforce availability, increased costs of raw materials and components, increased liabilities, and decreased revenues than what we have experienced in the past from such events. In addition, increased public concern over climate change could result in new legal or regulatory requirements designed to mitigate the effects of

climate change, which could include the adoption of more stringent environmental laws and regulations or stricter enforcement of existing laws and regulations. Such developments could result in increased compliance costs and adverse impacts on raw material sourcing, manufacturing operations and the distribution of our products, which could adversely affect our operations and operating results.

### ITEM 1B.          UNRESOLVED STAFF COMMENTS.

None.

### ITEM 2.          PROPERTIES.

We have approximately 28 company-owned and 328 leased locations worldwide including 50 manufacturing locations. We believe that our properties are in good operating condition and adequate for the manufacture and distribution of our products. We do not anticipate difficulty in renewing existing leases as they expire or in finding alternative facilities.

### ITEM 3.          LEGAL PROCEEDINGS.

We are involved in various proceedings, legal actions and claims arising in the normal course of business, including proceedings related to product, labor and intellectual property, and the matters described in more detail in Note 7 to our Consolidated Financial Statements.

### ITEM 4.          MINE SAFETY DISCLOSURES.

Not applicable.

## PART II

### ITEM 5.          MARKET FOR THE REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES.

Our common stock is traded on the New York Stock Exchange under the symbol SYK.

Our Board of Directors considers payment of cash dividends at its quarterly meetings. On January 31, 2022 there were 2,543 shareholders of record of our common stock.

We did not repurchase any shares in the three months ended December 31, 2021 and the total dollar value of shares that could be acquired under our authorized repurchase program at December 31, 2021 was $1,033.

In the fourth quarter 2021 we did not issue shares of our common stock as performance incentive awards to employees. When issued, these shares are not registered under the Securities Act of 1933 based on the conclusion that the awards would not be events of sale within the meaning of Section 2(a)(3) of the Act.

**STRYKER CORPORATION 2021 FORM 10-K**

The following graph compares our total returns (including reinvestments of dividends) against the Standard & Poor's (S&P) 500 Index and the S&P 500 Health Care Index. The graph assumes $100 (not in millions) invested on December 31, 2016 in our common stock and each of the indices.



| Company / Index | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|
| **Stryker Corporation** | $ 100.00 | $ 130.84 | $ 134.02 | $ 181.37 | $ 214.32 | $ 236.24 |
| S&P 500 Index | $ 100.00 | $ 121.83 | $ 116.49 | $ 153.17 | $ 181.35 | $ 233.41 |
| S&P 500 Health Care Index | $ 100.00 | $ 122.08 | $ 129.97 | $ 157.04 | $ 178.15 | $ 224.71 |

**Dollar amounts in millions except per share amounts or as otherwise specified.**

STRYKER CORPORATION 2021 FORM 10-K

**ITEM 6.**          **SELECTED FINANCIAL DATA.**

| Statement of Earnings Data | | 2021 | | 2020 | | 2019 | | 2018 | | 2017 |
|---|---|---|---|---|---|---|---|---|---|---|
| Net sales | $ | 17,108 | $ | 14,351 | $ | 14,884 | $ | 13,601 | $ | 12,444 |
| Cost of sales | | 6,140 | | 5,294 | | 5,188 | | 4,663 | | 4,264 |
| Gross profit | $ | 10,968 | $ | 9,057 | $ | 9,696 | $ | 8,938 | $ | 8,180 |
| Research, development and engineering expenses | | 1,235 | | 984 | | 971 | | 862 | | 787 |
| Selling, general and administrative expenses | | 6,427 | | 5,361 | | 5,356 | | 5,099 | | 4,552 |
| Recall charges | | 103 | | 17 | | 192 | | 23 | | 173 |
| Amortization of intangible assets | | 619 | | 472 | | 464 | | 417 | | 371 |
| Total operating expenses | $ | 8,384 | $ | 6,834 | $ | 6,983 | $ | 6,401 | $ | 5,883 |
| Operating income | $ | 2,584 | $ | 2,223 | $ | 2,713 | $ | 2,537 | $ | 2,297 |
| Other income (expense), net | | (303) | | (269) | | (151) | | (181) | | (234) |
| Earnings before income taxes | $ | 2,281 | $ | 1,954 | $ | 2,562 | $ | 2,356 | $ | 2,063 |
| Income taxes | | 287 | | 355 | | 479 | | (1,197) | | 1,043 |
| Net earnings | $ | 1,994 | $ | 1,599 | $ | 2,083 | $ | 3,553 | $ | 1,020 |
| | | | | | | | | | | |
| Net earnings per share of common stock: | | | | | | | | | | |
| Basic | $ | 5.29 | $ | 4.26 | $ | 5.57 | $ | 9.50 | $ | 2.73 |
| Diluted | $ | 5.21 | $ | 4.20 | $ | 5.48 | $ | 9.34 | $ | 2.68 |
| | | | | | | | | | | |
| Dividends declared per share of common stock | $ | 2.585 | $ | 2.355 | $ | 2.135 | $ | 1.93 | $ | 1.745 |
| | | | | | | | | | | |
| Balance Sheet Data | | | | | | | | | | |
| Cash, cash equivalents and current marketable securities | $ | 3,019 | $ | 3,024 | $ | 4,425 | $ | 3,699 | $ | 2,793 |
| Accounts receivable, net | | 3,022 | | 2,701 | | 2,893 | | 2,332 | | 2,198 |
| Inventories | | 3,314 | | 3,494 | | 2,980 | | 2,955 | | 2,465 |
| Property, plant and equipment, net | | 2,833 | | 2,752 | | 2,567 | | 2,291 | | 1,975 |
| Total assets | $ | 34,631 | $ | 34,330 | $ | 30,167 | $ | 27,229 | $ | 22,197 |
| Accounts payable | | 1,129 | | 810 | | 675 | | 646 | | 487 |
| Total debt | | 12,479 | | 13,991 | | 11,090 | | 9,859 | | 7,222 |
| Shareholders' equity | $ | 14,877 | $ | 13,084 | $ | 12,807 | $ | 11,730 | $ | 9,980 |
| | | | | | | | | | | |
| Cash Flow Data | | | | | | | | | | |
| Net cash provided by operating activities | $ | 3,263 | $ | 3,277 | $ | 2,191 | $ | 2,610 | $ | 1,559 |
| Purchases of property, plant and equipment | | 525 | | 487 | | 649 | | 572 | | 598 |
| Depreciation | | 371 | | 340 | | 314 | | 306 | | 271 |
| Acquisitions, net of cash acquired | | 339 | | 4,222 | | 802 | | 2,451 | | 831 |
| Amortization of intangible assets | | 619 | | 472 | | 464 | | 417 | | 371 |
| Payments of dividends | | 950 | | 863 | | 778 | | 703 | | 636 |
| Repurchase of common stock | | — | | — | | 307 | | 300 | | 230 |
| | | | | | | | | | | |
| Other Data | | | | | | | | | | |
| Number of shareholders of record | | 2,551 | | 2,597 | | 2,636 | | 2,732 | | 2,850 |
| Approximate number of employees | | 46,000 | | 43,000 | | 40,000 | | 36,000 | | 33,000 |

**ITEM 7.        MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.**

### About Stryker

Stryker is one of the world's leading medical technology companies and, together with our customers, we are driven to make healthcare better. We offer innovative products and services in Medical and Surgical, Neurotechnology, Orthopaedics and Spine that help improve patient and hospital outcomes. Our goal is to achieve sales growth at the high-end of the medical technology (MedTech) industry and maintain our long-term capital allocation strategy that prioritizes: (1) Acquisitions, (2) Dividends and (3) Share repurchases.

### COVID-19 Pandemic

The COVID-19 pandemic has led to severe disruptions in the market and the global and United States economies that may continue for a prolonged duration and trigger a recession or a period of economic slowdown. In response, various governmental authorities and private enterprises have implemented numerous measures to contain the pandemic, such as travel bans and restrictions, quarantines, shelter-in-place orders and shutdowns. A significant number of our customers, global suppliers, vendors, distributors and manufacturing facilities are located in regions that have been affected by the pandemic. Those operations have been materially adversely affected by restrictive government and private enterprise measures implemented in response to the pandemic.

Some of our products are particularly sensitive to reductions in elective medical procedures. Elective medical procedures were suspended in the first quarter of 2020 in many of the markets where our products are marketed and sold, which negatively affected our business, cash flows, financial condition and results of operations through the first quarter of 2021. In the second quarter of 2021 we saw partial recovery of elective procedures in most geographies; however, in the third quarter of 2021 we saw hospitalization rates increase, especially in the United States, as a result of the Delta variant. This, along with the Omicron variant, has continued to adversely impact elective procedures and increased inflationary pressure on our gross margin, including an increase in freight and transportation costs as well as increased absenteeism in the fourth quarter of 2021.

### Overview of 2021

In 2021 we achieved reported net sales growth of 19.2%. Excluding the impact of acquisitions and divestitures, sales grew 12.6% in constant currency. We reported net earnings of $1,994 and net earnings per diluted share of $5.21. Excluding the impact of certain items, we achieved adjusted net earnings[1] of $3,474

and adjusted net earnings per diluted share[1] of $9.09 representing growth of 22.3%.

Effective December 31, 2021 we changed our reportable business segments to (i) MedSurg and Neurotechnology and (ii) Orthopaedics and Spine to align to our new internal reporting structure. Refer to Note 14 to our Consolidated Financial Statements for further information.

We continued our capital allocation strategy by investing $339 in acquisitions and paying $950 in dividends to our shareholders.

In 2021 we had total long-term debt repayments of $1,151. In October 2021 we entered into a new revolving credit agreement that replaces our previous agreement dated August 19, 2016. Refer to Note 10 to our Consolidated Financial Statements for further information.

In 2021 we completed acquisitions for total net cash consideration of $339 and $54 in future milestone payments primarily due upon the achievement of certain regulatory and commercial milestones. In September 2021 we completed the acquisition of Gauss Surgical, Inc. (Gauss) for $120 in cash and up to $40 in future milestone payments. Gauss is a medical device company that has developed Triton, an artificial intelligence-enabled platform for real-time monitoring of blood loss during surgery. Gauss is part of our Instruments business within MedSurg and Neurotechnology. In January 2022 we announced a definitive merger agreement to acquire all of the issued and outstanding common shares of Vocera Communications, Inc. (Vocera) for $79.25 per share, or an aggregate purchase price of approximately $3.1 billion (including convertible notes). Refer to Note 6 to our Consolidated Financial Statements for further information.

In 2021 we did not repurchase any shares of our common stock under our authorized repurchase program. The total dollar value of shares of our common stock that could be acquired under our authorized repurchase program was $1,033 as of December 31, 2021.

In 2021 we recorded asset impairments of $264, $105 for certain long-lived and intangible assets related to the China volume-based procurement program and the remaining consisting primarily of in-process research and development, other intangible assets and property, plant and equipment as a result of COVID-19-related demand impacts on in-process product development and certain other divestiture and restructuring activities. Refer to Note 15 to our Consolidated Financial Statements for further information.

---

[1]  Refer to "Non-GAAP Financial Measures" for a discussion of non-GAAP financial measures used in this report and a reconciliation to the most directly comparable GAAP financial measure.

**STRYKER CORPORATION 2021 FORM 10-K**

## CONSOLIDATED RESULTS OF OPERATIONS

| | 2021 | 2020 | 2019 | Percent Net Sales 2021 | 2020 | 2019 | Percentage Change 2021 vs. 2020 | 2020 vs. 2019 |
|---|---|---|---|---|---|---|---|---|
| Net sales | $ 17,108 | $ 14,351 | $ 14,884 | 100.0 % | 100.0 % | 100.0 % | 19.2 % | (3.6)% |
| Gross profit | 10,968 | 9,057 | 9,696 | 64.1 | 63.1 | 65.1 | 21.1 | (6.6) |
| Research, development and engineering expenses | 1,235 | 984 | 971 | 7.2 | 6.9 | 6.5 | 25.5 | 1.3 |
| Selling, general and administrative expenses | 6,427 | 5,361 | 5,356 | 37.6 | 37.4 | 36.0 | 19.9 | 0.1 |
| Recall charges, net of insurance proceeds | 103 | 17 | 192 | 0.6 | 0.1 | 1.3 | nm | (91.1) |
| Amortization of intangible assets | 619 | 472 | 464 | 3.6 | 3.3 | 3.1 | 31.1 | 1.7 |
| Other income (expense), net | (303) | (269) | (151) | (1.8) | (1.9) | (1.0) | 12.6 | 78.1 |
| Income taxes | 287 | 355 | 479 | | | | (19.2) | (25.9) |
| Net earnings | $ 1,994 | $ 1,599 | $ 2,083 | 11.7 % | 11.1 % | 14.0 % | 24.7 % | (23.2)% |
| Net earnings per diluted share | $ 5.21 | $ 4.20 | $ 5.48 | | | | 24.0 % | (23.4)% |
| Adjusted net earnings per diluted share[1] | $ 9.09 | $ 7.43 | $ 8.26 | | | | 22.3 % | (10.0)% |

### Geographic and Segment Net Sales

| | 2021 | 2020 | 2019 | Percentage Change 2021 vs. 2020 As Reported | Constant Currency | 2020 vs. 2019 As Reported | Constant Currency |
|---|---|---|---|---|---|---|---|
| **Geographic:** | | | | | | | |
| United States | $ 12,321 | $ 10,455 | 10,957 | 17.9 % | 17.9 % | (4.6) % | (4.6) % |
| International | 4,787 | 3,896 | 3,927 | 22.8 | 18.8 | (0.8) | (0.9) |
| **Total** | $ 17,108 | $ 14,351 | 14,884 | 19.2 % | 18.1 % | (3.6) % | (3.6) % |
| **Segment:** | | | | | | | |
| MedSurg and Neurotechnology | $ 9,538 | $ 8,345 | 8,475 | 14.3 % | 13.3 % | (1.5) % | (1.5) % |
| Orthopaedics and Spine | 7,570 | 6,006 | 6,409 | 26.0 | 24.8 | (6.3) | (6.4) |
| **Total** | $ 17,108 | $ 14,351 | 14,884 | 19.2 % | 18.1 % | (3.6) % | (3.6) % |

### Supplemental Net Sales Growth Information

| | 2021 | 2020 | 2019 | Percentage Change 2021 vs. 2020 As Reported | Constant Currency | United States As Reported | International As Reported | Constant Currency | 2020 vs. 2019 As Reported | Constant Currency | United States As Reported | International As Reported | Constant Currency |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **MedSurg and Neurotechnology:** | | | | | | | | | | | | | |
| Instruments | $ 2,111 | $ 1,863 | 1,959 | 13.4 % | 12.5 % | 11.3 % | 20.9 % | 16.6 % | (5.0) % | (5.0) % | (4.7) % | (6.1) % | (6.2) % |
| Endoscopy | 2,141 | 1,763 | 1,983 | 21.5 | 20.8 | 18.6 | 32.7 | 29.4 | (11.1) | (11.0) | (10.7) | (12.5) | (12.2) |
| Medical | 2,607 | 2,524 | 2,264 | 3.3 | 2.2 | 5.1 | (2.4) | (6.6) | 11.5 | 11.8 | 6.9 | 28.9 | 30.3 |
| Neurovascular | 1,188 | 973 | 924 | 22.0 | 19.5 | 18.3 | 24.4 | 20.3 | 5.3 | 4.9 | (2.4) | 11.1 | 10.1 |
| Neuro Cranial | 1,214 | 972 | 1,059 | 24.9 | 24.3 | 23.4 | 32.4 | 28.6 | (8.2) | (8.3) | (10.1) | 1.2 | 1.0 |
| Other | 277 | 250 | 286 | 10.4 | 10.3 | 10.0 | 48.9 | 40.8 | (12.3) | (12.3) | (12.4) | — | (2.2) |
| | $ 9,538 | $ 8,345 | 8,475 | 14.3 % | 13.3 % | 13.0 % | 18.1 % | 14.0 % | (1.5) % | (1.5) % | (3.9) % | 6.1 % | 6.2 % |
| **Orthopaedics and Spine:** | | | | | | | | | | | | | |
| Knees | $ 1,848 | $ 1,567 | 1,815 | 18.0 % | 16.9 % | 15.4 % | 25.5 % | 21.3 % | (13.7) % | (13.7) % | (13.1) % | (15.3) % | (15.5) % |
| Hips | 1,342 | 1,206 | 1,383 | 11.2 | 9.9 | 5.8 | 21.1 | 17.2 | (12.8) | (12.7) | (12.0) | (14.1) | (13.8) |
| Trauma and Extremities | 2,664 | 1,722 | 1,639 | 54.6 | 53.0 | 63.8 | 36.8 | 32.3 | 5.1 | 4.7 | 8.4 | (0.9) | (1.9) |
| Spine | 1,167 | 1,047 | 1,157 | 11.5 | 10.5 | 8.7 | 19.1 | 15.2 | (9.5) | (9.6) | (12.5) | (0.6) | (0.9) |
| Other | 549 | 464 | 415 | 18.2 | 18.0 | 10.1 | 58.8 | 57.4 | 11.7 | 11.4 | 15.8 | (4.9) | (6.5) |
| | $ 7,570 | $ 6,006 | 6,409 | 26.0 % | 24.8 % | 25.0 % | 28.6 % | 24.5 % | (6.3) % | (6.4) % | (5.6) % | (8.0) % | (8.4) % |
| **Total** | $ 17,108 | $ 14,351 | $ 14,884 | 19.2 % | 18.1 % | 17.9 % | 22.8 % | 18.8 % | (3.6) % | (3.6) % | (4.6) % | (0.8) % | (0.9) % |

nm - not meaningful

### Consolidated Net Sales

Consolidated net sales increased 19.2% as reported and 18.1% in constant currency. Excluding the 5.5% impact of acquisitions and divestitures, net sales in constant currency increased by 13.4% from increased unit volume partially offset by 0.8% due to lower prices. The unit volume increase was primarily due to higher shipments across all product lines.

Consolidated net sales in 2020 were significantly negatively impacted by the global response to the COVID-19 pandemic. Consolidated net sales decreased 3.6% as reported and in constant currency. Excluding the 1.2% impact of acquisitions, net

sales in constant currency decreased by 4.1% from decreased unit volume and 0.7% due to lower prices. The unit volume decrease was primarily due to lower shipments of instruments, endoscopy, neurotechnology, spine, knee and hip products partially offset by higher shipments of medical products.

### MedSurg and Neurotechnology Net Sales

MedSurg and Neurotechnology net sales in 2021 increased 14.3% as reported and 13.3% in constant currency, as foreign currency exchange rates positively impacted net sales by 1.0%. Excluding the 0.2% impact of acquisitions and divestitures, net sales in constant currency increased by 13.6% from increased

unit volume partially offset by 0.5% due to lower prices. The unit volume increase was primarily due to higher shipments across all medsurg and neurotechnology product lines.

MedSurg and Neurotechnology net sales in 2020 decreased 1.5% as reported and 1.5% in constant currency. Excluding the 0.4% impact of acquisitions, net sales in constant currency decreased by 1.8% from decreased unit volume and 0.1% due to lower prices. The unit volume decrease was primarily due to lower shipments of instruments, endoscopy and other medsurg and neurotechnology products partially offset by higher shipments of medical products.

### Orthopaedics and Spine Net Sales

Orthopaedics and Spine net sales in 2021 increased 26.0% as reported and 24.8% in constant currency, as foreign currency exchange rates positively impacted net sales by 1.2%. Excluding the 12.8% impact of acquisitions and divestitures, net sales in constant currency increased by 13.2% from increased unit volume partially offset by 1.2% due to lower prices. The unit volume increase was primarily due to higher shipments across all orthopaedics and spine products.

Orthopaedics and Spine net sales in 2020 decreased 6.3% as reported and 6.4% in constant currency, as foreign currency exchange rates positively impacted net sales by 0.1%. Excluding the 2.3% impact of acquisitions, net sales in constant currency decreased by 7.1% from unit volume and 1.6% due to lower prices. The unit volume decrease was due to lower shipments of knees, hips and spine products partially offset by higher shipments of other orthopaedic and spine products.

### Gross Profit

Gross profit as a percentage of net sales increased to 64.1% in 2021 from 63.1% in 2020. Excluding the impact of the items noted below, gross profit increased to 65.9% from 63.8% in 2020 primarily due to leverage from higher sales volumes and favorable product mix, partially offset by lower selling prices.

Gross profit was significantly negatively impacted by the global response to the COVID-19 pandemic in 2020, decreasing as a percentage of net sales to 63.1% from 65.1% in 2019. Excluding the impact of the items noted below, gross profit decreased to 63.8% from 65.9% in 2019 primarily due to lower sales volumes, lower selling prices, lower manufacturing volumes and unfavorable product mix due to the postponement of elective medical procedures.

| | 2021 | 2020 | 2019 | Percent Net Sales | | |
| | | | | 2021 | 2020 | 2019 |
|---|---|---|---|---|---|---|
| **Reported** | $ 10,968 $ | 9,057 $ | 9,696 | 64.1 % | 63.1 % | 65.1 % |
| Inventory stepped up to fair value | 266 | 48 | 67 | 1.6 | 0.3 | 0.5 |
| Restructuring-related and other charges | 28 | 53 | 38 | 0.2 | 0.4 | 0.3 |
| Medical device regulations | 5 | 2 | 6 | — | — | — |
| **Adjusted** | $ 11,267 $ | 9,160 $ | 9,807 | 65.9 % | 63.8 % | 65.9 % |

### Research, Development and Engineering Expenses

Research, development and engineering expenses as a percentage of net sales increased to 7.2% in 2021 from 6.9% in 2020 and 6.5% in 2019. Excluding the impact of the items noted below, expenses increased to 6.6% in 2021 from 6.3% in 2020 and 6.1% in 2019. Disciplined ramp up in spending to facilitate our growth, including projects to develop new products, investments in new technologies and integration of recent acquisitions contributed to the increase.

| | 2021 | 2020 | 2019 | Percent Net Sales | | |
| | | | | 2021 | 2020 | 2019 |
|---|---|---|---|---|---|---|
| **Reported** | $ 1,235 $ | 984 $ | 971 | 7.2 % | 6.9 % | 6.5 % |
| Medical device regulations | (102) | (79) | (56) | (0.6) | (0.6) | (0.4) |
| **Adjusted** | $ 1,133 $ | 905 $ | 915 | 6.6 % | 6.3 % | 6.1 % |

### Selling, General and Administrative Expenses

Selling, general and administrative expenses as a percentage of net sales in 2021 increased to 37.6% from 37.4% in 2020 and 36.0% in 2019. Both 2021 and 2020 included charges related to certain asset impairments. Refer to Note 15 to our Consolidated Financial Statements for further information. Excluding the impact of the items noted below, expenses increased to 33.6% in 2021 from 33.1% in 2020 and 33.5% in 2019 primarily due to disciplined ramp up in spending to facilitate our growth.

| | 2021 | 2020 | 2019 | Percent Net Sales | | |
| | | | | 2021 | 2020 | 2019 |
|---|---|---|---|---|---|---|
| **Reported** | $ 6,427 $ | 5,361 $ | 5,356 | 37.6 % | 37.4 % | 36.0 % |
| Other acquisition and integration-related | (319) | (194) | (208) | (1.9) | (1.4) | (1.4) |
| Restructuring-related and other charges | (358) | (406) | (188) | (2.1) | (2.9) | (1.3) |
| Regulatory and legal matters | 2 | (6) | 24 | — | — | 0.2 |
| **Adjusted** | $ 5,752 $ | 4,755 $ | 4,984 | 33.6 % | 33.1 % | 33.5 % |

### Recall Charges, Net of Insurance Proceeds

Recall charges were $103, $17 and $192 in 2021, 2020 and 2019. Charges were primarily due to the previously disclosed Rejuvenate and ABGII Modular-Neck hip stems and LFIT V40 femoral head voluntary recalls. Refer to Note 7 to our Consolidated Financial Statements for further information.

### Amortization of Intangible Assets

Amortization of intangible assets was $619, $472 and $464 in 2021, 2020 and 2019. The increase in 2021 was primarily due to the acquisition of Wright Medical Group N.V. (Wright) in the fourth quarter of 2020. Refer to Notes 6 and 8 to our Consolidated Financial Statements for further information.

### Operating Income

Operating income decreased as a percentage of sales to 15.1% in 2021 from 15.5% in 2020. Excluding the impact of the items noted below, operating income increased to 25.6% of sales in 2021 from 24.4% in 2020, primarily due to leverage from higher sales volumes partially offset by disciplined spending to facilitate our growth.

Operating income as a percentage of sales in 2020 decreased to 15.5% from 18.2% in 2019. Excluding the impact of the items noted below, operating income decreased to 24.4% in 2020 from 26.3% in 2019 due to unfavorable product mix and impact of lower sales volumes from the postponement of elective medical procedures partially offset by continued focus on our operating expense savings actions.

| | 2021 | 2020 | 2019 | Percent Net Sales 2021 | 2020 | 2019 |
|---|---|---|---|---|---|---|
| Reported | $ 2,584 $ | 2,223 $ | 2,713 | 15.1 % | 15.5 % | 18.2 % |
| Inventory stepped up to fair value | 266 | 48 | 67 | 1.6 | 0.3 | 0.5 |
| Other acquisition and integration-related | 319 | 194 | 208 | 1.9 | 1.4 | 1.4 |
| Amortization of intangible assets | 619 | 472 | 464 | 3.5 | 3.3 | 3.2 |
| Restructuring-related and other charges | 386 | 458 | 226 | 2.3 | 3.2 | 1.5 |
| Medical device regulations | 107 | 81 | 62 | 0.6 | 0.6 | 0.4 |
| Recall-related matters | 103 | 17 | 192 | 0.6 | 0.1 | 1.3 |
| Regulatory and legal matters | (2) | 6 | (24) | — | — | (0.2) |
| Adjusted | $ 4,382 $ | 3,499 $ | 3,908 | 25.6 % | 24.4 % | 26.3 % |

| | 2021 | 2020 | 2019 | Percent Net Sales 2021 | 2020 | 2019 |
|---|---|---|---|---|---|---|
| Reported | $ 1,994 $ | 1,599 $ | 2,083 | 11.7 % | 11.1 % | 14.0 % |
| Inventory stepped up to fair value | 203 | 36 | 51 | 1.2 | 0.3 | 0.3 |
| Other acquisition and integration-related | 244 | 157 | 160 | 1.4 | 1.1 | 1.1 |
| Amortization of intangible assets | 489 | 381 | 375 | 2.9 | 2.6 | 2.6 |
| Restructuring-related and other charges | 345 | 397 | 180 | 2.0 | 2.8 | 1.2 |
| Medical device regulations | 90 | 63 | 48 | 0.5 | 0.4 | 0.3 |
| Recall-related matters | 89 | 13 | 154 | 0.5 | 0.1 | 1.0 |
| Regulatory and legal matters | (12) | 8 | (33) | (0.1) | 0.1 | (0.2) |
| Tax matters | 32 | 173 | 121 | 0.2 | 1.2 | 0.8 |
| Adjusted | $ 3,474 $ | 2,827 $ | 3,139 | 20.3 % | 19.7 % | 21.1 % |

**Other Income (Expense), Net**

Other income (expense), net was ($303), ($269) and ($151) in 2021, 2020 and 2019. The increase in net expense in 2021 was primarily due to increased interest expense driven by the additional debt from the bond offerings completed in June 2020 and November 2020. Refer to Note 10 to our Consolidated Financial Statements for further information.

**Income Taxes**

Our effective tax rate was 12.6%, 18.2% and 18.7% for 2021, 2020 and 2019. The effective income tax rate for 2021 reflects the continued lower effective income tax rates as a result of our European operations, certain discrete tax benefits, the tax effect related to the transfer of intellectual property between tax jurisdictions and the tax effect of future remittances of the undistributed earnings of foreign subsidiaries.

The effective income tax rate for 2020 and 2019 reflects the tax effect related to the transfer of intellectual properties between tax jurisdictions, the effective income tax rates as a result of our European operations and the tax effect of future remittances of the undistributed earnings of foreign subsidiaries.

**Net Earnings**

Net earnings increased to $1,994 or $5.21 per diluted share from $1,599 or $4.20 per diluted share in 2020 and decreased from $2,083 or $5.48 per diluted share in 2019. Adjusted net earnings per diluted share[1] of $9.09 increased 22.3% from $7.43 in 2020 compared to $8.26 in 2019. The impact of foreign currency exchange rates increased net earnings per diluted share by approximately $0.19 in 2021 and reduced net earnings per diluted share by approximately $0.02 and $0.14 in 2020 and 2019.

**Non-GAAP Financial Measures**

We supplement the reporting of our financial information determined under accounting principles generally accepted in the United States (GAAP) with certain non-GAAP financial measures, including percentage sales growth in constant currency; percentage organic sales growth; adjusted gross profit; adjusted selling, general and administrative expenses; adjusted research, development and engineering expenses; adjusted operating income; adjusted other income (expense), net; adjusted effective income tax rate; adjusted net earnings; adjusted net earnings per diluted share (Diluted EPS); free cash flow; and free cash flow conversion. We believe these non-GAAP financial measures provide meaningful information to assist investors and shareholders in understanding our financial results and assessing our prospects for future performance. Management believes percentage sales growth in constant currency and the other adjusted measures described above are important indicators of our operations because they exclude items that may not be indicative of or are unrelated to our core operating results and provide a baseline for analyzing trends in our underlying businesses. Management uses these non-GAAP financial measures for reviewing the operating results of reportable business segments and analyzing potential future business trends in connection with our budget process and bases certain management incentive compensation on these non-GAAP financial measures. To measure percentage sales growth in constant currency, we remove the impact of changes in foreign currency exchange rates that affect the comparability and trend of sales. Percentage sales growth in constant currency is calculated by translating current and prior year results at the same foreign currency exchange rate. To measure percentage organic sales growth, we remove the impact of changes in foreign currency exchange rates, acquisitions and divestitures, which affect the comparability and trend of sales. Percentage organic sales growth is calculated by translating current and prior year results at the same foreign currency exchange rates excluding the impact of acquisitions and divestitures. To measure earnings performance on a consistent and comparable basis, we exclude certain items that affect the comparability of operating results and the trend of earnings. To measure free cash flow, we adjust cash provided by operating activities by the amount of purchases of property, plant and equipment and proceeds from long-lived asset disposals and remove the impact of certain legal settlements and recall payments. To measure free cash flow conversion we divide free cash flow by adjusted net earnings. These adjustments are irregular in timing and may not be

**STRYKER CORPORATION 2021 FORM 10-K**

indicative of our past and future performance. The following are examples of the types of adjustments that may be included in a period:

1. *Acquisition and integration-related costs*. Costs related to integrating recently acquired businesses (e.g., costs associated with the termination of sales relationships, workforce reductions and other integration-related activities) and specific costs (e.g., inventory step-up and deal costs) related to the consummation of the acquisition process.

2. *Amortization of purchased intangible assets*. Periodic amortization expense related to purchased intangible assets.

3. *Restructuring-related and other charges*. Costs associated with the termination of sales relationships in certain countries, workforce reductions, elimination of product lines, certain long-lived and intangible asset impairments and associated costs and other restructuring-related activities.

4. *Medical device regulations*. Costs specific to updating our quality system, product labeling, asset write-offs and product remanufacturing to comply with the new medical device reporting regulations and other requirements of the European Union and the more stringent regulations for medical devices in China.

5. *Recall-related matters*. Our best estimate of the minimum of the range of probable loss to resolve the Rejuvenate, LFIT V40 and other product recalls.

6. *Regulatory and legal matters*. Our best estimate of the

minimum of the range of probable loss to resolve certain regulatory matters and other legal settlements.

7. *Tax matters*. Charges represent the impact of accounting for certain significant and discrete tax items.

Because non-GAAP financial measures are not standardized, it may not be possible to compare these financial measures with other companies' non-GAAP financial measures having the same or similar names. These adjusted financial measures should not be considered in isolation or as a substitute for reported sales growth, gross profit, selling, general and administrative expenses, research, development and engineering expenses, operating income, other income (expense), net, effective income tax rate, net earnings and net earnings per diluted share, the most directly comparable GAAP financial measures. These non-GAAP financial measures are an additional way of viewing aspects of our operations when viewed with our GAAP results and the reconciliations to corresponding GAAP financial measures at the end of the discussion of Consolidated Results of Operations below. We strongly encourage investors and shareholders to review our financial statements and publicly-filed reports in their entirety and not to rely on any single financial measure.

The weighted-average diluted shares outstanding used in the calculation of non-GAAP net earnings per diluted share are the same as those used in the calculation of reported net earnings per diluted share for the respective period.

### Reconciliation of the Most Directly Comparable GAAP Financial Measure to Non-GAAP Financial Measure

| 2021 | Gross Profit | Selling, General & Administrative Expenses | Research, Development & Engineering Expenses | Operating Income | Other Income (Expense), Net | Net Earnings | Effective Tax Rate | Diluted EPS |
|---|---|---|---|---|---|---|---|---|
| Reported | $ 10,968 | $ 6,427 | $ 1,235 | $ 2,584 | $ (303) | $ 1,994 | 12.6 % | $ 5.21 |
| Acquisition and integration-related costs: | | | | | | | | |
|   Inventory stepped-up to fair value | 266 | — | — | 266 | — | 203 | 1.0 | 0.53 |
|   Other acquisition and integration-related | — | (319) | — | 319 | — | 244 | 1.2 | 0.64 |
| Amortization of purchased intangible assets | — | — | — | 619 | — | 489 | 1.6 | 1.28 |
| Restructuring-related and other charges | 28 | (358) | — | 386 | 11 | 345 | (0.3) | 0.90 |
| Medical device regulations | 5 | — | (102) | 107 | — | 90 | — | 0.24 |
| Recall-related matters | — | — | — | 103 | — | 89 | — | 0.23 |
| Regulatory and legal matters | — | 2 | — | (2) | (7) | (12) | 0.2 | (0.02) |
| Tax matters | — | — | — | — | — | 32 | (1.4) | 0.08 |
| Adjusted | $ 11,267 | $ 5,752 | $ 1,133 | $ 4,382 | $ (299) | $ 3,474 | 14.9 % | $ 9.09 |

| 2020 | Gross Profit | Selling, General & Administrative Expenses | Research, Development & Engineering Expenses | Operating Income | Other Income (Expense), Net | Net Earnings | Effective Tax Rate | Diluted EPS |
|---|---|---|---|---|---|---|---|---|
| Reported | $ 9,057 | $ 5,361 | $ 984 | $ 2,223 | $ (269) | $ 1,599 | 18.2 % | $ 4.20 |
| Acquisition and integration-related costs: | | | | | | | | |
|   Inventory stepped-up to fair value | 48 | — | — | 48 | — | 36 | 0.3 | 0.10 |
|   Other acquisition and integration-related | — | (194) | — | 194 | — | 157 | 0.7 | 0.41 |
| Amortization of purchased intangible assets | — | — | — | 472 | — | 381 | 1.6 | 1.00 |
| Restructuring-related and other charges | 53 | (406) | — | 458 | — | 397 | 0.2 | 1.04 |
| Medical device regulations | 2 | — | (79) | 81 | — | 63 | 0.4 | 0.17 |
| Recall-related matters | — | — | — | 17 | — | 13 | 0.1 | 0.03 |
| Regulatory and legal matters | — | (6) | — | 6 | — | 8 | (0.1) | 0.02 |
| Tax matters | — | — | — | — | 4 | 173 | (8.8) | 0.46 |
| Adjusted | $ 9,160 | $ 4,755 | $ 905 | $ 3,499 | $ (265) | $ 2,827 | 12.6 % | $ 7.43 |

**STRYKER CORPORATION 2021 FORM 10-K**

| 2019 | Gross Profit | Selling, General & Administrative Expenses | Research, Development & Engineering Expenses | Operating Income | Other Income (Expense), Net | Net Earnings | Effective Tax Rate | Diluted EPS |
|---|---|---|---|---|---|---|---|---|
| Reported | $ 9,696 | $ 5,356 | $ 971 | $ 2,713 | $ (151) | $ 2,083 | 18.7 % | $ 5.48 |
| Acquisition and integration-related costs: | | | | | | | | |
| Inventory stepped-up to fair value | 67 | — | — | 67 | — | 51 | 0.2 | 0.13 |
| Other acquisition and integration-related | — | (208) | — | 208 | — | 160 | 0.6 | 0.42 |
| Amortization of purchased intangible assets | — | — | — | 464 | — | 375 | 0.6 | 0.99 |
| Restructuring-related and other charges | 38 | (188) | — | 226 | — | 180 | 0.4 | 0.47 |
| Medical device regulations | 6 | — | (56) | 62 | — | 48 | 0.2 | 0.13 |
| Recall-related matters | — | — | — | 192 | — | 154 | 0.3 | 0.41 |
| Regulatory and legal matters | — | 24 | — | (24) | — | (33) | 0.5 | (0.09) |
| Tax matters | — | — | — | — | (30) | 121 | (5.7) | 0.32 |
| Adjusted | $ 9,807 | $ 4,984 | $ 915 | $ 3,908 | $ (181) | $ 3,139 | 15.8 % | $ 8.26 |

## FINANCIAL CONDITION AND LIQUIDITY

| | 2021 | 2020 | 2019 |
|---|---|---|---|
| Net cash provided by operating activities | $ 3,263 | $ 3,277 | $ 2,191 |
| Net cash used in investing activities | (859) | (4,701) | (1,455) |
| Net cash provided by (used in) financing activities | (2,365) | (11) | 3 |
| Effect of exchange rate changes | (38) | 41 | (18) |
| Change in cash and cash equivalents | $ 1 | $ (1,394) | $ 721 |

We believe our financial condition continues to be of high quality, as evidenced by our ability to generate substantial cash from operations and to readily access capital markets at competitive rates despite the COVID-19 pandemic. Operating cash flow provides the primary source of cash to fund operating needs and capital expenditures. Excess operating cash is used first to fund acquisitions to complement our portfolio of businesses. Other discretionary uses include dividends and share repurchases. We supplement operating cash flow with debt to fund our activities as necessary. Our overall cash position reflects our business results and a global cash management strategy that takes into account liquidity management, economic factors and tax considerations.

### Operating Activities

Cash provided by operating activities was $3,263, $3,277 and $2,191 in 2021, 2020 and 2019. The slight decrease from 2020 was primarily due to higher accounts receivable, partially offset by increased net earnings and accounts payable.

### Investing Activities

Cash used in investing activities was $859, $4,701 and $1,455 in 2021, 2020 and 2019. The decrease in cash used in 2021 was primarily due to decreased payments for acquisitions and certain other businesses and related assets. In 2020 we acquired Wright, while in 2019 we acquired Mobius Imaging and Cardan Robotics and certain other businesses and related assets.

### Financing Activities

Cash provided by (used in) financing activities was ($2,365), ($11) and $3 in 2021, 2020 and 2019. The increase in cash used in financing activities was primarily driven by long-term debt repayments of $1,151 and dividend payments of $950 in 2021. In 2020 we secured a $400 term loan in November, issued $600 of notes in November and $2,300 of notes in June, which was offset by total debt repayments of $2,297 and dividend payments of $863. There were no share repurchases in 2021 or 2020.

We maintain debt levels that we consider appropriate after evaluating a number of factors including cash requirements for ongoing operations, investment and financing plans (including acquisitions and share repurchase activities) and overall cost of capital. Refer to Note 10 to our Consolidated Financial Statements for further information.

| | 2021 | 2020 | 2019 |
|---|---|---|---|
| Dividends paid per common share | $ 2.52 | $ 2.30 | $ 2.08 |
| Total dividends paid to common shareholders | $ 950 | $ 863 | $ 778 |
| Total amount paid to repurchase common stock | $ — | $ — | $ 307 |
| Shares of repurchased common stock (in millions) | — | — | 1.9 |

### Liquidity

Cash, cash equivalents and marketable securities were $3,019 and $3,024, and our current assets exceeded current liabilities by $5,468 and $4,666 on December 31, 2021 and 2020. We anticipate being able to support our short-term liquidity and operating needs from a variety of sources including cash from operations, commercial paper and existing credit lines. In October 2021 we entered into a new revolving credit agreement that replaces our previous agreement dated August 19, 2016. The primary changes were to increase the aggregate principal amount of the facility from $750 to $2,250, extend the maturity date to October 26, 2026, increase the leverage ratio to 3.75 and provide LIBOR replacement language.

We raised funds in the capital markets in 2020 and 2019 and may continue to do so from time-to-time. We continue to have strong investment-grade short-term and long-term debt ratings that we believe should enable us to refinance our debt as needed.

Our cash, cash equivalents and marketable securities held in locations outside the United States was approximately 26% and 30% on December 31, 2021 and 2020. We intend to use this cash to expand operations organically and through acquisitions.

### Guarantees and Other Off-Balance Sheet Arrangements

We do not have guarantees or other off-balance sheet financing arrangements, including variable interest entities, of a magnitude that we believe could have a material impact on our financial condition or liquidity.

### CONTRACTUAL OBLIGATIONS AND FORWARD-LOOKING CASH REQUIREMENTS

As further described in Note 7 to our Consolidated Financial Statements, in 2021 we recorded charges to earnings related to the Rejuvenate and ABG II and LFIT Anatomic CoCr V40 Femoral Heads recall matters and recorded product liabilities relating to Wright legacy hip products claims. Recorded reserves represent the minimum of the range of probable cost remaining to resolve these matters. The final outcome of these matters is dependent on many variables that are difficult to predict. The ultimate cost to entirely resolve these matters may be materially different from the amount of the current estimates and could have a material adverse effect on our financial position, results of operations and cash flows. We are not able to reasonably estimate the future periods in which payments will be made.

As further described in Note 11 to our Consolidated Financial Statements, on December 31, 2021 we had a reserve for

uncertain income tax positions of $444. Due to uncertainties regarding the ultimate resolution of income tax audits, we are not able to reasonably estimate the future periods in which any income tax payments to settle these uncertain income tax positions will be made.

As further described in Note 12 to our Consolidated Financial Statements, on December 31, 2021 our defined benefit pension plans were underfunded by $493, of which approximately $491 related to plans outside the United States. Due to the rules affecting tax-deductible contributions in the jurisdictions in which the plans are offered and the impact of future plan asset performance, changes in interest rates and potential changes in legislation in the United States and other foreign jurisdictions, we are not able to reasonably estimate the amounts that may be required to fund defined benefit pension plans.

| Contractual Obligations | Total | 2022 | 2023 - 2024 | 2025 - 2026 | After 2026 |
|---|---|---|---|---|---|
| Total debt | $ 12,589 | $ 7 | $ 2,790 | $ 2,400 | $ 7,392 |
| Interest payments | 3,511 | 294 | 568 | 468 | 2,181 |
| Unconditional purchase obligations | 2,107 | 1,889 | 123 | 95 | — |
| Operating leases | 402 | 112 | 146 | 72 | 72 |
| United States Tax Cuts and Jobs Act Transition Tax | 531 | 63 | 277 | 191 | — |
| Other | 191 | 5 | 19 | 12 | 155 |
| Total | $ 19,331 | $ 2,370 | $ 3,923 | $ 3,238 | $ 9,800 |

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

In preparing our financial statements in accordance with generally accepted accounting principles, there are certain accounting policies, which may require substantial judgment or estimation in their application. We believe these accounting policies and the others set forth in Note 1 to our Consolidated Financial Statements are critical to understanding our results of operations and financial condition. Actual results could differ from our estimates and assumptions, and any such differences could be material to our results of operations and financial condition.

### Inventory Reserves

We maintain reserves for excess and obsolete inventory resulting from the potential inability to sell certain products at prices in excess of current carrying costs. We make estimates regarding the future recoverability of the costs of these products and record provisions based on historical experience, expiration of sterilization dates and expected future trends. If actual product life cycles, product demand or acceptance of new product introductions are less favorable than projected by management, additional inventory write downs may be required, which could unfavorably affect future operating results.

### Income Taxes

Our annual tax rate is determined based on our income, statutory tax rates and the tax impacts of items treated differently for tax purposes than for financial reporting purposes. Tax law requires certain items to be included in the tax return at different times than the items are reflected in the financial statements. Some of these differences are permanent, such as expenses that are not deductible in our tax return, and some differences are temporary and reverse over time, such as depreciation expense. These temporary differences create deferred tax assets and liabilities.

Deferred tax assets generally represent the tax effect of items that can be used as a tax deduction or credit in future years for which we have already recorded the tax benefit in our income statement. Deferred tax liabilities generally represent tax expense recognized in our financial statements for which payment was deferred, the tax effect of expenditures for which a deduction was taken in our tax return but has not yet been recognized in our

financial statements or assets recorded at fair value in business combinations for which there was no corresponding tax basis adjustment.

Inherent in determining our annual tax rate are judgments regarding business plans, tax planning opportunities and expectations about future outcomes. Realization of certain deferred tax assets is dependent upon generating sufficient taxable income in the appropriate jurisdiction prior to the expiration of the carryforward periods. Although realization is not assured, management believes it is more likely than not that our deferred tax assets, net of valuation allowances, will be realized.

We operate in multiple jurisdictions with complex tax policy and regulatory environments. In certain of these jurisdictions, we may take tax positions that management believes are supportable but are potentially subject to successful challenge by the applicable taxing authority. These differences of interpretation with the respective governmental taxing authorities can be impacted by the local economic and fiscal environment. We evaluate our tax positions and establish liabilities in accordance with the applicable accounting guidance on uncertainty in income taxes. We review these tax uncertainties in light of changing facts and circumstances, such as the progress of tax audits, and adjust them accordingly. We have a number of audits in process in various jurisdictions. Although the resolution of these tax positions is uncertain, based on currently available information, we believe that it is more likely than not that the ultimate outcomes will not have a material adverse effect on our financial position, results of operations or cash flows.

Due to the number of estimates and assumptions inherent in calculating the various components of our tax provision, certain changes or future events, such as changes in tax legislation, geographic mix of earnings, completion of tax audits or earnings repatriation plans, could have an impact on those estimates and our effective tax rate.

### Acquisitions, Goodwill and Intangibles, and Long-Lived Assets

Our financial statements include the operations of an acquired business starting from the completion of the acquisition. In addition, the assets acquired and liabilities assumed are recorded on the date of acquisition at their respective estimated fair values, with any excess of the purchase price over the estimated fair values of the net assets acquired recorded as goodwill.

Significant judgment is required in estimating the fair value of intangible assets and in assigning their respective useful lives. Accordingly, we typically obtain the assistance of third-party valuation specialists for significant items. The fair value estimates are based on available historical information and on future expectations and assumptions deemed reasonable by management but are inherently uncertain. We typically use an income method to estimate the fair value of intangible assets, which is based on forecasts of the expected future cash flows attributable to the respective assets. Significant estimates and assumptions inherent in the valuations reflect a consideration of other marketplace participants and include the amount and timing of future cash flows (including expected growth rates and profitability), the underlying product or technology life cycles, the economic barriers to entry and the discount rate applied to the cash flows. Unanticipated market or macroeconomic events and circumstances may occur that could affect the accuracy or validity of the estimates and assumptions.

Determining the useful life of an intangible asset also requires judgment. With the exception of certain trade names, the majority of our acquired intangible assets (e.g., certain trademarks or

brands, customer and distributor relationships, patents and technologies) are expected to have determinable useful lives. Our assessment as to the useful lives of these intangible assets is based on a number of factors including competitive environment, market share, trademark, brand history, underlying product life cycles, operating plans and the macroeconomic environment of the countries in which the trademarked or branded products are sold. Our estimates of the useful lives of determinable-lived intangibles are primarily based on these same factors. Determinable-lived intangible assets are amortized to expense over their estimated useful life.

In some of our acquisitions, we acquire in-process research and development (IPRD) intangible assets. For acquisitions accounted for as business combinations, IPRD is considered to be an indefinite-lived intangible asset until the research is completed (then it becomes a determinable-lived intangible asset) or determined to have no future use (then it is impaired). For asset acquisitions, IPRD is expensed immediately unless there is an alternative future use.

The value of indefinite-lived intangible assets and goodwill is not amortized but is tested at least annually for impairment. Our impairment testing for goodwill is performed separately from our impairment testing of indefinite-lived intangibles. We perform our annual impairment test for goodwill in the fourth quarter of each year. We consider qualitative indicators of the fair value of a reporting unit when it is unlikely that a reporting unit has impaired goodwill and periodically corroborate that assessment with quantitative information. In certain circumstances, we also use a discounted cash flow analysis that requires certain assumptions and estimates be made regarding market conditions and our future profitability. In those circumstances we test goodwill for impairment by reviewing the carrying value compared to the fair value at the reporting unit level. We test individual indefinite-lived intangibles by reviewing the individual carrying values compared to the fair value. We determine the fair value of our reporting units and indefinite-lived intangible assets based on the income approach. Under the income approach, we calculate the fair value of our reporting units and indefinite-lived intangible assets based on the present value of estimated future cash flows. Considerable management judgment is necessary to evaluate the impact of operating and macroeconomic changes and to estimate future cash flows to measure fair value. Assumptions used in our impairment evaluations, such as forecasted growth rates and cost of capital, are consistent with internal projections and operating plans. We believe such assumptions and estimates are also comparable to those that would be used by other marketplace participants.

Our annual impairment testing indicated that all reporting unit goodwill fair values significantly exceeded their respective recorded values. Future changes in the judgments, assumptions and estimates that are used in our impairment testing for goodwill and indefinite-lived intangible assets, including discount and tax rates and future cash flow projections, could result in significantly different estimates of the fair values. A significant reduction in the estimated fair values could result in impairment charges that could materially affect our results of operations.

We review our other long-lived assets for indicators of impairment whenever events or changes in circumstances indicate that the carrying amount may not be recoverable. The evaluation is performed at the lowest level of identifiable cash flows, which is at the individual asset level or the asset group level. The undiscounted cash flows expected to be generated by the related assets are estimated over their useful life based on updated projections. If the evaluation indicates that the carrying amount of

the assets may not be recoverable, any potential impairment is measured based upon the fair value of the related assets or asset group as determined by an appropriate market appraisal or other valuation technique. Assets classified as held for sale, if any, are recorded at the lower of carrying amount or fair value less costs to sell.

**Legal and Other Contingencies**

We are involved in various ongoing proceedings, legal actions and claims arising in the normal course of business, including proceedings related to product, labor and intellectual property, and other matters that are more fully described in Note 7 to our Consolidated Financial Statements. The outcomes of these matters will generally not be known for prolonged periods of time. In certain of the legal proceedings, the claimants seek damages, as well as other compensatory and equitable relief, that could result in the payment of significant claims and settlements and/or the imposition of injunctions or other equitable relief. For legal matters for which management had sufficient information to reasonably estimate our future obligations, a liability representing management's best estimate of the probable loss, or the minimum of the range of probable losses when a best estimate within the range is not known, for the resolution of these legal matters is recorded. The estimates are based on consultation with legal counsel, previous settlement experience and settlement strategies. If actual outcomes are less favorable than those projected by management, additional expense may be incurred, which could unfavorably affect future operating results. We are currently self-insured for certain claims and expenses. The ultimate cost to us with respect to product liability claims could be materially different than the amount of the current estimates and accruals and could have a material adverse effect on our financial position, results of operations and cash flows.

**NEW ACCOUNTING PRONOUNCEMENTS**

Refer to Note 1 to our Consolidated Financial Statements for further information.

**ITEM 7A.          QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.**

We sell our products globally and, as a result, our financial results could be significantly affected by factors such as market risk exposure from weak economic conditions, exchange rate risk and the impacts of the COVID-19 pandemic on our operations and financial results. Our operating results are primarily exposed to changes in exchange rates among the United States Dollar, Australian Dollar, British Pound, Canadian Dollar, Chinese Yuan, Euro and Japanese Yen. We develop and manufacture products in the United States, Canada, China, France, Germany, India, Ireland, Mexico, Puerto Rico, Switzerland and Turkey and incur costs in the applicable local currencies. This global deployment of facilities serves to partially mitigate the impact of currency exchange rate changes on our cost of sales. Refer to Notes 1, 4 and 5 to our Consolidated Financial Statements for information regarding our use of derivative instruments to mitigate these risks. A hypothetical 10% change in foreign currencies relative to the United States Dollar would change the December 31, 2021 fair value of these instruments by approximately $514.

We are not able to quantify the impacts of the COVID-19 pandemic on our financial results. Qualitative disclosures about the COVID-19 pandemic are included in Part II, Item 7 "Management's Discussion and Analysis of Financial Condition and Results of Operations" and Part I, Item 1A "Risk Factors" of this Form 10-K.

**ITEM 8.**        **FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA.**

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Shareholders and the Board of Directors of Stryker Corporation

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Stryker Corporation and subsidiaries (the Company) as of December 31, 2021 and 2020, the related consolidated statements of earnings and comprehensive income, shareholders' equity, and cash flows, for each of the three years in the period ended December 31, 2021, and the related notes and the financial statement schedule listed in the Index at Item 15(a) (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the consolidated financial position of the Company at December 31, 2021 and 2020, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2021, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2021, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) and our report dated February 11, 2022 expressed an unqualified opinion thereon.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matters**

The critical audit matters communicated below are matters arising from the current period audit of the financial statements that were communicated or required to be communicated to the audit committee and that: (1) relate to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

|  | **Product Liabilities** |
|---|---|
| *Description of the Matter* | As described in Note 7 to the consolidated financial statements, the Company recognized $385 million of liabilities at December 31, 2021 for product liability matters relating to claims for certain products. The Company establishes liabilities for product liability claims to the extent probable future losses are estimable based on quantitative and qualitative information from various sources. |
|  | Auditing management's estimate of product liabilities was especially challenging due to the significant measurement uncertainty associated with the product liabilities estimate that involved management's significant judgment and analysis. Further, the product liability is sensitive to significant management assumptions, including average costs per claim and the number of future claims, including those resulting in revision surgery. |
| *How We Addressed the Matter in Our Audit* | We obtained an understanding, evaluated management's design and tested the operating effectiveness of the controls over the Company's product liability estimation process, including management's assessment of the assumptions, and the completeness and accuracy of the data underlying the product liabilities. |
|  | To evaluate the liabilities for product claims, we performed audit procedures that included, among others, testing the completeness and accuracy of the underlying claims and average cost per claim data and obtaining legal confirmation letters to evaluate the liabilities recognized. We involved our actuarial specialists in the evaluation of the methodologies and significant assumptions applied by management in estimating the product liabilities and range of probable losses. We also evaluated the adequacy of the Company's disclosures included in Note 7 related to these liabilities. |

**STRYKER CORPORATION 2021 FORM 10-K**

### Uncertain Tax Positions

*Description of the Matter*

As described in Note 11 to the consolidated financial statements, the Company operates in multiple jurisdictions with complex tax policy and regulatory environments and establishes reserves for uncertain tax positions in accordance with the accounting guidance governing uncertainty in income taxes. Uncertainty in a tax position may arise because tax laws are subject to interpretation. The Company uses significant judgment to (1) determine whether, based on the technical merits, a tax position is more likely than not to be sustained and (2) measure the amount of tax benefit that qualifies for recognition. At December 31, 2021, the Company had accrued liabilities of $444 million relating to uncertain tax positions.

Auditing management's analysis of the Company's uncertain tax positions and the related unrecognized tax benefits was especially challenging as the analysis involved significant auditor judgment due to complex interpretations of tax laws, legal rulings and determination of arm's length pricing for intercompany transactions.

*How We Addressed the Matter in Our Audit*

We obtained an understanding, evaluated the design and tested the operating effectiveness of controls over the Company's accounting process for uncertain tax positions. For example, we tested controls over management's identification of uncertain tax positions and its application of the recognition and measurement principles, including management's review of the inputs and calculations of unrecognized income tax benefits.

Our audit procedures included, among others, evaluating the assumptions the Company used to develop its uncertain tax positions and related unrecognized income tax benefit amounts by jurisdiction. We also tested the completeness and accuracy of the underlying data used by the Company to calculate its uncertain tax positions. For example, we involved our tax professionals to evaluate tax technical merits, which included, for certain intercompany transactions, assessing the Company's assumptions and pricing methodology to determine they were arm's length and complied with local jurisdictional laws and regulations. We also evaluated the estimated liabilities for unrecognized income tax benefits in consideration of current tax controversy and litigation trends in similar positions challenged by tax authorities. We also evaluated the adequacy of the Company's disclosures included in Note 11 related to these tax matters.

/s/   ERNST & YOUNG LLP

We have served as the Company's auditor since 1974
Grand Rapids, Michigan
February 11, 2022

---

**Dollar amounts in millions except per share amounts or as otherwise specified.**                                                                                               21

**STRYKER CORPORATION 2021 FORM 10-K**

**Stryker Corporation and Subsidiaries**
**CONSOLIDATED STATEMENTS OF EARNINGS**

| | 2021 | 2020 | 2019 |
|---|---|---|---|
| Net sales | $ 17,108 | $ 14,351 | $ 14,884 |
| Cost of sales | 6,140 | 5,294 | 5,188 |
| Gross profit | $ 10,968 | $ 9,057 | $ 9,696 |
| Research, development and engineering expenses | 1,235 | 984 | 971 |
| Selling, general and administrative expenses | 6,427 | 5,361 | 5,356 |
| Recall charges | 103 | 17 | 192 |
| Amortization of intangible assets | 619 | 472 | 464 |
| Total operating expenses | $ 8,384 | $ 6,834 | $ 6,983 |
| Operating income | $ 2,584 | $ 2,223 | $ 2,713 |
| Other income (expense), net | (303) | (269) | (151) |
| Earnings before income taxes | $ 2,281 | $ 1,954 | $ 2,562 |
| Income taxes | 287 | 355 | 479 |
| Net earnings | $ 1,994 | $ 1,599 | $ 2,083 |
| | | | |
| Net earnings per share of common stock: | | | |
| Basic | $ 5.29 | $ 4.26 | $ 5.57 |
| Diluted | $ 5.21 | $ 4.20 | $ 5.48 |
| | | | |
| Weighted-average shares outstanding (in millions): | | | |
| Basic | 377.0 | 375.5 | 374.0 |
| Effect of dilutive employee stock compensation | 5.3 | 4.8 | 5.9 |
| Diluted | 382.3 | 380.3 | 379.9 |

Anti-dilutive shares excluded from the calculation of dilutive employee stock compensation were de minimis in all periods.

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**

| | 2021 | 2020 | 2019 |
|---|---|---|---|
| Net earnings | $ 1,994 | $ 1,599 | $ 2,083 |
| Other comprehensive income (loss), net of tax | | | |
| Marketable securities | 3 | — | 1 |
| Pension plans | 104 | (80) | (42) |
| Unrealized gains (losses) on designated hedges | 50 | (57) | (3) |
| Financial statement translation | 469 | (414) | 69 |
| Total other comprehensive income (loss), net of tax | $ 626 | $ (551) | $ 25 |
| Comprehensive income | $ 2,620 | $ 1,048 | $ 2,108 |

*See accompanying notes to Consolidated Financial Statements.*

**Stryker Corporation and Subsidiaries**
**CONSOLIDATED BALANCE SHEETS**

| | 2021 | 2020 |
|---|---:|---:|
| **Assets** | | |
| **Current assets** | | |
| Cash and cash equivalents | $ 2,944 | $ 2,943 |
| Marketable securities | 75 | 81 |
| Accounts receivable, less allowance of $167 ($131 in 2020) | 3,022 | 2,701 |
| Inventories: | | |
| Materials and supplies | 691 | 678 |
| Work in process | 264 | 251 |
| Finished goods | 2,359 | 2,565 |
| **Total inventories** | $ 3,314 | $ 3,494 |
| Prepaid expenses and other current assets | 662 | 488 |
| **Total current assets** | $ 10,017 | $ 9,707 |
| **Property, plant and equipment:** | | |
| Land, buildings and improvements | 1,656 | 1,546 |
| Machinery and equipment | 3,842 | 3,636 |
| Total property, plant and equipment | 5,498 | 5,182 |
| Less allowance for depreciation | 2,665 | 2,430 |
| **Property, plant and equipment, net** | $ 2,833 | $ 2,752 |
| Goodwill | 12,918 | 12,778 |
| Other intangibles, net | 4,840 | 5,554 |
| Noncurrent deferred income tax assets | 1,760 | 1,530 |
| Other noncurrent assets | 2,263 | 2,009 |
| **Total assets** | $ 34,631 | $ 34,330 |
| | | |
| **Liabilities and shareholders' equity** | | |
| **Current liabilities** | | |
| Accounts payable | $ 1,129 | $ 810 |
| Accrued compensation | 1,092 | 925 |
| Income taxes | 192 | 207 |
| Dividend payable | 263 | 237 |
| Accrued product liabilities | 401 | 515 |
| Accrued expenses and other liabilities | 1,465 | 1,586 |
| Current maturities of debt | 7 | 761 |
| **Total current liabilities** | $ 4,549 | $ 5,041 |
| Long-term debt, excluding current maturities | 12,472 | 13,230 |
| Income taxes | 913 | 990 |
| Other noncurrent liabilities | 1,820 | 1,985 |
| **Total liabilities** | $ 19,754 | $ 21,246 |
| **Shareholders' equity** | | |
| Common stock, $0.10 par value | 38 | 38 |
| Additional paid-in capital | 1,890 | 1,741 |
| Retained earnings | 13,480 | 12,462 |
| Accumulated other comprehensive loss | (531) | (1,157) |
| **Total shareholders' equity** | $ 14,877 | $ 13,084 |
| **Total liabilities & shareholders' equity** | $ 34,631 | $ 34,330 |

*See accompanying notes to Consolidated Financial Statements.*

**Stryker Corporation and Subsidiaries**
**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY**

| | 2021 | | 2020 | | 2019 | |
|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | Shares | Amount |
| **Common stock** | | | | | | |
| Beginning | 376.1 | $ 38 | 374.5 | $ 37 | 374.4 | $ 37 |
| Issuance of common stock under stock compensation and benefit plans | 1.4 | — | 1.6 | 1 | 2.0 | — |
| Repurchase of common stock | — | — | — | — | (1.9) | — |
| Ending | 377.5 | $ 38 | 376.1 | $ 38 | 374.5 | $ 37 |
| **Additional paid-in capital** | | | | | | |
| Beginning | | $ 1,741 | | $ 1,628 | | $ 1,559 |
| Issuance of common stock under stock compensation and benefit plans | | (22) | | (29) | | (50) |
| Repurchase of common stock | | — | | — | | (8) |
| Share-based compensation | | 171 | | 142 | | 127 |
| Ending | | $ 1,890 | | $ 1,741 | | $ 1,628 |
| **Retained earnings** | | | | | | |
| Beginning | | $ 12,462 | | $ 11,748 | | $ 10,765 |
| Net earnings | | 1,994 | | 1,599 | | 2,083 |
| Repurchase of common stock | | — | | — | | (299) |
| Cash dividends declared | | (976) | | (885) | | (801) |
| Ending | | $ 13,480 | | $ 12,462 | | $ 11,748 |
| **Accumulated other comprehensive (loss) income** | | | | | | |
| Beginning | | $ (1,157) | | $ (606) | | $ (631) |
| Other comprehensive income (loss) | | 626 | | (551) | | 25 |
| Ending | | $ (531) | | $ (1,157) | | $ (606) |
| **Total shareholders' equity** | | $ 14,877 | | $ 13,084 | | $ 12,807 |

*See accompanying notes to Consolidated Financial Statements.*

**Dollar amounts in millions except per share amounts or as otherwise specified.**                                                                        **24**

STRYKER CORPORATION 2021 FORM 10-K

**Stryker Corporation and Subsidiaries**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

|  | 2021 | 2020 | 2019 |
|---|---|---|---|
| **Operating activities** | | | |
| **Net earnings** | $ 1,994 | $ 1,599 | $ 2,083 |
| Adjustments to reconcile net earnings to net cash provided by operating activities: | | | |
| Depreciation | 371 | 340 | 314 |
| Amortization of intangible assets | 619 | 472 | 464 |
| Asset impairments | 264 | 215 | 16 |
| Share-based compensation | 171 | 142 | 127 |
| Recall charges | 103 | 17 | 192 |
| Sale of inventory stepped up to fair value at acquisition | 266 | 48 | 67 |
| Deferred income tax (benefit) expense | (237) | 48 | 126 |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable | (377) | 354 | (563) |
| Inventories | (189) | 27 | (400) |
| Accounts payable | 329 | 100 | 63 |
| Accrued expenses and other liabilities | 315 | (54) | 113 |
| Recall-related payments | (221) | (17) | (177) |
| Income taxes | (98) | (16) | (105) |
| Other, net | (47) | 2 | (129) |
| **Net cash provided by operating activities** | $ 3,263 | $ 3,277 | $ 2,191 |
| **Investing activities** | | | |
| Acquisitions, net of cash acquired | (339) | (4,222) | (802) |
| Purchases of marketable securities | (49) | (54) | (74) |
| Proceeds from sales of marketable securities | 55 | 61 | 69 |
| Purchases of property, plant and equipment | (525) | (487) | (649) |
| Other investing, net | (1) | 1 | 1 |
| **Net cash used in investing activities** | $ (859) | $ (4,701) | $ (1,455) |
| **Financing activities** | | | |
| Proceeds and payments on short-term borrowings, net | (7) | (6) | (7) |
| Proceeds from issuance of long-term debt | 5 | 3,292 | 2,642 |
| Payments on long-term debt | (1,151) | (2,297) | (1,342) |
| Payments of dividends | (950) | (863) | (778) |
| Repurchases of common stock | — | — | (307) |
| Cash paid for taxes from withheld shares | (114) | (110) | (136) |
| Other financing, net | (148) | (27) | (69) |
| **Net cash provided by (used in) financing activities** | $ (2,365) | $ (11) | $ 3 |
| Effect of exchange rate changes on cash and cash equivalents | (38) | 41 | (18) |
| **Change in cash and cash equivalents** | $ 1 | $ (1,394) | $ 721 |
| Cash and cash equivalents at beginning of year | 2,943 | 4,337 | 3,616 |
| **Cash and cash equivalents at end of year** | $ 2,944 | $ 2,943 | $ 4,337 |
| | | | |
| **Supplemental cash flow disclosure:** | | | |
| Cash paid for income taxes, net of refunds | $ 622 | $ 323 | $ 457 |
| Cash paid for interest on debt | $ 325 | $ 304 | $ 286 |

*See accompanying notes to Consolidated Financial Statements.*

Dollar amounts in millions except per share amounts or as otherwise specified.                    25

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 1 - SIGNIFICANT ACCOUNTING POLICIES

**Nature of Operations:** Stryker (the "Company," "we," "us," or "our") is one of the world's leading medical technology companies and, together with its customers, is driven to make healthcare better. The Company offers innovative products and services in Medical and Surgical, Neurotechnology, Orthopaedics and Spine that help improve patient and hospital outcomes. Our products include surgical equipment and surgical navigation systems; endoscopic and communications systems; patient handling, emergency medical equipment and intensive care disposable products; neurosurgical and neurovascular devices; implants used in joint replacement and trauma surgeries; Mako Robotic-Arm Assisted technology; spinal devices; as well as other products used in a variety of medical specialties.

**Basis of Presentation and Consolidation:** The Consolidated Financial Statements include the Company and its subsidiaries. All significant intercompany accounts and transactions are eliminated in consolidation. We have no material interests in variable interest entities and none that require consolidation. Prior years' segment results have been reclassified to conform with current year presentation in our Consolidated Financial Statements.

**Use of Estimates:** The preparation of financial statements in conformity with accounting principles generally accepted in the United States (GAAP) requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities on the date of the financial statements and the reported amounts of net sales and expenses in the reporting period. Actual results could differ from those estimates.

**Revenue Recognition:** Sales are recognized as the performance obligations to deliver products or services are satisfied and are recorded based on the amount of consideration we expect to receive in exchange for satisfying the performance obligations. Our sales are recognized primarily when we transfer control to the customer, which can be on the date of shipment, the date of receipt by the customer or, for most Orthopaedics products, when we have received a purchase order and appropriate notification the product has been used or implanted. Products and services are primarily transferred to customers at a point in time, with some transfers of services taking place over time.

Sales represent the amount of consideration we expect to receive from customers in exchange for transferring products and services. Net sales exclude sales, value added and other taxes we collect from customers. Other costs to obtain and fulfill contracts are generally expensed as incurred due to the short-term nature of most of our sales. We extend terms of payment to our customers based on commercially reasonable terms for the markets of our customers, while also considering their credit quality.

A provision for estimated sales returns, discounts and rebates is recognized as a reduction of sales in the same period that the sales are recognized. Our estimate of the provision for sales returns has been established based on contract terms with our customers and historical business practices and current trends. Shipping and handling costs charged to customers are included in net sales.

**Cost of Sales:** Cost of sales is primarily comprised of direct materials and supplies consumed in the manufacture of product, as well as manufacturing labor, depreciation expense and direct

overhead expense necessary to acquire and convert the purchased materials and supplies into finished product. Cost of sales also includes the cost to distribute products to customers, inbound freight costs, warehousing costs and other shipping and handling activity.

**Research, Development and Engineering Expenses:** Research, development and engineering costs are charged to expense as incurred. Costs include research, development and engineering activities relating to the development of new products, improvement of existing products, technical support of products and compliance with governmental regulations for the protection of customers and patients. Costs primarily consist of salaries, wages, consulting and depreciation and maintenance of research facilities and equipment.

**Selling, General and Administrative Expenses:** Selling, general and administrative expense is primarily comprised of selling expenses, marketing expenses, administrative and other indirect overhead costs, amortization of loaner instrumentation, depreciation and amortization expense of non-manufacturing assets and other miscellaneous operating items.

**Currency Translation:** Financial statements of subsidiaries outside the United States generally are measured using the local currency as the functional currency. Adjustments to translate those statements into United States Dollars are recorded in other comprehensive income (OCI). Transactional exchange gains and losses are included in other income (expense), net.

**Cash Equivalents:** Highly liquid investments with remaining stated maturities of three months or less when purchased or other money market instruments that are redeemable upon demand are considered cash equivalents and recorded at cost.

**Marketable Securities:** Marketable securities consist of marketable debt securities, certificates of deposit and mutual funds. Mutual funds are acquired to offset changes in certain liabilities related to deferred compensation arrangements and are expected to be used to settle these liabilities and are recognized in other noncurrent assets. Pursuant to our investment policy, all individual marketable security investments must have a minimum credit quality of single A (Standard & Poor's and Fitch) and A2 (Moody's Corporation) at the time of acquisition, while the overall portfolio of marketable securities must maintain a minimum average credit quality of double A (Standard & Poor's and Fitch) or Aa (Moody's Corporation). In the event of a rating downgrade below the minimum credit quality subsequent to purchase, the marketable security investment is evaluated to determine the appropriate action to take to minimize the overall risk to our marketable security investment portfolio. Our marketable securities are classified as available-for-sale and trading securities. Investments in trading securities represent participant-directed investments of deferred employee compensation.

**Accounts Receivable:** Accounts receivable consists of trade and other miscellaneous receivables. An allowance is maintained for doubtful accounts for estimated losses in the collection of accounts receivable. Estimates are made regarding the ability of customers to make required payments based on historical credit experience, current market conditions and expected credit losses. Accounts receivable are written off when all reasonable collection efforts are exhausted.

**Inventories:** Inventories are stated at the lower of cost or net realizable value, with cost generally determined using the first-in, first-out (FIFO) cost method. For excess and obsolete inventory resulting from the potential inability to sell specific products at prices in excess of current carrying costs, reserves are maintained to reduce current carrying cost to net realizable value.

**STRYKER CORPORATION 2021 FORM 10-K**

**Financial Instruments:** Our financial instruments consist of cash, cash equivalents, marketable securities, accounts receivable, other investments, accounts payable, debt and foreign currency exchange contracts. The carrying value of our financial instruments, with the exception of our senior unsecured notes, approximates fair value on December 31, 2021 and 2020. Refer to Notes 3 and 10 for further details.

All marketable securities are recognized at fair value. Adjustments to the fair value of marketable securities that are classified as available-for-sale are recognized as increases or decreases, net of income taxes, within accumulated other comprehensive income (AOCI) in shareholders' equity and adjustments to the fair value of marketable securities that are classified as trading are recognized in earnings. The amortized cost of marketable debt securities is adjusted for amortization of premiums and discounts to maturity computed under the effective interest method. Such amortization and interest and realized gains and losses are included in other income (expense), net. The cost of securities sold is determined by the specific identification method.

We review declines in the fair value of our investments classified as available-for-sale to determine whether the decline in fair value is a result of credit loss or other factors. Impairments of available-for-sale marketable debt securities related to credit loss are included in earnings and impairments related to other factors are recognized within AOCI.

**Derivatives:** All derivatives are recognized at fair value and reported on a gross basis. We enter into forward currency exchange contracts to mitigate the impact of currency fluctuations on transactions denominated in nonfunctional currencies, thereby limiting our risk that would otherwise result from changes in exchange rates. The periods of the forward currency exchange contracts correspond to the periods of the exposed transactions, with realized gains and losses included in the measurement and recording of transactions denominated in the nonfunctional currencies. All forward currency exchange contracts are recorded at their fair value each period.

Forward currency exchange contracts designated as cash flow hedges are designed to hedge the variability of cash flows associated with forecasted transactions denominated in a foreign currency that will take place in the future. These nonfunctional currency exposures principally relate to forecasted intercompany sales and purchases of manufactured products and generally have maturities up to eighteen months. Changes in value of derivatives designated as cash flow hedges are recorded in AOCI on the Consolidated Balance Sheets until earnings are affected by the variability of the underlying cash flows. At that time, the applicable amount of gain or loss from the derivative instrument that is deferred in shareholders' equity is reclassified into earnings and is included in cost of goods sold in the Consolidated Statements of Earnings. Cash flows associated with these hedges are included in cash from operations in the same category as the cash flows from the items being hedged.

Forward currency exchange contracts are used to offset our exposure to the change in value of specific foreign currency denominated assets and liabilities, primarily intercompany payables and receivables. These derivatives are not designated as hedges and, therefore, changes in the value of these forward contracts are recognized in earnings, thereby offsetting the current earnings effect of the related changes in value of foreign currency denominated assets and liabilities. The estimated fair value of our forward currency exchange contracts represents the

measurement of the contracts at month-end spot rates as adjusted by current forward points.

From time to time, we designate derivative and non-derivative financial instruments as net investment hedges of our investments in certain international subsidiaries. For derivative instruments that are designated and qualify as a net investment hedge, the effective portion of the derivative's gain or loss is recognized in OCI and reported as a component of AOCI. We have elected to use the spot method to assess effectiveness for our derivatives designated as net investment hedges. Accordingly, the change in fair value attributable to changes in the spot rate is recorded in AOCI. We exclude the spot-forward difference from the assessment of hedge effectiveness and amortize this amount separately on a straight-line basis over the term of the forward contracts. This amortization is recognized in other income (expense), net.

From time to time, we designate forward starting interest rate derivative instruments as cash flow hedges to manage the exposure to interest rate volatility with regard to future issuance and refinancing of debt. Changes in value of derivatives designated as cash flow hedges are recorded in AOCI on the Consolidated Balance Sheets until earnings are affected by the variability of the underlying cash flows. At that time, the applicable amount of gain or loss from the derivative instrument that is deferred in shareholders' equity is reclassified into earnings and is included in interest expense in the Consolidated Statements of Earnings.

Interest rate derivative instruments designated as fair value hedges have been used in the past to manage interest rate movements and to reduce borrowing costs by converting fixed-rate debt into floating-rate debt. Under these agreements, we agree to exchange, at specified intervals, the difference between fixed and floating interest amounts calculated by reference to an agreed-upon notional principal amount.

**Property, Plant and Equipment:** Property, plant and equipment is stated at cost. Depreciation is generally computed by the straight-line method over the estimated useful lives of three to 30 years for buildings and improvements and three to 15 years for machinery and equipment.

**Goodwill and Other Intangible Assets:** Goodwill represents the excess of purchase price over fair value of tangible net assets of acquired businesses at the acquisition date, after amounts allocated to other identifiable intangible assets. Factors that contribute to the recognition of goodwill include synergies that are specific to our business and not available to other market participants and are expected to increase net sales and profits; acquisition of a talented workforce; cost savings opportunities; the strategic benefit of expanding our presence in core and adjacent markets; and diversifying our product portfolio.

The fair values of other identifiable intangible assets acquired in a business combination are primarily determined using the income approach. Other intangible assets include, but are not limited to, developed technology, customer and distributor relationships (which reflect expected continued customer or distributor patronage) and trademarks and patents. Intangible assets with determinable useful lives are amortized on a straight-line basis over their estimated useful lives of four to 40 years. Certain acquired trade names are considered to have indefinite lives and are not amortized, but are assessed annually for potential impairment as described below.

In some of our acquisitions, we acquire in-process research and development (IPRD) intangible assets. For acquisitions accounted for as business combinations IPRD is considered to

---

be an indefinite-lived intangible asset until the research is completed (then it becomes a determinable-lived intangible asset) or determined to have no future use (then it is impaired). For asset acquisitions IPRD is expensed immediately unless there is an alternative future use.

**Goodwill, Intangibles and Long-Lived Asset Impairment Tests:** We perform our annual impairment test for goodwill in the fourth quarter of each year. We consider qualitative indicators of the fair value of a reporting unit when it is unlikely that a reporting unit has impaired goodwill and periodically corroborate that assessment with quantitative information. In certain circumstances, we may also utilize a discounted cash flow analysis that requires certain assumptions and estimates are made regarding market conditions and our future profitability. Indefinite-lived intangible assets are also tested at least annually for impairment by comparing the individual carrying values to the fair value.

We review long-lived assets for indicators of impairment whenever events or changes in circumstances indicate that the carrying amount may not be recoverable. The evaluation is performed at the lowest level of identifiable cash flows. Undiscounted cash flows expected to be generated by the related assets are estimated over the asset's useful life based on updated projections. If the evaluation indicates that the carrying amount of the asset may not be recoverable, any potential impairment is measured based upon the fair value of the related asset or asset group as determined by an appropriate market appraisal or other valuation technique. Assets classified as held for sale are recorded at the lower of carrying amount or fair value less costs to sell.

**Share-Based Compensation:** Share-based compensation is in the form of stock options, restricted stock units (RSUs) and performance stock units (PSUs). Stock options are granted under long-term incentive plans to certain key employees and non-employee directors at an exercise price not less than the fair market value of the underlying common stock, which is the quoted closing price of our common stock on the day prior to the date of grant. The options are granted for periods of up to 10 years and become exercisable in varying installments.

We grant RSUs to key employees and non-employee directors and PSUs to certain key employees under our long-term incentive plans. The fair value of RSUs is determined based on the number of shares granted and the quoted closing price of our common stock on the date of grant, adjusted for the fact that RSUs do not include anticipated dividends. RSUs generally vest in one-third increments over a three-year period and are settled in stock. PSUs are earned over a three-year performance cycle and vest in March of the year following the end of that performance cycle. The number of PSUs that will ultimately be earned is based on our performance relative to pre-established goals in that three-year performance cycle. The fair value of PSUs is determined based on the quoted closing price of our common stock on the day of grant.

Compensation expense is recognized in the Consolidated Statements of Earnings based on the estimated fair value of the awards on the grant date. Compensation expense recognized reflects an estimate of the number of awards expected to vest after taking into consideration an estimate of award forfeitures based on actual experience and is recognized on a straight-line basis over the requisite service period, which is generally the period required to obtain full vesting. Management expectations related to the achievement of performance goals associated with PSU grants is assessed regularly and that assessment is used to

determine whether PSU grants are expected to vest. If performance-based milestones related to PSU grants are not met or not expected to be met, any compensation expense recognized associated with such grants will be reversed.

**Income Taxes:** Deferred income tax assets and liabilities are determined based on differences between financial reporting and income tax bases of assets and liabilities and are measured using the enacted income tax rates in effect for the years in which the differences are expected to reverse. Deferred income tax benefits generally represent the change in net deferred income tax assets and liabilities in the year. Other amounts result from adjustments related to acquisitions and foreign currency as appropriate.

We operate in multiple income tax jurisdictions both within the United States and internationally. Accordingly, management must determine the appropriate allocation of income to each of these jurisdictions based on current interpretations of complex income tax regulations. Income tax authorities in these jurisdictions regularly perform audits of our income tax filings. Income tax audits associated with the allocation of this income and other complex issues, including inventory transfer pricing and cost sharing, product royalty and foreign branch arrangements, may require an extended period of time to resolve and may result in significant income tax adjustments if changes to the income allocation are required between jurisdictions with different income tax rates.

**New Accounting Pronouncements Not Yet Adopted**

In October 2021 the Financial Accounting Standards Board issued Accounting Standards Update 2021-08, *Business Combinations: Accounting for Contract Assets and Contract Liabilities from Contracts with Customers*. This update requires an entity to recognize and measure contract assets and contract liabilities acquired in a business combination in accordance with Accounting Standards Codification 606, *Revenue from Contracts with Customers*. We are evaluating the impact this update will have on our Consolidated Financial Statements.

**Accounting Pronouncements Recently Adopted**

No new accounting pronouncements were issued or became effective in the period that had, or are expected to have, a material impact on our Consolidated Financial Statements.

**NOTE 2 - REVENUE RECOGNITION**

We disaggregate our net sales by product line and geographic location for each of our segments as we believe it best depicts how the nature, amount, timing and certainty of our net sales and cash flows are affected by economic factors.

Products and services are primarily transferred to customers at a point in time, with some transfers of services taking place over time. In 2021 less than 10% of our sales were recognized as services transferred over time. Refer to Note 1 for further discussion on our revenue recognition policies.

**STRYKER CORPORATION 2021 FORM 10-K**

## Segment Net Sales

| MedSurg and Neurotechnology: | 2021 | 2020 | 2019 |
|---|---|---|---|
| Instruments | $ 2,111 | $ 1,863 | $ 1,959 |
| Endoscopy | 2,141 | 1,763 | 1,983 |
| Medical | 2,607 | 2,524 | 2,264 |
| Neurovascular | 1,188 | 973 | 924 |
| Neuro Cranial | 1,214 | 972 | 1,059 |
| Other | 277 | 250 | 286 |
| | $ 9,538 | $ 8,345 | $ 8,475 |
| **Orthopaedics and Spine:** | | | |
| Knees | $ 1,848 | $ 1,567 | $ 1,815 |
| Hips | 1,342 | 1,206 | 1,383 |
| Trauma and Extremities | 2,664 | 1,722 | 1,639 |
| Spine | 1,167 | 1,047 | 1,157 |
| Other | 549 | 464 | 415 |
| | $ 7,570 | $ 6,006 | $ 6,409 |
| **Total** | $ 17,108 | $ 14,351 | $ 14,884 |

## United States Net Sales

| MedSurg and Neurotechnology: | 2021 | 2020 | 2019 |
|---|---|---|---|
| Instruments | $ 1,637 | $ 1,471 | $ 1,542 |
| Endoscopy | 1,670 | 1,408 | 1,577 |
| Medical | 2,007 | 1,910 | 1,787 |
| Neurovascular | 451 | 381 | 391 |
| Neuro Cranial | 988 | 801 | 890 |
| Other | 273 | 247 | 283 |
| | $ 7,026 | $ 6,218 | $ 6,470 |
| **Orthopaedics and Spine:** | | | |
| Knees | $ 1,351 | $ 1,170 | $ 1,347 |
| Hips | 822 | 777 | 882 |
| Trauma and Extremities | 1,866 | 1,139 | 1,051 |
| Spine | 831 | 764 | 873 |
| Other | 425 | 387 | 334 |
| | $ 5,295 | $ 4,237 | $ 4,487 |
| **Total** | $ 12,321 | $ 10,455 | $ 10,957 |

## International Net Sales

| MedSurg and Neurotechnology: | 2021 | 2020 | 2019 |
|---|---|---|---|
| Instruments | $ 474 | $ 392 | $ 417 |
| Endoscopy | 471 | 355 | 406 |
| Medical | 600 | 614 | 477 |
| Neurovascular | 737 | 592 | 533 |
| Neuro Cranial | 226 | 171 | 169 |
| Other | 4 | 3 | 3 |
| | $ 2,512 | $ 2,127 | $ 2,005 |
| **Orthopaedics and Spine:** | | | |
| Knees | $ 497 | $ 397 | $ 468 |
| Hips | 520 | 429 | 501 |
| Trauma and Extremities | 798 | 583 | 588 |
| Spine | 336 | 283 | 284 |
| Other | 124 | 77 | 81 |
| | $ 2,275 | $ 1,769 | $ 1,922 |
| **Total** | $ 4,787 | $ 3,896 | $ 3,927 |

### MedSurg and Neurotechnology

MedSurg and Neurotechnology products include surgical equipment and navigation systems (Instruments), endoscopic and communications systems (Endoscopy), patient handling, emergency medical equipment and intensive care disposable products (Medical), minimally invasive products for the treatment of acute ischemic and hemorrhagic stroke (Neurovascular), a comprehensive line of products for traditional brain and open skull based surgical procedures; orthobiologic and biosurgery products, including synthetic bone grafts and vertebral augmentation products (Neuro Cranial) and other medical device products used in a variety of medical specialties. Substantially all MedSurg and Neurotechnology sales are recognized when a purchase order has been received and control has transferred. For certain Endoscopy, Instruments and Medical services, we may recognize sales over time as we satisfy performance obligations that may include an obligation to complete installation, provide training and perform ongoing services, generally performed within one year.

### Orthopaedics and Spine

Orthopaedics and Spine products consist primarily of implants used in hip and knee joint replacements and trauma and extremity surgeries, and cervical, thoracolumbar and interbody systems used in spinal injury, deformity and degenerative therapies. Substantially all Orthopaedics sales are recognized when we have received a purchase order and appropriate notification the product has been used or implanted. Substantially all Spine sales are recognized when a purchase order has been received and control has transferred. For certain Orthopaedic products in the "other" category, we recognize sales at a point in time, as well as over time for performance obligations that may include an obligation to complete installation and provide training and ongoing services. Performance obligations are generally satisfied within one year.

### Contract Assets and Liabilities

The nature of our products and services do not generally give rise to contract assets as we typically do not incur costs to fulfill a contract before a product or service is provided to a customer. Our costs to obtain contracts are typically in the form of sales commissions paid to employees or third-party agents. Certain sales commissions paid to employees prior to recognition of sales are recorded as contract assets. We expense sales commissions associated with obtaining a contract at the time of the sale or as incurred as the amortization period is generally less than one year. These costs have been presented within selling, general and administrative expenses. On December 31, 2021 contract assets recorded in our Consolidated Balance Sheets were not significant.

Our contract liabilities arise as a result of consideration received from customers at inception of contracts for certain businesses or where the timing of billing for services precedes satisfaction of our performance obligations. We generally satisfy performance obligations within one year from the contract inception date. Our contract liabilities were $529 and $416 on December 31, 2021 and December 31, 2020.

### NOTE 3 - FAIR VALUE MEASUREMENTS

Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Financial assets and liabilities carried at fair value are classified in their entirety based on the lowest level of input and disclosed in one of the following three categories:

| Level 1 | Quoted market prices in active markets for identical assets or liabilities. |
|---|---|
| Level 2 | Observable market-based inputs or unobservable inputs that are corroborated by market data. |
| Level 3 | Unobservable inputs reflecting our assumptions or external inputs from active markets. |

Use of observable market data, when available, is required in making fair value measurements. When inputs used fall within different levels of the hierarchy, the level within which the fair value measurement is categorized is based on the lowest level input that is significant to the fair value measurement. We

---

**STRYKER CORPORATION 2021 FORM 10-K**

determine fair value for Level 1 instruments using exchange-traded prices for identical instruments. We determine fair value of Level 2 instruments using exchange-traded prices of similar instruments, where available, or utilizing other observable inputs that take into account our credit risk and that of our counterparties. Foreign currency exchange contracts and interest rate hedges are included in Level 2 and we use inputs other than quoted prices that are observable for the asset or liability. The Level 2 derivative instruments are primarily valued using standard calculations and models that use readily observable market data as their basis. Our Level 3 liabilities are comprised of contingent consideration arising from recently completed acquisitions. We determine fair value of these Level 3 liabilities using a discounted cash flow technique. Significant unobservable inputs were used in our assessment of fair value, including assumptions regarding future business results, discount rates, discount periods and probability assessments based on the likelihood of reaching various targets. We remeasure the fair value of our assets and liabilities each reporting period. We record the changes in fair value within selling, general and administrative expense and the changes in the time value of money within other income (expense), net.

*Assets Measured at Fair Value*

| | | 2021 | | 2020 |
|---|---|---|---|---|
| Cash and cash equivalents | $ | 2,944 | $ | 2,943 |
| Trading marketable securities | | 193 | | 171 |
| **Level 1 - Assets** | **$** | **3,137** | **$** | **3,114** |
| Available-for-sale marketable securities: | | | | |
| Corporate and asset-backed debt securities | $ | 48 | $ | 38 |
| Foreign government debt securities | | 2 | | — |
| United States agency debt securities | | 5 | | 5 |
| United States treasury debt securities | | 19 | | 36 |
| Certificates of deposit | | 1 | | 2 |
| Total available-for-sale marketable securities | $ | 75 | $ | 81 |
| Foreign currency exchange forward contracts | | 212 | | 20 |
| **Level 2 - Assets** | **$** | **287** | **$** | **101** |
| **Total assets measured at fair value** | **$** | **3,424** | **$** | **3,215** |

*Liabilities Measured at Fair Value*

| | | 2021 | | 2020 |
|---|---|---|---|---|
| Deferred compensation arrangements | $ | 193 | $ | 171 |
| **Level 1 - Liabilities** | **$** | **193** | **$** | **171** |
| Foreign currency exchange forward contracts | $ | 17 | $ | 160 |
| Interest rate swap liability | | — | | 53 |
| **Level 2 - Liabilities** | **$** | **17** | **$** | **213** |
| Contingent consideration: | | | | |
| Beginning | $ | 393 | $ | 306 |
| Additions | | 62 | | 108 |
| Change in estimate | | (1) | | 9 |
| Settlements | | (148) | | (30) |
| Ending | $ | 306 | $ | 393 |
| **Level 3 - Liabilities** | **$** | **306** | **$** | **393** |
| **Total liabilities measured at fair value** | **$** | **516** | **$** | **777** |

*Fair Value of Available for Sale Securities by Maturity*

| | | 2021 | | 2020 |
|---|---|---|---|---|
| Due in one year or less | $ | 36 | $ | 42 |
| Due after one year through three years | $ | 39 | $ | 39 |

On December 31, 2021 the aggregate difference between the cost and fair value of available-for-sale marketable securities was nominal. Interest and marketable securities income was $68, $102 and $155 in 2021, 2020 and 2019, which was recorded in other income (expense), net.

Our investments in available-for-sale marketable securities had a minimum credit quality rating of A2 (Moody's), A (Standard & Poor's) and A (Fitch). We do not plan to sell the investments, and it is not more likely than not that we will be required to sell the

investments before recovery of their amortized cost basis, which may be maturity.

**NOTE 4 - DERIVATIVE INSTRUMENTS**

We use operational and economic hedges, foreign currency exchange forward contracts, net investment hedges (both derivative and non-derivative financial instruments) and interest rate derivative instruments to manage the impact of currency exchange and interest rate fluctuations on earnings, cash flow and equity. We do not enter into derivative instruments for speculative purposes. We are exposed to potential credit loss in the event of nonperformance by counterparties on our outstanding derivative instruments but do not anticipate nonperformance by any of our counterparties. Should a counterparty default, our maximum loss exposure is the asset balance of the instrument.

**Foreign Currency Hedges**

| 2021 | | Cash Flow | | Net Investment | | Non-Designated | | Total |
|---|---|---|---|---|---|---|---|---|
| Gross notional amount | $ | 973 | $ | 2,266 | $ | 5,512 | $ | 8,751 |
| Maximum term in years | | | | | | | | 4.9 |
| Fair value: | | | | | | | | |
| Other current assets | $ | 15 | $ | 39 | $ | 92 | $ | 146 |
| Other noncurrent assets | | 1 | | 65 | | — | | 66 |
| Other current liabilities | | (7) | | — | | (10) | | (17) |
| **Total fair value** | **$** | **9** | **$** | **104** | **$** | **82** | **$** | **195** |
| **2020** | | | | | | | | |
| Gross notional amount | $ | 949 | $ | 1,828 | $ | 5,382 | $ | 8,159 |
| Maximum term in years | | | | | | | | 4.9 |
| Fair value: | | | | | | | | |
| Other current assets | $ | 9 | $ | — | $ | 7 | $ | 16 |
| Other noncurrent assets | | — | | 4 | | — | | 4 |
| Other current liabilities | | (12) | | — | | (121) | | (133) |
| Other noncurrent liabilities | | (1) | | (26) | | — | | (27) |
| **Total fair value** | **$** | **(4)** | **$** | **(22)** | **$** | **(114)** | **$** | **(140)** |

We had €2.0 billion and €1.5 billion at December 31, 2021 and 2020 in certain forward currency contracts designated as net investment hedges to hedge a portion of our investments in certain of our entities with functional currencies denominated in Euros. In addition to these derivative financial instruments designated as net investment hedges, we had €4.4 billion at December 31, 2021 and 2020 of senior unsecured notes designated as net investment hedges to selectively hedge portions of our investment in certain international subsidiaries. The currency effects of our Euro-denominated senior unsecured notes are reflected in AOCI within shareholders' equity where they offset gains and losses recorded on our net investment in international subsidiaries.

On December 31, 2021 the total after-tax gain (loss) in AOCI related to designated net investment hedges was ($34).

*Net Currency Exchange Rate Gains (Losses)*

| Derivative Instrument | Recorded in: | | 2021 | | 2020 | | 2019 |
|---|---|---|---|---|---|---|---|
| Cash Flow | Cost of sales | $ | (12) | $ | 5 | $ | 2 |
| Net Investment | Other income (expense), net | | 35 | | 28 | | 14 |
| Non-Designated | Other income (expense), net | | (10) | | (13) | | (7) |
| **Total** | | **$** | **13** | **$** | **20** | **$** | **9** |

Pretax gains (losses) on derivatives designated as cash flow hedges of $9 and net investment hedges of $37 recorded in AOCI are expected to be reclassified to cost of sales and other income (expense), net in earnings within 12 months as of December 31, 2021. This cash flow hedge reclassification is primarily due to the sale of inventory that includes previously hedged purchases. A component of the AOCI amounts related to net investment hedges is reclassified over the life of the hedge

instruments as we elected to exclude the initial value of the component related to the spot-forward difference from the effectiveness assessment.

**Interest Rate Hedges**

In 2021 a loss of $11 was reclassified from AOCI to other income (expense), net in earnings relating to the termination of forward starting interest rate swaps with notional amounts of $750 designated as cash flow hedges as we now consider it probable that the original forecasted debt issuances will not occur. Pretax gains of $5 recorded in AOCI related to other interest rate hedges closed in conjunction with debt issuances are expected to be reclassified to other income (expense), net in earnings within 12 months of December 31, 2021. The cash flow effect of interest rate hedges is recorded in cash flow from operations.

**NOTE 5 - ACCUMULATED OTHER COMPREHENSIVE (LOSS) INCOME (AOCI)**

| | Marketable Securities | Pension Plans | Hedges | Financial Statement Translation | Total |
|---|---|---|---|---|---|
| **2019** | $ (3) | $ (179) | $ 47 | $ (471) | $ (606) |
| OCI | — | (117) | (64) | (459) | (640) |
| Income taxes | — | 28 | 17 | 66 | 111 |
| Reclassifications to: | | | | | |
| Cost of Sales | — | — | (5) | — | (5) |
| Other (income) expense, net | — | 12 | (6) | (28) | (22) |
| Income taxes | — | (3) | 1 | 7 | 5 |
| Net OCI | — | (80) | (57) | (414) | (551) |
| **2020** | $ (3) | $ (259) | $ (10) | $ (885) | $ (1,157) |
| OCI | 4 | 123 | 46 | 551 | 724 |
| Income taxes | — | (32) | (15) | (54) | (101) |
| Reclassifications to: | | | | | |
| Cost of Sales | — | — | 12 | — | 12 |
| Other (income) expense, net | — | 15 | 6 | (35) | (14) |
| Income taxes | (1) | (2) | 1 | 7 | 5 |
| Net OCI | 3 | 104 | 50 | 469 | 626 |
| **2021** | $ — | $ (155) | $ 40 | $ (416) | $ (531) |

**NOTE 6 - ACQUISITIONS**

We acquire stock in companies and various assets that continue to support our capital deployment and product development strategies. The aggregate purchase price of our acquisitions, net of cash acquired was $393 and $4,304 in 2021 and 2020.

In September 2021 we completed the acquisition of Gauss Surgical, Inc. (Gauss) for $120 in cash and up to $40 in future milestone payments. Gauss is a medical device company that has developed Triton, an artificial intelligence-enabled platform for real-time monitoring of blood loss during surgery. Gauss is part of our Instruments business within MedSurg and Neurotechnology. Goodwill attributable to the acquisition is not deductible for tax purposes.

In November 2020 we completed the acquisition of Wright Medical Group N.V. (Wright) for $30.75 per share, or an aggregate purchase price of $4.1 billion ($5.6 billion including convertible notes). Wright is a global medical device company focused on extremities and biologics. Wright is part of our Trauma and Extremities business within Orthopaedics and Spine. Goodwill attributable to the acquisition is not deductible for tax purposes.

In November and December 2020 note holders elected to redeem the 1.625% and 2.25% convertible notes assumed in the Wright acquisition for $864 and $576. These repayments are classified as financing activities.

In December 2020 we completed the acquisition of OrthoSensor, Inc. (OrthoSensor). OrthoSensor is a leader in the digital evolution of musculoskeletal care and sensor technology for total joint replacement. OrthoSensor is part of our Joint Replacement business within Orthopaedics and Spine. Goodwill attributable to the acquisition is not deductible for tax purposes.

Had the above acquisitions taken place as of the beginning of the comparable prior year, our consolidated financial results of operations in the aggregate would not have been materially different. Accordingly, we have not disclosed pro forma financial information.

Purchase price allocations for our significant acquisitions are:

*Purchase Price Allocation of Acquired Net Assets*

| 2020 | Wright |
|---|---|
| Tangible assets acquired: | |
| Accounts receivable | $ 127 |
| Deferred income tax assets | 491 |
| Inventory | 440 |
| Other assets | 343 |
| Debt | (1,446) |
| Deferred income tax liabilities | (503) |
| Product liabilities | (218) |
| Other liabilities | (296) |
| Intangible assets: | |
| Customer and distributor relationships | 182 |
| Developed technology and patents | 1,506 |
| Trade name | 58 |
| Goodwill | 3,397 |
| *Purchase price, net of cash acquired* | $ 4,081 |
| *Weighted average life of intangible assets* | 12 |

Purchase price allocations for 2021 acquisitions were based on preliminary valuations, primarily related to intangible assets, product liabilities and deferred income taxes. Our estimates and assumptions are subject to change within the measurement period. The purchase price allocations for Wright, OrthoSensor and other 2020 acquisitions were finalized in 2021 without material adjustments.

In January 2022 we announced a definitive merger agreement to acquire all of the issued and outstanding common shares of Vocera Communications, Inc. (Vocera) for $79.25 per share, or an aggregate purchase price of approximately $3.1 billion (including convertible notes). Pursuant to the agreement we commenced a tender offer to purchase all of the outstanding shares of common stock of Vocera for $79.25 per share in cash. The boards of directors of both Stryker and Vocera have unanimously approved the transaction. We expect the acquisition to close in the first quarter of 2022, subject to completion of the tender offer and other customary conditions. Vocera has emerged as a leading platform in the digital care coordination and communication category. Following closing, we plan to integrate Vocera into our Medical business within MedSurg and Neurotechnology.

**NOTE 7 - CONTINGENCIES AND COMMITMENTS**

We are involved in various ongoing proceedings, legal actions and claims arising in the normal course of business, including proceedings related to product, labor, intellectual property and other matters, the most significant of which are more fully described below. The outcomes of these matters will generally not be known for prolonged periods of time. In certain of the legal proceedings the claimants seek damages as well as other compensatory and equitable relief that could result in the payment of significant claims and settlements and/or the imposition of injunctions or other equitable relief. For legal matters for which management had sufficient information to

reasonably estimate our future obligations, a liability representing management's best estimate of the probable loss, or the minimum of the range of probable losses when a best estimate within the range is not known, is recorded. The estimates are based on consultation with legal counsel, previous settlement experience and settlement strategies. If actual outcomes are less favorable than those estimated by management, additional expense may be incurred, which could unfavorably affect future operating results. We are self-insured for certain claims and expenses. The ultimate cost to us with respect to product liability claims could be materially different than the amount of the current estimates and accruals and could have a material adverse effect on our financial position, results of operations and cash flows.

**Recall Matters**

In June 2012 we voluntarily recalled our Rejuvenate and ABG II Modular-Neck hip stems and terminated global distribution of these hip products. Product liability lawsuits relating to this voluntary recall have been filed against us. In November 2014 we entered into a settlement agreement to compensate eligible United States patients who had revision surgery prior to November 3, 2014 and in December 2016 the settlement program was extended to patients who had revision surgery prior to December 19, 2016. In September 2020 we entered into a second settlement agreement to compensate eligible United States patients who had revision surgery prior to September 9, 2020. We continue to offer support for recall-related care and reimburse patients who are not eligible to enroll in the settlement program for testing and treatment services, including any necessary revision surgeries. In addition, there are remaining lawsuits that we will continue to defend against.

In August 2016 and May 2018 we voluntarily recalled certain lot-specific sizes and offsets of LFIT Anatomic CoCr V40 Femoral Heads. Product liability lawsuits and claims relating to this voluntary recall have been filed against us. In November 2018 we entered into a settlement agreement to resolve a significant number of claims and lawsuits related to the recalls. In December 2021, we reached a second agreement to resolve a significant number of claims and lawsuits related to the recalls. The specific terms of the settlement agreements, including the financial terms, are confidential.

With the acquisition of Wright as more fully described in Note 6, we are responsible for certain product liability claims, primarily related to certain hip products sold by Wright prior to its 2014 divestiture of the OrthoRecon business. We will continue to evaluate each claim and the possible loss we may incur.

We have incurred, and expect to incur in the future, costs associated with the defense and settlement of these matters. In 2021, we recorded charges of $103 and made payments of $221, primarily related to Rejuvenate and ABG II Modular-Neck hip stems. Based on the information that has been received, we have estimated the remaining range of probable loss related to recall matters globally to be approximately $385 to $520. We have recorded reserves representing the remaining minimum of the range of probable loss. The final outcomes of these matters are dependent on many factors that are difficult to predict. Accordingly, the ultimate cost related to these matters may be materially different than the amount of our current estimate and accruals and could have a material adverse effect on our results of operations and cash flows.

**Leases**

We lease various manufacturing, warehousing and distribution facilities, administrative and sales offices as well as equipment under operating leases. We evaluate our contracts to identify leases, which is generally if there is an identified asset and we

have the right to direct the use of and obtain substantially all of the economic benefit from the use of the identified asset. Certain of our lease agreements contain rent escalation clauses (including index-based escalations), rent holidays, capital improvement funding or other lease incentives. We recognize our minimum rental expense on a straight-line basis over the term of the lease beginning with the date of initial control of the asset. Right-of-use assets are recorded in Other noncurrent assets on our Consolidated Balance Sheets. Current and noncurrent lease liabilities are recorded in Accrued expenses and other liabilities and Other noncurrent liabilities, respectively.

We have made certain significant assumptions and judgments when recording leases. For all asset classes, we elected to not recognize a right-of-use asset and lease liability for short-term leases and not separate non-lease components from lease components to which they relate and have accounted for the combined lease and non-lease components as a single lease component. The determination of the discount rate used in a lease is our incremental borrowing rate which is based on what we would normally pay to borrow on a collateralized basis over a similar term an amount equal to the lease payments.

|  | 2021 | 2020 |
|---|---|---|
| Right-of-use assets | $ 419 | $ 423 |
| Lease liabilities, current | $ 112 | $ 109 |
| Lease liabilities, noncurrent | $ 310 | $ 325 |
| **Other information:** | | |
| Weighted-average remaining lease term | 5.4 years | 5.6 years |
| Weighted-average discount rate | 2.86 % | 2.57 % |

Operating lease expense totaled $133, $130, and $133 in 2021, 2020 and 2019.

**Future Obligations**

We have purchase commitments for materials, supplies, services and property, plant and equipment as part of the normal course of business. In addition, we lease various manufacturing, warehousing and distribution facilities, administrative and sales offices as well as equipment under operating leases. Refer to Note 10 for more information on the debt obligations.

|  | 2022 | 2023 | 2024 | 2025 | 2026 | Thereafter |
|---|---|---|---|---|---|---|
| Debt repayments | $ 7 | $ 1,226 | $ 1,564 | $ 1,400 | $ 1,000 | $ 7,392 |
| Purchase obligations | $ 1,889 | $ 69 | $ 54 | $ 46 | $ 49 | — |
| Minimum lease payments | $ 112 | $ 86 | $ 60 | $ 38 | $ 34 | 72 |

**NOTE 8 - GOODWILL AND OTHER INTANGIBLE ASSETS**

We completed our annual impairment tests of goodwill in 2021 and 2020 and concluded in each year that no impairments exist.

*Changes in the Net Carrying Value of Goodwill by Segment*

|  | MedSurg and Neurotechnology | Orthopaedics and Spine | Total |
|---|---|---|---|
| **2019** | $ 5,377 | $ 3,692 | $ 9,069 |
| Additions and adjustments | 1 | 3,558 | 3,559 |
| Foreign exchange | 81 | 69 | 150 |
| **2020** | $ 5,459 | $ 7,319 | $ 12,778 |
| Additions and adjustments | 223 | 59 | 282 |
| Foreign exchange | (13) | (129) | (142) |
| **2021** | 5,669 | 7,249 | 12,918 |

*Summary of Other Intangible Assets*

| | Weighted Average Amortization Period (Years) | Gross Carrying Amount | Less Accumulated Amortization | Net Carrying Amount |
|---|---|---|---|---|
| **Developed technologies** | | | | |
| 2021 | 13 | $ 5,326 | $ 1,956 | $ 3,370 |
| 2020 | 13 | 5,305 | 1,573 | 3,732 |
| **Customer relationships** | | | | |
| 2021 | 15 | $ 2,324 | $ 1,174 | $ 1,150 |
| 2020 | 15 | 2,352 | 988 | 1,364 |
| **Patents** | | | | |
| 2021 | 12 | $ 343 | $ 286 | $ 57 |
| 2020 | 12 | 346 | 278 | 68 |
| **Trademarks** | | | | |
| 2021 | 16 | $ 415 | $ 199 | $ 216 |
| 2020 | 17 | 428 | 162 | 266 |
| **In-process research and development** | | | | |
| 2021 | N/A | $ 29 | $ — | $ 29 |
| 2020 | N/A | 97 | — | 97 |
| **Other** | | | | |
| 2021 | 9 | $ 105 | $ 87 | $ 18 |
| 2020 | 8 | 128 | 101 | 27 |
| **Total** | | | | |
| **2021** | **14** | **$ 8,542** | **$ 3,702** | **$ 4,840** |
| **2020** | **14** | **8,656** | **3,102** | **5,554** |

*Estimated Amortization Expense*

| 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|
| $ 581 | $ 558 | $ 528 | $ 506 | $ 447 |

## NOTE 9 - CAPITAL STOCK

The aggregate number of shares of all classes of stock which we are authorized to issue is up to 1,000,500,000, divided into two classes consisting of 500,000 shares of $1 par value preferred stock and 1,000,000,000 shares of common stock with a par value of $0.10. No shares of preferred stock were outstanding on December 31, 2021.

We made no repurchases of shares in 2021. The manner, timing and amount of repurchases are determined by management based on an evaluation of market conditions, stock price and other factors and are subject to regulatory considerations. Purchases are made from time-to-time in the open market, in privately negotiated transactions or otherwise. On December 31, 2021 the total dollar value of shares that could be purchased under our authorized repurchase program was $1,033.

Shares reserved for future compensation grants of our common stock were 25 million and 28 million on December 31, 2021 and 2020.

### Stock Options

We measure the cost of employee stock options based on the grant-date fair value and recognize that cost using the straight-line method over the period in which a recipient is required to provide services in exchange for the options, typically the vesting period. The weighted-average fair value per share of options is estimated on the date of grant using the Black-Scholes option pricing model.

*Option Value and Assumptions*

| | 2021 | 2020 | 2019 |
|---|---|---|---|
| Weighted-average fair value per share | $ 53.35 | $ 39.34 | $ 36.30 |
| **Assumptions:** | | | |
| Risk-free interest rate | 0.8 % | 1.4 % | 2.6 % |
| Expected dividend yield | 1.2 % | 1.0 % | 1.1 % |
| Expected stock price volatility | 26.9 % | 18.9 % | 18.3 % |
| Expected option life (years) | 5.9 | 5.8 | 5.9 |

The risk-free interest rate for periods within the expected life of options granted is based on the United States Treasury yield curve in effect at the time of grant. Expected stock price volatility is based on the historical volatility of our stock. The expected option life, representing the period of time that options granted are expected to be outstanding, is based on historical option exercise and employee termination data.

*2021 Stock Option Activity*

| | Shares (in millions) | Weighted Average Exercise Price | Weighted-Average Remaining Term (in years) | Aggregate Intrinsic Value |
|---|---|---|---|---|
| **Outstanding January 1** | **12.2** | **$ 131.72** | | |
| Granted | 1.8 | 235.35 | | |
| Exercised | (1.6) | 96.41 | | |
| Canceled or forfeited | (0.3) | 192.60 | | |
| **Outstanding December 31** | **12.1** | **$ 150.17** | **5.7** | **$ 1,424.2** |
| Exercisable December 31 | 7.1 | $ 113.56 | 4.2 | $ 1,086.3 |
| Options expected to vest | 4.6 | $ 199.41 | 7.7 | $ 313.3 |

The aggregate intrinsic value of options, which represents the cumulative difference between the fair market value of the underlying common stock and the option exercise prices, exercised was $253, $258, and $294 in 2021, 2020 and 2019. Exercise prices for options outstanding ranged from $53.60 to $270.94 on December 31, 2021. On December 31, 2021 there was $101 of unrecognized compensation cost related to nonvested stock options granted under the long-term incentive plans; that cost is expected to be recognized over the weighted-average period of approximately 1.5 years.

*Restricted Stock Units (RSUs) and Performance Stock Units (PSUs) Activity*

| | Shares (in millions) | | Weighted Average Grant Date Fair Value | |
|---|---|---|---|---|
| | RSUs | PSUs | RSUs | PSUs |
| **Nonvested on January 1** | **0.8** | **0.2** | **$ 187.72** | **$ 185.46** |
| Granted | 0.4 | 0.1 | 230.61 | 233.95 |
| Vested | (0.4) | (0.1) | 179.15 | 153.67 |
| Canceled or forfeited | (0.1) | — | 187.38 | 160.11 |
| **Nonvested on December 31** | **0.7** | **0.2** | **$ 213.16** | **$ 210.73** |

On December 31, 2021 there was $71 of unrecognized compensation cost related to nonvested RSUs. That cost is expected to be recognized as expense over the weighted-average period of approximately one year. The weighted-average grant date fair value per share of RSUs granted was $230.61 and $208.96 in 2021 and 2020. The fair value of RSUs and PSUs vested in 2021 was $63 and $5. On December 31, 2021 there was $18 of unrecognized compensation cost related to nonvested PSUs; the cost is expected to be recognized as expense over the weighted-average period of approximately one year.

### Employee Stock Purchase Plans (ESPP)

Employees may participate in our ESPP provided they meet certain eligibility requirements. The purchase price for our common stock under the terms of the ESPP is defined as 95% of the closing stock price on the last trading day of a purchase period. We issued 183,964 and 209,837 shares under the ESPP in 2021 and 2020.

## NOTE 10 - DEBT AND CREDIT FACILITIES

We have lines of credit issued by various financial institutions that are available to fund our day-to-day operating needs. Certain of our credit facilities require us to comply with financial and other covenants. We were in compliance with all covenants on December 31, 2021.

---

**STRYKER CORPORATION 2021 FORM 10-K**

In October 2021 we entered into a new revolving credit agreement that replaces our previous agreement dated August 19, 2016. The primary changes were to increase the aggregate principal amount of the facility from $750 to $2,250, extend the maturity date to October 26, 2026, increase the leverage ratio to 3.75 and provide LIBOR replacement language.

In the first quarter of 2022, our Board of Directors approved an increase to the maximum amount of commercial paper that can be outstanding under our commercial paper program from $1,500 to $2,250, with maturities up to 397 days from the date of issuance. On December 31, 2021 there were no borrowings outstanding under our credit facility or commercial paper program.

### Summary of Total Debt

**Senior unsecured notes:**

| Rate | Due | 2021 | 2020 |
|---|---|---|---|
| 2.625% | March 15, 2021 | $ — | $ 750 |
| 1.125% | November 30, 2023 | 622 | 668 |
| 0.600% | December 1, 2023 | 598 | 597 |
| 3.375% | May 15, 2024 | 593 | 590 |
| 0.250% | December 3, 2024 | 958 | 1,030 |
| 1.150% | June 15, 2025 | 645 | 644 |
| 3.375% | November 1, 2025 | 748 | 747 |
| 3.500% | March 15, 2026 | 994 | 992 |
| 2.125% | November 30, 2027 | 845 | 909 |
| 3.650% | March 7, 2028 | 597 | 596 |
| 0.750% | March 1, 2029 | 901 | 969 |
| 1.950% | June 15, 2030 | 990 | 989 |
| 2.625% | November 30, 2030 | 727 | 782 |
| 1.000% | December 3, 2031 | 840 | 903 |
| 4.100% | April 1, 2043 | 392 | 392 |
| 4.375% | May 15, 2044 | 395 | 395 |
| 4.625% | March 15, 2046 | 982 | 981 |
| 2.900% | June 15, 2050 | 642 | 641 |
| Term loan | | — | 400 |
| Other | | 10 | 16 |
| **Total debt** | | **$ 12,479** | **$ 13,991** |
| Less current maturities | | 7 | 761 |
| **Total long-term debt** | | **$ 12,472** | **$ 13,230** |
| | | | |
| Unamortized debt issuance costs | | $ 62 | $ 71 |
| Borrowing capacity on existing facilities | | $ 2,162 | $ 2,903 |
| Fair value of senior unsecured notes | | $ 13,391 | $ 15,022 |

The fair value of the senior unsecured notes was estimated using quoted interest rates, maturities and amounts of borrowings based on quoted active market prices and yields that took into account the underlying terms of the debt instruments. Substantially all of our debt is classified within Level 2 of the fair value hierarchy.

In March 2021 we repaid $750 of senior unsecured notes with a coupon of 2.625% that were due on March 15, 2021.

In June 2021 we repaid the $400 term loan that was due on November 10, 2023.

Interest expense, including required fees incurred on outstanding debt and credit facilities that were included in other income (expense), net, totaled $337, $315, and $287 in 2021, 2020 and 2019.

## NOTE 11 - INCOME TAXES

Our effective tax rate was 12.6%, 18.2% and 18.7% for 2021, 2020 and 2019. The effective income tax rate for 2021 reflects the continued lower effective income tax rates as a result of our European operations, certain discrete tax benefits, the tax effect related to the transfer of intellectual property between tax jurisdictions and the tax effect of future remittances of the undistributed earnings of foreign subsidiaries. The effective income tax rate for 2020 and 2019 reflects the tax effect related to the transfer of intellectual properties between tax jurisdictions, the effective income tax rates as a result of our European operations and the tax effect of future remittances of the undistributed earnings of foreign subsidiaries.

### Effective Income Tax Rate Reconciliation

| | 2021 | 2020 | 2019 |
|---|---|---|---|
| United States federal statutory rate | 21.0 % | 21.0 % | 21.0 % |
| United States state and local income taxes, less federal deduction | 2.7 | 0.1 | 1.7 |
| Foreign income tax at rates other than 21% | (6.9) | (3.3) | (4.6) |
| Tax related to repatriation of foreign earnings | 1.4 | 3.0 | (0.5) |
| Intellectual property transfer | (2.3) | (1.4) | 3.5 |
| Other | (3.3) | (1.2) | (2.4) |
| **Effective income tax rate** | **12.6 %** | **18.2 %** | **18.7 %** |

### Earnings Before Income Taxes

| | 2021 | 2020 | 2019 |
|---|---|---|---|
| United States | $ 433 | $ 239 | $ 366 |
| International | 1,848 | 1,715 | 2,196 |
| **Total** | **$ 2,281** | **$ 1,954** | **$ 2,562** |

### Components of Income Tax Expense (Benefit)

| Current income tax expense: | 2021 | 2020 | 2019 |
|---|---|---|---|
| United States federal | $ 155 | $ 80 | $ (17) |
| United States state and local | 97 | 20 | 46 |
| International | 272 | 207 | 324 |
| **Total current income tax expense** | **$ 524** | **$ 307** | **$ 353** |
| Deferred income tax (benefit) expense: | | | |
| United States federal | $ (82) | $ 1 | $ 10 |
| United States state and local | (23) | (25) | (1) |
| International | (132) | 72 | 117 |
| **Total deferred income tax (benefit) expense** | **$ (237)** | **$ 48** | **$ 126** |
| **Total income tax expense** | **$ 287** | **$ 355** | **$ 479** |

Interest and penalties included in other income (expense), net were expense of ($23), ($35) and ($9) in 2021, 2020 and 2019. The United States federal deferred income tax benefit (expense) includes the utilization of net operating loss carryforwards of $283, $41 and $50 in 2021, 2020 and 2019.

### Deferred Income Tax Assets and Liabilities

| Deferred income tax assets: | 2021 | 2020 |
|---|---|---|
| Inventories | $ 513 | $ 434 |
| Product-related liabilities | 39 | 48 |
| Other accrued expenses | 501 | 512 |
| Depreciation and amortization | 1,194 | 1,269 |
| State income taxes | 128 | 108 |
| Share-based compensation | 63 | 56 |
| Net operating loss and other credit carryforwards | 232 | 470 |
| Other | 191 | 166 |
| **Total deferred income tax assets** | **$ 2,861** | **$ 3,063** |
| Less valuation allowances | (164) | (203) |
| **Net deferred income tax assets** | **$ 2,697** | **$ 2,860** |
| Deferred income tax liabilities: | 2021 | 2020 |
| Depreciation and amortization | $ (891) | $ (1,286) |
| Undistributed earnings | (114) | (161) |
| **Total deferred income tax liabilities** | **$ (1,005)** | **$ (1,447)** |
| **Net deferred income tax assets** | **$ 1,692** | **$ 1,413** |
| Reported as: | | |
| Noncurrent deferred income tax assets | $ 1,760 | $ 1,530 |
| Noncurrent liabilities—Other liabilities | (68) | (117) |
| **Total** | **$ 1,692** | **$ 1,413** |

Accrued interest and penalties were $150 and $133 on December 31, 2021 and 2020 which were reported in current and noncurrent accrued expenses and other liabilities.

Net operating loss carryforwards totaling $602 with $192 being subject to a full valuation allowance ($183 and $106 related to the Wright acquisition) on December 31, 2021 are available to reduce future taxable earnings of certain domestic and foreign

subsidiaries. United States loss carryforwards of $403 expire through 2045. International loss carryforwards of $198 begin to expire in 2022; however, some have no expiration. We also have tax credit carryforwards of $104 with $83 being subject to a full valuation allowance. The credits with a full valuation allowance begin to expire in 2022; however, some have no expiration. We do not anticipate generating income tax in excess of the non-expiring credits in the foreseeable future.

The Tax Cuts and Jobs Act ("the Act") was enacted in 2017 in the United States. We recorded a one-time transition tax on earnings of certain foreign subsidiaries that were previously deferred. The Act also subjects a United States shareholder to tax on Global Intangible Low-Taxed Income (GILTI) earned by certain foreign subsidiaries. We have elected to account for GILTI tax in the year the tax is incurred.

We recorded deferred income tax on undistributed earnings of foreign subsidiaries not determined to be indefinitely reinvested. Determination of the total amount of unrecognized deferred income tax on undistributed earnings of foreign subsidiaries is not practicable.

### Uncertain Income Tax Positions

| | 2021 | 2020 |
|---|---|---|
| **Beginning uncertain tax positions** | $ 457 | $ 472 |
| Increases related to current year income tax positions | 13 | 12 |
| Increases related to prior year income tax positions | 4 | 5 |
| Decreases related to prior year income tax positions: | | |
| Settlements and resolutions of income tax audits | (18) | (41) |
| Statute of limitations expirations and other | — | (7) |
| Foreign currency translation | (12) | 16 |
| **Ending uncertain tax positions** | $ 444 | $ 457 |
| Reported as: | | |
| Noncurrent liabilities—Income taxes | $ 444 | $ 457 |

Our income tax expense would have been reduced by $445 and $456 in 2021 and 2020 had these uncertain income tax positions been favorably resolved. It is reasonably possible that the amount of unrecognized tax benefits will significantly change due to one or more of the following events in the next 12 months: expiring statutes, audit activity, tax payments, competent authority proceedings related to transfer pricing or final decisions in matters that are the subject of controversy in various taxing jurisdictions in which we operate, including inventory transfer pricing, cost sharing, product royalty and foreign branch arrangements. We are not able to reasonably estimate the amount or the future periods in which changes in unrecognized tax benefits may be resolved. Interest and penalties incurred associated with uncertain tax positions are included in other income (expense), net.

In the normal course of business, income tax authorities in various income tax jurisdictions both within the United States and internationally conduct routine audits of our income tax returns filed in prior years. These audits are generally designed to determine if individual income tax authorities are in agreement with our interpretations of complex income tax regulations regarding the allocation of income to the various income tax jurisdictions. Income tax years are open from 2014 through the current year for the United States federal jurisdiction. Income tax years open for our other major jurisdictions range from 2006 through the current year.

### NOTE 12 - RETIREMENT PLANS

#### Defined Contribution Plans

We provide certain employees with defined contribution plans and other types of retirement plans. A portion of our retirement plan expense under the defined contribution plans is funded with Stryker common stock. The use of Stryker common stock

represents a non-cash operating activity that is not reflected in our Consolidated Statements of Cash Flows.

| | 2021 | 2020 | 2019 |
|---|---|---|---|
| Plan expense | $ 259 | $ 235 | $ 205 |
| Expense funded with Stryker common stock | 37 | 34 | 31 |
| **Stryker common stock held by plan:** | | | |
| Dollar amount | 582 | 542 | 470 |
| Shares (in millions) | 2.2 | 2.2 | 2.2 |
| Value as a percentage of total plan assets | 10 % | 11 % | 12 % |

#### Defined Benefit Plans

Certain of our subsidiaries have both funded and unfunded defined benefit pension plans covering some or all of their employees. Substantially all of the defined benefit pension plans have projected benefit obligations in excess of plan assets.

#### Discount Rate

The discount rates were selected using a hypothetical portfolio of high quality bonds on December 31 that would provide the necessary cash flows to match our projected benefit payments.

#### Expected Return on Plan Assets

The expected return on plan assets is determined by applying the target allocation in each asset category of plan investments to the anticipated return for each asset category based on historical and projected returns.

### Components of Net Periodic Pension Cost

| | 2021 | 2020 | 2019 |
|---|---|---|---|
| **Net periodic benefit cost:** | | | |
| Service cost | $ (72) | $ (63) | $ (41) |
| Interest cost | (7) | (8) | (12) |
| Expected return on plan assets | 11 | 13 | 12 |
| Amortization of prior service credit | 1 | 1 | 1 |
| Recognized actuarial loss | (16) | (13) | (9) |
| Curtailment gain | 9 | — | — |
| **Net periodic benefit cost** | $ (74) | $ (70) | $ (49) |
| **Changes in assets and benefit obligations recognized in OCI:** | | | |
| Net actuarial gain (loss) | $ 132 | $ (117) | $ (74) |
| Recognized net actuarial loss | 16 | 13 | 9 |
| Prior service credit and transition amount | (1) | (1) | (1) |
| Curtailment gain | (9) | — | — |
| **Total recognized in other comprehensive income (loss)** | $ 138 | $ (105) | $ (66) |
| **Total recognized in net periodic benefit cost and OCI** | $ 64 | $ (175) | $ (115) |
| **Weighted-average rates used to determine net periodic benefit cost:** | | | |
| Discount rate | 0.8 % | 1.0 % | 1.9 % |
| Expected return on plan assets | 2.5 % | 2.9 % | 3.5 % |
| Rate of compensation increase | 2.6 % | 2.9 % | 2.9 % |
| Weighted-average discount rate used to determine projected benefit obligations | 1.1 % | 0.8 % | 1.0 % |

The actuarial gain (loss) for all pension plans was primarily related to a change in the discount rate used to measure the benefit obligations of those plans.

#### Investment Strategy

The investment strategy for our defined benefit pension plans is to meet the liabilities of the plans as they fall due and to maximize the return on invested assets within appropriate risk tolerances.

**STRYKER CORPORATION 2021 FORM 10-K**

| | 2021 | 2020 |
|---|---|---|
| Fair value of plan assets | $ 543 | $ 522 |
| Benefit obligations | (1,036) | (1,118) |
| **Funded status** | **$ (493)** | **$ (596)** |
| Reported as: | | |
| Current liabilities—accrued compensation | $ (2) | $ (2) |
| Noncurrent liabilities—other liabilities | (491) | (594) |
| Pre-tax amounts recognized in AOCI: | | |
| Unrecognized net actuarial loss | (215) | (354) |
| Unrecognized prior service credit | 7 | 8 |
| **Total** | **$ (208)** | **$ (346)** |

### Change in Benefit Obligations

| | 2021 | 2020 |
|---|---|---|
| **Beginning projected benefit obligations** | **$ 1,118** | **$ 869** |
| Service cost | 72 | 63 |
| Interest cost | 7 | 8 |
| Foreign exchange impact | (70) | 80 |
| Employee contributions | 8 | 8 |
| Actuarial (gains) losses | (71) | 110 |
| Curtailment gain | (23) | — |
| Benefits paid | (5) | (20) |
| **Ending projected benefit obligations** | **$ 1,036** | **$ 1,118** |
| **Ending accumulated benefit obligations** | **$ 987** | **$ 1,056** |

### Change in Plan Assets

| | 2021 | 2020 |
|---|---|---|
| **Beginning fair value of plan assets** | **$ 522** | **$ 428** |
| Actual return | 17 | 30 |
| Employer contributions | 33 | 33 |
| Employee contributions | 8 | 8 |
| Foreign exchange impact | (29) | 37 |
| Benefits paid | (8) | (14) |
| **Ending fair value of plan assets** | **$ 543** | **$ 522** |

### Allocation of Plan Assets

| | 2022 Target | 2021 Actual | 2020 Actual |
|---|---|---|---|
| Equity securities | 23 % | 23 % | 23 % |
| Debt securities | 39 | 41 | 44 |
| Other | 38 | 36 | 33 |
| **Total** | **100 %** | **100 %** | **100 %** |

### Valuation of Plan Assets

| 2021 | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Cash and cash equivalents | $ 21 | $ — | $ — | $ 21 |
| Equity securities | 28 | 119 | — | 147 |
| Corporate debt securities | 2 | 202 | — | 204 |
| Other | 4 | 68 | 99 | 171 |
| **Total** | **$ 55** | **$ 389** | **$ 99** | **$ 543** |
| 2020 | | | | |
| Cash and cash equivalents | $ 14 | $ — | $ — | $ 14 |
| Equity securities | 23 | 108 | — | 131 |
| Corporate debt securities | 2 | 201 | — | 203 |
| Other | 7 | 63 | 104 | 174 |
| **Total** | **$ 46** | **$ 372** | **$ 104** | **$ 522** |

Our Level 3 pension plan assets consist primarily of guaranteed investment contracts with insurance companies. The insurance contracts guarantee us principal repayment and a fixed rate of return. The $5 decrease in Level 3 pension plan assets is primarily driven by the change in the corresponding pension liability. We expect to contribute $21 to our defined benefit pension plans in 2022.

### Estimated Future Benefit Payments

| 2022 | 2023 | 2024 | 2025 | 2026 | 2027-2031 |
|---|---|---|---|---|---|
| $ 21 | $ 21 | $ 27 | $ 22 | $ 23 | 138 |

## NOTE 13 - SUMMARY OF QUARTERLY DATA (UNAUDITED)

| 2021 Quarters | Mar 31 | Jun 30 | Sep 30 | Dec 31 |
|---|---|---|---|---|
| **Net sales** | **$ 3,953** | **$ 4,294** | **$ 4,160** | **$ 4,701** |
| Gross profit | 2,509 | 2,772 | 2,642 | 3,045 |
| Earnings (loss) before income taxes | 367 | 662 | 495 | 757 |
| **Net earnings (loss)** | **302** | **592** | **438** | **662** |
| **Net earnings (loss) per share of common stock:** | | | | |
| Basic | $ 0.80 | $ 1.57 | $ 1.17 | $ 1.75 |
| Diluted | $ 0.79 | $ 1.55 | $ 1.14 | 1.73 |
| Dividends declared per share of common stock | $ 0.630 | $ 0.630 | $ 0.630 | $ 0.695 |
| **2020 Quarters** | **Mar 31** | **Jun 30** | **Sep 30** | **Dec 31** |
| **Net sales** | **$ 3,588** | **$ 2,764** | **$ 3,737** | **$ 4,262** |
| Gross profit | 2,331 | 1,548 | 2,461 | 2,717 |
| Earnings before income taxes | 590 | (87) | 780 | 671 |
| **Net earnings** | **493** | **(83)** | **621** | **568** |
| **Net earnings per share of common stock:** | | | | |
| Basic | $ 1.32 | (0.22) $ | 1.66 $ | 1.51 |
| Diluted | $ 1.30 | (0.22) $ | 1.63 $ | 1.49 |
| Dividends declared per share of common stock | $ 0.575 | $ 0.575 | $ 0.575 | 0.630 |

## NOTE 14 - SEGMENT AND GEOGRAPHIC DATA

Effective December 31, 2021 we segregate our operations into two reportable business segments: (i) MedSurg and Neurotechnology and (ii) Orthopaedics and Spine. This change realigns the Company's reportable business segments to its new internal reporting structure and how the Company manages its businesses as a result of the transition of responsibilities of our President and Chief Operating Officer, and the division of responsibilities between Group President, MedSurg and Neurotechnology, and Group President, Orthopaedics and Spine, in the fourth quarter of 2021. We have reflected these changes in all historical periods presented.

The Corporate and Other category shown in the table below includes corporate and administration, corporate initiatives and share-based compensation, which includes compensation related to employee stock options, restricted stock units and performance stock unit grants and director stock options and restricted stock unit grants.

| Segment Results | 2021 | 2020 | 2019 |
|---|---|---|---|
| MedSurg and Neurotechnology | $ 9,538 | $ 8,345 | $ 8,475 |
| Orthopaedics and Spine | 7,570 | 6,006 | 6,409 |
| **Net sales** | **$ 17,108** | **$ 14,351** | **$ 14,884** |
| MedSurg and Neurotechnology | $ 518 | $ 496 | $ 488 |
| Orthopaedics and Spine | 629 | 458 | 457 |
| **Segment depreciation and amortization** | **$ 1,147** | **$ 954** | **$ 945** |
| Corporate and Other | 125 | 122 | 99 |
| **Total depreciation and amortization** | **$ 1,272** | **$ 1,076** | **$ 1,044** |
| MedSurg and Neurotechnology | $ 2,807 | $ 2,414 | $ 2,304 |
| Orthopaedics and Spine | 2,180 | 1,588 | 2,084 |
| **Segment operating income** | **$ 4,987** | **$ 4,002** | **$ 4,388** |
| Items not allocated to segments: | | | |
| Corporate and Other | $ (605) | $ (503) | $ (480) |
| Acquisition and integration-related charges | (585) | (242) | (275) |
| Amortization of intangible assets | (619) | (472) | (464) |
| Restructuring-related and other charges | (386) | (458) | (226) |
| Medical device regulations | (107) | (81) | (62) |
| Recall-related matters | (103) | (17) | (192) |
| Regulatory and legal matters | 2 | (6) | 24 |
| **Consolidated operating income** | **$ 2,584** | **$ 2,223** | **$ 2,713** |

***Segment Assets and Capital Spending***

| Assets: | | 2021 | | 2020 | | 2019 |
|---|---|---|---|---|---|---|
| MedSurg and Neurotechnology | $ | 15,218 | $ | 15,250 | $ | 16,270 |
| Orthopaedics and Spine | | 18,149 | | 18,090 | | 12,527 |
| **Total segment assets** | **$** | **33,367** | **$** | **33,340** | **$** | **28,797** |
| Corporate and Other | | 1,264 | | 990 | | 1,370 |
| **Total assets** | **$** | **34,631** | **$** | **34,330** | **$** | **30,167** |
| **Purchases of property, plant and equipment:** | | | | | | |
| MedSurg and Neurotechnology | $ | 197 | $ | 192 | $ | 281 |
| Orthopaedics and Spine | | 165 | | 150 | | 138 |
| **Total segment purchases of property, plant and equipment** | **$** | **362** | **$** | **342** | **$** | **419** |
| Corporate and Other | | 163 | | 145 | | 230 |
| **Total purchases of property, plant and equipment** | **$** | **525** | **$** | **487** | **$** | **649** |

We measure the financial results of our reportable segments using an internal performance measure that excludes acquisition and integration-related charges, restructuring-related charges, reserves for certain product recall matters and reserves for certain legal and regulatory matters. Identifiable assets are those assets used exclusively in the operations of each business segment or allocated when used jointly. Corporate assets are principally property, plant and equipment and noncurrent assets.

The countries in which we have local revenue generating operations have been combined into the following geographic areas: the United States (including Puerto Rico); Europe, Middle East, Africa; Asia Pacific; and other foreign countries, which include Canada and countries in the Latin American region. Net sales are reported based on the geographic area of the Stryker location where the sales to the customer originated.

***Geographic Information***

| | Net Sales | | | Net Property, Plant and Equipment | |
|---|---|---|---|---|---|
| | 2021 | 2020 | 2019 | 2021 | 2020 |
| United States | $    12,321 $ | 10,455 $ | 10,957 | $    1,717 $ | 1,645 |
| Europe, Middle East, Africa | 2,299 | 1,818 | 1,888 | 941 | 938 |
| Asia Pacific | 1,973 | 1,630 | 1,617 | 76 | 91 |
| Other countries | 515 | 448 | 422 | 99 | 78 |
| Total | $    17,108 $ | 14,351 $ | 14,884 | $    2,833 $ | 2,752 |

## NOTE 15 - ASSET IMPAIRMENTS

The government in China has launched regional and national programs for volume-based procurement ("VBP") of high-value medical consumables to reduce healthcare costs. Each VBP program has specific requirements to award contracts to the lowest bidders who are able to satisfy the quality and quantity requirements. The successful bidders may be guaranteed sales volume for certain products, while unsuccessful bidders may lose unit sales volume. We expect that the prices required for a successful bid will, nevertheless, negatively impact our existing commercial operations of joint replacement and trauma products in China. As a result of the outcome of certain regional programs for our trauma products and the national VBP program for hips and knees we recorded charges of $105 to impair certain long-lived and intangible assets in the third quarter of 2021. These charges were included in selling, general and administrative expenses. Spine products are part of the VBP program in one province and it is not clear to what extent spine products will be included in further provincial or national VBP programs. We do not expect any significant impairments related to the potential Spine VBP programs. Our business in China represented approximately 2.5% of our revenues for the year ended December 31, 2021.

Aside from the impairments from the VBP programs, we recorded asset impairments of $159 in 2021 consisting primarily of in-

process research and development, other intangible assets and property, plant and equipment as a result of COVID-19-related demand impacts on in-process product development and certain other divestiture and restructuring activities.

In 2020 we suspended certain in-process investments resulting in charges of $195 to impair certain long-lived assets (primarily the portion of our investment in a new global ERP system that was in-process of being developed for future deployment) and product line and other exit costs. These charges were included in cost of sales and selling, general and administrative expenses.

ITEM 9.         CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE.

Not applicable.

ITEM 9A.        CONTROLS AND PROCEDURES.

### Evaluation of Disclosure Controls and Procedures

The Company's management, with the participation of the Chief Executive Officer and Chief Financial Officer (the Certifying Officers), evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) or 15d-15(e) promulgated under the Securities Exchange Act of 1934, as amended) (Exchange Act) as of December 31, 2021. Based on that evaluation, the Certifying Officers concluded that the Company's disclosure controls and procedures were effective as of December 31, 2021.

### Changes in Internal Control over Financial Reporting

There was no change to our internal control over financial reporting during the fourth quarter of 2021 that materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

### MANAGEMENT'S REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING

The Company's management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). The Company's internal control over financial reporting was designed to provide reasonable assurance to the Company's management and Board of Directors regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that: (i) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the Company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

The Company's management assessed the effectiveness of our internal control over financial reporting on December 31, 2021. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in *Internal Control-Integrated Framework (2013)*. Based on this assessment, management concluded that our internal control over financial reporting was effective as of December 31, 2021.

Stryker's independent registered public accounting firm has issued an audit report on their assessment of the effectiveness of the Company's internal control over financial reporting.

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Shareholders and the Board of Directors of Stryker Corporation

#### Opinion on Internal Control over Financial Reporting

We have audited Stryker Corporation and subsidiaries' internal control over financial reporting as of December 31, 2021, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). In our opinion, Stryker Corporation and subsidiaries (the Company) maintained, in all material respects, effective internal control over financial reporting as of December 31, 2021, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the 2021 consolidated financial statements of the Company and our report dated February 11, 2022 expressed an unqualified opinion thereon.

#### Basis for Opinion

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

#### Definition and Limitations of Internal Control Over Financial Reporting

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's

assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/   ERNST & YOUNG LLP

Grand Rapids, Michigan
February 11, 2022

### ITEM 9B.        OTHER INFORMATION.

Not applicable.

### ITEM 9C.        DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS.

Not applicable.

## PART III

### ITEM 10.        DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE.

Information regarding our executive officers appears under the caption "Information about our Executive Officers" in Part I, Item 1 of this report.

Information regarding our directors and certain corporate governance and other matters appearing under the captions "Proposal 1—Election of Directors," "Corporate Governance," and "Additional Information—Delinquent Section 16(a) Reports" in the 2022 proxy statement is incorporated herein by reference.

The Corporate Governance Guidelines adopted by our Board of Directors, as well as the charters of each of the Audit Committee, the Governance and Nominating Committee and the Compensation Committee and the Code of Ethics applicable to the principal executive officer, president, principal financial officer and principal accounting officer or controller or persons performing similar functions are posted on the "Corporate Governance" section of our website at *www.stryker.com*.

### ITEM 11.        EXECUTIVE COMPENSATION.

Information regarding the compensation of our management appearing under the captions "Compensation Discussion and Analysis," "Compensation Committee Report," "Executive Compensation" and "Compensation of Directors" in the 2022 proxy statement is incorporated herein by reference.

### ITEM 12.        SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS.

The information under the caption "Stock Ownership" in the 2022 proxy statement is incorporated herein by reference.

On December 31, 2021 we had an equity compensation plan under which options were granted at a price not less than fair market value at the date of grant and under which awards of restricted stock units (RSUs) and performance stock units (PSUs) were made. Options and RSUs were also awarded under a previous plan. Additional information regarding our equity compensation plans appears in Note 1 and Note 9 to our Consolidated Financial Statements. On December 31, 2021 we

also had a stock performance incentive award program pursuant to shares of our common stock were and may be issued to certain employees with respect to performance. The status of these plans, each of which were previously submitted to and approved by our shareholders, on December 31, 2021 is as follows:

| Plan | Number of securities to be issued upon exercise of outstanding options, warrants and rights | Weighted-average exercise price of outstanding options, warrants and rights | Number of securities remaining available for future issuance under equity compensation plans (excluding shares reflected in the first column) |
|---|---|---|---|
| 2006 Long-Term Incentive Plan | 752,254 | $ 61.46 | — |
| 2008 Employee Stock Purchase Plan | N/A | N/A | 4,189,238 |
| 2011 Long-Term Incentive Plan[1] | 12,314,563 | $ 156.03 | 25,210,811 |
| 2011 Performance Incentive Award Plan | N/A | N/A | 293,449 |
| **Total** | | | **29,693,498** |

[1] The 2011 Long-Term Incentive Plan securities to be issued upon exercise include 717,277 RSUs and 202,424 PSUs. The weighted-average exercise prices does not take these awards into account.

### ITEM 13.        CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE.

The information under the caption "Corporate Governance" and "Corporate Governance—Certain Relationships and Related Party Transactions" in the 2022 proxy statement is incorporated herein by reference.

### ITEM 14.        PRINCIPAL ACCOUNTING FEES AND SERVICES.

The information under the caption "Proposal 2—Ratification of Appointment of Our Independent Registered Public Accounting Firm" in the 2022 proxy statement is incorporated herein by reference.

---

## PART IV

**ITEM 15.          EXHIBITS, FINANCIAL STATEMENT SCHEDULES.**

(a) 1.    Financial Statements

The following Consolidated Financial Statements are set forth in Part II, Item 8 of this report.

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | 20 |
| Consolidated Statements of Earnings for 2021, 2020 and 2019 | 22 |
| Consolidated Statements of Comprehensive Income for 2021, 2020 and 2019 | 22 |
| Consolidated Balance Sheets on 2021 and 2020 | 23 |
| Consolidated Statements of Shareholders' Equity for 2021, 2020 and 2019 | 24 |
| Consolidated Statements of Cash Flows for 2021, 2020 and 2019 | 25 |
| Notes to Consolidated Financial Statements | 26 |

(a) 2.    Financial Statement Schedules

The Consolidated Financial Statement schedule of Stryker Corporation and its subsidiaries is:

### SCHEDULE II - VALUATION AND QUALIFYING ACCOUNTS

| Description | Balance at Beginning of Period | Additions — Charged to Costs & Expenses | Deductions — Uncollectible Amounts Written Off, Net of Recoveries | Effect of Changes in Foreign Currency Exchange Rates | Balance at End of Period |
|---|---|---|---|---|---|
| DEDUCTED FROM ASSET ACCOUNTS | | | | | |
| Allowance for Doubtful Accounts: | | | | | |
| Year ended December 31, 2021 | $  131 | $  61 | $  23 | $  2 | $  167 |
| Year ended December 31, 2020 | $  88 | $  65 | $  22 | $  — | $  131 |
| Year ended December 31, 2019 | $  64 | $  39 | $  13 | $  2 | $  88 |

All other schedules for which provision is made in the applicable accounting regulation of the United States Securities and Exchange Commission are not required under the related instructions or are inapplicable and, therefore, have been omitted.

(a) 3.    Exhibits

### FORM 10-K—ITEM 15(a) 3. AND ITEM 15(c)
### STRYKER CORPORATION AND SUBSIDIARIES
### EXHIBIT INDEX

| | |
|---|---|
| Exhibit 2— | Plan of Acquisition, Reorganization, Arrangement, Liquidation or Succession |
| (i) | Agreement and Plan of Merger, dated as of August 29, 2018, by and among Stryker Corporation, Austin Merger Sub Corp. and K2M Group Holdings, Inc. — Incorporated by reference to Exhibit 2.1 to the Company's Form 8-K dated August 30, 2018 (Commission File No. 000-09165). |
| (ii) | Purchase Agreement, dated as of November 4, 2019, among Stryker Corporation, Stryker B.V. and Wright Medical Group N.V. — Incorporated by reference to Exhibit 2.1 to the Company's Form 8-K dated November 6, 2019 (Commission File No. 001-13149). |
| (iii) ▲ | Agreement and Plan of Merger, dated as of January 6, 2022, by and among Stryker Corporation, Voice Merger Sub Corp., and Vocera Communications, Inc. — Incorporated by reference to Exhibit 2.1 to the Company's Form 8-K dated January 11, 2022 (Commission File No. 001-13149). |
| Exhibit 3— | Articles of Incorporation and By-Laws |
| (i) | Restated Articles of Incorporation — Incorporated by reference to Exhibit 3(i) to the Company's Form 10-Q for the quarterly period ended September 30, 2018 (Commission File No. 00-09165). |
| (ii) | Amended and Restated Bylaws — Incorporated by reference to Exhibit 3.1 to the Company's Form 8-K dated February 5, 2021 (Commission File No. 001-13149). |
| Exhibit 4— | Instruments defining the rights of security holders, including indentures—We agree to furnish to the Commission upon request a copy of each instrument pursuant to which long-term debt of Stryker Corporation and its subsidiaries not exceeding 10% of the total assets of Stryker Corporation and its consolidated subsidiaries is authorized. |
| (i) | Indenture, dated January 15, 2010, between Stryker Corporation and U.S. Bank National Association.— Incorporated by reference to Exhibit 4.1 to the Company's Form 8-K dated January 15, 2010 (Commission File No. 000-09165). |

| (ii) | Fifth Supplemental Indenture (including the form of 2043 note) dated March 25, 2013, between Stryker Corporation and U.S. Bank National Association.— Incorporated by reference to Exhibit 4.3 to the Company's Form 8-K dated March 25, 2013 (Commission File No. 000-09165). |
| (iii) | Sixth Supplemental Indenture (including the form of 2024 note), dated May 1, 2014, between Stryker Corporation and U.S. Bank National Association.— Incorporated by reference to Exhibit 4.2 to the Company's Form 8-K dated May 1, 2014 (Commission File No. 000-09165). |
| (iv) | Seventh Supplemental Indenture (including the form of 2044 note), dated May 1, 2014, between Stryker Corporation and U.S. Bank National Association.— Incorporated by reference to Exhibit 4.3 to the Company's Form 8-K dated May 1, 2014 (Commission File No. 000-09165). |
| (v) | Eighth Supplemental Indenture (including the form of 2025 note), dated October 29, 2015, between Stryker Corporation and U.S. Bank National association.— Incorporated by reference to Exhibit 4.2 to the Company's Form 8-K dated October 29, 2015 (Commission File No. 000-09165). |
| (vi) | Tenth Supplemental Indenture (including the form of the 2021 note), dated March 10, 2016, between Stryker Corporation and U.S. Bank National Association. — Incorporated by reference to Exhibit 4.3 to the Company's Form 8-K dated March 10, 2016 (Commission File No. 000-09615). |
| (vii) | Eleventh Supplemental Indenture (including the form of the 2026 note), dated March 10, 2016, between Stryker Corporation and U.S. Bank National Association.— Incorporated by reference to Exhibit 4.4 to the Company's Form 8-K dated March 10, 2016 (Commission File No. 000-09615). |
| (viii) | Twelfth Supplemental Indenture (including the form of the 2046 note), dated March 10, 2016, between Stryker Corporation and U.S. Bank National Association. — Incorporated by reference to Exhibit 4.5 to the Company's Form 8-K dated March 10, 2016 (Commission File No. 000-09615). |
| (ix) | Fourteenth Supplemental Indenture (including the form of the 2028 note), dated March 7, 2018, between Stryker Corporation and U.S. Bank National Association. — Incorporated by reference to Exhibit 4.2 to the Company's Form 8-K dated March 7, 2018 (Commission File No. 000-09615). |
| (x) | Fifteenth Supplemental Indenture (including the form of the 2023 note), dated November 30, 2018, between Stryker Corporation and U.S. Bank National Association. — Incorporated by reference to Exhibit 4.2 to the Company's Form 8-K dated November 30, 2018 (Commission File No. 000-09615). |
| (xi) | Sixteenth Supplemental Indenture (including the form of the 2027 note), dated November 30, 2018, between Stryker Corporation and U.S. Bank National Association. — Incorporated by reference to Exhibit 4.3 to the Company's Form 8-K dated November 30, 2018 (Commission File No. 000-09615). |
| (xii) | Seventeenth Supplemental Indenture (including the form of the 2030 note), dated November 30, 2018, between Stryker Corporation and U.S. Bank National Association. — Incorporated by reference to Exhibit 4.4 to the Company's Form 8-K dated November 30, 2018 (Commission File No. 000-09615). |
| (xiii) | Nineteenth Supplemental Indenture (including the form of the 2024 note), dated December 3, 2019, between Stryker Corporation and U.S. Bank National Association. — Incorporated by reference to Exhibit 4.2 to the Company's Form 8-K dated December 3, 2019 (Commission File No. 001-13149). |
| (xiv) | Twentieth Supplemental Indenture (including the form of the 2029 note), dated December 3, 2019, between Stryker Corporation and U.S. Bank National Association. — Incorporated by reference to Exhibit 4.3 to the Company's Form 8-K dated December 3, 2019 (Commission File No. 001-13149). |
| (xv) | Twenty-First Supplemental Indenture (including the form of the 2031 note), dated December 3, 2019, between Stryker Corporation and U.S. Bank National Association. — Incorporated by reference to Exhibit 4.4 to the Company's Form 8-K dated December 3, 2019 (Commission File No. 001-13149). |
| (xvi) | Twenty-Second Supplemental Indenture (including the form of the 2025 note), dated June 4, 2020, between Stryker Corporation and U.S. Bank National Association, as trustee - Incorporated by reference to Exhibit 4.2 to the Company's Form 8-K dated June 4, 2020 (Commission File No. 001-13149). |
| (xvii) | Twenty-Third Supplemental Indenture (including the form of the 2030 note), dated June 4, 2020, between Stryker Corporation and U.S. Bank National Association — Incorporated by reference to Exhibit 4.3 to the Company's Form 8-K dated June 4, 2020 (Commission File No. 001-13149). |
| (xviii) | Twenty-Fourth Supplemental Indenture (including the form of the 2050 note), dated June 4, 2020, between Stryker Corporation and U.S. Bank National Association — Incorporated by reference to Exhibit 4.4 to the Company's Form 8-K dated June 4, 2020 (Commission File No. 001-13149). |
| (xix) | Twenty-Fifth Supplemental Indenture (including the form of the 2023 note), dated November 23, 2020, between Stryker Corporation and U.S. Bank National Association, as trustee — Incorporated by reference to Exhibit 4.2 to the Company's Form 8-K dated November 23, 2020 (Commission File No. 001-13149). |
| (xx) † | Description of Securities |

| Exhibit 10— | Material contracts |
| (i)* † | Form of grant notice and terms and conditions for stock options granted in 2022 under the 2011 Long-Term Incentive Plan. |
| (ii)* † | Form of grant notice and terms and conditions for restricted stock units granted in 2022 under the 2011 Long-Term Incentive Plan. |
| (iii)* † | Form of grant notice and terms and conditions for performance stock units granted in 2022 under the 2011 Long-Term Incentive Plan. |
| (iv)* | Form of grant notice and terms and conditions for stock options granted in 2021 under the 2011 Long-Term Incentive Plan — Incorporated by reference to Exhibit 10(i) to the Company's Form 10-K for the year ended December 31, 2020 (Commission File No. 001-13149). |
| (v)* | Form of grant notice and terms and conditions for restricted stock units granted in 2021 under the 2011 Long-Term Incentive Plan — Incorporated by reference to Exhibit 10(ii) to the Company's Form 10-K for the year ended December 31, 2020 (Commission File No. 001-13149). |
| (vi)* | Form of grant notice and terms and conditions for performance stock units granted in 2021 under the 2011 Long-Term Incentive Plan — Incorporated by reference to Exhibit 10(iii) to the Company's Form 10-K for the year ended December 31, 2020 (Commission File No. 001-13149). |

41

**STRYKER CORPORATION 2021 FORM 10-K**

| | |
|---|---|
| (vii)* | Form of grant notice and terms and conditions for restricted stock units granted in 2021 under the 2011 Long-Term Incentive Plan to non-employee directors — Incorporated by reference to Exhibit 10(i) to the Company's Form 10-Q for the quarterly period ended June 30, 2021 (Commission File No. 001-13149). |
| (viii)* | Form of grant notice and terms and conditions for restricted stock units granted in 2020 under the 2011 Long-Term Incentive Plan to non-employee directors — Incorporated by reference to Exhibit 10(i) to the Company's Form 10-Q for the quarterly period ended June 30, 2020 (Commission File No. 001-13149). |
| (ix)* | 2011 Long-Term Incentive Plan (as amended effective February 4, 2020) — Incorporated by reference to Exhibit 10(i) to the Company's Form 10-K for the year ended December 31, 2019 (Commission File No. 001-13149). |
| (x)* | Form of grant notice and terms and conditions for stock options granted in 2020 under the 2011 Long-Term Incentive Plan — Incorporated by reference to Exhibit 10(ii) to the Company's Form 10-K for the year ended December 31, 2019 (Commission File No. 001-13149). |
| (xi)* | Form of grant notice and terms and conditions for restricted stock units granted in 2020 under the 2011 Long-Term Incentive Plan — Incorporated by reference to Exhibit 10(iii) to the Company's Form 10-K for the year ended December 31, 2019 (Commission File No. 001-13149). |
| (xii)* | Form of grant notice and terms and conditions for performance stock units granted in 2020 under the 2011 Long-Term Incentive Plan — Incorporated by reference to Exhibit 10(iv) to the Company's Form 10-K for the year ended December 31, 2019 (Commission File No. 001-13149). |
| (xiii)* | Form of terms and conditions for restricted stock units granted to non-employee directors in 2019 under the 2011 Long-Term Incentive Plan — Incorporated by reference to Exhibit 10(v) to the Company's Form 10-K for the year ended December 31, 2019 (Commission File No. 001-13149). |
| (xiv)* | Supplemental Savings and Retirement Plan (as amended effective January 1, 2008 and January 1, 2019) — Incorporated by reference to Exhibit 10(vi) to the Company's Form 10-K for the year ended December 31, 2019 (Commission File No. 001-13149). |
| (xv)* | Form of grant notice and terms and conditions for stock options granted in 2019 under the 2011 Long-Term Incentive Plan — Incorporated by reference to Exhibit 10(ii) to the Company's Form 10-K for the year ended December 31, 2018 (Commission File No. 001-13149). |
| (xvi)* | Form of grant notice and terms and conditions for restricted stock units granted in 2019 under the 2011 Long-Term Incentive Plan — Incorporated by reference to Exhibit 10(iii) to the Company's Form 10-K for the year ended December 31, 2018 (Commission File No. 001-13149). |
| (xvii)* | Form of grant notice and terms and conditions for performance stock units granted in 2019 under the 2011 Long-Term Incentive Plan — Incorporated by reference to Exhibit 10(iv) to the Company's Form 10-K for the year ended December 31, 2018 (Commission File No 001-13149). |
| (xviii)* | 2006 Long-Term Incentive Plan (as amended effective February 7, 2017) — Incorporated by reference to Exhibit 10(ii) to the Company's Form 10-K for the year ended December 31, 2016 (Commission File No. 000-09165). |
| (xix)* | Form of grant notice and terms and conditions for stock options granted in 2018 under the 2011 Long-Term Incentive Plan — Incorporated by reference to Exhibit 10(ii) to the Company's Form 10-K for the year ended December 31, 2017 (Commission File No. 000-09165). |
| (xx)* | Form of grant notice and terms and conditions for restricted stock units granted in 2018 under the 2011 Long-Term Incentive Plan — Incorporated by reference to Exhibit 10(iii) to the Company's Form 10-K for the year ended December 31, 2017 (Commission File No. 000-09165). |
| (xxi)* | Form of grant notice and terms and conditions for performance stock units granted in 2018 under the 2011 Long-Term Incentive Plan — Incorporated by reference to Exhibit 10(iv) to the Company's Form 10-K for the year ended December 31, 2017 (Commission File No. 000-09165). |
| (xxii)* | Form of grant notice and terms and conditions for restricted stock units granted in 2018 under the 2011 Long-Term Incentive Plan to non-employee directors — Incorporated by reference to Exhibit 10(i) to the Company's Form 10-Q for the quarterly period ended June 30, 2018 (Commission File No. 000-09165). |
| (xxiii)* | Stryker Corporation Executive Bonus Plan — Incorporated by reference to Exhibit 10.1 to the Company's Form 8-K dated February 21, 2007 (Commission File No. 000-09165). |
| (xxiv) | Form of Indemnification Agreement for Directors — Incorporated by reference to Exhibit 10 (xiv) to the Company's Form 10-K for the year ended December 31, 2008 (Commission File No. 000-09165). |
| (xxv) | Form of Indemnification Agreement for Certain Officers—Incorporated by reference to Exhibit 10 (xv) to the Company's Form 10-K for the year ended December 31, 2008 (Commission File No. 000-09165). |
| (xxvi) | Settlement Agreement between Howmedica Osteonics Corp. and the counsel listed on the signature pages thereto, dated as of November 3, 2014 (Rejuvenate and ABF II Hip Implant Products Liability Litigation) — Incorporated by reference to Exhibit 10xxiii to the Company's Form 10-K for the year ended December 31, 2014 (Commission File No. 000-09165). |
| (xxvii)* | Letter Agreement between Stryker Corporation and Glenn Boehnlein — Incorporated by reference to Exhibit 10.2 to the Company's Form 8-K dated January 26, 2016 (Commission File No. 000-09165). |
| (xxviii)▲ | Credit Agreement, dated as of August 19, 2016, among Stryker Corporation and certain subsidiaries, as designated borrowers; the lenders party thereto; and Bank of America, N.A., as administrative agent — Incorporated by reference to Exhibit 4.1 to the Company's 8-K dated August 23, 2016 (Commission File No. 000-09165). |
| (xxix)* | Letter Agreement between Stryker Corporation and Timothy J. Scannell — Incorporated by reference to Exhibit 10.1 to the Company's Form 8-K dated August 18, 2021 (Commission File No. 001-13149). |
| (xxx) | Credit Agreement, dated as of October 26, 2021, among Stryker Corporation as borrower; the lenders party thereto; and Wells Fargo Bank, N.A., as administrative agent — Incorporated by reference to Exhibit 10(i) to the Company's Form 10-Q for the quarterly period ended September 30, 2021 (Commission File No. 001-13149). |
| (xxxi) | Amendment No. 1, dated as of April 30, 2020, to Credit Agreement, dated as of August 19, 2016, among Stryker Corporation and certain of its subsidiaries, as designated borrowers; the lenders party thereto; and Bank of America, N.A., as administrative agent — Incorporated by reference to Exhibit 10(i) to the Company's Form 10-Q for the quarterly period ended March 31, 2020 (Commission File No. 001-13149). |

**STRYKER CORPORATION 2021 FORM 10-K**

| (xxxii) | Credit Agreement, dated as of April 30, 2020, among Stryker Corporation as borrower; the lenders party thereto; and Bank of America, N.A., as administrative agent — Incorporated by reference to Exhibit 10(ii) to the Company's Form 10-Q for the quarterly period ended March 31, 2020 (Commission File No. 001-13149). |
|---|---|
| (xxxiii) | Term Loan Agreement, dated as of November 10, 2020, among Stryker Corporation, as borrower, the lenders party thereto and Bank of America, N.A., as administrative agent — Incorporated by reference to Exhibit 10.1 to the Company's Form 8-K dated November 13, 2020 (Commission File No. 001-13149). |
| Exhibit 21— | Subsidiaries of the registrant |
| (i) † | List of Subsidiaries. |
| Exhibit 23— | Consent of experts and counsel |
| (i) † | Consent of Independent Registered Public Accounting Firm. |
| Exhibit 31— | Rule 13a-14(a) Certifications |
| (i) † | Certification by Principal Executive Officer of Stryker Corporation. |
| (ii) † | Certification by Principal Financial Officer of Stryker Corporation. |
| Exhibit 32— | 18 U.S.C. Section 1350 Certifications |
| (i) † | Certification by Principal Executive Officer of Stryker Corporation. |
| (ii) † | Certification by Principal Financial Officer of Stryker Corporation. |
| Exhibit 101— | iXBRL (Inline Extensible Business Reporting Language) Documents |
| 101.INS | iXBRL Instance Document |
| 101.SCH | iXBRL Schema Document |
| 101.CAL | iXBRL Calculation Linkbase Document |
| 101.DEF | iXBRL Definition Linkbase Document |
| 101.LAB | iXBRL Label Linkbase Document |
| 101.PRE | iXBRL Presentation Linkbase Document |
| 104 | Cover Page Interactive Data File (the cover page XBRL tags are embedded within the Inline XBRL document) |

\*    Compensation arrangement

†    Furnished with this Form 10-K

⅄    Schedules have been omitted pursuant to Item 601(a)(5) of Regulation S-K. Stryker hereby agrees to furnish supplementally a copy of any omitted schedule upon request by the U.S. Securities and Exchange Commission.

**ITEM 16.          FORM 10-K SUMMARY.**

None.

**STRYKER CORPORATION 2021 FORM 10-K**

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

|  |  |
|---|---|
|  | STRYKER CORPORATION |
| Date:     February 11, 2022 | /s/ GLENN S. BOEHNLEIN |
|  | Glenn S. Boehnlein |
|  | Vice President, Chief Financial Officer |

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on the date indicated above on behalf of the registrant and in the capacities indicated.

| | |
|---|---|
| /s/ KEVIN A. LOBO | /s/ GLENN S. BOEHNLEIN |
| Kevin A. Lobo | Glenn S. Boehnlein |
| Chair, Chief Executive Officer and President | Vice President, Chief Financial Officer |
| (Principal Executive Officer) | (Principal Financial Officer) |
| | |
| /s/ WILLIAM E. BERRY JR. | |
| William E. Berry, Jr. | |
| Vice President, Chief Accounting Officer | |
| (Principal Accounting Officer) | |
| | |
| /s/ ALLAN C. GOLSTON | /s/ ANDREW K. SILVERNAIL |
| Allan C. Golston | Andrew K. Silvernail |
| Lead Independent Director | Director |
| | |
| /s/ MARY K. BRAINERD | /s/ LISA M. SKEETE TATUM |
| Mary K. Brainerd | Lisa M. Skeete Tatum |
| Director | Director |
| | |
| /s/ GIOVANNI CAFORIO | /s/ RONDA E. STRYKER |
| Giovanni Caforio, M.D. | Ronda E. Stryker |
| Director | Director |
| | |
| /s/ SRIKANT M. DATAR | /s/ RAJEEV SURI |
| Srikant M. Datar, Ph.D. | Rajeev Suri |
| Director | Director |
| | |
| /s/ SHERILYN S. MCCOY | |
| Sherilyn S. McCoy | |
| Director | |

44

Exhibit 4(xx)

**DESCRIPTION OF THE REGISTRANT'S SECURITIES REGISTERED PURSUANT TO SECTION 12 OF THE SECURITIES EXCHANGE ACT OF 1934**

**Description of Capital Stock**

The following description is a summary of certain terms of the capital stock of Stryker Corporation ("Stryker" or the "Company"). It does not purport to be complete and is subject in all respects to the applicable provisions of the Michigan Business Corporation Act, as amended, or the MBCA, our Restated Articles of Incorporation, as amended, or our articles, and our By-laws, as amended, or our by-laws. As used in this exhibit, and except where the context otherwise requires, "we," "us," and "our" refer to Stryker Corporation.

**Capital Stock**

Our authorized capital stock consists of (1) 1,000,000,000 shares of common stock, $0.10 par value per share and (2) 500,000 shares of preferred stock, $1.00 par value per share.

***Common Stock***

Each share of common stock entitles the holder thereof to one vote for each share held by it of record on each matter submitted to a vote. Other than the election of directors, if an action is to be taken by vote of the shareholders, it will be authorized by a majority of the votes cast by the holders of shares entitled to vote on the action, unless a greater vote is required in our articles or by-laws. Directors are elected by a majority of the votes cast by the holders of shares entitled to vote (and for such purpose, a majority of the votes cast means that the number of shares voted "for" a nominee must exceed the number of votes cast "against" that nominee); provided, however, that if as of the record date for a meeting at which directors will be elected, there are more nominees than positions on the board of directors to be filled by election at such meeting, each director shall be elected by a plurality of the votes cast at the election.

Subject to the prior payment or provision therefor of dividends on the preferred stock, if any, holders of the common stock are entitled to receive ratably such dividends, if any, as may be declared from time to time by our Board of Directors out of funds legally available therefor. Holders of our common stock have no conversion, preemptive or other rights to subscribe for any securities of ours, and there are no redemption or sinking fund provisions with respect to such shares. In the event of any liquidation, dissolution or distribution of our assets and after satisfaction of the preferential requirements of the preferred stock, if any, holders of common stock will be entitled to share ratably in the distribution of the remaining assets of the Company available for distribution. The rights, preferences and privileges of holders of common stock are subject to applicable law and the rights of the holders of any shares of preferred stock and any additional classes of stock that we may issue in the future.

***Preferred Stock***

Our articles authorize our Board of Directors to issue up to 500,000 shares of preferred stock in one or more series, with such distinctive designation or title and in such number of shares as may be authorized by our Board of Directors. Our Board of Directors is authorized to

Exhibit 4(xx)

prescribe the relative rights and preferences of each series, and the limitations applicable thereto, including but not limited to the following: (1) the voting powers, full, special, or limited, or no voting powers; (2) the rate, terms and conditions on which dividends will be paid, whether such dividends will be cumulative, and what preference such dividends shall have in relation to the dividends on other series or classes of stock; (3) the rights, terms and conditions, if any, for conversion of preferred stock into shares of other series or classes of stock; (4) any right of the Company to redeem the shares of preferred stock, and the price, time and conditions of redemption, including the provisions for any sinking fund; and (5) the rights of holders of preferred stock in relation to the rights of other series and classes of stock upon the liquidation, dissolution or distribution of our assets. Unless otherwise provided by our Board of Directors, upon redemption or conversion, shares of preferred stock will revert to authorized but unissued shares and may be reissued as shares of any series of preferred stock.

**Limitation of Liability**

Our articles provide that, to the full extent authorized or permitted by the MBCA, directors of Stryker will not be personally liable to Stryker or its shareholders for any acts or omissions in such person's capacity as a director. Such limitation of liability does not affect the availability of equitable remedies such as injunctive relief or rescission. These provisions will not limit the liability of directors under federal securities laws.

**Certain Statutory, Articles and By-law Provisions Affecting Shareholders**

Certain provisions in our articles and by-laws and the MBCA may have the effect of delaying, deferring or preventing a change of control of the Company or may operate only with respect to extraordinary corporate transactions involving the Company.

*Business Combination Act*

We are subject to the provisions of Chapter 7A of the MBCA, which provides that business combinations between a Michigan corporation and a beneficial owner of shares entitled to 10% or more of the voting power of such corporation generally require the affirmative vote of 90% of the votes of each class of stock entitled to vote and not less than two-thirds of each class of stock entitled to vote (excluding voting shares owned by such 10% owner). Chapter 7A defines a "business combination" to encompass any merger, consolidation, share exchange, sale of assets, stock issue, liquidation, or reclassification of securities involving an interested shareholder or certain affiliates. An "interested shareholder" is generally any person who owns 10% or more of the voting shares of the corporation. An "affiliate" is a person who directly or indirectly controls, is controlled by, or is under common control with, a specified person. Such requirements do not apply if the transaction satisfies fairness standards, other specified conditions are met and the interested shareholder has been such for at least five years.

*Article and By-Law Provisions*

Our articles and by-laws include a number of provisions that may have the effect of encouraging persons considering unsolicited tender offers or other unilateral takeover proposals to negotiate with our Board of Directors rather than pursue non-negotiated takeover attempts. These provisions include an advance notice requirement for director nominations and actions to

Exhibit 4(xx)

be taken at annual meetings of shareholders and the availability of authorized but unissued blank check preferred stock.

### Advance Notice Requirement

Our by-laws set forth advance notice procedures with regard to shareholder proposals relating to the nomination of candidates for election as directors or new business to be presented at meetings of shareholders. These procedures provide that notice of such shareholder proposals must be timely given in writing to the secretary of Stryker prior to the meeting at which the action is to be taken. Generally, to be timely, notice must be received at the principal executive offices of Stryker not less than 90 days nor more than 120 days prior to the meeting. The advance notice requirement does not give the Board of Directors any power to approve or disapprove shareholder director nominations or proposals but may have the effect of precluding the consideration of certain business at a meeting if the proper notice procedures are not followed.

### Special Meetings of Shareholders

Under our by-laws, special meetings of shareholders may be called by the chair of our Board of Directors, our chief executive officer, our president or by order of our Board of Directors. Our by-laws provide that a special meeting of the shareholders shall be called by the chief executive officer upon written request of one or more record holders of shares of our common stock representing not less than 25% of our issued and outstanding shares of common stock.

### Blank Check Preferred Stock

Our preferred stock could be deemed to have an anti-takeover effect in that, if a hostile takeover situation should arise, shares of preferred stock could be issued to purchasers sympathetic with our management or others in such a way as to render more difficult or to discourage a merger, tender offer, proxy contest, the assumption of control by a holder of a large block of our securities or the removal of incumbent management.

The effects of the issuance of one or more series of the preferred stock on the holders of our common stock could include:

- reduction of the amount otherwise available for payments of dividends on common stock if dividends are payable on the series of preferred stock;
- restrictions on dividends on our common stock if dividends on the series of preferred stock are in arrears;
- dilution of the voting power of our common stock if the series of preferred stock has voting rights, including a possible "veto" power if the series of preferred stock has class voting rights;
- dilution of the equity interest of holders of our common stock if the series of preferred stock is convertible, and is converted, into our common stock; and

Exhibit 4(xx)

- restrictions on the rights of holders of our common stock to share in our assets upon liquidation until satisfaction of any liquidation preference granted to the holders of the series of preferred stock.

**Transfer Agent and Registrar**

The transfer agent and registrar for our common stock is American Stock Transfer & Trust Company, LLC.

**Listing**

Our common stock is listed on the New York Stock Exchange under the symbol "SYK."

Exhibit 4(xx)

**Description of Debt Securities:**

**1.125% Notes due 2023**

**2.125% Notes due 2027**

**2.625% Notes due 2030**

The Company previously filed a registration statement on Form S-3 (File No. 333-209526), which was filed with the Securities and Exchange Commission on February 12, 2016 and covers the issuance of the Company's 1.125% Notes due 2023 (the "2023 notes"), the 2.125% Notes due 2027 (the "2027 notes"), and the 2.625% Notes due 2030 (the "2030 notes" and together with the 2023 notes, the 2027 notes and the 2030 notes, the "notes"). The notes are governed by a base indenture dated January 15, 2010 between the Company and U.S. Bank National Association, as trustee, as supplemented by the applicable supplemental indenture governing a particular series of notes (as so supplemented, the "Indenture"). This summary is subject to and qualified in its entirety by reference to all of the provisions of the Indenture and the notes, including definitions of certain terms used in the Indenture and the notes.

**General**

The 2023 notes, the 2027 notes and the 2030 notes were issued as separate series of debt securities under the Indenture. The notes are senior unsecured obligations of ours and rank equally in right of payment with our other existing and future senior unsecured indebtedness. The notes are not secured by any of our assets. Any future claims of our secured lenders with respect to assets securing their loans will be prior to any claim of the holders of the notes with respect to those assets. Holders of secured debt that we have now or may issue in the future may foreclose on the assets securing such debt, reducing the cash flow from the foreclosed property available for payment of unsecured debt, including the notes. Holders of our secured debt also would have priority over unsecured creditors in the event of our bankruptcy, liquidation or similar proceeding to the extent of the value of the collateral securing such debt. The notes are structurally subordinated to all liabilities of our subsidiaries, including trade payables. Because we conduct many of our operations through our subsidiaries, our right to participate in any distribution of the assets of a subsidiary when it winds up its business is subject to the prior claims of the creditors of that subsidiary. This means that your right to payment as a holder of our notes is also subject to the prior claims of these creditors if a subsidiary liquidates or reorganizes or otherwise winds up its business. If we are a creditor of any of our subsidiaries, our right as a creditor would be subordinated to any security interest in the assets of those subsidiaries and any indebtedness of our subsidiaries senior in right of payment to that held by us.

The Indenture does not limit the amount of notes, unsecured debentures or other evidences of indebtedness that we may issue under the Indenture and provides that notes, unsecured debentures or other evidences of indebtedness may be issued from time to time in one or more series. We may from time to time, without notice to or the consent of the holders of the notes, create and issue additional notes of any series having the same ranking and terms and conditions as the notes of the same series, except for the issue date, the public offering price and, in some cases, the first interest payment date. Any additional notes having such similar terms,

Exhibit 4(xx)

together with the notes offered of the same series, will constitute a single series of securities under the Indenture.

We issued the notes in fully registered book-entry form without coupons and in denominations of €100,000 and integral multiples of €1,000 thereafter.

Principal of and interest on the notes are payable, and the notes are transferable or exchangeable, at the office or offices or agency maintained by us for these purposes. Payment of interest on the notes may be made at our option by check mailed to the registered holders thereof.

The 2023 notes, the 2027 notes and the 2030 notes are listed on the New York Stock Exchange under the symbols "SYK23," "SYK27," and "SYK30," respectively. We have no obligation to maintain such listings, and we may delist any series of the notes at any time.

U.S. Bank National Association is registrar and transfer agent for the notes. Upon notice to the trustee, we may change the registrar or transfer agent.

**Fixed Rate Notes**

The 2023 notes, 2027 notes and 2030 notes bear interest from the date of issuance, payable annually on November 30 of each year, beginning November 30, 2019, to the persons in whose names such notes are registered at the close of business on the business day (for this purpose, a day on which Clearstream and Euroclear are open for business) immediately preceding the relevant interest payment. Interest on the notes is computed on the basis of the actual number of days in the period for which interest is being calculated and the actual number of days from and including the last date on which interest was paid on the notes, to, but excluding, the next scheduled interest payment date. This payment convention is referred to as Actual/Actual (ICMA) as defined in the rulebook of the International Capital Market Association.

If any interest payment date would otherwise be a day that is not a business day, such interest payment date will be postponed to the next date that is a business day and no interest will accrue on the amounts payable from and after such interest payment date to the next business day. If the maturity date of any series of the notes falls on a day that is not a business day, the related payment of principal, premium, if any, and interest will be made on the next business day as if it were made on the date such payment was due, and no interest will accrue on the amounts so payable for the period from and after such date to the next business day.

**Business Day**

For purposes of the notes, a "business day" is any day that is not a Saturday, Sunday or other day on which banking institutions in New York City, London or another place of payment on the notes are authorized or required by law to close and on which the Trans-European Automated Real-Time Gross Settlement Express Transfer system (the TARGET2 system), or any successor thereto, is open.

Exhibit 4(xx)

**Issuance in euro**

All payments of interest, premium, if any, and principal, including payments made upon any redemption or repurchase of the notes, will be made in euro; provided that if the euro is unavailable to us due to the imposition of exchange controls or other circumstances beyond our control or if the euro is no longer being used by the then member states of the European Monetary Union that have adopted the euro as their currency or for the settlement of
transactions by public institutions of or within the international banking community, then all payments in respect of the notes will be made in U.S. dollars until the euro is again available to us or so used. In such circumstances, the amount payable on any date in euro will be converted into U.S. dollars at the rate mandated by the Board of Governors of the Federal Reserve System as of the close of business on the second business day prior to the relevant payment date or, if the Board of Governors of the Federal Reserve System has not announced a rate of conversion, on the basis of the most recent U.S. dollar/euro exchange rate published in The Wall Street Journal on or prior to the second business day prior to the relevant payment date or, in the event The Wall Street Journal has not published such exchange rate, the rate is determined in our sole discretion on the basis of the most recently available market exchange rate for the euro. Any payment in respect of the notes so made in U.S. dollars do not constitute an Event of Default (as defined in the Indenture). Neither the trustee nor the paying agent shall have any responsibility for any calculation or conversion in connection with the foregoing.

**Optional Redemption**

We may redeem the notes prior to October 31, 2023 in the case of the 2023 notes, August 31, 2027 in the case of the 2027 notes and August 31, 2030 in the case of the 2030 notes, in whole, at any time, or in part, from time to time, at our option, for cash, at a redemption price equal to the greater of:

1)  100% of the principal amount of the applicable series of the notes to be redeemed; or
2)  an amount determined by the Quotation Agent (as defined below) equal to the sum of the
present values of the remaining scheduled payments of principal, premium, if any, and interest thereon (not including any portion of such payments of interest accrued to the date of redemption) to October 31, 2023 with respect to the 2023 notes, August 31, 2027 with respect to the 2027 notes and August 31, 2030 with respect to the 2030 notes, discounted to the date of redemption on an annual basis (Actual/Actual (ICMA) at the Comparable Government Bond Rate (as defined below), plus 25 basis points with respect to the 2023 notes, 30 basis points with respect to the 2027 notes and 35 basis points with respect to the 2030 notes, plus accrued and unpaid interest thereon to, but not including, the date of redemption.

On or after October 31, 2023 in the case of the 2023 notes, August 31, 2027, in the case of the 2027 notes and August 31, 2030, in the case of the 2030 notes, we may redeem the applicable series of the notes, in whole, at any time, or in part, from time to time, at our option, for cash, at a redemption price equal to 100% of the principal amount of such series of the notes, plus accrued and unpaid interest to, but not including, the redemption date.

Exhibit 4(xx)

The principal amount of any note remaining outstanding after a redemption in part shall be €100,000 or a higher integral multiple of €1,000. Notwithstanding the foregoing, installments of interest on any series of the notes that are due and payable on interest payment dates falling on or prior to a redemption date will be payable on the interest payment date to the registered holders as of the close of business on the relevant record date.

"Comparable *Government Bond*" means, in relation to any Comparable Government Bond Rate calculation, at the discretion of an independent investment bank selected by us (the "Quotation Agent"), a German government bund whose maturity is closest to the par call date, or if such Quotation Agent in its discretion determines that such similar bond is not in issue, such other German government bund as such Quotation Agent may, with the advice of three brokers of, and/or market makers in, German government bunds selected by us, determine to be appropriate for determining the Comparable Government Bond Rate.

"Comparable *Government Bond Rate"* means the price, expressed as a percentage (rounded to three decimal places, with 0.0005 being rounded upwards), at which the gross redemption yield on the notes to be redeemed, if they were to be purchased at such price on the third business day prior to the date fixed for redemption, would be equal to the gross redemption yield on such business day of the Comparable Government Bond on the basis of the middle market price of the Comparable Government Bond prevailing at 11:00 a.m. (London time) on such business day as determined by the Quotation Agent selected by us.

Notice of any redemption will be mailed (or, in the case of notes held in book-entry form, be transmitted electronically) at least 10 days but not more than 60 days before the redemption date to each registered holder of the applicable series of the notes to be redeemed. Unless we default in payment of the redemption price, on and after the redemption date, interest will cease to accrue on the applicable series of the notes or portions thereof called for redemption. If less than all of the applicable series of the notes are to be redeemed, the notes to be redeemed will be selected by the trustee in accordance with the standard procedures of the depositary. If the notes to be redeemed are not global notes then held by Euroclear or Clearstream, the trustee will select the notes to be redeemed on a pro rata basis. If the notes are listed on the NYSE or any other national securities exchange, the trustee will select notes in compliance with the requirements of the NYSE or other principal national securities exchange on which the notes are listed.

Notwithstanding the foregoing, if less than all of a series of notes are to be redeemed, no notes of such series of a principal amount of €100,000 or less shall be redeemed in part. If money sufficient to pay the redemption price on the series of notes (or portions thereof) to be redeemed on the redemption date is deposited with the paying agent on or before the redemption date and certain other conditions are satisfied, then on and after such redemption date, interest will cease to accrue on such series of the Fixed Rate Notes (or such portion thereof) called for redemption.

**Optional Redemption for Tax Reasons**

The notes of any series may be redeemed at our option in whole, but not in part, on not less than 10 nor more than 60 days' prior notice, at 100% of the principal amount of such series,

Exhibit 4(xx)

together with accrued and unpaid interest, if any, to, but excluding, the redemption date if, as a result of any change in, or amendment to, the laws, regulations or rulings of the United States (or any political subdivision or taxing authority thereof or therein having power to tax), or any change in official position regarding application or interpretation of those laws, regulations or rulings (including a holding by a court of competent jurisdiction), which change, amendment, application or interpretation is announced or becomes effective on or after the original issue date with respect to the notes, we become or, based upon a written opinion of independent counsel selected by us, will become obligated to pay additional amounts as described below in "—Payment of Additional Amounts."

**Payment of Additional Amounts**

All payments of principal, interest, and premium, if any, in respect of the notes will be made free and clear of, and without withholding or deduction for, any present or future taxes, assessments, duties or governmental charges of whatever nature imposed, levied or collected by the United States (or any political subdivision or taxing authority thereof or therein having power to tax), unless such withholding or deduction is required by law or the official interpretation or administration thereof.

We will, subject to the exceptions and limitations set forth below, pay as additional interest in respect of the notes such additional amounts as are necessary in order that the net payment by us of the principal of, premium, if any, and interest in respect of the notes to a holder who is not a United States person (as defined below), after withholding or deduction for any present or future tax, assessment, duties or other governmental charge imposed by the United States (or any political subdivision or taxing authority thereof or therein having power to tax), will not be less than the amount provided in the notes to be then due and payable; provided, however, that the foregoing obligation to pay additional amounts shall not apply:

1) to the extent any tax, assessment or other governmental charge would not have been imposed but for the holder (or the beneficial owner for whose benefit such holder holds such note), or a fiduciary, settlor, beneficiary, member or shareholder of the holder if the holder is an estate, trust, partnership or corporation, or a person holding a power over an estate or trust administered by a fiduciary holder, being considered as:

   a) being or having been engaged in a trade or business in the United States or having or having had a permanent establishment in the United States;

   b) having a current or former connection with the United States (other than a connection arising solely as a result of the ownership of the notes, the receipt of any payment in respect of the notes or the enforcement of any rights hereunder), including being or having been a citizen or resident of the United States;

   c) being or having been a personal holding company, a passive foreign investment company or a controlled foreign corporation for U.S. federal income tax purposes, a foreign tax-exempt organization, or a corporation that has accumulated earnings to avoid U.S. federal income tax;

Exhibit 4(xx)

    d)   being or having been a "10-percent shareholder" of the Company as defined in section 871(h)(3) of the United States Internal Revenue Code of 1986, as amended (the "Code") or any successor provision; or

    e)   being a bank receiving payments on an extension of credit made pursuant to a loan agreement entered into in the ordinary course of its trade or business, as described in section 881(c)(3)(A) of the Code or any successor provision;

2)  to any holder that is not the sole beneficial owner of the notes, or a portion of the notes, or that is a fiduciary, partnership, limited liability company or other fiscally transparent entity, but only to the extent that a beneficial owner with respect to the holder, a beneficiary or settlor with respect to the fiduciary, or a beneficial owner or member of the partnership, limited liability company or other fiscally transparent entity would not have been entitled to the payment of an additional amount had the beneficiary, settlor, beneficial owner or member received directly its beneficial or distributive share of the payment;

3)  to the extent any tax, assessment or other governmental charge that would not have been imposed but for the failure of the holder or any other person to comply with certification, identification or information reporting requirements concerning the nationality, residence, identity or connection with the United States of the holder or beneficial owner of the notes, if compliance is required by statute, by regulation of the United States or any taxing authority therein or by an applicable income tax treaty to which the United States is a party as a precondition to exemption from such tax, assessment or other governmental charge;

4)  to any tax, assessment or other governmental charge that is imposed otherwise than by withholding by us or a paying agent from the payment;

5)  to any tax, assessment or other governmental charge required to be withheld by any paying agent from any payment of principal of or interest on any notes, if such payment can be made without such withholding by any other paying agent;

6)  to any estate, inheritance, gift, sales, transfer, wealth, capital gains or personal property tax or similar tax, assessment or other governmental charge, or excise tax imposed on the transfer of notes;

7)  to the extent any tax, assessment or other governmental charge would not have been imposed but for the presentation by the holder of any note, where presentation is required, for payment on a date more than 30 days after the date on which payment became due and payable or the date on which payment thereof is duly provided for, whichever occurs later except to the extent that the beneficiary or holder thereof would have been entitled to the payment of additional amounts had such note been presented for payment on any day during such 30-day period;

8)  to any tax, assessment or other governmental charge imposed under sections 1471 through 1474 of the Code (or any amended or successor provisions), any current or future

Exhibit 4(xx)

regulations or official interpretations thereof, any agreement entered into pursuant to section 1471(b) of the Code or any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of such sections of the Code, whether currently in effect or as published and amended from time to time;

9)  to any tax, assessment or other governmental charge that is imposed or withheld solely by reason of a change in law, regulation, or administrative or judicial interpretation that becomes effective more than 15 days after the payment becomes due or is duly provided for, whichever occurs later; or

10)  in the case of any combination of the above numbered items.

The notes are subject in all cases to any tax, fiscal or other law or regulation or administrative or judicial interpretation applicable to the notes. Except as specifically provided under this heading "—Payment of Additional Amounts," we are not required to make any payment for any tax, assessment or other governmental charge imposed by any government or a political subdivision or taxing authority of or in any government or political subdivision.

As used under this heading "—Payment of Additional Amounts" and under the heading "—Optional Redemption for Tax Reasons," the term "United States" means the United States of America, its territories and possessions, the states of the United States and the District of Columbia, and the term "United States person" means (i) any individual who is a citizen or resident of the United States for U.S. federal income tax purposes, (ii) a corporation, partnership or other entity created or organized in or under the laws of the United States, any state of the United States or the District of Columbia (other than a partnership that is not treated as a United States person for United States federal income tax purposes), (iii) any estate the income of which is subject to U.S. federal income taxation regardless of its source, or (iv) any trust if a United
States court can exercise primary supervision over the administration of the trust and one or more United States persons can control all substantial trust decisions, or if a valid election is in place to treat the trust as a United States person.

**Repurchase at the Option of Holders Upon Change of Control Repurchase Event**
If a Change of Control Repurchase Event (as defined below) occurs in respect of a series of notes, unless we have exercised our right to redeem the notes of such series as described above under "—Optional Redemption," we will be required to make an offer (a "Change of Control Offer") to each holder of notes of such series to repurchase all or any part (in minimum denominations of €100,000 and integral multiples of €1,000 original principal amount above that amount) of that holder's notes at a repurchase price in cash equal to 101% of the aggregate principal amount of notes repurchased plus any accrued and unpaid interest on the notes repurchased to, but not including, the date of such repurchase. Within 30 days following any Change of Control Repurchase Event or, at our option, prior to any Change of Control (as defined below), but after the public announcement of an impending Change of Control, we will mail a notice to each holder, with a copy to the trustee, describing the transaction or transactions that constitute or may constitute the Change of Control Repurchase Event and offering to

Exhibit 4(xx)

repurchase notes on the payment date specified in the notice, which date will be no earlier than 30 days and no later than 60 days from the date such notice is mailed. The notice shall, if mailed prior to the date of consummation of the Change of Control, state that the offer to purchase is conditioned on the Change of Control Repurchase Event occurring on or prior to the payment date specified in the notice.

We will comply with the requirements of Rule 14e-1 under the Securities Exchange Act of 1934, as amended, or the Exchange Act, and any other securities laws and regulations thereunder, to the extent those laws and regulations are applicable in connection with the repurchase of the notes as a result of a Change of Control Repurchase Event. To the extent that the provisions of any securities laws or regulations conflict with the Change of Control Repurchase Event provisions of the notes, we will comply with the applicable securities laws and regulations and will not be deemed to have breached our obligations under the Change of Control Repurchase Event provisions of the notes by virtue of such conflict.

On the Change of Control Repurchase Event payment date, we will, to the extent lawful:

- accept for payment all notes or portions of notes (in minimum denominations of €100,000 and integral multiples of €1,000 original principal amount above that amount) properly tendered pursuant to our offer;
- deposit with the paying agent an amount equal to the aggregate purchase price in respect of all notes or portions of notes properly tendered; and
- deliver or cause to be delivered to the trustee for cancellation the notes properly accepted, together with an officers' certificate stating the aggregate principal amount of notes being repurchased by us.

The paying agent will promptly mail to each holder of notes properly tendered the purchase price for the notes, and the trustee will promptly authenticate and mail (or cause to be transferred by book-entry) to each holder a new note equal in principal amount to any unpurchased portion of any notes surrendered; provided, that each new note will be in minimum denominations of €100,000 and integral multiples of €1,000 original principal amount above that amount.

We will not be required to make a Change of Control Offer upon a Change of Control Repurchase Event if (i) a third party makes such an offer in the manner, at the times and otherwise in compliance with the requirements for a Change of Control Offer made by us and such third party purchases all notes properly tendered and not withdrawn under its offer or (ii) we have previously or concurrently mailed a redemption notice with respect to all of the outstanding notes as described under "Optional Redemption" above.

If holders of not less than 90% in aggregate principal amount of the outstanding notes of any series validly tender and do not withdraw such notes in a Change of Control Offer and we, or any third party making such an offer in lieu of us as described above, purchases all of the notes of such series validly tendered and not withdrawn by such holders, we or such third party will have the right, upon not less than 10 days nor more than 60 days' prior notice, provided that such

Exhibit 4(xx)

notice is given not more than 30 days following such repurchase pursuant to the Change of Control Offer described above, to redeem all notes of such series that remain outstanding following such purchase on a date specified in such notice (the "Second Change of Control Payment Date") and at a price in cash equal to 101% of the aggregate principal amount of notes of such series repurchased plus any accrued and unpaid interest on the notes repurchased to, but not including, the Second Change of Control Payment Date.

We have no present intention to engage in a transaction involving a Change of Control, although it is possible that we would decide to do so in the future. We could, in the future, enter into certain transactions, including acquisitions, refinancings or other recapitalizations, that would not constitute a Change of Control but that could increase the amount of debt outstanding at such time or otherwise affect our capital structure or credit ratings.

### *Definitions*

"Below Investment Grade Rating Event" means the notes of such series are rated below Investment Grade by each of the Rating Agencies on any date during the period commencing upon the first public notice of the occurrence of a Change of Control or our intention to effect a Change of Control and ending 60 days following public notice of the occurrence of the related Change of Control (which period shall be extended so long as the rating of the notes of such series is under publicly announced consideration for possible downgrade by any of the Rating Agencies, provided that no such extension shall occur if on such 60th day the notes of such series are rated Investment Grade by at least one of such Rating Agency and are not subject to review for possible downgrade by such Rating Agency); provided further that a Below Investment Grade Rating Event otherwise arising by virtue of a particular reduction in rating shall not be deemed to have occurred in respect of a particular Change of Control (and thus shall not be deemed a Below Investment Grade Rating Event for purposes of the definition of Change of Control Repurchase Event hereunder) if the Rating Agencies making the reduction in rating to which this definition would otherwise apply do not announce or publicly confirm or inform the trustee in writing at its request that the reduction was the result, in whole or in part, of any event or circumstance comprised of or arising as a result of, or in respect of, the applicable Change of Control (whether or not the applicable Change of Control shall have occurred at the time of the Below Investment Grade Rating Event).

"Change of Control" means the occurrence of any of the following:

1) the direct or indirect sale, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of our assets and those of our subsidiaries taken as a whole to any "person" (as that term is used in Section 13(d)(3) of the Exchange Act), other than us or one of our subsidiaries;

2) the adoption of a plan relating to our liquidation or dissolution;

3) the first day on which a majority of the members of our Board of Directors are not Continuing Directors; or

Exhibit 4(xx)

4)   the consummation of any transaction (including, without limitation, any merger or consolidation) the result of which is that any "person" (as that term is used in Section 13(d)(3) of the Exchange Act), other than us or one or more of our subsidiaries, becomes the beneficial owner (as defined in Rule 13d-3 of the Exchange Act), directly or indirectly, of more than 50% of the then outstanding number of shares of our Voting Stock.

Notwithstanding the foregoing, a transaction will not be considered to be a Change of Control if (a) we become a direct or indirect wholly-owned subsidiary of a holding company and (b)(i) immediately following that transaction, the direct or indirect holders of the Voting Stock of the holding company are substantially the same as the holders of our Voting Stock immediately prior to that transaction or (ii) immediately following that transaction, no person is the beneficial owner, directly or indirectly, of more than 50% of the Voting Stock of such holding company.

"Change of Control Repurchase Event" means the occurrence of both a Change of Control and a Below Investment Grade Rating Event.

"Continuing Directors" means, as of any date of determination, any member of our Board of Directors who (1) was a member of such Board of Directors on the date of the issuance of the notes; or (2) was nominated for election, elected or appointed to such Board of Directors with the approval of a majority of the Continuing Directors who were members of such Board of Directors at the time of such nomination, election or appointment (either by a specific vote or by approval of our proxy statement in which such member was named as a nominee for election as a director). "Investment Grade" means a rating of Baa3 or better by Moody's (or its equivalent under any successor rating categories of Moody's) and a rating of BBB- or better by S&P (or its equivalent under any successor rating categories of S&P) or the equivalent investment grade credit rating from any additional Rating Agency or Rating Agencies selected by us.

"Moody's" means Moody's Investors Service Inc., a subsidiary of Moody's Corporation, and its successors.

"Rating Agency" means (1) each of Moody's and S&P; and (2) if any of Moody's or S&P ceases to rate the notes or fails to make a rating of the notes publicly available for reasons outside of our control, a "nationally recognized statistical rating organization" within the meaning of Section 3(a)(62) under the Exchange Act, selected by us as a replacement agency for Moody's or S&P, or both of them, as the case may be.

"S&P" means S&P Global Ratings Inc., a division of S&P Global Inc. and its successors.

"Voting Stock" of any specified person as of any date means the capital stock of such person that is at the time entitled to vote generally in the election of the board of directors of such person. The definition of "Change of Control" includes a phrase relating to the direct or indirect sale, transfer, conveyance or other disposition of "all or substantially all" of our assets and those of our subsidiaries, taken as a whole. Although there is a limited body of case law interpreting

Exhibit 4(xx)

the phrase "substantially all," there is no precise established definition of the phrase under applicable law. Accordingly, the ability of a holder of notes to require us to repurchase the notes as a result of a sale, transfer, conveyance or other disposition of less than all of our assets and the assets of our subsidiaries, taken as a whole, to another person or group may be uncertain.

## Certain Covenants

### *Limitation on Liens*

The Indenture contains a covenant that we will not, and we will not permit any of our Restricted Subsidiaries to, issue, assume or guarantee any Indebtedness secured by any Mortgage upon any of our Principal Properties or those of any of our Restricted Subsidiaries without equally and ratably securing the notes (and, if we so determine, any other Indebtedness ranking equally with the notes) with such Indebtedness.

This covenant will not prevent us or any of our Restricted Subsidiaries from issuing, assuming or guaranteeing:

- any purchase money mortgage on such Principal Property prior to, simultaneously with or within 180 days after the later of (1) the acquisition or completion of construction or completion of substantial reconstruction, renovation, remodeling, expansion or improvement (each, a substantial improvement") of such Principal Property or (2) the placing in operation of such property after the acquisition or completion of any such construction or substantial improvement;
- Mortgages on a Principal Property existing at the time of acquisition, including acquisition through merger or consolidation;
- Mortgages existing on the date of the initial issuance of the notes, Mortgages on assets of a corporation or other business entity existing on te date it becomes a Restricted Subsidiary or is merged or consolidated with us or a Restricted Subsidiary or at the time the corporation or the business entity sells, leases or otherwise disposes of its property as an entirety or substantially as an entirety to us or a Restricted Subsidiary or Mortgages on the assets of a Subsidiary that is newly designated as a Restricted Subsidiary if the Mortgage would have been permitted under the provisions of this paragraph if such Mortgage was created while the Subsidiary was a Restricted Subsidiary;
- Mortgages in favor of us or a Restricted Subsidiary;
- Mortgages for taxes, assessments or governmental charges or levies that are not delinquent or that are being contested in good faith;
- Carriers', warehousemen's, materialmen's, repairmen's, mechanic's, landlords' and other similar Mortgages arising in ordinary course of business that are not delinquent or remain payable without penalty or that are being contested in good faith;
- Mortgages (other than any Mortgage imposed by ERISA) consisting of pledges or deposits required in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation;

Exhibit 4(xx)

- Easements, rights-of-way, restrictions, encroachments, imperfections and other similar encumbrances affecting real property that, in the aggregate, are not substantial in amount and do not in any case materially detract from the value of the Principal Property subject thereto or materially interfere with the ordinary conduct of our and our Subsidiaries' business, taken as a whole;
- Mortgages arising by reason of deposits with, or the giving of any form of security to, any governmental agency or anybody created or approved by law or governmental regulation, including any zoning or similar law or right reserved to or vested in any governmental office or agency to control or regulate the use of any real property;
- Mortgages arising from filing Uniform Commercial Code financing statements relating solely to leases; and
- Mortgages to secure Indebtedness incurred to extend, renew, refinance or replace Indebtedness secured by any Mortgages referred to above, provided that the principal amount of the extended, renewed, refinanced or replaced Indebtedness does not exceed the principal amount of Indebtedness so extended, renewed, refinanced or replaced, plus transaction costs and fees, and that any such Mortgage applies only to the same property or assets subject to the prior permitted Mortgage (and, in the case of real property, improvements).

**Limitations on Sale and Leaseback Transactions**

The Indenture contains a covenant that we will not, and will not permit our Restricted Subsidiaries to, enter into any arrangement with any person providing for the leasing by us or any Restricted Subsidiary of any Principal Property owned or acquired thereafter that has been or is to be sold or transferred by us or such Restricted Subsidiary to such person with the intention of taking back a lease of such Principal Property, a "sale and leaseback transaction," without equally and ratably securing the notes (and, if we shall so determine, any other Indebtedness ranking equally with the notes), unless:

- within 180 days after the receipt of the proceeds of the sale or transfer, we or any Restricted Subsidiary apply an amount equal to the greater of the net proceeds of the sale or transfer or the fair value of such Principal Property at the time of such sale or transfer to any (or a combination) of (1) the prepayment or retirement (other than any mandatory prepayment or retirement) of our Senior Funded Debt or (2) the purchase, construction, development, expansion or improvement of other comparable property, subject in each case to credits for voluntary retirements of Senior Funded Debt; or
- we or such Restricted Subsidiary would be entitled, at the effective date of the sale or transfer, to incur Indebtedness secured by a Mortgage on such Principal Property, in an amount at least equal to the Attributable Debt in respect of the sale and leaseback transaction, without equally and ratably securing the notes pursuant to "—Limitation on Liens" described above.

Exhibit 4(xx)

The foregoing restriction will not apply to:

- any sale and leaseback transaction for a term of not more than three years including renewals;
- any sale and leaseback transaction with respect to a Principal Property if a binding commitment with respect thereto is entered into within three years after the later of (1) the date of the issuance of the notes under the Supplemental Indenture, or (2) the date such Principal Property was acquired;
- any sale and leaseback transaction with respect to a Principal Property if a binding commitment with respect thereto is entered into within 180 days after the later of the date such property was acquired and, if applicable, the date such property was first placed in operation; or
- any sale and leaseback transaction between us and a Restricted Subsidiary or between Restricted Subsidiaries.

***Exception to Limitations for Exempted Debt***

Notwithstanding the limitations in the Indenture on liens and sale and leaseback transactions, we or our Restricted Subsidiaries may, in addition to amounts permitted under such restrictions and without equally and ratably securing the notes, create or assume and renew, extend or replace Mortgages, or enter into sale and leaseback transactions without any obligation to retire any Senior Funded Debt of us or any Restricted Subsidiary, provided that at the time of such creation, assumption, renewal, extension or replacement of a Mortgage or at the time of entering into such sale and leaseback transactions, and after giving effect thereto, Exempted Debt does not exceed 15% of our Consolidated Net Tangible Assets.

***Definitions***

For purposes of the Indenture:

"Attributable Debt" in respect of a sale and leaseback transaction means, at the time of determination, the present value (discounted at the imputed rate of interest of such transaction as determined in good faith by us) of the obligation of the lessee for net rental payments during the remaining term of the lease included in such sale and leaseback transaction (including any period for which such lease has been extended or may, at the option of the lessor, be extended). The term "net rental payments" under any lease for any period means the sum of the rental and other payments required to be paid in such period by the lessee thereunder, not including any amounts required to be paid by such lessee (whether or not designated as rental or additional rent) on account of maintenance and repairs, insurance, taxes, assessments, water rates or similar charges required to be paid by such lessee thereunder or any amount required to be paid by lessee thereunder contingent upon the amount of maintenance and repairs, insurance, taxes, assessments, water rates or similar charges. In the case of any lease that is terminable by the lessee upon the payment of a penalty, such net amount shall be the lesser of (x) the net amount determined assuming termination upon the first date such lease may be terminated (in which case the net amount shall also include the amount of the penalty, but shall not include any rent that would be required to be paid under such lease subsequent to the first date upon which it may

Exhibit 4(xx)

be so terminated) or (y) the net amount determined assuming no such termination.

"Consolidated Net Tangible Assets" means the total amounts of assets (less depreciation and valuation reserves and other reserves and items deductible from gross book value of specific asset accounts under generally accepted accounting principles) that under generally accepted accounting principles would be included on a consolidated balance sheet of us and our consolidated Restricted Subsidiaries after deducting (1) all current liabilities, excluding current liabilities that could be classified as long-term debt under generally accepted accounting principles and current liabilities that are by their terms extendable or renewable at the obligor's option to a time more than 12 months after the time as of which the amount of current liabilities is being computed; (2) investments in Unrestricted Subsidiaries; and (3) all trade names, trademarks, licenses, patents, copyrights and goodwill, organizational and development costs, deferred charges, other than prepaid items such as insurance, taxes, interest, commissions, rents and similar items and tangible assets being amortized, and amortized debt discount and expense, less unamortized premium.

"Exempted Debt" means the sum of the following items outstanding as of the date Exempted Debt is being determined (1) Indebtedness of us and our Restricted Subsidiaries secured by a Mortgage and not permitted to exist under the Indenture and (2) Attributable Debt of us and our Restricted Subsidiaries in respect of all sale and leaseback transactions not permitted under the Indenture.

"Funded Debt" means Indebtedness that matures more than one year from the date of creation, or that is extendable or renewable at the sole option of the obligor so that it may become payable more than one year from such date. Funded Debt does not include (1) obligations created pursuant to leases, (2) any Indebtedness or portion thereof maturing by its terms within one year from the time of any computation of the amount of outstanding
Funded Debt unless such Indebtedness shall be extendable or renewable at the sole option of the obligor in such manner that it may become payable more than one year from such time, or (3) any Indebtedness for the payment or redemption of which money in the necessary amount shall have been deposited in trust either at or before the maturity date thereof.

"Indebtedness" means any and all of the obligations of a person for money borrowed that in accordance with generally accepted accounting principles would be reflected on the balance sheet of such person as a liability as of the date of which the Indebtedness is to be determined. For the avoidance of doubt, a change in generally accepted accounting principles subsequent to the issue date of the notes shall not be deemed an incurrence of Indebtedness.

"Investment" means any investment in stock, evidences of Indebtedness, loans or advances, however made or acquired, but does not include our account receivable or the accounts receivable of any Restricted Subsidiary arising from transactions in the ordinary course of business, or any evidences of Indebtedness, loans or advance made in connection with the sale to any Subsidiary of our accounts receivable or the accounts receivable of any Restricted Subsidiary arising from transactions in the ordinary course of business.

Exhibit 4(xx)

"Mortgage" means any mortgage, security interest, pledge, lien or other encumbrance.

"Principal Property" means all real property and improvements thereon owned by us or a Restricted Subsidiary, including, without limitation, any manufacturing, warehouse, distribution or research facility, and improvements therein, having a net book value in excess of 2% of Consolidated Net Tangible Assets that is located within the United States, excluding its territories and possessions and Puerto Rico. This term does not include any real
property and improvements thereon that our Board of Directors declares by resolution not to be of material importance to the total business conducted by us and our Restricted Subsidiaries taken as a whole.

"Restricted Subsidiary" means a Subsidiary that owns a Principal Property.

"Senior Funded Debt" means all Funded Debt (except Funded Debt, the payment of which is subordinated to the payment of the notes).

"Subsidiary" means a corporation, partnership or other legal entity of which, in the case of a corporation, more than 50% of the outstanding voting stock is owned, directly or indirectly, by us or by one or more other Subsidiaries, or by us and one or more other Subsidiaries or, in the case of any partnership or other legal entity, more than 50% of the ordinary capital interests is, at the time, directly or indirectly owned or controlled by us or by one or more other Subsidiaries. For the purposes of this definition, "voting stock" means the equity interest that ordinarily has voting power for the election of directors, managers or trustees of an entity, or persons performing similar functions, whether at all times or only so long as no senior class of equity
interest has such voting power by reason of any contingency.

"Unrestricted Subsidiary" means any Subsidiary other than a Restricted Subsidiary.

### Consolidation, Merger and Sale of Assets
We may consolidate or merge with or into any other corporation, and we may sell or transfer all or substantially all of our assets to another corporation, provided, among other things, that (a) we are the surviving corporation or the corporation formed by or resulting from any such
consolidation or merger or the transferee of such assets shall be a corporation organized and existing under the laws of the United States, any state thereof or the District of Columbia and shall expressly assume by supplemental indenture payment of the principal of, and premium, if any, and interest, if any, on the notes issued under the Indenture and the performance and observance of the Indenture and (b) we or such successor corporation shall not immediately thereafter be in default under the Indenture.

### Events of Default
The following events are defined in the Indenture as "Events of Default":
- default in the payment of any installment of interest on any series of notes for 30 days after becoming due;

Exhibit 4(xx)

- default in the payment of principal or premium, if any, of any series of notes when due;
- default in the deposit of any sinking fund payment, when due;
- default in the performance of any other covenant for 90 days after notice, which must be sent by either the trustee or holders of 25% of the principal amount of the notes of the affected series; and
- certain events of bankruptcy, insolvency or reorganization.

   If an Event of Default occurs and continues with respect to a series of notes, either the trustee or the holders of at least 25% in principal amount of the outstanding notes of such series may declare the entire principal amount of all of such series to be due and payable; provided that, in the case of an Event of Default involving certain events of bankruptcy, insolvency or reorganization, such acceleration is automatic; and, provided further, that after such acceleration, but before a judgment or decree based on acceleration, the holders of a majority in aggregate principal amount of the outstanding notes of that series may, subject to certain conditions, rescind and annul such acceleration if all Events of Default, other than the nonpayment of accelerated principal, have been cured or waived.

Exhibit 4(xx)

**Description of Debt Securities:**

**0.250% Notes due 2024**

**0.750% Notes due 2029**

**1.000 % Notes due 2031**

The Company has an effective a registration statement on Form S-3 (File No. 333-229539), which was filed with the Securities and Exchange Commission on February 7, 2019 and covers the issuance of the Company's 0.250% Notes due 2024 (the "2024 notes"), the 0.750% Notes due 2029 (the "2029 notes") and the 1.000% Notes due 2031 (the "2031 notes" and together with the 2024 notes, the 2029 notes and the 2031 notes, the "notes"). The notes are governed by a base indenture dated January 15, 2010 between the Company and U.S. Bank National Association, as trustee, as supplemented by the applicable supplemental indenture governing a particular series of notes (as so supplemented, the "Indenture"). This summary is subject to and qualified in its entirety by reference to all of the provisions of the Indenture and the notes, including definitions of certain terms used in the Indenture and the notes.

**General**

The notes were issued as separate series of debt securities under the Indenture. The notes are senior unsecured obligations of ours and rank equally in right of payment with our other existing and future senior unsecured indebtedness. The notes are not secured by any of our assets. Any future claims of our secured lenders with respect to assets securing their loans will be prior to any claim of the holders of the notes with respect to those assets. Holders of secured debt that we have now or may issue in the future may foreclose on the assets securing such debt, reducing the cash flow from the foreclosed property available for payment of unsecured debt, including the notes. Holders of our secured debt also would have priority over unsecured creditors in the event of our bankruptcy, liquidation or similar proceeding to the extent of the value of the collateral securing such debt. The notes are structurally subordinated to all liabilities of our subsidiaries, including trade payables. Because we conduct many of our operations through our subsidiaries, our right to participate in any distribution of the assets of a subsidiary when it winds up its business is subject to the prior claims of the creditors of that subsidiary. This means that your right to payment as a holder of our notes is also subject to the prior claims of these creditors if a subsidiary liquidates or reorganizes or otherwise winds up its business. If we are a creditor of any of our subsidiaries, our right as a creditor would be subordinated to any security interest in the assets of those subsidiaries and any indebtedness of our subsidiaries senior in right of payment to that held by us.

Exhibit 4(xx)

The Indenture does not limit the amount of notes, unsecured debentures or other evidences of indebtedness that we may issue under the Indenture and provides that notes, unsecured debentures or other evidences of indebtedness may be issued from time to time in one or more series. We may from time to time, without notice to or the consent of the holders of the notes, create and issue additional notes of any series having the same ranking and terms and conditions as the notes of the same series, except for the issue date, the public offering price and, in some cases, the first interest payment date. Any additional notes having such similar terms, together with the notes offered of the same series, will constitute a single series of securities under the Indenture. If the additional notes of a series, if any, are not fungible with the notes of that series offered for U.S. federal income tax purposes, the additional notes have a separate CUSIP number.

We issued the notes in fully registered book-entry form without coupons and in denominations of €100,000 and integral multiples of €1,000 thereafter.

Principal of and interest on the notes are payable, and the notes are transferable or exchangeable, at the office or offices or agency maintained by us for these purposes. Payment of interest on the notes may be made at our option by check mailed to the registered holders thereof.

The 2024 notes, the 2029 notes and the 2031 notes are listed on the New York Stock Exchange under the symbols "SYK24A," "SYK29" and "SYK31," respectively. We have no obligation to maintain such listings, and we may delist any series of the notes at any time.

Elavon Financial Services DAC is paying agent for the notes. U.S. Bank National Association will is registrar and transfer agent for the notes. Upon notice to the trustee, we may change the paying agent, registrar or transfer agent.

**Interest**

The 2024 notes and 2031 notes bear interest from the date of issuance, payable annually on December 3 of each year, beginning December 3, 2020, and the 2029 notes bear interest from the date of issuance, payable annually on March 1 of each year, beginning March 1, 2021, to the persons in whose names such notes are registered at the close of business on the business day (for this purpose, a day on which Clearstream and Euroclear are open for business) immediately preceding the relevant interest payment. Interest on the notes is computed on the basis of the actual number of days in the period for which interest is being calculated and the actual number of days from and including the last date on which interest was paid on the notes (or December 3, 2019, if no interest has been paid on the applicable series of notes), to, but excluding, the next scheduled interest payment date. This payment convention is referred to as Actual/Actual (ICMA) as defined in the rulebook of the International Capital Market Association.

Exhibit 4(xx)

If any interest payment date would otherwise be a day that is not a business day, such interest payment date will be postponed to the next date that is a business day and no interest will accrue on the amounts payable from and after such interest payment date to the next business day. If the maturity date of any series of notes falls on a day that is not a business day, the related payment of principal, premium, if any, and interest will be made on the next business day as if it were made on the date such payment was due, and no interest will accrue on the amounts so payable for the period from and after such date to the next business day.

**Business Day**

For purposes of the notes, a "business day" is any day that is not a Saturday, Sunday or other day on which banking institutions in New York City, London or another place of payment on the notes are authorized or required by law to close and on which the Trans-European Automated Real-Time Gross Settlement Express Transfer system (the TARGET2 system), or any successor thereto, is open.

**Issuance in euro**

All payments of interest, premium, if any, and principal, including payments made upon any redemption or repurchase of the notes, will be made in euro; provided that if the euro is unavailable to us due to the imposition of exchange controls or other circumstances beyond our control or if the euro is no longer being used by the then member states of the European Monetary Union that have adopted the euro as their currency or for the settlement of transactions by public institutions of or within the international banking community, then all payments in respect of the notes will be made in U.S. dollars until the euro is again available to us or so used. In such circumstances, the amount payable on any date in euro will be converted into U.S. dollars at the rate mandated by the Board of Governors of the Federal Reserve System as of the close of business on the second business day prior to the relevant payment date or, if the Board of Governors of the Federal Reserve System has not announced a rate of conversion, on the basis of the most recent U.S. dollar/euro exchange rate published in The Wall Street Journal on or prior to the second business day prior to the relevant payment date or, in the event The Wall Street Journal has not published such exchange rate, the rate will be determined in our sole discretion on the basis of the most recently available market exchange rate for the euro. Any payment in respect of the notes so made in U.S. dollars will not constitute an Event of Default (as defined in the Indenture). Neither the trustee nor the paying agent shall have any responsibility for any calculation or conversion in connection with the foregoing.

Investors are subject to foreign exchange risks as to payments of principal, premium, if any, and interest that may have important economic and tax consequences to them.

Exhibit 4(xx)

**Optional Redemption**

We may redeem the notes prior to November 3, 2024 in the case of the 2024 notes, December 1, 2028 in the case of the 2029 notes and September 3, 2031 in the case of the 2031 notes, in whole, at any time, or in part, from time to time, at our option, for cash, at a redemption price equal to the greater of:

1) 100% of the principal amount of the applicable series of notes to be redeemed; or
2) an amount determined by the Quotation Agent (as defined below) equal to the sum of the present values of the remaining scheduled payments of principal, premium, if any, and interest thereon (not including any portion of such payments of interest accrued to the date of redemption) to November 3, 2024 with respect to the 2024 notes, December 1, 2028 with respect to the 2029 notes and September 3, 2031 with respect to the 2031 notes, discounted to the date of redemption on an annual basis (Actual/Actual (ICMA) at the Comparable Government Bond Rate (as defined below)), plus 15 basis points with respect to the 2024 notes, 20 basis points with respect to the 2029 notes and 25 basis points with respect to the 2031 notes,

plus accrued and unpaid interest thereon to, but not including, the date of redemption.

On or after November 3, 2024 in the case of the 2024 notes, December 1, 2028 in the case of the 2029 notes and September 3, 2031 in the case of the 2031 notes, we may redeem the applicable series of notes, in whole, at any time, or in part, from time to time, at our option, for cash, at a redemption price equal to 100% of the principal amount of such series of notes, plus accrued and unpaid interest to, but not including, the redemption date.

The principal amount of any note remaining outstanding after a redemption in part shall be €100,000 or a higher integral multiple of €1,000. Notwithstanding the foregoing, installments of interest on any series of notes that are due and payable on interest payment dates falling on or prior to a redemption date will be payable on the interest payment date to the registered holders as of the close of business on the relevant record date.

"*Comparable Government Bond*" means, in relation to any Comparable Government Bond Rate calculation, at the discretion of an independent investment bank selected by us (the "Quotation Agent"), a German government bund whose maturity is closest to the par call date, or if such Quotation Agent in its discretion determines that such similar bond is not in issue, such other German government bund as such Quotation Agent may, with the advice of three brokers of, and/or market makers in, German government bunds selected by us, determine to be appropriate for determining the Comparable Government Bond Rate.

Exhibit 4(xx)

"*Comparable Government Bond Rate*" means the price, expressed as a percentage (rounded to three decimal places, with 0.0005 being rounded upwards), at which the gross redemption yield on the notes to be redeemed, if they were to be purchased at such price on the third business day prior to the date fixed for redemption, would be equal to the gross redemption yield on such business day of the Comparable Government Bond on the basis of the middle market price of the Comparable Government Bond prevailing at 11:00 A.M. (London time) on such business day as determined by the Quotation Agent selected by us.

Notice of any redemption will be sent (or, in the case of notes held in book-entry form, be transmitted electronically) at least 10 days but not more than 60 days before the redemption date to each registered holder of the applicable series of notes to be redeemed. Unless we default in payment of the redemption price, on and after the redemption date, interest will cease to accrue on the applicable series of notes or portions thereof called for redemption. If less than all of the applicable series of notes are to be redeemed, the notes to be redeemed will be selected by the trustee in accordance with the standard procedures of the depositary. If the notes to be redeemed are not global notes then held by Euroclear or Clearstream, the trustee will select the notes to be redeemed on a pro rata basis. If the notes are listed on the NYSE or any other national securities exchange, the trustee will select notes in compliance with the requirements of the NYSE or other principal national securities exchange on which the notes are listed.

Notwithstanding the foregoing, if less than all of a series of notes is to be redeemed, no notes of such series of a principal amount of €100,000 or less shall be redeemed in part. If money sufficient to pay the redemption price on the series of notes (or portions thereof) to be redeemed on the redemption date is deposited with the paying agent on or before the redemption date and certain other conditions are satisfied, then on and after such redemption date, interest will cease to accrue on such series of notes (or such portion thereof) called for redemption.

**Special Mandatory Redemption**

If we do not satisfy the minimum tender and other conditions in the Purchase Agreement and consummate the Wright Tender Offer on or prior to February 4, 2021, or if, prior to such date, we notify the trustee in writing that the Purchase Agreement has been terminated (each, a "Special Mandatory Redemption Event"), the provisions set forth below will be applicable (other than with respect to the 2029 notes). The 2029 notes will not be subject to the special mandatory redemption and will remain outstanding (unless otherwise redeemed) even if the Wright Tender Offer is not consummated on or prior to February 4, 2021. If a Special Mandatory Redemption Event occurs, we will be required to redeem each series of notes (other than the 2029 notes) in the manner set forth below in whole and not in part at a special mandatory redemption price (the "Special Mandatory Redemption Price") equal to 101% of the aggregate principal amount of such series, plus accrued and unpaid interest, if any, to, but excluding, the Special Mandatory

Exhibit 4(xx)

Redemption Date (as defined below) (subject to the right of holders of record on the relevant record date to receive interest due on any interest payment date that is on or prior to the Special Mandatory Redemption Date).

Upon the occurrence of a Special Mandatory Redemption Event, we will promptly (but in no event later than ten business days following such Special Mandatory Redemption Event) notify the trustee in writing of such event (such notice to include the officers' certificate required by the Indenture), and the trustee shall, no later than five business days following receipt of such notice from us, notify the holders of each series of notes (such date of notification to such holders, the "Redemption Notice Date") that all of the outstanding notes will be redeemed at the Special Mandatory Redemption Price on the third business day following the Redemption Notice Date (such date, the "Special Mandatory Redemption Date") automatically and without any further action by the holders of the notes, in each case in accordance with the applicable provisions of the Indenture. At or prior to 12:00 p.m. (New York City time) on the business day immediately preceding the Special Mandatory Redemption Date, we will deposit with the trustee funds sufficient to pay the Special Mandatory Redemption Price for the notes. If such deposit is made as provided above, the notes will cease to bear interest on and after the Special Mandatory Redemption Date.

If we fail to pay the Special Mandatory Redemption Price, it will be an event of default with respect to each series of notes (other than the 2029 notes) under the Indenture.

**Optional Redemption for Tax Reasons**

The notes of any series may be redeemed at our option in whole, but not in part, on not less than 10 nor more than 60 days' prior notice, at 100% of the principal amount of such series together with accrued and unpaid interest, if any, to, but excluding, the redemption date if, as a result of any change in, or amendment to, the laws, regulations or rulings of the United States (or any political subdivision or taxing authority thereof or therein having power to tax), or any change in official position regarding application or interpretation of those laws, regulations or rulings (including a holding by a court of competent jurisdiction), which change, amendment, application or interpretation is announced or becomes effective on or after the original issue date with respect to the notes, we become or, based upon a written opinion of independent counsel selected by us, will become obligated to pay additional amounts as described below in "— Payment of Additional Amounts."

**Payment of Additional Amounts**

All payments of principal, interest, and premium, if any, in respect of the notes are will be made free and clear of, and without withholding or deduction for, any present or future taxes, assessments, duties or governmental charges of whatever nature imposed, levied or collected by

Exhibit 4(xx)

the United States (or any political subdivision or taxing authority thereof or therein having power to tax), unless such withholding or deduction is required by law or the official interpretation or administration thereof.

We will, subject to the exceptions and limitations set forth below, pay as additional interest in respect of the notes such additional amounts as are necessary in order that the net payment by us of the principal of, premium, if any, and interest in respect of the notes to a holder who is not a United States person (as defined below), after withholding or deduction for any present or future tax, assessment, duties or other governmental charge imposed by the United States (or any political subdivision or taxing authority thereof or therein having power to tax), will not be less than the amount provided in the notes to be then due and payable; provided, however, that the foregoing obligation to pay additional amounts shall not apply:

1) to the extent any tax, assessment or other governmental charge would not have been imposed but for the holder (or the beneficial owner for whose benefit such holder holds such note), or a fiduciary, settlor, beneficiary, member or shareholder of the holder if the holder is an estate, trust, partnership or corporation, or a person holding a power over an estate or trust administered by a fiduciary holder, being considered as:
    a) being or having been engaged in a trade or business in the United States or having or having had a permanent establishment in the United States;
    b) having a current or former connection with the United States (other than a connection arising solely as a result of the ownership of the notes, the receipt of any payment in respect of the notes or the enforcement of any rights hereunder), including being or having been a citizen or resident of the United States;
    c) being or having been a personal holding company, a passive foreign investment company or a controlled foreign corporation for U.S. federal income tax purposes, a foreign tax-exempt organization, or a corporation that has accumulated earnings to avoid U.S. federal income tax;
    d) being or having been a "10-percent shareholder" of the Company as defined in section 871(h)(3) of the United States Internal Revenue Code of 1986, as amended (the "Code") or any successor provision; or
    e) being a bank receiving payments on an extension of credit made pursuant to a loan agreement entered into in the ordinary course of its trade or business, as described in section 881(c)(3)(A) of the Code or any successor provision;
2) to any holder that is not the sole beneficial owner of the notes, or a portion of the notes, or that is a fiduciary, partnership, limited liability company or other fiscally transparent entity, but only to the extent that a beneficial owner with respect to the holder, a beneficiary or settlor with respect to the fiduciary, or a beneficial owner or member of the partnership, limited liability company or other fiscally transparent entity would not have

Exhibit 4(xx)

been entitled to the payment of an additional amount had the beneficiary, settlor, beneficial owner or member received directly its beneficial or distributive share of the payment;

3) to the extent any tax, assessment or other governmental charge that would not have been imposed but for the failure of the holder or any other person to comply with certification, identification or information reporting requirements concerning the nationality, residence, identity or connection with the United States of the holder or beneficial owner of the notes, if compliance is required by statute, by regulation of the United States or any taxing authority therein or by an applicable income tax treaty to which the United States is a party as a precondition to exemption from such tax, assessment or other governmental charge;

4) to any tax, assessment or other governmental charge that is imposed otherwise than by withholding by us or a paying agent from the payment;

5) to any tax, assessment or other governmental charge required to be withheld by any paying agent from any payment of principal of or interest on any notes, if such payment can be made without such withholding by any other paying agent;

6) to any estate, inheritance, gift, sales, transfer, wealth, capital gains or personal property tax or similar tax, assessment or other governmental charge, or excise tax imposed on the transfer of notes;

7) to the extent any tax, assessment or other governmental charge would not have been imposed but for the presentation by the holder of any note, where presentation is required, for payment on a date more than 30 days after the date on which payment became due and payable or the date on which payment thereof is duly provided for, whichever occurs later except to the extent that the beneficiary or holder thereof would have been entitled to the payment of additional amounts had such note been presented for payment on any day during such 30-day period;

8) to any tax, assessment or other governmental charge imposed under sections 1471 through 1474 of the Code (or any amended or successor provisions), any current or future regulations or official interpretations thereof, any agreement entered into pursuant to section 1471(b) of the Code or any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of such sections of the Code, whether currently in effect or as published and amended from time to time;

9) to any tax, assessment or other governmental charge that is imposed or withheld solely by reason of a change in law, regulation, or administrative or judicial interpretation that becomes effective more than 15 days after the payment becomes due or is duly provided for, whichever occurs later; or

10) in the case of any combination of the above numbered items.

Exhibit 4(xx)

The notes are subject in all cases to any tax, fiscal or other law or regulation or administrative or judicial interpretation applicable to the notes. Except as specifically provided under this heading "—Payment of Additional Amounts," we are not required to make any payment for any tax, assessment or other governmental charge imposed by any government or a political subdivision or taxing authority of or in any government or political subdivision.

As used under this heading "—Payment of Additional Amounts" and under the heading "—Optional Redemption for Tax Reasons," the term "United States" means the United States of America, its territories and possessions, the states of the United States and the District of Columbia, and the term "United States person" means (i) any individual who is a citizen or resident of the United States for U.S. federal income tax purposes, (ii) a corporation, partnership or other entity created or organized in or under the laws of the United States, any state of the United States or the District of Columbia (other than a partnership that is not treated as a United States person for United States federal income tax purposes), (iii) any estate the income of which is subject to U.S. federal income taxation regardless of its source, or (iv) any trust if a United States court can exercise primary supervision over the administration of the trust and one or more United States persons can control all substantial trust decisions, or if a valid election is in place to treat the trust as a United States person.

**Repurchase at the Option of Holders Upon Change of Control Repurchase Event**

If a Change of Control Repurchase Event (as defined below) occurs in respect of a series of notes, unless we have exercised our right to redeem the notes of such series as described above under "—Optional Redemption or "Optional Redemption for Tax Reasons" or have been required to redeem the notes as described under "—Special Mandatory Redemption" we will be required to make an offer (a "Change of Control Offer") to each holder of such series of notes to repurchase all or any part (in minimum denominations of €100,000 and integral multiples of €1,000 original principal amount above that amount) of that holder's notes at a repurchase price in cash equal to 101% of the aggregate principal amount of notes repurchased plus any accrued and unpaid interest on the notes repurchased to, but not including, the date of such repurchase. Within 30 days following any Change of Control Repurchase Event or, at our option, prior to any Change of Control (as defined below), but after the public announcement of an impending Change of Control, we will mail a notice to each holder, with a copy to the trustee, describing the transaction or transactions that constitute or may constitute the Change of Control Repurchase Event and offering to repurchase notes on the payment date specified in the notice, which date will be no earlier than 30 days and no later than 60 days from the date such notice is mailed. The notice will, if mailed prior to the date of consummation of the Change of Control, state that the offer to purchase is conditioned on the Change of Control Repurchase Event occurring on or prior to the payment date specified in the notice.

Exhibit 4(xx)

We will comply with the requirements of Rule 14e-1 under the Securities Exchange Act of 1934, as amended, or the Exchange Act, and any other securities laws and regulations thereunder, to the extent those laws and regulations are applicable in connection with the repurchase of the notes as a result of a Change of Control Repurchase Event. To the extent that the provisions of any securities laws or regulations conflict with the Change of Control Repurchase Event provisions of the notes, we will comply with the applicable securities laws and regulations and will not be deemed to have breached our obligations under the Change of Control Repurchase Event provisions of the notes by virtue of such conflict.

On the Change of Control Repurchase Event payment date, we will, to the extent lawful:
- accept for payment all notes or portions of notes (in minimum denominations of €100,000 and integral multiples of €1,000 original principal amount above that amount) properly tendered pursuant to our offer;
- deposit with the paying agent an amount equal to the aggregate purchase price in respect of all notes or portions of notes properly tendered; and
- deliver or cause to be delivered to the trustee for cancellation the notes properly accepted, together with an officers' certificate stating the aggregate principal amount of notes being repurchased by us.

The paying agent will promptly mail to each holder of notes properly tendered the purchase price for the notes, and the trustee will promptly authenticate and mail (or cause to be transferred by book-entry) to each holder a new note equal in principal amount to any unpurchased portion of any notes surrendered; provided, that each new note will be in minimum denominations of €100,000 and integral multiples of €1,000 original principal amount above that amount.

We will not be required to make a Change of Control Offer upon a Change of Control Repurchase Event if (i) a third party makes such an offer in the manner, at the times and otherwise in compliance with the requirements for a Change of Control Offer made by us and such third party purchases all notes properly tendered and not withdrawn under its offer or (ii) we have previously or concurrently mailed a redemption notice with respect to all of the outstanding notes as described under "Optional Redemption" above.

If holders of not less than 90% in aggregate principal amount of the outstanding notes of any series validly tender and do not withdraw such notes in a Change of Control Offer and we, or any third party making such an offer in lieu of us as described above, purchases all of the notes of such series validly tendered and not withdrawn by such holders, we or such third party will have the right, upon not less than 10 days nor more than 60 days' prior notice, provided that such notice is given not more than 30 days following such repurchase pursuant to the Change of

Exhibit 4(xx)

Control Offer described above, to redeem all notes of such series that remain outstanding following such purchase on a date specified in such notice (the "Second Change of Control Payment Date") and at a price in cash equal to 101% of the aggregate principal amount of notes of such series repurchased plus any accrued and unpaid interest on the notes repurchased to, but not including, the Second Change of Control Payment Date.

We have no present intention to engage in a transaction involving a Change of Control, although it is possible that we would decide to do so in the future. We could, in the future, enter into certain transactions, including acquisitions, refinancings or other recapitalizations, that would not constitute a Change of Control but that could increase the amount of debt outstanding at such time or otherwise affect our capital structure or credit ratings.

### *Definitions*

"Below Investment Grade Rating Event" means the notes of such series are rated below Investment Grade by each of the Rating Agencies on any date during the period commencing upon the first public notice of the occurrence of a Change of Control or our intention to effect a Change of Control and ending 60 days following public notice of the occurrence of the related Change of Control (which period shall be extended so long as the rating of the notes of such series is under publicly announced consideration for possible downgrade by any of the Rating Agencies, provided that no such extension shall occur if on such 60th day the notes of such series are rated Investment Grade by at least one of such Rating Agency and are not subject to review for possible downgrade by such Rating Agency); provided further that a Below Investment Grade Rating Event otherwise arising by virtue of a particular reduction in rating shall not be deemed to have occurred in respect of a particular Change of Control (and thus shall not be deemed a Below Investment Grade Rating Event for purposes of the definition of Change of Control Repurchase Event hereunder) if the Rating Agencies making the reduction in rating to which this definition would otherwise apply do not announce or publicly confirm or inform the trustee in writing at its request that the reduction was the result, in whole or in part, of any event or circumstance comprised of or arising as a result of, or in respect of, the applicable Change of Control (whether or not the applicable Change of Control shall have occurred at the time of the Below Investment Grade Rating Event).

"Change of Control" means the occurrence of any of the following:

1) the direct or indirect sale, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of our assets and those of our subsidiaries taken as a whole to any "person" (as that term is used in Section 13(d)(3) of the Exchange Act), other than us or one of our subsidiaries;

2) the adoption of a plan relating to our liquidation or dissolution;

Exhibit 4(xx)

3) the first day on which a majority of the members of our Board of Directors are not Continuing Directors; or

4) the consummation of any transaction (including, without limitation, any merger or consolidation) the result of which is that any "person" (as that term is used in Section 13(d)(3) of the Exchange Act), other than us or one or more of our subsidiaries, becomes the beneficial owner (as defined in Rule 13d-3 of the Exchange Act), directly or indirectly, of more than 50% of the then outstanding number of shares of our Voting Stock.

Notwithstanding the foregoing, a transaction will not be considered to be a Change of Control if (a) we become a direct or indirect wholly-owned subsidiary of a holding company and (b)(i) immediately following that transaction, the direct or indirect holders of the Voting Stock of the holding company are substantially the same as the holders of our Voting Stock immediately prior to that transaction or (ii) immediately following that transaction, no person is the beneficial owner, directly or indirectly, of more than 50% of the Voting Stock of such holding company.

"Change of Control Repurchase Event" means the occurrence of both a Change of Control and a Below Investment Grade Rating Event.

"Continuing Directors" means, as of any date of determination, any member of our Board of Directors who (1) was a member of such Board of Directors on the date of the issuance of the notes; or (2) was nominated for election, elected or appointed to such Board of Directors with the approval of a majority of the Continuing Directors who were members of such Board of Directors at the time of such nomination, election or appointment (either by a specific vote or by approval of our proxy statement in which such member was named as a nominee for election as a director).

"Investment Grade" means a rating of Baa3 or better by Moody's (or its equivalent under any successor rating categories of Moody's) and a rating of BBB- or better by S&P (or its equivalent under any successor rating categories of S&P) or the equivalent investment grade credit rating from any additional Rating Agency or Rating Agencies selected by us.

"Moody's" means Moody's Investors Service Inc., a subsidiary of Moody's Corporation, and its successors.

"Rating Agency" means (1) each of Moody's and S&P; and (2) if any of Moody's or S&P ceases to rate the notes or fails to make a rating of the notes publicly available for reasons outside of our control, a "nationally recognized statistical rating organization" within the

meaning of Section 3(a) (62) under the Exchange Act, selected by us as a replacement agency for Moody's or S&P, or both of them, as the case may be.

"S&P" means S&P Global Ratings Inc., a division of S&P Global Inc. and its successors.

"Voting Stock" of any specified person as of any date means the capital stock of such person that is at the time entitled to vote generally in the election of the board of directors of such person.

The definition of "Change of Control" includes a phrase relating to the direct or indirect sale, transfer, conveyance or other disposition of "all or substantially all" of our assets and those of any of our subsidiaries, taken as a whole. Although there is a limited body of case law interpreting the phrase "substantially all," there is no precise established definition of the phrase under applicable law. Accordingly, the ability of a holder of notes to require us to repurchase the notes as a result of a sale, transfer, conveyance or other disposition of less than all of our assets and the assets of our subsidiaries, taken as a whole, to another person or group may be uncertain.

**Certain Covenants**

***Limitation on Liens***

The Indenture contains a covenant that we will not, and we will not permit any of our Restricted Subsidiaries to, issue, assume or guarantee any Indebtedness secured by any Mortgage upon any of our Principal Properties or those of any of our Restricted Subsidiaries without equally and ratably securing the notes (and, if we so determine, any other Indebtedness ranking equally with the notes) with such Indebtedness.

This covenant will not prevent us or any of our Restricted Subsidiaries from issuing, assuming or guaranteeing:

- any purchase money mortgage on such Principal Property prior to, simultaneously with or within 180 days after the later of (1) the acquisition or completion of construction or completion of substantial reconstruction, renovation, remodeling, expansion or improvement (each, a "substantial improvement") of such Principal Property or (2) the placing in operation of such property after the acquisition or completion of any such construction or substantial improvement;
- Mortgages on a Principal Property existing at the time of acquisition, including acquisition through merger or consolidation;
- Mortgages existing on the date of the initial issuance of the notes, Mortgages on assets of a corporation or other business entity existing on the date it becomes a Restricted Subsidiary or is merged or consolidated with us or a Restricted Subsidiary or at the time

Exhibit 4(xx)

the corporation or other business entity sells, leases or otherwise disposes of its property as an entirety or substantially as an entirety to us or a Restricted Subsidiary or Mortgages on the assets of a Subsidiary that is newly designated as a Restricted Subsidiary if the Mortgage would have been permitted under the provisions of this paragraph if such Mortgage was created while the Subsidiary was a Restricted Subsidiary;

- Mortgages in favor of us or a Restricted Subsidiary;
- Mortgages for taxes, assessments or governmental charges or levies that are not delinquent or that are being contested in good faith;
- Carriers', warehousemen's, materialmen's, repairmen's, mechanic's, landlords' and other similar Mortgages arising in ordinary course of business that are not delinquent or remain payable without penalty or that are being contested in good faith;
- Mortgages (other than any Mortgage imposed by ERISA) consisting of pledges or deposits required in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation;
- Easements, rights-of-way, restrictions, encroachments, imperfections and other similar encumbrances affecting real property that, in the aggregate, are not substantial in amount and do not in any case materially detract from the value of the Principal Property subject thereto or materially interfere with the ordinary conduct of our and our Subsidiaries' business, taken as a whole;
- Mortgages arising by reason of deposits with, or the giving of any form of security to, any governmental agency or anybody created or approved by law or governmental regulation, including any zoning or similar law or right reserved to or vested in any governmental office or agency to control or regulate the use of any real property;
- Mortgages arising from filing Uniform Commercial Code financing statements relating solely to leases; and
- Mortgages to secure Indebtedness incurred to extend, renew, refinance or replace Indebtedness secured by any Mortgages referred to above, provided that the principal amount of the extended, renewed, refinanced or replaced Indebtedness does not exceed the principal amount of Indebtedness so extended, renewed, refinanced or replaced, plus transaction costs and fees, and that any such Mortgage applies only to the same property or assets subject to the prior permitted Mortgage (and, in the case of real property, improvements).

**Limitations on Sale and Leaseback Transactions**

The Indenture contains a covenant that we will not, and will not permit our Restricted Subsidiaries to, enter into any arrangement with any person providing for the leasing by us or any Restricted Subsidiary of any Principal Property owned or acquired thereafter that has been or is to be sold or transferred by us or such Restricted Subsidiary to such person with the intention of taking back a lease of such Principal Property, a "sale and leaseback transaction," without

Exhibit 4(xx)

equally and ratably securing the notes (and, if we shall so determine, any other Indebtedness ranking equally with the notes), unless:

- within 180 days after the receipt of the proceeds of the sale or transfer, we or any Restricted Subsidiary apply an amount equal to the greater of the net proceeds of the sale or transfer or the fair value of such Principal Property at the time of such sale or transfer to any (or a combination) of (1) the prepayment or retirement (other than any mandatory prepayment or retirement) of our Senior Funded Debt or (2) the purchase, construction, development, expansion or improvement of other comparable property, subject in each case to credits for voluntary retirements of Senior Funded Debt; or
- we or such Restricted Subsidiary would be entitled, at the effective date of the sale or transfer, to incur Indebtedness secured by a Mortgage on such Principal Property, in an amount at least equal to the Attributable Debt in respect of the sale and leaseback transaction, without equally and ratably securing the notes pursuant to "—Limitation on Liens" described above.

The foregoing restriction will not apply to:
- any sale and leaseback transaction for a term of not more than three years including renewals;
- any sale and leaseback transaction with respect to a Principal Property if a binding commitment with respect thereto is entered into within three years after the later of (1) the date of the issuance of the notes under the Supplemental Indenture, or (2) the date such Principal Property was acquired;
- any sale and leaseback transaction with respect to a Principal Property if a binding commitment with respect thereto is entered into within 180 days after the later of the date such property was acquired and, if applicable, the date such property was first placed in operation; or
- any sale and leaseback transaction between us and a Restricted Subsidiary or between Restricted Subsidiaries.

### *Exception to Limitations for Exempted Debt*

Notwithstanding the limitations in the Indenture on liens and sale and leaseback transactions, we or our Restricted Subsidiaries may, in addition to amounts permitted under such restrictions and without equally and ratably securing the notes, create or assume and renew, extend or replace Mortgages, or enter into sale and leaseback transactions without any obligation to retire any Senior Funded Debt of us or any Restricted Subsidiary, provided that at the time of such creation, assumption, renewal, extension or replacement of a Mortgage or at the time of entering into such sale and leaseback transactions, and after giving effect thereto, Exempted Debt does not exceed 15% of our Consolidated Net Tangible Assets.

Exhibit 4(xx)

***Definitions***

For purposes of the Indenture:

"Attributable Debt" in respect of a sale and leaseback transaction means, at the time of determination, the present value (discounted at the imputed rate of interest of such transaction as determined in good faith by us) of the obligation of the lessee for net rental payments during the remaining term of the lease included in such sale and leaseback transaction (including any period for which such lease has been extended or may, at the option of the lessor, be extended). The term "net rental payments" under any lease for any period means the sum of the rental and other payments required to be paid in such period by the lessee thereunder, not including any amounts required to be paid by such lessee (whether or not designated as rental or additional rent) on account of maintenance and repairs, insurance, taxes, assessments, water rates or similar charges required to be paid by such lessee thereunder or any amount required to be paid by lessee thereunder contingent upon the amount of maintenance and repairs, insurance, taxes, assessments, water rates or similar charges. In the case of any lease that is terminable by the lessee upon the payment of a penalty, such net amount shall be the lesser of (x) the net amount determined assuming termination upon the first date such lease may be terminated (in which case the net amount shall also include the amount of the penalty, but shall not include any rent that would be required to be paid under such lease subsequent to the first date upon which it may be so terminated) or (y) the net amount determined assuming no such termination.

"Consolidated Net Tangible Assets" means the total amounts of assets (less depreciation and valuation reserves and other reserves and items deductible from gross book value of specific asset accounts under generally accepted accounting principles) that under generally accepted accounting principles would be included on a consolidated balance sheet of us and our consolidated Restricted Subsidiaries after deducting (1) all current liabilities, excluding current liabilities that could be classified as long-term debt under generally accepted accounting principles and current liabilities that are by their terms extendable or renewable at the obligor's option to a time more than 12 months after the time as of which the amount of current liabilities is being computed; (2) investments in Unrestricted Subsidiaries; and (3) all trade names, trademarks, licenses, patents, copyrights and goodwill, organizational and development costs, deferred charges, other than prepaid items such as insurance, taxes, interest, commissions, rents and similar items and tangible assets being amortized, and amortized debt discount and expense, less unamortized premium.

"Exempted Debt" means the sum of the following items outstanding as of the date Exempted Debt is being determined (1) Indebtedness of us and our Restricted Subsidiaries secured by a Mortgage and not permitted to exist under the Indenture and (2) Attributable Debt

Exhibit 4(xx)

of us and our Restricted Subsidiaries in respect of all sale and leaseback transactions not permitted under the Indenture.

"Funded Debt" means Indebtedness that matures more than one year from the date of creation, or that is extendable or renewable at the sole option of the obligor so that it may become payable more than one year from such date. Funded Debt does not include (1) obligations created pursuant to leases, (2) any Indebtedness or portion thereof maturing by its terms within one year from the time of any computation of the amount of outstanding Funded Debt unless such Indebtedness shall be extendable or renewable at the sole option of the obligor in such manner that it may become payable more than one year from such time, or (3) any Indebtedness for the payment or redemption of which money in the necessary amount shall have been deposited in trust either at or before the maturity date thereof.

"Indebtedness" means any and all of the obligations of a person for money borrowed that in accordance with generally accepted accounting principles would be reflected on the balance sheet of such person as a liability as of the date of which the Indebtedness is to be determined. Notwithstanding the foregoing, a change in generally accepted accounting principles subsequent to November 30, 2018 shall not be deemed an incurrence of Indebtedness.

"Investment" means any investment in stock, evidences of Indebtedness, loans or advances, however made or acquired, but does not include our account receivable or the accounts receivable of any Restricted Subsidiary arising from transactions in the ordinary course of business, or any evidences of Indebtedness, loans or advance made in connection with the sale to any Subsidiary of our accounts receivable or the accounts receivable of any Restricted Subsidiary arising from transactions in the ordinary course of business.

"Mortgage" means any mortgage, security interest, pledge, lien or other encumbrance.

"Principal Property" means all real property and improvements thereon owned by us or a Restricted Subsidiary, including, without limitation, any manufacturing, warehouse, distribution or research facility, and improvements therein, having a net book value in excess of 2% of Consolidated Net Tangible Assets that is located within the United States, excluding its territories and possessions and Puerto Rico. This term does not include any real property and improvements thereon that our Board of Directors declares by resolution not to be of material importance to the total business conducted by us and our Restricted Subsidiaries taken as a whole.

"Restricted Subsidiary" means a Subsidiary that owns a Principal Property.

Exhibit 4(xx)

"Senior Funded Debt" means all Funded Debt (except Funded Debt, the payment of which is subordinated to the payment of the notes).

"Subsidiary" means a corporation, partnership or other legal entity of which, in the case of a corporation, more than 50% of the outstanding voting stock is owned, directly or indirectly, by us or by one or more other Subsidiaries, or by us and one or more other Subsidiaries or, in the case of any partnership or other legal entity, more than 50% of the ordinary capital interests is, at the time, directly or indirectly owned or controlled by us or by one or more other Subsidiaries. For the purposes of this definition, "voting stock" means the equity interest that ordinarily has voting power for the election of directors, managers or trustees of an entity, or persons performing similar functions, whether at all times or only so long as no senior class of equity interest has such voting power by reason of any contingency.

"Unrestricted Subsidiary" means any Subsidiary other than a Restricted Subsidiary.

### Consolidation, Merger and Sale of Assets

We may consolidate or merge with or into any other corporation, and we may sell or transfer all or substantially all of our assets to another corporation, provided, among other things, that (a) we are the surviving corporation or the corporation formed by or resulting from any such
consolidation or merger or the transferee of such assets shall be a corporation organized and existing under the laws of the United States, any state thereof or the District of Columbia and shall expressly assume by supplemental indenture payment of the principal of, and premium, if any, and interest, if any, on the notes issued under the Indenture and the performance and observance of the Indenture and (b) we or such successor corporation shall not immediately thereafter be in default under the Indenture.

### Events of Default

The following events are defined in the Indenture as "Events of Default":

- default in the payment of any installment of interest on any series of notes for 30 days after becoming due;
- default in the payment of principal or premium, if any, of any series of notes when due;
- default in the deposit of any sinking fund payment, when due;
- default in the performance of any other covenant for 90 days after notice, which must be sent by either the trustee or holders of 25% of the principal amount of the notes of the affected series; and
- certain events of bankruptcy, insolvency or reorganization.

If an Event of Default occurs and continues with respect to a series of notes, either the trustee or the holders of at least 25% in principal amount of the outstanding notes of such series may declare the entire principal amount of all the notes of such series to be due and payable; provided that, in the case of an Event of Default involving certain events of bankruptcy,

Exhibit 4(xx)

insolvency or reorganization, such acceleration is automatic; and, provided further, that after such acceleration, but before a judgment or decree based on acceleration, the holders of a majority in aggregate principal amount of the outstanding notes of that series may, subject to certain conditions, rescind and annul such acceleration if all Events of Default, other than the nonpayment of accelerated principal, have been cured or waived.

Exhibit 10(i)



**Kevin A. Lobo**

Chair and CEO
2825 Airview Boulevard
Kalamazoo MI 49002 USA
P 269 389 7353
www.stryker.com

*Personal and confidential*

February 2, 2022

<u>First Name Last Name</u>

Dear First Name:

I am pleased to inform you that you are one of a select group of individuals receiving a stock option award in 2022. We use these awards to reward performers who we believe will be key contributors to our growth well into the future. The total Award Date Value (ADV) of your award is approximately USD $xx,xxx.

We are awarding you a nonstatutory stock option for xxx shares of Stryker Corporation Common Stock at a price of USD $xxx.xx per share. Except as otherwise provided in the Terms and Conditions, you may exercise this option at 20% per year beginning on February 2, 2023, and it will expire on February 1, 2032.

**You must "Accept" the award online via the UBS One Source web site located at <span style="color:blue">www.ubs.com/onesource/SYK</span> between March 1 and March 31, 2022.** The detailed terms of the option are in the Terms and Conditions, any applicable country addendum and the provisions of the Company's 2011 Long-Term Incentive Plan. Those documents, together with the related Prospectus, are available on the UBS One Source web site, and you should read them before accepting the award. In addition, you may be asked to sign the most recent version of Stryker's Confidentiality, Intellectual Property, Non-Competition and Non-Solicitation Agreement ("Non-Compete Agreement") in connection with the award. If you are asked to sign the Non-Compete Agreement, it will be emailed to you and you will be asked to sign the document electronically via Adobe Sign by March 31, 2022. The exercisability of the options is conditioned on you having signed the Non-Compete Agreement by March 31, 2022, where permitted by applicable law.

You can find additional educational materials on the UBS One Source web site in the Resources section, including the Stock Option brochure and Stock Option Tax Questions & Answers.

We are committed to growing talent and want our people to experience rewarding careers at Stryker. Your valuable contributions helped us deliver strong results during a challenging year and I look forward to our continued business growth and success.

Sincerely,

Kevin A. Lobo
Chair and CEO

Exhibit 10(i)

**STRYKER CORPORATION**

**TERMS AND CONDITIONS**
**RELATING TO NONSTATUTORY STOCK OPTIONS GRANTED**
**PURSUANT TO THE 2011 LONG-TERM INCENTIVE PLAN, AS AMENDED AND**
**RESTATED**

1.     The Options to purchase Shares of Stryker Corporation (the "Company") granted to you during 2022 are subject to these Terms and Conditions Relating to Nonstatutory Stock Options Granted Pursuant to the 2011 Long-Term Incentive Plan, as Amended and Restated (the "Terms and Conditions") and all of the terms and conditions of the Stryker Corporation 2011 Long-Term Incentive Plan, as Amended and Restated (the "2011 Plan"), which is incorporated herein by reference. In the case of a conflict between these Terms and Conditions and the terms of the 2011 Plan, the provisions of the 2011 Plan will govern. Capitalized terms used but not defined herein have the meaning provided therefor in the 2011 Plan. For purposes of these Terms and Conditions, "Employer" means the Company or any Subsidiary that employs you on the applicable date, and "Stock Plan Administrator" means UBS Financial Services Inc. (or any other independent service provider engaged by the Company to assist with the implementation, operation and administration of the 2011 Plan).

2.     Upon the termination of your employment with your Employer, your right to exercise the Options shall be only as follows:

(a)     If your employment is terminated by reason of Disability (as such term is defined in the 2011 Plan) or death, you, your legal representative or your estate shall have the right, for a period of one (1) year following such termination, to exercise the Options with respect to all or any part of the Shares subject thereto, regardless of whether the right to purchase such Shares had vested on or before the date of your termination by Disability or death.

(b)     If your employment is terminated by reason of Retirement (as such term is defined in the 2011 Plan) prior to the date that your Options become fully vested, you will continue to vest in your Options in accordance with the vesting schedule as set forth in the award letter as if you had continued your employment with your Employer. You (or your estate in the event of your death after your termination by Retirement) shall have the right, at any time on or prior to the 10th anniversary of the grant date, to exercise the vested portion of the Options.

(c)     If you cease to be an Employee for any reason other than those provided in (a) or (b) above, you or your estate (in the event of your death after such termination) may, within the 30-day period following such termination, exercise the Options with respect to only such number of Shares as to which the right of exercise had vested on or before the Termination Date. If you are a resident of or employed in the United States, "Termination Date" shall mean the effective date of termination of your employment with your Employer. If you are resident or employed outside of the United States, "Termination Date" shall mean the earliest of (i) the date on which notice of termination is provided to you, (ii) the last day of your active service with your Employer, or (iii) the last day on which you are an Employee of your Employer, as determined in each case without including any required advance notice period and irrespective of the status of the termination under local labor or employment laws.

(d)     Notwithstanding the foregoing, the Options shall not be exercisable in whole or in part (i) after the 10th anniversary of the grant date or (ii) except as provided in Section 3(c) hereof or in the event of termination of employment because of Disability, Retirement or death, unless you shall have continued in the employ of the Company or one of its Subsidiaries for one (1) year following the date of grant of the Options.

(e)     Notwithstanding the foregoing, if you are eligible for Retirement but cease to be an Employee for any other reason before you retire, the right to exercise the Options shall be determined as if your employment ceased by reason of Retirement.

Exhibit 10(i)

(f)    If you are both an Employee and a Director, the provisions of this Section 2 shall not apply until such time as you are neither an Employee nor a Director.

3.    The number of Shares subject to the Options and the price to be paid therefor shall be subject to adjustment and the term and exercise dates hereof may be accelerated as follows:

(a)    In the event that the Shares, as presently constituted, shall be changed into or exchanged for a different number or kind of shares of stock or other securities of the Company or of another corporation (whether by reason of merger, consolidation, recapitalization, reclassification, split-up, combination of shares, or otherwise) or if the number of such Shares shall be increased through the payment of a stock dividend or a dividend on the Shares of rights or warrants to purchase securities of the Company shall be made, then there shall be substituted for or added to each Share theretofore subject to the Options the number and kind of shares of stock or other securities into which each outstanding Share shall be so changed, or for which each such Share shall be exchanged, or to which each such Share shall be entitled. The Options shall also be appropriately amended as to price and other terms as may be necessary to reflect the foregoing events. In the event there shall be any other change in the number or kind of the outstanding Shares, or of any stock or other securities into which such Common Stock shall have been exchanged, then if the Committee shall, in its sole discretion, determine that such change equitably requires an adjustment in the Options, such adjustment shall be made in accordance with such determination.

(b)    Fractional Shares resulting from any adjustment in the Options may be settled in cash or otherwise as the Committee shall determine, in its sole discretion. Notice of any adjustment will be given to you and such adjustment (whether or not such notice is given) shall be effective and binding for all purposes hereof.

(c)    The Committee shall have the power to amend the Options to permit the exercise of the Options (and to terminate any unexercised Options) prior to the effectiveness of (i) any disposition of substantially all of the assets of the Company or your Employer, (ii) the shutdown, discontinuance of operations or dissolution of the Company or your Employer, or (iii) the merger or consolidation of the Company or your Employer with or into any other unrelated corporation.

4.    To exercise the Options, you must complete the on-line exercise procedures as established through the Stock Plan Administrator at www.ubs.com/onesource/SYK or by telephone at +1 860 727 1515 (or such other direct dial-in number that may be established from time to time). As part of such procedures, you shall be required to specify the number of Shares that you elect to purchase and the date on which such purchase is to be made, and you shall be required to make full payment of the Exercise Price. An Option shall not be deemed to have been exercised (i.e., the exercise date shall not be deemed to have occurred) until the notice of such exercise and payment in full of the Exercise Price are provided. The exercise date will be defined by the New York Stock Exchange ("NYSE") trading hours. If an exercise is completed after the market close or on a weekend, the exercise will be dated the next following trading day.

The Exercise Price may be paid in such manner as the Committee may specify from time to time in its sole discretion and as established through Stock Plan Administrator, including (but not limited to) the following methods: (i) by a net exercise arrangement pursuant to which the Company will reduce the number of Shares issued upon exercise by the largest whole number of Shares with an aggregate Fair Market Value on the date of purchase sufficient to cover the aggregate Exercise Price; (ii) by a broker-assisted cashless exercise transaction pursuant to which the Stock Plan Administrator loans funds to you to enable you to pay the aggregate Exercise Price and purchase Shares, and then sells a sufficient [whole] number of the purchased Shares on your behalf to enable you to repay the aggregate Exercise Price (with the remaining Shares and/or cash then delivered by Stock Plan Administrator to you) or (iii) cash payment. In cases where you utilize the net exercise arrangement and the Fair Market Value of the number of whole Shares withheld or sold, as applicable, is greater than the aggregate Exercise Price, the Company shall make a cash payment to you equal to the difference as soon as administratively practicable.

5.    If you are resident and/or employed outside of the United States, you agree, as a condition of the grant of the Options, to repatriate all payments attributable to the Shares and/or cash acquired under the 2011 Plan (including, but not limited to, dividends and any proceeds derived from the sale of the Shares acquired pursuant to the Options) if required by and in accordance with local foreign exchange rules and regulations in your country of residence (and country of employment, if different). In addition, you also agree to take any and all actions, and consent to any and all actions taken by the Company and its Subsidiaries, as may be required to allow the Company and its Subsidiaries to comply with local laws, rules and regulations in your country of residence (and country of employment, if different). Finally, you agree to take any and all actions as may be required to comply with your personal legal and tax obligations under local laws, rules and regulations in your country of residence (and country of employment, if different).

6.    If you are resident or employed in a country that is a member of the European Union, the grant of the Options and these Terms and Conditions are intended to comply with the age discrimination provisions of the EU Equal Treatment Framework Directive, as implemented into local law (the "Age Discrimination Rules"). To the extent that a court or tribunal of competent jurisdiction determines that any provision of these Terms and Conditions is invalid or unenforceable, in whole or in part, under the Age Discrimination Rules, the Company, in its sole discretion, shall have the power and authority to revise or strike such provision to the minimum extent necessary to make it valid and enforceable to the full extent permitted under local law.

7.    Regardless of any action the Company and/or your Employer take with respect to any or all income tax (including U.S. federal, state and local taxes and/or non-U.S. taxes), social insurance, payroll tax, payment on account or other tax-related withholding ("Tax-Related Items"), you acknowledge that the ultimate liability for all Tax-Related Items legally due by you is and remains your responsibility and that the Company and your Employer (i) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the Options, including the grant of the Options, the vesting of the Options, the exercise of the Options, the subsequent sale of any Shares acquired pursuant to the Options and the receipt of any dividends and (ii) do not commit to structure the terms of the grant or any aspect of the Options to reduce or eliminate your liability for Tax-Related Items. Further, if you become subject to taxation in more than one country between the grant date and the date of any relevant taxable or tax withholding event, as applicable, you acknowledge that the Employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one country.

Prior to the delivery of Shares upon exercise of your Options, if your country of residence (and/or your country of employment, if different) requires withholding of Tax-Related Items, the Company may withhold a number of whole Shares otherwise issuable upon exercise of the Options that have an aggregate Fair Market Value that the Company, taking into account local requirements and administrative issues, determines in its sole discretion is appropriate to cover withholding for Tax-Related Items with respect to the Shares. The cash equivalent of the Shares withheld will be used to settle the obligation to withhold the Tax-Related Items. In cases where the Fair Market Value of the number of whole Shares withheld at the time of exercise is greater than the amount required to be paid to the relevant government authorities with respect to withholding for Tax-Related Items, the Company shall make a cash payment to you equal to the difference as soon as administratively practicable. In the event that withholding in Shares is prohibited or problematic under applicable law or causes adverse consequences to the Company or your Employer, your Employer may withhold the Tax-Related Items required to be withheld with respect to the Shares (i) from the proceeds of the sale of Shares acquired upon exercise of the Options either through a voluntary sale or through a mandatory sale arranged by the Company (on your behalf pursuant to this authorization without further consent), or (ii) in cash from your regular salary and/or wages or other amounts payable to you. In the event the withholding requirements are not satisfied through the withholding of Shares or through your regular salary and/or wages or any other amounts payable to you by your Employer, no Shares will be issued to you (or your estate) upon exercise of the Options unless and until satisfactory arrangements (as determined by the Board of Directors) have been made by you with respect to the payment of any Tax-Related Items that the Company or your Employer determines, in its sole discretion, should be withheld or collected with respect to such Options. By accepting these Options, you expressly consent to the withholding of Shares and/or withholding from your regular salary and/

or wages or other amounts payable to you as provided for hereunder. All other Tax-Related Items related to the Options and any Shares delivered in payment thereof are your sole responsibility.

8.    The Options are intended to be exempt from the requirements of Code Section 409A. The 2011 Plan and these Terms and Conditions shall be administered and interpreted in a manner consistent with this intent. If the Company determines that these Terms and Conditions are subject to Code Section 409A and that it has failed to comply with the requirements of that Section, the Company may, at the Company's sole discretion and without your consent, amend these Terms and Conditions to cause them to comply with Code Section 409A or be exempt from Code Section 409A.

9.    If you were required to sign the "Stryker Confidentiality, Intellectual Property, Non-Competition and Non-Solicitation Agreement" or a similar agreement in order to receive the Options or have previously signed such an agreement and you breach any non-competition, non-solicitation or non-disclosure provision or provision as to ownership of inventions contained therein at any time while employed by the Company or a Subsidiary or during the one-year period following termination of employment, any unexercised portion of the Options shall be rescinded and you shall return to the Company all Shares that were acquired upon exercise of the Options that you have not disposed of and the Company shall repay you an amount for each such Share equal to the lesser of the Exercise Price or the Fair Market Value of a Share at such time. Further, you shall pay to the Company an amount equal to the profit realized by you (if any) on all Shares that were acquired upon exercise of the Options that you have disposed of. For purposes of the preceding sentence, the profit shall be the positive difference between the Fair Market Value of the Shares at the time of disposition and the Exercise Price.

10.    The Options shall be transferable only by will or the laws of descent and distribution and shall be exercisable during your lifetime only by you. If you purport to make any transfer of the Options, except as aforesaid, the Options and all rights thereunder shall terminate immediately.

11.    The Options shall not be exercisable in whole or in part, and the Company shall not be obligated to issue any Shares subject to the Options, if such exercise and sale would, in the opinion of counsel for the Company, violate the Securities Act of 1933 or any other U.S. federal, state or non-U.S. statute having similar requirements as it may be in effect at the time. The Options are subject to the further requirement that, if at any time the Board of Directors shall determine in its discretion that the listing or qualification of the Shares subject to the Options under any securities exchange requirements or under any applicable law, or the consent or approval of any governmental regulatory body, is necessary or desirable as a condition of or in connection with the issuance of Shares pursuant to the Options, the Options may not be exercised in whole or in part unless such listing, qualification, consent or approval shall have been effected or obtained free of any conditions not acceptable to the Board of Directors.

12.    The grant of the Options shall not confer upon you any right to continue in the employ of your Employer nor limit in any way the right of your Employer to terminate your employment at any time. You shall have no rights as a shareholder of the Company with respect to any Shares issuable upon the exercise of the Options until the date of issuance of such Shares.

13.    You acknowledge and agree that the 2011 Plan is discretionary in nature and may be amended, cancelled, or terminated by the Company, in its sole discretion, at any time. The grant of the Options under the 2011 Plan is a one-time benefit and does not create any contractual or other right to receive a grant of Options or any other award under the 2011 Plan or other benefits in lieu thereof in the future. Future grants, if any, will be at the sole discretion of the Company, including, but not limited to, the form and timing of any grant, the number of Shares subject to the grant, the vesting provisions and the exercise price. Any amendment, modification or termination of the 2011 Plan shall not constitute a change or impairment of the terms and conditions of your employment with your Employer.

14.    Your participation in the 2011 Plan is voluntary. The value of the Options and any other awards granted under the 2011 Plan is an extraordinary item of compensation outside the scope of your employment (and your employment contract, if any). Any grant under the 2011 Plan, including the grant of the Options, is not part of normal or expected compensation for purposes of calculating any

severance, resignation, redundancy, end of service payments, bonuses, long-service awards, pension, or retirement benefits or similar payments.

15.    These Terms and Conditions shall bind and inure to the benefit of the Company, its successors and assigns and you and your estate in the event of your death.

16.    The Options are Nonstatutory Stock Options and shall not be treated as Incentive Stock Options.

17.    The Company is located at 2825 Airview Boulevard Kalamazoo, Michigan 49002, U.S.A. and grants Options under the 2011 Plan to employees of the Company and Subsidiaries in its sole discretion. In conjunction with the Company's grant of the Options under the 2011 Plan and its ongoing administration of such awards, the Company is providing the following information about its data collection, processing and transfer practices ("Personal Data Activities"). In accepting the grant of the Options, you expressly and explicitly consent to the Personal Data Activities as described herein.

The Company collects, processes and uses your personal data, including your name, home address, email address, and telephone number, date of birth, social insurance number or other identification number, salary, citizenship, job title, any Shares or directorships held in the Company, and details of all Options or any other equity compensation awards granted, canceled, exercised, vested, or outstanding in your favor, which the Company receives from you or your Employer. In granting the Options under the Plan, the Company will collect your personal data for purposes of allocating Shares and implementing, administering and managing the 2011 Plan. The Company's legal basis for the collection, processing and usage of your personal data is your consent.

(a)    The Company transfers your personal data to the Stock Plan Administrator. In the future, the Company may select a different Stock Plan Administrator and share your personal data with another company that serves in a similar manner. The Stock Plan Administrator will open an account for you, if an account is not already in place, to receive and trade Shares acquired under the 2011 Plan. You will be asked to agree on separate terms and data processing practices with the Stock Plan Administrator, which is a condition to your ability to participate in the 2011 Plan.

(b)    The Company and the Stock Plan Administrator are based in the United States. You should note that your country of residence may have enacted data privacy laws that are different from the United States. The Company's legal basis for the transfer of your personal data to the United States is your consent.

(c)    Your participation in the 2011 Plan and your grant of consent is purely voluntary. You may deny or withdraw your consent at any time. If you do not consent, or if you withdraw your consent, you may be unable to participate in the 2011 Plan. This would not affect your existing employment or salary; instead, you merely may forfeit the opportunities associated with the 2011 Plan.

You may have a number of rights under the data privacy laws in your country of residence. For example, your rights may include the right to (i) request access or copies of personal data the Company processes, (ii) request rectification of incorrect data, (iii) request deletion of data, (iv) place restrictions on processing, (v) lodge complaints with competent authorities in your country or residence, and/or (vi) request a list with the names and addresses of any potential recipients of your personal data. To receive clarification regarding your rights or to exercise your rights, you should contact your local HR manager or the Company's Human Resources Department.

18.    The grant of the Options is not intended to be a public offering of securities in your country of residence (and country of employment, if different). The Company has not submitted any registration statement, prospectus or other filing(s) with the local securities authorities (unless otherwise required under local law). **No employee of the Company is permitted to advise you on whether you should purchase Shares under the 2011 Plan or provide you with any legal, tax or financial advice with respect to the grant of your Options. Investment in Shares involves a degree of risk. Before deciding to purchase Shares pursuant to the Options, you should carefully consider all risk factors and tax considerations relevant to the acquisition of Shares**

**under the 2011 Plan or the disposition of them. Further, you should carefully review all of the materials related to the Options and the 2011 Plan, and you should consult with your personal legal, tax and financial advisors for professional advice in relation to your personal circumstances.**

19.   All questions concerning the construction, validity and interpretation of the Options and the 2011 Plan shall be governed and construed according to the laws of the state of Michigan, without regard to the application of the conflicts of laws provisions thereof. Any disputes regarding the Options or the 2011 Plan shall be brought only in the state or federal courts of the state of Michigan.

20.   The Company may, in its sole discretion, decide to deliver any documents related to the Options or other awards granted to you under the 2011 Plan by electronic means. You hereby consent to receive such documents by electronic delivery and agree to participate in the 2011 Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

21.   The invalidity or unenforceability of any provision of the 2011 Plan or these Terms and Conditions shall not affect the validity or enforceability of any other provision of the 2011 Plan or these Terms and Conditions.

22.   If you are resident outside of the United States, you acknowledge and agree that it is your express intent that these Terms and Conditions, the 2011 Plan and all other documents, notices and legal proceedings entered into, given or instituted pursuant to the Options be drawn up in English. If you have received these Terms and Conditions, the 2011 Plan or any other documents related to the Options translated into a language other than English and the meaning of the translated version is different than the English version, the English version will control.

23.   You acknowledge that, depending on your or your broker's country of residence or where the Shares are listed, you may be subject to insider trading restrictions and/or market abuse laws which may affect your ability to accept, acquire, sell or otherwise dispose of Shares, rights to Shares (e.g., Options) or rights linked to the value of Shares during such times you are considered to have "inside information" regarding the Company as defined in the laws or regulations in your country of employment (and country of residence, if different).   Local insider trading laws and regulations may prohibit the cancellation or amendment of orders you placed before you possessed inside information.   Furthermore, you could be prohibited from (i) disclosing the inside information to any third party (other than on a "need to know" basis) and (ii) "tipping" third parties or causing them otherwise to buy or sell securities.  Third parties include fellow employees.  Any restrictions under these laws or regulations are separate from and in addition to any restrictions that may be imposed under any applicable Company insider trading policy.   You acknowledge that it is your responsibility to comply with any restrictions and are advised to speak to your personal advisor on this matter.

24.   Notwithstanding any provisions of these Terms and Conditions to the contrary, the Options shall be subject to any special terms and conditions for your country of residence (and country of employment, if different) set forth in an addendum to these Terms and Conditions (an "Addendum"). Further, if you transfer your residence and/or employment to another country reflected in an Addendum to these Terms and Conditions at the time of transfer, the special terms and conditions for such country will apply to you to the extent the Company determines, in its sole discretion, that the application of such special terms and conditions is necessary or advisable in order to comply with local law, rules and regulations, or to facilitate the operation and administration of the award and the 2011 Plan (or the Company may establish alternative terms and conditions as may be necessary or advisable to accommodate your transfer). In all circumstances, any applicable Addendum shall constitute part of these Terms and Conditions.

25.   The Company reserves the right to impose other requirements on the Options, any Shares acquired pursuant to the Options and your participation in the 2011 Plan to the extent the Company determines, in its sole discretion, that such other requirements are necessary or advisable in order to comply with local law, rules and regulations, or to facilitate the operation and administration

Exhibit 10(i)

of the award and the 2011 Plan. Such requirements may include (but are not limited to) requiring you to sign any agreements or undertakings that may be necessary to accomplish the foregoing.

26. **This Section 26 applies only to those persons whom the Company's Recoupment Policy applies (the corporate officers elected by the Company's Board of Directors other than Assistant Controllers, Assistant Secretaries and Assistant Treasurers)**. Notwithstanding any other provision of these Terms and Conditions to the contrary, you acknowledge and agree that your Options, any Shares acquired pursuant thereto and/or any amount received with respect to any sale of such Shares are subject to potential cancellation, recoupment, rescission, payback or other action in accordance with the terms of the Company's Recoupment Policy as in effect on the date of grant (a copy of which has been furnished to you) and as the Recoupment Policy may be amended from time to time in order to comply with changes in laws, rules or regulations that are applicable to such Options and Shares. You agree and consent to the Company's application, implementation and enforcement of (a) the Recoupment Policy and (b) any provision of applicable law relating to cancellation, recoupment, rescission or payback of compensation and expressly agree that the Company may take such actions as are necessary to effectuate the Recoupment Policy (as applicable to you) or applicable law without further consent or action being required by you. For purposes of the foregoing, you expressly and explicitly authorize the Company to issue instructions, on your behalf, to any brokerage firm and/or third party administrator engaged by the Company to hold your Shares and other amounts acquired under the Plan to re-convey, transfer or otherwise return such Shares and/or other amounts to the Company. In the case of a conflict between these Terms and Conditions and the Recoupment Policy, the terms of the Recoupment Policy shall prevail.

27. **By accepting the grant of Options, you acknowledge that you have read these Terms and Conditions, the Addendum to these Terms and Conditions (as applicable) and the 2011 Plan and specifically accept and agree to the provisions therein.**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**STRYKER CORPORATION**

**ADDENDUM TO
TERMS AND CONDITIONS
RELATING TO NONSTATUTORY STOCK OPTIONS GRANTED
PURSUANT TO THE 2011 PLAN, AS AMENDED AND RESTATED**

In addition to the terms of the 2011 Plan and the Terms and Conditions, the Options are subject to the following additional terms and conditions (the "Addendum"). All capitalized terms as contained in this Addendum shall have the same meaning as set forth in the 2011 Plan and the Terms and Conditions. Pursuant to Section 24 of the Terms and Conditions, if you transfer your residence and/or employment to another country reflected in an Addendum at the time of transfer, the special terms and conditions for such country will apply to you to the extent the Company determines, in its sole discretion, that the application of such terms and conditions is necessary or advisable in order to comply with local law, rules and regulations, or to facilitate the operation and administration of the award and the 2011 Plan (or the Company may establish alternative terms and conditions as may be necessary or advisable to accommodate your transfer).

**Data Privacy Information: European Union ("EU") / European Economic Area ("EEA") / Switzerland and the United Kingdom***

***The below information is for data privacy purposes only and you should determine whether any other special terms and conditions apply to your awards in these jurisdictions.***

1.    Data Privacy. If you reside and/or you are employed in the EU / EEA, Switzerland or the United Kingdom the following provision replaces Section 17 of the Terms and Conditions:

The Company is located at 2825 Airview Boulevard Kalamazoo, Michigan 49002, U.S.A. and grants Options under the 2011 Plan to employees of the Company and its Subsidiaries in its sole discretion. You should review the following information about the Company's data processing practices.

(a)    Data Collection, Processing and Usage. Pursuant to applicable data protection laws, you are hereby notified that the Company collects, processes and uses certain personally-identifiable information about you for the legitimate interest of implementing, administering and managing the 2011 Plan and generally administering equity awards; specifically, including your name, home address, email address and telephone number, date of birth, social insurance number or other identification number, salary, citizenship, job title, any Shares or directorships held in the Company, and details of all options or any other awards granted, canceled, exercised, vested, or outstanding in your favor, which the Company receives from you or your Employer. In granting the Options under the 2011 Plan, the Company will collect your personal data for purposes of allocating Shares and implementing, administering and managing the 2011 Plan. The Company's collection, processing, use and transfer of your personal data is necessary for the performance of the Company's contractual obligations under the Plan and pursuant to the Company's legitimate interest of managing and generally administering employee equity awards. Your refusal to provide personal data would make it impossible for the Company to perform its contractual obligations and may affect your ability to participate in the 2011 Plan. As such, by participating in the 2011 Plan, you voluntarily acknowledge the collection, processing and use of your personal data as described herein.

(b)    Stock Plan Administration Service Provider. The Company transfers participant data to the Stock Plan Administrator. In the future, the Company may select a different Stock Plan Administrator and share your data with another company that serves in a similar manner. The Stock Plan Administrator will open an account for you, if an account is not already in place, to receive and trade Shares acquired under the 2011 Plan. You will be asked to agree on separate terms and data processing practices with the Stock Plan Administrator, which is a condition to your ability to participate in the 2011 Plan.

(c)    International Data Transfers. The Company and the Stock Plan Administrator are based in the United States. The Company can only meet its contractual obligations to you if your personal data is

transferred to the United States. The Company's legal basis for the transfer of your personal data to the United States is to satisfy its contractual obligations to you and/or its use of the standard data protection clauses adopted by the EU Commission.

(d)   Data Retention. The Company will use your personal data only as long as is necessary to implement, administer and manage your participation in the 2011 Plan or as required to comply with legal or regulatory obligations, including under tax and security laws. When the Company no longer needs your personal data, the Company will remove it from its systems. If the Company keeps your data longer, it would be to satisfy legal or regulatory obligations and the Company's legal basis would be for compliance with relevant laws or regulations.

(e)   Data Subject Rights. You may have a number of rights under data privacy laws in your country of residence. For example, your rights may include the right to (i) request access or copies of personal data the Company processes, (ii) request rectification of incorrect data, (iii) request deletion of data, (iv) place restrictions on processing, (v) lodge complaints with competent authorities in your country of residence, and/or (vi) request a list with the names and addresses of any potential recipients of the Participant's personal data. To receive clarification regarding your rights or to exercise your rights, you should contact your local HR manager or the Company's Human Resources Department.

**ARGENTINA**

1.   Securities Law Information. Neither the grant of the Options, nor the issuance of Shares subject to the exercise of the Options, constitutes a public offering in Argentina. The grant of Options pursuant to the 2011 Plan is a private placement and is not subject to any filing or disclosure requirements in Argentina.

**AUSTRALIA**

1.   Options Conditioned on Satisfaction of Regulatory Obligations. If you are (a) a director of a Subsidiary incorporated in Australia, or (b) a person who is a management-level executive of a Subsidiary incorporated in Australia and who also is a director of a Subsidiary incorporated outside of the Australia, the grant of the Options is conditioned upon satisfaction of the shareholder approval provisions of section 200B of the Corporations Act 2001 (Cth) in Australia.

The Australian Offer Document can be accessed at [UBS INSERT LINK HERE]

**AUSTRIA**

No country specific provisions.

**BELGIUM**

**Name: _____   Number of Shares: _____**

**Date of Grant: _____   Exercise Price: _____**

1.   Acceptance of Options. For the Options to be subject to taxation at the time of grant, you must affirmatively accept the Options in writing within 60 days of the date of grant specified above by signing below and returning this original executed Addendum to:

Stock Plan Administration Department<br>
2825 Airview Blvd.<br>
Kalamazoo, Michigan 49002 (U.S.A)

I hereby accept the _____ (number) Options granted to me by the Company on the date of grant. I also acknowledge that I have been encouraged to discuss the acceptance of the Options and the applicable

tax treatment with a financial and/or tax advisor, and that my decision to accept the Options is made with full knowledge of the applicable consequences.

Employee Signature:     _____

Employee Printed Name:    _____

Date of Acceptance:     _____

If you fail to affirmatively accept the Options in writing within 60 days of the date of grant, the Options will not be subject to taxation at the time of grant but instead will be subject to taxation on the date you exercise the Options (or such other treatment as may apply under Belgian tax law at the time of exercise).

     2.   <u>Payment of Exercise Price Limited to Cash Payment</u>. Notwithstanding anything to the contrary in Section 4 of the Terms and Conditions, you shall be permitted to pay the Exercise Price only by means of a cash payment (the net exercise method and the cashless exercise method shall not be permitted).

     3.   <u>Undertaking for Qualifying Options</u>. If you are accepting the Options in writing within 60 days of the date of grant and wish to have the Options subject to a lower valuation for Belgium tax purposes pursuant to the article 43, §6 of the Belgian law of 26 March 1999, you may agree and undertake to (a) not exercise the Options before the end of the third calendar year following the calendar year in which the date of grant falls, and (b) not transfer the Options under any circumstances (except on rights your heir might have in the Options upon your death). If you wish to make this undertaking, you must sign below and return this executed Addendum to the address listed above.

Employee Signature:     _____

Employee Printed Name:    _____

## BRAZIL

     1.   <u>Labor Law Acknowledgment</u>. By accepting the Options, you acknowledge and agree, for all legal purposes, that (a) the benefits provided under the Terms and Conditions and the 2011 Plan are the result of commercial transactions unrelated to your employment; (b) the Terms and Conditions and the 2011 Plan are not a part of the terms and conditions of your employment; and (c) the income from the Options, if any, is not part of your remuneration from employment.

     2.   <u>Compliance with Law</u>. By accepting the Options, you acknowledge and agree to comply with applicable Brazilian laws and to pay any and all applicable taxes associated with the exercise of the Options, the issuance and/or sale of Shares acquired under the 2011 Plan and the receipt of any dividends.

## CANADA

     1.   <u>Non-Qualified Securities</u>. All or a portion of the Shares subject to your Options may be "non-qualified securities" within the meaning of the *Income Tax Act* (Canada). The Company shall provide you with additional information and/or appropriate notification regarding the characterization of the Options for Canadian income tax purposes as may be required by the *Income Tax Act* (Canada) and the regulations thereunder.

     2.   <u>No Exercise by Using Previously Owned Shares</u>. Notwithstanding anything in Section 4 of the Terms and Conditions to the contrary, if you are resident in Canada, you shall not be permitted to use previously-owned Shares for exercising the Options.

     3.   <u>Termination of Employment</u>. The following supplements Section 2(c) of the Terms and Conditions as well as any other section required to give effect to the same:

In the event of your termination of employment for any reason (other than by reason of death, Disability or Retirement), either by you or by the Employer, with or without cause, your rights to vest or to continue to vest in the Options and receive Shares upon exercise under the 2011 Plan, if any, will terminate as of the actual Termination Date. For this purpose, the "Termination Date" shall mean the last day on which you are actively employed by the Employer, and shall not include or be extended by any period following such day during which you are in receipt of or eligible to receive any notice of termination, pay in lieu of notice of termination, severance pay or any other payments or damages, whether arising under statute, contract or at common law.

Notwithstanding the foregoing, if applicable employment standards legislation explicitly requires continued entitlement to vesting during a statutory notice period, your right to vest in the Options under the 2011 Plan, if any, will terminate effective as of the last day of your minimum statutory notice period, but you will not earn or be entitled to pro-rated vesting if the vesting date falls after the end of your statutory notice period, nor will you be entitled to any compensation for lost vesting.

4.   Use of English Language. If you are a resident of Quebec, by accepting the Options, you acknowledge and agree that it is your express wish that the Terms and Conditions, this Addendum, as well as all other documents, notices and legal proceedings entered into, given or instituted pursuant to your Option, either directly or indirectly, be drawn up in English.

**Langue anglaise. En acceptant l'allocation de votre Options, vous reconnaissez et acceptez avoir souhaité que le Termes et Conditions, le présent avenant, ainsi que tous autres documents exécutés, avis donnés et procédures judiciaires intentées, relatifs, directement ou indirectement, à l'allocation de votre Option, soient rédigés en anglais.**

**BY SIGNING BELOW, YOU ACKNOWLEDGE, UNDERSTAND AND AGREE TO THE PROVISIONS OF THE 2011 PLAN, THE TERMS AND CONDITIONS AND THIS ADDENDUM. PLEASE SIGN AND RETURN THIS ADDENDUM VIA EMAIL NO LATER THAN APRIL 29, 2022 TO STOCKPLANADMINISTRATION@STRYKER.COM.**

_____   _____
Employee Signature        Employee Name (Printed)

_____
Date

### COLOMBIA

1.   Nature of Grant. In addition to the provisions of Section 14 of the Terms and Conditions you acknowledge that, pursuant to Article 128 of the Colombian Labor Code, the 2011 Plan and related benefits do not constitute a component of your "salary" for any legal purpose. Therefore, they will not be included and/or considered for purposes of calculating any and all labor benefits, such as legal/fringe benefits, vacations, indemnities, payroll taxes, social insurance contributions and/or any other labor-related amount which may be payable.

2.   Securities Law Information. The Shares subject to the Options are not and will not be registered in the Colombian registry of publicly traded securities (*Registro Nacional de Valores y Emisores*) and therefore the Shares may not be offered to the public in Colombia. Nothing in this document should be construed as the making of a public offer of securities in Colombia.

### COSTA RICA

No country specific provisions.

## DENMARK

1.      <u>Treatment of Options upon Termination of Employment</u>. Notwithstanding any provision in the Terms and Conditions or the Plan to the contrary, unless you are a member of registered management who is not considered a salaried employee, the treatment of the Option upon a termination of employment which is not a result of death shall be governed by Sections 4 and 5 of the Danish Act on Stock Option in Employment Relations. However, if the provisions in the Terms and Conditions or the Plan governing the treatment of the Option upon a termination of employment are more favorable, then the provisions of the Terms and Conditions or the 2011 Plan will govern.

## FINLAND

1.      <u>Withholding of Tax-Related Items</u>. Notwithstanding anything in Section 5 of the Terms and Conditions to the contrary, if you are a local national of Finland, any Tax-Related Items shall be withheld only in cash from your regular salary/wages or other amounts payable to you in cash or such other withholding methods as may be permitted under the 2011 Plan and allowed under local law.

## FRANCE

1.      <u>Use of English Language</u>.  By accepting the Options, you acknowledge and agree that it is your express wish that the Terms and Conditions, this Addendum, as well as all other documents, notices and legal proceedings entered into, given or instituted pursuant to your Option, either directly or indirectly, be drawn up in English.

**Langue anglaise. En acceptant l'allocation de votre Option, vous reconnaissez et acceptez avoir souhaité que le Termes et Conditions, le présent avenant, ainsi que tous autres documents exécutés, avis donnés et procédures judiciaires intentées, relatifs, directement ou indirectement, à l'allocation de votre Option, soient rédigés en anglais.**

BY SIGNING BELOW, YOU ACKNOWLEDGE, UNDERSTAND AND AGREE TO THE PROVISIONS OF THE 2011 PLAN, THE TERMS AND CONDITIONS AND THIS ADDENDUM.

**PLEASE SIGN AND RETURN THIS ADDENDUM VIA EMAIL NO LATER THAN APRIL 29, 2022 TO STOCKPLANADMINISTRATION@STRYKER.COM.**

_____      _____
Employee Signature              Employee Name (Printed)

_____
Date

## GERMANY

No country specific provisions.

## HONG KONG

1.      <u>Important Notice</u>. Warning: The contents of the Terms and Conditions, this Addendum, the 2011 Plan, and all other materials pertaining to the Options and/or the 2011 Plan have not been reviewed by any regulatory authority in Hong Kong. You are hereby advised to exercise caution in relation to the offer thereunder. If you have any doubts about any of the contents of the aforesaid materials, you should obtain independent professional advice.

2.    <u>Lapse of Restrictions</u>. If, for any reason, Shares are issued to you within six (6) months of the grant date, you agree that you will not sell or otherwise dispose of any such Shares prior to the six-month anniversary of the grant date.

3.    <u>Settlement in Shares</u>. Notwithstanding anything to the contrary in this Addendum, the Terms and Conditions or the 2011 Plan, the Options shall be settled only in Shares (and may not be settled in cash).

4.    <u>Nature of the Plan</u>. The Company specifically intends that the 2011 Plan will not be treated as an occupational retirement scheme for purposes of the Occupational Retirement Schemes Ordinance ("ORSO"). To the extent any court, tribunal or legal/regulatory body in Hong Kong determines that the 2011 Plan constitutes an occupational retirement scheme for the purposes of ORSO, the grant of the Options shall be null and void.

## INDIA

1.    <u>Repatriation Requirements</u>. You expressly agree to repatriate all sale proceeds and dividends attributable to Shares acquired under the 2011 Plan in accordance with local foreign exchange rules and regulations. Neither the Company, your Employer or any of the Company's Subsidiaries shall be liable for any fines or penalties resulting from your failure to comply with applicable laws, rules or regulations.

## IRELAND

No country specific provisions.

## ITALY

No country specific provisions.

## JAPAN

No country specific provisions.

## MEXICO

1.    <u>Commercial Relationship</u>. You expressly recognize that your participation in the 2011 Plan and the Company's grant of the Options does not constitute an employment relationship between you and the Company. You have been granted the Options as a consequence of the commercial relationship between the Company and the Subsidiary in Mexico that employs you, and the Company's Subsidiary in Mexico is your sole employer. Based on the foregoing, (a) you expressly recognize the 2011 Plan and the benefits you may derive from your participation in the 2011 Plan do not establish any rights between you and the Company's Subsidiary in Mexico that employs you, (b) the 2011 Plan and the benefits you may derive from your participation in the 2011 Plan are not part of the employment conditions and/or benefits provided by the Company's Subsidiary in Mexico that employs you, and (c) any modification or amendment of the 2011 Plan by the Company, or a termination of the 2011 Plan by the Company, shall not constitute a change or impairment of the terms and conditions of your employment with the Company's Subsidiary in Mexico that employs you.

2.    <u>Securities Law Information</u>. You expressly recognize and acknowledge that the Company's grant of the Options and the underlying Shares under the Plan have not been registered with the National Register of Securities maintained by the Mexican National Banking and Securities Commission and cannot be offered or sold publicly in Mexico. In addition, the 2011 Plan, the Terms and Conditions and any other document relating to the Options may not be publicly distributed in Mexico. These materials are addressed to you only because of your existing relationship with the Company and these materials should not be reproduced or copied in any form. The offer contained in

these materials does not constitute a public offering of securities but rather constitutes a private placement of securities addressed specifically to individuals who are present employees of the Employer in Mexico made in accordance with the provisions of the Mexican Securities Market Law, and any rights under such offering shall not be assigned or transferred.

     3.   <u>Extraordinary Item of Compensation</u>. You expressly recognize and acknowledge that your participation in the 2011 Plan is a result of the discretionary and unilateral decision of the Company, as well as your free and voluntary decision to participate in the 2011 Plan in accord with the terms and conditions of the 2011 Plan, the Terms and Conditions, and this Addendum. As such, you acknowledge and agree that the Company may, in its sole discretion, amend and/or discontinue your participation in the 2011 Plan at any time and without any liability. The value of the Options is an extraordinary item of compensation outside the scope of your employment contract, if any. The Options are not part of your regular or expected compensation for purposes of calculating any severance, resignation, redundancy, end of service payments, bonuses, long-service awards, pension or retirement benefits, or any similar payments, which are the exclusive obligations of the Company's Subsidiary in Mexico that employs you.

**BY SIGNING BELOW, YOU ACKNOWLEDGE, UNDERSTAND AND AGREE TO THE PROVISIONS OF THE 2011 PLAN, THE TERMS AND CONDITIONS AND THIS ADDENDUM.**

**PLEASE SIGN AND RETURN THIS ADDENDUM VIA EMAIL NO LATER THAN APRIL 29, 2022 TO <u>STOCKPLANADMINISTRATION@STRYKER.COM</u>.**

_____  _____
Employee Signature        Employee Name (Printed)

_____
Date

**NETHERLANDS**

     1.   <u>Waiver of Termination Rights</u>. As a condition to the grant of the Options, you hereby waive any and all rights to compensation or damages as a result of the termination of your employment with the Company and your Employer for any reason whatsoever, insofar as those rights result or may result from (a) the loss or diminution in value of such rights or entitlements under the 2011 Plan, or (b) you ceasing to have rights under or ceasing to be entitled to any awards under the 2011 Plan as a result of such termination.

**NEW ZEALAND**

     1.   <u>WARNING</u>. You are being offered Options in Stryker Corporation. If the Company runs into financial difficulties and is wound up, you may lose some or all your investment. New Zealand law normally requires people who offer financial products to give information to investors before they invest. This requires those offering financial products to have disclosed information that is important for investors to make an informed decision. The usual rules do not apply to this offer because it is an offer made under the Employee Share Scheme exemption. As a result, you may not be given all the information usually required. You will also have fewer other legal protections for this investment. You should ask questions, read all documents carefully, and seek independent financial advice before accepting the offer. The Company's Shares are currently traded on the New York Stock Exchange under the ticker symbol "SYK" and Shares acquired under the 2011 Plan may be sold through this exchange. You may end up selling the Shares at a price that is lower than the value of the Shares when you acquired them. The price will depend on the demand for the Company's Shares. *The Company's most recent annual report (which includes the Company's financial statements) is available at* [http://phx.corporate-ir.net/phoenix.zhtml?c=118965&p=irol-irhome]. *You are entitled to receive a copy of this report, free of charge, upon written request to the Company at* **<u>STOCKPLANADMINISTRATION@STRYKER.COM</u>**.

**POLAND**

No country specific provisions.

**PORTUGAL**

No country specific provisions.

**PUERTO RICO**

No country specific provisions.

**ROMANIA**

No country specific provisions.

**SINGAPORE**

1.   Qualifying Person Exemption. The following provision shall replace Section 18 of the Terms and Conditions:

The grant of the Options under the 2011 Plan is being made pursuant to the "Qualifying Person" exemption" under section 273(1)(f) of the Securities and Futures Act (Chapter 289, 2006 Ed.) ("SFA"). The 2011 Plan has not been lodged or registered as a prospectus with the Monetary Authority of Singapore. You should note that, as a result, the Options are subject to section 257 of the SFA and you will not be able to make (a) any subsequent sale of the Shares in Singapore or (ii) any offer of such subsequent sale of the Shares subject to the Options in Singapore, unless such sale or offer is made pursuant to the exemptions under Part XIII Division (1) Subdivision (4) (other than section 280) of the SFA (Chapter 289, 2006 Ed.).

2.   Director Reporting Notification. If you are a director, associate director or shadow director of a Singapore company, you are subject to certain notification requirements under the Singapore Companies Act. Among these requirements is an obligation to notify the Singapore company in writing when you receive an interest (e.g., Options or Shares) in the Company or any related company. In addition, you must notify the Singapore company when you sell Shares (including when you sell Shares acquired upon exercise of the Options). These notifications must be made within two business days of acquiring or disposing of any interest in the Company or any related company. In addition, a notification must be made of Participant's interests in the Company or any related company within two business days of becoming a director.

**SOUTH AFRICA**

1.   Withholding Taxes. In addition to the provisions of Section 7 of the Terms and Conditions, you agree to notify your Employer in South Africa of the amount of any gain realized upon exercise of the Options. If you fail to advise the Company of the gain realized upon exercise, you may be liable for a fine. You will be responsible for paying any difference between the actual tax liability and the amount withheld.

2.   Exchange Control Obligations. You are solely responsible for complying with applicable exchange control regulations and rulings (the "Exchange Control Regulations") in South Africa. As the Exchange Control Regulations change frequently and without notice, you should consult your legal advisor prior to the acquisition or sale of Shares under the 2011 Plan to ensure compliance with current Exchange Control Regulations. Neither the Company nor any of its Subsidiaries will be liable for any fines or penalties resulting from your failure to comply with applicable laws.

3.   Securities Law Information and Deemed Acceptance of Options.  Neither the Options nor the underlying Shares shall be publicly offered or listed on any stock exchange in South Africa.  The

offer is intended to be private pursuant to Section 96 of the Companies Act and is not subject to the supervision of any South African governmental authority. Pursuant to Section 96 of the Companies Act, the Options offer must be finalized on or before the 60th day following the grant date.  If you do not want to accept the Options, you are required to decline the Options no later than the 60th day following the grant date.  If you do not reject the Options on or before the 60th day following the grant date, you will be deemed to accept the Options.

## SOUTH KOREA

No country specific provisions.

## SPAIN

1.      <u>Acknowledgement of Discretionary Nature of the 2011 Plan; No Vested Rights</u>. In accepting the Options, you acknowledge that you consent to participation in the 2011 Plan and have received a copy of the 2011 Plan. You understand that the Company has unilaterally, gratuitously and in its sole discretion granted Options under the 2011 Plan to individuals who may be employees of the Company or its Subsidiaries throughout the world. The decision is a limited decision that is entered into upon the express assumption and condition that any grant will not economically or otherwise bind the Company or any of its Subsidiaries on an ongoing basis. Consequently, you understand that the Options are granted on the assumption and condition that the Options and the Shares acquired upon exercise of the Options shall not become a part of any employment contract (either with the Company or any of its Subsidiaries) and shall not be considered a mandatory benefit, salary for any purposes (including severance compensation) or any other right whatsoever. In addition, you understand that this grant would not be made to you but for the assumptions and conditions referenced above. Thus, you acknowledge and freely accept that should any or all of the assumptions be mistaken or should any of the conditions not be met for any reason, the Options shall be null and void.

You understand and agree that, as a condition of the grant of the Options, any unvested Options as of the date you cease active employment and any vested portion of the Options not exercised within the post-termination exercise period set out in the Terms and Conditions will be forfeited without entitlement to the underlying Shares or to any amount of indemnification in the event of the termination of employment by reason of, but not limited to, (i) material modification of the terms of employment under Article 41 of the Workers' Statute or (ii) relocation under Article 40 of the Workers' Statute. You acknowledge that you have read and specifically accept the conditions referred to in the Terms and Conditions regarding the impact of a termination of employment on your Options.

**BY SIGNING BELOW, YOU ACKNOWLEDGE, UNDERSTAND AND AGREE TO THE PROVISIONS OF THE 2011 PLAN, THE TERMS AND CONDITIONS AND THIS ADDENDUM.**

**PLEASE SIGN AND RETURN THIS ADDENDUM VIA EMAIL NO LATER THAN APRIL 29, 2022 TO STOCKPLANADMINISTRATION@STRYKER.COM.**


_____ _____
Employee Signature        Employee Name (Printed)


_____
Date

## SWEDEN

1.      <u>Exercise by Cash Payment Only</u>. Notwithstanding anything in Section 4 of the Terms and Conditions to the contrary, if you are a local national of Sweden, you may exercise the Options only by means of a cash payment or such other methods as may be permitted under the 2011 Plan and allowed under local law.

Exhibit 10(i)

2.    <u>Withholding of Tax-Related Items</u>. Notwithstanding anything in the Terms and Conditions to the contrary, if you are a local national of Sweden, any Tax-Related Items shall be withheld only in cash from your regular salary/wages or other amounts payable to you in cash, or such other withholding methods as may be permitted under the 2011 Plan and allowed under local law. Additionally, the Company and/or the Employer may withhold Tax-Related Items from salary in an amount up to the statutory maximum withholding limitations, however, the Company and/or your Employer will not withhold amounts in excess of your statutory maximum withholding limitations.

## SWITZERLAND

1.    <u>Securities Law Information</u>. Neither this document nor any other materials relating to the Options (a) constitutes a prospectus according to articles 35 et seq. of the Swiss Federal Act on Financial Services ("FinSA") (b) may be publicly distributed or otherwise made publicly available in Switzerland to any person other than an employee of the Company or (c) has been or will be filed with, approved or supervised by any Swiss reviewing body according to article 51 FinSA or any Swiss regulatory authority, including the Swiss Financial Market Supervisory Authority ("FINMA").

## TAIWAN

1.    <u>Securities Law Notice</u>. The offer of participation in the 2011 Plan is available only for employees of the Company and its Subsidiaries. The offer of participation in the 2011 Plan is not a public offer of securities by a Taiwanese company.

## TURKEY

1.    <u>Securities Law Information</u>. Under Turkish law, you are not permitted to sell any Shares acquired under the 2011 Plan within Turkey. The Shares are currently traded on the New York Stock Exchange, which is located outside of Turkey, under the ticker symbol "SYK" and the Shares may be sold through this exchange.

2.    <u>Financial Intermediary Obligation</u>. You acknowledge that any activity related to investments in foreign securities (e.g., the sale of Shares) should be conducted through a bank or financial intermediary institution licensed by the Turkey Capital Markets Board and should be reported to the Turkish Capital Markets Board. You solely are responsible for complying with this requirement and should consult with a personal legal advisor for further information regarding any obligations in this respect.

## UNITED ARAB EMIRATES

1.    <u>Securities Law Information</u>. The offer of the Options is available only for select Employees of the Company and its Subsidiaries and is in the nature of providing incentives in the United Arab Emirates. The 2011 Plan and the Terms and Conditions are intended for distribution only to such individuals and must not be delivered to, or relied on by any other person. Prospective purchasers of securities should conduct their own due diligence.

The Emirates Securities and Commodities Authority has no responsibility for reviewing or verifying any documents in connection with this statement, including the 2011 Plan and the Terms and Conditions, or any other incidental communication materials distributed in connection with the Options. Further, neither the Ministry of Economy nor the Dubai Department of Economic Development has approved this statement nor taken steps to verify the information set out in it, and has no responsibility for it. Residents of the United Arab Emirates who have any questions regarding the contents of the 2011 Plan and the Terms and Conditions should obtain independent advice.

**UNITED KINGDOM**

1.   <u>No Exercise by Using Existing Shares</u>. Notwithstanding anything in Section 4 of the Terms and Conditions to the contrary, if you are resident in the United Kingdom, you shall not be permitted to use existing Shares for exercising the Options and paying the Exercise Price.

2.   <u>Income Tax and Social Insurance Contribution Withholding</u>. The following provision shall supplement Section 7 of the Terms and Conditions:

Without limitation to Section 7 of the Terms and Conditions, you agree that you are liable for all Tax-Related Items and hereby covenant to pay all such Tax-Related Items, as and when requested by the Company, your Employer or by Her Majesty's Revenue and Customs ("HMRC") (or any other tax authority or any other relevant authority). You also agree to indemnify and keep indemnified the Company and your Employer against any Tax-Related Items that they are required to pay or withhold or have paid or will pay to HMRC on your behalf (or any other tax authority or any other relevant authority).

3.   <u>Exclusion of Claim</u>. You acknowledge and agree that you will have no entitlement to compensation or damages in consequence of the termination of your employment with the Company and the Subsidiary that employs you for any reason whatsoever and whether or not in breach of contract, insofar as any purported claim to such entitlement arises or may arise from your ceasing to have rights under or to be entitled to exercise the Options as a result of such termination of employment (whether the termination is in breach of contract or otherwise), or from the loss or diminution in value of the Options. Upon the grant of the Options, you shall be deemed irrevocably to have waived any such entitlement.

****************************

Exhibit 10(ii)



## **Kevin** A. Lobo

Chair and CEO
2825 Airview Boulevard
Kalamazoo MI 49002 USA
P 269 389 7353
www.stryker.com

Personal and confidential

February 2, 2022

First Name Last Name

Dear First Name:

I am pleased to inform you that you are one of a select group of individuals receiving a restricted stock units (RSUs) award in 2022. We use these awards to reward performers who we believe will be key contributors to our growth well into the future. The total Award Date Value (ADV) of your award is approximately USD $xx,xxx.

We are awarding you xxx RSUs with respect to Common Stock of Stryker Corporation. Except as otherwise provided in the Terms and Conditions, one-third of these RSUs will vest on March 21 of each of the three years beginning March 21, 2023.

**You must "Accept" the award online via the UBS One Source web site located at www.ubs.com/onesource/SYK between March 1 and March 31, 2022.** The detailed terms of the RSUs are in the Terms and Conditions, any applicable country addendum and the provisions of the Company's 2011 Long-Term Incentive Plan. Those documents, together with the related Prospectus, are available on the UBS One Source web site, and you should read them before accepting the award. In addition, you may be asked to sign the most recent version of Stryker's Confidentiality, Intellectual Property, Non-Competition and Non-Solicitation Agreement ("Non-Compete Agreement") in connection with the award. If you are asked to sign the Non-Compete Agreement, it will be emailed to you and you will be asked to sign the document electronically via Adobe Sign by March 31, 2022. The vesting of the RSUs is conditioned on you having signed the Non-Compete Agreement by March 31, 2022, where permitted by applicable law.

You can find additional educational materials on the UBS One Source web site in the Resources section, including the RSU brochure and RSU Tax Questions & Answers.

We are committed to growing talent and want our people to experience rewarding careers at Stryker. Your valuable contributions helped us deliver strong results during a challenging year and I look forward to our continued business growth and success.

Sincerely,

Kevin A. Lobo
Chair and CEO

Exhibit 10(ii)

**STRYKER CORPORATION**

**TERMS AND CONDITIONS**
**RELATING TO RESTRICTED STOCK UNITS GRANTED**
**PURSUANT TO THE 2011 LONG-TERM INCENTIVE PLAN, AS AMENDED AND**
**RESTATED**

1.    The Restricted Stock Units ("RSUs") with respect to Common Stock of Stryker Corporation (the "Company") granted to you during 2022 are subject to these Terms and Conditions Relating to Restricted Stock Units Granted Pursuant to the 2011 Long-Term Incentive Plan, as Amended and Restated (the "Terms and Conditions") and all of the terms and conditions of the Stryker Corporation 2011 Long-Term Incentive Plan, as Amended and Restated (the "2011 Plan"), which is incorporated herein by reference. In the case of a conflict between these Terms and Conditions and the terms of the 2011 Plan, the provisions of the 2011 Plan will govern. Capitalized terms used but not defined herein have the meaning provided therefor in the 2011 Plan. For purposes of these Terms and Conditions, "Employer" means the Company or any Subsidiary that employs you on the applicable date, and "Stock Plan Administrator" means UBS Financial Services Inc. (or any other independent service provider engaged by the Company to assist with the implementation, operation and administration of the 2011 Plan).

2.   Your right to receive the Shares issuable pursuant to the RSUs shall be only as follows:

(a)    If you continue to be an Employee, you will receive the Shares underlying the RSUs that have become vested as soon as administratively possible following the vesting date as set forth in the award letter.

(b)    If you cease to be an Employee by reason of Disability (as such term is defined in the 2011 Plan or determined under local law) or death prior to the date that your RSUs become fully vested, you or your estate will become fully vested in your RSUs, and you, your legal representative or your estate will receive all of the underlying Shares as soon as administratively practicable following your termination by Disability or death.

(c)    If you cease to be an Employee by reason of Retirement (as such term is defined in the 2011 Plan or determined under local law) prior to the date that your RSUs become fully vested, you (or your estate in the event of your death after your termination by Retirement) will continue to vest in your RSUs in accordance with the vesting schedule as set forth in the award letter as if you had continued your employment with your Employer.

(d)    If you cease to be an Employee prior to the date that your RSUs become fully vested for any reason other than those provided in (b) or (c) above, you shall cease vesting in your RSUs effective as of your Termination Date. If you are a resident of or employed in the United States, "Termination Date" shall mean the effective date of termination of your employment with your Employer. If you are resident or employed outside of the United States, "Termination Date" shall mean the earliest of (i) the date on which notice of termination is provided to you, (ii) the last day of your active service with your Employer, or (iii) the last day on which you are an Employee of your Employer, as determined in each case without including any required advance notice period and irrespective of the status of the termination under local labor or employment laws.

(e)    Notwithstanding the foregoing, the Company may, in its sole discretion, settle your RSUs in the form of: (i) a cash payment to the extent settlement in Shares (1) is prohibited under local law, (2) would require you, the Company and/or your Employer to obtain the approval of any governmental and/or regulatory body in your country of residence (and country of employment, if different), or (3) is administratively burdensome; or (ii) Shares, but require you to immediately sell such Shares (in which case, the Company shall have the authority to issue sales instructions in relation to such Shares on your behalf).

3.    The number of Shares subject to the RSUs shall be subject to adjustment and the vesting dates hereof may be accelerated as follows:

(a)    In the event that the Shares, as presently constituted, shall be changed into or exchanged for a different number or kind of shares of stock or other securities of the Company or of another corporation (whether by reason of merger, consolidation, recapitalization, reclassification, split-up, combination of shares, or otherwise) or if the number of such Shares shall be increased through the payment of a stock dividend or a dividend on the Shares of rights or warrants to purchase securities of the Company shall be made, then there shall be substituted for or added to each Share theretofore subject to the RSUs the number and kind of shares of stock or other securities into which each outstanding Share shall be so changed, or for which each such Share shall be exchanged, or to which each such Share shall be entitled. The other terms of the RSUs shall also be appropriately amended as may be necessary to reflect the foregoing events. In the event there shall be any other change in the number or kind of the outstanding Shares, or of any stock or other securities into which such Shares shall have been exchanged, then if the Committee shall, in its sole discretion, determine that such change equitably requires an adjustment in the RSUs, such adjustment shall be made in accordance with such determination.

(b)    Fractional Shares resulting from any adjustment in the RSUs may be settled in cash or otherwise as the Committee shall determine, in its sole discretion. Notice of any adjustment will be given to you and such adjustment (whether or not such notice is given) shall be effective and binding for all purposes hereof.

(c)    The Committee shall have the power to amend the RSUs to permit the immediate vesting of the RSUs (and to terminate any unvested RSUs) and the distribution of the underlying Shares prior to the effectiveness of (i) any disposition of substantially all of the assets of the Company or your Employer, (ii) the shutdown, discontinuance of operations or dissolution of the Company or your Employer, or (iii) the merger or consolidation of the Company or your Employer with or into any other unrelated corporation.

4.    If you are resident and/or employed outside of the United States, you agree, as a condition of the grant of the RSUs, to repatriate all payments attributable to the Shares and/or cash acquired under the 2011 Plan (including, but not limited to, dividends, dividend equivalents and any proceeds derived from the sale of the Shares acquired pursuant to the RSUs) if required by and in accordance with local foreign exchange rules and regulations in your country of residence (and country of employment, if different). In addition, you also agree to take any and all actions, and consent to any and all actions taken by the Company and its Subsidiaries, as may be required to allow the Company and its Subsidiaries to comply with local laws, rules and regulations in your country of residence (and country of employment, if different). Finally, you agree to take any and all actions as may be required to comply with your personal legal and tax obligations under local laws, rules and regulations in your country of residence (and country of employment, if different).

5.    If you are resident and/or employed in a country that is a member of the European Union, the grant of the RSUs and these Terms and Conditions are intended to comply with the age discrimination provisions of the EU Equal Treatment Framework Directive, as implemented into local law (the "Age Discrimination Rules"). To the extent that a court or tribunal of competent jurisdiction determines that any provision of these Terms and Conditions is invalid or unenforceable, in whole or in part, under the Age Discrimination Rules, the Company, in its sole discretion, shall have the power and authority to revise or strike such provision to the minimum extent necessary to make it valid and enforceable to the full extent permitted under local law.

6.    Regardless of any action the Company and/or your Employer take with respect to any or all income tax (including U.S. federal, state and local taxes and/or non-U.S. taxes), social insurance, payroll tax, payment on account or other tax-related withholding ("Tax-Related Items"), you acknowledge that the ultimate liability for all Tax-Related Items legally due by you is and remains your responsibility and that the Company and your Employer (i) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the RSUs, including the grant of the RSUs, the vesting of the RSUs, the subsequent sale of any Shares acquired pursuant to

the RSUs and the receipt of any dividends or dividend equivalents and (ii) do not commit to structure the terms of the grant or any aspect of the RSUs to reduce or eliminate your liability for Tax-Related Items. Further, if you become subject to taxation in more than one country between the grant date and the date of any relevant taxable or tax withholding event, as applicable, you acknowledge that your Employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one country.

Prior to any taxable event, if your country of residence (and/or your country of employment, if different) requires withholding of Tax-Related Items, the Company shall withhold a number of whole Shares that have an aggregate Fair Market Value that the Company, taking into account local requirements and administrative issues, determines in its sole discretion is appropriate to cover withholding for Tax-Related Items with respect to the Shares. The cash equivalent of the Shares withheld will be used to settle the obligation to withhold the Tax-Related Items. In cases where the Fair Market Value of the number of whole Shares withheld is greater than the amount required to be paid to the relevant government authorities with respect to withholding for Tax-Related Items, the Company shall make a cash payment to you equal to the difference as soon as administratively practicable. In the event that withholding in Shares is prohibited or problematic under applicable law or otherwise may trigger adverse consequences to the Company or your Employer, your Employer shall withhold the Tax-Related Items required to be withheld with respect to the Shares in cash from your regular salary and/or wages or other amounts payable to you. In the event the withholding requirements are not satisfied through the withholding of Shares or through your regular salary and/or wages or any other amounts payable to you by your Employer, no Shares will be issued to you (or your estate) unless and until satisfactory arrangements (as determined by the Board of Directors) have been made by you with respect to the payment of any Tax-Related Items that the Company or your Employer determines, in its sole discretion, should be withheld or collected with respect to such RSUs. By accepting these RSUs, you expressly consent to the withholding of Shares and/or withholding from your regular salary and/or wages or other amounts payable to you as provided for hereunder. All other Tax-Related Items related to the RSUs and any Shares delivered in payment thereof are your sole responsibility.

7.    The RSUs are intended to be exempt from the requirements of Code Section 409A. The 2011 Plan and these Terms and Conditions shall be administered and interpreted in a manner consistent with this intent. If the Company determines that these Terms and Conditions are subject to Code Section 409A and that it has failed to comply with the requirements of that Section, the Company may, at the Company's sole discretion and without your consent, amend these Terms and Conditions to cause them to comply with Code Section 409A or be exempt from Code Section 409A.

8.    If you were required to sign the "Stryker Confidentiality, Intellectual Property, Non-Competition and Non-Solicitation Agreement" or a similar agreement in order to receive the RSUs or have previously signed such an agreement and you breach any non-competition, non-solicitation or non-disclosure provision or provision as to ownership of inventions contained therein at any time while employed by the Company or a Subsidiary, or during the one-year period following termination of employment, any unvested RSUs shall be rescinded and you shall return to the Company all Shares that were acquired upon vesting of the RSUs that you have not disposed of. Further, you shall pay to the Company an amount equal to the profit realized by you (if any) on all Shares that were acquired upon vesting of the RSUs that you have disposed of. For purposes of the preceding sentence, the profit shall be the Fair Market Value of the Shares at the time of disposition.

9.    The RSUs shall be transferable only by will or the laws of descent and distribution. If you purport to make any transfer of the RSUs, except as aforesaid, the RSUs and all rights thereunder shall terminate immediately.

10.    The RSUs shall not be vested in whole or in part, and the Company shall not be obligated to issue any Shares subject to the RSUs, if such issuance would, in the opinion of counsel for the Company, violate the Securities Act of 1933 or any other U.S. federal, state or non-U.S. statute having similar requirements as it may be in effect at the time. The RSUs are subject to the further requirement that, if at any time the Board of Directors shall determine in its discretion that the listing or qualification of the Shares subject to the RSUs under any securities exchange requirements or under

any applicable law, or the consent or approval of any governmental regulatory body, is necessary or desirable as a condition of or in connection with the issuance of Shares pursuant to the RSUs, the RSUs may not be vested in whole or in part unless such listing, qualification, consent or approval shall have been effected or obtained free of any conditions not acceptable to the Board of Directors.

11.    The grant of the RSUs shall not confer upon you any right to continue in the employ of your Employer nor limit in any way the right of your Employer to terminate your employment at any time. You shall have no rights as a shareholder of the Company with respect to any Shares issuable upon the vesting of the RSUs until the date of issuance of such Shares.

12.    You acknowledge and agree that the 2011 Plan is discretionary in nature and may be amended, cancelled, or terminated by the Company, in its sole discretion, at any time. The grant of the RSUs under the 2011 Plan is a one-time benefit and does not create any contractual or other right to receive a grant of RSUs or any other award under the 2011 Plan or other benefits in lieu thereof in the future. Future grants, if any, will be at the sole discretion of the Company, including, but not limited to, the form and timing of any grant, the number of Shares subject to the grant, and the vesting provisions. Any amendment, modification or termination of the 2011 Plan shall not constitute a change or impairment of the terms and conditions of your employment with your Employer.

13.    Your participation in the 2011 Plan is voluntary. The value of the RSUs and any other awards granted under the 2011 Plan is an extraordinary item of compensation outside the scope of your employment (and your employment contract, if any). Any grant under the 2011 Plan, including the grant of the RSUs, is not part of normal or expected compensation for purposes of calculating any severance, resignation, redundancy, end of service payments, bonuses, long-service awards, pension, or retirement benefits or similar payments.

14.    These Terms and Conditions shall bind and inure to the benefit of the Company, its successors and assigns and you and your estate in the event of your death.

15.    The Company is located at 2825 Airview Boulevard Kalamazoo, Michigan 49002, U.S.A. and grants RSUs under the 2011 Plan to employees of the Company and Subsidiaries in its sole discretion. In conjunction with the Company's grant of the RSUs under the 2011 Plan and its ongoing administration of such awards, the Company is providing the following information about its data collection, processing and transfer practices ("Personal Data Activities"). In accepting the grant of the RSUs, you expressly and explicitly consent to the Personal Data Activities as described herein.

(a)    The Company collects, processes and uses your personal data, including your name, home address, email address, and telephone number, date of birth, social insurance number or other identification number, salary, citizenship, job title, any Shares or directorships held in the Company, and details of all RSUs or any other equity compensation awards granted, canceled, exercised, vested, or outstanding in your favor, which the Company receives from you or your Employer. In granting the RSUs under the Plan, the Company will collect your personal data for purposes of allocating Shares and implementing, administering and managing the 2011 Plan. The Company's legal basis for the collection, processing and usage of your personal data is your consent.

(b)    The Company transfers your personal data to the Stock Plan Administrator. In the future, the Company may select a different Stock Plan Administrator and share your personal data with another company that serves in a similar manner. The Stock Plan Administrator will open an account for you, if an account is not already in place, to receive and trade Shares acquired under the 2011 Plan You will be asked to agree on separate terms and data processing practices with the Stock Plan Administrator, which is a condition to your ability to participate in the 2011 Plan.

(c)    The Company and the Stock Plan Administrator are based in the United States. You should note that your country of residence may have enacted data privacy laws that are different from the United States. The Company's legal basis for the transfer of your personal data to the United States is your consent.

(d)     Your participation in the 2011 Plan and your grant of consent is purely voluntary. You may deny or withdraw your consent at any time. If you do not consent, or if you withdraw your consent, you may be unable to participate in the 2011 Plan. This would not affect your existing employment or salary; instead, you merely may forfeit the opportunities associated with the 2011 Plan.

(e)     You may have a number of rights under the data privacy laws in your country of residence. For example, your rights may include the right to (i) request access or copies of personal data the Company processes, (ii) request rectification of incorrect data, (iii) request deletion of data, (iv) place restrictions on processing, (v) lodge complaints with competent authorities in your country or residence, and/or (vi) request a list with the names and addresses of any potential recipients of your personal data. To receive clarification regarding your rights or to exercise your rights, you should contact your local HR manager or the Company's Human Resources Department.

16.     The grant of the RSUs is not intended to be a public offering of securities in your country of residence (and country of employment, if different). The Company has not submitted any registration statement, prospectus or other filing(s) with the local securities authorities (unless otherwise required under local law). **No employee of the Company is permitted to advise you on whether you should acquire Shares under the 2011 Plan or provide you with any legal, tax or financial advice with respect to the grant of the RSUs. The acquisition of Shares involves certain risks, and you should carefully consider all risk factors and tax considerations relevant to the acquisition of Shares under the 2011 Plan or the disposition of them. Further, you should carefully review all of the materials related to the RSUs and the 2011 Plan, and you should consult with your personal legal, tax and financial advisors for professional advice in relation to your personal circumstances.**

17.     All questions concerning the construction, validity and interpretation of the RSUs and the 2011 Plan shall be governed and construed according to the laws of the state of Michigan, without regard to the application of the conflicts of laws provisions thereof. Any disputes regarding the RSUs or the 2011 Plan shall be brought only in the state or federal courts of the state of Michigan.

18.     The Company may, in its sole discretion, decide to deliver any documents related to the RSUs or other awards granted to you under the 2011 Plan by electronic means. You hereby consent to receive such documents by electronic delivery and agree to participate in the 2011 Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

19.     The invalidity or unenforceability of any provision of the 2011 Plan or these Terms and Conditions shall not affect the validity or enforceability of any other provision of the 2011 Plan or these Terms and Conditions.

20.     If you are resident outside of the United States, you acknowledge and agree that it is your express intent that these Terms and Conditions, the 2011 Plan and all other documents, notices and legal proceedings entered into, given or instituted pursuant to the RSUs be drawn up in English. If you have received these Terms and Conditions, the 2011 Plan or any other documents related to the RSUs translated into a language other than English and the meaning of the translated version is different than the English version, the English version will control.

21.     You acknowledge that, depending on your or your broker's country of residence or where the Shares are listed, you may be subject to insider trading restrictions and/or market abuse laws which may affect your ability to accept, acquire, sell or otherwise dispose of Shares, rights to Shares (e.g., RSUs) or rights linked to the value of Shares during such times you are considered to have "inside information" regarding the Company as defined in the laws or regulations in your country of employment (and country of residence, if different).  Local insider trading laws and regulations may prohibit the cancellation or amendment of orders you placed before you possessed inside information.  Furthermore, you could be prohibited from (i) disclosing the inside information to any third party (other than on a "need to know" basis) and (ii) "tipping" third parties or causing them otherwise to buy or sell securities.  Third parties include fellow employees.  Any restrictions under these laws or regulations are separate from and in addition to any restrictions that may be imposed under any

applicable Company insider trading policy.  You acknowledge that it is your responsibility to comply with any restrictions and are advised to speak to your personal advisor on this matter.

22.    Notwithstanding any provisions of these Terms and Conditions to the contrary, the RSUs shall be subject to any special terms and conditions for your country of residence (and country of employment, if different) set forth in an addendum to these Terms and Conditions (an "Addendum"). Further, if you transfer your residence and/or employment to another country reflected in an Addendum to these Terms and Conditions at the time of transfer, the special terms and conditions for such country will apply to you to the extent the Company determines, in its sole discretion, that the application of such special terms and conditions is necessary or advisable in order to comply with local law, rules and regulations, or to facilitate the operation and administration of the award and the 2011 Plan (or the Company may establish alternative terms and conditions as may be necessary or advisable to accommodate your transfer). In all circumstances, any applicable Addendum shall constitute part of these Terms and Conditions.

23.    The Company reserves the right to impose other requirements on the RSUs, any Shares acquired pursuant to the RSUs and your participation in the 2011 Plan to the extent the Company determines, in its sole discretion, that such other requirements are necessary or advisable in order to comply with local law, rules and regulations, or to facilitate the operation and administration of the award and the 2011 Plan. Such requirements may include (but are not limited to) requiring you to sign any agreements or undertakings that may be necessary to accomplish the foregoing.

24.    **This Section 24 applies only to those persons whom the Company's Recoupment Policy applies (the corporate officers elected by the Company's Board of Directors other than Assistant Controllers, Assistant Secretaries and Assistant Treasurers).** Notwithstanding any other provision of these Terms and Conditions to the contrary, you acknowledge and agree that your RSUs, any Shares acquired pursuant thereto and/or any amount received with respect to any sale of such Shares are subject to potential cancellation, recoupment, rescission, payback or other action in accordance with the terms of the Company's Recoupment Policy as in effect on the date of grant (a copy of which has been furnished to you) and as the Recoupment Policy may be amended from time to time in order to comply with changes in laws, rules or regulations that are applicable to such RSUs and Shares. You agree and consent to the Company's application, implementation and enforcement of (a) the Recoupment Policy and (b) any provision of applicable law relating to cancellation, recoupment, rescission or payback of compensation and expressly agree that the Company may take such actions as are necessary to effectuate the Recoupment Policy (as applicable to you) or applicable law without further consent or action being required by you. For purposes of the foregoing, you expressly and explicitly authorize the Company to issue instructions, on your behalf, to any brokerage firm and/or third party administrator engaged by the Company to hold your Shares and other amounts acquired under the 2011 Plan to re-convey, transfer or otherwise return such Shares and/or other amounts to the Company. In the case of a conflict between these Terms and Conditions and the Recoupment Policy, the terms of the Recoupment Policy shall prevail.

25.    **By accepting the grant of the RSUs, you acknowledge that you have read these Terms and Conditions, the Addendum to these Terms and Conditions (as applicable) and the 2011 Plan and specifically accept and agree to the provisions therein.**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**STRYKER CORPORATION**

**ADDENDUM TO**
**TERMS AND CONDITIONS**
**RELATING TO RESTRICTED STOCK UNITS GRANTED**
**PURSUANT TO THE 2011 PLAN, AS AMENDED AND RESTATED**

In addition to the terms of the 2011 Plan and the Terms and Conditions, the RSUs are subject to the following additional terms and conditions (the "Addendum"). All capitalized terms as contained in this Addendum shall have the same meaning as set forth in the 2011 Plan and the Terms and Conditions. Pursuant to Section 22 of the Terms and Conditions, if you transfer your residence and/or employment to another country reflected in an Addendum at the time of transfer, the special terms and conditions for such country will apply to you to the extent the Company determines, in its sole discretion, that the application of such terms and conditions is necessary or advisable in order to comply with local law, rules and regulations, or to facilitate the operation and administration of the award and the 2011 Plan (or the Company may establish alternative terms and conditions as may be necessary or advisable to accommodate your transfer).

**Data Privacy Information: European Union ("EU") / European Economic Area ("EEA") / Switzerland and the United Kingdom***

***The below information is for data privacy purposes only and you should determine whether any other special terms and conditions apply to your awards in these jurisdictions.**

1.  Data Privacy. If you reside and/or you are employed in the EU / EEA, Switzerland or the United Kingdom the following provision replaces Section 15 of the Terms and Conditions:

The Company is located at 2825 Airview Boulevard Kalamazoo, Michigan 49002, U.S.A. and grants RSUs under the 2011 Plan to employees of the Company and its Subsidiaries in its sole discretion. You should review the following information about the Company's data processing practices.

(a)  Data Collection, Processing and Usage. Pursuant to applicable data protection laws, you are hereby notified that the Company collects, processes and uses certain personally-identifiable information about you for the legitimate interest of implementing, administering and managing the 2011 Plan and generally administering equity awards; specifically, including your name, home address, email address and telephone number, date of birth, social insurance number or other identification number, salary, citizenship, job title, any Shares or directorships held in the Company, and details of all options or any other awards granted, canceled, exercised, vested, or outstanding in your favor, which the Company receives from you or your Employer. In granting the RSUs under the 2011 Plan, the Company will collect your personal data for purposes of allocating Shares and implementing, administering and managing the 2011 Plan. The Company's collection, processing, use and transfer of your personal data is necessary for the performance of the Company's contractual obligations under the Plan and pursuant to the Company's legitimate interest of managing and generally administering employee equity awards. Your refusal to provide personal data would make it impossible for the Company to perform its contractual obligations and may affect your ability to participate in the 2011 Plan. As such, by participating in the 2011 Plan, you voluntarily acknowledge the collection, processing and use of your personal data as described herein.

(b)  Stock Plan Administration Service Provider. The Company transfers participant data to the Stock Plan Administrator. In the future, the Company may select a different Stock Plan Administrator and share your data with another company that serves in a similar manner. The Stock Plan Administrator will open an account for you, if an account is not already in place, to receive and trade Shares acquired under the 2011 Plan. You will be asked to agree on separate terms and data processing practices with the Stock Plan Administrator, which is a condition to your ability to participate in the 2011 Plan.

(c)  <u>International Data Transfers</u>. The Company and the Stock Plan Administrator are based in the United States. The Company can only meet its contractual obligations to you if your personal data is transferred to the United States. The Company's legal basis for the transfer of your personal data to the United States is to satisfy its contractual obligations to you and/or its use of the standard data protection clauses adopted by the EU Commission.

(d)  <u>Data Retention</u>. The Company will use your personal data only as long as is necessary to implement, administer and manage your participation in the 2011 Plan or as required to comply with legal or regulatory obligations, including under tax and security laws. When the Company no longer needs your personal data, the Company will remove it from its systems. If the Company keeps your data longer, it would be to satisfy legal or regulatory obligations and the Company's legal basis would be for compliance with relevant laws or regulations.

(e)  <u>Data Subject Rights</u>. You may have a number of rights under data privacy laws in your country of residence. For example, your rights may include the right to (i) request access or copies of personal data the Company processes, (ii) request rectification of incorrect data, (iii) request deletion of data, (iv) place restrictions on processing, (v) lodge complaints with competent authorities in your country of residence, and/or (vi) request a list with the names and addresses of any potential recipients of the Participant's personal data. To receive clarification regarding your rights or to exercise your rights, you should contact your local HR manager or the Company's Human Resources Department.

## ARGENTINA

1.  <u>Securities Law Information</u>. Neither the grant of the RSUs, nor the issuance of Shares subject to the RSUs, constitutes a public offering in Argentina. The grant of RSUs pursuant to the 2011 Plan is a private placement and is not subject to any filing or disclosure requirements in Argentina.

## AUSTRALIA

1.  <u>RSUs Conditioned on Satisfaction of Regulatory Obligations</u>. If you are (a) a director of a Subsidiary incorporated in Australia, or (b) a person who is a management-level executive of a Subsidiary incorporated in Australia and who also is a director of a Subsidiary incorporated outside of the Australia, the grant of the RSUs is conditioned upon satisfaction of the shareholder approval provisions of section 200B of the Corporations Act 2001 (Cth) in Australia.

The Australian Offer document can be accessed here [UBS INSERT LINK HERE]

## AUSTRIA

No country specific provisions.

## BELGIUM

No country specific provisions.

## BRAZIL

1.  <u>Labor Law Acknowledgment</u>. By accepting the RSUs, you acknowledge and agree, for all legal purposes, that (a) the benefits provided under the Terms and Conditions and the 2011 Plan are the result of commercial transactions unrelated to your employment; (b) the Terms and Conditions and the 2011 Plan are not a part of the terms and conditions of your employment; and (c) the income from the RSUs, if any, is not part of your remuneration from employment.

2.  <u>Compliance with Law</u>. By accepting the RSUs, you acknowledge and agree to comply with applicable Brazilian laws and to pay any and all applicable taxes associated with the vesting of the RSUs, the issuance and/or sale of Shares acquired under the 2011 Plan and the receipt of any dividends.

**CANADA**

1.  Settlement in Shares. Notwithstanding anything to the contrary in the Terms and Conditions or the 2011 Plan, the RSUs shall be settled only in Shares (and may not be settled in cash).

2.  Termination of Employment. The following supplements Section 2(b) of the Terms and Conditions as well as any other section required to give effect to the same:

In the event of your termination of employment for any reason (other than by reason of death, Disability or Retirement), either by you or by the Employer, with or without cause, your rights to vest or to continue to vest in the RSUs and receive Shares under the 2011 Plan, if any, will terminate as of the actual Termination Date. For this purpose, the "Termination Date" shall mean the last day on which you are actively employed by the Employer, and shall not include or be extended by any period following such day during which you are in receipt of or eligible to receive any notice of termination, pay in lieu of notice of termination, severance pay or any other payments or damages, whether arising under statute, contract or at common law.

Notwithstanding the foregoing, if applicable employment standards legislation explicitly requires continued entitlement to vesting during a statutory notice period, your right to vest in the RSUs under the 2011 Plan, if any, will terminate effective as of the last day of your minimum statutory notice period, but you will not earn or be entitled to pro-rated vesting if the vesting date falls after the end of your statutory notice period, nor will you be entitled to any compensation for lost vesting.

3.  Use of English Language.  If you are a resident of Quebec, by accepting your RSUs, you acknowledge and agree that it is your wish that the Terms and Conditions, this Addendum, as well as all other documents, notices and legal proceedings entered into, given or instituted pursuant to your RSUs, either directly or indirectly, be drawn up in English.

**Langue anglaise. En acceptant l'allocation de vos RSUs, vous reconnaissez et acceptez avoir souhaité que le Termes et Conditions, le présent avenant, ainsi que tous autres documents exécutés, avis donnés et procédures judiciaires intentées, relatifs, directement ou indirectement, à l'allocation de vos RSUs, soient rédigés en anglais.**

**BY SIGNING BELOW, YOU ACKNOWLEDGE, UNDERSTAND AND AGREE TO THE PROVISIONS OF THE 2011 PLAN, THE TERMS AND CONDITIONS AND THIS ADDENDUM.**

**PLEASE SIGN AND RETURN THIS ADDENDUM VIA EMAIL NO LATER THAN APRIL 29, 2022 TO STOCKPLANADMINISTRATION@STRYKER.COM.**

_____   _____
Employee Signature               Employee Name (Printed)

_____
Date

**CHILE**

1.  Private Placement. The following provision shall replace Section 16 of the Terms and Conditions:

The grant of the RSUs hereunder is not intended to be a public offering of securities in Chile but instead is intended to be a private placement.

a)  The starting date of the offer will be the grant date, and this offer conforms to General Ruling no. 336 of the Chilean Commission for the Financial Markets ("CMF");

b) The offer deals with securities not registered in the registry of securities or in the registry of foreign securities of the CMF, and therefore such securities are not subject to its oversight;

c) The Company, as the issuer, is not obligated to provide public information in Chile regarding the foreign securities, as such securities are not registered with the CMF; and

d) The Shares, as foreign securities, shall not be subject to public offering as long as they are not registered with the corresponding registry of securities in Chile.

a) La fecha de inicio de la oferta será el de la fecha de otorgamiento y esta oferta se acoge a la norma de Carácter General n° 336 de la *Comisión para el Mercado Financiero Chilena ("CMF")*;

b) La oferta versa sobre valores no inscritos en el registro de valores o en el registro de valores extranjeros que lleva la CMF, por lo que tales valores no están sujetos a la fiscalización de ésta;

c) Por tratar de valores no inscritos no existe la obligación por parte del emisor de entregar en chile información pública respecto de esos valores; y

d) Esos valores no podrán ser objeto de oferta pública mientras no sean inscritos en el registro de valores correspondiente.

## CHINA

1. <u>RSUs Conditioned on Satisfaction of Regulatory Obligations</u>. If you are a People's Republic of China ("PRC") national, the grant of the RSUs is conditioned upon the Company securing all necessary approvals from the PRC State Administration of Foreign Exchange to permit the operation of the 2011 Plan and the participation of PRC nationals employed by your Employer, as determined by the Company in its sole discretion.

2. <u>Sale of Shares</u>. Notwithstanding anything to the contrary in the 2011 Plan, upon any termination of employment with your Employer, you shall be required to sell all Shares acquired under the 2011 Plan within such time period as may be established by the PRC State Administration of Foreign Exchange.

3. <u>Exchange Control Restrictions</u>. You acknowledge and agree that you will be required immediately to repatriate to the PRC the proceeds from the sale of any Shares acquired under the 2011 Plan, as well as any other cash amounts attributable to the Shares acquired under the 2011 Plan (collectively, "Cash Proceeds"). Further, you acknowledge and agree that the repatriation of the Cash Proceeds must be effected through a special bank account established by your Employer, the Company or one of its Subsidiaries, and you hereby consent and agree that the Cash Proceeds may be transferred to such account by the Company on your behalf prior to being delivered to you. The Cash Proceeds may be paid to you in U.S. dollars or local currency at the Company's discretion. If the Cash Proceeds are paid to you in U.S. dollars, you understand that a U.S. dollar bank account must be established and maintained in China so that the proceeds may be deposited into such account. Additionally, if the Company changes its Stock Plan Administrator, you acknowledge and agree that the Company may transfer any Shares issued under the 2011 Plan to the new designated Stock Plan Administrator if necessary for legal or administrative reasons. You agree to sign any documentation necessary to facilitate the transfer. If the Cash Proceeds are paid to you in local currency, you acknowledge and agree that the Company is under no obligation to secure any particular exchange conversion rate and that the Company may face delays in converting the Cash Proceeds to local currency due to exchange control restrictions. You agree to bear any currency fluctuation risk between the time the Shares are sold and the Cash Proceeds are converted into local currency and distributed to you. You further agree to comply with any other requirements that may be imposed by your Employer, the Company and its Subsidiaries in the future in order to facilitate compliance with exchange control requirements in the PRC.

**COLOMBIA**

1.  <u>Nature of Grant</u>. In addition to the provisions of Section 13 of the Terms and Conditions you acknowledge that, pursuant to Article 128 of the Colombian Labor Code, the 2011 Plan and related benefits do not constitute a component of your "salary" for any legal purpose. Therefore, they will not be included and/or considered for purposes of calculating any and all labor benefits, such as legal/fringe benefits, vacations, indemnities, payroll taxes, social insurance contributions and/or any other labor-related amount which may be payable.

2.  <u>Securities Law Information</u>. The Shares subject to the RSUs are not and will not be registered in the Colombian registry of publicly traded securities (*Registro Nacional de Valores y Emisores*) and therefore the Shares may not be offered to the public in Colombia. Nothing in this document should be construed as the making of a public offer of securities in Colombia.

**COSTA RICA**

No country specific provisions.

**DENMARK**

1.  <u>Treatment of RSUs upon Termination of Employment</u>. Notwithstanding any provision in the Terms and Conditions or the 2011 Plan to the contrary, unless you are a member of registered management who is not considered a salaried employee, the treatment of the RSUs upon a termination of employment which is not a result of death shall be governed by Sections 4 and 5 of the Danish Act on Stock Option in Employment Relations. However, if the provisions in the Terms and Conditions or the Plan governing the treatment of the RSUs upon a termination of employment are more favorable, then the provisions of the Terms and Conditions or the 2011 Plan will govern.

**FINLAND**

1.  <u>Withholding of Tax-Related Items</u>. Notwithstanding anything in Section 6 of the Terms and Conditions to the contrary, if you are a local national of Finland, any Tax-Related Items shall be withheld only in cash from your regular salary/wages or other amounts payable to you in cash or such other withholding methods as may be permitted under the 2011 Plan and allowed under local law.

**FRANCE**

1.  <u>Use of English Language</u>.  By accepting your RSUs, you acknowledge and agree that it is your wish that the Terms and Conditions, this Addendum, as well as all other documents, notices and legal proceedings entered into, given or instituted pursuant to your RSUs, either directly or indirectly, be drawn up in English.

**Langue anglaise. En acceptant l'allocation de vos RSUs, vous reconnaissez et acceptez avoir souhaité que le Termes et Conditions, le présent avenant, ainsi que tous autres documents exécutés, avis donnés et procédures judiciaires intentées, relatifs, directement ou indirectement, à l'allocation de vos RSUs, soient rédigés en anglais.**

**BY SIGNING BELOW, YOU ACKNOWLEDGE, UNDERSTAND AND AGREE TO THE PROVISIONS OF THE 2011 PLAN, THE TERMS AND CONDITIONS AND THIS ADDENDUM.**

**PLEASE SIGN AND RETURN THIS ADDENDUM VIA EMAIL NO LATER THAN APRIL 29, 2022 TO STOCKPLANADMINISTRATION@STRYKER.COM.**

_____  _____
Employee Signature          Employee Name (Printed)

_____
Date

## GERMANY

No country specific provisions.

## HONG KONG

    1.   <u>Important Notice</u>. Warning: The contents of the Terms and Conditions, this Addendum, the 2011 Plan, and all other materials pertaining to the RSUs and/or the 2011 Plan have not been reviewed by any regulatory authority in Hong Kong. You are hereby advised to exercise caution in relation to the offer thereunder. If you have any doubts about any of the contents of the aforesaid materials, you should obtain independent professional advice.

    2.   <u>Lapse of Restrictions</u>. If, for any reason, Shares are issued to you within six (6) months of the grant date, you agree that you will not sell or otherwise dispose of any such Shares prior to the six-month anniversary of the grant date.

    3.   <u>Settlement in Shares</u>. Notwithstanding anything to the contrary in this Addendum, the Terms and Conditions or the 2011 Plan, the RSUs shall be settled only in Shares (and may not be settled in cash).

    4.   <u>Nature of the Plan</u>. The Company specifically intends that the 2011 Plan will not be treated as an occupational retirement scheme for purposes of the Occupational Retirement Schemes Ordinance ("ORSO"). To the extent any court, tribunal or legal/regulatory body in Hong Kong determines that the 2011 Plan constitutes an occupational retirement scheme for the purposes of ORSO, the grant of the RSUs shall be null and void.

## INDIA

    1.   <u>Repatriation Requirements</u>. You expressly agree to repatriate all sale proceeds and dividends attributable to Shares acquired under the 2011 Plan in accordance with local foreign exchange rules and regulations. Neither the Company, your Employer or any of the Company's Subsidiaries shall be liable for any fines or penalties resulting from your failure to comply with applicable laws, rules or regulations.

## IRELAND

No country specific provisions.

## ITALY

No country specific provisions.

## JAPAN

No country specific provisions.

## MEXICO

    1.   <u>Commercial Relationship</u>. You expressly recognize that your participation in the 2011 Plan and the Company's grant of the RSUs does not constitute an employment relationship between you and the Company. You have been granted the RSUs as a consequence of the commercial relationship between the Company and the Subsidiary in Mexico that employs you, and the Company's Subsidiary in Mexico is your sole employer. Based on the foregoing, (a) you expressly recognize the 2011 Plan and the benefits you may derive from your participation in the 2011 Plan do not establish any rights between you and the Company's Subsidiary in Mexico that employs you, (b) the 2011 Plan

and the benefits you may derive from your participation in the 2011 Plan are not part of the employment conditions and/or benefits provided by the Company's Subsidiary in Mexico that employs you, and (c) any modification or amendment of the 2011 Plan by the Company, or a termination of the 2011 Plan by the Company, shall not constitute a change or impairment of the terms and conditions of your employment with the Company's Subsidiary in Mexico that employs you.

2.    Securities Law Information. You expressly recognize and acknowledge that the Company's grant of RSUs and the underlying Shares under the Plan have not been registered with the National Register of Securities maintained by the Mexican National Banking and Securities Commission and cannot be offered or sold publicly in Mexico. In addition, the 2011 Plan, the Terms and Conditions and any other document relating to the RSUs may not be publicly distributed in Mexico. These materials are addressed to you only because of your existing relationship with the Company and these materials should not be reproduced or copied in any form. The offer contained in these materials does not constitute a public offering of securities but rather constitutes a private placement of securities addressed specifically to individuals who are present employees of the Employer in Mexico made in accordance with the provisions of the Mexican Securities Market Law, and any rights under such offering shall not be assigned or transferred.

3.    Extraordinary Item of Compensation. You expressly recognize and acknowledge that your participation in the 2011 Plan is a result of the discretionary and unilateral decision of the Company, as well as your free and voluntary decision to participate in the 2011 Plan in accord with the terms and conditions of the 2011 Plan, the Terms and Conditions, and this Addendum. As such, you acknowledge and agree that the Company may, in its sole discretion, amend and/or discontinue your participation in the 2011 Plan at any time and without any liability. The value of the RSUs is an extraordinary item of compensation outside the scope of your employment contract, if any. The RSUs are not part of your regular or expected compensation for purposes of calculating any severance, resignation, redundancy, end of service payments, bonuses, long-service awards, pension or retirement benefits, or any similar payments, which are the exclusive obligations of the Company's Subsidiary in Mexico that employs you.

**BY SIGNING BELOW, YOU ACKNOWLEDGE, UNDERSTAND AND AGREE TO THE PROVISIONS OF THE 2011 PLAN, THE TERMS AND CONDITIONS AND THIS ADDENDUM.**

**PLEASE SIGN AND RETURN THIS ADDENDUM VIA EMAIL NO LATER THAN APRIL 29, 2022 TO STOCKPLANADMINISTRATION@STRYKER.COM.**

_____    _____
Employee Signature              Employee Name (Printed)

_____
Date

**NETHERLANDS**

1.    Waiver of Termination Rights. As a condition to the grant of the RSUs, you hereby waive any and all rights to compensation or damages as a result of the termination of your employment with the Company and your Employer for any reason whatsoever, insofar as those rights result or may result from (a) the loss or diminution in value of such rights or entitlements under the 2011 Plan, or (b) you ceasing to have rights under or ceasing to be entitled to any awards under the 2011 Plan as a result of such termination.

2.    Tax Deferral Upon Retirement. Unless you otherwise elect by contacting Stryker no later than April 29, 2022, you hereby agree that upon Retirement eligibility, the RSUs shall not become taxable until the date of settlement when Shares are actually delivered or otherwise made available.

## NEW ZEALAND

1. <u>WARNING</u>. You are being offered RSUs to be settled in the form of shares of Stryker Corporation common stock. If the Company runs into financial difficulties and is wound up, you may lose some or all your investment. New Zealand law normally requires people who offer financial products to give information to investors before they invest. This requires those offering financial products to have disclosed information that is important for investors to make an informed decision. The usual rules do not apply to this offer because it is an offer made under the Employee Share Scheme exemption. As a result, you may not be given all the information usually required. You will also have fewer other legal protections for this investment. You should ask questions, read all documents carefully, and seek independent financial advice before accepting the offer. The Company's Shares are currently traded on the New York Stock Exchange under the ticker symbol "SYK" and Shares acquired under the 2011 Plan may be sold through this exchange. You may end up selling the Shares at a price that is lower than the value of the Shares when you acquired them. The price will depend on the demand for the Company's Shares. *The Company's most recent annual report (which includes the Company's financial statements) is available at* [http://phx.corporate-ir.net/phoenix.zhtml?c=118965&p=irol-irhome]. *You are entitled to receive a copy of this report, free of charge, upon written request to the Company at* **STOCKPLANADMINISTRATION@STRYKER.COM**.

## POLAND

No country specific provisions.

## PORTUGAL

No country specific provisions.

## PUERTO RICO

No country specific provisions.

## ROMANIA

No country specific provisions.

## RUSSIA

1. IMPORTANT EMPLOYEE NOTIFICATION. You may be required to repatriate certain cash amounts received with respect to the RSUs to Russia as soon as you intend to use those cash amounts for any purpose, including reinvestment. If the repatriation requirement applies, such funds must initially be credited to you through a foreign currency account at an authorized bank in Russia. After the funds are initially received in Russia, they may be further remitted to foreign banks in accordance with Russian exchange control laws. Under the Directive N 5371-U of the Russian Central Bank (the "**CBR**"), the repatriation requirement may not apply in certain cases with respect to cash amounts received in an account that is considered by the CBR to be a foreign brokerage account. Statutory exceptions to the repatriation requirement also may apply. *You should contact your personal advisor to ensure compliance with the applicable exchange control requirements prior to vesting in the RSUs and/or selling the Shares acquired pursuant to the RSUs.*

2. <u>SECURITIES LAW NOTIFICATION</u>. The grant of RSUs and the issuance of Shares upon vesting are not intended to be an offering of securities with the Russian Federation, and the Terms and Conditions, the 2011 Plan, this Addendum and all other materials that you receive in connection with the grant of RSUs and your participation in the 2011 Plan (collectively, "Grant Materials") do not constitute advertising or a solicitation within the Russian Federation. In connection with your grant of RSUs, the Company has not submitted any registration statement, prospectus or other filing with the Russian Federal Bank or any other governmental or regulatory body within the Russian Federation, and the Grant Materials expressly may not be used, directly or indirectly, for the purpose of making a

securities offering or public circulation of Shares within the Russian Federation. Any Shares acquired under the 2011 Plan will be maintained on your behalf outside of Russia. Moreover, you will not be permitted to sell or otherwise alienate any Shares directly to other Russian legal entities or individuals.

3. <u>EXCHANGE CONTROL NOTIFICATION</u>. You are solely responsible for complying with applicable Russian exchange control regulations. Since the exchange control regulations change frequently and without notice, you should consult your legal advisor prior to the acquisition or sale of Shares under the 2011 Plan to ensure compliance with current regulations. As noted, it is your personal responsibility to comply with Russian exchange control laws, and neither the Company nor any Subsidiary will be liable for any fines or penalties resulting from failure to comply with applicable laws.

4. <u>ANTI-CORRUPTION NOTIFICATION</u>. Anti-corruption laws prohibit certain public servants, their spouses and their dependent children from owning any foreign source financial instruments (*e.g.*, shares of foreign companies such as the Company). Accordingly, you should inform the Company if you are covered by these laws as this relates to your acquisition of Shares under the 2011 Plan.

**SINGAPORE**

1. <u>Qualifying Person Exemption</u>. The following provision shall replace Section 16 of the Terms and Conditions:

The grant of the RSUs under the 2011 Plan is being made pursuant to the "Qualifying Person" exemption" under section 273(1)(f) of the Securities and Futures Act (Chapter 289, 2006 Ed.) ("SFA"). The 2011 Plan has not been lodged or registered as a prospectus with the Monetary Authority of Singapore. You should note that, as a result, the RSUs are subject to section 257 of the SFA and you will not be able to make (a) any subsequent sale of the Shares in Singapore or (ii) any offer of such subsequent sale of the Shares subject to the RSUs in Singapore, unless such sale or offer is made pursuant to the exemptions under Part XIII Division (1) Subdivision (4) (other than section 280) of the SFA (Chapter 289, 2006 Ed.).

2. <u>Director Reporting Notification</u>. If you are a director, associate director or shadow director of a Singapore company, you are subject to certain notification requirements under the Singapore Companies Act. Among these requirements is an obligation to notify the Singapore company in writing when you receive an interest (e.g., RSUs or Shares) in the Company or any related company. In addition, you must notify the Singapore company when you sell Shares (including when you sell Shares acquired at vesting of the Restricted Stock Units). These notifications must be made within two business days of acquiring or disposing of any interest in the Company or any related company. In addition, a notification must be made of Participant's interests in the Company or any related company within two business days of becoming a director.

**SOUTH AFRICA**

1. <u>Withholding Taxes</u>. In addition to the provisions of Section 6 of the Terms and Conditions, you agree to notify your Employer in South Africa of the amount of any gain realized upon vesting of the RSUs. If you fail to advise your Employer of the gain realized upon vesting of the RSUs, you may be liable for a fine. You will be responsible for paying any difference between the actual tax liability and the amount withheld.

2. <u>Exchange Control Obligations</u>. You are solely responsible for complying with applicable exchange control regulations and rulings (the "Exchange Control Regulations") in South Africa. As the Exchange Control Regulations change frequently and without notice, you should consult your legal advisor prior to the acquisition or sale of Shares under the 2011 Plan to ensure compliance with current Exchange Control Regulations. Neither the Company nor any of its Subsidiaries will be liable for any fines or penalties resulting from your failure to comply with applicable laws.

3.  <u>Securities Law Information and Deemed Acceptance of RSUs</u>.  Neither the RSUs nor the underlying Shares shall be publicly offered or listed on any stock exchange in South Africa.  The offer is intended to be private pursuant to Section 96 of the Companies Act and is not subject to the supervision of any South African governmental authority. Pursuant to Section 96 of the Companies Act, the RSU offer must be finalized on or before the 60th day following the grant date.  If you do not want to accept the RSUs, you are required to decline the RSUs no later than the 60th day following the grant date.  If you do not reject the RSUs on or before the 60th day following the grant date, you will be deemed to accept the RSUs.

**SOUTH KOREA**

No country specific provisions.

**SPAIN**

1.  <u>Acknowledgement of Discretionary Nature of the 2011 Plan; No Vested Rights</u>. In accepting the RSUs, you acknowledge that you consent to participation in the 2011 Plan and have received a copy of the 2011 Plan. You understand that the Company has unilaterally, gratuitously and in its sole discretion granted RSUs under the 2011 Plan to individuals who may be employees of the Company or its Subsidiaries throughout the world. The decision is a limited decision that is entered into upon the express assumption and condition that any grant will not economically or otherwise bind the Company or any of its Subsidiaries on an ongoing basis. Consequently, you understand that the RSUs are granted on the assumption and condition that the RSUs and the Shares acquired upon vesting of the RSUs shall not become a part of any employment contract (either with the Company or any of its Subsidiaries) and shall not be considered a mandatory benefit, salary for any purposes (including severance compensation) or any other right whatsoever. In addition, you understand that this grant would not be made to you but for the assumptions and conditions referenced above. Thus, you acknowledge and freely accept that should any or all of the assumptions be mistaken or should any of the conditions not be met for any reason, the RSUs shall be null and void.

You understand and agree that, as a condition of the grant of the RSUs, any unvested RSUs as of the date you cease active employment will be forfeited without entitlement to the underlying Shares or to any amount of indemnification in the event of the termination of employment by reason of, but not limited to, (i) material modification of the terms of employment under Article 41 of the Workers' Statute or (ii) relocation under Article 40 of the Workers' Statute. You acknowledge that you have read and specifically accept the conditions referred to in the Terms and Conditions regarding the impact of a termination of employment on your RSUs.

**BY SIGNING BELOW, YOU ACKNOWLEDGE, UNDERSTAND AND AGREE TO THE PROVISIONS OF THE 2011 PLAN, THE TERMS AND CONDITIONS AND THIS ADDENDUM.**

**PLEASE SIGN AND RETURN THIS ADDENDUM VIA EMAIL NO LATER THAN APRIL 29, 2022 TO STOCKPLANADMINISTRATION@STRYKER.COM.**

_____   _____
Employee Signature        Employee Name (Printed)

_____
Date

**SWITZERLAND**

1.  <u>Securities Law Information</u>. Neither this document nor any other materials relating to the RSUs (a) constitutes a prospectus according to articles 35 et seq. of the Swiss Federal Act on Financial Services ("FinSA") (b) may be publicly distributed or otherwise made publicly available in Switzerland to any person other than an employee of the Company or (c) has been or will be filed with,

approved or supervised by any Swiss reviewing body according to article 51 FinSA or any Swiss regulatory authority, including the Swiss Financial Market Supervisory Authority ("FINMA").

## TAIWAN

1. <u>Securities Law Notice</u>. The offer of participation in the 2011 Plan is available only for employees of the Company and its Subsidiaries. The offer of participation in the 2011 Plan is not a public offer of securities by a Taiwanese company.

## THAILAND

No country specific provisions.

## TURKEY

1. <u>Securities Law Information</u>. Under Turkish law, you are not permitted to sell any Shares acquired under the 2011 Plan within Turkey. The Shares are currently traded on the New York Stock Exchange, which is located outside of Turkey, under the ticker symbol "SYK" and the Shares may be sold through this exchange.

2. <u>Financial Intermediary Obligation</u>. You acknowledge that any activity related to investments in foreign securities (e.g., the sale of Shares) should be conducted through a bank or financial intermediary institution licensed by the Turkey Capital Markets Board and should be reported to the Turkish Capital Markets Board. You solely are responsible for complying with this requirement and should consult with a personal legal advisor for further information regarding any obligations in this respect.

## UNITED ARAB EMIRATES

1. <u>Securities Law Information</u>. The offer of the RSUs is available only for select Employees of the Company and its Subsidiaries and is in the nature of providing incentives in the United Arab Emirates. The 2011 Plan and the Terms and Conditions are intended for distribution only to such individuals and must not be delivered to, or relied on by any other person. Prospective purchasers of securities should conduct their own due diligence.

The Emirates Securities and Commodities Authority has no responsibility for reviewing or verifying any documents in connection with this statement, including the 2011 Plan and the Terms and Conditions, or any other incidental communication materials distributed in connection with the RSUs. Further, neither the Ministry of Economy nor the Dubai Department of Economic Development has approved this statement nor taken steps to verify the information set out in it, and has no responsibility for it. Residents of the United Arab Emirates who have any questions regarding the contents of the 2011 Plan and the Terms and Conditions should obtain independent advice.

## UNITED KINGDOM

1. <u>Income Tax and Social Insurance Contribution Withholding</u>. The following provision shall supplement Section 6 of the Terms and Conditions:

Without limitation to Section 6 of the Terms and Conditions, you agree that you are liable for all Tax-Related Items and hereby covenant to pay all such Tax-Related Items, as and when requested by the Company, your Employer or by Her Majesty's Revenue and Customs ("HMRC") (or any other tax authority or any other relevant authority). You also agree to indemnify and keep indemnified the Company and your Employer against any Tax-Related Items that they are required to pay or withhold or have paid or will pay to HMRC on your behalf (or any other tax authority or any other relevant authority).

Exhibit 10(ii)

   2.   <u>Exclusion of Claim</u>. You acknowledge and agree that you will have no entitlement to compensation or damages in consequence of the termination of your employment with the Company and your Employer for any reason whatsoever and whether or not in breach of contract, insofar as any purported claim to such entitlement arises or may arise from your ceasing to have rights under or to be entitled to vest in the RSUs as a result of such termination of employment (whether the termination is in breach of contract or otherwise), or from the loss or diminution in value of the RSUs. Upon the grant of the RSUs, you shall be deemed irrevocably to have waived any such entitlement.

***************************

Exhibit 10(iii)



**Kevin** A. Lobo

Chair and CEO
2825 Airview Boulevard
Kalamazoo MI 49002 USA
P 269 389 7353
www.stryker.com

*Personal and confidential*

February 2, 2022

<u>First Name Last Name</u>

Dear First Name:

I am pleased to inform you that as an SLT member, you are receiving a performance stock units (PSUs) award in 2022. We use these awards to reward performers who we believe will be key contributors to our growth well into the future. The total Award Date Value (ADV) of your award is approximately USD $xx,xxx.

We are awarding you xxx PSUs. The number of PSUs actually earned will be dependent upon Stryker's financial performance during the three-year period ending December 31, 2024. Refer to the Terms and Conditions accompanying the 2022 PSUs award for specific criteria associated with vesting in such award. In order to earn any of the PSUs, you must be continuously employed with Stryker through the vesting date of March 21, 2025 except as otherwise provided in the Terms and Conditions.

**You must "Accept" the award online via the UBS One Source web site located at <u>www.ubs.com/onesource/SYK</u> between March 1 and March 31, 2022.** The detailed terms of the PSUs are in the Terms and Conditions, any applicable country addendum and the provisions of the Company's 2011 Long-Term Incentive Plan. Those documents, together with the related Prospectus, are available on the UBS One Source web site, and you should read them before accepting the award. In addition, you may be asked to sign the most recent version of Stryker's Confidentiality, Intellectual Property, Non-Competition and Non-Solicitation Agreement ("Non-Compete Agreement") in connection with the award. If you are asked to sign the Non-Compete Agreement, it will be emailed to you and you will be asked to sign the document electronically via Adobe Sign by March 31, 2022. The vesting of the PSUs is conditioned on you having signed the Non-Compete Agreement by March 31, 2022, where permitted by applicable law.

Thank you for your efforts in helping us deliver strong results. With your help, I look forward to our continued business growth and success.

Sincerely,

Kevin A. Lobo
Chair and CEO

Exhibit 10(iii)

**STRYKER CORPORATION**

**TERMS AND CONDITIONS**
**RELATING TO PERFORMANCE STOCK UNITS GRANTED**
**PURSUANT TO THE 2011 LONG-TERM INCENTIVE PLAN, AS AMENDED AND**
**RESTATED**

1.    The Performance Stock Units with respect to Common Stock of Stryker Corporation (the "Company") granted to you during 2022 (the "PSUs") are subject to these Terms and Conditions Relating to Performance Stock Units Granted Pursuant to the 2011 Long-Term Incentive Plan, as Amended and Restated (the "Terms and Conditions") and all of the terms and conditions of the Stryker Corporation 2011 Long-Term Incentive Plan, as Amended and Restated (the "2011 Plan"), which is incorporated herein by reference. In the case of a conflict between these Terms and Conditions and the terms of the 2011 Plan, the provisions of the 2011 Plan will govern. Capitalized terms used but not defined herein have the meaning provided therefor in the 2011 Plan. For purposes of these Terms and Conditions, "Employer" means the Company or any Subsidiary that employs you on the applicable date, and "Stock Plan Administrator" means UBS Financial Services Inc. (or any other independent service provider engaged by the Company to assist with the implementation, operation and administration of the 2011 Plan).

2.    <u>Vesting</u>. Except as provided in Section 8(a), the vesting of your PSUs is dependent upon your remaining continuously employed with your Employer through March 21, 2025 (the "Vesting Date") as well as upon the Company's financial performance during the three-year period ending December 31, 2024 (the "Performance Period"). Specifically, the vesting of any of the PSUs is dependent upon attainment of the Threshold Performance Target as set forth in Section 3. If the Threshold Performance Target is attained, then the vesting of 50% of the PSUs (the "EPS PSUs") is dependent on Adjusted EPS Growth as set forth in Section 4, and vesting of the remaining 50% of the PSUs (the "Sales Growth PSUs") is dependent on the Sales Growth Percentile Ranking as set forth in Section 5. The actual number of your PSUs that become vested, if any, shall be determined based on exercise of negative discretion by the Committee in accordance with Sections 4, 5 and 6 below.

3.    <u>Threshold Performance Target</u>. If the Company's Adjusted EPS Growth as of the last day of the Performance Period is less than 3.0%, none of your PSUs shall become vested and all of your PSUs shall be forfeited as of the last day of the Performance Period. If the Company's Adjusted EPS Growth as of the last day of the Performance Period is 3.0% or greater (the "Threshold Performance Target") and, except as provided in Section 8(a), you remain in the continuous employment of Stryker through the Vesting Date, you shall become eligible to vest in up to 200% of your PSUs, although the actual number of your PSUs that become vested shall be determined based on exercise of negative discretion by the Committee in accordance with Sections 4, 5 and 6 below.

4.    <u>Adjusted EPS Growth</u>.

(a)    If the Threshold Performance Target is attained and, except as provided in Section 8(a), you have remained in the continuous employment of Stryker through the Vesting Date, then subject to Section 6 you shall become vested in the percentage of the EPS PSUs determined based on the Company's Adjusted EPS Growth using the table below, applying straight line interpolation rounded down to the nearest whole number of EPS PSUs for Adjusted EPS Growth resulting in vested EPS PSUs between 50% and 100% or between 100% and 200%.

| | < Minimum | Minimum | Target | Maximum |
|---|---|---|---|---|
| **Adjusted EPS Growth** | Less than 6.0% | 6.0% | 9.0% | 12% or more |
| **Vested Percent of EPS PSUs** | 0% | 50% | 100% | 200% |

Any EPS PSUs that do not become vested in accordance with the foregoing shall be forfeited.

(b)     As soon as administratively practicable following the Vesting Date (but in no event later than December 31, 2025), the Company shall issue you the Shares underlying the vested EPS PSUs.

(c)     For purposes of these Terms and Conditions:

(i)     "Adjusted EPS" for a calendar year shall mean the Company's diluted net earnings per share for such year as determined under U.S. generally accepted accounting principles ("GAAP") but subject to such adjustments, if any, for non-GAAP financial measures that are reflected in a reconciliation to the GAAP financial statements included in the Company's Annual Report on Form 10-K filed with the Securities and Exchange Commission.

(ii)     "Adjusted EPS Growth" shall mean the sum of the Annual Percentage Change in Adjusted EPS for the three (3) calendar years in the Performance Period divided by three (3).

(iii)     "Annual Percentage Change in Adjusted EPS" for calendar year shall mean the amount by which the Adjusted EPS for such calendar year has increased or decreased relative to the immediately preceding calendar year, expressed as a positive or negative percentage (depending on whether Adjusted EPS increased or decreased) of the Adjusted EPS for such preceding calendar year.

(d)     Notwithstanding anything to the contrary herein, the Committee shall have discretion to make such adjustments to the foregoing metrics as it deems appropriate to reflect the impact of corporate transactions, accounting or tax law changes or extraordinary, unusual, nonrecurring or infrequent items; provided, however, that for purposes of calculating the Threshold Performance Target in Section 3, in no case shall such adjustments have the net aggregate effect of increasing Adjusted EPS Growth.

5.    Sales Growth Percentile Ranking.

(a)     If the Threshold Performance Target is attained and, except as provided in Section 8(a), you have remained in the continuous employment of Stryker through the Vesting Date, then subject to Section 6 you shall become vested in the percentage of the Sales Growth PSUs based upon the Company's Sales Growth Percentile Ranking, as determined using the table below, applying straight line interpolation rounded down to the nearest whole number of Sales Growth PSUs for Sales Growth Percentile Ranking resulting in vested Sales Growth PSUs between 50% and 100% or between 100% and 200%.

| Sales Growth Percentile Ranking | Below 33rd | 33rd | 50th | 75th and Above |
|---|---|---|---|---|
| Vested Percent of Sales Growth PSUs | 0% | 50% | 100% | 200% |

Any Sales Growth PSUs that do not become vested in accordance with the foregoing shall be forfeited, and if the Company's Average Sales Growth in the Performance Period is equal to or less than zero, all of the Sales Growth PSUs shall be forfeited (irrespective of the Sales Growth Percentile Ranking).

(b)     As soon as administratively practicable following the Vesting Date (but in no event later than December 31, 2025), the Company shall issue you the Shares underlying the vested Sales Growth PSUs.

(c)   For purposes of these Terms and Conditions and subject to Section 5(d) below:

(i)   "Average Sales Growth" shall mean, for the Company and each company in the Comparison Group, the sum of the Sales Growth for each Reporting Period ending within the Performance Period divided by three;

(ii)   "Comparison Group" shall mean:

- Abbott Laboratories
- Agilent Technologies, Inc.
- Baxter International Inc.
- Becton, Dickinson and Company
- Boston Scientific Corporation
- Cerner Corporation
- Danaher Corporation
- Fresenius Medical Care AG & Co. KGaA
- General Electric Company (Healthcare)
- Johnson & Johnson (Medical Devices)
- Laboratory Corporation of America Holdings
- Medtronic plc
- Quest Diagnostics Incorporated
- Royal Philips (combined segments of Diagnosis & Treatment and Connected Care)
- Siemens Healthineers AG
- Smith & Nephew plc
- Thermo Fisher Scientific Inc.
- 3M Company (Healthcare)
- Zimmer Biomet Holdings, Inc.

For purposes of the foregoing, any company for which Sales Growth cannot be calculated for three full annual Reporting Periods ending within the Performance Period shall be excluded.

(iii)   "Net Sales" shall mean, for the Company and each company in the Comparison Group, net sales as publicly reported for the applicable Reporting Period.

(iv)   "Reporting Period" shall mean a calendar year in the case of the Company and each company in the Comparison Group that reports on a calendar year basis, and in the case of any other company in the Comparison Group, the four fiscal quarters that include the last fiscal quarter ending prior to December 31 for which such company has publicly reported prior to the following February 28.

(v)   "Sales Growth" for a Reporting Period shall mean the amount by which Net Sales has increased or decreased relative to the immediately preceding Reporting Period, expressed as a positive or negative percentage (depending on whether Net Sales increased or decreased) of the Net Sales for such preceding Reporting Period.

(vi)   "Sales Growth Percentile Ranking" shall mean the percentile ranking of the Company's Average Sales Growth relative to the Average Sales Growth for each company in the Comparison Group, rounded to the whole nearest percentile. For this purpose, the percentile ranking shall be calculated as 1 – (Rank-1)/(Total of the Comparison Group plus the Company-1). For example, if the Company ranked 5th out of 20 companies including itself, the percentile rank would be calculated as 1 – (5-1)/(20-1) or 1 – (4/19) or 1-0.21 or the 79th percentile.

(d)   The Committee may make such revisions and adjustments to each of the items set forth in Sections 5(c)(i)-(vi) as it may determine necessary and appropriate in its discretion.

6.   <u>Discretion of the Committee</u>. Notwithstanding anything in these Terms or Conditions or the 2011 Plan to the contrary, provided that the Threshold Performance Target has been attained, the Committee shall have the power and authority, in its sole and absolute exercise of negative discretion,

to reduce or increase the vested PSUs such that the actual earned PSUs will be greater than or less than the vested PSUs, which increase or reduction may be made by taking into account any criteria the Committee deems appropriate; provided further that notwithstanding anything in these Terms or Conditions to the contrary you shall not become vested in more than 200% of your PSUs.

7.    Dividend Equivalents. In connection with your PSUs, you shall be entitled to receive all of the cash dividends for which the record date occurs during the period between the commencement of the Performance Period and the Vesting Date with respect to each Share underlying your vested PSUs ("Dividend Equivalents"). Dividend Equivalents shall be converted into their equivalent number of additional PSUs rounded down to the nearest whole number of PSUs based on the Fair Market Value of a Share on the Vesting Date, provided, that the maximum number of additional PSUs you may receive upon such conversion shall be equal to 200% of your originally granted PSUs. Such additional PSUs shall be subject to the terms and conditions applicable to the PSUs to which the Dividend Equivalents relate, including, without limitation, the vesting, forfeiture, and payment form and timing provisions contained herein.

8.    In the event you cease to remain in the continuous employment of the Company or a Subsidiary for the entire period commencing on the grant date and ending on the applicable Vesting Date, your right to receive the Shares issuable pursuant to the PSUs shall be only as follows:

(a)    If you cease to be an Employee prior to the Vesting Date by reason of Disability (as such term is defined in the 2011 Plan), death or Retirement (as such term is defined in the 2011 Plan), you or your estate will become vested on the Vesting Date in a pro-rata portion (determined by dividing (a) the number of days during the Performance Period in which you were an Employee by (b) the total number of days during the Performance Period) of your PSUs based upon the Company's Adjusted EPS Growth and Sales Growth Percentile Ranking for the Performance Period as determined pursuant to Sections 3, 4 and 5 of these Terms and Conditions. Any pro rata portion shall be rounded down to the nearest whole number of PSUs. You, your legal representative or your estate will receive all of the underlying Shares attributable to the vested PSUs as soon as administratively practicable following (and in no event more than ninety (90) days after) the Vesting Date.

(b)    If you cease to be an Employee for any reason other than those provided in (a) above and your Termination Date is prior to the Vesting Date, you shall immediately forfeit all PSUs granted hereunder effective as of your Termination Date. If you are a resident of or employed in the United States, "Termination Date" shall mean the effective date of termination of your employment with your Employer. If you are resident or employed outside of the United States, "Termination Date" shall mean the earliest of (i) the date on which notice of termination is provided to you, (ii) the last day of your active service with your Employer, or (iii) the last day on which you are an Employee of your Employer, as determined in each case without including any required advance notice period and irrespective of the status of the termination under local labor or employment laws.

9.    Notwithstanding the foregoing, the Company may, in its sole discretion, settle the PSUs (and any Dividend Equivalents) in the form of: (i) a cash payment to the extent settlement in Shares (1) is prohibited under local law, (2) would require you, the Company and/or your Employer to obtain the approval of any governmental and/or regulatory body in your country of residence (and country of employment, if different), or (3) is administratively burdensome; or (ii) Shares, but require you to immediately sell such Shares (in which case, the Company shall have the authority to issue sales instructions in relation to such Shares on your behalf).

10.    The number of Shares subject to the PSUs shall be subject to adjustment and the vesting dates hereof may be accelerated as follows:

(a)    In the event that the Shares, as presently constituted, shall be changed into or exchanged for a different number or kind of shares of stock or other securities of the Company or of another corporation (whether by reason of merger, consolidation, recapitalization, reclassification, split-up, combination of shares, or otherwise) or if the number of such Shares shall be increased through the payment of a stock dividend or a dividend on the Shares of rights or warrants to purchase securities of the Company shall be made, then there shall be substituted for or added to each Share theretofore

subject to the PSUs the number and kind of shares of stock or other securities into which each outstanding Share shall be so changed, or for which each such Share shall be exchanged, or to which each such Share shall be entitled. The other terms of the PSUs shall also be appropriately amended as may be necessary to reflect the foregoing events. In the event there shall be any other change in the number or kind of the outstanding Shares, or of any stock or other securities into which such Shares shall have been exchanged, then if the Committee shall, in its sole discretion, determine that such change equitably requires an adjustment in the PSUs, such adjustment shall be made in accordance with such determination.

(b)      Fractional Shares resulting from any adjustment in the PSUs may be settled in cash or otherwise as the Committee shall determine, in its sole discretion. Notice of any adjustment will be given to you and such adjustment (whether or not such notice is given) shall be effective and binding for all purposes hereof.

(c)      The Committee shall have the power to amend the PSUs to permit the immediate vesting of the PSUs (and to terminate any unvested PSUs) and the distribution of the underlying Shares prior to the effectiveness of (i) any disposition of substantially all of the assets of the Company or your Employer, (ii) the shutdown, discontinuance of operations or dissolution of the Company or your Employer, or (iii) the merger or consolidation of the Company or your Employer with or into any other unrelated corporation.

11.      If you are resident or employed outside of the United States, you agree, as a condition of the grant of the PSUs, to repatriate all payments attributable to the Shares and/or cash acquired under the 2011 Plan (including, but not limited to, dividends, dividend equivalents and any proceeds derived from the sale of the Shares acquired pursuant to the PSUs) if required by and in accordance with local foreign exchange rules and regulations in your country of residence (and country of employment, if different). In addition, you also agree to take any and all actions, and consent to any and all actions taken by the Company and its Subsidiaries, as may be required to allow the Company and its Subsidiaries to comply with local laws, rules and regulations in your country of residence (and country of employment, if different). Finally, you agree to take any and all actions as may be required to comply with your personal legal and tax obligations under local laws, rules and regulations in your country of residence (and country of employment, if different).

12.      If you are resident and/or employed in a country that is a member of the European Union, the grant of the PSUs and these Terms and Conditions are intended to comply with the age discrimination provisions of the EU Equal Treatment Framework Directive, as implemented into local law (the "Age Discrimination Rules"). To the extent that a court or tribunal of competent jurisdiction determines that any provision of these Terms and Conditions are invalid or unenforceable, in whole or in part, under the Age Discrimination Rules, the Company, in its sole discretion, shall have the power and authority to revise or strike such provision to the minimum extent necessary to make it valid and enforceable to the full extent permitted under local law.

13.      Regardless of any action the Company and/or your Employer take with respect to any or all income tax (including U.S. federal, state and local taxes or non-U.S. taxes), social insurance, payroll tax, payment on account or other tax-related withholding ("Tax-Related Items"), you acknowledge that the ultimate liability for all Tax-Related Items legally due by you is and remains your responsibility and that the Company and your Employer (i) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the PSUs, including the grant of the PSUs, the vesting of the PSUs, the subsequent sale of any Shares acquired pursuant to the PSUs and the receipt of any dividends or dividend equivalents and (ii) do not commit to structure the terms of the grant or any aspect of the PSUs to reduce or eliminate your liability for Tax-Related Items. Further, if you become subject to taxation in more than one country between the grant date and the date of any relevant taxable or tax withholding event, as applicable, you acknowledge that your Employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one country.

Prior to any taxable event, if your country of residence (and/or your country of employment, if different) requires withholding of Tax-Related Items, the Company shall withhold a number of whole

Shares that have an aggregate Fair Market Value that the Company, taking into account local requirements and administrative issues, determines in its sole discretion is appropriate to cover withholding for Tax-Related Items with respect to the Shares. The cash equivalent of the Shares withheld will be used to settle the obligation to withhold the Tax-Related Items. In cases where the Fair Market Value of the number of whole Shares withheld is greater than the amount required to be paid to the relevant government authorities with respect to withholding for Tax-Related Items, the Company shall make a cash payment to you equal to the difference as soon as administratively practicable. In the event that withholding in Shares is prohibited or problematic under applicable law or otherwise may trigger adverse consequences to the Company or your Employer, your Employer shall withhold the Tax-Related Items required to be withheld with respect to the Shares in cash from your regular salary and/or wages or other amounts payable to you. In the event the withholding requirements are not satisfied through the withholding of Shares or through your regular salary and/or wages or any other amounts payable to you by your Employer, no Shares will be issued to you (or your estate) unless and until satisfactory arrangements (as determined by the Board of Directors) have been made by you with respect to the payment of any Tax-Related Items that the Company or your Employer determines, in its sole discretion, should be withheld or collected with respect to such PSUs. By accepting these PSUs, you expressly consent to the withholding of Shares and/or withholding from your regular salary and/or wages or other amounts payable to you as provided for hereunder. All other Tax-Related Items related to the PSUs and any Shares delivered in payment thereof are your sole responsibility.

14.    The PSUs are intended to be exempt from the requirements of Code Section 409A. The 2011 Plan and these Terms and Conditions shall be administered and interpreted in a manner consistent with this intent. If the Company determines that these Terms and Conditions are subject to Code Section 409A and that it has failed to comply with the requirements of that Section, the Company may, at the Company's sole discretion and without your consent, amend these Terms and Conditions to cause them to comply with Code Section 409A or be exempt from Code Section 409A.

15.    If you were required to sign the "Stryker Confidentiality, Intellectual Property, Non-Competition and Non-Solicitation Agreement" or a similar agreement in order to receive the PSUs or have previously signed such an agreement and you breach any non-competition, non-solicitation or non-disclosure provision or provision as to ownership of inventions contained therein at any time while employed by the Company or a Subsidiary, or during the one-year period following termination of employment, any unvested PSUs shall be rescinded and you shall return to the Company all Shares that were acquired upon vesting of the PSUs that you have not disposed of. Further, you shall pay to the Company an amount equal to the profit realized by you (if any) on all Shares that were acquired upon vesting of the PSUs that you have disposed of. For purposes of the preceding sentence, the profit shall be the Fair Market Value of the Shares at the time of disposition.

16.    The PSUs shall be transferable only by will or the laws of descent and distribution. If you shall purport to make any transfer of the PSUs, except as aforesaid, the PSUs and all rights thereunder shall terminate immediately.

17.    The PSUs shall not be vested in whole or in part, and the Company shall not be obligated to issue any Shares subject to the PSUs, if such issuance would, in the opinion of counsel for the Company, violate the Securities Act of 1933 or any other U.S. federal, state or non-U.S. statute having similar requirements as it may be in effect at the time. The PSUs are subject to the further requirement that, if at any time the Board of Directors shall determine in its discretion that the listing or qualification of the Shares subject to the PSUs under any securities exchange requirements or under any applicable law, or the consent or approval of any governmental regulatory body, is necessary or desirable as a condition of or in connection with the issuance of Shares pursuant to the PSUs, the PSUs may not be vested in whole or in part unless such listing, qualification, consent or approval shall have been effected or obtained free of any conditions not acceptable to the Board of Directors.

18.    The grant of the PSUs shall not confer upon you any right to continue in the employ of your Employer nor limit in any way the right of your Employer to terminate your employment at any time. You shall have no rights as a shareholder of the Company with respect to any Shares issuable upon the vesting of the PSUs until the date of issuance of such Shares.

19.     You acknowledge and agree that the 2011 Plan is discretionary in nature and may be amended, cancelled, or terminated by the Company, in its sole discretion, at any time. The grant of the PSUs under the 2011 Plan is a one-time benefit and does not create any contractual or other right to receive a grant of PSUs or any other award under the 2011 Plan or other benefits in lieu thereof in the future. Future grants, if any, will be at the sole discretion of the Company, including, but not limited to, the form and timing of any grant, the number of Shares subject to the grant, and the vesting provisions. Any amendment, modification or termination of the 2011 Plan shall not constitute a change or impairment of the terms and conditions of your employment with your Employer.

20.     Your participation in the 2011 Plan is voluntary. The value of the PSUs and any other awards granted under the 2011 Plan is an extraordinary item of compensation outside the scope of your employment (and your employment contract, if any). Any grant under the 2011 Plan, including the grant of the PSUs, is not part of normal or expected compensation for purposes of calculating any severance, resignation, redundancy, end of service payments, bonuses, long-service awards, pension, or retirement benefits or similar payments.

21.     These Terms and Conditions shall bind and inure to the benefit of the Company, its successors and assigns and you and your estate in the event of your death.

22.     The Company is located at 2825 Airview Boulevard Kalamazoo, Michigan 49002, U.S.A. and grants PSUs under the 2011 Plan to employees of the Company and Subsidiaries in its sole discretion. In conjunction with the Company's grant of the PSUs under the 2011 Plan and its ongoing administration of such awards, the Company is providing the following information about its data collection, processing and transfer practices ("Personal Data Activities"). In accepting the grant of the PSUs, you expressly and explicitly consent to the Personal Data Activities as described herein.

(a)     The Company collects, processes and uses your personal data, including your name, home address, email address, and telephone number, date of birth, social insurance number or other identification number, salary, citizenship, job title, any Shares or directorships held in the Company, and details of all PSUs or any other equity compensation awards granted, canceled, exercised, vested, or outstanding in your favor, which the Company receives from you or your Employer. In granting the PSUs under the Plan, the Company will collect your personal data for purposes of allocating Shares and implementing, administering and managing the 2011 Plan. The Company's legal basis for the collection, processing and usage of your personal data is your consent.

(b)     The Company transfers your personal data to the Stock Plan Administrator. In the future, the Company may select a different Stock Plan Administrator and share your personal data with another company that serves in a similar manner. The Stock Plan Administrator will open an account for you, if an account is not already in place, to receive and trade Shares acquired under the 2011 Plan. You will be asked to agree on separate terms and data processing practices with the Stock Plan Administrator, which is a condition to your ability to participate in the 2011 Plan.

(c)     The Company and the Stock Plan Administrator are based in the United States. You should note that your country of residence may have enacted data privacy laws that are different from the United States. The Company's legal basis for the transfer of your personal data to the United States is your consent.

(d)     Your participation in the 2011 Plan and your grant of consent is purely voluntary. You may deny or withdraw your consent at any time. If you do not consent, or if you withdraw your consent, you may be unable to participate in the 2011 Plan. This would not affect your existing employment or salary; instead, you merely may forfeit the opportunities associated with the 2011 Plan.

You may have a number of rights under the data privacy laws in your country of residence. For example, your rights may include the right to (i) request access or copies of personal data the Company

processes, (ii) request rectification of incorrect data, (iii) request deletion of data, (iv) place restrictions on processing, (v) lodge complaints with competent authorities in your country or residence, and/or (vi) request a list with the names and addresses of any potential recipients of your personal data. To receive clarification regarding your rights or to exercise your rights, you should contact your local HR manager or the Company's Human Resources Department.

23.     The grant of the PSUs is not intended to be a public offering of securities in your country of residence (and country of employment, if different). The Company has not submitted any registration statement, prospectus or other filing(s) with the local securities authorities (unless otherwise required under local law). **No employee of the Company is permitted to advise you on whether you should acquire Shares under the 2011 Plan or provide you with any legal, tax or financial advice with respect to the grant of the PSUs. The acquisition of Shares involves certain risks, and you should carefully consider all risk factors and tax considerations relevant to the acquisition of Shares under the 2011 Plan or the disposition of them. Further, you should carefully review all of the materials related to the PSUs and the 2011 Plan, and you should consult with your personal legal, tax and financial advisors for professional advice in relation to your personal circumstances.**

24.     All questions concerning the construction, validity and interpretation of the PSUs and the 2011 Plan shall be governed and construed according to the laws of the state of Michigan, without regard to the application of the conflicts of laws provisions thereof. Any disputes regarding the PSUs or the 2011 Plan shall be brought only in the state or federal courts of the state of Michigan.

25.     The Company may, in its sole discretion, decide to deliver any documents related to the PSUs or other awards granted to you under the 2011 Plan by electronic means. You hereby consent to receive such documents by electronic delivery and agree to participate in the 2011 Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

26.     The invalidity or unenforceability of any provision of the 2011 Plan or these Terms and Conditions shall not affect the validity or enforceability of any other provision of the 2011 Plan or these Terms and Conditions.

27.     If you are resident outside of the United States, you acknowledge and agree that it is your express intent that these Terms and Conditions, the 2011 Plan and all other documents, notices and legal proceedings entered into, given or instituted pursuant to the PSUs be drawn up in English. If you have received these Terms and Conditions, the 2011 Plan or any other documents related to the PSUs translated into a language other than English and the meaning of the translated version is different than the English version, the English version will control.

28.     You acknowledge that, depending on your or your broker's country of residence or where the Shares are listed, you may be subject to insider trading restrictions and/or market abuse laws which may affect your ability to accept, acquire, sell or otherwise dispose of Shares, rights to Shares (e.g., PSUs) or rights linked to the value of Shares during such times you are considered to have "inside information" regarding the Company as defined in the laws or regulations in your country of employment (and country of residence, if different).  Local insider trading laws and regulations may prohibit the cancellation or amendment of orders you placed before you possessed inside information.  Furthermore, you could be prohibited from (i) disclosing the inside information to any third party (other than on a "need to know" basis) and (ii) "tipping" third parties or causing them otherwise to buy or sell securities.  Third parties include fellow employees.  Any restrictions under these laws or regulations are separate from and in addition to any restrictions that may be imposed under any applicable Company insider trading policy.  You acknowledge that it is your responsibility to comply with any restrictions and are advised to speak to your personal advisor on this matter.

29.     Notwithstanding any provisions of these Terms and Conditions to the contrary, the PSUs shall be subject to any special terms and conditions for your country of residence (and country of employment, if different) set forth in an addendum to these Terms and Conditions (an "Addendum"). Further, if you transfer your residence and/or employment to another country reflected in an

Addendum to these Terms and Conditions at the time of transfer, the special terms and conditions for such country will apply to you to the extent the Company determines, in its sole discretion, that the application of such special terms and conditions is necessary or advisable in order to comply with local law, rules and regulations, or to facilitate the operation and administration of the award and the 2011 Plan (or the Company may establish alternative terms and conditions as may be necessary or advisable to accommodate your transfer). In all circumstances, any applicable Addendum shall constitute part of these Terms and Conditions.

30.    The Company reserves the right to impose other requirements on the PSUs, any Shares acquired pursuant to the PSUs and your participation in the 2011 Plan to the extent the Company determines, in its sole discretion, that such other requirements are necessary or advisable in order to comply with local law, rules and regulations, or to facilitate the operation and administration of the award and the 2011 Plan. Such requirements may include (but are not limited to) requiring you to sign any agreements or undertakings that may be necessary to accomplish the foregoing.

31.    **This Section 31 applies only to those persons whom the Company's Recoupment Policy applies (the corporate officers elected by the Company's Board of Directors other than Assistant Controllers, Assistant Secretaries and Assistant Treasurers).** Notwithstanding any other provision of these Terms and Conditions to the contrary, you acknowledge and agree that your PSUs, any Shares acquired pursuant thereto and/or any amount received with respect to any sale of such Shares are subject to potential cancellation, recoupment, rescission, payback or other action in accordance with the terms of the Company's Recoupment Policy as in effect on the date of grant (a copy of which has been furnished to you) and as the Recoupment Policy may be amended from time to time in order to comply with changes in laws, rules or regulations that are applicable to such PSUs and Shares. You agree and consent to the Company's application, implementation and enforcement of (a) the Recoupment Policy and (b) any provision of applicable law relating to cancellation, recoupment, rescission or payback of compensation and expressly agree that the Company may take such actions as are necessary to effectuate the Recoupment Policy (as applicable to you) or applicable law without further consent or action being required by you. For purposes of the foregoing, you expressly and explicitly authorize the Company to issue instructions, on your behalf, to any brokerage firm and/or third party administrator engaged by the Company to hold your Shares and other amounts acquired under the 2011 Plan to re-convey, transfer or otherwise return such Shares and/or other amounts to the Company. In the case of a conflict between these Terms and Conditions and the Recoupment Policy, the terms of the Recoupment Policy shall prevail.

32.    **By accepting the grant of the PSUs, you acknowledge that you have read these Terms and Conditions, the Addendum to these Terms and Conditions (as applicable) and the 2011 Plan and specifically accept and agree to the provisions therein.**

************************

**STRYKER CORPORATION**

**ADDENDUM TO**
**TERMS AND CONDITIONS**
**RELATING TO PERFORMANCE STOCK UNITS GRANTED**
**PURSUANT TO THE 2011 PLAN, AS AMENDED AND RESTATED**

In addition to the terms of the 2011 Plan and the Terms and Conditions, the PSUs are subject to the following additional terms and conditions (the "Addendum"). All capitalized terms as contained in this Addendum shall have the same meaning as set forth in the 2011 Plan and the Terms and Conditions. Pursuant to Section 29 of the Terms and Conditions, if you transfer your residence and/or employment to another country reflected in an Addendum at the time of transfer, the special terms and conditions for such country will apply to you to the extent the Company determines, in its sole discretion, that the application of such terms and conditions is necessary or advisable in order to comply with local law, rules and regulations, or to facilitate the operation and administration of the award and the 2011 Plan (or the Company may establish alternative terms and conditions as may be necessary or advisable to accommodate your transfer).

**Data Privacy Information: European Union ("EU") / European Economic Area ("EEA") / Switzerland and the United Kingdom\***

***The below information is for data privacy purposes only and you should determine whether any other special terms and conditions apply to your awards in these jurisdictions.***

1.    Data Privacy. If you reside and/or you are employed in the EU / EEA, Switzerland or the United Kingdom the following provision replaces Section 22 of the Terms and Conditions:

The Company is located at 2825 Airview Boulevard Kalamazoo, Michigan 49002, U.S.A. and grants PSUs under the 2011 Plan to employees of the Company and its Subsidiaries in its sole discretion. You should review the following information about the Company's data processing practices.

(a)    Data Collection, Processing and Usage. Pursuant to applicable data protection laws, you are hereby notified that the Company collects, processes and uses certain personally-identifiable information about you for the legitimate interest of implementing, administering and managing the 2011 Plan and generally administering equity awards; specifically, including your name, home address, email address and telephone number, date of birth, social insurance number or other identification number, salary, citizenship, job title, any Shares or directorships held in the Company, and details of all options or any other awards granted, canceled, exercised, vested, or outstanding in your favor, which the Company receives from you or your Employer. In granting the PSUs under the 2011 Plan, the Company will collect your personal data for purposes of allocating Shares and implementing, administering and managing the 2011 Plan. The Company's collection, processing, use and transfer of your personal data is necessary for the performance of the Company's contractual obligations under the Plan and pursuant to the Company's legitimate interest of managing and generally administering employee equity awards. Your refusal to provide personal data would make it impossible for the Company to perform its contractual obligations and may affect your ability to participate in the 2011 Plan. As such, by participating in the 2011 Plan, you voluntarily acknowledge the collection, processing and use of your personal data as described herein.

(b)    Stock Plan Administration Service Provider. The Company transfers participant data to the Stock Plan Administrator. In the future, the Company may select a different Stock Plan Administrator and share your data with another company that serves in a similar manner. The Stock Plan Administrator will open an account for you, if an account is not already in place, to receive and trade Shares acquired under the 2011 Plan. You will be asked to agree on separate terms and data processing practices with the Stock Plan Administrator, which is a condition to your ability to participate in the 2011 Plan.

(c)    International Data Transfers. The Company and the Stock Plan Administrator are based in the United States. The Company can only meet its contractual obligations to you if your

personal data is transferred to the United States. The Company's legal basis for the transfer of your personal data to the United States is to satisfy its contractual obligations to you and/or its use of the standard data protection clauses adopted by the EU Commission.

(d)  Data Retention. The Company will use your personal data only as long as is necessary to implement, administer and manage your participation in the 2011 Plan or as required to comply with legal or regulatory obligations, including under tax and security laws. When the Company no longer needs your personal data, the Company will remove it from its systems. If the Company keeps your data longer, it would be to satisfy legal or regulatory obligations and the Company's legal basis would be for compliance with relevant laws or regulations.

(e)  Data Subject Rights. You may have a number of rights under data privacy laws in your country of residence. For example, your rights may include the right to (i) request access or copies of personal data the Company processes, (ii) request rectification of incorrect data, (iii) request deletion of data, (iv) place restrictions on processing, (v) lodge complaints with competent authorities in your country of residence, and/or (vi) request a list with the names and addresses of any potential recipients of the Participant's personal data. To receive clarification regarding your rights or to exercise your rights, you should contact your local HR manager or the Company's Human Resources Department.

## ARGENTINA

1.  Securities Law Information. Neither the grant of the PSUs, nor the issuance of Shares subject to the PSUs, constitutes a public offering in Argentina. The grant of PSUs pursuant to the 2011 Plan is a private placement and not subject to any filing or disclosure requirements in Argentina.

## AUSTRALIA

1.  PSUs Conditioned on Satisfaction of Regulatory Obligations. If you are (a) a director of a Subsidiary incorporated in Australia, or (b) a person who is a management-level executive of a Subsidiary incorporated in Australia and who also is a director of a Subsidiary incorporated outside of the Australia, the grant of the PSUs is conditioned upon satisfaction of the shareholder approval provisions of section 200B of the Corporations Act 2001 (Cth) in Australia.

The Australian Offer document can be accessed here [UBS INSERT LINK HERE]

## AUSTRIA

No country specific provisions.

## BELGIUM

No country specific provisions.

## BRAZIL

1.  Labor Law Acknowledgment. By accepting the PSUs, you acknowledge and agree, for all legal purposes, that (a) the benefits provided under the Terms and Conditions and the 2011 Plan are the result of commercial transactions unrelated to your employment; (b) the Terms and Conditions and the 2011 Plan are not a part of the terms and conditions of your employment; and (c) the income from the PSUs, if any, is not part of your remuneration from employment.

2.  Compliance with Law. By accepting the PSUs, you acknowledge and agree to comply with applicable Brazilian laws and to pay any and all applicable taxes associated with the vesting of the PSUs, the issuance and/or sale of Shares acquired under the 2011 Plan and the receipt of any dividends.

**CANADA**

1. <u>Settlement in Shares</u>. Notwithstanding anything to the contrary in the Terms and Conditions or the 2011 Plan, the PSUs shall be settled only in Shares (and may not be settled in cash).

2. <u>Termination of Employment</u>. The following supplements Section 8(b) of the Terms and Conditions as well as any other section required to give effect to the same:

In the event of your termination of employment for any reason (other than by reason of death, Disability or Retirement), either by you or by the Employer, with or without cause, your rights to vest or to continue to vest in the PSUs and receive Shares under the 2011 Plan, if any, will terminate as of the actual Termination Date. For this purpose, the "Termination Date" shall mean the last day on which you are actively employed by the Employer, and shall not include or be extended by any period following such day during which you are in receipt of or eligible to receive any notice of termination, pay in lieu of notice of termination, severance pay or any other payments or damages, whether arising under statute, contract or at common law. Notwithstanding the foregoing, if applicable employment standards legislation explicitly requires continued entitlement to vesting during a statutory notice period, your right to vest in the PSUs under the 2011 Plan, if any, will terminate effective as of the last day of your minimum statutory notice period, but you will not earn or be entitled to pro-rated vesting if the vesting date falls after the end of your statutory notice period, nor will you be entitled to any compensation for lost vesting.

3. <u>Use of English Language</u>.  If you are a resident of Quebec, by accepting your PSUs, you acknowledge and agree that it is your wish that the Terms and Conditions, this Addendum, as well as all other documents, notices and legal proceedings entered into, given or instituted pursuant to your PSUs, either directly or indirectly, be drawn up in English.

**Langue anglaise. En acceptant l'allocation de vos PSUs, vous reconnaissez et acceptez avoir souhaité que le Termes et Conditions, le présent avenant, ainsi que tous autres documents exécutés, avis donnés et procédures judiciaires intentées, relatifs, directement ou indirectement, à l'allocation de vos PSUs, soient rédigés en anglais.**

**BY SIGNING BELOW, YOU ACKNOWLEDGE, UNDERSTAND AND AGREE TO THE PROVISIONS OF THE 2011 PLAN, THE TERMS AND CONDITIONS AND THIS ADDENDUM.**

**PLEASE SIGN AND RETURN THIS ADDENDUM VIA EMAIL NO LATER THAN APRIL 29, 2022 TO STOCKPLANADMINISTRATION@STRYKER.COM.**

_____  _____
Employee Signature         Employee Name (Printed)

_____
Date

**CHILE**

1. <u>Private Placement</u>. The following provision shall replace Section 23 of the Terms and Conditions:

The grant of the PSUs hereunder is not intended to be a public offering of securities in Chile but instead is intended to be a private placement.

a) The starting date of the offer will be the grant date, and this offer conforms to General Ruling no. 336 of the Chilean Commission for the Financial Markets ("CMF");

b) The offer deals with securities not registered in the registry of securities or in the registry of foreign securities of the CMF, and therefore such securities are not subject to its oversight;

c) The Company, as the issuer, is not obligated to provide public information in Chile regarding the foreign securities, as such securities are not registered with the CMF; and

d) The Shares, as foreign securities, shall not be subject to public offering as long as they are not registered with the corresponding registry of securities in Chile.

a) La fecha de inicio de la oferta será el de la fecha de otorgamiento y esta oferta se acoge a la norma de Carácter General n° 336 de la *Comisión para el Mercado Financiero Chilena ("CMF")*;

b) La oferta versa sobre valores no inscritos en el registro de valores o en el registro de valores extranjeros que lleva la CMF, por lo que tales valores no están sujetos a la fiscalización de ésta;

c) Por tratar de valores no inscritos no existe la obligación por parte del emisor de entregar en chile información pública respecto de esos valores; y

d) Esos valores no podrán ser objeto de oferta pública mientras no sean inscritos en el registro de valores correspondiente.

## CHINA

1. <u>PSUs Conditioned on Satisfaction of Regulatory Obligations</u>. If you are a People's Republic of China ("PRC") national, the grant of the PSUs is conditioned upon the Company securing all necessary approvals from the PRC State Administration of Foreign Exchange to permit the operation of the 2011 Plan and the participation of PRC nationals employed by your Employer, as determined by the Company in its sole discretion.

2. <u>Sale of Shares</u>. Notwithstanding anything to the contrary in the 2011 Plan, upon any termination of employment with your Employer, you shall be required to sell all Shares acquired under the 2011 Plan within such time period as may be established by the PRC State Administration of Foreign Exchange.

3. <u>Exchange Control Restrictions</u>. You acknowledge and agree that you will be required immediately to repatriate to the PRC the proceeds from the sale of any Shares acquired under the 2011 Plan, as well as any other cash amounts attributable to the Shares acquired under the 2011 Plan (collectively, "Cash Proceeds"). Further, you acknowledge and agree that the repatriation of the Cash Proceeds must be effected through a special bank account established by your Employer, the Company or one of its Subsidiaries, and you hereby consent and agree that the Cash Proceeds may be transferred to such account by the Company on your behalf prior to being delivered to you. The Cash Proceeds may be paid to you in U.S. dollars or local currency at the Company's discretion. If the Cash Proceeds are paid to you in U.S. dollars, you understand that a U.S. dollar bank account must be established and maintained in China so that the proceeds may be deposited into such account. Additionally, if the Company changes its Stock Plan Administrator, you acknowledge and agree that the Company may transfer any Shares issued under the 2011 Plan to the new designated Stock Plan Administrator if necessary for legal or administrative reasons. You agree to sign any documentation necessary to facilitate the transfer. If the Cash Proceeds are paid to you in local currency, you acknowledge and agree that the Company is under no obligation to secure any particular exchange conversion rate and that the Company may face delays in converting the Cash Proceeds to local currency due to exchange control restrictions. You agree to bear any currency fluctuation risk between the time the Shares are sold and the Cash Proceeds are converted into local currency and distributed to you. You further agree to comply with any other requirements that may be imposed by your Employer, the Company and its Subsidiaries in the future in order to facilitate compliance with exchange control requirements in the PRC.

## COLOMBIA

1. <u>Nature of Grant</u>. In addition to the provisions of Section 20 of the Terms and Conditions you acknowledge that, pursuant to Article 128 of the Colombian Labor Code, the 2011 Plan and related benefits do not constitute a component of your "salary" for any legal purpose. Therefore, they will not be included and/or considered for purposes of calculating any and all labor benefits, such as legal/fringe benefits,

vacations, indemnities, payroll taxes, social insurance contributions and/or any other labor-related amount which may be payable.

    2.  <u>Securities Law Information</u>. The Shares subject to the PSUs are not and will not be registered in the Colombian registry of publicly traded securities (*Registro Nacional de Valores y Emisores*) and therefore the Shares may not be offered to the public in Colombia. Nothing in this document should be construed as the making of a public offer of securities in Colombia.

**COSTA RICA**

No country specific provisions.

**DENMARK**

    1.  <u>Treatment of PSUs upon Termination of Employment</u>. Notwithstanding any provision in the Terms and Conditions or the 2011 Plan to the contrary, unless you are a member of registered management who is not considered a salaried employee, the treatment of the PSUs upon a termination of employment which is not a result of death shall be governed by Sections 4 and 5 of the Danish Act on Stock Option in Employment Relations. However, if the provisions in the Terms and Conditions or the Plan governing the treatment of the PSUs upon a termination of employment are more favorable, then the provisions of the Terms and Conditions or the 2011 Plan will govern.

**FINLAND**

    1.  <u>Withholding of Tax-Related Items</u>. Notwithstanding anything in Section 13 of the Terms and Conditions to the contrary, if you are a local national of Finland, any Tax-Related Items shall be withheld only in cash from your regular salary/wages or other amounts payable to you in cash or such other withholding methods as may be permitted under the 2011 Plan and allowed under local law.

**FRANCE**

    1.  <u>Use of English Language</u>.  By accepting your PSUs, you acknowledge and agree that it is your wish that the Terms and Conditions, this Addendum, as well as all other documents, notices and legal proceedings entered into, given or instituted pursuant to your PSUs, either directly or indirectly, be drawn up in English.

**<u>Langue anglaise</u>. En acceptant l'allocation de vos PSUs, vous reconnaissez et acceptez avoir souhaité que le Termes et Conditions, le présent avenant, ainsi que tous autres documents exécutés, avis donnés et procédures judiciaires intentées, relatifs, directement ou indirectement, à l'allocation de vos PSUs, soient rédigés en anglais**.

**BY SIGNING BELOW, YOU ACKNOWLEDGE, UNDERSTAND AND AGREE TO THE PROVISIONS OF THE 2011 PLAN, THE TERMS AND CONDITIONS AND THIS ADDENDUM.**

**PLEASE SIGN AND RETURN THIS ADDENDUM VIA EMAIL NO LATER THAN APRIL 29, 2022 TO <u>STOCKPLANADMINISTRATION@STRYKER.COM</u>.**

_____  _____
Employee Signature       Employee Name (Printed)

_____
Date

**GERMANY**

No country specific provisions.

**HONG KONG**

1.   Importance Notice. Warning: The contents of the Terms and Conditions, this Addendum, the 2011 Plan, and all other materials pertaining to the PSUs and/or the 2011 Plan have not been reviewed by any regulatory authority in Hong Kong. You are hereby advised to exercise caution in relation to the offer thereunder. If you have any doubts about any of the contents of the aforesaid materials, you should obtain independent professional advice.

2.   Lapse of Restrictions. If, for any reason, Shares are issued to you within six (6) months of the grant date, you agree that you will not sell or otherwise dispose of any such Shares prior to the six-month anniversary of the grant date.

3.   Settlement in Shares. Notwithstanding anything to the contrary in this Addendum, the Terms and Conditions or the 2011 Plan, the PSUs shall be settled only in Shares (and may not be settled in cash).

4.   Nature of the Plan. The Company specifically intends that the 2011 Plan will not be treated as an occupational retirement scheme for purposes of the Occupational Retirement Schemes Ordinance ("ORSO"). To the extent any court, tribunal or legal/regulatory body in Hong Kong determines that the 2011 Plan constitutes an occupational retirement scheme for the purposes of ORSO, the grant of the PSUs shall be null and void.

**INDIA**

1.   Repatriation Requirements. You expressly agree to repatriate all sale proceeds and dividends attributable to Shares acquired under the 2011 Plan in accordance with local foreign exchange rules and regulations. Neither the Company, your Employer or any of the Company's Subsidiaries shall be liable for any fines or penalties resulting from your failure to comply with applicable laws, rules or regulations.

**IRELAND**

No country specific provisions.

**ITALY**

No country specific provisions.

**JAPAN**

No country specific provisions.

**MEXICO**

1.     <u>Commercial Relationship</u>. You expressly recognize that your participation in the 2011 Plan and the Company's grant of the PSUs does not constitute an employment relationship between you and the Company. You have been granted the PSUs as a consequence of the commercial relationship between the Company and the Subsidiary in Mexico that employs you, and the Company's Subsidiary in Mexico is your sole employer. Based on the foregoing, (a) you expressly recognize the 2011 Plan and the benefits you may derive from your participation in the 2011 Plan do not establish any rights between you and the Company's Subsidiary in Mexico that employs you, (b) the 2011 Plan and the benefits you may derive from your participation in the 2011 Plan are not part of the employment conditions and/or benefits provided by the Company's Subsidiary in Mexico that employs you, and (c) any modification or amendment of the 2011 Plan by the Company, or a termination of the 2011 Plan by the Company, shall not constitute a change or impairment of the terms and conditions of your employment with the Company's Subsidiary in Mexico that employs you.

2.     <u>Securities Law Information</u>. You expressly recognize and acknowledge that the Company's grant of PSUs and the underlying Shares under the Plan have not been registered with the National Register of Securities maintained by the Mexican National Banking and Securities Commission and cannot be offered or sold publicly in Mexico. In addition, the 2011 Plan, the Terms and Conditions and any other document relating to the PSUs may not be publicly distributed in Mexico. These materials are addressed to you only because of your existing relationship with the Company and these materials should not be reproduced or copied in any form. The offer contained in these materials does not constitute a public offering of securities but rather constitutes a private placement of securities addressed specifically to individuals who are present employees of the Employer in Mexico made in accordance with the provisions of the Mexican Securities Market Law, and any rights under such offering shall not be assigned or transferred.

3.     <u>Extraordinary Item of Compensation</u>. You expressly recognize and acknowledge that your participation in the 2011 Plan is a result of the discretionary and unilateral decision of the Company, as well as your free and voluntary decision to participate in the 2011 Plan in accord with the terms and conditions of the 2011 Plan, the Terms and Conditions, and this Addendum. As such, you acknowledge and agree that the Company may, in its sole discretion, amend and/or discontinue your participation in the 2011 Plan at any time and without any liability. The value of the PSUs is an extraordinary item of compensation outside the scope of your employment contract, if any. The PSUs are not part of your regular or expected compensation for purposes of calculating any severance, resignation, redundancy, end of service payments, bonuses, long-service awards, pension or retirement benefits, or any similar payments, which are the exclusive obligations of the Company's Subsidiary in Mexico that employs you.

**BY SIGNING BELOW, YOU ACKNOWLEDGE, UNDERSTAND AND AGREE TO THE PROVISIONS OF THE 2011 PLAN, THE TERMS AND CONDITIONS AND THIS ADDENDUM.**

**PLEASE SIGN AND RETURN THIS ADDENDUM VIA EMAIL NO LATER THAN APRIL 29, 2022 TO STOCKPLANADMINISTRATION@STRYKER.COM.**

_____   _____
Employee Signature        Employee Name (Printed)

_____
Date

**NETHERLANDS**

1.     <u>Waiver of Termination Rights</u>. As a condition to the grant of the PSUs, you hereby waive any and all rights to compensation or damages as a result of the termination of your employment with the Company and your Employer for any reason whatsoever, insofar as those rights result or may

result from (a) the loss or diminution in value of such rights or entitlements under the 2011 Plan, or (b) you ceasing to have rights under or ceasing to be entitled to any awards under the 2011 Plan as a result of such termination.

2. <u>Tax Deferral Upon Retirement</u>. Unless you otherwise elect by contacting Stryker no later than April 29, 2022, you hereby agree that upon Retirement eligibility, the PSUs shall not become taxable until the date of settlement when Shares are actually delivered or otherwise made available.

**NEW ZEALAND**

1. <u>WARNING</u>. You are being offered PSUs to be settled in the form of shares of Stryker Corporation common stock. If the Company runs into financial difficulties and is wound up, you may lose some or all your investment. New Zealand law normally requires people who offer financial products to give information to investors before they invest. This requires those offering financial products to have disclosed information that is important for investors to make an informed decision. The usual rules do not apply to this offer because it is an offer made under the Employee Share Scheme exemption. As a result, you may not be given all the information usually required. You will also have fewer other legal protections for this investment. You should ask questions, read all documents carefully, and seek independent financial advice before accepting the offer. The Company's Shares are currently traded on the New York Stock Exchange under the ticker symbol "SYK" and Shares acquired under the 2011 Plan may be sold through this exchange. You may end up selling the Shares at a price that is lower than the value of the Shares when you acquired them. The price will depend on the demand for the Company's Shares. *The Company's most recent annual report (which includes the Company's financial statements) is available at* http://phx.corporate-ir.net/phoenix.zhtml?c=118965&p=irol-irhome. *You are entitled to receive a copy of this report, free of charge, upon written request to the Company at* **STOCKPLANADMINISTRATION@STRYKER.COM**.

**POLAND**

No country specific provisions.

**PORTUGAL**

No country specific provisions.

**PUERTO RICO**

No country specific provisions.

**ROMANIA**

No country specific provisions.

**RUSSIA**

1. <u>IMPORTANT EMPLOYEE NOTIFICATION</u>. You may be required to repatriate certain cash amounts received with respect to the PSUs to Russia as soon as you intend to use those cash amounts for any purpose, including reinvestment. If the repatriation requirement applies, such funds must initially be credited to you through a foreign currency account at an authorized bank in Russia. After the funds are initially received in Russia, they may be further remitted to foreign banks in accordance with Russian exchange control laws. Under the Directive N 5371-U of the Russian Central Bank (the "***CBR***"), the repatriation requirement may not apply in certain cases with respect to cash amounts received in an account that is considered by the CBR to be a foreign brokerage account. Statutory exceptions to the repatriation requirement also may apply. *You should contact your personal advisor to ensure compliance with the applicable exchange control requirements prior to vesting in the PSUs and/or selling the Shares acquired pursuant to the PSUs.*

2. <u>SECURITIES LAW NOTIFICATION</u>. The grant of PSUs and the issuance of Shares upon vesting are not intended to be an offering of securities with the Russian Federation, and the Terms and

Conditions, the 2011 Plan, this Addendum and all other materials that you receive in connection with the grant of PSUs and your participation in the 2011 Plan (collectively, "Grant Materials") do not constitute advertising or a solicitation within the Russian Federation. In connection with your grant of PSUs, the Company has not submitted any registration statement, prospectus or other filing with the Russian Federal Bank or any other governmental or regulatory body within the Russian Federation, and the Grant Materials expressly may not be used, directly or indirectly, for the purpose of making a securities offering or public circulation of Shares within the Russian Federation. Any Shares acquired under the 2011 Plan will be maintained on your behalf outside of Russia. Moreover, you will not be permitted to sell or otherwise alienate any Shares directly to other Russian legal entities or individuals.

3. <u>EXCHANGE CONTROL NOTIFICATION</u>. You are solely responsible for complying with applicable Russian exchange control regulations. Since the exchange control regulations change frequently and without notice, you should consult your legal advisor prior to the acquisition or sale of Shares under the 2011 Plan to ensure compliance with current regulations. As noted, it is your personal responsibility to comply with Russian exchange control laws, and neither the Company nor any Subsidiary will be liable for any fines or penalties resulting from failure to comply with applicable laws.

4. <u>ANTI-CORRUPTION NOTIFICATION</u>. Anti-corruption laws prohibit certain public servants, their spouses and their dependent children from owning any foreign source financial instruments (*e.g.*, shares of foreign companies such as the Company). Accordingly, you should inform the Company if you are covered by these laws as this relates to your acquisition of Shares under the 2011 Plan.

## SINGAPORE

1. <u>Qualifying Person Exemption</u>. The following provision shall replace Section 23 of the Terms and Conditions:

The grant of the PSUs under the 2011 Plan is being made pursuant to the "Qualifying Person" exemption" under section 273(1)(f) of the Securities and Futures Act (Chapter 289, 2006 Ed.) ("SFA"). The 2011 Plan has not been lodged or registered as a prospectus with the Monetary Authority of Singapore. You should note that, as a result, the PSUs are subject to section 257 of the SFA and you will not be able to make (a) any subsequent sale of the Shares in Singapore or (ii) any offer of such subsequent sale of the Shares subject to the PSUs in Singapore, unless such sale or offer is made pursuant to the exemptions under Part XIII Division (1) Subdivision (4) (other than section 280) of the SFA (Chapter 289, 2006 Ed.).

2. <u>Director Reporting Notification</u>. If you are a director, associate director or shadow director of a Singapore company, you are subject to certain notification requirements under the Singapore Companies Act. Among these requirements is an obligation to notify the Singapore company in writing when you receive an interest (e.g., PSUs or Shares) in the Company or any related company. In addition, you must notify the Singapore company when you sell Shares (including when you sell Shares acquired at vesting of the Performance Stock Units). These notifications must be made within two business days of acquiring or disposing of any interest in the Company or any related company. In addition, a notification must be made of Participant's interests in the Company or any related company within two business days of becoming a director.

## SOUTH AFRICA

1. <u>Withholding Taxes</u>. In addition to the provisions of Section 13 of the Terms and Conditions, you agree to notify your Employer in South Africa of the amount of any gain realized upon vesting of the PSUs. If you fail to advise your Employer of the gain realized upon vesting of the PSUs, you may be liable for a fine. You will be responsible for paying any difference between the actual tax liability and the amount withheld.

2. <u>Exchange Control Obligations</u>. You are solely responsible for complying with applicable exchange control regulations and rulings (the "Exchange Control Regulations") in South Africa. As the

Exchange Control Regulations change frequently and without notice, you should consult your legal advisor prior to the acquisition or sale of Shares under the 2011 Plan to ensure compliance with current Exchange Control Regulations. Neither the Company nor any of its Subsidiaries will be liable for any fines or penalties resulting from your failure to comply with applicable laws.

3.   <u>Securities Law Information and Deemed Acceptance of PSUs</u>.  Neither the PSUs nor the underlying Shares shall be publicly offered or listed on any stock exchange in South Africa.  The offer is intended to be private pursuant to Section 96 of the Companies Act and is not subject to the supervision of any South African governmental authority. Pursuant to Section 96 of the Companies Act, the PSU offer must be finalized on or before the 60th day following the grant date.  If you do not want to accept the PSUs, you are required to decline the PSUs no later than the 60th day following the grant date.  If you do not reject the PSUs on or before the 60th day following the grant date, you will be deemed to accept the PSUs.

**SOUTH KOREA**

No country specific provisions.

**SPAIN**

1.   <u>Acknowledgement of Discretionary Nature of the 2011 Plan; No Vested Rights</u>. In accepting the PSUs, you acknowledge that you consent to participation in the 2011 Plan and have received a copy of the 2011 Plan. You understand that the Company has unilaterally, gratuitously and in its sole discretion granted PSUs under the 2011 Plan to individuals who may be employees of the Company or its Subsidiaries throughout the world. The decision is a limited decision that is entered into upon the express assumption and condition that any grant will not economically or otherwise bind the Company or any of its Subsidiaries on an ongoing basis. Consequently, you understand that the PSUs are granted on the assumption and condition that the PSUs and the Shares acquired upon vesting of the PSUs shall not become a part of any employment contract (either with the Company or any of its Subsidiaries) and shall not be considered a mandatory benefit, salary for any purposes (including severance compensation) or any other right whatsoever. In addition, you understand that this grant would not be made to you but for the assumptions and conditions referenced above. Thus, you acknowledge and freely accept that should any or all of the assumptions be mistaken or should any of the conditions not be met for any reason, the PSUs shall be null and void.

You understand and agree that, as a condition of the grant of the PSUs, any unvested PSUs as of the date you cease active employment will be forfeited without entitlement to the underlying Shares or to any amount of indemnification in the event of the termination of employment by reason of, but not limited to, (i) material modification of the terms of employment under Article 41 of the Workers' Statute or (ii) relocation under Article 40 of the Workers' Statute. You acknowledge that you have read and specifically accept the conditions referred to in the Terms and Conditions regarding the impact of a termination of employment on your PSUs.

**BY SIGNING BELOW, YOU ACKNOWLEDGE, UNDERSTAND AND AGREE TO THE PROVISIONS OF THE 2011 PLAN, THE TERMS AND CONDITIONS AND THIS ADDENDUM.**

**PLEASE SIGN AND RETURN THIS ADDENDUM VIA EMAIL NO LATER THAN APRIL 29, 2022 TO STOCKPLANADMINISTRATION@STRYKER.COM.**

_____   _____

Employee Signature        Employee Name (Printed)

_____

Date

**SWITZERLAND**

    1.    <u>Securities Law Information</u>. Neither this document nor any other materials relating to the RSUs (a) constitutes a prospectus according to articles 35 et seq. of the Swiss Federal Act on Financial Services ("FinSA") (b) may be publicly distributed or otherwise made publicly available in Switzerland to any person other than an employee of the Company or (c) has been or will be filed with, approved or supervised by any Swiss reviewing body according to article 51 FinSA or any Swiss regulatory authority, including the Swiss Financial Market Supervisory Authority ("FINMA").

**TAIWAN**

    1.    <u>Securities Law Notice</u>. The offer of participation in the 2011 Plan is available only for employees of the Company and its Subsidiaries. The offer of participation in the 2011 Plan is not a public offer of securities by a Taiwanese company.

**THAILAND**

No country specific provisions.

**TURKEY**

    1.    <u>Securities Law Information</u>. Under Turkish law, you are not permitted to sell any Shares acquired under the 2011 Plan within Turkey. The Shares are currently traded on the New York Stock Exchange, which is located outside of Turkey, under the ticker symbol "SYK" and the Shares may be sold through this exchange.

    2.    <u>Financial Intermediary Obligation</u>. You acknowledge that any activity related to investments in foreign securities (e.g., the sale of Shares) should be conducted through a bank or financial intermediary institution licensed by the Turkey Capital Markets Board and should be reported to the Turkish Capital Markets Board. You solely are responsible for complying with this requirement and should consult with a personal legal advisor for further information regarding any obligations in this respect.

**UNITED ARAB EMIRATES**

    1.    <u>Securities Law Information</u>. The offer of the PSUs is available only for select Employees of the Company and its Subsidiaries and is in the nature of providing incentives in the United Arab Emirates. The 2011 Plan and the Terms and Conditions are intended for distribution only to such individuals and must not be delivered to, or relied on by any other person. Prospective purchasers of securities should conduct their own due diligence.

The Emirates Securities and Commodities Authority has no responsibility for reviewing or verifying any documents in connection with this statement, including the 2011 Plan and the Terms and Conditions, or any other incidental communication materials distributed in connection with the PSUs. Further, neither the Ministry of Economy nor the Dubai Department of Economic Development has approved this statement nor taken steps to verify the information set out in it, and has no responsibility for it. Residents of the United Arab Emirates who have any questions regarding the contents of the 2011 Plan and the Terms and Conditions should obtain independent advice.

**UNITED KINGDOM**

    1.    <u>Income Tax and Social Insurance Contribution Withholding</u>. The following provision shall supplement Section 13 of the Terms and Conditions:

    Without limitation to Section 13 of the Terms and Conditions, you agree that you are liable for all Tax-Related Items and hereby covenant to pay all such Tax-Related Items, as and when requested by the Company, your Employer or by Her Majesty's Revenue and Customs ("HMRC") (or any other tax authority or any other relevant authority). You also agree to indemnify and keep indemnified

the Company and your Employer against any Tax-Related Items that they are required to pay or withhold or have paid or will pay to HMRC on your behalf (or any other tax authority or any other relevant authority).

    2.  <u>Exclusion of Claim</u>. You acknowledge and agree that you will have no entitlement to compensation or damages in consequence of the termination of your employment with the Company and your Employer for any reason whatsoever and whether or not in breach of contract, insofar as any purported claim to such entitlement arises or may arise from your ceasing to have rights under or to be entitled to vest in the PSUs as a result of such termination of employment (whether the termination is in breach of contract or otherwise), or from the loss or diminution in value of the PSUs. Upon the grant of the PSUs, you shall be deemed irrevocably to have waived any such entitlement.

****************************

Exhibit 21(i)

STRYKER CORPORATION LIST OF SUBSIDIARIES
As of December 31, 2021

| Name of Subsidiary | State or Country of Incorporation |
|---|---|
| 2Hip Holdings SAS | France |
| Aimago SA | Switzerland |
| Alcott Indemnity Company | USA - Vermont |
| Arrinex, Inc. | USA - Delaware |
| Berchtold + Fritz GmbH | Germany |
| Berchtold Consulting GmbH | Switzerland |
| Berchtold Corporation | USA - Delaware |
| Berchtold GmbH & Co. KG | Germany |
| Berchtold Holding Switzerland GmbH | Switzerland |
| BioMimetic Therapeutics USA, Inc. | USA - Delaware |
| BioMimetic Therapeutics, LLC | USA - Delaware |
| Cartiva, Inc. | USA - Delaware |
| Changzhou Orthomed Medical Instrument Company Limited | China |
| EnMovi, Ltd. | United Kingdom |
| Entellus Medical, Inc. | USA - Delaware |
| Gauss Surgical Singapore Pte. Ltd. | Singapore |
| Gauss Surgical, Inc. | USA - Delaware |
| Gongping (Shanghai) Medical Devices Trading Co. Ltd. | China |
| GYS Tech, LLC | USA - Delaware |
| HeartSine Technologies Limited | United Kingdom |
| HeartSine Technologies, LLC | USA - Delaware |
| Howmedica International S. de R.L. | Panama |
| Howmedica Osteonics Corp. | USA - New Jersey |
| Hygia Healthcare Services, Inc. | USA - Alabama |
| Hyperbranch Medical Technologies, Inc. | USA - Delaware |
| Imascap SAS | France |
| Imorphics Limited | United Kingdom |
| Infinity MSD Corp. | USA - Delaware |
| Infinity MSF Corp. | USA - Delaware |
| InstruMedics, L.L.C | USA - Michigan |
| Invuity, Inc. | USA - Delaware |
| Ivy Sports Medicine, LLC | USA - Delaware |
| Jiangsu Chuangyi Medical Instrument Company Limited | China |
| Jolife AB | Sweden |
| K2M Group Holdings, Inc. | USA - Delaware |
| K2M Holdings, Inc. | USA - Delaware |
| K2M UK Limited | United Kingdom |
| K2M, Inc. | USA - Delaware |
| Loon Intermediateco, LLC | USA - Delaware |
| MAKO Surgical Corp | USA - Delaware |
| Mobius Imaging, LLC | USA - Delaware |
| Muka Metal Ticaret ve Sanayi Anaonim Sirketi | Turkey |
| Nettrick Limited | Ireland |
| Novadaq Corp | USA - Delaware |
| Novadaq Technologies ULC | Canada |
| NV Stryker SA | Belgium |
| OOO "Stryker" | Russia |
| Orneo Özel Sağlık Hizmetleri Medikal Ticaret Anonim Şirketi | Turkey |
| OrthoHelix Surgical Designs, Inc. | USA - Delaware |
| Orthomed (Hong Kong) Medical Instrument Company Limited | Hong Kong |
| OrthoSensor Korea, Ltd | South Korea |
| Orthosensor, Inc. | USA - Delaware |
| OrthoSpace US Inc. | USA - Delaware |
| Ortho-Space, Ltd. | Israel |
| Orthovita, Inc. | USA - Pennsylvania |
| P.C. Sweden Holding AB | Sweden |

Exhibit 21(i)

| Name of Subsidiary | State or Country of Incorporation |
|---|---|
| Physio-Control (Shanghai) Sales Co., Ltd. | China |
| Physio-Control Brazil Vendas Ltda. | Brazil |
| Physio-Control Holdings Coöperatief U.A. | Netherlands |
| Physio-Control Holdings Inc | USA - Delaware |
| Physio-Control Investments, LLC | USA - Delaware |
| Physio-Control Lebanon Sales Offshore s.a.l. | Lebanon |
| Physio-Control Manufacturing, Inc. | USA - Washington |
| Physio-Control Operations Netherlands B.V. | Netherlands |
| Physio-Control Sales Limited Liability Company | Russia |
| Physio-Control, Inc. | USA - Washington |
| PTH West, LLC | USA - Delaware |
| SafeAir AG | Switzerland |
| Sage Products Coöperatief U.A. | Netherlands |
| Sage Products Holdings II, LLC | USA - Delaware |
| Sage Products Holdings III, LLC | USA - Delaware |
| Sage Products, LLC | USA - Delaware |
| SCI Calyx SA | France |
| Scopis GmbH | Germany |
| Spirox, Inc. | USA - Delaware |
| SSI Divestiture, Inc. | USA - Massachusetts |
| Stanmore Implants Worldwide Limited | United Kingdom |
| Stanmore, Inc. | USA - Massachusetts |
| Stryker (Barbados) Foreign Sales Corporation | Barbados |
| Stryker (Beijing) Healthcare Products Co., Ltd. | China |
| Stryker (Shanghai) Healthcare Products Co., Ltd. | China |
| Stryker (Suzhou) Medical Technology Co Ltd | China |
| Stryker (Thailand) Limited | Thailand |
| Stryker AB | Sweden |
| Stryker Acquisitions B.V. | Netherlands |
| Stryker Asia Holdings C.V. | Netherlands |
| Stryker Australia LLC | USA - Delaware |
| Stryker Australia Pty. Ltd. | Australia |
| Stryker Austria GmbH | Austria |
| Stryker B.V. | Netherlands |
| Stryker Berchtold B.V. | Netherlands |
| Stryker Beteiligungs GmbH | Germany |
| Stryker Canada Holding Company ULC | Canada |
| Stryker Canada Manufacturing ULC | Canada |
| Stryker Canada ULC | Canada |
| Stryker Canadian Management, ULC | Canada |
| Stryker Capital B.V. | Netherlands |
| Stryker China Limited | Hong Kong |
| Stryker Colombia SAS | Colombia |
| Stryker Communications, Inc. | USA - Delaware |
| Stryker Corporation (Chile) y Compania Limitada | Chile |
| Stryker Corporation (Malaysia) Sdn. Bhd. | Malaysia |
| Stryker Customs Brokers, LLC | USA - Delaware |
| Stryker Czech Republic s.r.o. | Czech Republic |
| Stryker Delaware, Inc. | USA - Delaware |
| Stryker do Brasil Ltda | Brazil |
| Stryker EMEA Supply Chain Services B.V. | Netherlands |
| Stryker Employment Company, LLC | USA - Michigan |
| Stryker European Holdings Coöperatief U.A | Netherlands |
| Stryker European Holdings, LLC | USA - Delaware |
| Stryker European Operations B.V. | Netherlands |
| Stryker European Operations Holdings I B.V. | Netherlands |
| Stryker European Operations Holdings II B.V. | Netherlands |
| Stryker European Operations Holdings III B.V. | Netherlands |
| Stryker European Operations Holdings, LLC | USA - Delaware |

Exhibit 21(i)

| Name of Subsidiary | State or Country of Incorporation |
|---|---|
| Stryker European Operations Limited | Ireland |
| Stryker Far East, Inc. | USA - Delaware |
| Stryker Foreign Acquisitions, Inc. | USA - Delaware |
| Stryker France SAS | France |
| Stryker Funding B.V. | Netherlands |
| Stryker Global Technology Center Private Limited | India |
| Stryker GmbH | Switzerland |
| Stryker GmbH & Co. KG | Germany |
| Stryker Grundstücks GmbH & Co KG | Germany |
| Stryker Grundstücks Verwaltungs GmbH | Germany |
| Stryker Holdings B.V. | Netherlands |
| Stryker Iberia, S.L. Unipersonal | Spain |
| Stryker IFSC Designated Activity Company | Ireland |
| Stryker India Private Limited | India |
| Stryker International Acquisitions B.V. | Netherlands |
| Stryker International Holdings B.V. | Netherlands |
| Stryker Ireland Limited | Ireland |
| Stryker Italia S.r.l. | Italy |
| Stryker Japan K.K. | Japan |
| Stryker Korea Ltd. | South Korea |
| Stryker Lebanon (Offshore) S.A.L. | Lebanon |
| Stryker Leibinger GmbH & Co. KG | Germany |
| Stryker Luxembourg Sarl | Luxembourg |
| Stryker Malta Holdings Limited | Malta |
| Stryker Manufacturing Holdings B.V. | Netherlands |
| Stryker Manufacturing S. de R.L. de C.V. | Mexico |
| Stryker Mauritius Holding Ltd. | Mauritius |
| Stryker Medical London LP | Canada |
| Stryker Medtech K.K. | Japan |
| Stryker Medtech Limited | Ireland |
| Stryker Mexico Holdings B.V. | Netherlands |
| Stryker Mexico SA de CV | Mexico |
| Stryker Nederland B.V. | Netherlands |
| Stryker New Zealand Limited | New Zealand |
| Stryker NV Operations Limited | Ireland |
| Stryker Osteonics AG | Switzerland |
| Stryker Pacific Limited | Hong Kong |
| Stryker Performance Solutions, LLC | USA - New Jersey |
| Stryker Poland Services sp. z o.o. | Poland |
| Stryker Polska sp.z.o.o. | Poland |
| Stryker Portugal - Produtos Medicos, Unipessoal, Lda. | Portugal |
| Stryker Professional Latin America S. de R.L. de C.V. | Mexico |
| Stryker Puerto Rico Holdings B.V. | Netherlands |
| Stryker Puerto Rico Sales, LLC | Puerto Rico |
| Stryker Puerto Rico, LLC | Puerto Rico |
| Stryker Renovation Services, LLC | USA - Delaware |
| Stryker Romania SRL | Romania |
| Stryker Sales LLC | USA - Michigan |
| Stryker Servicios Administrativos S.de R.L. de C.V. | Mexico |
| Stryker Singapore Private Limited | Singapore |
| Stryker South Africa (Proprietary) Limited | South Africa |
| Stryker Spine Sarl | Switzerland |
| Stryker Spine SAS | France |
| Stryker Sustainability Solutions, Inc. | USA - Delaware |
| Stryker Tibbi Cihazlan Sanayi ve Ticaret Limited Sirketi | Turkey |
| Stryker Tijuana Operations, S. de R.L. de C.V. | Mexico |
| Stryker Trauma GmbH | Germany |
| Stryker Turkish Holdings B.V. | Netherlands |
| Stryker UK Limited | United Kingdom |

Exhibit 21(i)

| Name of Subsidiary | State or Country of Incorporation |
| --- | --- |
| Stryker Unite, Ltd. | Bermuda |
| Stryker Verwaltungs GmbH | Germany |
| Stryker Vietnam Company Limited | Vietnam |
| SYK Costa Rica Services Sociedad De Responsabilidad Limitada | Costa Rica |
| Thermedx LLC | USA - Ohio |
| TMG France SAS | France |
| TMJ Solutions, LLC | USA - Delaware |
| Tornier Orthopedics Ireland Limited | Ireland |
| Tornier Pty Ltd. | Australia |
| Tornier SAS | France |
| Tornier Scandinavia A/S | Denmark |
| Tornier UK Limited | United Kingdom |
| Tornier US Holdings, Inc. | USA - Delaware |
| Tornier, Inc. | USA - Delaware |
| Trauson (China) Medical Instrument Company Limited | China |
| Trauson (Hong Kong) Company Limited | Hong Kong |
| Trauson Holdings (B.V.I.) Company Limited | British Virgin Islands |
| Trauson Holdings (Hong Kong) Company Limited | Hong Kong |
| Trauson Holdings Company Limited | Cayman Islands |
| Trooper Holdings Inc. | USA - Delaware |
| TSO3 Corporation | United States |
| TSO3 Inc. | Canada |
| Wright DutchCo B.V. | Netherlands |
| Wright Medical Australia Pty Limited | Australia |
| Wright Medical Brasil Ltda | Brazil |
| Wright Medical Costa Rica, S.A. | Costa Rica |
| Wright Medical Device (Shanghai) Co., Ltd. | China |
| Wright Medical Group, Inc. | USA - Delaware |
| Wright Medical Netherlands B.V. | Netherlands |
| Wright Medical Singapore Pte Ltd | Singapore |
| Wright Medical Technology, Inc. | USA - Delaware |
| Wright Medical UK Ltd | United Kingdom |
| Wright PacRim, Inc. | USA - Delaware |
| ZipLine Medical Consulting (Shanghai) Co., Ltd. | China |
| ZipLine Medical Hong Kong Limited | Hong Kong |
| ZipLine Medical, Inc. | USA - Delaware |

Stryker Corporation directly or indirectly owns 100% of the outstanding voting securities of each of the above-named subsidiaries, with the exception of any designated by an asterisk (*), which Stryker Corporation directly or indirectly owns a majority of the outstanding voting securities.

Exhibit 23(i)

Consent of Independent Registered Public Accounting Firm

We consent to the incorporation by reference in the following Registration Statements:

a.   Registration Statement (Form S-8 No. 333-78201) pertaining to the 1998 Stock Option Plan of Stryker Corporation, and
b.   Registration Statement (Form S-8 No. 333-140961) pertaining to the 2006 Long-Term Incentive Plan of Stryker Corporation, and
c.   Registration Statements (Form S-8 No. 333-150396 and Form S-8 333-221959) pertaining to the 2008 Employee Stock Purchase Plan of Stryker Corporation, and
d.   Registration Statements (Form S-8 No. 333-179142 and Form S-8 333-221958) pertaining to the 2011 Long-Term Incentive Plan of Stryker Corporation;

of our reports dated February 11, 2022, with respect to the consolidated financial statements and schedule of Stryker Corporation and subsidiaries and the effectiveness of internal control over financial reporting of Stryker Corporation and subsidiaries included in this Annual Report (Form 10-K) for the year ended December 31, 2021.

/s/ ERNST & YOUNG LLP

Grand Rapids, Michigan
February 11, 2022

Exhibit 31(i)

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER**
**PURSUANT TO SECTION 302**
**OF THE SARBANES-OXLEY ACT OF 2002**

I, Kevin A. Lobo, certify that:

1. I have reviewed this Annual Report on Form 10-K for the year ended December 31, 2021 of Stryker Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:      February 11, 2022                                     /s/ KEVIN A. LOBO
                                                                Kevin A. Lobo
                                                                Chair, Chief Executive Officer and President

Exhibit 31(ii)

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER**
**PURSUANT TO SECTION 302**
**OF THE SARBANES-OXLEY ACT OF 2002**

I, Glenn S. Boehnlein, certify that:

1. I have reviewed this Annual Report on Form 10-K for the year ended December 31, 2021 of Stryker Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:     February 11, 2022                                 /s/ GLENN S. BOEHNLEIN
                                                           Glenn S. Boehnlein
                                                           Vice President, Chief Financial Officer

Exhibit 32(i)

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report on Form 10-K of Stryker Corporation (the "Company") for the year ended December 31, 2021 (the "Report"), I, Kevin A. Lobo, Chairman and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1)     The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:       February 11, 2022                                    /s/ KEVIN A. LOBO
                                                                           Kevin A. Lobo
                                                                           Chair, Chief Executive Officer and President

Exhibit 32(ii)

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report on Form 10-K of Stryker Corporation (the "Company") for the year ended December 31, 2021 (the "Report"), I, Glenn S. Boehnlein, Vice President, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1)     The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.


Date:     February 11, 2022                             /s/ GLENN S. BOEHNLEIN
                                                        Glenn S. Boehnlein
                                                        Vice President, Chief Financial Officer

EXHIBITS G-H
REDACTED IN
THEIR ENTIRETY

# Exhibit I

**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7120**

WRITER'S EMAIL ADDRESS
**brianbiddinger@quinnemanuel.com**

December 1, 2021

**VIA E-MAIL**

Christopher Scharff
McAndrews Held & Malloy
500 W Madison Street # 34,
Chicago, IL 60661
E-mail: cscharff@mcandrews-ip.com

Re:    *PureWick Corporation v. Sage Products, LLC,* D. Del. 19-1508-MN

Chris,

It has come to our attention that Sage is offering for sale a new PrimaFit device. *See, e.g.*, https://www.stryker.com/us/en/sage/products/sage-primafit.html.  We request that Sage provide us with samples of this product.

Please confirm that Sage will provide the requested samples and ship them to my attention.

Sincerely,

*/s/ Brian P. Biddinger*

Brian P. Biddinger

# Exhibit J

## Nicola Felice

| | |
|---|---|
| **From:** | Christopher Scharff <CSCHARFF@mcandrews-ip.com> |
| **Sent:** | Monday, March 7, 2022 6:26 PM |
| **To:** | Nicola Felice; Brad P. Loren; Deborah Laughton; Fanelli, Dominic; Sandra Frantzen; Gaza, Anne Shea; Paul McAndrews; Ryan J. Pianetto; Bob Surrette; Annette Vonder Mehden; Wilson, Samantha |
| **Cc:** | Steven Cherny; Brian Biddinger; Athena Dalton; Jason Williams; Ray Nimrod; John Shaw (SKPureWick@shawkeller.com); Bianca Fox; Ian Ibarra |
| **Subject:** | RE: PureWick v. Sage, No. 19-1508-MN - Asserted Claims |
| **Attachments:** | Sage Second Supp Disclosure re Invalidity.pdf |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

[EXTERNAL EMAIL from cscharff@mcandrews-ip.com]

Dear Nicola and Jason:

As a follow up to your email below eliminating one of the remaining eleven claims, attached is our follow up on the prior art.  We have eliminated another five prior art references. We also have minimal combinations of two or more references for the 376/989 and 407 patents. For the 376 and 989 patents, we now have only two main references in combinations with second references.  The same is true for the 407.  We are still hopeful that PureWick will reconsider and can drop more than one claim given our limited trial time.

As an additional matter, as a follow up to Jason's email, we are looking into the availability of Brian Ecklund and Brett Blabas for depositions relating to the discussions they had with Sage's experts about non-infringing alternatives.  We hope to get back to you shortly.  Relatedly, we continue to consider our mutual goal of narrowing and streamlining the litigation. Given the time constraints for the trial and the fact that PrimaFit 2.0 is now accused of infringement in the second Delaware litigation (C.A. No. 1-22-cv-00102-MN), Sage will not be arguing at trial that PrimaFit 2.0 is a non-infringing alternative in this lawsuit.  To be clear, we maintain our position that PrimaFit 2.0 does not infringe and reserve all rights with regard to the second lawsuit. Given that PrimaFit 2.0 is no longer at issue in this case as an NIA, there is no need for an additional deposition relating to Dan Ulreich's discussions with Sage's experts about 2.0 as an NIA.

Finally, we do not understand some of PureWick's edits to the PTO and believe it makes sense to confer to discuss some of it. Also, it does not appear that you sent any edits to the verdict form.  Please send that immediately.

Sincerely,

Chris



**Christopher Scharff**
**Attorney at Law**
McAndrews, Held & Malloy, Ltd.
500 W. Madison St.
Suite 3400 | Chicago, IL 60661

P: 312-775-8000
cscharff@mcandrews-ip.com
bio | v-card | website

CONFIDENTIALITY NOTICE:
This material is intended for the named recipient and, unless otherwise expressly
indicated, is confidential and privileged information. Any dissemination, distribution
or copying of this material is prohibited. If you received this message in error,
please notify the sender by replying to this message and then deleting it from your
system. Your cooperation is appreciated.

---

**From:** Christopher Scharff <CSCHARFF@mcandrews-ip.com>
**Sent:** Tuesday, March 1, 2022 5:01 PM
**To:** 'Nicola Felice' <nicolafelice@quinnemanuel.com>; Brad P. Loren <BLoren@mcandrews-ip.com>; Deborah Laughton <DLAUGHTON@mcandrews-ip.com>; Fanelli, Dominic <DFanelli@ycst.com>; Sandra Frantzen <SFRANTZEN@mcandrews-ip.com>; Gaza, Anne Shea <agaza@ycst.com>; Paul McAndrews <PWMCANDREWS@mcandrews-ip.com>; Ryan J. Pianetto <RPianetto@mcandrews-ip.com>; Bob Surrette <BSURRETTE@mcandrews-ip.com>; Annette Vonder Mehden <AVONDERMEHDEN@mcandrews-ip.com>; Wilson, Samantha <SWilson@ycst.com>
**Cc:** Steven Cherny <stevencherny@quinnemanuel.com>; Brian Biddinger <brianbiddinger@quinnemanuel.com>; Athena Dalton <athenadalton@quinnemanuel.com>; Jason Williams <jasonwilliams@quinnemanuel.com>; Ray Nimrod <raynimrod@quinnemanuel.com>; John Shaw (SKPureWick@shawkeller.com) <SKPureWick@shawkeller.com>; Bianca Fox <biancafox@quinnemanuel.com>; Ian Ibarra <ianibarra@quinnemanuel.com>
**Subject:** RE: PureWick v. Sage, No. 19-1508-MN - Asserted Claims

Dear Nicola:

We received the email below in which PureWick has dropped only one claim on the 376 patent out of its eleven asserted claims on all three patents-in-suit.  We believe that further narrowing beyond one claim should focus the issues for trial.  Please let us know if you will narrow beyond eliminating this one claim.

Sincerely,

Chris



**Christopher Scharff**
**Attorney at Law**
McAndrews, Held & Malloy, Ltd.
500 W. Madison St.
Suite 3400 | Chicago, IL 60661
P: 312-775-8000
cscharff@mcandrews-ip.com
bio | v-card | website

CONFIDENTIALITY NOTICE:
This material is intended for the named recipient and, unless otherwise expressly
indicated, is confidential and privileged information. Any dissemination, distribution
or copying of this material is prohibited. If you received this message in error,
please notify the sender by replying to this message and then deleting it from your
system. Your cooperation is appreciated.

**From:** Nicola Felice <nicolafelice@quinnemanuel.com>
**Sent:** Monday, February 28, 2022 5:00 PM
**To:** Brad P. Loren <BLoren@mcandrews-ip.com>; Deborah Laughton <DLAUGHTON@mcandrews-ip.com>; Fanelli, Dominic <DFanelli@ycst.com>; Sandra Frantzen <SFRANTZEN@mcandrews-ip.com>; Gaza, Anne Shea <agaza@ycst.com>; Paul McAndrews <PWMCANDREWS@mcandrews-ip.com>; Ryan J. Pianetto <RPianetto@mcandrews-ip.com>; Christopher Scharff <CSCHARFF@mcandrews-ip.com>; Bob Surrette <BSURRETTE@mcandrews-ip.com>; Annette Vonder Mehden <AVONDERMEHDEN@mcandrews-ip.com>; Wilson, Samantha <SWilson@ycst.com>
**Cc:** Steven Cherny <stevencherny@quinnemanuel.com>; Brian Biddinger <brianbiddinger@quinnemanuel.com>; Athena Dalton <athenadalton@quinnemanuel.com>; Nicola Felice <nicolafelice@quinnemanuel.com>; Jason Williams <jasonwilliams@quinnemanuel.com>; Ray Nimrod <raynimrod@quinnemanuel.com>; John Shaw (SKPureWick@shawkeller.com) <SKPureWick@shawkeller.com>; Bianca Fox <biancafox@quinnemanuel.com>; Ian Ibarra <ianibarra@quinnemanuel.com>
**Subject:** PureWick v. Sage, No. 19-1508-MN - Asserted Claims

CAUTION: External Email From: nicolafelice@quinnemanuel.com

Counsel,

Pursuant to the parties' discussions during the February 23rd hearing,  PureWick hereby narrows its asserted claims as follows:

'376 Patent: Claims 1, 5, and 9
'989 Patent: Claims 1, 2, and 6
'407 Patent: Claims 1, 2, 7, and 13

Best,
Nicola

**Nicola Felice**
*Associate*
**Quinn Emanuel Urquhart & Sullivan, LLP**

51 Madison Avenue, 22nd Floor
New York, NY 10010
212-849-7346 Direct
212-849-7000 Main Office Number
212-849-7100 FAX
nicolafelice@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

# EXHIBIT K
# REDACTED IN ITS
# ENTIRETY